**IN THE UNITED STATE DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

E. FRED SCHUBERT,

              Plaintiff,

       v.

LUMILEDS LLC,

          Defendants.

C.A. No. 12-924-MN

**JURY TRIAL DEMANDED**

**Public Version**
**Filed September 11, 2020**

**DECLARATION OF MICHAEL A. MOLANO IN SUPPORT OF LUMILEDS LLC'S**
**SUPPLEMENTAL BRIEF IN OPPOSITION TO BOSTON UNIVERSITY'S**
**MOTION TO DISMISS**

MAYER BROWN LLP

Edward D. Johnson (*pro hac vice*)
Michael A. Molano (*pro hac vice*)
Cliff A. Maier (*pro hac vice*)
Graham (Gray) Buccigross (*pro hac vice*)
3000 El Camino Real
Two Palo Alto Square, Suite 300
Palo Alto, CA  94306
(650) 331-2000

COOCH AND TAYLOR

C. Scott Reese, Esq. (#2036)
Blake A. Bennett, Esq. (#5133)
The Nemours Building,
1007 N. Orange Street, Suite 1120
P.O. Box 1680
Wilmington, DE  19899-1680
(302) 984-3800
sreese@coochtaylor.com
bbennett@coochtaylor.com

Dated: September 4, 2020

738131292.1

I, Michael A. Molano, declare as follows:

1.      I am an attorney at the law firm of Mayer Brown LLP.  I have been admitted *pro hac vice* by the United States District Court of the District of Delaware for the purpose of participating in this action as an attorney of record for Defendant Lumileds LLC ("Lumileds"). I submit this declaration in support of Lumileds' Supplemental Brief in Opposition to Boston University's Motion to Dismiss. I have personal knowledge of the facts set forth below, and could testify competently to them if called to do so.

2.      Attached hereto as Exhibit 1 is a true and correct copy of December 3, 2009 email correspondence between Plaintiff E. Fred Schubert and Dr. Sean Lee bearing production number EFS00027270.

3.      Attached hereto as Exhibit 2 are true and correct excerpts from the transcript of the August 13, 2020 deposition, pursuant to Fed. R. Civ. P. 30(b)(6), of Boston University.

4.      Attached hereto as Exhibit 3 is a true and correct copy of December 2, 2009 email correspondence between Plaintiff E. Fred Schubert and Dr. Sean Lee bearing production number BU001360-63.

5.      Attached hereto as Exhibit 4 is a true and correct copy of December 8-10, 2009 email correspondence between Plaintiff E. Fred Schubert and Dr. Sean Lee bearing production number BU001367-69.

6.      Attached hereto as Exhibit 5 are true and correct excerpts from the transcript of the August 5, 2020 deposition of Dr. Ashley Stevens.

7.      Attached hereto as Exhibit 6 is a true and correct copy of an invitation to a January 15, 2020 meeting sent from Dr. Sean Lee to Dr. Ashley Stevens, Janine Anderson, and Plaintiff E. Fred Schubert bearing production number BU001366.

738131292.1

8.      Attached hereto as Exhibit 7 are true and correct excerpts from the transcript of the July 31, 2020 deposition of Janine Anderson.

9.      Attached hereto as Exhibit 8 is a true and correct copy of Plaintiff's Second Supplemental Objections and Responses to Defendant's Second Set of Interrogatories (Nos. 3-20), dated July 13, 2020.

10.      Attached hereto as Exhibit 9 is a true and correct copy of a series of emails bearing production number BU001117-1142, including April 21-22, 2010 email correspondence between Plaintiff E. Fred Schubert and Dr. Sean Lee, at page number BU001118.

11.      Attached hereto as Exhibit 10 is a true and correct copy of a printout of a Boston University database entry, bearing production number BU001550.

12.      Attached hereto as Exhibit 11 are true and correct excerpts from the transcript of the August 3, 2020 deposition of Plaintiff E. Fred Schubert.

13.      Attached hereto as Exhibit 12 are true and correct excerpts from the transcript of the August 11, 2020 deposition of Vinit Nijhawan.

14.      Attached hereto as Exhibit 13 are true and correct excerpts from the transcript of the July 21, 2020 deposition of Matthew Connors.

15.      Attached hereto as Exhibit 14 is a true and correct copy of December 1, 2011 email correspondence between Plaintiff E. Fred Schubert, Michael Pratt, Brian Gildea, and Janine Anderson bearing production number BU000393-95.

16.      Attached hereto as Exhibit 15 is a true and correct copy of the Supplemental Assignment, executed by Boston University on July 2, 2012, bearing production number BU000391-92.

17.     Attached hereto as Exhibit 16 is a true and correct copy of July 24, 2012 email correspondence between Brian Gildea and other Boston University employees bearing production number BU001379.

18.     Attached hereto as Exhibit 17 is a true and correct copy of September 11, 2013 email correspondence between Brian Gildea and Vinit Nijhawan bearing production number BU001399.

19.     Attached hereto as Exhibit 18 is a true and correct copy of the Schubert-Osram Settlement Agreement, License, and Release dated March 1, 2017, bearing production number EFS00007528-36.

20.     Attached hereto as Exhibit 19 is a true and correct copy of a photograph produced by Boston University bearing production number BU001356a.

21.     Attached hereto as Exhibit 20 is a true and correct copy of an image produced by Boston University bearing production number BU001566.

22.     Attached hereto as Exhibit 21 is a true and correct copy of a July 6, 2020 letter from Karen E. Keller to Blake A. Bennett.

23.     Attached hereto as Exhibit 22 is a true and correct copy of the transcript of the August 7, 2020 telephonic hearing in this matter.

Executed on September 4, 2020 in Palo Alto, California.

**Public Version
Filed September 11, 2020**

*/s/ Michael A. Molano*
Michael A. Molano (*pro hac vice*)
MAYER BROWN LLP
3000 El Camino Real
Two Palo Alto Square, Suite 300
Palo Alto, CA  94306

4

# Exhibit 1

| | |
|---|---|
| **From:** | efredschubert@gmail.com [efredschubert@gmail.com] |
| **on behalf of** | Schubert, E. Fred [EFSchubert@rpi.edu] |
| **Sent:** | 12/3/2009 6:15:24 PM |
| **To:** | Lee, Sean [seanlee@bu.edu] |
| **Subject:** | Re: Invention BU98-11 |

Sean

Thank you for the timely response. I would like to call you again about this, maybe I could call you tomorrow (Friday) afternoon?

Regards, Fred

On Thu, Dec 3, 2009 at 5:09 PM, Lee, Sean <seanlee@bu.edu> wrote:

Hi Fred,

I checked on the possibility of reviving the case after the missed due date, and have to deliver the bad news that we can't revive it because it was intentionally abandoned. The patent office allows for reviving only if it can be explained in good faith that the abandonment was unintentional. As our patent manager, Janine is a notary, and so is perhaps more honor bound than most to be truthful to the patent office. Sorry for the disappointing news….

Best Regards,

Sean

---

Sean Lee, Ph.D
*Licensing Manager - Physical Sciences*
Boston University | Technology Development
53 Bay State Road, Boston, MA 02215
Phone: (617) 353-4567 • Mobile: 617-981-1646 • Fax: (617) 353-6141
Email: seanlee@bu.edu • Web Site: http://www.bu.edu/otd/

--
E. Fred Schubert, Rensselaer Polytechnic Institute
110 Eighth Street, Troy, New York 12180
Office: 518-276-8775  Email: EFSchubert@rpi.edu
Assistant: Gina Moore 518-276-8072  Email: gina@ecse.rpi.edu

# Exhibit 2

Michael J. Pratt

0   01


2                    UNITED STATES DISTRICT COURT

3                    FOR THE DISTRICT OF DELAWARE

4

5

6        Civil Action No.:  1:12-CV-00924-MN

7        - - - - - - - - - - - - - - - - -X

         E. FRED SCHUBERT,                 :

8                         Plaintiff        :

                                           :

9        V.                                :

                                           :

10       LUMILEDS, LLC,                    :

                         Defendant         :

11       - - - - - - - - - - - - - - - - -X

12

13

14              Videotaped deposition of

15                 MICHAEL J. PRATT

16      taken via videoconference, before Clifford Edwards,

17              Certified Shorthand Reporter,

18           on August 13, 2020, at 10:04 a.m.

19

20

21

22            GOLKOW LITIGATION SERVICES

            877.370.3377 ph | 917.591.5672 fax

23                  deps@golkow.com

24

25

Michael J. Pratt

```
 1     A P P E A R A N C E S:      (all via videoconference)
 2
 3     ON BEHALF OF THE PLAINTIFF:
 4       JAMES MOORE BOLLINGER, ESQ.
         GERALD E. PORTER, ESQ.
 5       TROUTMAN PEPPER HAMILTON SANDERS, LLP
         875 Third Avenue
 6       New York, New York 10022
         (212) 704-6113
 7       James.bollinger@troutman.com
         Gerald.porter@troutman.com
 8
 9
       ON BEHALF OF THE DEFENDANT LUMILEDS, LLC:
10
         GREG APGAR, ESQ.
11       GRAHAM "GRAY" M. BUCCIGROSS, ESQ.
         MAYER BROWN, LLP
12       Two Palo Alto Square, Suite 300
         3000 El Camino Real
13       Palo Alto, California 94306
         (650) 331-2000
14       Gapgar@mayerbrown.com
         gbuccigross@mayerbrown.com
15
16
       ON BEHALF OF THE TRUSTEES OF BOSTON UNIVERSITY:
17
         MICHAEL RADER, ESQ.
18       SUSMITA A. GADRE, ESQ.
         WOLF, GREENFIELD & SACKS, P.C.
19       Federal Reserve Building
         600 Atlantic Avenue
20       Boston, Massachusetts 02210
         (617) 646-8000
21       Mrader@wolfgreenfield.com
         Susmita.gadre@wolfgreenfield.com
22
23
24
25
```

Michael J. Pratt

```
 1      A P P E A R A N C E S:

 2      (all via videoconference)

 3      (continued)

 4

 5      ALSO PRESENT:

 6              Maureen Pollard, Notary Public

 7              Danny Ortega, Videographer

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Michael J. Pratt

```
 1                    INDEX OF EXAMINATION

 2                                                    PAGE

 3    DIRECT EXAMINATION BY MR. APGAR                    9

 4

 5                     INDEX OF EXHIBITS

 6    Pratt Exhibit                                    PAGE

 7    No. 1, Defendant Lumileds, LLC's Notice of

 8           30(b)(6) Deposition of Counterclaim

 9           Defendant Boston University Topic Numbers

10           1 through 28                               22

11    No. 2, U.S. Patent Number 6294475                 26

12    No. 3, Document with Beginning Bates

13           Number BU 000354                           27

14    No. 4, Document Bates-stamped EFS 0006680         78

15    No. 5, Document Bates-stamped BU 000268          107

16    No. 6, Documents Bates-stamped BU 000289

17           through 293                               115

18    No. 7, Document Bates-stamped BU 001550          149

19    No. 8, Document Bates-stamped EFS 0002720        155

20    No. 9, Document Bates-stamped 001367

21           through 001369                            165

22    No. 10, Rough Transcript of F. Stevens

23           deposition                                173

24    No. 11, Document Bates-stamped BU 000424

25           through 000426                            185
```

Michael J. Pratt

```
 1                    INDEX OF EXHIBITS

 2                        (continued)

 3    Pratt Exhibit                              PAGE

 4

 5    No. 12, Document Bearing Bates Numbers

 6          BU 000447 through 48                  190

 7    No. 13, Document Bates-stamped BU 001143    195

 8    No. 14, Document Bates-stamped BU 001117    213

 9    No. 15, Document Bates-stamped BU 000288    233

10    No. 16, Document Reference Number Case

11          1:12-cv-00924-MN Document 108, Filed

12          March 20, 2020                        238

13    No. 17, Document Bates-stamped BU 001379    261

14    No. 18, Documents Bates-stamped BU 000393

15          through 395                           267

16    No. 19, Documents Bates-stamped BU 000391

17          through 392                           286

18    No. 20, Document Starting with the Bates Stamp

19          BU 000590                             293

20    No. 21, Document Bates-Stamped BU 001102    305

21    No. 22, Document Bates-stamped BU 001354    310

22    No. 23, Document Bates-stamped BU 001356    319

23    No. 24, Document Bates-stamped BU 001356A   320

24    No. 25, Document Bates-stamped BU 001566    323

25
```

Michael J. Pratt

1                   INDEX OF EXHIBITS

2                      (continued)

3

4      Pratt Exhibit                                    PAGE

5      No. 26, Document Bates-stamped BU 001380           337

6      No. 27, Document with Beginning Bates-stamped

7           Number BU 001294                              340

8      No. 28, Document Bates-stamped BU 001297           348

9      No. 29, Six-page Document Beginning with

10          Bates BU 1300                                 352

11     No. 30, Document Bates-stamped BU 001314           356

12     No. 31, Document Bates-stamped BU 001567

13          through 69                                    360

14     No. 32, Document Bates-stamped BU 001399           365

15     No. 33, Document Bates-stamped EFS 6465            367

16

17     (Reporter's Note:  Exhibits marked electronically.)

18

19

20

21

22

23

24

25

Michael J. Pratt

```
 1     let each other finish speaking before -- before

 2     the -- before we jump in, just so there's no

 3     interruptions and there's a -- a better transcript.

 4              Does that sound good.

 5     A     Yes.

 6     Q     And is there any reason why you can't

 7     testify accurately and truthfully today?

 8     A     No.

 9     Q     And are -- are -- are there -- are -- are

10     you on any medications or have any other factors

11     that may impair your memory today?

12     A     No.

13     Q     And this case is pending in the District

14     of Delaware, where there is a rule that prohibits

15     you, now that this deposition has started, from

16     speaking to your counsel, even on breaks, about the

17     substance of the testimony that you've given or that

18     you anticipate giving until the deposition is over.

19              Do you understand that?

20     A     Yes.

21     Q     So Mr. Pratt, am I right that your --

22     your current employer is Boston University?

23     A     Yes.

24     Q     And what is your -- your current title at

25     Boston University?
```

Michael J. Pratt

```
1          A      Managing director technology development.

2          Q      Okay.  And technology development, did --

3     did that used to be called or referred to as the

4     "OTD"?

5          A      Yeah.

6                 Why don't -- why don't I just put the

7     explanation on the record, so that we don't have to

8     go through a series of questions?

9                 Is that okay?

10         Q      That -- that would be great?

11         A      Boston University, from a marketing

12    standpoint, asked us not to formally refer to it as

13    the Office of Technology Development, which is

14    colloquially known as OTD.  So its official title is

15    Managing Director Technology Development.  Although,

16    it's the technology development office, but,

17    informally around BU and as we refer to it today,

18    referring to it as OTD is -- is -- is convenient and

19    sufficient.

20         Q      Thank you.

21                And how long have you been the managing

22    director of technology development?

23         A      I became the interim managing director in

24    August of 2015.  I -- I don't know a precise day for

25    you but August 2015, and then that became a
```

Michael J. Pratt

```
1        A      No.  No, they did not.

2        Q      And was anyone else present for either of

3    those communications?

4        A      No, sir.

5        Q      Okay.  When did you speak to Sean Lee?

6        A      Okay.  So just give me a moment here.

7    I -- Janine's deposition was on Friday, July 31st.

8        Q      That sounds correct.

9        A      And I -- it was -- so I was on

10   vacation -- this was Sunday, Monday, Tuesday,

11   Wednesday -- it was the Wednesday after that, so

12   that's Wednesday, August 5th.

13       Q      I think --

14       A      Does that --

15       Q      The 5th sounds right.

16       A      Yeah.  Is that right?  Yeah, because --

17   because Tuesday --

18              So on Wednesday, August 5th, I spoke to

19   both Janine and to Sean Lee.

20       Q      Okay.  And how long was your conversation

21   with Sean Lee?

22       A      Again, it was probably 20 minutes,

23   maybe --

24       Q      And --

25       A      -- maybe -- maybe a little bit more.
```

Michael J. Pratt

```
 1          Q      And was anyone else involved in that
 2   conversation?
 3          A      No.
 4          Q      And do you recall what -- what Sean Lee
 5   told you?
 6          A      Yeah, relevant to the case, obviously.
 7   Again, we had a few niceties because we hadn't seen
 8   each other in a while or talked to in a while.
 9                 He -- he -- he did a couple things.  One
10   is he confirmed that he has no direct memories of
11   any of this stuff.  I -- I asked him, you know, if
12   he had anything to add.
13                 I did -- I did bring up that e-mail.
14   There's an e-mail in the record -- and I'm sorry, I
15   won't be able to give you the number for it.  But
16   there was an e-mail that was asked a lot to -- to
17   Ashley and Vinit and Janine where -- where Sean had
18   had some correspondence with Fred Schubert --
19   Professor Schubert.  Excuse me.  And it was the one
20   where he talked about Janine being a notary.  We can
21   refer to the Bates number.
22                 So I -- I wanted to ask him specifically
23   about that, because -- because Sean had this -- had
24   this kind of hyperbolic sense of humor, where he
25   would -- he would dramatize things sometimes just
```

Michael J. Pratt

1    that the -- that the '475 patent had been

2    intentionally abandoned and couldn't be revived?

3         A    No.  I -- he -- he confirmed that he had

4    no recollection of it, and I didn't get into the

5    word "intentional."

6         Q    Okay.  Are you aware that one of the

7    primary disputed issues in this case is whether or

8    not BU intentionally abandoned the '475 patent?

9         A    I am aware that the word "intentional" is

10   an important word for this -- for this case and

11   that, you know, there's lot of discussions in

12   Vinit's and Ashley's and Janine's deposition about

13   what the word means and, you know, the layman's

14   explanation of the word and the -- the legal

15   explanation.  That's why I actually looked the word

16   this morning in the dictionary, because I was just

17   sitting here killing time before this started, so I

18   looked it up.

19          And I actually liked the dictionary,

20   because it says -- it says "by design" was -- well,

21   the Merriam-Webster one I was looking at; right?

22          And I -- I can confirm for you just to,

23   again, save a lot of time, that between me, Sean,

24   Ashley, and others who were working in the office,

25   we all share that same layman's explanation of the

Michael J. Pratt

```
 1      word.  And, if it has some sort of special meaning

 2      with regard to the U.S. PTO or practice before the

 3      U.S. PTO, we -- we always rely upon counsel to --

 4      to -- to handle those matters.

 5          Q     But you didn't discuss the -- the

 6      intent -- the term "intentional" or Sean Lee's

 7      understanding of the word with him in your

 8      conversation with him; is that right?

 9          A     I didn't, no.

10          Q     And do you know where -- where is Sean

11      Lee -- excuse me.  I'm going to try the say it

12      right, but when I see the spelling, it's just habit

13      to say "Shawn."

14          A     That's okay.

15          Q     Do -- do you -- where is Sean Lee

16      located?

17          A     My understanding he's -- he lives in

18      Germany.

19          Q     Okay.  And did -- did you -- when you

20      spoke to him, did you have his contact information

21      or were you provided it by counsel?

22          A     I -- I -- I have his phone number.

23          Q     Okay.  Is that the -- is that the only --

24      the contact -- only contact information you have for

25      him?
```

Michael J. Pratt

1       deadline; Janine was aware of the deadline.  So I

2       got to figure -- I got to figure that that -- that

3       failure to pay that maintenance fee was known.

4                It's hard to say that it was intentional

5       or not, because the lack of an action; right?  The

6       lack of something, it's -- it's -- it's -- you know,

7       it's a -- it's a little tricky to be -- for me to

8       find something that's a lack of an action; right?

9                Nobody says, Oh, I'm not going to breathe

10      today; right?  It -- it -- you know, so I didn't

11      find anything that said, Well, I'm not going to do

12      this today.

13               But I have to -- I have to believe, after

14      looking through the record, that that decision --

15      that decision not to pay that maintenance fee on

16      September 25th was -- was intentional by my layman's

17      understanding of "by design."  Okay?

18          Q    Okay.

19          A    So when you -- when you get into the

20      different time period, you get into the time period

21      of from September 25th to April 22nd, okay?  Then,

22      when I think of that word "intentional," I think of

23      the word "by design."  Okay?

24               First of all, this is all outside

25      counsel, because outside counsel is filing that

Michael J. Pratt

```
 1    thing for us.  But I can tell you that, from my own
 2    personal opinion, nothing that happened between that
 3    date of September 25th to April 22nd was by design,
 4    because it was a abnormal circumstance, and all
 5    sorts of things were going on between the transition
 6    of the office and all that kind of stuff.
 7              So I think when you're using the word
 8    "intentional," let's be clear, I think that, if it
 9    were non-decision, whatever you want to call, it
10    appears from the record that that was intentional.
11    But this -- this delay issue and -- and this issue I
12    think that you are trying to get at, you know,
13    anything -- any interpretation of the word
14    "intentional," I got to rely upon outside counsel
15    for that when they filed that form on April 25th and
16    Connors made that decision of filing that.
17         Q    Okay.  So then it's -- so BU using -- you
18    know, BU's understanding of the term made an
19    intentional decision not to pay the maintenance fee
20    on September 25th, 2009; right?
21              Is that --
22         A    What -- what I'm saying is I have nothing
23    in the record that -- that someone documented and
24    said, I made this intentional decision.  All -- alls
25    I have is that communication with Sean Lee and --
```

Michael J. Pratt

```
 1    and Professor Schubert and then his forwarding that
 2    communication to Janine.  So it appears as though
 3    they knew about the deadline, and it's obvious from
 4    the facts that payment wasn't made.  So, I mean, I
 5    got to figure -- in -- in -- in the spirit of just
 6    moving things forward, I -- I got to figure, based
 7    upon the record, that there was some intentionality
 8    there.  There was -- it was -- it was -- it was --
 9    it was known.  But I -- but that's the best I can
10    do.  I -- I don't have something direct that -- that
11    supports it.
12         Q    Okay.  And then -- and so -- and so
13    you're -- you're not -- you're not aware of anything
14    or it's not BU's position -- I'll start again.
15              So it's not BU's position that the
16    deadline was just forgotten; correct?
17         A    It -- it doesn't appear from that -- from
18    the -- from the -- what I'm -- what I'm reporting on
19    is the data, the facts that I have, which is those
20    couple of communications.  And then, as -- as the
21    university witness, I'm just saying that's the best
22    conclusion I can infer or draw from those -- those
23    communications, but I have no direct evidence to
24    support, you know, someone saying, I'm not going to
25    do this today.  I didn't find anything along those
```

Michael J. Pratt

```
 1     patent office working with all sorts of other
 2     actions at the office -- with the office is that
 3     that seemed to be a -- kind of a common occurrence.
 4     You know, if -- if we were late on responding to an
 5     office action or -- or -- or something like that,
 6     it -- it seemed to always have this kind of ability
 7     to respond but just later.  But -- but with a, you
 8     know, more expensive fee.  Just -- just in general
 9     that was a general sense at the patent office.
10          Q     And, during your time at the OTD, how
11     many patents did BU try to pay a maintenance fee on
12     after the -- the deadline to pay the fee?
13          A     Okay.  So I -- I don't have an exact
14     number for you.  I don't -- I don't even know how to
15     search for this particular feature, and, of course,
16     you are welcome to look at the -- the U.S. PTO
17     records and see if you can you find -- and whatever
18     you find, I'm happy by to discuss.
19               In preparation for this, obviously, where
20     we have this particular case, in preparation for
21     this, I -- I did recall another instance that
22     happened in -- well, I guess the 2019 time frame,
23     where a -- a -- a similar petition was filed for
24     this -- whatever this -- this, you know, failure to
25     pay a maintenance fee.  I think that was -- was --
```

Michael J. Pratt

```
 1    was sent over to you guys probably just recently,

 2    because I -- just came to my mind as we were doing

 3    this preparation.

 4              I don't remember any others.  We sat

 5    down, we -- we discussed this, we tried to

 6    brainstorm and think if we could remember any

 7    others.  I don't have a simple way to search for it.

 8    We just don't have a field in our database or

 9    anything like that.  And I don't even know if you

10    could do it at the U.S. -- U.S. PTO, if there's some

11    sort of simple search to look at which case, given a

12    certain assignee, had this, you know, late payment

13    of a -- of a -- of a maintenance fee.

14              I don't know how to search for that.  So

15    I'm aware of those two cases; this one and that one

16    that happened in 2019.  There could be others; it's

17    possible.  It -- it -- it's certainly was not

18    frequent.  It's not something that happened

19    regularly.

20              But I -- I -- I -- I can't say for

21    certain there aren't others.  You know, there's --

22    there's --

23         Q    Okay.

24         A    There's probably others.

25         Q    Okay.
```

Michael J. Pratt

```
 1    office.  We're -- we're familiar with that.  But,

 2    again, when it comes to procedures with the patent

 3    office, that's not something we -- we get involved

 4    with much.

 5         Q    Okay.  So you had -- you had said that

 6    you don't recall a specific instance where the duty

 7    of candor was discussed in any detail.

 8              Can -- can you recall just generally

 9    whether the -- the duty of candor ever came up with

10    either Mr. Gildea or Mr. Zwicker?

11         A    I -- I don't have a specific memory.  I

12    don't have a memory of -- of it coming up, no.  I --

13    I -- I just say it's likely that it -- there could

14    have been a conversation at one time, but I have no

15    memory of a conversation.

16         Q    How about with any of the other OTD

17    employees?

18              Do you ever remember -- remember a duty

19    of candor coming up in the conversation?

20         A    No, I don't.

21         Q    Okay.  I'm going to put -- how about --

22    how about as of today?

23              Does the -- does the OTD understand

24    whether or not there was duty of candor to the

25    patent office in connection with its patent
```

Michael J. Pratt

1    portfolio?

2         A     Yeah.  You know, it just popped into my

3    head, but you got -- probably going to pop up in

4    Sean's e-mail that we talked about earlier, where he

5    referred to Janine and her -- her honor and stuff

6    like that.  I don't know if he referred to it in

7    there.

8               But, in general, we did not talk about

9    the issue of duty of candor --

10        Q     Okay.

11        A     -- or however you phrased it.

12        Q     Okay.  I mean, whether or not you recall

13   talking about it as a -- the question is, you know,

14   as you sit here today, does -- does the OTD have an

15   understanding that it owes a duty of candor to the

16   patent office with respect to the patents in its

17   portfolio?

18        A     Not beyond Ken Zwicker, no.  And outside

19   counsel, of course.

20        Q     And you didn't speak to Mr. Zwicker in

21   preparation for your deposition today --

22        A     No.

23        Q     -- right?

24        A     No, but I made that statement based upon

25   the fact that he's a trained attorney and I would

Michael J. Pratt

```
 1    assume that terms like that -- well, I -- I suppose,

 2    now that -- now that I say that, both Elizabeth

 3    Carlson and John Turiers are both attorneys as well.

 4    So I -- I suppose between the three of them as

 5    trained attorneys, that they are probably familiar

 6    with that general responsibility.

 7              But I -- that -- that's the basis for --

 8    based on their training, not -- not based on some

 9    sort of internal process.

10    Q    Okay.  And then -- and that -- I just --

11    that's your assumption based on their background as

12    attorneys?

13    A    Correct.

14    Q    And you don't recall any specific

15    instance of them ever informing any OTD employees

16    about the duty of candor; is that right?

17    A    I -- I can't recall one.

18    Q    Okay.

19              MR. APGAR:  I'm going to put another

20              document into the chat.

21              COURT REPORTER:  Are we a calling

22              this Exhibit 4 or are we just --

23              MR. APGAR:  Yes.  Yes.

24              This will be Exhibit 5 to your

25              deposition, Mr. Pratt.
```

Michael J. Pratt

```
 1      Mr. Connors.  I -- you know, I'm not an attorney.
 2      I -- I can only go by what the document says, so,
 3      just like you are reading it here today, that's --
 4      there's a statement there and he signed at the
 5      bottom of the document.
 6          Q      And so do -- so BU has -- has no position
 7      whether or not that reviving the '475 patent
 8      required Mr. Connors to certify that the delay in
 9      payment of the maintenance fee was unintentional; is
10      that right?
11          A      I can only go by what the document says.
12      It -- it has that statement, and he signed it at the
13      bottom.
14          Q      And so when -- when did BU become aware
15      that Lumileds and Osram were alleging that it
16      committed inequitable conduct in connection with --
17                     (Whereupon, the court reporter
18                     requests clarification.)
19                     MR. APGAR:  Sure.
20      BY MR. APGAR:
21          Q      When did BU become aware that Lumileds
22      and Osram were alleging that BU committed
23      inequitable conduct with respect to the '475 patent?
24          A      My recollection -- we can -- we can pull
25      up the documents, but my recollection is that the --
```

Michael J. Pratt

```
 1     the lawsuits that Professor Schubert -- or the --
 2     or -- well, I'll call them "lawsuits."  I don't know
 3     if that's the proper term.  But the lawsuits that
 4     Professor Schubert initiated was in the time frame
 5     roughly of July 2012.  And I believe they -- they
 6     had filed some petitions about a year -- a year
 7     after that.
 8              I'm -- I know I don't have the documents
 9     in front of me, but I'm just going off of memory by
10     looking through those documents.  So I'm sure
11     there's a document in there somewhere, but it was
12     approximately a year after the -- the initiation of
13     those what I'll call "lawsuits," I guess, if that's
14     the right word to use.
15         Q    All right.  So roughly 2013?
16         A    Yeah.  Yeah.  It would have been, you
17     know, close to July 2000 -- so, sometime around
18     there, yes.  Yeah.
19         Q    And had -- and has BU been aware, since
20     that time, that the inequitable conduct that was
21     alleged related to the revival of the '475 patent?
22         A    The -- so the allegation in that -- those
23     filings by Osram -- I guess it was -- and then I
24     don't know what the mechanics were, it transferred
25     over to Lumileds or whatever -- yes.  What --
```

Michael J. Pratt

```
1     when -- when they made their allegations, yes, BU
2     was aware of those allegations and was aware that it
3     was related to the '475 patent.
4          Q     Okay.  So in the -- in the seven years
5     since those allegations have been made, has BU taken
6     any steps to understand the meaning of the
7     certification in this petition that the delay in
8     paying the maintenance fee was unintentional?
9                        MR. RADER:  Objection.
10                       I just want to caution the witness.
11                       Obviously, BU is and has been represented
12                       by counsel.  This question should not be
13                       answered with reference to discussions
14                       you've had with attorneys, but, if
15                       there's something outside of that, you
16                       can -- you can respond in that regard.
17                       MR. PORTER:  Objection as well.
18         A     Oh, you know, the -- the question -- I'm
19    not going to remember it exactly.  But I'll just --
20    I'll just say this, and, if it doesn't answer your
21    question, Attorney Apgar, I'm happy to have you, you
22    know, to restate it and I'll answer it again.
23                       My -- my recollection or feeling is that
24    BU feels as though it didn't do anything wrong.  And
25    anything related to this word "unintentional" with
```

Michael J. Pratt

1    Osram, and then the -- it's the document that

2    specifies that allegation.  So the details of that

3    allegation specified in those documents, we -- yes,

4    we were aware of those.  Yes.

5        Q    Okay.  And -- and your position is, at

6    the time that this petition was filed, BU did not

7    know what it meant to certify that the delay was

8    unintentional; correct?

9              MR. RADER:  Objection to form.

10             Misstates prior testimony.

11             But you can answer.

12       A    Yeah.  I -- my answer is no.  Whenever it

13   came to those formal filings with the patent office,

14   we relied upon outside counsel to make those

15   filings.  That's how -- that's how it worked.

16   BY MR. APGAR:

17       Q    And -- and, in the seven years since the

18   inequitable conduct allegations were first raised,

19   has the OTD taken any steps to further inform itself

20   as to what the certification of unintentional delay

21   means in this petition?

22             MR. RADER:  I just want to object

23             and give you the same instruction.

24             Obviously, since this arose, BU has been

25             represented both by the office of general

Michael J. Pratt

```
 1                   You are aware that some of the

 2      individuals listed in the allegations of inequitable

 3      conduct are OTD employees; correct?

 4           A     Janine Anderson is a current OTD

 5      employee, and I believe that she was listed.

 6           Q     Yup.

 7           A     Ashley Stevens, Sean Lee, Jon Jensen are

 8      not current employees.

 9                 Vinit -- was Vinit listed on that, too?

10                 We can look -- we should look at the

11      list.  If you want to pull up the document, we can

12      look at the list.  I can tell you who is a current

13      employee and who is not.

14           Q     How about this?

15                 Other than communicating with counsel,

16      has the OTD taken any steps since 2013 to further

17      understand the meaning of Mr. Connors' certification

18      that the delay in payment of the maintenance fee of

19      the '475 patent was unintentional?

20           A     Not that I'm aware of.

21           Q     So at the time that Mr. Connors submitted

22      this petition in April 2010, what was his basis for

23      certifying that the delay in payment of the

24      maintenance fees of the '475 patent was

25      unintentional?
```

Michael J. Pratt

```
1            A      I have no -- I have no information with

2    regard to what his basis was.

3            Q      Okay.  And I'm not -- not asking for

4    the -- the content of any of these communications,

5    but did BU have any conversations or communications

6    with Mr. Connors concerning the circumstances

7    surrounding the delay in payment of the maintenance

8    fee?

9            A      So I think the best document to do is

10   refer to Ashley's testimony.  And if I recall

11   correctly from Ashley's recent testimony to you, he

12   did have a communication or conversation with

13   Mr. Connors.  And my understanding, from his

14   testimony, is that he relayed some of the facts

15   to -- to -- to Mr. Connors.  That's the extent of my

16   knowledge.

17           Q      Okay.  So -- and your understanding is

18   that Dr. Stevens had one conversation with

19   Mr. Connors about this; correct?

20           A      That's my recollection from reading his

21   testimony, yes.

22           Q      And, other than whatever information

23   Dr. Stevens provided to Mr. Connors, are you aware

24   of any other instance in which BU provided any

25   information to Mr. Connors about the circumstances
```

Michael J. Pratt

```
 1    BY MR. APGAR:
 2         Q    So Mr. Pratt, I've just put into the chat
 3    a document that's going to be the next exhibit to
 4    your deposition.  I believe will be Exhibit
 5    Number 7, as the spreadsheet produced in this case,
 6    bearing the Bates Number BU 001550.
 7              And Mr. Pratt, if you could just, once
 8    you have it open, let me know if you recognize this
 9    document.
10         A    Yeah, I have it open and I -- and I -- I
11    recognize it, and I also remember that Janine and
12    probably Ashley testified about this as well.
13         Q    Okay.  So what is your understanding of
14    what this document is?
15         A    My understanding from Janine's testimony
16    was that, earlier today, you had showed me an image
17    of the FileMaker database, but the fields -- you
18    couldn't read all the fields.  So there was an
19    interest in disclosing all the data that was in
20    those fields, so that a -- a -- a colleague in my
21    office, John Turiers, or -- I -- according to
22    Janine's testimony, was able to download that
23    information into an Excel document, so that database
24    fields could -- could be -- could be read by all of
25    us.
```

Michael J. Pratt

1        Q      Okay.  And do you see, on the top of this

2    spreadsheet, there are columns with letter headers

3    on them?

4        A      Yes.

5        Q      Okay.  So these go in alphabetical order.

6               So, if you scroll all the way through and

7    you get through the alphabet, it will start going to

8    "AA."  And, if you keep scrolling, eventually you'll

9    get to one that -- there's a column that says --

10   named "BN."  And let -- let me know when -- when

11   you've got there.

12       A      I am there.

13       Q      Okay. So do you see that that column is

14   entitled "Prosecution Notes"?

15       A      I do.

16       Q      And do you see, in the first row of that

17   column, there's an entry that says "Petition to

18   accept unintentionally delayed payment of

19   maintenance fee filed 4/22/10, instructed Matt

20   Connors on 4/22 to revive patent"?

21       A      I do.

22       Q      Okay.  So -- but, based on this document,

23   is it -- is it your understanding that BU did

24   instruct Mr. Connors to submit the petition to

25   revive '475 patent?

Michael J. Pratt

1          A     Yeah, you know what?

2               This is the entry into the database.  I

3     think that's a logical conclusion.  It -- it's not

4     clear, from that note, exactly how it went down.

5               But Matt Connors was instructed by whom?

6     by what? by when?

7               But it's logical to probably assume that

8     somewhere, as -- as I testified earlier, since Matt

9     Connors was our counsel, you'd expect him to

10    probably have received instruction from their

11    client.  But there's no e-mail or document that --

12    that shows that to me.

13         Q     Okay.  So you have no reason to doubt

14    that someone at BU instructed Mr. Connors to submit

15    the 47 -- the petition to revive the '475 patent;

16    correct?

17         A     I -- I think it's a logical inference

18    from -- from -- especially from -- from this

19    database entry.  I just don't have any direct

20    document or knowledge that -- that shows that.

21         Q     Well, BU typically accurately keep

22    information in its patent database?

23         A     Yeah.  You know, the -- the database is

24    there to help us.  It's not -- it's not perfect.

25    But, yeah, we try to -- try to do our best.

Michael J. Pratt

```
1     do that page search thing.  So just --

2          Q     Yeah.  I will guide you as best I can.

3          A     Yeah.  Thank -- thank you --

4          Q     I --

5          A     -- for that.  Thank you for that.

6          Q     I understand.  So Mr. Pratt, is this the

7     transcript of the Ashley Stevens deposition that you

8     had mentioned you reviewed in preparation for your

9     deposition today?

10         A     Is there a -- I -- I would assume

11    you're -- you're correctly representing it, but is

12    there a -- is there a -- is there a reference to it

13    that says it somehow so I could verify?

14         Q     Sure.

15               If you scroll down past --

16         A     Well --

17         Q     -- the initial capital text --

18         A     It looks like it's --

19         Q     -- you should see it.

20         A     -- it looks like it's, like, line 10. It

21    says, "Ashley --the video-taped deposition of" --

22         Q     Yes.

23         A     -- "Ashley Stevens."

24         Q     Yes.

25         A     So, you know, I'm assuming that's
```

Michael J. Pratt

```
1     accurate so, yes.

2         Q     Okay.

3         A     I'll say "yes."

4         Q     And then, if I could ask you to scroll

5     down, it's going to be somewhere between, I'd say,

6     two-thirds and three-quarters of the way down the --

7     to page Number 191 -- actually 190?

8         A     All right.  So I -- I have a Number 190

9     and the line Number 1 starts, "Mr. Porter:

10    Objection."

11        Q     That is correct.

12        A     Okay.

13        Q     And, if I could direct your attention now

14    to line 15, there's a question that begins that's

15    directing Dr. Stevens to an e-mail from Sean Lee to

16    Professor Schubert at 4:37 p.m. on December 10th,

17    2009.

18              Do you see that?

19        A     It -- it starts off the question starts

20    off "and then do you see"?

21        Q     Yes.

22        A     Correct.

23        Q     And then, on line 21, there's a -- a

24    reading of that e-mail, where it's saying, "Hi,

25    Fred.  I was able to speak to Ashley and he's brief
```

Michael J. Pratt

1    reaction was that we could probably work something,

2    but we need to discuss details."

3              Do you see that?

4        A    Yes.

5        Q    And do you recognize that language from

6    the e-mail thread that we just looked at a few

7    minutes ago?

8        A    I -- I do.

9        Q    Okay.  And then, if you could scroll down

10   to the -- the next page, page 191, line 11, do you

11   see there's a question that says, "Do you recall

12   common" -- it should probably say "coming" in the

13   final transcript -- "to go to the conclusion that BU

14   could revive the '475 patent"?

15             Do you see that?

16       A    Yes, I do see that.

17       Q    And then you see after, there's some

18   dialogue from Mr. Rader, there's an answer that

19   says, "I think, at this point, I was of the opinion

20   that there was a potential pathway that the patent

21   could be revived."

22             Do you see that?

23       A    I do.

24       Q    And is that consistent with your

25   recollection of Dr. Stevens' testimony?

Michael J. Pratt

```
1          Q     Okay.  And do you know whether BU ever

2     discussed -- or strike that.

3                And -- and we saw in the petition, if you

4     recall, there was a statement certifying that the

5     delay was unintentional; correct?

6          A     That's --

7          Q     Do you remember that?

8          A     -- what the petition says, yes.

9          Q     And do you recall whether, after that

10    petition was filed, BU ever considered providing

11    more information to the patent office concerning

12    the -- the circumstances of the delay.

13         A     I -- I'm not aware of any information or

14    further communications on the matter.

15         Q     And BU became aware of the inequitable

16    conduct allegations in 2013; correct?

17         A     Yes, that's about a year after the suits

18    were filed when this counterclaim was filed, yes.

19         Q     And, after becoming aware of the

20    allegations, is it still true that BU never

21    considered providing additional information about

22    the delay to the patent office?

23               MR. RADER:  Objection.  Asked and

24               answered.

25               You can answer again.
```

Michael J. Pratt

1      A      I'm not aware of any additional

2  communication with the patent office on this matter.

3  BY MR. APGAR:

4      Q      Is BU familiar with the concept of a -- a

5  supplementary examination of the patent?

6      A      So certainly members of the staff now --

7  for example Ken Zwicker, works at with the office

8  now and Ken Zwicker is a patent attorney.  I'm sure

9  that he has some familiarity with different

10 procedures of the patent office including what

11 you -- what you mentioned.  I guess -- so he's an

12 employee of BU, so he probably has some of that

13 knowledge.

14          Again, even though he has that knowledge,

15 we would still, and we still and we still do to this

16 day, rely upon outside counsel to, you know, provide

17 us information with regard to formal filings with

18 the patent office.  That would probably be the

19 extent -- unless -- we do have a law school.  I'm

20 sure there's attorneys or people who teach in -- we

21 are pretty prominent, BU law school.

22          So I'm sure there's faculty there that

23 are familiar with the procedures.  There -- there

24 may be other people at the university who have

25 some -- some knowledge of it.  But, with regard to

Michael J. Pratt

1    eventually settled on, as you see through later

2    communications, is, you know, if Fred gets something

3    and he has expenses, he pays off those expenses, and

4    then whatever Fred received, we would receive

5    10 percent of that.  Yes.

6         Q    And BU's understanding that given this

7    10 percent ongoing term, that this -- this agreement

8    with Professor Schubert remains in effect today; is

9    that right?

10        A    Yeah, I think we had some clarifications.

11   I think there was a clarification maybe a letter

12   back and forth, but -- but, yes.

13        Q    Okay.

14        A    We still have an agreement with him.

15        Q    And then, if you can look in the next

16   paragraph.  So it's the one that starts, "You also

17   agree that."

18             Do you see that paragraph?

19        A    Yes.

20        Q    Okay.  And this paragraph states that

21   Professor Schubert would reimburse Boston University

22   $10,000 to cover previous prosecution costs;

23   correct?

24        A    Yes.

25        Q    Okay.  When BU returns patents to

Michael J. Pratt

1    inventors, does it typically get an upfront payment

2    from the investor?

3         A    It -- it's possible.  This looks like it

4    was a deal that seemed worked out with Professor

5    Schubert, but it's varied over the years.

6              I think you probably want the look at

7    this time period.  I think, if you limited your

8    question to this time period, the general terms

9    described in the first paragraph were probably

10   employed more often than not.  And this would be an

11   outlier, but it was a agreement that Sean had kind

12   of ironed out with -- with Professor Schubert.

13        Q    And do you know why Sean negotiated this

14   extra $10,000 payment with Professor Schubert?

15        A    No.

16        Q    Okay.  But at -- and this -- at this time

17   period, it would be correct to say that most returns

18   that BU was entering would not have included this

19   upfront payment; correct?

20        A    Yeah.  I think that -- I think that --

21   that truly reflects the record, yes.

22        Q    Okay.  And then do you see there is -- in

23   the middle of the page, there's a paragraph that's

24   in all capital letters?

25        A    Yes, that -- "No representations," that

Michael J. Pratt

```
1     that was a source of the revenue that BU has

2     generated or BU has received from the '475 patent?

3         A    So I -- I guess what I'm relying upon in

4     my answer is that Professor Schubert provided us

5     with a simple accounting of the -- of the $395,000

6     and how he calculated it.  And that document leads

7     me to believe that the source of the funds was the

8     settlements with -- with the two parties you

9     mentioned.  That's -- that's what I have for the

10    information on that.

11        Q    Does BU expect to receive any additional

12    revenue from -- from Professor Schubert relating to

13    the '475 patent?

14        A    It's possible.

15        Q    Okay.  Possible from -- from this lawsuit

16    against Lumileds?

17        A    Yeah.

18        Q    Can you think of any other sources from

19    which additional revenue would be possible?

20        A    None that I'm aware of at this time.

21        Q    I'm going to put another document into

22    the chat.

23             (Whereupon, Pratt Exhibit No. 19,

24             Documents Bates-stamped BU 000391

25             through 392, was marked for
```

Michael J. Pratt

```
 1                    identification.)

 2                    MR. APGAR:  This will be Exhibit 19

 3              to your deposition.  It is a document

 4              with Bates numbers BU 000391 through 392.

 5                    THE WITNESS:  I have a document in

 6              front of me titled "Supplemental

 7              Assignment" with the BU number ending

 8              391.

 9    BY MR. APGAR:

10         Q    Yes.  Mr. Pratt, have you -- have you

11    seen this document before?

12         A    Yes, I've -- I've seen it as part of the

13    preparation of the deposition.  You know, it's --

14    it's possible I saw it earlier, but I -- that's my

15    recollection -- you know, my most recent

16    recollection, seeing it as part of the preparation.

17         Q    Okay.  Where -- what is your

18    understanding of what this document is?

19         A    I think the -- the -- the key parts is

20    after the "now -- now therefore."  I think it's

21    after the "Whereas" paragraphs.  It kind of says

22    what the document is.

23                    But my understanding is that Professor

24    Schubert approached us or his attorney approached --

25    approached us.  He contacted Brian Gildea, and they
```

Michael J. Pratt

1    wanted to confirm -- make sure it was absolutely

2    clear that any rights that BU had during its time of

3    ownership were -- were conveyed.  And I think the

4    primary issue was, if there was somebody who was

5    infringing the patent, let's say, or -- or using the

6    patent in some way while BU owned it, which would

7    be, you know, some sort of past infringement

8    activity, that Professor Schubert would be

9    absolutely clear that, when we did the original

10   assignment for all right, title, and interest, that

11   there was no question that that assignment included

12   those rights for any -- whatever it is -- whatever

13   you want the call that -- use -- use of the patent

14   during that -- that time.

15            And this clarified that, you know, we

16   assigned all right, title, and interest, including

17   his right to be able to, you know, talk to people

18   about their past damages.  Yes.

19            Is that --

20   Q      Okay.

21   A      -- kind of --

22   Q      Sure.  So --

23   A      That's my long answer.

24   Q      And it's not just to -- not to talk about

25   past damages, but it's to recover past damages;

Michael J. Pratt

```
 1        A     Vaguely.  You know, it's -- it's in
 2   relatively recent history but certainly through the
 3   prep.
 4        Q     Okay.  And then does this e-mail refer to
 5   the -- the lunch that you had suggested in -- in the
 6   e-mail we -- we just looked at?
 7        A     Yes.
 8        Q     Okay.  So Professor Schubert did come
 9   to -- to BU and had a lunch with you and Dean
10   Stocker and Thomas Bifano; is that -- is that
11   correct?
12        A     That is correct.
13        Q     Okay.  And do you see this e-mail,
14   Professor Schubert, he -- he handed over the -- the
15   $395,000 check at that lunch; is that correct?
16        A     He did, yes.
17        Q     Okay.  And you see he writes, "A couple
18   photographs are attached"?
19        A     Yes.
20        Q     Okay.
21              MR. APGAR:  I'm just going to put
22              another document into the chat here.
23              (Whereupon, Pratt Exhibit No. 24,
24              Document Bates-stamped BU 001356A,
25              was marked for identification.)
```

Michael J. Pratt

```
 1                    MR. APGAR:  The next document should

 2                 be through momentarily.  It's going to be

 3                 Exhibit 24.  And it is -- has the Bates

 4                 Number BU 001356A.

 5      BY MR. APGAR:

 6           Q    And Mr. Pratt, let me know when you have

 7      it open.

 8           A    I have open before me, looks like two --

 9      two photographs.

10           Q    Okay.  And are these the photographs that

11      were attached to the e-mail we just looked at?

12           A    Yes.

13           Q    Okay.  And are these photographs from the

14      lunch that we -- that were referenced in that

15      e-mail?

16           A    Yes.

17           Q    Okay.  And I -- I see -- I see you in --

18      in the -- the photos, but can you just identify,

19      from left to right, who those individuals are?

20           A    Sure.  The gentleman with the beard on

21      the far left is Dean Stocker, and the -- the taller

22      gentleman with the glasses to his right is -- is

23      Professor Schubert.  And to his right, the gentleman

24      next to me is Professor Bifano, and that's myself.

25           Q    Okay.  And am I correct in understanding
```

Michael J. Pratt

1        the -- the piece of paper that Professor Schubert

2        and Thomas Bifano are holding, is that the -- the --

3        the $395,000 check?

4              A     It is.

5              Q     Okay.  What -- what do you remember about

6        what was discussed at that lunch?

7              A     Oh, my gosh.  It was mostly just a social

8        lunch.  We talked a lot about Dean -- he -- he had

9        spent a number of years in Malawi.  I kind of -- i

10       never really met Dean, even when he was here at BU,

11       even though we -- we might -- might have overlapped

12       a little bit or we didn't overlap.

13             So we talked a little about him.  He's

14       a -- he's a teacher now.  He -- I think he teaches

15       physics.  And then we got into a discussion.  BU was

16       in the midst of this -- at the time, back in 2019,

17       was in the midst of this strategic plan, planning

18       for the future for a 10-year strategic plan, and Tom

19       Bifano was on one of the committees.

20             So we got into a discussion about

21       engineering education and -- and practical -- you

22       know, do you do practicums and have people do

23       practical education or do you stick more theory.

24       Fred had talked about a little bit how he still

25       teaches at RPI, and it's a -- it's a big joy to him

Michael J. Pratt

```
 1      to continue his teaching.  He talked a little bit of

 2      the fact that he spent some time, since he left BU,

 3      as an expert witness doing patent matters.

 4              So he -- he kind of shared some

 5      experiences about just roughly his -- his time as an

 6      expert witness.  In fact, we joked a little bit

 7      because he had a pending expert witness thing coming

 8      up on a some matter, and there was a -- there was a

 9      current BU faculty member who was going to be the

10      opposing expert witness.  So we -- that's Marc

11      Orenstein, who has collaborated quite a bit with

12      Professor Bifano.  So we kind of -- we talked about

13      that a little bit.

14          Q    Did -- did you discuss anything related

15      to -- to Professor Schubert's lawsuit against

16      Lumileds?

17          A    No.

18                  MR. APGAR:  Okay.  I'm going to put

19                  another document into the chat.  This

20                  will be Exhibit 25 to your deposition.

21                  (Whereupon, Pratt Exhibit No. 25,

22                  Document Bates-stamped BU 001566, was

23                  marked for identification.)

24                  MR. APGAR:  This is document

25                  produced Bates Number BU 001566.
```

Michael J. Pratt

```
 1      BY MR. APGAR:

 2          Q      And let me know when you have that open,

 3      Mr. Pratt.

 4          A      Got it.

 5          Q      Okay.  Do you recognize this document?

 6          A      Yes, that's the check that we were

 7      holding.

 8          Q      So the -- the -- the -- the picture shown

 9      in -- in Exhibit 25 is an image of a check that

10      Professor Schubert gave to -- to BU to pay per his

11      agreement with BU; is that correct?

12          A      Correct.

13          Q      Okay.  So, earlier, do you remember we

14      were discussing -- we were -- discussed a few times

15      that Dr. Stevens had a conversation with Matt

16      Connors in December of 2009?

17          A      Yes.

18          Q      And do you remember we looked at a

19      portion of Dr. Steven's testimony, where he

20      indicated that, as a result of that conversation,

21      he -- he felt that there was a potential path

22      forward to providing --

23          A      Yes.

24          Q      Do you remember that?

25          A      Yes.
```

Michael J. Pratt

```
 1        Q     Okay.  And, if you scroll down to the
 2   second and third page of the actual report --
 3        A     Yes.
 4        Q     -- do you have any knowledge of whether
 5   or not this -- this report is more or less detailed
 6   than BU typically receives from other inventors from
 7   whom it receives these annual reports?
 8        A     I think you are going to have to be a
 9   little more specific in the question so that I
10   understand it and can answer it --
11        Q     Sure.
12        A     -- appropriately.
13        Q     So Professor Schubert is not the only
14   inventor from whom you receive these annual reports,
15   is he?
16        A     So other people we've returned patents to
17   may have an obligation to send us a report.  How
18   many of those inventors send us reports is probably
19   really low.  We probably -- we might not get any,
20   because most of the time when we return an invention
21   to an inventor, nothing happens.
22              Most of the time -- in fact, we changed
23   our procedure a few years ago, where, before we
24   return it, we insist that they go file a patent
25   application.  Because we used to return things to
```

Michael J. Pratt

1               C E R T I F I C A T E

2          I, Clifford Edwards, Certified Shorthand

3      Reporter, do hereby certify that prior to the

4      commencement of the examination, the witness was

5      duly remotely sworn to testify to the truth, the

6      whole truth and nothing but the truth.

7              I DO FURTHER CERTIFY that the foregoing is

8      a verbatim transcript of the testimony, that said

9      deposition was taken by me stenographically at the

10     time and date hereinbefore set forth, and the

11     foregoing is a true and accurate transcript of the

12     testimony.

13             I FURTHER CERTIFY that I am neither of

14     counsel nor attorney to any of the parties to said

15     suit, nor am I an employee of any party to said

16     suit, nor of any counsel in said suit, nor am I

17     interested in the outcome of said cause.

18             Witness my hand and seal as Notary Public

19     this 26th day of August, 2020.

20

21     _____

22                    Clifford Edwards

23                    Notary Public

24     My commission expires:  9/30/2021

25

Exhibit 5

Ashley J.   Stevens

1             UNITED STATES DISTRICT COURT
2             FOR THE DISTRICT OF DELAWARE
3                          Civil Action No.
                           1:12-CV-00924-MN
4

    *******************************************
5

    E. FRED SCHUBERT,
6
          Plaintiff and Counterclaim Defendant,
7
          v.
8

    LUMILEDS LLC,
9
          Defendant and Counterclaim Plaintiff,
10
          v.
11

    TRUSTEES OF BOSTON UNIVERSITY,
12
          Counterclaim Defendant.
13  *******************************************
14             Videotaped via Zoom Deposition of
15  ASHLEY J. STEVENS, DPhil., held at the
16  location of the deponent in Winchester,
17  Massachusetts, commencing at 10:04 a.m., on
18  the 5th of August, 2020, before Maureen
19  O'Connor Pollard, Registered Diplomate
20  Reporter, Realtime Systems Administrator,
21  Certified Shorthand Reporter.
22                     – – –
            GOLKOW LITIGATION SERVICES
23     877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
24

Ashley J.  Stevens

1    APPEARANCES: ALL PARTIES APPEARED REMOTELY

2

3    FOR THE PLAINTIFF AND COUNTERCLAIM DEFENDANT:

4        GERALD E. PORTER, ESQ.

5            TROUTMAN PEPPER

6            875 Third Avenue

7            New York, New York 10022

8            212-704-6113

9            gerald.porter@troutman.com

10

11   FOR THE COUNTERCLAIM DEFENDANT and THE

12   DEPONENT:

13       MICHAEL N. RADER, ESQ.

14       SUSMITA A. GADRE, ESQ.

15           WOLF, GREENFIELD & SACKS, PC

16           605 Third Avenue

17           New York, New York 10158

18           212-336-3850

19           michael.rader@wolfgreenfield.com

20           susmita.gadre@wolfgreenfield.com

21

22

23

24

Ashley J.  Stevens

```
 1    APPEARANCES (Continued):

 2

 3    FOR THE DEFENDANT AND COUNTERCLAIM PLAINTIFF:

 4        GREGORY J. APGAR, ESQ.

 5          MAYER BROWN, LLP

 6          1221 Avenue of the Americas

 7          New York, New York 10020-1001

 8          212-506-2780

 9          gapgar@mayerbrown.com

10

11

12    Videographer:  James Vonweigen

13

14

15

16

17

18

19

20

21

22

23

24
```

Ashley J.  Stevens

```
 1                    INDEX
 2    EXAMINATION                      PAGE
 3    ASHLEY J. STEVENS, DPhil.
 4    BY MR. APGAR                        8
 5    BY MR. RADER                      304
 6    BY MR. APGAR                      306
 7
 8
 9            E X H I B I T S
10    NO.        DESCRIPTION           PAGE
11    1     Ashley J. Stevens, D.Phil.
            (Oxon), CLP, RTTP Resume, Bates
12          STEVENS000014 through 40.........   35
13    2     United States Patent No. 6,
            294,475..........................   82
14
      3     Provisional application file for
15          Case BU 98-11, Bates BU000001
            through 94.......................   93
16
      4     Folder titled PCT Patent
17          Application for BU 98-11, Bates
            BU000095 through 228.............  111
18
      5     Cover pages with attached
19          Petition to Accept
            Unintentionally Delayed Payment
20          of Maintenance Fee in an Expired
            Patent, Bates BU000289 through
21          293..............................  131
22    6     9/2/09 e-mail from Sean Lee,
            Bates EFS00006680................  151
23
      7     E-mail chain, Bates BU000268......  156
24
```

Ashley J.  Stevens

8        Document from the FileMaker Pro
         database, Bates BU001145 and
         1146.............................   167

9        Excel spreadsheet, Bates
         BU001550.........................   171

10       November 27, 2009 letter, Bates
         BU000451.........................   176

11       E-mail chain, Bates BU001360
         through 1363.....................   180

12       E-mail chain, Bates EFT00027270...   184

13       E-mail chain, Bates BU00367
         through 369......................   199

14       E-mail calendar invitation,
         Bates BU001366...................   218

15       February 2, 2010 Memorandum,
         Bates BU000450...................   223

16       E-mail chain, Bates
         STEVENS000098 and 99.............   230

17       February 16, 2010 e-mail, Bates
         STEVENS000103....................   236

18       February 22, 2010 Memorandu,
         Bates BU000447 and 448...........   243

19       Charles River Campus Patent
         Committee Meeting Minutes of
         Regular Meeting, February 22,
         2919, Bates BU001143 and 1144.....   264

20       Subpoena to Testify at a
         Deposition in a Civil Action
         with attachments.................   277

21       Excerpt of the August 3, 2020
         Rough transcript of E. Fred
         Schubert.........................   290

Ashley J.   Stevens

1

    22      April 11, 2016 e-mail, Bates

2           STEVENS000154.....................   298

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Ashley J.  Stevens

1    2009 or 2010 time frame Sean Lee had any

2    knowledge of the process for reviving an

3    abandoned patent?

4         A.      I don't.

5         Q.      How about Janine Anderson?

6         A.      I have no idea.

7         Q.      How many patents during your

8    time at the OTD did BU attempt to revive?

9         A.      So you say "patents," therefore

10   I assume you mean issued patents where the

11   maintenance fee had not been paid.  To the

12   best of my knowledge, this was the only one.

13        Q.      And when you say "this one,"

14   are you referring to the patent with the

15   named inventors of Fred Schubert and Dean

16   Stocker with the number 6,294,475?

17        A.      I do.

18        Q.      So as best you can recall, that

19   was -- how about before you got to BU, were

20   you ever involved in the revival of any other

21   issued patents that had expired for failure

22   to pay a maintenance fee?

23        A.      Not to the best of my

24   recollection.

Ashley J.   Stevens

1    part in any of the routine operations of

2    technology transfer.

3           Q.     Sure.

4                  Do you recall when you left

5    technology transfer in February of 2010

6    whether there was a plan in place to revive

7    the '475 patent?

8           A.     No.  The first issue was would

9    the patent committee agree to return it to

10   Professor Schubert, and that decision was

11   reached.  It was my expectation that we would

12   return it to Professor Schubert and he would

13   do the reviving.

14          Q.     Do you recall any -- whether

15   you had any discussions before leaving the

16   technology transfer group whether or not the

17   '475 patent could be revived?

18          A.     Yes.

19                 MR. RADER:  I'll just caution

20          the witness not to reveal the content

21          of attorney/client communications.  I

22          think, though, I just want to caution

23          you in that regard.  But otherwise,

24          you can answer.

Ashley J.  Stevens

1          A.     And I answered yes.

2     BY MR. APGAR:

3          Q.     And do you recall who those

4     discussions were with?

5          A.     Yes.

6          Q.     Who were they with?

7          A.     Matt Connors.

8                 And I'm not sure I would

9     characterize them as discussions.  My best

10    recollection is it was a discussion.

11                MR. RADER:  I just want to

12          caution the witness not to go further

13          into the contents of that discussion.

14    BY MR. APGAR:

15         Q.     Do you, without revealing the

16    contents of that discussion, do you reveal --

17    do you --

18         A.     Freudian slip.

19         Q.     I got mixed up there.

20                Without revealing the contents

21    of that discussion, do you recall when that

22    discussion took place?

23         A.     No.

24         Q.     Was it --

Ashley J.  Stevens

1          A.      I testified to that previously.

2          Q.      But it would have been before

3    you left technology transfer, correct?

4          A.      Correct.

5          Q.      And without revealing the

6    contents of any legal advice that was

7    discussed, do you remember whether or not,

8    just yes or no, whether Mr. Connors provided

9    any advice about whether the '475 patent

10   could be revived?

11         A.      Yes.

12         Q.      And just to clarify, is that

13   yes, you remember, or yes, Mr. Connors did

14   provide advice?

15         A.      Yes, I remember.

16         Q.      And do you remember that

17   Mr. Connors did provide advice regarding

18   whether the '475 patent could be revived?

19              THE WITNESS:  Mr. Rader, is

20        that too close to the line?

21              MR. RADER:  It's very close.

22        I'll let you answer this one, but

23        we're not going further than this.

24         A.      Repeat the question, please?

Ashley J.   Stevens

1    BY MR. APGAR:

2         Q.     Sure.

3                So yes or no, did Mr. Connors

4    provide advice regarding whether the '475

5    patent could be revived?

6         A.     Yes.

7         Q.     And as best you can recall, do

8    you recall receiving advice from anyone else

9    about whether or not the '475 patent could be

10   revived?

11        A.     No.

12        Q.     And do you know whether or not

13   anyone at the OTD received any advice from

14   anyone else about whether or not the '475

15   patent could be revived?

16        A.     I cannot speak to events that

17   occurred after I had transferred to special

18   assignment to the vice president for

19   research.

20        Q.     How about before you

21   transferred to vice president for research?

22        A.     I don't believe anybody else

23   would have done.

24        Q.     Do you recall any discussions

Ashley J.  Stevens

```
 1                  MR. PORTER:  Objection as well.
 2          A.      I think my testimony was that
 3     it had to be unavoidable or unintentional,
 4     not the other way around as you phrased it.
 5     BY MR. APGAR:
 6          Q.      Okay.  I didn't mean anything
 7     by the order.
 8                  Now, is it your understanding
 9     that the '475 patent was revived on the basis
10     of the delay in paying the maintenance fee
11     being unintentional?
12          A.      That's what this statement
13     says.
14          Q.      And are you aware one way or
15     the other whether Mr. Connors was aware of
16     any of the facts surrounding the delay in
17     paying the maintenance fee at the time he
18     filed his application?
19                  MR. RADER:  I just want to
20             caution the witness, you're not to
21             disclose the contents of the
22             conversation or conversations you had
23             with Mr. Connors.
24                  But if this is a yes or no
```

Ashley J.  Stevens

1           question as to whether you're aware,

2           just your awareness of whether he knew

3           those facts, which I think it is, you

4           can answer that.

5           A.    The answer would be yes.

6    BY MR. APGAR:

7           Q.    Is it your understanding that

8    yes, Mr. Connors was aware of the facts

9    surrounding the delay in paying the

10   maintenance fee at the time he filed his

11   application?

12          A.    Yes.

13          Q.    Is it also your understanding

14   that Mr. Connors was aware of the reasons why

15   BU chose not to pay the maintenance fee at

16   the time he filed this petition?

17               MR. RADER:  Well, I think

18          your -- I want to be careful here.

19          We're not waiving privilege.  I'm

20          trying to give you have as much leeway

21          as I can, but we're not going to waive

22          privilege.

23               That question sounds like it

24          requires him to reveal the contents of

Ashley J.  Stevens

1              The time is 2:15 p.m.  We are
2         off the record.
3              (Pause.)
4              THE VIDEOGRAPHER:  The time is
5         2:17.  We are back on the record.
6    BY MR. APGAR:
7         Q.    Dr. Stevens, to the best of
8    your recollection, at the time that
9    Mr. Connors filed the petition to revive the
10   '475 patent, what facts concerning the delay
11   in paying the second maintenance fee was he
12   aware of?
13             MR. RADER:  So I just want to
14        be careful here, as I said before.
15             BU is not waiving the
16        attorney/client privilege here.  I
17        certainly don't want to frustrate any
18        line of questioning that you feel is
19        legitimate and does not invade the
20        privilege.  This is a close one.
21             So I just want to verify,
22        Mr. Apgar, if I allow him to answer
23        this question, will you represent that
24        your client is not going to treat that

1           as a waiver of the privilege?

2                MR. APGAR:  Correct.  As long

3           as Mr. Stevens just tells me the

4           facts, our position is that the facts

5           are not privileged, so there would be

6           no waiver based on facts.

7                MR. RADER:  Okay.  With the

8           understanding that his answer to this

9           question is not going to be considered

10          a waiver of the privilege by your

11          client, I'll let him answer this one.

12          A.    This sound to me to be more

13    detailed and closer to a breach of privilege

14    than your previous one.  It seems to me

15    you're asking me to tell you what I told

16    Mr. Connors.  Previously you asked me if he

17    was aware of the facts of the decision not to

18    pay the maintenance fee.

19               Michael?

20               MR. RADER:  Okay.  Maybe I

21          misheard the question.  I mean --

22               MR. APGAR:  My question is just

23          what facts.  I don't think it had been

24          established how the facts were being

Ashley J.   Stevens

1          transmitted.  I did not ask that.

2                  Dr. Stevens testified earlier

3          that Mr. Connors, I'm reading from the

4          transcript, was aware of the facts

5          surrounding the delay in paying the

6          maintenance fee at the time he filed

7          this petition, and I'm just asking for

8          what were those facts of which

9          Mr. Connors was aware.  And that's it.

10                 I'm not asking for how they

11         were transmitted.  I'm not asking for

12         who -- you know, I'm not asking for

13         any of the surrounding communications,

14         just specifically what those facts

15         were.

16                 MR. RADER:  All right.

17         Dr. Stevens, with the understanding I

18         previously stated, I'll let you do

19         your best in answering that just as to

20         the facts that you are aware he was

21         aware of regarding the abandonment of

22         the patent.

23         A.      By beginning of September we

24     were not aware of commercial interest in the

Ashley J.  Stevens

1    '475 patent, and that we had determined not

2    to pay the second maintenance fee

3    accordingly.

4              I don't recall whether -- I

5    assume I would have also told him that, at

6    the beginning of September, Professor

7    Schubert declined the offer of taking over

8    the patent.

9              Those are the facts.

10   BY MR. APGAR:

11       Q.    Are there any other facts that

12   you can recall as you sit here today?

13       A.    No.  I mean, obviously the fact

14   that now Professor Schubert wanted it,

15   obviously that's why we're having the

16   conversation.

17       Q.    And was anyone else present for

18   your communication with Mr. Connors?  I'm not

19   asking for anything about the communications.

20   Was it just the two of you, or was there

21   someone else involved in the discussion?

22              MR. RADER:  That's okay.  You

23        can answer that.

24       A.    I don't believe anybody else

Ashley J.   Stevens

1    question?

2         Q.    Yes.

3              So when BU offered a patent to

4    return to an inventor into which it had

5    committed --

6              THE VIDEOGRAPHER:  One second.

7         We've got to go off the record real

8         quick.

9              MR. APGAR:  I'm seeing strange

10        pop-ups.

11             THE VIDEOGRAPHER:  The time is

12        2:36.  We are off the record.

13             (Pause.)

14             THE VIDEOGRAPHER:  The time is

15        2:39.  We are on the record.

16   BY MR. APGAR:

17        Q.    Dr. Stevens, when BU would

18   require the 10 percent ongoing royalty, do

19   you recall approximately how often it wound

20   up making -- or wound up recouping its own

21   patent costs?

22             MR. PORTER:  Objection.  Vague.

23        A.    I think when I learned about

24   this matter, and if this had generated

Ashley J.  Stevens

1   revenues to BU, this was the first one I was

2   aware of.

3   BY MR. APGAR:

4        Q.    The '475 patent is the first

5   patent you're aware of that generated revenue

6   to BU under the ongoing royalty requirement,

7   is that correct?

8        A.    Yes, this was the first time

9   where the inventor could do a better job with

10  it than we could.  I think I said earlier we

11  returned patents or offered to return them

12  purely as a service to faculty to encourage

13  their entrepreneurial aspirations.

14       Q.    But it is correct that BU does

15  include terms of the transfer to include an

16  ongoing stake in the patent, is that right?

17       A.    Correct.

18            MR. RADER:  Objection.

19            MR. PORTER:  Same objection.

20            MR. RADER:  I think it

21       mischaracterizes some of the prior

22       testimony.

23            But you can answer again.

24       A.    We felt it was a very

Ashley J.   Stevens

1   user-friendly way to do it.  Because just as

2   the basic deal between an inventor and the

3   university, whereby we will sign our

4   inventions over to you and in return we get a

5   risk-free 30 percent of the income, we have

6   to put no money up for the patent and we get

7   30 percent off the top, that's pretty

8   user-friendly.

9            And when we gave it back to

10  them, we didn't ask for reimbursement up

11  front, we say you only reimburse us if you

12  make any money out of it.  It was continuing

13  that highly user-friendly aspect to the

14  faculty member.

15       Q.    Well, it wasn't always the case

16  that there was no upfront payment, right,

17  before -- if you look at Exhibit 7, Dr. Lee

18  does put a term there that the inventor would

19  reimburse BU for the sunk patent costs, in

20  this case $27,000, correct?

21       A.    Yeah, I think -- but I think

22  you need to read that in conjunction with the

23  "and," it then says "a 10 percent royalty,"

24  and both of those halves of that sentence are

Ashley J.  Stevens

1        Q.    So do you recall whether or not

2    as of December, 2009 you shared that belief

3    with Dr. Lee?

4        A.    Well, I am familiar, you know,

5    I obviously understand the common usage of

6    the word intentional and unintentional.

7    However, patent practice is an extremely

8    specialized and, some would say, arcane part

9    of the law, and certainly neither Sean nor I

10   were experts on what intentional and

11   unintentional meant in the context of

12   practice before the patent office and the

13   ability to revive a patent.  We -- neither of

14   us were qualified to practice before the

15   patent office.

16       Q.    But as of December, 2009, was

17   it your understanding that the patent office

18   allows patents to revive only if they can be

19   in good faith explained that the abandonment

20   was unintentional?  Putting aside what the

21   contours of unintentional are, were you aware

22   of that requirement?

23           MR. PORTER:  Objection.

24           MR. RADER:  Objection to form.

Ashley J.   Stevens

1          A.      I think I testified earlier

2    that I was aware of the words unavoidable or

3    unintentional in the delay in paying the

4    maintenance fee.

5    BY MR. APGAR:

6          Q.      Okay.  Do you recall ever

7    discussing with Sean Lee what it means for an

8    abandonment to be unintentional?

9          A.      I don't recall that I did.

10         Q.      Do you recall taking any steps

11   to find out what it means for an abandonment

12   to be unintentional?

13         A.      No.

14                 MR. PORTER:  Objection.

15   BY MR. APGAR:

16         Q.      Do you recall as of December

17   3rd, 2009 whether you had a belief as to

18   whether BU had intentionally or

19   unintentionally abandoned the '475 patent?

20                 MR. RADER:  Objection.

21                 You can answer.

22                 MR. PORTER:  Objection.

23         A.      As I said, I have an

24   understanding of the common usage of the

Ashley J.  Stevens

1          A.     I do.

2          Q.     Do you have any recollection of

3   having a conversation with Sean Lee where you

4   told him that you could probably work

5   something out regarding the missed

6   maintenance fees?

7          A.     I don't recall a conversation.

8   Obviously it says that there was one, but I

9   do not recall that conversation.

10         Q.     Do you recall coming to the

11  conclusion that BU could revive the '475

12  patent?

13                MR. RADER:  I just caution you

14         not to reveal attorney/client.  But I

15         think if it's, you know, your mindset,

16         if it doesn't require revealing the

17         contents of attorney/client

18         communications, you can answer.

19         A.     I think at this point I was of

20  the opinion that there was a potential

21  pathway by which the patent could be revived.

22  BY MR. APGAR:

23         Q.     And what is your understanding

24  of what that potential pathway was?

Ashley J.  Stevens

1          A.     I'm not going to answer that

2     question on the grounds of privilege.

3          Q.     Does this e-mail -- this series

4     of e-mails refresh your recollection as to

5     when the conversation was that you had with

6     Mr. Connors?

7          A.     I think this would say that

8     this was after December 2nd and before

9     December 10th.

10         Q.     Okay.  Without asking for what

11    you spoke about with Mr. Connors, is it fair

12    to say that your belief that there was a

13    potential pathway forward came about as a

14    result of that conversation with Mr. Connors?

15              MR. PORTER:  Objection.

16              MR. RADER:  That's a -- you

17         know, privilege is a pretty subtle and

18         complex area.

19              I just want to confirm before

20         deciding whether to let him answer

21         that question, it sounds like a yes or

22         no question, will Lumileds maintain if

23         I let him answer that that there's any

24         waiver of the attorney/client

Ashley J.   Stevens

```
1              privilege?
2                   MR. APGAR:  Well, I'm asking
3         what -- I'm asking whether or not the
4         conversation with Mr. Connors was the
5         basis for Dr. Stevens changing his
6         mind.
7                   THE WITNESS:  I think that's
8         too close, Michael.
9                   MR. RADER:  I mean, we're not
10        waiving privilege.  If you can
11        represent that your client won't
12        regard it as a waiver, I would put it
13        in the same bucket as before and let
14        him answer on that basis.  Otherwise,
15        I'm not going to.
16                  MR. APGAR:  I mean, the fact
17        that -- whether or not Dr. Stevens
18        relied on advice from Mr. Connors is
19        not privileged.  We are entitled to
20        find out the basis for Dr. Stevens'
21        belief.
22                  I'm not asking for the
23        privileged communication.  But if --
24        Dr. Stevens has testified this
```

Ashley J.  Stevens

1          conversation took place and that his

2          mind changed after this conversation,

3          and I would like to know whether that

4          conversation was the basis for his

5          changing belief, and that's what I'm

6          asking.

7                MR. RADER:  First of all, I'm

8          not sure what you're talking about

9          when you say Dr. Stevens changed his

10         mind.  I'm not aware of testimony that

11         Dr. Stevens changed his mind.

12               But secondly, all I'm saying is

13         you can't have it both ways.  You

14         can't ask him to answer this question

15         and then later claim that by me

16         letting him answer we've somehow

17         waived the attorney/client privilege.

18               So it sounds like you recognize

19         this is a pretty close call as well.

20               MR. APGAR:  The issue -- maybe

21         we can go off the record a minute.

22               But the issue the way I see it

23         is if the legal advice provided by

24         Mr. Connors is going to become a basis

Ashley J.   Stevens

1           for a litigation contention that there

2           was no intent to deceive the patent

3           office, then I believe that we are

4           entitled -- then you're using

5           privilege as a sword and a shield.  So

6           that's where I see the issue.

7                And I don't know if -- you

8           know, I don't want to take up all this

9           record time going back and forth about

10          this, but I can't -- to the extent

11          that this is going to be relied on as

12          a litigation contention by either BU

13          or Schubert, our position would be

14          that we're entitled to find out the

15          basis for the litigation contention,

16          just the way an opinion of counsel

17          defense, anything like that.

18               So that's my position on this.

19               MR. RADER:  I'm just defending

20          a deposition.  So every time you ask a

21          question --

22               MR. APGAR:  I understand.

23               MR. RADER:  -- I'm deciding

24          whether you're trying to get into

Ashley J.  Stevens

1          privileged information or not.

2                    MR. APGAR:  I'm not asking --

3                    MR. RADER:  We're talking over

4          each other now.

5                    I think what we should probably

6          do now is just move on, because at

7          this moment I'm not going to let him

8          answer the question that you just

9          asked.

10                   MR. APGAR:  All right.  So I'm

11         going to ask the question just to

12         create a record, and then I'll decide

13         whether I want to revisit it.

14    BY MR. APGAR:

15         Q.    So, Dr. Stevens, was your

16    understanding that BU could probably work

17    something out regarding the missed

18    maintenance fee of the '475 patent based on

19    your conversation with Mr. Connors?  Yes or

20    no.

21         A.    I decline to answer that

22    question on the advice of counsel -- sorry,

23    the instruction of counsel.

24                   MR. RADER:  Correct.

Ashley J.   Stevens

1    BY MR. APGAR:

2         Q.      Sure.

3              At the time that you spoke to

4    Sean Lee and told him that there was probably

5    a way for BU to work something out with

6    respect to reviving the '475 patent, had you

7    already come to the conclusion that there was

8    a way for BU to revive the '475 patent?

9         A.      I think my previous testimony

10   was a potential pathway, and I think by the

11   time of this conversation I was of that

12   opinion.

13        Q.      Do you see that Sean Lee

14   continues this e-mail to you, Dr. Stevens,

15   saying, "though we need to discuss details"?

16              Do you see that?

17        A.      I do.

18        Q.      Do you know what details Sean

19   Lee is referring to?

20        A.      No.

21        Q.      And then in the next sentence

22   Sean Lee informs Dr. Schubert he'll be out of

23   the country, and then he continues, "That

24   still gives us time to fix it at the patent

Ashley J.   Stevens

1    before or after, but I think it was probably

2    a call was made in response to a request for

3    guidance from Sean.

4         Q.     I'm going to send another

5    document through the chat.

6              Dr. Stevens, I just put through

7    the chat a document which will be Exhibit 14,

8    which has a Bates number of BU001366.  And

9    please let me know once you've opened it.

10             (Whereupon, Stevens Exhibit

11        Number 14 was marked for

12        identification.)

13        A.     It's open.

14   BY MR. APGAR:

15        Q.     Dr. Stevens, do you recognize

16   what this document is?

17        A.     I have seen it in preparation

18   for this litigation.

19        Q.     And do you recall seeing it any

20   time previously?

21        A.     No.

22        Q.     Okay.  And is it your

23   understanding this is a calendar invitation

24   sent by Sean Lee to you, Janine Anderson, and

Ashley J.  Stevens

1    Professor Schubert?

2          A.      It appears to be.

3          Q.      Okay.  And do you see that it

4    sets a meeting for Friday, January 15th,

5    2010?

6          A.      I see that.

7          Q.      Do you see that the location

8    that this will be an in-person meeting?

9          A.      It appears to be in fifth floor

10   conference room, yes.

11         Q.      Do you recall this meeting?

12         A.      No.

13         Q.      Do you see that underneath the

14   header of the invite there's a statement that

15   says, "To discuss revival and return of

16   invention, currently abandoned at USPTO"?

17                 Do you see that?

18         A.      I read those words.

19         Q.      Do you understand that to be

20   referring to -- the invention to be referring

21   to the '475 patent?

22         A.      I do.

23         Q.      And do you recall ever

24   discussing the revival and return of the '475

Ashley J.   Stevens

1          Speculation.

2                     You can do your best.

3                     MR. PORTER:   Objection.

4          A.      I mean, it seems to me there

5    were two fees likely becoming due, the

6    maintenance fee and any fee associated with

7    an assignment of BU's interest to Professor

8    Schubert.   I think both of those were liable

9    to have costs associated.

10   BY MR. APGAR:

11         Q.      Okay.   And do you read

12   Professor Schubert's statement to cover both

13   of those costs?

14                    MR. RADER:   Same objection.

15         A.      Yes.

16                    MR. PORTER:   Objection.

17         A.      I'm sorry.   Fees as in the

18   plural, yes.

19   BY MR. APGAR:

20         Q.      Do you have an understanding

21   whether as of February 2nd, 2010, BU had

22   reached any conclusions about whether or not

23   the '475 patent could in good faith be

24   revived at the patent office?

Ashley J.  Stevens

1          A.     I think I said earlier it was

2     my expectation that we would transfer the

3     dead patent back to Dr. Schubert and he would

4     revive it, and I think this agreement here is

5     consistent with that expectation of mine.

6          Q.     And can you recall any

7     documents that would have set out that BU

8     would transfer a dead patent back to

9     Professor Schubert?

10         A.     He says, "I am interested to

11    acquire ownership of the '475 patent

12    currently owned by BU," it's currently dead.

13    So he says he wants to acquire a dead patent.

14         Q.     In your time at BU, are you

15    aware of BU ever transferring a dead patent

16    back to an inventor?

17         A.     No.  I told you this was the

18    first time that I had been involved in

19    revival of a patent after a decision not to

20    pay a maintenance fee.

21         Q.     Okay.  So is it also true that

22    you have never in your time at BU recommended

23    to the patent committee that BU should return

24    a dead patent to an inventor?

Ashley J.   Stevens

1  recover at least a portion of our prior

2  patent costs.

3       Q.     And so your understanding, am I

4  correct, of the phrase "didn't generate

5  significant revenue" is that you take that to

6  mean something that the patent was not likely

7  to do?

8       A.     Correct.

9       Q.     If you go to the next sentence,

10  it is true, right, that BU got a better

11  financial deal for the return of the '475

12  patent than it typically did?

13            MR. PORTER:  Objection.

14       A.     It was generally not our

15  practice to ask for money up front.

16  BY MR. APGAR:

17       Q.     And in this case you asked for,

18  I believe, $10,000, is that correct?

19       A.     I think I would say we asked

20  rather than you meaning me, but yes.

21       Q.     And do you recall why in this

22  particular case you insisted on a $10,000

23  upfront payment?

24       A.     No.  That was Sean's

Ashley J.   Stevens

1    recommendation, and Professor Schubert

2    agreed.

3          Q.    So as of February 22nd, 2010,

4    can you recall taking any steps to determine

5    whether or not the '475 patent could be

6    legitimately revived, other than the one

7    conversation with Mr. Connors that we've

8    already discussed?

9                MR. RADER:  Objection.  He's

10          already talked about other

11          consideration, so that's asked and

12          answered.

13                But you can do it again.

14                MR. PORTER:  Same objection.

15          A.    I mean, my answer would be no,

16    because we weren't going to do the reviving

17    in my scheme.

18    BY MR. APGAR:

19          Q.    Ultimately BU did do the

20    reviving, correct?

21          A.    I have subsequently been told

22    that, yes.

23          Q.    So other than the one

24    conversation you had with Mr. Connors, are

Ashley J.   Stevens

1    important to explain the further

2    circumstances to the patent office about how

3    the -- excuse me, to the patent committee

4    about how the '475 patent could potentially

5    be revived?

6         A.    No, we weren't going to do it.

7    Professor Schubert was going to do it.  The

8    university was out of it.  That's why I

9    didn't go into those issues in that memo.

10        Q.    Are you aware of a single

11   document that expresses that Professor

12   Schubert was going to revive the patent?

13             MR. RADER:  Objection.  Asked

14        and answered.

15             You can answer again.

16             MR. PORTER:  Objection.

17        A.    We've been around that circle

18   several times.

19   BY MR. APGAR:

20        Q.    So you've testified a number of

21   times that you don't remember discussing the

22   revival of the '475 patent with Professor

23   Schubert, so I'm trying to determine what

24   you're basing your recollection on that the

Ashley J.   Stevens

1    plan was for Professor Schubert to revive the

2    '475 patent?

3              MR. RADER:   Objection.

4              MR. PORTER:   Objection.

5         A.      I think we within -- I thought

6    Sean and I had agreed that we were happy to

7    give Professor Schubert back the dead patent,

8    and that he would revive it, and it was

9    generally our policy when we did that to

10   allow the inventor to use the same patent

11   counsel that the university had used if they

12   so desired.

13   BY MR. APGAR:

14        Q.      Do you remember when -- do you

15   remember having discussions with Sean Lee

16   about that?

17        A.      Not the specifics.

18        Q.      Do you remember when you would

19   have discussed that with Sean Lee?

20        A.      I think when he told me that

21   Professor Schubert had expressed an interest

22   in getting the patent back.

23        Q.      And are you aware whether or

24   not the expectation that Professor Schubert

Ashley J.  Stevens

1    and inaccurate claims made against me.

2         Q.     What is your understanding of

3    the nature of the allegations of inequitable

4    conduct?

5         A.     I've read them in there.  I got

6    accused of fraud on the patent office, and

7    that is absolutely not the case.

8         Q.     Why do you believe it's not the

9    case?

10        A.     Because I took no action with

11   the patent office on this matter.  It was my

12   intention to return a dead patent to

13   Professor Schubert, and for him to make the

14   case for revival.  I had nothing to do with

15   that.  I had nothing to do whatsoever with

16   the actions that were taken.  I can't say why

17   I have been accused in this matter.

18        Q.     So is it your understanding

19   that you had no impact whatsoever on the

20   decision to file a petition to revive the

21   '475 patent?

22        A.     Absolutely.  I've made that

23   clear throughout today.

24        Q.     Is it your understanding that

Ashley J.  Stevens

1          Q.     I'd like to go back to a

2    document we looked at earlier today.

3                Looking now, if you still have

4    it open, Dr. Stevens, it is -- it was

5    Exhibit 13, and it is the document has the

6    numbers BU-367 through 69.

7          A.     What is this amended complaint

8    that we've put up, what number exhibit was

9    that?

10         Q.     That was Exhibit Number 20.

11                And I'm sorry, it's BU-1367?

12         A.     This is Exhibit Number 13?

13         Q.     Yes.  It's BU-1367.

14         A.     Yes, I have it.

15         Q.     And do you recall in these

16   e-mails that Sean Lee informed Professor

17   Schubert that your reaction was that

18   something could be worked out probably to

19   revive the '475 patent?

20                Do you remember that?

21         A.     I read that.

22         Q.     Okay.  So would it surprise you

23   if Dr. Schubert relied on your reaction in

24   deciding that -- for informing his own belief

Ashley J.  Stevens

1    whether the '475 patent could be revived?

2                    MR. PORTER:  Objection.

3         A.    I think he would have been

4    ill-advised to do that.  He should have taken

5    opinion from counsel.  We would have allowed

6    him to use Matt Connors.  It was always our

7    practice to allow faculty to continue to use

8    the law firm or the lawyer who had prosecuted

9    the case on behalf of the university.

10   BY MR. APGAR:

11        Q.    Okay.  But it was your reaction

12   at this time that the patent could be

13   probably revived, correct?

14                   MR. PORTER:  Objection.

15        A.    I think my testimony was there

16   was a potential pathway.

17   BY MR. APGAR:

18        Q.    And Sean Lee informed Professor

19   Schubert of that belief, correct?

20                   MR. PORTER:  Objection.

21        A.    Yeah.  I mean, he says

22   probably, which I think covers the

23   conditionality that I had just testified to.

24   It's perhaps a little stronger than I would

Ashley J.   Stevens

1    have done.  My characterization was a

2    potential pathway rather than a probable

3    pathway.

4    BY MR. APGAR:

5        Q.    Just give me one moment here.

6    Just give me one moment here to get this

7    document.

8            MR. APGAR:  Okay.  So the next

9        document, I just want to touch on

10       confidentiality issues.  The next

11       document is the transcript from

12       Professor Schubert's deposition.

13           Does anyone object to me

14       putting the full transcript in the

15       chat and directing Mr. Stevens only to

16       nonconfidential portions, or would you

17       prefer I could do a screen share so he

18       doesn't have access to the full

19       transcript, which I understand may

20       touch on confidentiality issues.

21           MR. PORTER:  Yeah, I don't want

22       it shared.

23           MR. APGAR:  Okay.

24           MR. PORTER:  Sorry, to clarify,

Ashley J.   Stevens

1                 FURTHER EXAMINATION

2    BY MR. APGAR:

3         Q.     Just to follow up briefly, when

4    you say that outside counsel would make the

5    decision whether a patent could be revived,

6    when you were at the OTD, did BU ever face a

7    decision of whether or not to revive an

8    expired patent other than the '475 patent?

9         A.     I believe I testified earlier

10   today that the '475 was the first and only

11   time that that has been done in my career.

12        Q.     So then when you testified that

13   outside counsel would make the decision

14   whether a delay in payment was unintentional,

15   you're referring to the '475 patent, correct?

16        A.     In any situation that came up,

17   they made that determination.

18        Q.     Did any other situations come

19   up?

20        A.     No.

21        Q.     And do you recall in this case

22   whether outside counsel made the decision

23   whether a delay in payment -- whether a delay

24   in paying the '475 patent's maintenance fees

Ashley J.  Stevens

1    was unintentional?

2         A.    As I testified multiple times,

3    those decisions were taken after I ceased to

4    have an operating role in OTD.

5         Q.    So to the best of your

6    recollection, outside counsel had not made

7    any such decision by the time you left the

8    OTD on February 22nd, 2010, is that correct?

9              MR. RADER:  Objection.

10              MR. PORTER:  Objection.

11        A.    May I answer?

12   BY MR. APGAR:

13        Q.    Yes, you can answer.

14              MR. RADER:  Yes.

15        A.    Okay.  That's my understanding.

16              MR. APGAR:  No further

17   questions from me.

18              Thank you very much,

19   Dr. Stevens.

20              THE WITNESS:  Mr. Porter?

21              MR. PORTER:  Nothing on my end.

22   Thank you.  Thank you, Dr. Stevens.

23              THE WITNESS:  Okay.

24              THE VIDEOGRAPHER:  The time is

Ashley J.  Stevens

1
2                ACKNOWLEDGMENT OF DEPONENT
3
4        I, _____, do
   Hereby certify that I have read the foregoing
5   pages, and that the same is a correct
   transcription of the answers given by me to
6   the questions therein propounded, except for
   the corrections or changes in form or
7   substance, if any, noted in the attached
   Errata Sheet.
8
9   _____
10  WITNESS NAME                    DATE
11
12
13
14
15
16
    Subscribed and sworn
17  To before me this
    _____ day of _____, 20_____.
18
    My commission expires: _____
19
20  _____
    Notary Public
21
22
23
24

Exhibit 7

Janine B. Anderson

1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF DELAWARE
2

                                    Civil Action No.
3                                   1:12-CV-00924-MN
4       ****************************************
        E. FRED SCHUBERT,
5
           Plaintiff and Counterclaim Defendant,
6
               v.
7
        LUMILEDS LLC,
8
           Defendant and Counterclaim Plaintiff,
9
               v.
10
        TRUSTEES OF BOSTON UNIVERSITY,
11
           Counterclaim Defendant.
12
        ****************************************
13
14              Remote via Zoom Videotaped
15      Deposition of JANINE B. ANDERSON, held at the
16      location of the deponent in Medford,
17      Massachusetts, commencing at 10:05 a.m., on
18      the 31st of July, 2020, before Maureen
19      O'Connor Pollard, Registered Diplomate
20      Reporter, Realtime Systems Administrator,
21      Certified Shorthand Reporter.
22                          – – –
                  GOLKOW LITIGATION SERVICES
23          877.370.3377 ph | 917.591.5672 fax
                     deps@golkow.com
24

Janine B. Anderson

```
 1   APPEARANCES:   ALL PARTIES APPEARED REMOTELY

 2

 3   FOR THE PLAINTIFF:

 4       JAMES MOORE BOLLINGER, ESQ.

 5       KATHERINE HARIHAR, ESQ.

 6         TROUTMAN PEPPER

 7         875 Third Avenue

 8         New York, New York 10022

 9         212-704-6113

10         james.bollinger@troutman.com

11         katherine.harihar@troutman.com

12

13

14   FOR THE TRUSTEES OF BOSTON UNIVERSITY and the

15   DEPONENT:

16       MICHAEL ALBERT, ESQ.

17         WOLF, GREENFIELD & SACKS, PC

18         600 Atlantic Avenue

19         Boston, Massachusetts 02210

20         617-646-8000

21         michael.albert@wolfgreenfield.com

22

23            -and-

24
```

Janine B. Anderson

```
 1    APPEARANCES (Continued):

 2

 3    FOR THE TRUSTEES OF BOSTON UNIVERSITY:

 4        SUSMITA A. GADRE, ESQ.

 5           WOLF, GREENFIELD & SACK, PC

 6           605 Third Avenue

 7           New York, New York 10158

 8           212-336-3850

 9           susmita.gadre@wolfgreenfield.com

10

11

12    FOR LUMILEDS LLC:

13        GREGORY J. APGAR, ESQ.

14           MAYER BROWN LLP

15           1221 Avenue of the Americas

16           New York, New York 10020-1001

17           212-506-2780

18           gapgar@mayerbrown.com

19

20              -and-

21

22

23

24
```

Janine B. Anderson

```
 1    APPEARANCES (Continued):

 2

 3       GRAHAM (GRAY) M. BUCCIGROSS, ESQ.

 4       CLIFF A. MAIER, ESQ.

 5         MAYER BROWN LLP

 6         Two Palo Alto Square, Suite 300

 7         3000 El Camino Real

 8         Palo Alto, California 94306-2112

 9         650-331-2067

10         gbuccigross@mayerbrown.com

11         cmaier@mayerbrown.com

12

13

14    Videographer:  Vince Rosica

15

16

17

18

19

20

21

22

23

24
```

Janine B. Anderson

```
 1                      INDEX

 2     EXAMINATION                        PAGE

 3     JANINE B. ANDERSON

 4     BY MR. BUCCIGROSS                      9

 5     BY MR. BOLLINGER                     306

 6

 7

 8            E X H I B I T S

 9     NO.        DESCRIPTION            PAGE

10     1      US Patent No. 6,294,475...........   79

11     2      Patent file, BU98-11, Bates
              BU000229 through 353..............  111

12

       3      Copy of disclosure file,

13            Crystallographic Wet Chemical
              Etching of GAN, BU98-11, Bates

14            BU000354 through 589.............  129

15     4      9/2/2009 e-mail, Bates
              EFS00006680......................  161

16

       5      E-mail with attachment, Bates

17            BU000268 through 273.............  173

18     6      Petition to Accept
              Unintentionally Delayed Payment

19            of Maintenance Fee in an Expired
              Patent, Bates BU000289 through

20            293.............................  180

21     7      FileMaker Pro screenshots, Bates
              BU001145 and 1146................  196

22

       8      Excel Spreadsheet, Bates BU1550...  206

23

       9      November 27, 2009 letter, Bates

24            BU000451.........................  221
```

Janine B. Anderson

1

10      E-mail chain, Bates BU001360
        through 1363...................... 225

11      E-mail chain, Bates EFS00027270... 238

12      Request for meeting, Bates
        BU001366.......................... 261

13      Subpoena to Testify at a
        Deposition in a Civil Action...... 264

14      Subpoena to Testify at a
        Deposition in a Civil Action
        with attachments.................. 266

15      Janine B. Anderson Curriculum
        Vitae, BU001357 and 1358.......... 284

16      Boston University's Profile of    294
        Janine Anderson...................

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Janine B. Anderson

1              P R O C E E D I N G S

2

3              THE VIDEOGRAPHER:  We are now

4       on the record.  My name is Vince

5       Rosica.  I'm a videographer for Golkow

6       Litigation Services.

7              Today's date is July 31st,

8       2020, and the time is 10:05 a.m.

9              This remote video deposition is

10      being held in the matter of Fred E.

11      Schubert versus Lumileds, LLC for the

12      United States District Court, District

13      of Delaware.

14              The deponent is Janine

15      Anderson.

16              All parties to this deposition

17      are appearing remotely and have agreed

18      to the witness being sworn in

19      remotely.

20              Due to the nature of remote

21      reporting, please pause briefly before

22      speaking to ensure all parties are

23      heard completely.

24              Will counsel please identify

Janine B. Anderson

1              themselves.

2                   MR. BUCCIGROSS:  Good morning.

3              This is Graham Buccigross from Mayer

4              Brown for Lumileds, LLC.  And with me

5              today also from Mayer Brown for

6              Lumileds are Greg Apgar and Cliff

7              Maier.

8                   MR. BOLLINGER:  Good morning.

9              This is James Bollinger.  I'm with the

10             law firm Troutman Pepper, and we

11             represent Professor Schubert.  With me

12             today is Katherine Harihar.

13                  MR. ALBERT:  Good morning.

14             This is Michael Albert of the law firm

15             of Wolf, Greenfield & Sacks in Boston.

16             We represent Boston University as well

17             as the witness, Janine Anderson.  And

18             with me is Susmita Gadre, also with

19             Wolf Greenfield.

20                  THE VIDEOGRAPHER:  The court

21             reporter is Maureen Pollard, and will

22             now swear the witness.

23

24                  ///

Janine B. Anderson

1          A.      I'm sorry, E did you say?

2          Q.      B, B as in boy, I.  Thank you.

3          A.      Oh, boy.  Yes.

4          Q.      So see the second row down

5     there it says "2nd Maint. Fee"?

6          A.      Yes.

7          Q.      And then if you look over to

8     the right a little at column B, as in boy, N

9     as in Nancy, do you see that says "Do not pay

10    per Sean Lee; Fred Schubert agreed"?

11         A.      Yes.

12         Q.      "USP 6,294,475"?

13         A.      Well, I have to -- oh, yeah, it

14    keeps going.

15                 Yes.

16         Q.      So that indicates that you put

17    in this comment, correct, ma'am?

18         A.      Yes.

19         Q.      Okay, ma'am.  And if you would

20    take a look at the row directly above that in

21    column B as in boy, I, do you see "Petition"?

22         A.      Yes.

23         Q.      Okay.  And then if you would

24    look over to the right to again column B as

Janine B. Anderson

1    in boy, N as in Nancy, do you see that it

2    says -- you may have to expand this.  Could

3    you read that to us, please?

4         A.    BN?

5         Q.    Yes, ma'am.  B as in boy, N as

6    in Nancy.

7         A.    "Petition to accept."  It goes

8    all the way across.

9         Q.    Yes, ma'am.  If you would read

10   that.

11        A.    "Petition to accept

12   unintentionally delayed payment of

13   maintenance fee filed 4/22/10."

14        Q.    And then?

15        A.    Oh, "Instructed Matt Connors on

16   4/22 to revive."

17        Q.    And there's one more word I

18   believe.

19        A.    Oh, "patent."

20        Q.    So just so we have a clear

21   record, let me read what I believe it says,

22   and you can confirm if you agree with me.  It

23   says "Petition to accept unintentionally

24   delayed payment of maintenance fee filed

Janine B. Anderson

1    4/22/10; Instructed Matt Connors on 4/22 to

2    revive patent."

3         A.    Correct.

4         Q.    Okay, ma'am.  So based on what

5    you've seen here and what you saw in

6    Exhibit 8, the screenshot, is it correct that

7    you would have entered those comments about

8    the petition?

9         A.    Correct.

10        Q.    Okay, ma'am.  So is it fair to

11   say you would have instructed Matt Connors on

12   April 22nd to file the petition to revive the

13   '475 patent?

14             MR. BOLLINGER:  I'm going to

15        object to the form.

16        A.    I don't remember it, but I

17   entered it in the database.

18   BY MR. BUCCIGROSS:

19        Q.    So based on your regular

20   practice at BU, do you have any reason to

21   doubt that you instructed Matt Connors on

22   April 22nd, 2010 to file the petition to

23   revive the '475 patent?

24             MR. BOLLINGER:  Same objection.

Janine B. Anderson

1        A.      I probably did.  I probably did

2    instruct him.

3    BY MR. BUCCIGROSS:

4        Q.      Do you have any reason to doubt

5    that you did, that you did that?

6        A.      No.

7        Q.      Okay.  So here's what I'd like

8    to understand, ma'am.

9                What was your basis for

10   instructing him to file a petition that

11   certified that there had been unintentional

12   delay in paying the maintenance fees?

13               MR. BOLLINGER:  Objection to

14        form.

15               MR. ALBERT:  Objection to form,

16        foundation.

17       A.      I don't remember.  I guess it

18   was because Fred wanted to license the

19   patent.

20   BY MR. BUCCIGROSS:

21       Q.      Okay.  So that-- so how is

22   that -- how does that lead to BU having

23   unintentionally delayed paying the

24   maintenance fees?

Janine B. Anderson

1    BY MR. BUCCIGROSS:

2         Q.     Have you ever seen Exhibit 12

3    before, Ms. Anderson?

4         A.     Yes, I've seen it.

5         Q.     Okay.  What is it, ma'am?

6         A.     It's a meeting -- it's a

7    request for a meeting.

8         Q.     Okay.  And when would that

9    meeting have been on?

10        A.     It says January 15th, 2010.

11        Q.     And does it say anything about

12   the subject of that meeting?

13        A.     "Meeting with Fred Schubert."

14        Q.     What's it say down below in the

15   main body of this calendar request?

16        A.     "To discuss the revival and

17   return of invention, currently abandoned at

18   the USPTO."

19        Q.     And this is a meeting request

20   from Sean Lee to Ashley Stevens, you, and

21   Dr. Schubert, correct?

22        A.     Yep.

23        Q.     So here's my question, ma'am.

24   Did you attend that meeting?

Janine B. Anderson

1          A.      I don't remember.

2          Q.      You don't remember anything

3    about it whatsoever?

4          A.      No, I do not remember that.

5          Q.      Would it be your understanding

6    that "invention" refers to the '475 patent?

7                  MR. ALBERT:   Objection.   Lack

8          of foundation.

9          A.      I don't know.

10   BY MR. BUCCIGROSS:

11         Q.      Can you think of any -- go

12   ahead.

13         A.      I don't know.

14         Q.      Can you think of anything else

15   it would have referred to?

16         A.      No.

17         Q.      Have you ever heard of the

18   Manual of Patent Examining Procedure,

19   Ms. Anderson?

20         A.      Yes.

21         Q.      What is it?

22         A.      What is it?

23         Q.      Yes, ma'am.

24         A.      I think it's all of the -- all

Janine B. Anderson

1   COMMONWEALTH OF MASSACHUSETTS )

2   SUFFOLK, SS.                    )

3           I, MAUREEN O'CONNOR POLLARD,

4   Registered Diplomate Reporter and Notary

5   Public in and for the Commonwealth of

6   Massachusetts, do certify that on the 31st

7   day of July, 2020, at 10:05 a.m., the person

8   above-named was duly remotely sworn to

9   testify to the truth of their knowledge, and

10  examined, and such examination reduced to

11  typewriting under my direction, and is a true

12  record of the testimony given by the witness.

13  I further certify that I am neither attorney,

14  related or employed by any of the parties to

15  this action, and that I am not a relative or

16  employee of any attorney employed by the

17  parties hereto, or financially interested in

18  the action.

19          In witness whereof, I have

20  hereunto set my hand this 11th day of August,

21  2020.

22  _____ *Maureen O Pollard*    _____

23  MAUREEN O'CONNOR POLLARD, NOTARY PUBLIC

24  CSR #149108

Exhibit 9

| From: | Lee, Sean |
| --- | --- |
| To: | "Dean Stocker" |
| Cc: | Jensen, Jonathan J |
| Subject: | RE: Crystallographic etching patent (BU95-69) |
| Date: | Monday, September 18, 2006 10:10:18 AM |

Hi Dean,

To be honest, I had to look it up myself in our database; it is still an active, unlicensed case, but there has been no activity, so thanks for bringing it to my attention! (Fred Schubert is no longer here at BU)

At some point we would like to contact you in process of looking to see if we can license it. In the meantime, if you have any information along those lines, it would be great if you could send it to me.

Thanks, and Best Regards,
Sean

Sean Lee, Ph.D
Licensing Associate
Office of Technology Development
Boston University
108 Bay State Road
Boston, MA 02215
Ph: 617-353-4567
Fax: 617-353-6141

**From:** Dean Stocker [mailto:dean_stocker@yahoo.com]
**Sent:** Sunday, September 17, 2006 1:30 AM
**To:** Lee, Sean
**Subject:** Crystallographic etching patent

Dear Mr. Lee,

I was doing a patent search last week and was surprised to find that I have a patent from my days at BU (Number 6,294,475, Crystallographic wet chemical etching of III-nitride material). I know that we filed an invention disclosure for it and were submitting an application, but I never heard that anything actually came of it. I am curious to know whether anyone has been interested in licensing it?

Thanks,

Dean Stocker

| | |
|---|---|
| **From:** | Lee, Sean |
| **To:** | Schubert, E. Fred |
| **Cc:** | Jensen, Jonathan J; Anderson, Janine B; Mulrean, Susan M |
| **Subject:** | RE: Etching patent |
| **Date:** | Thursday, April 22, 2010 9:12:00 PM |

Hi Fred,

Sorry I wasn't reachable yesterday and today, I'm out of the office until Monday.

As we have been shifting responsibilities and portfolios in the office, my esteemed and extremely able colleague Jon Jensen (copied here) is handling the return of the invention to you. Jon is briefed on status and next steps needed and will be getting in touch with you.

Best Regards,
Sean

Sean Lee, Ph.D
Director, Business Development
Boston University
Technology Development Office
Phone: 617-353-4567

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Wednesday, April 21, 2010 1:34 PM
**To:** Lee, Sean
**Subject:** Etching patent

Sean:

Greetings! I have tried to call you during the last couple of days for an update on the BU etching patent (Fred Schubert and Dean Stocker) but, unfortunately, was unable to reach you. As I indicated earlier, I am still very much interested in becoming the assignee of the patent and also would be prepared to take all steps necessary to make the transfer possible in a timely manner. I understand that you have sent a letter to Dean Stocker gaging his potential interest in the patent and I also understand that you planned to contact Federal Agencies. So would there be a good time that I could call you for an update?

Regards, Fred

| From: | Schubert, E. Fred |
|-------|-------------------|
| To: | Jensen, Jonathan J |
| Subject: | Re: Etching patent |
| Date: | Friday, April 23, 2010 7:00:43 PM |

Jon:

Greetings! I would like to introduce myself: I am Fred Schubert, formerly on the faculty of Boston University (from 1995 - 2002). As I understand, Sean has updated you on me having responded positively to a verbal offer from BU on the return of a patent to me. Since I have not done such a transaction in the past, I would be interested in talking with you about the next steps in the process. Either a telephone conversation or, if you prefer, a meeting at BU would be fine with me (I live in the Troy NY area and could drive to Boston). Could you please let me know what you think?

Best regards, Fred

On Thu, Apr 22, 2010 at 9:11 PM, Lee, Sean <seanlee@bu.edu> wrote:

Hi Fred,

Sorry I wasn't reachable yesterday and today, I'm out of the office until Monday.

As we have been shifting responsibilities and portfolios in the office, my esteemed and extremely able colleague Jon Jensen (copied here) is handling the return of the invention to you. Jon is briefed on status and next steps needed and will be getting in touch with you.

Best Regards,

Sean

Sean Lee, Ph.D

Director, Business Development

Boston University

Technology Development Office

Phone: 617-353-4567

BU001119

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Wednesday, April 21, 2010 1:34 PM
**To:** Lee, Sean
**Subject:** Etching patent

Sean:

Greetings! I have tried to call you during the last couple of days for an update on the BU etching patent (Fred Schubert and Dean Stocker) but, unfortunately, was unable to reach you. As I indicated earlier, I am still very much interested in becoming the assignee of the patent and also would be prepared to take all steps necessary to make the transfer possible in a timely manner. I understand that you have sent a letter to Dean Stocker gaging his potential interest in the patent and I also understand that you planned to contact Federal Agencies. So would there be a good time that I could call you for an update?

Regards, Fred

--
E. Fred Schubert, Rensselaer Polytechnic Institute
110 Eighth Street, Troy, New York 12180
Office: 518-276-8775  Email: EFSchubert@rpi.edu
Assistant: Gina Moore 518-276-8072  Email: gina@ecse.rpi.edu

BU001120

| **From:** | Jensen, Jonathan J |
|-----------|-------------------|
| **To:** | Schubert, E. Fred |
| **Cc:** | Anderson, Janine B; Lee, Sean |
| **Subject:** | RE: Etching patent |
| **Date:** | Wednesday, April 28, 2010 9:21:02 AM |

Hi Fred,

Thanks for the e-mail. I'm happy to talk anytime. I don't think a trip to Boston is necessary at this point as the attorneys are still working on this. Let's shoot for a call sometime next week to touch base. We should have another call after May 10th when Janine (our patent manager) is back in the office.

Next week I'm available:
Mon 5/3: before 1:30pm
Tues 5/4: before 12 noon
Wed 5/6: anytime
Thurs 5/7: after 10:30am
Fri 5/8: before 1:30pm

Let me know what works for you.

Best,
Jon

_____

Jonathan J. Jensen
Director, Business Development
Technology Development
Boston University
53 Bay State Road
Boston, MA 02215
Ph: 617-358-3795
Fax: 617-353-6141
www.linkedin.com/in/jonathanjensen
www.bu.edu/otd/transfer/license.html

This email message and any attachments are confidential and may be privileged. It is intended only for the individual(s) to whom it is addressed and may not be saved, copied, printed, disclosed or otherwise used by anyone else. If you are not the intended recipient, kindly notify the sender and delete this email and any attachments immediately.

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Friday, April 23, 2010 7:00 PM
**To:** Jensen, Jonathan J
**Subject:** Re: Etching patent

BU001121

Jon:

Greetings! I would like to introduce myself: I am Fred Schubert, formerly on the faculty of Boston University (from 1995 - 2002). As I understand, Sean has updated you on me having responded positively to a verbal offer from BU on the return of a patent to me. Since I have not done such a transaction in the past, I would be interested in talking with you about the next steps in the process. Either a telephone conversation or, if you prefer, a meeting at BU would be fine with me (I live in the Troy NY area and could drive to Boston). Could you please let me know what you think?

Best regards, Fred

On Thu, Apr 22, 2010 at 9:11 PM, Lee, Sean <seanlee@bu.edu> wrote:
Hi Fred,

Sorry I wasn't reachable yesterday and today, I'm out of the office until Monday.

As we have been shifting responsibilities and portfolios in the office, my esteemed and extremely able colleague Jon Jensen (copied here) is handling the return of the invention to you. Jon is briefed on status and next steps needed and will be getting in touch with you.

Best Regards,
Sean

Sean Lee, Ph.D
Director, Business Development
Boston University
Technology Development Office
Phone: 617-353-4567

---

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Wednesday, April 21, 2010 1:34 PM
**To:** Lee, Sean
**Subject:** Etching patent

Sean:

Greetings! I have tried to call you during the last couple of days for an update on the BU etching patent (Fred Schubert and Dean Stocker) but, unfortunately, was unable to reach you. As I indicated earlier, I am still very much interested in becoming the assignee of the patent and also would be prepared to take all steps necessary to make the transfer possible in a timely manner. I understand that you have sent a letter to Dean Stocker gaging his potential interest in the patent and I also understand that you planned to contact Federal Agencies. So would there be a good time that I could call you for an update?

Regards, Fred


--

E. Fred Schubert, Rensselaer Polytechnic Institute
110 Eighth Street, Troy, New York 12180
Office: 518-276-8775 Email: EFSchubert@rpi.edu
Assistant: Gina Moore 518-276-8072 Email: gina@ecse.rpi.edu

BU001123

| From: | Schubert, E. Fred |
| --- | --- |
| To: | Jensen, Jonathan J |
| Cc: | Anderson, Janine B; Lee, Sean |
| Subject: | Re: Etching patent |
| Date: | Wednesday, April 28, 2010 3:26:00 PM |

Thank you, Jon, I am glad that we finally connected. --- I also want to confirm our teleconference this coming Monday; I will call you at 10:00 AM at 617-358-3795.

Regards, Fred


On Wed, Apr 28, 2010 at 9:21 AM, Jensen, Jonathan J <jjensen@bu.edu> wrote:

Hi Fred,


Thanks for the e-mail. I'm happy to talk anytime. I don't think a trip to Boston is necessary at this point as the attorneys are still working on this. Let's shoot for a call sometime next week to touch base. We should have another call after May 10th when Janine (our patent manager) is back in the office.


Next week I'm available:

Mon 5/3: before 1:30pm

Tues 5/4: before 12 noon

Wed 5/6: anytime

Thurs 5/7: after 10:30am

Fri 5/8: before 1:30pm


Let me know what works for you.


Best,

Jon

_____

Jonathan J. Jensen

Director, Business Development

BU001124

Technology Development

Boston University

53 Bay State Road

Boston, MA 02215

Ph: 617-358-3795

Fax: 617-353-6141

www.linkedin.com/in/jonathanjensen

www.bu.edu/otd/transfer/license.html

This email message and any attachments are confidential and may be
privileged. It is intended only for the individual(s) to whom it is
addressed and may not be saved, copied, printed, disclosed or otherwise
used by anyone else. If you are not the intended recipient, kindly notify
the sender and delete this email and any attachments immediately.

---

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Friday, April 23, 2010 7:00 PM
**To:** Jensen, Jonathan J
**Subject:** Re: Etching patent

Jon:

Greetings! I would like to introduce myself: I am Fred Schubert, formerly on the
faculty of Boston University (from 1995 - 2002). As I understand, Sean has
updated you on me having responded positively to a verbal offer from BU on the
return of a patent to me. Since I have not done such a transaction in the past, I
would be interested in talking with you about the next steps in the process. Either
a telephone conversation or, if you prefer, a meeting at BU would be fine with me
(I live in the Troy NY area and could drive to Boston). Could you please let me
know what you think?

Best regards, Fred

On Thu, Apr 22, 2010 at 9:11 PM, Lee, Sean <seanlee@bu.edu> wrote:

BU001125

Hi Fred,

Sorry I wasn't reachable yesterday and today, I'm out of the office until Monday.

As we have been shifting responsibilities and portfolios in the office, my esteemed and extremely able colleague Jon Jensen (copied here) is handling the return of the invention to you. Jon is briefed on status and next steps needed and will be getting in touch with you.

Best Regards,

Sean

Sean Lee, Ph.D

Director, Business Development

Boston University

Technology Development Office

Phone: 617-353-4567

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Wednesday, April 21, 2010 1:34 PM
**To:** Lee, Sean
**Subject:** Etching patent

Sean:

Greetings! I have tried to call you during the last couple of days for an update on the BU etching patent (Fred Schubert and Dean Stocker) but, unfortunately, was unable to reach you. As I indicated earlier, I am still very much interested in becoming the assignee of the patent and also would be prepared to take all steps necessary to make the transfer possible in a timely manner. I understand that you have sent a letter to Dean Stocker gaging his potential interest in the patent and I also understand that you planned to contact Federal Agencies. So would there be a good time that I could call you for an update?

Regards, Fred


--
E. Fred Schubert, Rensselaer Polytechnic Institute
110 Eighth Street, Troy, New York 12180
Office: 518-276-8775 Email: EFSchubert@rpi.edu
Assistant: Gina Moore 518-276-8072 Email: gina@ecse.rpi.edu


--
E. Fred Schubert, Rensselaer Polytechnic Institute
110 Eighth Street, Troy, New York 12180
Office: 518-276-8775 Email: EFSchubert@rpi.edu
Assistant: Gina Moore 518-276-8072 Email: gina@ecse.rpi.edu

BU001127

| | |
|---|---|
| **From:** | Schubert, E. Fred |
| **To:** | Jensen, Jonathan J; Anderson, Janine B |
| **Subject:** | Thursday |
| **Date:** | Tuesday, June 01, 2010 11:21:13 AM |

Jon, Janine

I will be in Boston this week. Would it be possible to meet with you on Thursday morning? Please advise. Any time in the morning would be fine with me.

Regards, Fred

BU001128

| From: | Anderson, Janine B |
|---|---|
| To: | Jensen, Jonathan J; "efredschubert@gmail.com" |
| Subject: | RE: Thursday |
| Date: | Tuesday, June 01, 2010 11:34:32 AM |

Same for me.

Janine

**From:** Jensen, Jonathan J
**Sent:** Tuesday, June 01, 2010 11:23 AM
**To:** 'efredschubert@gmail.com'; Anderson, Janine B
**Subject:** Re: Thursday

Sure, anytime between 10am and 12 noon works for me.

----------------------------------------
Jon Jensen
Please excuse typos, sent from my Blackberry

**From:** Schubert, E. Fred
**To:** Jensen, Jonathan J; Anderson, Janine B
**Sent:** Tue Jun 01 11:19:22 2010
**Subject:** Thursday
Jon, Janine

I will be in Boston this week. Would it be possible to meet with you on Thursday morning?
Please advise. Any time in the morning would be fine with me.

Regards, Fred

BU001129

| From: | Schubert, E. Fred |
|---|---|
| To: | Anderson, Janine B; Jensen, Jonathan J |
| Subject: | Re: Thursday |
| Date: | Tuesday, June 01, 2010 11:51:41 AM |

Great, thanks to both of you, I will come to your office at BU on this Thursday 10:00 AM.

Regards, Fred

On Tue, Jun 1, 2010 at 11:34 AM, Anderson, Janine B <jandersn@bu.edu> wrote:

Same for me.

Janine

**From:** Jensen, Jonathan J
**Sent:** Tuesday, June 01, 2010 11:23 AM
**To:** 'efredschubert@gmail.com'; Anderson, Janine B
**Subject:** Re: Thursday

Sure, anytime between 10am and 12 noon works for me.

---------------------------------------
Jon Jensen
Please excuse typos, sent from my Blackberry

**From**: Schubert, E. Fred
**To:** Jensen, Jonathan J; Anderson, Janine B
**Sent:** Tue Jun 01 11:19:22 2010
**Subject**: Thursday

Jon, Janine

I will be in Boston this week. Would it be possible to meet with you on Thursday morning? Please advise. Any time in the morning would be fine with me.

Regards, Fred

BU001130

--
E. Fred Schubert, Rensselaer Polytechnic Institute
110 Eighth Street, Troy, New York 12180
Office: 518-276-8775  Email: EFSchubert@rpi.edu
Assistant: Gina Moore 518-276-8072  Email: gina@ecse.rpi.edu

BU001131

| | |
|---|---|
| **From:** | Schubert, E. Fred |
| **To:** | Jensen, Jonathan J; Anderson, Janine B |
| **Subject:** | IP / Patent |
| **Date:** | Tuesday, June 08, 2010 8:53:34 AM |

Jon, Janine

Just a short note of appreciation: Thank you very much for our productive meeting last Thursday. Please keep me posted on the patent / title transfer. If you need anything from my side, please let me know.

Regards, Fred

BU001132

| | |
|---|---|
| **From:** | Jensen, Jonathan J |
| **To:** | Schubert, E. Fred |
| **Cc:** | Anderson, Janine B |
| **Subject:** | RE: IP / Patent |
| **Date:** | Tuesday, June 08, 2010 9:55:15 AM |

Glad we could be of help Fred. It was a pleasure meeting you.

Congrats again on your son's wedding.

Best,
Jon

_____

Jonathan J. Jensen
Director, Business Development
Technology Development
Boston University
53 Bay State Road
Boston, MA 02215
Ph: 617-358-3795
Fax: 617-353-6141
www.linkedin.com/in/jonathanjensen
www.bu.edu/otd/transfer/license.html

This email message and any attachments are confidential and may be
privileged. It is intended only for the individual(s) to whom it is addressed
and may not be saved, copied, printed, disclosed or otherwise used by anyone
else. If you are not the intended recipient, kindly notify the sender and
delete this email and any attachments immediately.

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Tuesday, June 08, 2010 8:52 AM
**To:** Jensen, Jonathan J; Anderson, Janine B
**Subject:** IP / Patent

Jon, Janine

Just a short note of appreciation: Thank you very much for our productive meeting last
Thursday. Please keep me posted on the patent / title transfer. If you need anything from my
side, please let me know.

Regards, Fred

BU001133

| | |
|---|---|
| **From:** | Jensen, Jonathan J |
| **To:** | Anderson, Janine B |
| **Subject:** | letter to Fred Schubert |
| **Date:** | Wednesday, June 16, 2010 11:06:26 AM |

Hi Janine,

So Fred got to me ☺

He's planning to be in Washington next week and is considering visiting the agencies, but will not do so if he doesn't have the letter by then. I let him know we would scan the letter in and e-mail it to him as soon as it's signed. He's hoping to receive it by the end of the week. I told him we'd do the best we can but didn't make any promises.

Thanks,
Jon

**Jonathan J. Jensen**
*Director, Business Development*
master-logo **Boston University | Technology Development**
53 Bay State Road, Boston, MA 02215
Phone: (617) 358-3795 • Fax: (617) 353-6141
Web Site: http://www.bu.edu/otd/
LinkedIn: http://www.linkedin.com/in/jonathanjensen

This email message and any attachments are confidential and may be privileged. It is intended only for the individual(s) to whom it is addressed and may not be saved, copied, printed, disclosed or otherwise used by anyone else. If you are not the intended recipient, kindly notify the sender and delete this email and any attachments immediately.

| | |
|---|---|
| **From:** | Anderson, Janine B |
| **To:** | Schubert, E. Fred |
| **Cc:** | Ruckenstein, Andrei E; Talley, Crystal D; Jensen, Jonathan J; "Matthew E. Connors" |
| **Subject:** | BU98-11 invention return letter |
| **Date:** | Friday, June 18, 2010 2:12:29 PM |
| **Attachments:** | BU98-11 Schubert 1b ltr 6-16-10.pdf |

Dear Fred,

Scanned copy of our letter returning BU98-11 invention to you attached. Original going out today via FedEx.

Best,
Janine


Janine B. Anderson
Patent Manager, Technology Transfer
Boston University
Technology Development Office
53 Bay State Road
Boston, MA 02215
Tel: (617) 358-0238
Fax: (617) 353-6141
email: jandersn@bu.edu
Web: www.bu.edu/otd/

BU001135



**Boston University** Technology Development

53 Bay State Road
Boston, Massachusetts 02215
T 617-353-4550 F 617-353-6141

**Vinit Nijhawan**
**Managing Director, Technology Development Office**
**Lecturer School of Management & Director Enterprise Programs, ITEC**
**T 617-353-0606**
**vinit@bu.edu**

July 16, 2010

VIA EMAIL (efredschubert@gmail.com and FEDEX

Dr. E. Fred Schubert
17 Eaton Road
Troy, NY 12180

Dear Fred:

> Re:      BU98-11 Invention Disclosure
> "Crystallographic Wet Chemical Etching of III-Nitride Material"
> U.S. Application No. 09/338,709 filed June 23, 1999
> U.S. Patent No. 6,294,475 issued September 25, 2001
> Inventors: E. Fred Schubert and Dean A. Stocker

I am pleased to be able to inform you that the Charles River Campus Patent Committee approved your request that the above -referenced invention be returned to you under the Charles River Campus Patent Policy, subject to the stipulations set out below.

The invention will be returned solely to you. On April 5, 2010 we sent a Certified Mail, Return Receipt Requested letter to Dean Stocker notifying him that Boston University is no longer supporting the patent costs for this invention and asking if he was interested in having the invention returned to him. The letter was received and signed for by Dean on April 12, 2010. We indicated in our letter that if we received no response by April 16 we would treat the matter as closed regarding his potential interest in the invention. As of this date, we have not received a response from him. Nevertheless, Dean Stocker may continue to have rights in this invention under U.S. patent law.

Because the U.S. application was assigned to Trustees of Boston University, we will need to file an assignment of it to you. The law firm of Gauthier and Connors is preparing such an Assignment for execution by Martin J. Howard on behalf of the Trustees of Boston University.

Since you used federal funding in the course of research that led to the Patent Rights, the University must obtain the consent of the Office of Naval Research and the National Science Foundation to assign the Patent Rights to you. We are notifying the ONR and the NSF that we are relinquishing our rights to the invention and returning the invention to the ONR and the NSF. You now need to request title of this invention from the ONR and NSF and your request should be directed to John Karasek at the ONR and Robin Fritsch at the NSF (contact details below). They will then send you the appropriate paperwork for electing title to the invention.

E. Fred Schubert
Page 2
June 15, 2010

ONR Grant No. N00014-98-1-0194
John Karasek
Tel:    (703) 696-4007
Email:  john.karasek@navy.mil

NSF Grant No. ECS 9714047
Robin Fritsch
Tel:    (703) 292-8060
Email:  rfritsch@nsf.gov

The University's expenditures on the case to date total $27,272.32. This amount does not include the $3,771.00 for reviving the patent which we invoiced you for on June 14, 2010. In consideration for the assignment of the Patent Rights, you agree to pay the University 25% of any future income stream arising from the Patent Rights until these costs are reimbursed and 10% thereafter.

You also agree that, upon notification from the ONR and the NSF that they have granted your request for election of title to the invention, you will reimburse Trustees of Boston University $10,000.00 to cover previous prosecution costs.

You agree not to assert any patent that may be issued against Boston University, Boston Medical Center or any other educational or non-profit research institution that is conducting non-commercial research using the Patent Rights.

THE UNIVERSITY MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR WITH RESPECT TO (1) THE SCOPE OR VALIDITY OF ANY OF THE PATENT RIGHTS; (2) WHETHER THE PATENT RIGHTS MAY BE EXPLOITED BY YOU OR ANY SUBLICENSEE WITHOUT INFRINGING THE RIGHTS (INCLUDING PATENT RIGHTS) OF OTHERS; OR (3) THE RESULTS TO BE OBTAINED BY USE OF THE PATENT RIGHTS. THE PATENT RIGHTS ARE DELIVERED "AS IS" IN EVERY RESPECT.

You agree to defend, indemnify and hold the University and its affiliated hospital, Boston Medical Center Corporation, their trustees, officers, employees, agents and harmless from and against all claims, suits, demands, liability and expenses, including legal expenses and reasonable attorneys' fees, arising out of or relating to the Patent Rights and any product, service or process relating to or developed using the Patent Rights

You agree to provide us with a short annual report on your utilization of the technology by January 31 of each year commencing in 2011, until such time as you abandon the intellectual property. This report will be for our internal purposes only and will be considered a confidential document.

Boston University appreciates having had the opportunity to work with you on this case and wishes you success with it in the future.

E. Fred Schubert
Page 3
June 15, 2010

Please signify you agreement to these conditions by countersigning this letter below and returning one copy to me, retaining the other for your files.

Yours sincerely,

Vinit Nijhawan

cc      Andre Ruckenstein *(email only)*
        Christy Talley *(email only)*
        Janine Anderson
        Jon Jensen
        Matt Connors    Gauthier & Connors *(email and mail)*

Acknowledged and Agreed:

_____

E. Fred Schubert

BU001138

| From: | Schubert, E. Fred |
| --- | --- |
| To: | Anderson, Janine B |
| Cc: | Jensen, Jonathan J |
| Subject: | Re: BU98-11 invention return letter |
| Date: | Friday, June 18, 2010 3:07:40 PM |

Dear Janine

Thank you very much for the electronic advance copy of the letter. Once I receive the hard copy of the letter, I will sign it and send one signed copy back to you along with the first payment ($ 3771).

Best regards, Fred


On Fri, Jun 18, 2010 at 2:12 PM, Anderson, Janine B <jandersn@bu.edu> wrote:

Dear Fred,


Scanned copy of our letter returning BU98-11 invention to you attached. Original going out today via FedEx.


Best,

Janine



Janine B. Anderson

Patent Manager, Technology Transfer

Boston University

Technology Development Office

53 Bay State Road

Boston, MA 02215

Tel: (617) 358-0238

Fax: (617) 353-6141

email: jandersn@bu.edu

Web: www.bu.edu/otd/

BU001139

--
E. Fred Schubert, Rensselaer Polytechnic Institute
110 Eighth Street, Troy, New York 12180
Office: 518-276-8775  Email: EFSchubert@rpi.edu
Assistant: Gina Moore 518-276-8072  Email: gina@ecse.rpi.edu

BU001140

| | |
|---|---|
| **From:** | Anderson, Janine B |
| **To:** | "Schubert, E. Fred" |
| **Cc:** | Jensen, Jonathan J |
| **Subject:** | RE: BU98-11 invention return letter |
| **Date:** | Friday, June 18, 2010 3:09:18 PM |

Hi Fred,

You're entirely welcome. Good luck with the agencies!

Best,

Janine

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Friday, June 18, 2010 3:07 PM
**To:** Anderson, Janine B
**Cc:** Jensen, Jonathan J
**Subject:** Re: BU98-11 invention return letter

Dear Janine

Thank you very much for the electronic advance copy of the letter. Once I receive the hard copy of the letter, I will sign it and send one signed copy back to you along with the first payment ($ 3771).

Best regards, Fred

On Fri, Jun 18, 2010 at 2:12 PM, Anderson, Janine B <jandersn@bu.edu> wrote:
Dear Fred,

Scanned copy of our letter returning BU98-11 invention to you attached. Original going out today via FedEx.

Best,
Janine

Janine B. Anderson
Patent Manager, Technology Transfer
Boston University
Technology Development Office
53 Bay State Road
Boston, MA 02215
Tel: (617) 358-0238
Fax: (617) 353-6141
email: jandersn@bu.edu

BU001141

Web: www.bu.edu/otd/

--
E. Fred Schubert, Rensselaer Polytechnic Institute
110 Eighth Street, Troy, New York 12180
Office: 518-276-8775 Email: EFSchubert@rpi.edu
Assistant: Gina Moore 518-276-8072 Email: gina@ecse.rpi.edu

BU001142

Exhibit 12

1              UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF DELAWARE
2

                            Civil Action No.
3                           1:12-CV-00924-MN
4     ****************************************
      E. FRED SCHUBERT,
5
         Plaintiff and Counterclaim Defendant,
6
              v.
7

      LUMILEDS LLC,
8
         Defendant and Counterclaim Plaintiff,
9
              v.
10

      TRUSTEES OF BOSTON UNIVERSITY,
11
         Counterclaim Defendant.
12

      ****************************************
13

14              Remove via Zoom Videotaped
15    Deposition of VINIT NIJHAWAN, held at the
16    location of the deponent in Cambridge,
17    Massachusetts, commencing at 9:00 a.m., on
18    the 11th of August, 2020, before Maureen
19    O'Connor Pollard, Registered Diplomate
20    Reporter, Realtime Systems Administrator,
21    Certified Shorthand Reporter.
22                       – – –
                GOLKOW LITIGATION SERVICES
23       877.370.3377 ph | 917.591.5672 fax
                   deps@golkow.com
24

Vinit Nijhawan

```
1    APPEARANCES:   ALL PARTIES APPEARED REMOTELY

2

3    FOR THE PLAINTIFF and COUNTERCLAIM

4    DEFENDANT:

5        JAMES MOORE BOLLINGER, ESQ.

6        GERALD E. PORTER, ESQ.

7          TROUTMAN PEPPER, LLP

8          875 Third Avenue

9          New York, New York 10022

10         212-704-6113

11         james.bollinger@troutman.com

12         gerald.porter@troutman.com

13

14   FOR THE TRUSTEES OF BOSTON UNIVERSITY:

15       MICHAEL N. RADER, ESQ.

16       SUSMITA A. GADRE, ESQ.

17         WOLF, GREENFIELD & SACKS, PC

18         605 Third Avenue

19         New York, New York 10158

20         212-336-3850

21         michael.rader@wolfgreenfield.com

22         susmita.gadre@wolfgreenfield.com

23

24
```

Vinit Nijhawan

```
1    APPEARANCES (Continued):

2

3    FOR LUMILEDS, LLC:

4        GREGORY J. APGAR, ESQ.

5          MAYER BROWN, LLP

6          1221 Avenue of the Americas

7          New York, New York 10020-1001

8          212-506-2780

9          gapgar@mayerbrown.com

10              -and-

11      PRIYA A. DESAI, ESQ.

12          MAYER BROWN, LLP

13          71 South Wacker Drive

14          Chicago, Illinois 60606

15          312-701-7496

16          pdesai@mayerbrown.com

17

18

19    Videographer:  Ingrid Rodriguez

20

21

22

23

24
```

```
 1                    INDEX
 2    EXAMINATION                          PAGE
 3    VINIT NIJHAWAN
 4    BY MS. DESAI                           7
 5
 6
 7            E X H I B I T S
 8    NO.         DESCRIPTION            PAGE
 9    1     Vinit Nijhawan LinkedIn profile...   16
10    2     Copy of US Patent No. 6,294,475...   54
11    3     April 5, 2010 letter with
            attachment, Bates EFS00006449
12          through 6452.....................   55
13    4     July 16, 2010 letter with
            attachment, Bates BU000424
14          through 428......................   89
15    5     Decision Granting Petition with
            attachments, Bates EFS00000229
16          through 234......................   94
17    6     Charles River Campus Patent
            Committee Meeting Minutes,
18          February 22, 2010, Bates
            BU0001143 and 1144...............  135
19
      7     E-mail chain, Bates EFS00027270...  146
20
      8     November 4, 2010 e-mail with
21          attached Assignment, Bates
            BU000398 through 413.............  158
22
      9     E-mail chain, Bates BU001367
23          through 1369.....................  160
24    10    Supplemental Assignment, Bates
```

1

    11    Subpoena to Boston University in
2          Schubert v Osram, et al, with
          attachments, Bates BU001231
3          through 1262...................... 181

4   12    E-mail chain, Bates BU001391 and
          1392.............................. 186

5

    13    E-mail chain, Bates BU001389 and
6         1390.............................. 190

7   14    E-mail chain, Bates BU001397 and
          1398.............................. 192

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Vinit Nijhawan

1          "Petition is granted."

2     BY MS. DESAI:

3          Q.    And earlier you told me BU

4     decided not to pay the maintenance fee on the

5     patent, correct?

6          A.    I told you that I wasn't the

7     managing director of OTD at that time.

8          Q.    Okay.  But is it your

9     understanding that BU decided not to pay the

10    maintenance fee on the '475 patent?

11         A.    I have the documents that I

12    read in preparation for the deposition.

13         Q.    Okay.  And this petition was

14    submitted when you were managing director of

15    OTD?

16         A.    Yes.

17         Q.    Were you involved with the

18    decision to file this petition?

19         A.    The patent committee approved

20    the process of reviving the patent and

21    returning it to Schubert.

22         Q.    Was there ever discussion of

23    returning the patent to Dr. Schubert without

24    reviving it first?

Vinit Nijhawan

```
 1          Q.     I'm asking you for your
 2     independent knowledge.
 3          A.     I don't -- I don't remember
 4     Dr. Stevens telling me that the patent could
 5     be revived.
 6          Q.     So let me ask this question
 7     again because I think we have conflicting
 8     answers now.
 9               Earlier you told me that BU
10     must have had some basis for seeking revival
11     of the patent, correct?
12          A.     I don't remember saying that.
13          Q.     Okay.  How could BU file a
14     petition seeking revival of a patent if it
15     had no basis for seeking that revival?
16               MR. RADER:  Objection.  Assumes
17          facts not in evidence.
18               You can answer.
19               MR. PORTER:  Objection.
20          A.     I mean, I think the timeline is
21     pretty clear that Dr. Stevens had a
22     conversation with outside counsel, I learned
23     of that in preparing for this deposition, and
24     then made a recommendation to the patent
```

Vinit Nijhawan

1    committee.

2    BY MS. DESAI:

3         Q.     Dr. Stevens made a

4    recommendation to the patent committee?

5         A.     Dr. Stevens in his prior role

6    as head of OTD, yes.

7         Q.     Okay.  How did you learn that

8    Dr. Stevens had a conversation with outside

9    counsel prior to making a recommendation to

10   the patent committee?

11        A.     I learned about it in preparing

12   for this deposition.

13        Q.     Okay.  And at the patent

14   committee, we looked at those minutes, did

15   the topic of revival come up?

16        A.     I can only read the minutes,

17   and that's all I know about the patent

18   committee meeting.

19        Q.     Okay.  So what is your

20   understanding that revival was discussed at

21   the patent committee?

22             MR. RADER:  Objection to form.

23        Incomplete question.

24             But if you understand it, you

Vinit Nijhawan

1  COMMONWEALTH OF MASSACHUSETTS )

2  SUFFOLK, SS.                  )

3          I, MAUREEN O'CONNOR POLLARD,

4  Registered Diplomate Reporter and Notary

5  Public in and for the Commonwealth of

6  Massachusetts, do certify that on the 11th

7  day of August, 2020, at 9:00 a.m., the person

8  above-named was duly remotely sworn to

9  testify to the truth of their knowledge, and

10 examined, and such examination reduced to

11 typewriting under my direction, and is a true

12 record of the testimony given by the witness.

13 I further certify that I am neither attorney,

14 related or employed by any of the parties to

15 this action, and that I am not a relative or

16 employee of any attorney employed by the

17 parties hereto, or financially interested in

18 the action.

19          In witness whereof, I have

20 hereunto set my hand this 23rd day of August,

21 2020.

22 _____

23 MAUREEN O'CONNOR POLLARD, NOTARY PUBLIC

24 CSR #149108

Exhibit 13

Matthew E. Connors

1           UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF DELAWARE

3                           Civil Action No.
                            1:12-CV-00924-MN

4    ********************************

5    E. FRED SCHUBERT,

6               Plaintiff,

7          v.

8    LUMILEDS LLC,

9               Defendant.

10   ********************************

11

12           Remote via Zoom Videotaped

13   Deposition of MATTHEW E. CONNORS and GESMER

14   UPDEGROVE LLP, held at the location of the

15   deponent in Hingham, Massachusetts,

16   commencing at 10:03 a.m., on the 21st of

17   July, 2020, before Maureen O'Connor Pollard,

18   Registered Diplomate Reporter, Realtime

19   Systems Administrator, Certified Shorthand

20   Reporter.

21                     – – –

22

              GOLKOW LITIGATION SERVICES
23        877.370.3377 ph | 917.591.5672 fax
                   deps@golkow.com

24

Matthew E. Connors

```
 1    APPEARANCES:

 2

 3    FOR THE PLAINTIFF:

 4        JAMES MOORE BOLLINGER, ESQ.

 5        GERALD E. PORTER, ESQ.

 6        KATHERINE HARIHAR, ESQ.

 7          TROUTMAN PEPPER

 8          875 Third Avenue

 9          New York, New York 10022

10          212-704-6113

11          james.bollinger@troutman.com

12          gerald.porter@troutman.com

13          katherine.harihar@troutman.com

14

15    FOR THE TRUSTEES OF BOSTON UNIVERSITY:

16        MICHAEL N. RADER, ESQ.

17        SUSMITA A. GADRE, ESQ.

18          WOLF, GREENFIELD & SACKS, PC

19          605 Third Avenue

20          New York, New York 10158

21          212-336-3850

22          michael.rader@wolfgreenfield.com

23          susmita.gadre@wolfgreenfield.com

24
```

1   FOR THE DEFENDANT:

2      GREGORY J. APGAR, ESQ.

3         MAYER BROWN LLP

4         1221 Avenue of the Americas

5         New York, New York 10020-1001

6         212-506-2780

7         gapgar@mayerbrown.com

8             -and-

9      GRAHAM (GRAY) M. BUCCIGROSS, ESQ.

10     CLIFF A. MAIER, ESQ.

11        MAYER BROWN LLP

12        Two Palo Alto Square, Suite 300

13        3000 El Camino Real

14        Palo Alto, California 94306-2112

15        650-331-2067

16        gbuccigross@mayerbrown.com

17        cmaier@mayerbrown.com

18            -and-

19     PRIYA A. DESAI, ESQ.

20        MAYER BROWN LLP

21        71 South Wacker Drive

22        Chicago, Illinois 60606

23        312-701-7496

24        pdesai@mayerbrown.com

Matthew E. Connors

```
 1   APPEARANCES (Continued):

 2

 3   FOR THE DEPONENT:

 4       KERRY L. TIMBERS, ESQ.

 5         SUNSTEIN LAW

 6         100 High Street

 7         Boston, Massachusetts 02110

 8         617-443-9292

 9         ktimbers@sunsteinlaw.com

10

11

12   Videographer:  Vince Rosica

13

14

15

16

17

18

19

20

21

22

23

24
```

Matthew E. Connors

```
 1                      INDEX

 2   EXAMINATION                        PAGE

 3   MATTHEW E. CONNORS

 4   BY MR. APGAR                          9

 5

 6        GESMER UPDEGROVE DEPOSITION

 7   BY MR. APGAR                        215

 8   BY MR. RADER                        246

 9   BY MR. APGAR                        261

10

11

12            E X H I B I T S

13   NO.         DESCRIPTION              PAGE

14   1      Subpoena to Testify at a
            Deposition in a Civil Action to

15          Matthew Connors.................   16

16   2      Subpoena to Testify at a
            Deposition in a Civil Action to

17          Gesmer Updegrove LLP.............  16

18   3      Document titled "Petition to
            Accept Unintentionally Delayed

19          Payment of Maintenance Fee in an
            Expired Patent (37 CFR

20          1.378(c))." ....................   43

21   4      United States Patent 6,294,475....  67

22   5      Privilege Log....................   74

23   6      E-mail chain with attachments,
            Bates BU000268 through 273........  89

24
```

Matthew E. Connors

1

    7       Petition to Accept
2           Unintentionally Delayed Payment
            of Maintenance Fee in an Expired
3           Patent (37 CFR 1.378(c)), Bates
            EFS00000232 through 234........... 93
4

    8       Electronic Acknowledgement
5           Receipt with attachments, Bates
            GES000004 through 6.............. 95
6

    9       Entry from Boston University's
7           patent database, Bates BU001145... 119

8   10      November 27, 2009 letter, Bates
            BU000451......................... 122
9

    11      E-mail chain, Bates BU000445 and
10          446.............................. 129

11  12      February 2, 2010 Memorandum,
            Bates BU000450................... 133
12

    13      February 22, 2010 Memo, bates
13          BU000447 and 448................. 137

14  14      6/18/20 e-mail, Bates
            EFS00006582...................... 151
15

    15      July 16, 2010 letter, Bates
16          EFS00006583 through 6585......... 151

17  16      [Proposed] Amended Answer,
            Defenses and Counterclaim of the
18          Osram Defendants to Plaintiff's
            Complaint........................ 170
19

    17      Osram's Motion for Leave to File
20          an Amended Answer and
            Counterclaim and to Join the
21          Trustees of Boston University as
            a Counterclaim Defendant......... 171
22

    18      Subpoena to Produce Documents,
23          Information, or Objects or to
            Permit Inspection of Premises in
24          a Civil Action to Matthew

Matthew E. Connors

1

    19      Subpoena to Produce Documents,

2           Information, or Objects or to

            Permit Inspection of Premises in

3           a Civil Action to Gesmer

            Updegrove....................... 229

4

    20      Network Signatures, Inc. V. Stat

5           Farm Mut. Auto, Cite as 731

            F.3rd 1239 (Fed. Cir. 2013)....... 249

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Matthew E. Connors

1    BY MR. APGAR:

2         Q.      And that applies for the entire

3    delay period, correct?

4         A.      Correct.

5         Q.      So is it your testimony that

6    you did have a reasonable basis for believing

7    that the entire delay period from

8    September 25th, 2009 through April 22nd, 2010

9    was unintentional at the time you submitted

10   this petition?

11        A.      That is my general practice.

12        Q.      Do you recall whether or not

13   it's true with respect to the petition for

14   the '475 patent specifically?

15        A.      Specifically, no.

16        Q.      So as you sit here today, you

17   can't recall whether or not you had a

18   reasonable basis for certifying to the patent

19   office that the entire delay period of

20   September 25th, 2009 through April 22nd, 2010

21   was unintentional, is that correct?

22        A.      I would not have filed that

23   petition for this or any other matter if I

24   did not have a reasonable belief that it was

Matthew E. Connors

1    unintentionally abandoned for the entire

2    period of time.

3         Q.     Do you recall what facts

4    informed your reasonable belief that the

5    entire delay period was unintentional?

6         A.     I do not specifically recall.

7         Q.     Do you recall whether or not

8    you took any steps before filing the revival

9    petition to verify that BU's entire delay in

10   paying the maintenance fee was unintentional?

11        A.     I do not recall specifically.

12        Q.     So what generally do you recall

13   about what you did to obtain a reasonable

14   belief that the delay was unintentional?

15              MR. TIMBERS:  I would instruct

16         the witness not to disclose the

17         content of any of communications with

18         BU.

19              Otherwise, you can answer.

20        A.     Generally my practice is to

21   have an understanding that I have a

22   reasonable belief that the case went

23   abandoned unintentionally.

24              ///

Matthew E. Connors

1              THE VIDEOGRAPHER:  I apologize.

2       I just lost the witness on my feed.

3       Do we mind going off the record?

4              MR. APGAR:  Yes.  Sure.

5              THE VIDEOGRAPHER:  Sorry.  I

6       apologize.

7              The time is 12:15 p.m.  We are

8       off the record.

9              (Whereupon, a recess was

10      taken.)

11             THE VIDEOGRAPHER:  The time is

12      12:26 p.m.  We are back on the record.

13 BY MR. APGAR:

14      Q.    So, Mr. Connors, you said a few

15 times that you don't specifically recall what

16 steps you took to verify that the delay in

17 the maintenance fee payment was

18 unintentionally.

19             Even if you can't recite the

20 specific steps that you took, can you

21 generally recall the investigation that you

22 performed to verify your certification to the

23 patent office?

24      A.    I don't recall.

Matthew E. Connors

1          Q.      You can't recall a single thing

2     you did to verify that the entire seven-month

3     delay in paying the maintenance fee was

4     unintentional?

5          A.      I don't recall.

6          Q.      When did you first learn

7     that -- when did you first learn of the

8     allegation that the filing of the revival

9     petition constituted inequitable conduct?

10         A.      I don't believe I ever did

11    learn that it constituted inequitable

12    conduct.

13         Q.      Of the allegation.

14                 When did you first learn of the

15    allegation -- when did you first learn that

16    you were being accused of inequitable conduct

17    with respect to the '475 patent?

18         A.      I think I answered that I'm not

19    sure earlier in this deposition.

20         Q.      2013?

21         A.      Yes.

22         Q.      That's three years after you

23    filed the revival petition, correct?

24         A.      I believe, yes, that's correct.

Matthew E. Connors

1    don't believe I recall having any knowledge

2    of BU's reduction of costs on patents.

3    BY MR. APGAR:

4         Q.    At the time you filed the

5    revival petition, do you recall a single fact

6    about your understanding of BU's reasoning

7    for not timely paying the maintenance fee?

8              MR. RADER:  Objection.  Asked

9         and answered.

10             If you can answer without

11        revealing communications with the

12        client, proceed.

13        A.    I'd have to hear the question

14   again.

15   BY MR. APGAR:

16        Q.    Sure.

17             So at the time you filed the

18   revival petition, do you recall a single fact

19   about your understanding of BU's reasoning

20   for not timely paying the maintenance fee?

21        A.    I do not recall.

22        Q.    Do you agree that under the

23   duty of candor you had an obligation to try

24   to find those facts out?

Matthew E. Connors

1    a few minutes ago?

2         A.    Yes.

3         Q.    And then the revival petition

4    was not filed with the PTO for over two and a

5    half months later on April 22nd, 2010,

6    correct?

7         A.    Correct.

8         Q.    So putting the Network

9    Signatures case aside, based on everything

10   you've seen today, as you sit here today

11   would you have proceeded in the exact same

12   fashion as you did on April 22nd, 2010 in

13   your filing of the revival petition for the

14   '475 patent?

15             MR. BOLLINGER:  Objection to

16        form.

17        A.    I'm not sure what I would have

18   done.  I'd have to review everything,

19   including -- how can I put aside the

20   Signature case?

21   BY MR. APGAR:

22        Q.    So based on everything you've

23   seen today --

24        A.    Yes.

Matthew E. Connors

1      Q.      -- as you sit here today, based

2   on the facts as you understand them, would

3   you have proceeded in the same fashion as you

4   did when you filed the revival petition on

5   April 22nd, 2010?

6      A.      I might have done it a little

7   different.

8      Q.      What would you have done

9   differently?

10      A.      If I had an understanding that

11   there wasn't intentional abandonment, I would

12   have discussed that, found out more facts as

13   to whether it was intentionally abandoned.

14      Q.      And the documents you've seen

15   today indicate to you that there was an

16   intentional decision to abandon the patent on

17   September 25th, 2009?

18      A.      I don't know that they

19   specifically do that.  I see a lot of

20   comments from people.  I don't know what

21   their intentions are.  You'd have to ask

22   them.

23      Q.      Okay.  But you would agree that

24   you would need to do -- you would need to do

Matthew E. Connors

1   some additional factual investigation based

2   on materials you saw today to determine

3   whether delay truly was unintentional, is

4   that correct?

5          A.     Correct.

6                 MR. RADER:  Objection.  Form.

7          Assumes facts not in evidence

8          regarding what was or wasn't done.

9                 But you can answer if you're

10         able.

11         A.     I think that's correct.

12                MR. APGAR:  No further

13         questions for me.

14                MR. RADER:  Thank you.

15                THE VIDEOGRAPHER:  The time is

16         4:37 p.m.  We are off the record.

17                (Whereupon, the deposition was

18         concluded.)

19

20

21

22

23

24

Matthew E. Connors

1    COMMONWEALTH OF MASSACHUSETTS.)

2    SUFFOLK, SS.                    )

3              I, MAUREEN O'CONNOR POLLARD,

4    Registered Diplomate Reporter and Notary

5    Public in and for the Commonwealth of

6    Massachusetts, do certify that on the 21st

7    day of July, 2020, at 10:03 a.m., the person

8    above-named was duly sworn to testify to the

9    truth of their knowledge, and examined, and

10   such examination reduced to typewriting under

11   my direction, and is a true record of the

12   testimony given by the witness.  I further

13   certify that I am neither attorney, related

14   or employed by any of the parties to this

15   action, and that I am not a relative or

16   employee of any attorney employed by the

17   parties hereto, or financially interested in

18   the action.

19              In witness whereof, I have

20   hereunto set my hand this 23rd day of July,

21   2020.

22   _____

23   MAUREEN O'CONNOR POLLARD, NOTARY PUBLIC

24   CSR #149108

# Exhibit 14

## Anderson, Janine B

| From: | Gildea, Brian D |
|---|---|
| Sent: | Thursday, December 01, 2011 3:14 PM |
| To: | Pratt, Michael J |
| Cc: | Anderson, Janine B |
| Subject: | RE: FW: U.S. Patent No. 6,294,475 |

Janine,

Let's look this up as this should have been returned to both inventors so that we have no reporting requirements. He also won't be able to litigate alone if it's owned by both inventors.

Brian

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Thursday, December 01, 2011 1:37 PM
**To:** Pratt, Michael J
**Cc:** Gildea, Brian D; Anderson, Janine B
**Subject:** Re: FW: U.S. Patent No. 6,294,475 — $BU 98-11$  $SCHUBERT) STOCKER$

Dear Michael

It was good talking with you earlier this week, after not having talked with you for an extended period of time, I think we may not have had a conversation since I left Boston University in 2002. Also, congratulations on the promotion to Director (my wishes may come late, but it is only now that I learn that you have been promoted to Director).  *BU 98-24*
*SCHUBERT*

I would like to confirm that, based on the contract that governs the return of the '475 and '899 patents to me, you and I have the joint understanding that BU will receive 10% of the net revenue that I personally receive by licensing / selling these patents. BU would not receive a share from revenue that may be received by any third parties, e.g., an LED company, a troll company, or a law firm.

The second inventor on the '475 patent, Dr. Dean Stocker, would be compensated by BU based on the applicable BU policies that govern the compensation of BU inventors. I would not be compensated by BU. I would not be obligated to compensate Dr. Stocker.

Also, as I indicated during my call, I plan to submit to you / BU my annual report on the '475 / '899 licensing effort by the end of the year, i.e. at the end of this month.

Best regards, Fred

On Wed, Nov 23, 2011 at 1:03 PM, Schubert, E. Fred <efredschubert@gmail.com> wrote:
Dear Michael

1

BU000393

A few weeks ago, I sent a query to BU that is shown in the email from me to Janine below. Janine forwarded my email to you. Could you please let me know your view on my query? Thank you in advance.

Happy Thanksgiving! --- Fred

On Wed, Oct 12, 2011 at 6:24 PM, Anderson, Janine B <jandersn@bu.edu> wrote:

Dear Fred,

By copy of this email, I am asking Michael Pratt , Executive Director of Business Development, to respond to your email.

Best,

Janine

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Wednesday, October 12, 2011 5:09 PM
**To:** Anderson, Janine B
**Subject:** U.S. Patent No. 6,294,475

Dear Janine,

This communication concerns my licensing efforts with respect to the U.S. Patent No. 6,294,475. The licensing effort is proceeding as planned and I will update you later this year through the annual report. One question came up: From our agreement, dated July 16, 2010, it is my understanding that payments from me to Boston University will come from income arising from licensing.

I would like to consider the following scenarios:

(A) I may license the patent to a company. My income from licensing the patent would be a one-time payment of $ 500,000. However, the company may derive an income of $ 5,000,000 from the patent. It is my understanding that payments from me to BU would be based on my income, i.e. $ 500,000.

(B) I may sell my Patent Rights to an Intellectual Property (IP) Firm (Troll company). I would receive a one-time payment of $ 500,000 from the IP Firm for the Patent Rights. The IP Firm may enforce the Patent Rights via a lawsuit and may receive $ 5,000,000 from which I would receive nothing. It is my understanding that payments to BU would be based on my income, i.e. $ 500,000.

2

BU000394

(C) I may litigate against one or multiple companies for infringement on the patent with the assistance of a law firm. As a result, a settlement or verdict would be reached. I would receive $ 500,000. An additional $ 500,000 would be paid by the companies to the law firm assisting me. It is my understanding that payments to BU would be based on my income, i.e. $ 500,000.

I would very much appreciate if you could please let me know that my understanding is congruent with the understanding of the BU Technology Transfer Office. For your convenience, I have attached BU's Letter / Agreement concerning this Patent. Thank you very much in advance.

Best regards, Fred

3

BU000395

Exhibit 15

### SUPPLEMENTAL ASSIGNMENT

WHEREAS, the, Trustees of Boston University, a Massachusetts corporation, with its principal place of business at One Silber Way, Boston, MA 02215, transferred its entire right, title and interest in and to U.S. Patent No. 6,294,475 (the "Patent") to E. Fred Schubert (Professor. Schubert), a United States citizen, residing at 17 Eaton Road, Troy, NY 12180, through an Assignment executed October 20, 2010, which is recorded with the United States Patent and Trademark Office at Reel 025178, Frame 0715 (the "Assignment"); and

WHEREAS, the Trustees of Boston University and Professor Schubert intended said transfer to include all rights to recoveries based on any claim for damages by reason of past infringements of the Patent, i.e., for any infringement which occurred prior to the date of the Assignment (October 20, 2010), in addition to any damages based on any act of infringement occurring subsequent to the date of the Assignment; and

WHEREAS, the Trustees of Boston University and Professor Schubert recognize that, to pass the right to sue and recover for past infringements, it may be necessary to expressly so state in the assignment, and desire that this Supplemental Assignment perform that function:

NOW, THEREFORE, this Supplemental Assignment: a) confirms that the Assignment was intended to and did sell, assign, and transfer to Professor Schubert, his successors, legal representatives, and assigns, all rights to sue for, obtain, and collect any recoveries based on any claim for damages by reason of any past infringement of the Patent; and b) to the extent that the original Assignment did not assign such rights, the Trustees of Boston University hereby assign, transfer and sell (for good and valuable consideration) to Professor Schubert, his successors, legal representatives, and assigns, all rights of the Trustees of Boston University to sue for, obtain and collect any recoveries based on any claim for damages by reason of any past infringements of the Patent, i.e., for damages based on any act of infringement that occurred prior to the date of the Assignment (October 20, 2010).

The undersigned hereby grant(s) Professor Schubert's patent counsel, Troutman Sanders LLP,. the power to insert on this Supplemental Assignment any further identification which may be necessary or desirable in order to comply with the rules of the U.S. Patent and Trademark Office.

BU000391

IN TESTIMONY WHEREOF, WE, Trustees of Boston University, hereunto set our signature this 2nd day of July , 2012.



Signature of Trustees of Boston University Representative

Martin J. Howard
Printed Name of Representative Treasurer

Title of Representative

STATE OF __Massachusetts__
COUNTY OF __Suffolk__ SS:

This 2nd day of __July__ , 2012, before me personally came the above-named __Martin J. Howard__, to me personally known as the individual who executed the same of his/her own free will for the purposes therein set forth.

Linda M. Durns
Notary Public



1487180v1

Exhibit 22





Exhibit 24



Karen E. Keller
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0702 - Direct
kkeller@shawkeller.com

July 6, 2020

**BY E-MAIL (bbennett@coochtaylor.com)**
Blake A. Bennett
COOCH AND TAYLOR P.A.
The Brandywine Building
1000 N. West Street, 10th Floor
Wilmington, DE 19801

  Re:  *E. Fred Schubert v. Lumileds LLC,* C.A. No. 12-924-MN (D. Del.)


Dear Blake:

  I write on behalf of Counterclaim Defendant Trustees of Boston University ("BU") regarding Lumileds LLC's First Set of Requests for Production to Trustees of Boston University and the First Set of Interrogatories to Trustees of Boston University (collectively, the "Requests"). BU objects to these Requests in their entirety given the motion to dismiss filed by BU for lack of jurisdiction and therefore, BU will not be providing responses at this time. Should the court deny BU's motion, it will respond promptly thereafter.

       Respectfully,

       */s/ Karen E. Keller*

       Karen E. Keller


cc:  All Counsel of Record (Via Email)

Exhibit 25

1

13:12:40

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
E. FRED SCHUBERT, et al.,    )
                             )
            Plaintiffs,      )
                             ) C.A. No. 12-924(MN)
       v.                    )
                             )
KONINKLIJKE PHILIPS          )
ELECTRONICS N.V., et al.,    )
                             )
            Defendants.      )
```

Friday, August 7, 2020
11:00 a.m.
Discovery Dispute Teleconference

844 King Street
Wilmington, Delaware

BEFORE:  THE HONORABLE MARYELLEN NOREIKA
         United States District Court Judge

APPEARANCES:

         FARNAN LLP
         BY:  MICHAEL FARNAN, ESQ.

         -and-

         TROUTMAN PEPPER
         BY:  JAMES MOORE BOLLINGER, ESQ.
         BY:  MAGNUS ESSUNGER, ESQ.

                    Counsel for the Plaintiffs

---

2

1    APPEARANCES CONTINUED:

2

3

4        COOCH & TAYLOR, P.A.
         BY:  BLAKE A. BENNETT, ESQ.
5        BY:  DEAN R. ROLAND, ESQ.

6        -and-

7        MAYER BROWN, LLP
         BY:  GRAHAM M. BUCCIGROSS, ESQ.
8        BY:  EDWARD D. JOHNSON, ESQ.
         BY:  MICHAEL A. MOLANO, ESQ.
9        BY:  CLIFF A. MAIER, ESQ.

10           Counsel for the Defendant
             Lumileds, LLC
11

12

13       SHAW KELLER, LLP
         BY:  KAREN KELLER, ESQ.
14       BY:  NATHAN HOESCHEN, ESQ.

15       -and-

16       WOLF GREENFIELD & SACKS, P.C.
         BY:  MICHAEL N. RADER, ESQ.
17       BY:  SUSMITA A. GADRE, ESQ.

18           Counsel for the Defendant
             Boston University
19

20           _ _ _ _ _ _ _ _ _ _ _ _
21

10:59:12  22       THE COURT:  Good morning, counsel.  Who is
10:59:15  23  there, please?
11:01:02  24       MR. FARNAN:  Good morning, Your Honor.  This is
11:01:04  25  Michael Farnan on behalf of the Plaintiff.  With me on the
```

---

3

```
11:01:07   1  line is James Bollinger and Magnus Essunger from Troutman
11:01:12   2  Pepper.
11:01:12   3       MR. ESSUNGER:  Good morning, Your Honor.
11:01:13   4       THE COURT:  Good morning.
11:01:14   5       MR. BENNETT:  Good morning, Your Honor.  This is
11:01:16   6  Blake Bennett from Cooch and Taylor on behalf of Defendant,
11:01:20   7  Lumileds, LLC.  With me on the line are my associate, Dean
11:01:25   8  Roland from my office, as well as our co-counsel from the
11:01:29   9  Mayer Brown firm, Edward Johnson, Michael Molano, Dr. Cliff
11:01:37  10  Maier, and Gray Buccigross, as well as Gina Flynn who is
11:01:42  11  in-house counsel for Lumileds, LLC.  Jim Molano will present
11:01:50  12  our motion to compel and Mr. Buccigross will address Boston
11:01:55  13  University's motion to dismiss with Your Honor's permission.
11:01:59  14       THE COURT:  Thank you.
           15       Anyone else on the line?
11:02:04  16       MS. KELLER:  Good morning, Your Honor.  Karen
11:02:06  17  Keller from Shaw Keller on behalf of Boston University.  And
11:02:09  18  with me today is Nate Hoeschen of my office as well as
11:02:19  19  Michael Rader and Susmita Gadre from Wolf Greenfield.
11:02:19  20  Mr. Rader will argue on behalf of Boston University.
11:02:23  21       THE COURT:  Thank you.  Good morning to all of
11:02:25  22  you as well.
11:02:26  23       So I have the discovery letters here and when we
11:02:29  24  were looking at the discovery letters, we realized that we
11:02:32  25  also had the motion to dismiss and the motion for
```

---

4

```
11:02:35   1  jurisdictional discovery pending and thought that there
11:02:40   2  might be some overlap on those, so I ask that you all be
11:02:44   3  prepared to address each of those motions.
11:02:47   4       But why don't we start with the discovery issue,
11:02:55   5  the motion to compel.  And I want to hear from the
11:03:03   6  Defendants on this, but what I understood is that Boston
11:03:07   7  University has agreed to provide certain discovery, they
11:03:11   8  have provided certain discovery including perhaps
11:03:16   9  depositions that have already occurred, and I need to
11:03:21  10  understand not with a chart, not with generalities of make
11:03:28  11  them respond to everything in my interrogatories, but what
11:03:31  12  specifically do you want that they have not given you.
11:03:36  13  That's what I need to understand.
11:03:38  14       So let me hear from Defendants.
11:03:44  15       MR. MOLANO:  Thank you, Your Honor.  This is
11:03:45  16  Michael Molano on behalf of the Defendants.  There are six
11:03:49  17  specific items we need, Your Honor.  Number one, yesterday
11:03:56  18  Boston University refused to answer a first set of RFA's,
11:04:01  19  requests for admission, and nineteen of them, they're all on
11:04:06  20  inequitable conduct, they're merits discovery, and it was
11:04:09  21  not provided.  We received objections that simply said they
11:04:12  22  weren't specific.  They just said that they were awaiting a
11:04:16  23  decision on the motion to dismiss before they would respond.
11:04:16  24       Number two, yesterday they also refused a second
11:04:23  25  set of requests for production, number 24 through 27, also
```

5

11:04:28 1 merits discovery on inequitable conduct.

11:04:32 2 Number three, 30(b)(6) subpoena that is actually
11:04:39 3 happening next week for BU, the subpoena for BU, BU still
11:04:43 4 refuses jurisdictional topics 1 through 3.

11:04:46 5 Number four, on the BU document subpoena, BU
11:04:51 6 still refusing jurisdictional discovery on topics 1
11:04:55 7 through 6 and 12.

11:04:57 8 And lastly, the last two items, number five, the
11:05:01 9 first set of interrogatories, and number six, the first set
11:05:05 10 of RFP's, BU has refused to provide merit discovery on
11:05:11 11 inequitable conduct.

11:05:13 12 That's a summary, Your Honor.

11:05:14 13 THE COURT: So when you say on inequitable
11:05:18 14 conduct, they are giving you -- the whole issue with BU in
11:05:28 15 the case is your assertions of inequitable conduct. What
11:05:36 16 are they giving you if they're not giving you documents that
11:05:39 17 you're asking for? Like you said okay, the sixth thing you
11:05:44 18 want is requests for production on inequitable conduct.
11:05:50 19 Well, they've offered to give you documents, so what is it
11:05:54 20 specifically in there that they aren't giving you that you
11:05:58 21 think that weren't covered by other topics that they have
11:06:01 22 said they would give you?

11:06:04 23 MR. MOLANO: An example, Your Honor, their
11:06:06 24 requests for admission, they're specifically asking --

11:06:10 25 THE COURT: I didn't ask -- no, sorry, I get it,

6

11:06:12 1 I read those requests for admissions and I'm not going to
11:06:15 2 make them respond to those at this point. But tell me about
11:06:19 3 the documents, what in the documents, they have given you
11:06:23 4 documents in response to the subpoena that was out there.
11:06:28 5 You're now saying that they won't give us anything in
11:06:31 6 response to the first set of requests for production on
11:06:40 7 inequitable conduct. What is it that's not already
11:06:43 8 addressed in what they've said they would give you in
11:06:49 9 response to the subpoena documents?

11:06:51 10 MR. MOLANO: Understood, Your Honor. Request
11:06:54 11 number 24, which is our Exhibit 23, we ask for all documents
11:06:59 12 constituting, evidencing, or referring to communications
11:07:02 13 with Hypergear which is an entity that's referenced in a
11:07:09 14 privilege log. And there has been no response to that.
11:07:13 15 They just said we're not responding. That's an example,
11:07:16 16 Your Honor.

11:07:16 17 THE COURT: Don't give me examples because I'm
11:07:18 18 going to be very specific. I'm not going to say BU respond
11:07:23 19 to every RFP. So if you want something, you have to be
11:07:28 20 specific.

11:07:29 21 MR. MOLANO: Specifically, Your Honor, for the
11:07:31 22 second, 24 through 26, we have received no response, and
11:07:36 23 they're specific as to items there specifically referenced
11:07:41 24 in a privilege log.

11:07:41 25 THE COURT: Tell me, though -- I get it. You

7

11:07:44 1 have to understand, I am by myself in my office. I don't
11:07:48 2 have printouts of this stuff. I'm looking at it on the
11:07:51 3 computer and I can't just go -- it's not that easy for me to
11:07:56 4 find stuff. Don't say numbers, tell me what you want so
11:07:59 5 that when I ask BU's attorneys about it, I can say tell me
11:08:06 6 about the communication for the Hypergear, what are these
11:08:09 7 other things you want from the privilege log?

11:08:11 8 MR. MOLANO: Anything reference to Hypergear,
11:08:14 9 Your Honor, in the privilege log. Any documents referring
11:08:17 10 to communications with SGS which is an entity referred to in
11:08:22 11 the privilege log, that's 25.

11:08:25 12 26 is all documents referring to communications
11:08:29 13 by, we have about seven individuals that are referenced in
11:08:32 14 the privilege log. Those are three, Your Honor, the
11:08:35 15 three --

11:08:36 16 THE COURT: And why is it that you -- what I'm
11:08:41 17 trying to understand is you're getting these things from the
11:08:46 18 privilege log, so is it a question of these things being
11:08:49 19 privileged, or is it -- I'm missing the fact that you're
11:08:55 20 asking for production of documents that appear to be
11:08:58 21 privileged.

11:09:00 22 MR. MOLANO: Those specific documents that were
11:09:03 23 produced by the prosecuting counsel that prosecuted the
11:09:08 24 patent-in-suit, and we don't believe -- it's unclear to us
11:09:12 25 where the privilege lies so we have asked specifically about

8

11:09:15 1 these, Hypergeal and SGS any communications that they
11:09:21 2 have to be able to test that privilege, Your Honor.

11:09:24 3 THE COURT: Are you asking -- is there someplace
11:09:26 4 elsewhere you asked who these people are so you can test the
11:09:31 5 privilege, because right now it sounds like in what I asked
11:09:34 6 you to give me specifics on, you were asking for documents
11:09:37 7 with these people which seems different than asking who are
11:09:42 8 they and what's the basis for the privilege.

11:09:45 9 MR. MOLANO: So, Your Honor, the deposition is
11:09:48 10 next Thursday and we wanted to ask that and that's why we
11:09:52 11 asked for these from the privilege log so we could have
11:09:55 12 those to ask questions on by the deposition date.

11:09:58 13 THE COURT: But what I'm missing is are you
11:10:01 14 asking for them to produce documents that they're claiming a
11:10:05 15 privilege on?

11:10:06 16 MR. MOLANO: No, those showed up in BU's
11:10:08 17 communications that their outside lawyer, Mr. Connors
11:10:14 18 produced in a privilege log that was communication with BU
11:10:17 19 and had mentioned these entities and we would like to test
11:10:20 20 the privilege because we don't know who those entities are
11:10:23 21 or what it relates to. So we receive a privilege log from
11:10:27 22 the lawyers for BU and we specifically asked documents
11:10:31 23 relating to the entities that are listed in the privilege
11:10:35 24 log so we can test the privilege during next Thursday's
11:10:39 25 deposition.

9

11:10:39 1 THE COURT: But I'm still not understanding.
11:10:42 2 You don't test a privilege by looking at the document
11:10:46 3 itself. So that's what I'm -- I'm missing what you want.
11:10:51 4 I'm sorry, apologize, I don't understand what you're saying.
11:10:55 5 MR. MOLANO: So, Your Honor, these entities
11:10:57 6 showed up on a privilege log and the --
11:10:59 7 THE COURT: I understand. No, no, I get it,
11:11:01 8 they showed up on a privilege log. There are documents that
11:11:06 9 are logged on the privilege log that this attorney had that
11:11:10 10 involved these entities. What I don't understand is what
11:11:16 11 you want. Normally I would think if you want to test the
11:11:19 12 privilege you would say to BU, tell me who these people are
11:11:23 13 and what the basis of the privilege is. That's not what
11:11:25 14 you're doing. You're saying in an RFP give me all
11:11:30 15 communications with these people. That's why I'm missing,
11:11:32 16 how does asking for every document that they -- every
11:11:36 17 communication with these people, how does that get you to
11:11:40 18 testing the privilege?
11:11:42 19 MR. MOLANO: Your Honor, to answer that, it's so
11:11:44 20 that we can understand the relationship between BU and these
11:11:47 21 entities so that we can understand whether or not those
11:11:51 22 communications were privileged.
11:11:53 23 THE COURT: Have you asked them what the
11:11:55 24 relationship is in an interrogatory or elsewhere?
11:11:58 25 MR. MOLANO: No, Your Honor, that was going to

10

11:12:01 1 be asked at the deposition next week.
11:12:05 2 THE COURT: Okay. Anything else on the first
11:12:09 3 set of RFP's? We have the communications with Hypergear,
11:12:14 4 with I don't know if it's SGS or FGS, communications with
11:12:19 5 seven individuals who are listed on the privilege log.
11:12:22 6 Anything else in those first set of RFP's?
11:12:25 7 MR. MOLANO: That was the second set of RFP's,
11:12:28 8 Your Honor, to be clear. And nothing else in the second set
11:12:31 9 of RFP's.
11:12:32 10 THE COURT: Thank you for that clarification.
11:12:34 11 What about in the first set of interrogatories?
11:12:39 12 MR. MOLANO: The first set of interrogatories,
11:12:42 13 they've refused all of them, Your Honor.
11:12:45 14 THE COURT: Yes. But have they given you any
11:12:48 15 interrogatory responses to anything?
11:12:50 16 MR. MOLANO: No, Your Honor.
11:12:51 17 THE COURT: A request to a subpoena or anything?
11:12:55 18 MR. MOLANO: No, Your Honor.
11:12:56 19 THE COURT: Okay. And then there were some
11:12:58 20 jurisdictional things, but we'll address those separately.
11:13:05 21 What was the second one you had, was that RFP's number 24
11:13:11 22 through 27?
11:13:11 23 MR. MOLANO: That was the first set of RFP's,
11:13:11 24 Your Honor.
11:13:16 25 THE COURT: What is it that you want in there?

11

11:13:18 1 MR. MOLANO: And those were the jurisdictional
11:13:21 2 discovery ones through 17.
11:13:25 3 THE COURT: So you want -- that's another one
11:13:29 4 that's jurisdictional?
11:13:31 5 MR. MOLANO: Yes, Your Honor.
11:13:32 6 THE COURT: Okay. And then it was the RFA's.
11:13:39 7 So as I understand it, we're going to talk about
11:13:43 8 jurisdictional stuff separately, but in terms of substantive
11:13:49 9 discovery, you want the RFA's, you want the first set of
11:13:58 10 interrogatories which haven't been responded to at all, and
11:14:02 11 in the second set of requests for permission you want the
11:14:07 12 communications with these folks who appear to be third
11:14:07 13 parties. Is that right?
11:14:13 14 MR. MOLANO: That's correct, Your Honor.
11:14:14 15 THE COURT: Okay. So let me hear from BU.
11:14:19 16 Mr. Rader, are you going to handle this?
11:14:23 17 MR. RADER: Yes, Your Honor.
11:14:25 18 THE COURT: Okay. So I think I already tipped
11:14:29 19 my hand that I'm not really thinking about making BU respond
11:14:33 20 to the RFA's at this point, but tell me why BU shouldn't
11:14:40 21 have to respond to the RFA's or the interrogatories at this
11:14:43 22 point given that this Court does have a practice of allowing
11:14:47 23 discovery to continue while a motion to dismiss is pending
11:14:52 24 in order to keep things moving.
11:14:55 25 MR. RADER: Sure. So on that threshold

12

11:14:58 1 question, Your Honor, what we have seen was that there was a
11:15:01 2 distinction in the case law between a motion, a dispositive
11:15:06 3 motion kind of on the merits like a Rule 12(b)(6) versus a
11:15:11 4 jurisdictional motion. Essentially, the interrogatories and
11:15:14 5 their requests for admission, we haven't responded on
11:15:18 6 principle because we believe BU is not subject to personal
11:15:24 7 jurisdiction, but we have not frustrated discovery into
11:15:28 8 those topics. For example, all the requests for admissions
11:15:32 9 that relate to the events surrounding the revival of the
11:15:36 10 patent just as an example of the first one, we have stuff to
11:15:42 11 admit that the entire delay between failing to pay the
11:15:47 12 maintenance fee and then submitting the revival contentions
11:15:51 13 was unintentional and there was a lot of RFA related to
11:15:55 14 those activities. Those topics completely overlap with the
11:15:59 15 deposition topic in the subpoena to BU for its corporate
11:16:05 16 deposition which is happening next week. So they can ask
11:16:08 17 BU's corporate representative all these questions and get
11:16:11 18 all the answers they want. I just wanted to make clear
11:16:15 19 we're not -- the same thing with the interrogatories. The
11:16:18 20 interrogatories basically overlap, they say things like
11:16:21 21 state whether you contend that your entire delay in paying
11:16:24 22 the fee was intentional or unintentional, et cetera. So
11:16:28 23 they've already deposed BU's paralegal who was involved in
11:16:33 24 the revival. They've already deposed the head of BU tech
11:16:38 25 transfer office at the time who dealt with this. They have

13

| | |
|---|---|
| 11:16:41 | 1 | a deposition on the calendar for next week for the successor |
| 11:16:46 | 2 | to that individual, in other words, the next head of tech |
| 11:16:50 | 3 | transfer who took over after the initial event took place |
| 11:16:56 | 4 | before the revival petition was actually filed.  And they |
| 11:17:00 | 5 | have a fourth deposition on the calendar for next week which |
| 11:17:04 | 6 | is BU's corporate deposition subject to a list of a couple |
| 11:17:08 | 7 | of dozen topics that cover all of it.  So we're not |
| 11:17:12 | 8 | frustrating the discovery. |
| 11:17:14 | 9 | It really is -- it's overlapping for us, so I'm |
| 11:17:17 | 10 | not going to represent to Your Honor that it would be a huge |
| 11:17:21 | 11 | burden for us to respond to these.  For us it's been the |
| 11:17:24 | 12 | principle, if Your Honor rules that personal -- a pending |
| 11:17:30 | 13 | substantive personal jurisdiction motion is no different |
| 11:17:34 | 14 | than a Rule 12(b)(6) motion, we'll just go ahead and respond |
| 11:17:38 | 15 | to, but to us it was the principle, we feel strongly, I know |
| 11:17:43 | 16 | that you're going to get to it separately, that there is no |
| 11:17:45 | 17 | personal jurisdiction here and therefore discovery that's |
| 11:17:48 | 18 | reserved for parties that are appropriately hailed into |
| 11:17:52 | 19 | court is something BU should need to respond to. |
| 11:17:55 | 20 | THE COURT:  Okay.  And then tell me with respect |
| 11:17:58 | 21 | to the specific issue where there were communications with |
| 11:18:07 | 22 | either entities or individuals who appear on a privilege log |
| 11:18:15 | 23 | but it's unclear what the potential privilege could be, is |
| 11:18:20 | 24 | that something where you allow whatever witnesses who are |
| 11:18:30 | 25 | going to be deposed to have them prepared to say who those |

14

| | |
|---|---|
| 11:18:37 | 1 | folks are, or you would be prepared to give some information |
| 11:18:42 | 2 | to allow Defendants to test the privilege? |
| 11:18:47 | 3 | MR. RADER:  Yes, Your Honor.  Let me -- the |
| 11:18:50 | 4 | answer is yes to the extent BU knows who these entities or |
| 11:18:54 | 5 | people are.  Let me step back.  I think I can bring more |
| 11:18:58 | 6 | clarity to it than you have gotten to this point. |
| 11:19:02 | 7 | What happened was that the Defendant, Lumileds |
| 11:19:05 | 8 | served a subpoena on Matt Connors and the Gesmer Updegrove |
| 11:19:10 | 9 | law firm, he's the individual who prosecuted the patent for |
| 11:19:14 | 10 | BU and who in early 2010 filed the revival petition.  He's |
| 11:19:19 | 11 | represented by separate counsel and his law firm.  They |
| 11:19:24 | 12 | produced a privilege log.  Lumileds has already deposed the |
| 11:19:29 | 13 | prosecuting attorney and the law firm in depositions.  They |
| 11:19:35 | 14 | asked him about these entries.  And I will just make an |
| 11:19:39 | 15 | observation, you know, there were entries that he was not |
| 11:19:45 | 16 | able to explain and some that he was. |
| 11:19:47 | 17 | It appears that the privilege log that his law |
| 11:19:50 | 18 | firm provided was semi-automatically prepared by polling |
| 11:19:58 | 19 | metadata into certain calls to the privilege log.  There are |
| 11:20:02 | 20 | three requests that they're talking about.  I would like to |
| 11:20:06 | 21 | briefly address each of them because I think I can bring |
| 11:20:08 | 22 | some clarity to it. |
| 11:20:10 | 23 | THE COURT:  Okay. |
| 11:20:11 | 24 | MR. RADER:  I'll start with 25 which is the |
| 11:20:12 | 25 | middle of the three.  That's the request where they're |

15

| | |
|---|---|
| 11:20:15 | 1 | asking for a document related to an entity called SGS |
| 11:20:20 | 2 | Patent.  That entity showed up in either the to or the from |
| 11:20:23 | 3 | column or the creation column of the privilege log that the |
| 11:20:27 | 4 | law firm provided, not BU, the law firm.  And they asked the |
| 11:20:31 | 5 | prosecuting attorney whom SGS Patent was at deposition, he |
| 11:20:37 | 6 | said that's the law firm, because it's -- before his law firm |
| 11:20:40 | 7 | was absorbed by Gesmer Updegrove was named Samuel Gosseay |
| 11:20:47 | 8 | and something, so SGS is his own law firm.  That one got |
| 11:20:52 | 9 | answered. |
| 11:20:52 | 10 | THE COURT:  Okay. |
| 11:20:53 | 11 | MR. RADER:  Then the third one, number 26, it |
| 11:20:56 | 12 | list a bunch of people who -- and they asked him about who |
| 11:21:00 | 13 | all these people were, and most of them he remembered the |
| 11:21:04 | 14 | names and he explained that they were either assistants or |
| 11:21:09 | 15 | paralegals or lawyers in his law firm.  I believe there were |
| 11:21:14 | 16 | one or two names he simply didn't remember who they were, |
| 11:21:18 | 17 | but most of the individuals are again, just employees of his |
| 11:21:21 | 18 | law firm.  Okay? |
| 11:21:21 | 19 | THE COURT:  All right. |
| 11:21:23 | 20 | MR. RADER:  Backing up to number 24, there were |
| 11:21:26 | 21 | some entries that I thought were strange that I don't |
| 11:21:29 | 22 | understand, and I don't represent him and I didn't prepare |
| 11:21:32 | 23 | the privilege log, but there were entries that listed the |
| 11:21:36 | 24 | name Hypergear, Inc. as either a creator, I don't remember |
| 11:21:41 | 25 | for sure which column it showed up in, it might have been |

16

| | |
|---|---|
| 11:21:45 | 1 | either creator or vendor or recipient of some |
| 11:21:49 | 2 | correspondence.  That didn't make a lot of sense to me. |
| 11:21:51 | 3 | They asked him about it and he didn't know either, so |
| 11:21:54 | 4 | they've asked the attorney and he doesn't know why that |
| 11:21:57 | 5 | showed up.  I don't know what follow-up they've done with |
| 11:22:00 | 6 | the prosecuting attorney's counsel.  They waited so long |
| 11:22:05 | 7 | that I think they're kind of out of time on that, but that |
| 11:22:08 | 8 | follow-up would be more appropriate with him. |
| 11:22:11 | 9 | If BU's witness has any idea why Hypergear |
| 11:22:16 | 10 | showed up, for all I know it's just some other client of |
| 11:22:19 | 11 | their law firm and it got into the privilege log.  I'm happy |
| 11:22:22 | 12 | for BU's witness to answer any questions.  I sincerely doubt |
| 11:22:27 | 13 | that BU has any idea why Hypergear showed up.  That's the |
| 11:22:31 | 14 | sum and substance of those three requests of the second set |
| 11:22:34 | 15 | of requests for production. |
| 11:22:36 | 16 | THE COURT:  Thank you.  Mr. Molano, in light of |
| 11:22:39 | 17 | that explanation as to the individuals and at least SGS, |
| 11:22:45 | 18 | what is it that you want from BU? |
| 11:22:48 | 19 | MR. MOLANO:  To the extent BU has any documents |
| 11:22:52 | 20 | that mention Hypergear or this SGS patent or these |
| 11:22:57 | 21 | individuals just to do a search and produce those. |
| 11:23:00 | 22 | THE COURT:  Okay. |
| 11:23:09 | 23 | MR. RADER:  Your Honor, could I just speak to |
| 11:23:11 | 24 | that? |
| 11:23:11 | 25 | THE COURT:  Mr. Rader, when you start to speak, |

17

11:23:15 1 just say your name if it's not clear, if it's not just a
11:23:19 2 back and forth with us so that my court reporter can get it
11:23:22 3 clear on the record.
11:23:23 4 MR. RADER: Apologize, yes, this is Mike Rader
11:23:26 5 for BU again.
11:23:28 6 So BU has actually searched four times now. I
11:23:37 7 won't go through all the gory details, but there has been
11:23:42 8 extensive searching, and as you can imagine, Your Honor, BU
11:23:46 9 has searched for any correspondence with the law firm
11:23:50 10 because that's part of this.
11:23:51 11 So did we search on each individual name of an
11:23:55 12 assistant or a paralegal, probably not, because I'm not sure
11:24:00 13 we knew these names until their attorney was deposed. But
11:24:05 14 we're not opposed in principle to do a search, but we have
11:24:09 15 done four separate rounds of searching including for the law
11:24:13 16 firm and I'll just -- normally I don't divulge how we do
11:24:18 17 things but I will represent to Your Honor that we used the
11:24:22 18 domain name of the law firm, so we should have gotten
11:24:26 19 anything that went back and forth to the law firm and then
11:24:29 20 the law firm produced a privilege log with all of its
11:24:33 21 correspondence with BU. So I just don't think it would be
11:24:37 22 reasonable to require us to do more searching. Anything we
11:24:41 23 find that goes back and forth at anyone at that law firm is
11:24:46 24 going to be privileged anyway.
11:24:48 25 THE COURT: Okay. So this is what I'm going to

18

11:24:51 1 do with respect to the non-jurisdictional topics. I am not
11:24:56 2 going to require formal response to the interrogatories or
11:24:59 3 the RFA's at this point and I'm not going to require further
11:25:04 4 document production regarding the third parties, or the
11:25:11 5 potentially third parties on the prosecuting attorney's
11:25:14 6 privilege log in light of the representations made of the
11:25:17 7 testimony by the attorney who prepared the log.
11:25:20 8 BU is allowing discovery to go forward in terms
11:25:23 9 of the production of documents and the searches it's made
11:25:28 10 and depositions on the inequitable conduct issues. So I'm
11:25:32 11 not -- and that I think is appropriate, but I'm not going to
11:25:37 12 require additional responses to the interrogatories, the
11:25:40 13 requests for admission, or the requests for production until
11:25:44 14 we address the motion to dismiss and the assertions of lack
11:25:49 15 of personal jurisdiction.
11:25:52 16 So now I want to talk about jurisdictional
11:25:56 17 discovery, and the pending motion there. So I'll hear first
11:26:04 18 from Lumileds.
11:26:11 19 MR. MOLANO: Your Honor, this is Michael Molano.
11:26:13 20 If I could introduce Gray Buccigross, he will be discussing
11:26:18 21 the jurisdictional issues.
11:26:19 22 THE COURT: Sure. Thank you.
11:26:21 23 MR. BUCCIGROSS: Thank you, Your Honor. This is
11:26:25 24 Gray Buccigross for Lumileds. I'll just address the
11:26:27 25 personal jurisdiction issues for now.

19

11:26:30 1 Important to keep in mind, Your Honor, all
11:26:32 2 Lumileds needs to show is a prima facie case of personal
11:26:37 3 jurisdiction. At this stage, the allegations in our
11:26:41 4 counterclaim are taken as true and the inferences are to be
11:26:44 5 resolved in favor of personal jurisdiction. There is two
11:26:48 6 grounds that we have asserted for personal jurisdiction,
11:26:51 7 conspiracy and the effects test. I'll start with
11:26:55 8 conspiracy. Simply put, if one conspirator's act subjects
11:27:00 9 that conspirator to jurisdiction, all the conspirators are
11:27:04 10 subject to jurisdiction. And I'll go through the conspiracy
11:27:09 11 very briefly and provide some examples --
11:27:11 12 THE COURT: But could I just ask you this? I
11:27:16 13 thought that one of the points that BU made, and I don't
11:27:20 14 remember if it was in connection with the motion to dismiss
11:27:23 15 or the motion for jurisdictional discovery is you want
11:27:31 16 discovery based, or you want jurisdiction to be based on a
11:27:34 17 conspiracy but you didn't allege a conspiracy as a count in
11:27:38 18 the complaint. How does that fit into this?
11:27:43 19 MR. BUCCIGROSS: Sure, Your Honor. Thank you.
11:27:47 20 So number one, Your Honor, we allege the fact underlying the
11:27:51 21 conspiracy in the amended counterclaim. And so we pled the
11:28:00 22 substance of that and what we knew at the time, and I'll
11:28:05 23 explain what I mean by at the time in a minute. But if I
11:28:08 24 could just give you four examples. Under the jurisdictional
11:28:11 25 heading, for example, number one, we pled BU's financial

20

11:28:16 1 interests in the patent, the ten percent interest and the
11:28:18 2 Delaware enforcement campaign, that's at paragraph 200 of
11:28:23 3 our counterclaim.
11:28:25 4 Second example. We pled a coordination and we
11:28:29 5 used that term between BU and Dr. Schubert to revive the
11:28:33 6 patent. That's in paragraph 217 of our counterclaim.
11:28:37 7 Third example, we pled the motivation to deceive
11:28:43 8 that BU wanted to obtain a portion of revenue. This is the
11:28:47 9 ten percentage from Dr. Schubert's enforcement efforts.
11:28:52 10 That's at paragraph 219 of the counterclaim.
11:28:55 11 Number four, failure to correct. In other
11:29:00 12 words, BU was put on notice of the materiality of the
11:29:05 13 inequitable conduct no later than 2013 with our motion for
11:29:12 14 leave to amend and Osram's motion for leave to amend and no
11:29:17 15 actions were to inform the PTO of the true facts which
11:29:23 16 continued this conspiracy. That is paragraph 221 of our
11:29:27 17 counterclaim.
11:29:28 18 And then we pled other things as well, example
11:29:31 19 number five, such as the photo op and celebration when BU
11:29:37 20 received substantial amount of money from the prior
11:29:42 21 settlement funds from the other 2nd District of Delaware
11:29:45 22 defendants, that's paragraph 330 of our counterclaim.
11:29:52 23 And, in fact, Your Honor, Dr. Schubert, BU's
11:29:59 24 co-conspirator wasn't opposing our 2020 leave to amend in
11:30:04 25 Dr. Schubert's opposition letter brief argued to the Court

21

11:30:08  1   that we alleged a conspiracy.  He called it a conspiracy in
11:30:12  2   his letter brief to BU and accused us of alleging a
11:30:21  3   conspiracy.  Let me go a little bit into why there isn't
11:30:25  4   more in that counterclaim, and that's because BU and
11:30:30  5   Dr. Schubert did not produce many of the most relevant
11:30:34  6   documents until briefing was already done on the motion to
11:30:39  7   dismiss.  It's been a significant handicap for us and shows
11:30:43  8   why we need help since we have BU and Dr. Schubert producing
11:30:48  9   some of the most critical evidence eight years after the
11:30:51  10  fact.
11:30:52  11         For example, the document that we just filed
11:30:53  12  with Your Honor two days ago was a 2009 e-mail from BU to
11:31:01  13  Dr. Schubert that says we cannot revive this patent because
11:31:07  14  we intentionally abandoned it and the PTO wouldn't allow
11:31:13  15  that.
11:31:13  16         THE COURT:  I understand that, and I read that
11:31:15  17  and I also read the other things that were attached where
11:31:17  18  they responded and said yeah, but you're ignoring the e-mail
11:31:21  19  that came out a week later.  So I get it that there is stuff
11:31:25  20  on both sides are going to rely on there, but I'm not -- I
11:31:32  21  mean, I guess at this point you're saying you've alleged
11:31:36  22  enough.  Right?
11:31:40  23         MR. BUCCIGROSS:  Well, Your Honor, we think we
11:31:42  24  alleged enough in terms of it's the underlying fact under
11:31:47  25  the *McQueen* case, we weren't even required to allege it.

22

11:31:51  1   And part of the issue, Your Honor, as well was as we
11:31:55  2   mentioned in our opposition brief, personal jurisdiction
11:31:58  3   should have been raised by somebody in 2013 when we first
11:32:02  4   sought leave to amend or in 2020 when Dr. Schubert asked for
11:32:07  5   a second motion to meet and confer on this, meaning on our
11:32:14  6   motion for leave to amend and then waited until his
11:32:19  7   opposition letter brief to raise the personal jurisdiction
11:32:23  8   issue in 2020 presumably at the behest --
11:32:28  9          THE COURT:  Wasn't the case stayed for a long
11:32:30  10  time?
11:32:32  11         MR. BUCCIGROSS:  Correct, Your Honor.
11:32:33  12         THE COURT:  So why was he supposed to be doing a
11:32:36  13  bunch of stuff in a stayed case?
11:32:38  14         MR. BUCCIGROSS:  Your Honor, it wasn't so much
11:32:40  15  the stay, it was in 2013 there was a full round of briefing
11:32:44  16  on Lumileds' and Osram's motion for leave to amend.  BU
11:32:50  17  never raised personal jurisdiction.  Then when the case was
11:32:53  18  unstayed in 2020, we already met and conferred on the motion
11:32:57  19  for leave but Dr. Schubert asked for a second motion to
11:33:01  20  confer.  When we talked to Dr. Schubert's counsel, they just
11:33:05  21  said look at our prior opposition.  This wasn't raised until
11:33:09  22  their opposition letter brief in 2020.
11:33:11  23         If I could, Your Honor, there, for example, is a
11:33:16  24  Delaware conspiracy case that said you don't need to
11:33:22  25  formally allege a conspiracy to defraud, you can have -- to

23

11:33:30  1   satisfy the conspiracy theory for personal jurisdiction, you
11:33:36  2   can allege facts for such things as aiding and abetting and
11:33:42  3   breach of fiduciary duty.  I think to say we have to have a
11:33:46  4   formal conspiracy count and call it as such is putting form
11:33:50  5   over substance.
11:33:53  6          THE COURT:  Okay.
11:33:57  7          MR. BUCCIGROSS:  And Your Honor, we're getting
11:34:01  8   new facts every day.  We certainly got a lot of new facts
11:34:05  9   since this briefing.  We're continuing to get new facts
11:34:08  10  every day as BU counsel mentioned, we have a number of
11:34:11  11  depositions coming up next week so, Your Honor, if you feel
11:34:19  12  like there may be more facts needed, we would ask for the
11:34:22  13  opportunity to provide some supplemental briefing because
11:34:25  14  we're completing depositions next week and we think --
11:34:29  15  besides what we have received just since this briefing and
11:34:32  16  some of this is documents that BU produced after briefing
11:34:36  17  was completed in response to a subpoena we had issued to
11:34:39  18  them in 2019, then we would ask for the opportunity to have
11:34:43  19  a round of supplemental briefing so that you can have all of
11:34:46  20  these new facts in front of you, Your Honor, because we
11:34:49  21  think frankly there will be triple the facts by the end of
11:34:53  22  next week.
11:34:54  23         THE COURT:  All right.  Then tell me about the
11:34:57  24  scope of the jurisdictional discovery that you are
11:35:03  25  requesting.  I mean, it seems like you call it in your

24

11:35:08  1   papers narrowly tailored, but it includes things like
11:35:12  2   discovery on other patents asserted in Delaware and
11:35:17  3   discussions about the motion to transfer.  Why is that
11:35:19  4   appropriate?
11:35:21  5          MR. BUCCIGROSS:  Sure, Your Honor.  And thank
11:35:25  6   you.  So just at the outset, we're not seeking discovery
11:35:31  7   about general jurisdiction, just specific jurisdiction.
11:35:34  8   Now, I know that you have asked about other patent cases and
11:35:38  9   we think that fairly fits within specific jurisdiction or at
11:35:43  10  least close enough to the extent that BU has stated in their
11:35:49  11  papers that they have a policy of what they call returning
11:35:55  12  patents to their inventors and keeping a ten percent
11:35:59  13  interest in those patents and there may be other lawsuits
11:36:02  14  that have been asserted in Delaware where BU has this ten
11:36:06  15  percent interest and, in fact, collected other very
11:36:09  16  substantial sums of money.
11:36:11  17         Now, I'll address the transfer motion now.  Now,
11:36:15  18  Osram tried to transfer the case to the District of
11:36:19  19  Massachusetts saying that BU was there and Dr. Schubert
11:36:23  20  successfully opposed that and this discovery is were there
11:36:29  21  communications between Dr. Schubert and BU at the time
11:36:32  22  regarding that.  But, Your Honor, those really aren't the
11:36:36  23  core of our specific jurisdictional requests.  The core are
11:36:41  24  things like, you know, we have a bunch of representations
11:36:46  25  from BU in connection with the briefing that there is no

25

11:36:49 1 evidence they knew about this lawsuit prior to Schubert
11:36:54 2 filing it.  They didn't anticipate being in Delaware.
11:36:57 3         And I'll give you two examples of why we have
11:37:02 4 some concerns with that, actually three, Your Honor, three
11:37:05 5 examples of why we have concerns.  First of all, that's mere
11:37:09 6 attorney argument and we haven't seen that they never knew,
11:37:12 7 we've just seen attorney representations that there is no
11:37:16 8 evidence in the record about it.
11:37:18 9         Number two, Your Honor, this lawsuit and two
11:37:21 10 others were filed in Delaware in July 2012 and the
11:37:26 11 enforcement campaign was in Delaware only on this patent.
11:37:31 12 Now, December of 2011, we have an e-mail from BU where
11:37:37 13 they're talking internally about the fact that they need to
11:37:41 14 make sure that Dr. Schubert's co-inventor on the patent
11:37:46 15 doesn't still have rights so that Schubert will be able to
11:37:51 16 litigate alone, which suggest, Your Honor, that they knew
11:37:55 17 there was a lot.
11:37:57 18         Number three, example for why we have concerns
11:37:59 19 about this is approximately two weeks before Dr. Schubert
11:38:04 20 started his enforcement campaign in Delaware by filing all
11:38:08 21 three of the lawsuits in Delaware, BU is continuing to
11:38:14 22 transfer rights to the asserted patents to Dr. Schubert,
11:38:20 23 just two weeks before the lawsuits are filed, BU is
11:38:23 24 transferring the rights to sue for past infringement.  This
11:38:27 25 raises a lot of questions in our mind about what BU knew.

26

11:38:30 1 And we have discovery about, for example, when BU found out
11:38:35 2 about the lawsuits, what communications it might have had
11:38:38 3 with Dr. Schubert about the lawsuits in Delaware, both
11:38:43 4 before and after they were filed to test variants of BU's
11:38:48 5 arguments to the Court.
11:38:52 6         But, Your Honor, since we're talking about this,
11:38:54 7 I do want to mention as well that under the conspiracy test,
11:38:59 8 Defendants -- it's not that BU has to know prior to
11:39:06 9 Schubert's filing in Delaware that he was going to do it,
11:39:10 10 it's just know or had reason to know there would be an act
11:39:14 11 in the forum state.  There is case law that says conspiracy
11:39:20 12 doesn't end when someone files a lawsuit, conspiracy
11:39:24 13 continues because the point of the lawsuit is to make money.
11:39:26 14         We have other requests about the communications
11:39:28 15 about this lawsuit once it was ongoing because they have
11:39:31 16 clearly known about the lawsuit.
11:39:39 17         THE COURT:  Okay.  Let me hear from BU.  Is that
11:39:42 18 Mr. Rader again?
11:39:44 19         MR. RADER:  It is, Your Honor.
11:39:45 20         THE COURT:  Okay.
11:39:46 21         MR. RADER:  Just I would like to quickly get one
11:39:50 22 thing out of the way.  I heard from Mr. Buccigross, although
11:39:54 23 he didn't use the word, a suggestion that somehow BU waived
11:39:58 24 its personal jurisdiction defense by not raising it in 2013
11:40:02 25 in response to a motion for leave to amend by Osram.  BU was

27

11:40:06 1 not a party, BU was not involved in the lawsuit.  There
11:40:11 2 would be no reason and, in fact, no way for BU to raise its
11:40:15 3 personal jurisdiction defense in response to a motion for
11:40:19 4 leave to amend.  In fact, when Lumileds filed a motion for
11:40:22 5 leave to amend in your court in March of this year, Your
11:40:27 6 Honor correctly stated I'm probably going to hear from BU on
11:40:31 7 its personal jurisdiction defense in a motion to dismiss,
11:40:36 8 I'll let the amendment go through and then hear from BU.
11:40:40 9 Once Your Honor granted it on May 18th, that was the very
11:40:43 10 first opportunity for BU to raise it and we immediately did
11:40:47 11 as Your Honor expected us to.
11:40:49 12         THE COURT:  Okay.  Tell me why they haven't
11:40:54 13 alleged enough to obtain some jurisdictional discovery.
11:41:02 14         MR. RADER:  Sure.  So let me kind of go through
11:41:09 15 in order logically in my mind, hopefully this will help the
11:41:15 16 Court.  So they agree there is no general jurisdiction,
11:41:18 17 that's off the table.  This is about specific jurisdiction.
11:41:23 18 Specific jurisdiction, specific personal jurisdiction
11:41:26 19 requires the claim, or in this case the counterclaim, that
11:41:32 20 arises from actions directed to the form.  That's pretty
11:41:38 21 simple, it's black letter law.
11:41:41 22         So in this case the actions that they have
11:41:43 23 raised, at least originally we were relying on before, well,
11:41:50 24 you know, you let the patent go abandoned, you revived it,
11:41:54 25 you transferred it to Dr. Schubert, all of that occurred in

28

11:41:57 1 Massachusetts and it was aimed either at the Patent Office
11:42:00 2 in Virginia or Dr. Schubert in New York, nothing to do with
11:42:04 3 Delaware.
11:42:04 4         So in response to our motion to dismiss when we
11:42:08 5 laid all that out, they came up with the first time this
11:42:12 6 conspiracy theory.  Their complaint doesn't even use the
11:42:16 7 word conspiracy let alone included a count of any of the
11:42:20 8 types that Delaware courts have entertained, civil
11:42:24 9 conspiracy, aiding and abetting, antitrust, various types of
11:42:30 10 counts that would arise at least in part from a conspiracy
11:42:33 11 between two parties.
11:42:35 12         The notion of the conspiracy theory which some
11:42:39 13 jurisdictions have it, other jurisdictions reject it --
11:42:46 14         THE COURT:  And you will agree that Delaware
11:42:49 15 does allow a conspiracy theory, right?  Delaware is one of
11:42:56 16 the jurisdictions that allows it?
11:42:58 17         MR. RADER:  Yes.  But a fundamental problem with
11:43:01 18 their argument based on Delaware having been one of the
11:43:05 19 jurisdictions that allows the conspiracy theory is that it's
11:43:09 20 Federal Circuit law that governs the personal jurisdiction
11:43:13 21 here, not Delaware law.
11:43:16 22         THE COURT:  I understand that it's Federal
11:43:19 23 Circuit law, but in looking -- in doing the analysis for the
11:43:22 24 Federal Circuit, isn't the first step that they look at
11:43:26 25 whether or not the long arm statute permits the service of

29

11:43:36  1  process?

11:43:38  2  MR. RADER:  They'll look at the long arm

11:43:41  3  statute, but the conspiracy theory is not a creature of the

11:43:46  4  long arm statute, it's a judicially created doctrine that

11:43:50  5  says when the long arm statute says -- one of the prongs of

11:43:54  6  the long arm statute for specific jurisdiction talks about

11:43:59  7  if you commit a tort in the foreign state that causes harm

11:44:03  8  in the foreign state, then the conspiracy theory is an

11:44:06  9  additional created doctrine that piggybacks off of that and

11:44:10 10  says well, okay in our jurisdiction, we're going to be more

11:44:16 11  expansive and say that we're not going to limit ourselves

11:44:19 12  literally to the long arm statute, but we're going to say

11:44:23 13  that if someone else commits that tort in the foreign state

11:44:27 14  and you conspire with them, then we will impute that

11:44:32 15  person's action to up for terms of determining jurisdiction.

11:44:37 16  That is not the type of thing that the Federal

11:44:39 17  Circuit would defer on, and in fact, we cited the *Grover*

11:44:44 18  case in our briefing, that was the case, a case in which it

11:44:53 19  was a different state, but that was a case in which the

11:44:57 20  District Court basically prognosticated that the Federal

11:45:00 21  Circuit would not recognize the conspiracy theory of

11:45:04 22  jurisdiction, and in fact, basically said what the court --

11:45:09 23  look, we haven't found any instance in which the Federal

11:45:11 24  Circuit has ever recognized it and, therefore, we're not

11:45:14 25  going to recognize it in this patent case.

30

11:45:16  1  And then the Federal Circuit affirmed in full

11:45:20  2  and specifically noted that it was affirming the District

11:45:23  3  Court's ruling on personal jurisdiction.  That's a threshold

11:45:27  4  matter of law that I don't think they can get over.

11:45:32  5  But, Your Honor, you hit the nail on the head in

11:45:35  6  our subsequent comment which is that there is another reason

11:45:39  7  why as a matter of law, and I really do want to get to the

11:45:42  8  facts as well, I think it's important for Your Honor to

11:45:44  9  understand why this is so far out in left field, but there

11:45:48 10  is another reason why as a matter of law this doesn't work,

11:45:52 11  even if contrary to fact as the Federal Circuit did

11:45:55 12  recognize, the doctrine of extension, which is that under

11:46:00 13  Delaware law, the role of the conspiracy theory is to allow

11:46:06 14  a plaintiff, or here it's a counter-plaintiff, to impute an

11:46:13 15  act from one party to the other that underlies one of the

11:46:18 16  claims in the case.  I mean, it's obvious why that is,

11:46:23 17  right, specific personal jurisdiction as a matter of Supreme

11:46:26 18  Court law requires a claim that arises from action directed

11:46:30 19  to the forum.  So the acts that they want to impute to BU

11:46:35 20  even though BU didn't do it, still has to, the claim or

11:46:39 21  counterclaim still has to arise from that imputed action,

11:46:43 22  that's fundamental.  And here their only counterclaims are

11:46:48 23  for declaratory judgment.

11:46:50 24  This patent is invalid if it's not infringed, if

11:46:53 25  it's not enforceable.  It's not because Dr. Schubert filed

31

11:46:57  1  this lawsuit, it's because of the revival that has nothing

11:47:00  2  to do with Delaware, or it's because of the prior art that

11:47:04  3  has nothing to do with Delaware, or it's because the product

11:47:07  4  doesn't meet claim limitations which has nothing to do with

11:47:10  5  Delaware.  That's a second threshold legal reason which they

11:47:14  6  never even grappled with or offered a response to that.

11:47:18  7  Threshold legal reason why the conspiracy theory just

11:47:22  8  doesn't apply.

11:47:23  9  THE COURT:  What about, isn't there a case, I

11:47:26 10  think there is a Delaware Chancery case that involves filing

11:47:29 11  of a patent case and dealt with the conspiracy issue, and I

11:47:34 12  thought that part of the conspiracy that was alleged in that

11:47:37 13  case was essentially profiting from the patent.  Isn't that

11:47:42 14  what the Defendants are getting at here?

11:47:47 15  MR. RADER:  Your Honor, I think, I believe

11:47:49 16  you're referring to Microsoft 2002, Westlaw 5899003.  And

11:47:56 17  that case makes my point, Your Honor, because there, the

11:47:59 18  cause of action was for civil conspiracy that arose from the

11:48:04 19  filing of a lawsuit.  So the claim or the counterclaim was

11:48:07 20  for civil conspiracy, not for declaratory judgment.  That's

11:48:11 21  a fundamental difference.  That case really makes BU's

11:48:17 22  point.

11:48:17 23  So I do want to -- unless Your Honor has any

11:48:24 24  more questions about those legal issues, I do want to

11:48:26 25  address some of the facts on what's really going on here, as

32

11:48:31  1  well as the scope of the jurisdictional discovery and why

11:48:36  2  the reality is that essentially it falls into three buckets.

11:48:41  3  The main bucket is things that they've already gotten

11:48:45  4  because as you can imagine what they're really looking for

11:48:49  5  is correspondence and discussions between BU and

11:48:52  6  Dr. Schubert that could establish that BU was involved in

11:48:58  7  any way in this lawsuit campaign or in selecting Delaware as

11:49:04  8  the forum.  They have gotten all that because obviously

11:49:06  9  we've produced every piece of correspondence that we have

11:49:10 10  between BU and Dr. Schubert, and they've asked our witnesses

11:49:13 11  and I'm sure will continue next week, they asked all our

11:49:19 12  witnesses and they asked Dr. Schubert at his deposition just

11:49:23 13  a couple of days ago whether he had any contact with BU

11:49:26 14  whatsoever before these lawsuits were filed and the answer

11:49:30 15  was no, BU had absolutely nothing to do it and they have

11:49:34 16  come up with no evidence of that because there is none.

11:49:37 17  This is a very standard return procedure and they've already

11:49:40 18  gotten that discovery.  That's kind of bucket one.

11:49:43 19  Bucket two is there are a whole bunch of

11:49:46 20  requests that relate to general jurisdiction which they have

11:49:53 21  already conceded they're not asking for, so things like does

11:49:57 22  BU own property in Delaware, the answer is no, does BU own

11:50:02 23  property in Delaware and that sort of thing.  That's

11:50:04 24  incumbent in what Mr. Buccigross is asking for now and I

11:50:09 25  think if he was more specific about the request, he would

33

11:50:11 1  agree they're not asking for that stuff.

11:50:13 2       And then bucket three are things which we
11:50:16 3  believe also are improper because they go, if anything, only
11:50:20 4  to general jurisdiction such as the other lawsuit, also are
11:50:25 5  irrelevant and frankly, Your Honor, we're not aware of ever
11:50:30 6  filing a lawsuit, a patent lawsuit in Delaware.  I'll just
11:50:34 7  say that.

11:50:35 8       But the point is these other actions unrelated
11:50:37 9  to this one, the notion that there are going to be
11:50:41 10  jurisdiction, specific jurisdiction, not general
11:50:43 11  jurisdiction on the idea that BU did other things unrelated
11:50:46 12  to this lawsuit, that's the definition of general
11:50:49 13  jurisdiction, not specific jurisdiction.

11:50:50 14       Those are the buckets that their requests fall
11:50:53 15  into.

11:50:54 16       THE COURT:  What about the discovery requests on
11:51:00 17  financial interests and BU obtaining continued revenues from
11:51:10 18  the patent, has that information been produced?

11:51:16 19       MR. RADER:  Absolutely.  So the first and
11:51:19 20  foremost, there is the agreement between BU and Dr. Schubert
11:51:23 21  which indicates that BU retains a ten percent interest which
11:51:27 22  was standard.  I understand they don't even bother with that
11:51:31 23  anymore, but it was standard at one time.  And then every
11:51:35 24  year, again, another standard aspect of these relationships
11:51:40 25  is that inventors who -- faculty members who get their

34

11:51:46 1  inventions returned provides to BU an annual report in
11:51:49 2  December of each year and Professor Schubert did that and we
11:51:55 3  produced all of them.  They know exactly -- those annual
11:52:00 4  reports indicate what the revenues were, what if anything BU
11:52:03 5  retained, they have all of that information, we haven't
11:52:06 6  withheld anything.

11:52:07 7       THE COURT:  Okay.  So Mr. Buccigross, what is it
11:52:16 8  -- I assume that you agree with Mr. Rader that Defendant is
11:52:23 9  not pursuing the request that goes to general jurisdictions
11:52:32 10  like BU's ownership of property and things like that, is
11:52:36 11  that correct?

11:52:38 12       MR. BUCCIGROSS:  That's correct, Your Honor.

11:52:43 13       THE COURT:  Then what more is it that you're
11:52:46 14  looking for in terms of communications with Dr. Schubert, in
11:52:50 15  terms of information about the financial aspects that BU, or
11:53:00 16  BU's financial interest in the patents, what more is it that
11:53:04 17  you're -- and information about the filing of the lawsuit,
11:53:10 18  whether BU knew about it, things like that, what more is it
11:53:14 19  that you want?  Because it sounds like they have given you
11:53:18 20  what they have on those topics.

11:53:22 21       MR. BUCCIGROSS:  Well, Your Honor, if I could
11:53:24 22  start with what more, it's a 30(b)(6) deposition about it,
11:53:32 23  Your Honor, because you know, as Mr. Rader mentioned, we did
11:53:35 24  depose Dr. Schubert, we did depose a few BU employees and
11:53:42 25  largely what we heard in those depositions overwhelmingly

35

11:53:48 1  was that they couldn't remember much about anything at all
11:53:51 2  about anything.  So if there is really nothing here, why not
11:53:54 3  give us a 30(b)(6) where we have a prepared BU witness
11:53:59 4  rather than somebody who says they can't remember anything
11:54:02 5  about it?  And frankly, if there is nothing there, that
11:54:06 6  should be pretty easy, Your Honor.

11:54:09 7       Let me move to the discovery, to the document
11:54:14 8  request for a minute, Your Honor.  What we're hearing -- by
11:54:20 9  the way, Your Honor, we're already taking that deposition
11:54:23 10  next week.  We just want a prepared witness on it.  It's
11:54:26 11  already scheduled.

11:54:27 12       Let me move to the document request, though.  We
11:54:32 13  have been told repeatedly by BU that we have had fulsome
11:54:38 14  discovery.  We were told that, you know, prior to the motion
11:54:42 15  to dismiss briefing with regard to our 2019 subpoena and
11:54:46 16  after the briefing is done they're dribbling out more
11:54:49 17  documents.  And then they're continuing, I mean, I think
11:54:52 18  last week they were still producing more documents after
11:54:56 19  they said they thought they had nothing else to provide.

11:54:58 20       Now they have outright refused to respond to our
11:55:02 21  specific jurisdiction document request, so it's not clear to
11:55:05 22  us at all that we have gotten everything from them.  And
11:55:09 23  based on the dribbling out of documents and the fact that BU
11:55:12 24  has not produced this frankly kind of once in a career
11:55:17 25  e-mail from BU itself to Dr. Schubert saying we can't revive

36

11:55:23 1  the patent, we would be lying if we did, there are a lot of
11:55:28 2  questions in our mind.  So that's the document request, Your
11:55:31 3  Honor.

11:55:31 4       Your Honor, may I briefly address some of the
11:55:35 5  more legal points that Mr. Rader brought up?

11:55:39 6       THE COURT:  Sure.

11:55:41 7       MR. BUCCIGROSS:  Okay.  So, Your Honor, as to I
11:55:44 8  believe it's this *Grover* case where BU is asserting that the
11:55:48 9  Federal Circuit somehow doesn't recognize the conspiracy
11:55:54 10  theory, Your Honor, to be clear, it's a District of
11:56:01 11  California case and the Federal Circuit has never rejected
11:56:04 12  the conspiracy theory, didn't say anything about the
11:56:07 13  conspiracy theory in its opinion on the appeal of that
11:56:12 14  *Grover* case.

11:56:13 15       And, Your Honor, I can point you, in fact, to a
11:56:16 16  District of Delaware case, a patent case that implemented
11:56:23 17  the conspiracy theory and found that there was personal
11:56:27 18  jurisdiction, Your Honor.  And I'll just name it quickly,
11:56:30 19  it's the *Constantine v. AngioScore* case, and instead of
11:56:36 20  going through the whole spelling I'll just tell you -- I'm
11:56:42 21  sorry, I have the wrong name because I'm looking at my
11:56:45 22  scribble here --

11:56:47 23       THE COURT:  Is that the Judge McKelvie case from
11:56:52 24  1993?

11:56:52 25       MR. BUCCIGROSS:  Yes, Your Honor, that is the

37

11:56:55 1 Judge McKelvie case.

11:56:56 2 THE COURT:  I have read that one.

11:56:58 3 MR. BUCCIGROSS:  Okay, Your Honor.  I can tell

11:57:00 4 you picked up on all of this.

11:57:02 5 So, Your Honor, let me turn to this argument by

11:57:05 6 BU that there is no nexus essentially.  Now, what we have

11:57:13 7 here inequitable conduct and a Section 285 claim against BU

11:57:20 8 and, you know, we have this conspiracy to not just revive,

11:57:27 9 but to file the suit in Delaware and monetize in Delaware,

11:57:33 10 Your Honor, and as you very apparently picked up, it's this

11:57:37 11 *Microsoft* case.  Part of it that says because the alleged

11:57:44 12 conspiratorial goal was the profit from the patent the

11:57:49 13 conspiracy was ongoing and lasted at least as long as

11:57:53 14 St. Claire was able to monetize the patent.

11:57:56 15 The same is true here, Your Honor, you have the

11:57:59 16 conspiracy, it's not just the filing of the suit in

11:58:03 17 Delaware, it's the revival of the patent, it wasn't being

11:58:05 18 revised for Dr. Schubert to hang on his wall and be proud of

11:58:10 19 it, it was being revised so it could be monetized through

11:58:15 20 this enforcement campaign in Delaware.  The revival had

11:58:18 21 everything to do with Delaware, Your Honor, and so did the

11:58:21 22 other two cases in Delaware because they're all part of this

11:58:24 23 enforcement scheme and they all go to specific jurisdiction

11:58:29 24 and BU continuing to collect and celebrate the money to this

11:58:34 25 very day.

38

11:58:35 1 And Your Honor, I want to -- you know, I think

11:58:42 2 Mr. Rader said, Your Honor, Mr. Buccigross seems to be

11:58:46 3 arguing that BU somehow waived its personal jurisdiction

11:58:49 4 defense by not raising it in 2013.  Your Honor, that's not

11:58:53 5 the point at all.  The point is frankly, Your Honor, we feel

11:58:56 6 like we have been a bit sandbagged by the fact that we filed

11:59:02 7 a motion for leave in 2013, it was fully briefed, personal

11:59:06 8 jurisdiction was never raised, and then again when

11:59:09 9 Dr. Schubert demanded the meet and confer knowing he was

11:59:12 10 going to bring up a personal jurisdiction just, you know, a

11:59:16 11 couple of weeks later in his opposition in 2020 and didn't

11:59:20 12 mention it after himself demanding the meet and confer.  The

11:59:24 13 point is, Your Honor, that handicapped us quite a bit

11:59:27 14 because we could have put in something more directed at

11:59:30 15 actually using the word conspiracy which is why, Your Honor,

11:59:33 16 I bring up the potential supplemental briefing or even a

11:59:37 17 proposed amended complaint that uses that because frankly

11:59:40 18 all the facts are there.

11:59:42 19 Your Honor, I would like to go through --

11:59:45 20 THE COURT:  I just want to make sure I

11:59:47 21 understand, though, when you sandbag, that's kind of a

11:59:51 22 strong word, but to the extent that you're feeling like you

11:59:55 23 have had a surprise, that's not BU's fault, right, you're

11:59:59 24 saying that that's just based on things that Dr. Schubert's

12:00:05 25 counsel did, BU didn't have an opportunity to weigh in

39

12:00:09 1 before the current motion: right?

12:00:13 2 MR. BUCCIGROSS:  They certainly didn't try to,

12:00:17 3 Your Honor, and I apologize perhaps if I'm using too strong

12:00:22 4 of a word, but presumably when Dr. Schubert finally raised

12:00:26 5 this in 2020, it was at BU's behest because Dr. Schubert

12:00:30 6 himself didn't have standing to.  Your Honor, if I could

12:00:33 7 give you six quick examples where there was contact by BU,

12:00:37 8 I'll quickly list them out.  Delaware contact number 1,

12:00:41 9 December 2011, as I mentioned, BU internal e-mail saying

12:00:45 10 they need to get -- make sure that Dr. Schubert alone has

12:00:49 11 the rights to the patent, not his co-inventor, they'll

12:00:54 12 litigate alone if there are multiple inventors, I am quoting

12:00:57 13 that.

12:00:58 14 Delaware contact number two, two weeks before as

12:01:00 15 I mentioned, Your Honor, Schubert filed the three Delaware

12:01:04 16 lawsuits, BU transfers the right to sue for patent

12:01:08 17 infringement.  Clearly an anticipation of Dr. Schubert suing

12:01:11 18 in Delaware.  Delaware contact number three, it's really a

12:01:14 19 group, it's these annual reports.  Every year Dr. Schubert

12:01:18 20 sent a detailed annual report to BU detailing the status of

12:01:22 21 all three of those Delaware lawsuits and not just when money

12:01:26 22 came in, really a status of everything that was going on in

12:01:30 23 the lawsuits, Your Honor.  Now, BU policy is standard, but

12:01:36 24 I'll tell you as we mentioned in one of the e-mails, you

12:01:42 25 know, BU deciding to return this to Dr. Schubert they say,

40

12:01:46 1 well normally we don't get an upfront payment so this is

12:01:50 2 even a better deal than usual.

12:01:52 3 Delaware contact number four, Osram 2017

12:01:56 4 settlement agreement, Your Honor, and I'll be intentionally

12:02:01 5 general here to avoid a confidentiality issue.  BU is listed

12:02:05 6 as a -- BU is treated as a third-party beneficiary and

12:02:09 7 specifically relief by Osram for all claims in the Delaware

12:02:13 8 lawsuit.

12:02:15 9 Delaware contact number five in 2017, BU asked

12:02:19 10 Dr. Schubert, reaches out to him and says we want a detailed

12:02:24 11 accounting of all the proceeds from a prior settlement and

12:02:28 12 Dr. Schubert sent them a multiple page detailed accounting

12:02:31 13 of everything that had gone in, had come out and gone in.

12:02:35 14 Delaware contact number six, 2019, BU received a very

12:02:40 15 substantial payment from Dr. Schubert for the settlement of

12:02:43 16 the Cree and the Osram Delaware lawsuits, Your Honor.

12:02:47 17 And this is just the tip of the iceberg.  We

12:02:53 18 feel that discovery has really destroyed the picture that BU

12:02:56 19 has tried to paint in their motion to dismiss of just being

12:02:59 20 an uninterested observer that occasionally receives a little

12:03:03 21 bit of money, Your Honor.

12:03:05 22 And I'll turn back for just a second, you know

12:03:09 23 --

12:03:09 24 THE COURT:  We need to wrap this up, though,

12:03:12 25 because we have been going for more than an hour.  Make your

41

| | |
|---|---|
| 12:03:15 1 | last point and we'll wrap it up. |
| 12:03:18 2 | MR. BUCCIGROSS: I think that's it, Your Honor. |
| 12:03:20 3 | THE COURT: Okay. So -- |
| 12:03:22 4 | MR. RADER: Your Honor, this is Mike Rader. May |
| 12:03:24 5 | I have a very brief opportunity to respond? |
| 12:03:27 6 | THE COURT: Yes. |
| 12:03:27 7 | MR. RADER: Okay. I guess I want to limit |
| 12:03:30 8 | myself because I know we're short on time, I want to address |
| 12:03:34 9 | two things. First of all, these supposedly quote unquote |
| 12:03:37 10 | Delaware contacts that Mr. Buccigross just went through, |
| 12:03:40 11 | none of them are Delaware contacts. First he talked about |
| 12:03:45 12 | an e-mail in December 2011 where BU wanted to make sure it |
| 12:03:51 13 | checked with the co-inventor and consolidated the rights, |
| 12:03:54 14 | that's something BU always has to do because if you return |
| 12:03:58 15 | an invention from two inventors to one inventor and not the |
| 12:04:03 16 | other, first of all, yes, you handicap the inventor you're |
| 12:04:07 17 | returning it to potentially, and down the road if they |
| 12:04:10 18 | wanted to file a lawsuit or if they wanted to transfer to |
| 12:04:13 19 | sell the patent, if they wanted to license the patent, for |
| 12:04:15 20 | all those reasons they need to consolidate the rights. |
| 12:04:19 21 | And secondly, BU doesn't want to open itself up |
| 12:04:22 22 | to problems with a co-inventor that wasn't contacted and |
| 12:04:25 23 | didn't have an opportunity to participate, had nothing to do |
| 12:04:28 24 | with Delaware, wasn't aimed at Delaware, didn't occur in |
| 12:04:32 25 | Delaware, neither Dean Stocker, the co-inventor or |

42

| | |
|---|---|
| 12:04:35 1 | Dr. Schubert were in Delaware. It's not a Delaware contact. |
| 12:04:37 2 | Transferring the right to sue for past |
| 12:04:41 3 | infringement which happened in early 2012, again, |
| 12:04:44 4 | Dr. Schubert explained to BU very clearly he never told them |
| 12:04:49 5 | what he was going to do, he said, I might sell this patent, |
| 12:04:52 6 | I might license this patent, I might provide this patent to |
| 12:04:55 7 | what he called a patent troll. He might file lawsuits on |
| 12:04:59 8 | this patent. He never told BU what he would do, but for any |
| 12:05:02 9 | of those things, he would need to consolidate his rights and |
| 12:05:05 10 | merely as a clarification, BU wasn't necessarily of the view |
| 12:05:09 11 | that the original assignment failed to transfer the right to |
| 12:05:13 12 | sue for patent infringement, but as a courtesy to Professor |
| 12:05:17 13 | Schubert when his law firm reached out, they agreed to a |
| 12:05:21 14 | supplemental assignment to make that clear. Those rights |
| 12:05:24 15 | would need to be if he was going to sell the patent, no one |
| 12:05:28 16 | is going to buy it if he doesn't have those rights. It in |
| 12:05:32 17 | no way initiated that he was going to file a lawsuit, let |
| 12:05:35 18 | alone where. Delaware was never mentioned once. In annual |
| 12:05:39 19 | reports that he sent from BU, from New York to Massachusetts |
| 12:05:42 20 | describing his activities, nothing to do with Delaware, may |
| 12:05:47 21 | have reported on things that he was doing in later years in |
| 12:05:49 22 | the lawsuit, but it's just an annual report coming from |
| 12:05:52 23 | Massachusetts from New York to Massachusetts. |
| 12:05:54 24 | I won't go through the rest, but they're all the |
| 12:06:00 25 | same. |

43

| | |
|---|---|
| 12:06:00 1 | THE COURT: Okay. |
| 12:06:00 2 | MR. RADER: Your Honor, can I finish off the |
| 12:06:03 3 | second one? |
| 12:06:07 4 | THE COURT: Yes. |
| 12:06:09 5 | MR. RADER: So Mr. Buccigross mentioned the |
| 12:06:11 6 | 30(b)(6) deposition next week. In this subpoena, let's be |
| 12:06:17 7 | specific there are four jurisdictional topics that they |
| 12:06:21 8 | requested in this subpoena. The first one is the amount of |
| 12:06:25 9 | revenue you received or expect to receive from the patent. |
| 12:06:29 10 | So we've already provided, as I said, all of that |
| 12:06:32 11 | information in writing. You know, if they want to ask the |
| 12:06:38 12 | witness about that, I mean, that's fine. The information is |
| 12:06:41 13 | all there. It's all been provided in writing already. |
| 12:06:44 14 | The second topic, the content and dates of |
| 12:06:47 15 | communication between BU and Dr. Schubert. Okay, regarding |
| 12:06:51 16 | things like transferring the patent or any lawsuits, as I |
| 12:06:54 17 | said before, we've provided every scrap of paper we have |
| 12:06:59 18 | between BU and Dr. Schubert. They can ask the witness |
| 12:07:02 19 | anything they want about that. The topic -- |
| 12:07:06 20 | THE COURT: Mr. Rader, I think their issue is |
| 12:07:08 21 | they want you to put that witness up pursuant to |
| 12:07:14 22 | Rule 30(b)(6), so that it's not just what do you remember, |
| 12:07:23 23 | it's that he had at least some responsibility and he's |
| 12:07:27 24 | required to try and figure out what the position is for the |
| 12:07:37 25 | institution. When you're saying you're free to ask him |

44

| | |
|---|---|
| 12:07:44 1 | those questions, I guess what I'm trying to figure out is, |
| 12:07:47 2 | are you saying they're free to ask him those questions as a |
| 12:07:50 3 | 30(b)(6) witness and he will be prepared to answer them |
| 12:07:53 4 | based on whatever investigation you have done or documents |
| 12:07:57 5 | you have uncovered? |
| 12:07:59 6 | MR. RADER: I guess what I'm saying, Your Honor, |
| 12:08:02 7 | there is different kinds of 30(b)(6) topics. This topic, |
| 12:08:07 8 | for example, the first two I have read to you are basically |
| 12:08:13 9 | of the really broad things saying any correspondence you |
| 12:08:18 10 | have we want you to talk about it. When people give up a |
| 12:08:21 11 | 30(b)(6) topic that requires some specific preparation like |
| 12:08:25 12 | we want to know about a particular feature of an accused |
| 12:08:28 13 | product, that's one thing. When they just say you mailed |
| 12:08:31 14 | fifty e-mails back and forth, we want an authoritative |
| 12:08:36 15 | witness on those e-mails, that's in my opinion, kind of a |
| 12:08:39 16 | nonsense 30(b)(6) topic, the documents are there, the people |
| 12:08:43 17 | are either gone or have already been deposed. The authors |
| 12:08:47 18 | of those e-mails, they've already deposed the paralegal, |
| 12:08:51 19 | they've already deposed the first head of tech transfer, |
| 12:08:55 20 | they're going to depose the second head of tech transfer, |
| 12:08:59 21 | we're going to provide a 30(b)(6) witness -- there is no one |
| 12:09:04 22 | left that has specific knowledge, so we are anticipate |
| 12:09:06 23 | providing a 30(b)(6) witness that's going to be educated. I |
| 12:09:10 24 | don't know what it means to say, educate him about a couple |
| 12:09:13 25 | of dozen e-mails that other people wrote and received that |

45

12:09:17 1 he wasn't even on.

12:09:18 2          So I guess I have multiple objections to this.

12:09:20 3 One is because we have a motion to dismiss for personal

12:09:26 4 jurisdiction, we shouldn't have -- and because the

12:09:29 5 allegations are so thin and really nonexistent of any

12:09:34 6 contact with Delaware under the cases we've cited in our

12:09:36 7 papers, we don't think we should have to respond formally to

12:09:40 8 more discovery.  But even if -- even setting that aside,

12:09:44 9 it's not really meaningful to say they want a 30(b)(6)

12:09:48 10 witness in addition to the people who wrote the e-mails that

12:09:52 11 they've already deposed or will depose, they want a separate

12:09:55 12 witness who is going to somehow be prepared, quote unquote

12:09:59 13 to talk about the contents of those e-mails.  It doesn't

12:10:02 14 really make sense.

12:10:04 15          THE COURT:  Okay.  So this is what I'm going to

12:10:08 16 do.  I'm going to grant the motion for jurisdictional

12:10:12 17 discovery, or at least the request for jurisdictional

12:10:19 18 discovery.  Defendant asserts that the Court has

12:10:21 19 jurisdiction over BU pursuant to at least a conspiracy

12:10:25 20 theory of jurisdiction.  BU says that Federal Circuit law

12:10:28 21 governs personal jurisdiction and the Federal Circuit does

12:10:31 22 not recognize the conspiracy theory of jurisdiction.  The

12:10:35 23 case on which BU relies, *Grover*, does not explicitly say

12:10:40 24 that a conspiracy theory is never permissible for personal

12:10:44 25 jurisdiction.  That case affirmed a California district

46

12:10:48 1 court's decision that no personal jurisdiction exists.

12:10:51 2          But the first step in the Federal Circuit

12:10:53 3 personal jurisdiction analysis is whether the states long

12:10:56 4 arm statute permits service of process.  Here, Delaware's

12:10:59 5 long arm statute allows an agency relationship and

12:11:04 6 recognizes the conspiracy theory in looking at agency under

12:11:07 7 the statute.

12:11:08 8          Now, as to the conspiracy, I'm cognizant that

12:11:13 9 there is no claim for conspiracy here, but Defendant alleges

12:11:16 10 that BU and Dr. Schubert conspired to fraudulently revive

12:11:20 11 the '475 Patent to profit from the patent, and sued

12:11:25 12 Defendant in Delaware in furtherance of that conspiracy.

12:11:28 13          And I find that the allegations are sufficient

12:11:31 14 to allow limited jurisdictional discovery.  The scope of

12:11:35 15 what Defendant requested, however, is too broad.  I will

12:11:39 16 allow discovery on BU's financial interests in the '475

12:11:44 17 Patent including revenue BU received or may receive relating

12:11:48 18 to the '475 Patent, and I will allow discovery as to

12:11:52 19 communications with Dr. Schubert relating to potentially and

12:11:55 20 actually filing any lawsuit asserting the '475 Patent

12:12:00 21 including communications about the venue or potential

12:12:04 22 defendants.

12:12:04 23          Now, it may be that that discovery has been

12:12:09 24 produced already, but if not, I will order that it be

12:12:12 25 produced.  I will also allow questions about those topics at

47

12:12:18 1 depositions including depositions taken pursuant to

12:12:22 2 Rule 30(b)(6).

12:12:24 3          Now, I take BU's point that some of the topics

12:12:27 4 are very broad in the current deposition notice, so I will

12:12:32 5 say that if there are specific issues that Defendant wants

12:12:37 6 the witness prepared for, it may be helpful for the

12:12:41 7 Defendant to specify those issues in advance of the

12:12:44 8 deposition so that the Deponent can be prepared to testify

12:12:48 9 or to say that he has investigated and there just isn't any

12:12:53 10 knowledge.  So I will leave that up to the Defendant.  I

12:12:58 11 think it would be helpful to get the information he wants,

12:13:01 12 then you can decide what you want to do.

12:13:03 13          I will not allow discovery on other patents

12:13:05 14 asserted in Delaware, or on discussions about the motion to

12:13:09 15 transfer, and I will not allow discovery to go forward on

12:13:13 16 the request directed to general jurisdiction such as BU's

12:13:17 17 ownership of property in Delaware, et cetera, as I

12:13:21 18 understand there is no assertion of general jurisdiction.

12:13:25 19          And I will also allow defendant an opportunity

12:13:30 20 to supplement its response to the motion to dismiss with

12:13:33 21 additional information that it may obtain, and I will allow

12:13:39 22 BU a chance to reply to any supplemental answering brief.

12:13:47 23          So I'm going to allow limited jurisdictional

12:13:52 24 discovery.  I'm going to grant the motion for an extension

12:13:55 25 to take discovery which is DI 146.

48

12:13:58 1          I think this is date requested in that motion

12:14:02 2 have already passed but I want the parties to go back and

12:14:04 3 talk about timing.  It sounds like much of the discovery has

12:14:08 4 been done or can be done quickly, so once you come to an

12:14:13 5 agreement on the dates for the discovery, dates for

12:14:18 6 supplementation of the papers, and let us know what you

12:14:23 7 agree to, via a stipulation.  And I think that addressed the

12:14:31 8 issues that I can address today.

12:14:33 9          Is there anything else from defendants,

12:14:38 10 Lumileds?

12:14:39 11          MR. RADER:  Nothing else, Your Honor, thank you.

12:14:41 12          THE COURT:  Anything else from BU?

12:14:47 13          MR. BOLLINGER:  No, Your Honor, I believe your

12:14:49 14 order is pretty clear, but will we receive a transcript of

12:14:53 15 this call fairly soon just to make sure we have it better

12:14:56 16 than our notes?

12:14:58 17          THE COURT:  Yes, I'm not sure when folks -- who

12:15:02 18 has asked for a transcript or what the timing was, but why

12:15:06 19 don't you talk with the parties about that.

12:15:14 20          And anything else for Plaintiff?

12:15:24 21          Could you maybe say who is speaking?

12:15:28 22          MR. BOLLINGER:  It's James Bollinger for

12:15:32 23 Professor Schubert.  We obviously don't have any role in

12:15:36 24 these various motions between BU and Defendant, however, we

12:15:40 25 have been swept up in the new allegation of conspiracy.

49

```
12:15:44  1   We're not sure, it's an awkward position to be in as a
12:15:48  2   litigant because they never alleged in the complaint that
12:15:52  3   Professor Schubert committed any conspiracy.
12:15:55  4          We were surprised at a lot of the notions that
12:15:58  5   were presented today, but again, we're recognizing the time
12:16:02  6   that went into it, we don't really have anything to
12:16:05  7   supplement the record and allow the Court to decide the
12:16:08  8   personal jurisdiction issue.
12:16:09  9          THE COURT:  Okay.  So then thanks to everyone
12:16:15 10   for getting on the call.  We'll look forward to getting a
12:16:18 11   stipulation from you regarding supplementation.  And I hope
12:16:23 12   everyone has a good weekend.  Thanks.
         13          (Teleconference concluded at 12:16 p.m.)
         14
         15          I hereby certify the foregoing is a true and
              accurate transcript from my stenographic notes in the proceeding.
         16
```

         17               /s/ Dale C. Hawkins
                          Official Court Reporter
         18               U.S. District Court
         19
         20
         21
         22
         23
         24
         25

**'**

**'475** [4] - 46:11, 46:16, 46:18, 46:20

**/**

**/s** [1] - 49:17

**1**

**1** [3] - 5:4, 5:6, 39:8
**11:00** [1] - 1:11
**12** [1] - 5:7
**12(b)(6** [2] - 12:3, 13:14
**12-924(MN** [1] - 1:5
**12:16** [1] - 49:13
**146** [1] - 47:25
**17** [1] - 11:2
**18th** [1] - 27:9
**1993** [1] - 36:24

**2**

**200** [1] - 20:2
**2002** [1] - 31:16
**2009** [1] - 21:12
**2010** [1] - 14:10
**2011** [3] - 25:12, 39:9, 41:12
**2012** [2] - 25:10, 42:3
**2013** [6] - 20:13, 22:3, 22:15, 26:24, 38:4, 38:7
**2017** [2] - 40:3, 40:9
**2019** [3] - 23:18, 35:15, 40:14
**2020** [8] - 1:10, 20:24, 22:4, 22:8, 22:18, 22:22, 38:11, 39:5
**217** [1] - 20:6
**219** [1] - 20:10
**221** [1] - 20:16
**23** [1] - 6:11
**24** [5] - 4:25, 6:11, 6:22, 10:21, 15:20
**25** [2] - 7:11, 14:24
**26** [3] - 6:22, 7:12, 15:11
**27** [2] - 4:25, 10:22
**285** [1] - 37:7
**2nd** [1] - 20:21

**3**

**3** [1] - 5:4
**30(b)(6** [12] - 5:2, 34:22, 35:3, 43:6, 43:22, 44:3, 44:7,

**'**

44:11, 44:16, 44:21, 44:23, 45:9
**30(b)(6)** [1] - 47:2
**330** [1] - 20:22

**5**

**5899003** [1] - 31:16

**6**

**6** [1] - 5:7

**7**

**7** [1] - 1:10

**8**

**844** [1] - 1:13

**A**

**a.m** [1] - 1:11
**abandoned** [2] - 21:14, 27:24
**abetting** [2] - 23:2, 28:9
**able** [4] - 8:2, 14:16, 25:15, 37:14
**absolutely** [2] - 32:15, 33:19
**absorbed** [1] - 15:7
**accounting** [2] - 40:11, 40:12
**accurate** [1] - 49:15
**accused** [2] - 21:2, 44:12
**act** [3] - 19:8, 26:10, 30:15
**action** [4] - 29:15, 30:18, 30:21, 31:18
**actions** [2] - 20:15, 27:20, 27:22, 33:8
**activities** [2] - 12:14, 42:20
**acts** [1] - 30:19
**addition** [1] - 45:10
**additional** [3] - 18:12, 29:9, 47:21
**address** [5] - 3:12, 4:3, 10:20, 14:21, 18:14, 18:24, 24:17, 31:25, 36:4, 41:8, 48:8
**addressed** [2] - 6:8, 48:7
**admission** [4] - 4:19, 5:24, 12:5, 18:13
**admissions** [2] - 6:1,

12:8
**admit** [1] - 12:11
**advance** [1] - 47:7
**affirmed** [2] - 30:1, 45:25
**affirming** [1] - 30:2
**agency** [2] - 46:5, 46:6
**ago** [2] - 21:12, 32:13
**agree** [5] - 27:16, 28:14, 33:1, 34:8, 48:7
**agreed** [2] - 4:7, 42:13
**agreement** [3] - 33:20, 40:4, 48:5
**ahead** [1] - 13:14
**aiding** [2] - 23:2, 28:9
**aimed** [1] - 28:1, 41:24
**al** [2] - 1:4, 1:7
**allegation** [1] - 48:25
**allegations** [3] - 19:3, 45:5, 46:13
**allege** [5] - 19:17, 19:20, 21:25, 22:25, 23:2
**alleged** [7] - 21:1, 21:21, 21:24, 27:13, 31:12, 37:11, 49:2
**alleges** [1] - 46:9
**alleging** [1] - 21:2
**allow** [15] - 13:24, 14:2, 21:14, 28:15, 30:13, 46:14, 46:16, 46:18, 46:25, 47:13, 47:15, 47:19, 47:21, 47:23, 49:7
**allowing** [2] - 11:22, 18:8
**allows** [3] - 28:16, 28:19, 46:5
**alone** [5] - 25:16, 28:7, 39:10, 39:12, 42:18
**amend** [9] - 20:14, 20:24, 22:4, 22:6, 22:16, 26:25, 27:4, 27:5
**amended** [2] - 19:21, 38:17
**amendment** [1] - 27:8
**amount** [2] - 20:20, 43:8
**analysis** [2] - 28:23, 46:3
**AngioScore** [1] - 36:19
**annual** [6] - 34:1, 34:3, 39:19, 39:20, 42:18, 42:22
**answer** [7] - 4:18, 9:19, 14:4, 16:12, 32:14, 32:22, 44:3

**answered** [1] - 15:9
**answering** [1] - 47:22
**answers** [1] - 12:18
**anticipate** [2] - 25:2, 44:22
**anticipation** [1] - 39:17
**antitrust** [1] - 28:9
**anyway** [1] - 17:24
**apologize** [5] - 9:4, 17:4, 39:3
**appeal** [1] - 36:13
**appear** [3] - 7:20, 11:12, 13:22
**APPEARANCES** [2] - 1:18, 2:1
**apply** [1] - 31:8
**appropriate** [3] - 16:8, 18:11, 24:4
**appropriately** [1] - 13:18
**argue** [1] - 3:20
**argued** [1] - 20:25
**arguing** [1] - 38:3
**argument** [3] - 25:6, 28:18, 37:5
**arguments** [1] - 26:5
**arise** [2] - 28:10, 30:21
**arises** [2] - 27:20, 30:18
**arm** [8] - 28:25, 29:2, 29:4, 29:5, 29:6, 29:12, 46:4, 46:5
**arose** [1] - 31:18
**art** [1] - 31:2
**aside** [1] - 45:8
**aspect** [1] - 33:24
**aspects** [1] - 34:15
**asserted** [5] - 19:6, 24:2, 24:14, 25:22, 47:14
**asserting** [2] - 36:8, 46:20
**assertion** [1] - 47:18
**assertions** [2] - 5:15, 18:14
**asserts** [1] - 45:18
**assignment** [2] - 42:11, 42:14
**assistant** [1] - 17:12
**assistants** [1] - 15:14
**associate** [1] - 3:7
**assume** [1] - 34:8
**attached** [1] - 21:17
**attorney** [8] - 9:9, 14:13, 15:5, 16:4, 17:13, 18:7, 25:6, 25:7
**attorney's** [2] - 16:6, 18:5

**attorneys** [1] - 7:5
**August** [1] - 1:10
**authoritative** [1] - 44:14
**authors** [1] - 44:17
**automatically** [1] - 14:18
**avoid** [1] - 40:5
**awaiting** [1] - 4:22
**aware** [1] - 33:5
**awkward** [1] - 49:1

**B**

**backing** [1] - 15:20
**based** [6] - 19:16, 28:18, 35:23, 38:24, 44:4
**basis** [2] - 8:8, 9:13
**BEFORE** [1] - 1:15
**behalf** [5] - 2:25, 3:6, 3:17, 3:20, 4:16
**behest** [2] - 22:8, 39:5
**beneficiary** [1] - 40:6
**BENNETT** [2] - 2:4, 3:5
**Bennett** [1] - 3:6
**better** [2] - 40:2, 48:15
**between** [12] - 9:20, 12:2, 12:11, 20:5, 24:21, 28:11, 32:5, 32:10, 33:20, 43:15, 43:18, 48:24
**bit** [4] - 21:3, 38:6, 38:13, 40:21
**black** [1] - 27:21
**BLAKE** [1] - 2:4
**Blake** [1] - 3:6
**BOLLINGER** [3] - 1:23, 48:13, 48:22
**Bollinger** [3] - 3:1, 48:22
**Boston** [6] - 2:18, 3:12, 3:17, 3:20, 4:6, 4:18
**bother** [1] - 33:22
**breach** [1] - 23:3
**brief** [7] - 20:25, 21:2, 22:2, 22:7, 22:22, 41:5, 47:22
**briefed** [1] - 38:7
**briefing** [12] - 21:6, 22:15, 23:9, 23:13, 23:15, 23:16, 23:19, 24:25, 29:18, 35:15, 35:16, 38:16
**briefly** [3] - 14:21, 19:11, 36:4
**bring** [4] - 14:5, 14:21, 38:10, 38:16

**broad** [3] - 44:9, 46:15, 47:4
**brought** [1] - 36:5
**BROWN** [1] - 2:6
**Brown** [1] - 3:9
**BU** [117] - 5:3, 5:5, 5:10, 5:14, 6:18, 8:18, 8:22, 9:12, 9:20, 11:15, 11:19, 11:20, 12:6, 12:15, 12:24, 13:19, 14:4, 14:10, 15:4, 16:13, 16:18, 16:19, 17:5, 17:6, 17:8, 17:21, 18:8, 19:13, 20:5, 20:8, 20:12, 20:19, 21:2, 21:4, 21:8, 21:12, 22:16, 23:10, 23:16, 24:10, 24:14, 24:19, 24:21, 24:25, 25:12, 25:21, 25:23, 25:25, 26:1, 26:8, 26:17, 26:23, 26:25, 27:1, 27:2, 27:6, 27:8, 27:10, 30:19, 30:20, 32:5, 32:6, 32:10, 32:13, 32:15, 32:22, 33:11, 33:17, 33:20, 33:21, 34:1, 34:4, 34:15, 34:18, 34:24, 35:3, 35:13, 35:23, 35:25, 36:8, 37:6, 37:7, 37:24, 38:3, 38:25, 39:7, 39:9, 39:16, 39:20, 39:23, 39:25, 40:5, 40:6, 40:9, 40:14, 40:18, 41:12, 41:14, 41:21, 42:4, 42:8, 42:10, 42:19, 43:15, 43:18, 45:19, 45:20, 45:23, 46:10, 46:17, 47:22, 48:12, 48:24
**BU's** [18] - 7:5, 8:16, 12:17, 12:23, 13:6, 16:9, 16:12, 19:25, 20:23, 26:4, 31:21, 34:10, 34:16, 38:23, 39:5, 46:16, 47:3, 47:16
**BUCCIGROSS** [15] - 2:7, 18:23, 19:19, 21:23, 22:11, 22:14, 23:7, 24:5, 34:12, 34:21, 36:7, 36:25, 37:3, 39:2, 41:2
**Buccigross** [10] - 3:10, 3:12, 18:20, 18:24, 26:22, 32:24, 34:7, 38:2, 41:10,

43:5
**bucket** [4] - 32:3, 32:18, 32:19, 33:2
**buckets** [2] - 32:2, 33:14
**bunch** [4] - 15:12, 22:13, 24:24, 32:19
**burden** [1] - 13:11
**buy** [1] - 42:16
**BY** [12] - 1:20, 1:23, 1:23, 2:4, 2:7, 2:7, 2:8, 2:8, 2:13, 2:13, 2:16, 2:16

---

## C

**C.A** [1] - 1:5
**calendar** [2] - 13:1, 13:5
**California** [2] - 36:11, 45:25
**campaign** [5] - 20:2, 25:11, 25:20, 32:7, 37:20
**cannot** [1] - 21:13
**career** [1] - 35:24
**case** [35] - 5:15, 12:2, 19:2, 21:25, 22:9, 22:13, 22:17, 22:24, 24:18, 26:11, 27:19, 27:22, 29:18, 29:19, 29:25, 30:16, 31:9, 31:10, 31:11, 31:13, 31:17, 31:21, 36:8, 36:11, 36:14, 36:16, 36:19, 36:23, 37:1, 37:11, 45:23, 45:25
**cases** [3] - 24:8, 37:22, 45:6
**causes** [1] - 29:7
**celebrate** [1] - 37:24
**celebration** [1] - 20:19
**certain** [3] - 4:7, 4:8, 14:19
**certainly** [2] - 23:8, 39:2
**certify** [1] - 49:15
**cetera** [2] - 12:22, 47:17
**chance** [1] - 47:22
**Chancery** [1] - 31:10
**chart** [1] - 4:10
**checked** [1] - 41:13
**Circuit** [13] - 28:20, 28:23, 28:24, 29:17, 29:21, 29:24, 30:1, 30:11, 36:9, 36:11, 45:20, 45:21, 46:2
**cited** [2] - 29:17, 45:6
**civil** [3] - 28:8, 31:18,

31:20
**claim** [7] - 27:19, 30:18, 30:20, 31:4, 31:19, 37:7, 46:9
**claiming** [1] - 8:14
**claims** [2] - 30:16, 40:7
**Claire** [1] - 37:14
**clarification** [2] - 10:10, 42:10
**clarity** [2] - 14:6, 14:22
**clear** [8] - 10:8, 12:18, 17:1, 17:3, 35:21, 36:10, 42:14, 48:14
**clearly** [3] - 26:16, 39:17, 42:4
**client** [1] - 16:10
**CLIFF** [1] - 2:8
**Cliff** [1] - 3:9
**close** [1] - 24:10
**co** [7] - 3:8, 20:24, 25:14, 39:11, 41:13, 41:22, 41:25
**co-conspirator** [1] - 20:24
**co-counsel** [1] - 3:8
**co-inventor** [5] - 25:14, 39:11, 41:13, 41:22, 41:25
**cognizant** [1] - 46:8
**collect** [1] - 37:24
**collected** [1] - 24:15
**column** [3] - 15:3, 15:25
**coming** [2] - 23:11, 42:22
**comment** [1] - 30:6
**commit** [1] - 29:7
**commits** [1] - 29:13
**committed** [1] - 49:3
**communication** [4] - 7:6, 8:18, 9:17, 43:15
**communications** [17] - 6:12, 7:10, 7:12, 8:1, 8:17, 9:15, 9:22, 10:3, 10:4, 11:12, 13:21, 24:21, 26:2, 26:14, 34:14, 46:19, 46:21
**compel** [2] - 3:12, 4:5
**complaint** [4] - 19:18, 28:6, 38:17, 49:2
**completed** [1] - 23:17
**completely** [1] - 12:14
**completing** [1] - 23:14
**computer** [1] - 7:3
**conceded** [1] - 32:21
**concerns** [3] - 25:4, 25:5, 25:18

**concluded** [1] - 49:13
**conduct** [10] - 4:20, 5:1, 5:11, 5:14, 5:15, 5:18, 6:7, 18:10, 20:13, 37:7
**confer** [4] - 22:5, 22:20, 38:9, 38:12
**conferred** [1] - 22:18
**confidentiality** [1] - 40:5
**connection** [2] - 19:14, 24:25
**Connors** [2] - 8:17, 14:8
**consolidate** [2] - 41:20, 42:9
**consolidated** [1] - 41:13
**conspiracy** [50] - 19:7, 19:8, 19:10, 19:17, 19:21, 20:16, 21:1, 21:3, 22:24, 22:25, 23:1, 23:4, 26:7, 26:11, 26:12, 28:6, 28:7, 28:9, 28:10, 28:12, 28:15, 28:19, 29:3, 29:8, 29:21, 30:13, 31:7, 31:11, 31:12, 31:18, 31:20, 36:9, 36:12, 36:13, 36:17, 37:8, 37:13, 37:16, 38:15, 45:19, 45:22, 45:24, 46:6, 46:8, 46:9, 46:12, 48:25, 49:3
**conspirator** [2] - 19:9, 20:24
**conspirator 's** [1] - 19:8
**conspiratorial** [1] - 37:12
**conspirators** [1] - 19:9
**conspire** [1] - 29:14
**conspired** [1] - 46:10
**Constantine** [1] - 36:19
**constituting** [1] - 6:12
**contact** [10] - 32:13, 39:7, 39:8, 39:14, 39:18, 40:3, 40:9, 40:14, 42:1, 45:6
**contacted** [1] - 41:22
**contacts** [2] - 41:10, 41:11
**contend** [1] - 12:21
**content** [1] - 43:14
**contentions** [1] - 12:12
**contents** [1] - 45:13

**continue** [2] - 11:23, 32:11
**CONTINUED** [1] - 2:1
**continued** [2] - 20:16, 33:17
**continues** [1] - 26:13
**continuing** [4] - 23:9, 25:21, 35:17, 37:24
**contrary** [1] - 30:11
**Cooch** [1] - 3:6
**COOCH** [1] - 2:3
**coordination** [1] - 20:4
**core** [2] - 24:23
**corporate** [3] - 12:15, 12:17, 13:6
**correct** [5] - 11:14, 20:11, 22:11, 34:11, 34:12
**correctly** [1] - 27:6
**correspondence** [6] - 16:2, 17:9, 17:21, 32:5, 32:9, 44:9
**Counsel** [3] - 1:25, 2:10, 2:17
**counsel** [9] - 2:22, 3:8, 3:11, 7:23, 14:11, 16:6, 22:20, 23:10, 38:25
**count** [3] - 19:17, 23:4, 28:7
**counter** [1] - 30:14
**counter-plaintiff** [1] - 30:14
**counterclaim** [11] - 19:4, 19:21, 20:3, 20:6, 20:10, 20:17, 20:22, 21:4, 27:19, 30:21, 31:19
**counterclaims** [1] - 30:22
**counts** [1] - 28:10
**couple** [4] - 13:6, 32:13, 38:11, 44:24
**COURT** [63] - 1:1, 2:22, 3:4, 3:14, 3:21, 5:13, 5:25, 6:17, 6:25, 7:16, 8:3, 8:13, 9:1, 9:7, 9:23, 10:2, 10:10, 10:14, 10:17, 10:19, 10:25, 11:3, 11:6, 11:15, 11:18, 13:20, 14:23, 15:10, 15:19, 16:16, 16:22, 16:25, 17:25, 18:22, 19:12, 21:16, 22:9, 22:12, 23:6, 23:23, 26:17, 26:20, 27:12, 28:14, 28:22, 31:9, 33:16, 34:7, 34:13,

36:6, 36:23, 37:2, 38:20, 40:24, 41:3, 41:6, 43:1, 43:4, 43:20, 45:15, 48:12, 48:17, 49:9

**court** [4] - 13:19, 17:2, 27:5, 29:22

**Court** [11] - 1:16, 11:22, 20:25, 26:5, 27:16, 29:20, 30:18, 45:18, 49:7, 49:17, 49:18

**court's** [1] - 46:1

**Court's** [1] - 30:3

**courtesy** [1] - 42:12

**courts** [1] - 28:8

**cover** [1] - 13:7

**covered** [1] - 5:21

**created** [2] - 29:4, 29:9

**creation** [1] - 15:3

**creator** [2] - 15:24, 16:1

**creature** [1] - 29:3

**Cree** [1] - 40:16

**critical** [1] - 21:9

**current** [2] - 39:1, 47:4

### D

**Dale** [1] - 49:17

**date** [2] - 8:12, 48:1

**dates** [3] - 43:14, 48:5

**days** [2] - 21:12, 32:13

**deal** [1] - 40:2

**dealt** [2] - 12:25, 31:11

**DEAN** [1] - 2:4

**Dean** [2] - 3:7, 41:25

**deceive** [1] - 20:7

**December** [4] - 25:12, 34:2, 39:9, 41:12

**decide** [2] - 47:12, 49:7

**deciding** [1] - 39:25

**decision** [2] - 4:23, 46:1

**declaratory** [2] - 30:23, 31:20

**Defendant** [12] - 2:10, 2:17, 3:6, 14:7, 34:8, 46:9, 46:12, 46:15, 47:5, 47:7, 47:10, 48:24

**defendant** [2] - 45:18, 47:19

**defendants** [3] - 20:22, 46:22, 48:9

**Defendants** [7] - 1:8, 4:6, 4:14, 4:16, 14:2, 26:8, 31:14

**defense** [4] - 26:24, 27:3, 27:7, 38:4

**defer** [1] - 29:17

**definition** [1] - 33:12

**defraud** [1] - 22:25

**DELAWARE** [1] - 1:2

**Delaware** [59] - 1:13, 20:2, 20:21, 22:24, 24:2, 24:14, 25:2, 25:10, 25:11, 25:20, 25:21, 26:3, 26:9, 28:3, 28:8, 28:14, 28:15, 28:18, 28:21, 30:13, 31:2, 31:3, 31:5, 31:10, 32:7, 32:22, 32:23, 33:6, 36:16, 37:9, 37:17, 37:20, 37:21, 37:22, 39:8, 39:14, 39:15, 39:18, 39:21, 40:3, 40:7, 40:9, 40:14, 40:16, 41:10, 41:11, 41:24, 41:25, 42:1, 42:18, 42:20, 45:6, 46:12, 47:14, 47:17

**Delaware 's** [1] - 46:4

**delay** [2] - 12:11, 12:21

**demanded** [1] - 38:9

**demanding** [1] - 38:12

**Deponent** [1] - 47:8

**depose** [4] - 34:24, 44:20, 45:11

**deposed** [9] - 12:23, 12:24, 13:25, 14:12, 17:13, 44:17, 44:18, 44:19, 45:11

**deposition** [16] - 8:9, 8:12, 8:25, 10:1, 12:15, 12:16, 13:1, 13:5, 13:6, 15:5, 32:12, 34:22, 35:9, 43:6, 47:4, 47:8

**depositions** [8] - 4:9, 14:13, 18:10, 23:11, 23:14, 34:25, 47:1

**describing** [1] - 42:20

**destroyed** [1] - 40:18

**detailed** [3] - 39:20, 40:10, 40:12

**detailing** [1] - 39:20

**details** [1] - 17:7

**determining** [1] - 29:15

**DI** [1] - 47:25

**difference** [1] - 31:21

**different** [4] - 8:7, 13:13, 29:19, 44:7

**directed** [4] - 27:20, 30:18, 38:14, 47:16

**discovery** [45] - 3:23, 3:24, 4:1, 4:4, 4:7, 4:8, 4:20, 5:1, 5:6, 5:10, 11:2, 11:9, 11:23, 12:7, 13:8, 13:17, 18:8, 18:17, 19:15, 19:16, 23:24, 24:2, 24:6, 24:20, 26:1, 27:13, 32:1, 32:18, 33:16, 35:7, 35:14, 40:18, 45:8, 45:17, 45:18, 46:14, 46:16, 46:18, 46:23, 47:13, 47:15, 47:24, 47:25, 48:3, 48:5

**Discovery** [1] - 1:11

**discussing** [1] - 18:20

**discussions** [3] - 24:3, 32:5, 47:14

**dismiss** [13] - 3:13, 3:25, 4:23, 11:23, 18:14, 19:14, 21:7, 27:7, 28:4, 35:15, 40:19, 45:3, 47:20

**dispositive** [1] - 22:3

**Dispute** [1] - 1:11

**distinction** [1] - 12:2

**district** [1] - 45:25

**DISTRICT** [2] - 1:1, 1:2

**District** [8] - 1:16, 20:21, 24:18, 29:20, 30:2, 36:10, 36:16, 49:18

**divulge** [1] - 17:16

**doctrine** [3] - 29:4, 29:9, 30:12

**document** [10] - 5:5, 9:2, 9:16, 15:1, 18:4, 21:11, 35:7, 35:12, 35:21, 36:2

**documents** [24] - 5:16, 5:19, 6:3, 6:4, 6:9, 6:11, 7:9, 7:12, 7:20, 7:22, 8:6, 8:14, 8:22, 9:8, 16:19, 18:9, 21:6, 23:16, 35:17, 35:18, 35:23, 44:4, 44:16

**domain** [1] - 17:18

**done** [7] - 16:5, 17:15, 21:6, 35:16, 44:4, 48:4

**doubt** [1] - 16:12

**down** [1] - 41:17

**dozen** [2] - 13:7, 44:25

**Dr** [45] - 3:9, 20:5, 20:9, 20:23, 20:25, 21:5, 21:8, 21:13, 22:4, 22:19, 22:20, 24:19, 24:21, 25:14,

25:19, 25:22, 26:3, 27:25, 28:2, 30:25, 32:6, 32:10, 32:12, 33:20, 34:14, 34:24, 35:25, 37:18, 38:9, 38:24, 39:4, 39:5, 39:10, 39:17, 39:19, 39:25, 40:10, 40:12, 40:15, 42:1, 42:4, 43:15, 43:18, 46:10, 46:19

**dribbling** [2] - 35:16, 35:23

**during** [1] - 8:24

**duty** [1] - 23:3

### E

**e-mail** [6] - 21:12, 21:18, 25:12, 35:25, 39:9, 41:12

**e-mails** [7] - 39:24, 44:14, 44:15, 44:18, 44:25, 45:10, 45:13

**early** [2] - 14:10, 42:3

**easy** [2] - 7:3, 35:6

**educate** [1] - 44:24

**educated** [1] - 44:23

**EDWARD** [1] - 2:7

**Edward** [1] - 3:9

**effects** [1] - 19:7

**efforts** [1] - 20:9

**eight** [1] - 21:9

**either** [8] - 13:22, 15:2, 15:14, 15:24, 16:1, 16:3, 28:1, 44:17

**ELECTRONICS** [1] - 1:7

**elsewhere** [2] - 8:4, 9:24

**employees** [2] - 15:17, 34:24

**end** [2] - 23:21, 26:12

**enforceable** [1] - 30:25

**enforcement** [6] - 20:2, 20:9, 25:11, 25:20, 37:20, 37:23

**entertained** [1] - 28:8

**entire** [2] - 12:11, 12:21

**entities** [8] - 8:19, 8:20, 8:23, 9:5, 9:10, 9:21, 13:22, 14:4

**entity** [4] - 6:13, 7:10, 15:1, 15:2

**entries** [4] - 14:14, 14:15, 15:21, 15:23

**ESQ** [13] - 1:20, 1:23,

1:23, 2:4, 2:4, 2:7, 2:7, 2:8, 2:8, 2:13, 2:13, 2:16, 2:16

**essentially** [4] - 12:4, 31:13, 32:2, 37:6

**Essunger** [1] - 3:1

**ESSUNGER** [2] - 1:23, 3:3

**establish** [1] - 32:6

**et** [4] - 1:4, 1:7, 12:22, 47:17

**event** [1] - 13:3

**events** [1] - 12:9

**evidence** [4] - 21:9, 25:1, 25:8, 32:16

**evidencing** [1] - 6:12

**exactly** [1] - 34:3

**example** [13] - 5:23, 6:15, 12:8, 12:10, 19:25, 20:4, 20:7, 20:18, 21:11, 22:23, 25:18, 26:1, 44:8

**examples** [6] - 6:17, 19:11, 19:24, 25:3, 25:5, 39:7

**Exhibit** [1] - 6:11

**exists** [1] - 46:1

**expansive** [1] - 29:11

**expect** [1] - 43:9

**expected** [1] - 27:11

**explain** [2] - 14:16, 19:23

**explained** [1] - 15:14, 42:4

**explanation** [1] - 16:17

**explicitly** [1] - 45:23

**extension** [2] - 30:12, 47:24

**extensive** [1] - 17:8

**extent** [4] - 14:4, 16:19, 24:10, 38:22

### F

**facie** [1] - 19:2

**fact** [15] - 7:19, 19:20, 20:23, 21:10, 21:24, 24:15, 25:13, 27:2, 27:4, 29:17, 29:22, 30:11, 35:23, 36:15, 38:6

**facts** [11] - 20:15, 23:2, 23:8, 23:9, 23:12, 23:20, 23:21, 30:8, 31:25, 38:18

**faculty** [1] - 33:25

**failed** [1] - 42:11

**failing** [1] - 12:11

**failure** [1] - 20:11

fairly [2] - 24:9, 48:15
fall [1] - 33:14
falls [1] - 32:2
far [1] - 30:9
FARNAN [3] - 1:20, 1:20, 2:24
Farnan [1] - 2:25
fault [1] - 38:23
favor [1] - 19:5
feature [1] - 44:12
Federal [13] - 28:20, 28:22, 28:24, 29:16, 29:20, 29:23, 30:1, 30:11, 36:9, 36:11, 45:20, 45:21, 46:2
fee [2] - 12:12, 12:22
few [1] - 34:24
FGS [1] - 10:4
fiduciary [1] - 23:3
field [1] - 30:9
fifty [1] - 44:14
figure [2] - 43:24, 44:1
file [4] - 37:9, 41:18, 42:7, 42:17
filed [11] - 13:4, 14:10, 21:11, 25:10, 25:23, 26:4, 27:4, 30:25, 32:14, 38:6, 39:15
files [1] - 26:12
filing [9] - 25:2, 25:20, 26:9, 31:10, 31:19, 33:6, 34:17, 37:16, 46:20
finally [1] - 39:4
financial [5] - 19:25, 33:17, 34:15, 34:16, 46:16
fine [1] - 43:12
finish [1] - 43:2
firm [20] - 3:9, 14:9, 14:11, 14:13, 14:18, 15:4, 15:6, 15:8, 15:15, 15:18, 16:11, 17:9, 17:16, 17:18, 17:19, 17:20, 17:23, 42:13
first [25] - 4:18, 5:9, 6:6, 10:2, 10:6, 10:11, 10:12, 10:23, 11:9, 12:10, 18:17, 22:3, 25:5, 27:10, 28:5, 28:24, 33:19, 41:9, 41:11, 41:16, 43:8, 44:8, 44:19, 46:2
fit [1] - 19:18
fits [1] - 24:9
five [3] - 5:8, 20:19, 40:9
Flynn [1] - 3:10

folks [3] - 11:12, 14:1, 48:17
follow [2] - 16:5, 16:8
follow-up [2] - 16:5, 16:8
FOR [1] - 1:2
foregoing [1] - 49:15
foreign [3] - 29:7, 29:8, 29:13
foremost [1] - 33:20
form [2] - 23:4, 27:20
formal [2] - 18:2, 23:4
formally [2] - 22:25, 45:7
forth [4] - 17:2, 17:19, 17:23, 44:14
forum [3] - 26:11, 30:19, 32:8
forward [3] - 18:8, 47:15, 49:10
four [7] - 5:5, 17:6, 17:15, 19:24, 20:11, 40:3, 43:7
fourth [1] - 13:5
frankly [6] - 23:21, 33:5, 35:5, 35:24, 38:5, 38:17
fraudulently [1] - 46:10
FRED [1] - 1:4
free [2] - 43:25, 44:2
Friday [1] - 1:10
front [1] - 23:20
frustrated [1] - 12:7
frustrating [1] - 13:8
full [2] - 22:15, 30:1
fully [1] - 38:7
fulsome [1] - 35:13
fundamental [1] - 28:17, 30:22, 31:21
funds [1] - 20:21
furtherance [1] - 46:12

G

GADRE [1] - 2:16
Gadre [1] - 3:19
general [10] - 24:7, 27:16, 32:20, 33:4, 33:10, 33:12, 34:9, 40:5, 47:16, 47:18
generalities [1] - 4:10
Gesmer [2] - 14:8, 15:7
Gina [1] - 3:10
given [5] - 4:12, 6:3, 10:14, 11:22, 34:19
goal [1] - 37:12
gory [1] - 17:7

Gosseay [1] - 15:7
governs [2] - 28:20, 45:21
GRAHAM [1] - 2:7
grant [2] - 45:16, 47:24
granted [1] - 27:9
grappled [1] - 31:6
Gray [3] - 3:10, 18:20, 18:24
Greenfield [1] - 3:19
GREENFIELD [1] - 2:15
grounds [1] - 19:6
group [1] - 39:19
Grover [4] - 29:17, 36:8, 36:14, 45:23
guess [5] - 21:21, 41:7, 44:1, 44:6, 45:2

H

hailed [1] - 13:18
hand [1] - 11:19
handicap [2] - 21:7, 41:16
handicapped [1] - 38:13
handle [1] - 11:16
hang [1] - 37:18
happy [1] - 16:11
harm [1] - 29:7
Hawkins [1] - 49:17
head [5] - 12:24, 13:2, 30:5, 44:19, 44:20
heading [1] - 19:25
hear [7] - 4:5, 4:14, 11:15, 18:17, 26:17, 27:6, 27:8
heard [2] - 26:22, 34:25
hearing [1] - 35:8
help [2] - 21:8, 27:15
helpful [2] - 47:6, 47:11
hereby [1] - 49:15
himself [2] - 38:12, 39:6
hit [1] - 30:5
HOESCHEN [1] - 2:13
Hoeschen [1] - 3:18
Honor [102] - 2:24, 3:3, 3:5, 3:16, 4:15, 4:17, 5:12, 5:23, 6:10, 6:16, 6:21, 7:9, 7:14, 8:2, 8:9, 9:5, 9:19, 9:25, 10:8, 10:13, 10:16, 10:18, 10:24, 11:5, 11:14,

11:17, 12:1, 13:10, 13:12, 14:3, 16:23, 17:8, 17:17, 18:19, 18:23, 19:1, 19:19, 19:20, 20:23, 21:12, 21:23, 22:1, 22:11, 22:14, 22:23, 23:7, 23:11, 23:20, 24:5, 24:22, 25:4, 25:9, 25:16, 26:6, 26:19, 27:6, 27:9, 27:11, 30:5, 30:8, 31:15, 31:17, 31:23, 33:5, 34:12, 34:21, 34:23, 35:6, 35:8, 35:9, 36:3, 36:4, 36:7, 36:10, 36:15, 36:18, 36:25, 37:3, 37:5, 37:10, 37:15, 37:21, 38:1, 38:2, 38:4, 38:5, 38:13, 38:15, 38:19, 39:3, 39:6, 39:15, 39:23, 40:4, 40:16, 40:21, 41:2, 41:4, 43:2, 44:6, 48:11, 48:13
Honor's [1] - 3:13
HONORABLE [1] - 1:15
hope [1] - 49:11
hopefully [1] - 27:15
hour [1] - 40:25
house [1] - 3:11
huge [1] - 13:10
Hypergear [9] - 6:13, 7:6, 7:8, 8:1, 10:3, 15:24, 16:9, 16:13, 16:20

I

iceberg [1] - 40:17
idea [3] - 16:9, 16:13, 33:11
ignoring [1] - 21:18
imagine [2] - 17:8, 32:4
immediately [1] - 27:10
implemented [1] - 36:16
important [2] - 19:1, 30:8
improper [1] - 33:3
impute [1] - 29:14, 30:14, 30:19
imputed [1] - 30:21
IN [1] - 1:1
in-house [1] - 3:11
Inc [1] - 15:24

included [1] - 28:7
includes [1] - 24:1
including [5] - 4:8, 17:15, 46:17, 46:21, 47:1
incumbent [1] - 32:24
indicate [1] - 34:4
indicates [1] - 33:21
individual [3] - 13:2, 14:9, 17:11
individuals [6] - 7:13, 10:5, 13:22, 15:17, 16:17, 16:21
inequitable [10] - 4:20, 5:1, 5:11, 5:13, 5:15, 5:18, 6:7, 18:10, 20:13, 37:7
inferences [1] - 19:4
inform [1] - 20:15
information [9] - 14:1, 33:18, 34:5, 34:15, 34:17, 43:11, 43:12, 47:11, 47:21
infringed [1] - 30:24
infringement [4] - 25:24, 39:17, 42:3, 42:12
initial [1] - 13:3
initiated [1] - 42:17
instance [1] - 29:23
instead [1] - 36:19
institution [1] - 43:25
intentional [1] - 12:22
intentionally [2] - 21:14, 40:4
interest [5] - 20:1, 24:13, 24:15, 33:21, 34:16
interests [3] - 20:1, 33:17, 46:16
internal [1] - 39:9
internally [1] - 25:13
interrogatories [11] - 4:11, 5:9, 10:11, 10:12, 11:10, 11:21, 12:4, 12:19, 12:20, 18:2, 18:12
interrogatory [2] - 9:24, 10:15
introduce [1] - 18:20
invalid [1] - 30:24
invention [1] - 41:15
inventions [1] - 34:1
inventor [7] - 25:14, 39:11, 41:13, 41:15, 41:16, 41:22, 41:25
inventors [4] - 24:12, 33:25, 39:12, 41:15
investigated [1] - 47:9
investigation [1] -

44:4
**involved** [4] - 9:10, 12:23, 27:1, 32:6
**involves** [1] - 31:10
**irrelevant** [1] - 33:5
**issue** [9] - 4:4, 5:14, 13:21, 22:1, 22:8, 31:11, 40:5, 43:20, 49:8
**issued** [1] - 23:17
**issues** [7] - 18:10, 18:21, 18:25, 31:24, 47:5, 47:7, 48:8
**items** [3] - 4:17, 5:8, 6:23
**itself** [3] - 9:3, 35:25, 41:21

**J**

**JAMES** [1] - 1:23
**James** [2] - 3:1, 48:22
**Jim** [1] - 3:11
**JOHNSON** [1] - 2:7
**Johnson** [1] - 3:9
**Judge** [3] - 1:16, 36:23, 37:1
**judgment** [2] - 30:23, 31:20
**judicially** [1] - 29:4
**July** [1] - 25:10
**jurisdiction** [56] - 12:7, 13:13, 13:17, 18:15, 18:25, 19:3, 19:5, 19:6, 19:9, 19:10, 19:16, 22:2, 22:7, 22:17, 23:1, 24:7, 24:9, 26:24, 27:3, 27:7, 27:16, 27:17, 27:18, 28:20, 29:6, 29:10, 29:15, 29:22, 30:3, 30:17, 32:20, 33:4, 33:10, 33:11, 33:13, 35:21, 36:18, 37:23, 38:3, 38:8, 38:10, 45:4, 45:19, 45:20, 45:21, 45:22, 45:25, 46:1, 46:3, 47:16, 47:18, 49:8
**jurisdictional** [22] - 4:1, 5:4, 5:6, 10:20, 11:1, 11:4, 11:8, 12:4, 18:1, 18:16, 18:21, 19:15, 19:24, 23:24, 24:23, 27:13, 32:1, 43:7, 45:16, 45:17, 46:14, 47:23
**jurisdictions** [5] - 28:13, 28:16, 28:19,

34:9

**K**

**Karen** [1] - 3:16
**KAREN** [1] - 2:13
**keep** [2] - 11:24, 19:1
**keeping** [1] - 24:12
**Keller** [2] - 3:17
**KELLER** [3] - 2:12, 2:13, 3:16
**kind** [7] - 12:3, 16:7, 27:14, 32:18, 35:24, 38:21, 44:15
**kinds** [1] - 44:7
**King** [1] - 1:13
**knowing** [1] - 38:9
**knowledge** [2] - 44:22, 47:10
**known** [1] - 26:16
**knows** [1] - 14:4
**KONINKLIJKE** [1] - 1:7

**L**

**lack** [1] - 18:14
**laid** [1] - 28:5
**largely** [1] - 34:25
**last** [3] - 5:8, 35:18, 41:1
**lasted** [1] - 37:13
**lastly** [1] - 5:8
**law** [31] - 12:2, 14:9, 14:11, 14:13, 14:17, 15:4, 15:6, 15:8, 15:15, 15:18, 16:11, 17:9, 17:15, 17:18, 17:19, 17:20, 17:23, 26:11, 27:21, 28:20, 28:21, 28:23, 30:4, 30:7, 30:10, 30:13, 30:18, 42:13, 45:20
**lawsuit** [20] - 25:1, 25:9, 26:12, 26:13, 26:15, 26:16, 27:1, 31:1, 31:19, 32:7, 33:4, 33:6, 33:12, 34:17, 40:8, 41:18, 42:17, 42:22, 46:20
**lawsuits** [12] - 24:13, 25:21, 25:23, 26:2, 26:3, 32:14, 39:16, 39:21, 39:23, 40:16, 42:7, 43:16
**lawyer** [1] - 8:17
**lawyers** [2] - 8:22, 15:15
**least** [8] - 16:17, 24:10, 27:23, 28:10,

37:13, 43:23, 45:17, 45:19
**leave** [12] - 20:14, 20:24, 22:4, 22:6, 22:16, 22:19, 26:25, 27:4, 27:5, 38:7, 47:10
**left** [2] - 30:9, 44:22
**legal** [4] - 31:5, 31:7, 31:24, 36:5
**letter** [5] - 20:25, 21:2, 22:7, 22:22, 27:21
**letters** [2] - 3:23, 3:24
**license** [2] - 41:19, 42:6
**lies** [1] - 7:25
**light** [2] - 16:16, 18:6
**limit** [2] - 29:11, 41:7
**limitations** [1] - 31:4
**limited** [2] - 46:14, 47:23
**line** [3] - 3:1, 3:7, 3:15
**list** [3] - 13:6, 15:12, 39:8
**listed** [4] - 8:23, 10:5, 15:23, 40:5
**literally** [1] - 29:12
**litigant** [1] - 49:2
**litigate** [2] - 25:16, 39:12
**LLC** [3] - 2:10, 3:7, 3:11
**LLP** [3] - 1:20, 2:6, 2:12
**log** [25] - 6:14, 6:24, 7:7, 7:9, 7:11, 7:14, 7:18, 8:11, 8:18, 8:21, 8:24, 9:6, 9:8, 9:9, 10:5, 13:22, 14:12, 14:17, 14:19, 15:3, 15:23, 16:11, 17:20, 18:6, 18:7
**logged** [1] - 9:9
**logically** [1] - 27:15
**look** [5] - 22:21, 28:24, 29:2, 29:23, 49:10
**looking** [8] - 3:24, 7:2, 9:2, 28:23, 32:4, 34:14, 36:21, 46:6
**Lumileds** [10] - 2:10, 3:7, 3:11, 14:7, 14:12, 18:18, 18:24, 19:2, 27:4, 48:10
**Lumileds '** [1] - 22:16
**lying** [1] - 36:1

**M**

**Magnus** [1] - 3:1
**MAGNUS** [1] - 1:23

**MAIER** [1] - 2:8
**Maier** [1] - 3:10
**mail** [6] - 21:12, 21:18, 25:12, 35:25, 39:9, 41:12
**mailed** [1] - 44:13
**mails** [9] - 39:24, 44:14, 44:15, 44:18, 44:25, 45:10, 45:13
**main** [1] - 32:3
**maintenance** [1] - 12:12
**March** [1] - 27:5
**MARYELLEN** [1] - 1:15
**Massachusetts** [5] - 24:19, 28:1, 42:19, 42:23
**materiality** [1] - 20:12
**Matt** [1] - 14:8
**matter** [4] - 30:4, 30:7, 30:10, 30:17
**MAYER** [1] - 2:6
**Mayer** [1] - 3:9
**McKelvie** [2] - 36:23, 37:1
**McQueen** [1] - 21:25
**mean** [6] - 19:23, 21:21, 23:25, 30:16, 35:17, 43:12
**meaning** [1] - 22:5
**meaningful** [1] - 45:9
**means** [1] - 44:24
**meet** [4] - 22:5, 31:4, 38:9, 38:12
**members** [1] - 33:25
**mention** [3] - 16:20, 26:7, 38:12
**mentioned** [9] - 8:19, 22:2, 23:10, 34:23, 39:9, 39:15, 39:24, 42:18, 43:5
**mere** [1] - 25:5
**merely** [1] - 42:10
**merit** [1] - 5:10
**merits** [3] - 4:20, 5:1, 12:3
**met** [1] - 22:18
**metadata** [1] - 14:19
**Michael** [5] - 2:25, 3:9, 3:19, 4:16, 18:19
**MICHAEL** [3] - 1:20, 2:8, 2:16
**Microsoft** [2] - 31:16, 37:11
**middle** [1] - 14:25
**might** [7] - 4:2, 15:25, 26:2, 42:5, 42:6, 42:7
**Mike** [2] - 17:4, 41:4

**mind** [4] - 19:1, 25:25, 27:15, 36:2
**minute** [2] - 19:23, 35:8
**missing** [4] - 7:19, 8:13, 9:3, 9:15
**MOLANO** [22] - 2:8, 4:15, 5:23, 6:10, 6:21, 7:8, 7:22, 8:9, 8:16, 9:5, 9:19, 9:25, 10:7, 10:12, 10:16, 10:18, 10:23, 11:1, 11:5, 11:14, 16:19, 18:19
**Molano** [5] - 3:9, 3:11, 4:16, 16:16, 18:19
**monetize** [2] - 37:9, 37:14
**monetized** [1] - 37:19
**money** [6] - 20:20, 24:16, 26:13, 37:24, 39:21, 40:21
**MOORE** [1] - 1:23
**morning** [7] - 2:22, 2:24, 3:3, 3:4, 3:5, 3:16, 3:21
**most** [4] - 15:13, 15:17, 21:5, 21:9
**motion** [41] - 3:12, 3:13, 3:25, 4:5, 4:23, 11:23, 12:2, 12:3, 12:4, 13:13, 13:14, 18:14, 18:17, 19:14, 19:15, 20:13, 20:14, 21:6, 22:5, 22:6, 22:16, 22:18, 22:19, 24:3, 24:17, 26:25, 27:3, 27:4, 27:7, 28:4, 35:14, 38:7, 39:1, 40:19, 45:3, 45:16, 47:14, 47:20, 47:24, 48:1
**motions** [2] - 4:3, 48:24
**motivation** [1] - 20:7
**move** [2] - 35:7, 35:12
**moving** [1] - 11:24
**MR** [61] - 2:24, 3:3, 3:5, 4:15, 5:23, 6:10, 6:21, 7:8, 7:22, 8:9, 8:16, 9:5, 9:19, 9:25, 10:7, 10:12, 10:16, 10:18, 10:23, 11:1, 11:5, 11:14, 11:17, 11:25, 14:3, 14:24, 15:11, 15:20, 16:19, 16:23, 17:4, 18:19, 18:23, 19:19, 21:23, 22:11, 22:14, 23:7, 24:5, 26:19, 26:21,

27:14, 28:17, 29:2, 31:15, 33:19, 34:12, 34:21, 36:7, 36:25, 37:3, 39:2, 41:2, 41:4, 41:7, 43:2, 43:5, 44:6, 48:11, 48:13, 48:22
**MS** [1] - 3:16
**multiple** [3] - 39:12, 40:12, 45:2

## N

**N.V** [1] - 1:7
**nail** [1] - 30:5
**name** [6] - 15:24, 17:1, 17:11, 17:18, 36:18, 36:21
**named** [1] - 15:7
**names** [3] - 15:14, 15:16, 17:13
**narrowly** [1] - 24:1
**Nate** [1] - 3:18
**NATHAN** [1] - 2:13
**necessarily** [1] - 42:10
**need** [12] - 4:9, 4:13, 4:17, 13:19, 21:8, 22:24, 25:13, 39:10, 40:24, 41:20, 42:9, 42:15
**needed** [1] - 23:12
**needs** [1] - 19:2
**never** [10] - 22:17, 25:6, 31:6, 36:11, 38:8, 42:4, 42:8, 42:18, 45:24, 49:2
**New** [3] - 28:2, 42:19, 42:23
**new** [5] - 23:8, 23:9, 23:20, 48:25
**next** [14] - 5:3, 8:10, 8:24, 10:1, 12:16, 13:1, 13:2, 13:5, 23:11, 23:14, 23:22, 32:11, 35:10, 43:6
**nexus** [1] - 37:6
**nineteen** [1] - 4:19
**non** [1] - 18:1
**non-jurisdictional** [1] - 18:1
**none** [2] - 32:16, 41:11
**nonexistent** [1] - 45:5
**nonsense** [1] - 44:16
**NOREIKA** [1] - 1:15
**normally** [3] - 9:11, 17:16, 40:1
**noted** [1] - 30:2
**notes** [2] - 48:16, 49:15

**nothing** [12] - 10:8, 28:2, 31:1, 31:3, 31:4, 32:15, 35:2, 35:5, 35:19, 41:23, 42:20, 48:11
**notice** [2] - 20:12, 47:4
**notion** [1] - 28:12, 33:9
**notions** [1] - 49:4
**number** [24] - 4:17, 4:24, 4:25, 5:2, 5:5, 5:8, 5:9, 6:11, 10:21, 15:11, 15:20, 19:20, 19:25, 20:11, 20:19, 23:10, 25:9, 25:18, 39:8, 39:14, 39:18, 40:3, 40:9, 40:14
**numbers** [1] - 7:4

## O

**objections** [2] - 4:21, 45:2
**observation** [1] - 14:15
**observer** [1] - 40:20
**obtain** [2] - 20:8, 27:13, 47:21
**obtaining** [1] - 33:17
**obvious** [1] - 30:16
**obviously** [2] - 32:8, 48:23
**occasionally** [1] - 40:20
**occur** [1] - 41:24
**occurred** [2] - 4:9, 27:25
**OF** [1] - 1:2
**offered** [2] - 5:19, 31:6
**office** [4] - 3:8, 3:18, 7:1, 12:25
**Office** [1] - 28:1
**Official** [1] - 49:17
**once** [5] - 26:15, 27:9, 35:24, 42:18, 48:4
**one** [29] - 4:17, 10:21, 11:3, 12:10, 15:8, 15:11, 15:16, 19:8, 19:13, 19:20, 19:25, 26:21, 28:15, 28:18, 29:5, 30:15, 32:18, 33:9, 33:23, 37:2, 39:24, 41:15, 42:15, 43:3, 43:8, 44:13, 44:21, 45:3
**ones** [1] - 11:2
**ongoing** [2] - 26:15, 37:13
**op** [1] - 20:19

**open** [1] - 41:21
**opinion** [2] - 36:13, 44:15
**opportunity** [7] - 23:13, 23:18, 27:10, 38:25, 41:5, 41:23, 47:19
**opposed** [2] - 17:14, 24:20
**opposing** [1] - 20:24
**opposition** [6] - 20:25, 22:2, 22:7, 22:21, 22:22, 38:11
**order** [4] - 11:24, 27:15, 46:24, 48:14
**original** [1] - 42:11
**originally** [1] - 27:23
**Osram** [5] - 24:18, 26:25, 40:3, 40:7, 40:16
**Osram's** [2] - 20:14, 22:16
**ourselves** [1] - 29:11
**outright** [1] - 35:20
**outset** [1] - 24:6
**outside** [1] - 8:17
**overlap** [3] - 4:2, 12:14, 12:20
**overlapping** [1] - 13:9
**overwhelmingly** [1] - 34:25
**own** [3] - 15:8, 32:22
**ownership** [2] - 34:10, 47:17

## P

**P.A** [1] - 2:3
**P.C** [1] - 2:15
**p.m** [1] - 49:13
**page** [1] - 40:12
**paint** [1] - 40:19
**paper** [1] - 43:17
**papers** [4] - 24:1, 24:11, 45:7, 48:6
**paragraph** [5] - 20:2, 20:6, 20:10, 20:16, 20:22
**paralegal** [3] - 12:23, 17:12, 44:18
**paralegals** [1] - 15:15
**part** [6] - 17:10, 22:1, 28:10, 31:12, 37:11, 37:22
**participate** [1] - 41:23
**particular** [1] - 44:12
**parties** [7] - 11:13, 13:18, 18:4, 18:5, 28:11, 48:2, 48:19
**party** [3] - 27:1, 30:15,

40:6
**passed** [1] - 48:2
**past** [2] - 25:24, 42:2
**patent** [36] - 7:24, 12:10, 14:9, 16:20, 20:1, 20:6, 21:13, 24:8, 25:11, 25:14, 27:24, 29:25, 30:24, 31:11, 31:13, 33:6, 33:18, 36:1, 36:16, 37:12, 37:14, 37:17, 39:11, 39:16, 41:19, 42:5, 42:6, 42:7, 42:8, 42:12, 42:15, 43:9, 43:16, 46:11
**Patent** [7] - 15:2, 15:5, 28:1, 46:11, 46:17, 46:18, 46:20
**patent-in-suit** [1] - 7:24
**patents** [6] - 24:2, 24:12, 24:13, 25:22, 34:16, 47:13
**pay** [1] - 12:11
**paying** [1] - 12:21
**payment** [2] - 40:1, 40:15
**pending** [4] - 4:1, 11:23, 13:12, 18:17
**people** [12] - 8:4, 8:7, 9:12, 9:15, 9:17, 14:5, 15:12, 15:13, 44:10, 44:16, 44:25, 45:10
**Pepper** [1] - 3:2
**PEPPER** [1] - 1:22
**percent** [4] - 20:1, 24:12, 24:15, 33:21
**percentage** [1] - 20:9
**perhaps** [2] - 4:8, 39:3
**permissible** [1] - 45:24
**permission** [2] - 3:13, 11:11
**permits** [2] - 28:25, 46:4
**person's** [1] - 29:15
**personal** [30] - 12:6, 13:12, 13:13, 13:17, 18:15, 18:25, 19:2, 19:5, 19:6, 22:2, 22:7, 22:17, 23:1, 26:24, 27:3, 27:7, 27:18, 28:20, 30:3, 30:17, 36:17, 38:3, 38:7, 38:10, 45:3, 45:21, 45:24, 46:1, 46:3, 49:8
**petition** [2] - 13:4, 14:10

**PHILIPS** [1] - 1:7
**photo** [1] - 20:19
**picked** [2] - 37:4, 37:10
**picture** [1] - 40:18
**piece** [1] - 32:9
**piggybacks** [1] - 29:9
**place** [1] - 13:3
**Plaintiff** [2] - 2:25, 48:20
**plaintiff** [2] - 30:14
**Plaintiffs** [2] - 1:5, 1:25
**pled** [5] - 19:21, 19:25, 20:4, 20:7, 20:18
**point** [16] - 6:2, 11:20, 11:22, 14:6, 18:3, 21:21, 26:13, 31:17, 31:22, 33:8, 36:15, 38:5, 38:13, 41:1, 47:3
**points** [2] - 19:13, 36:5
**policy** [2] - 24:11, 39:23
**polling** [1] - 14:18
**portion** [1] - 20:8
**position** [2] - 43:24, 49:1
**potential** [3] - 13:23, 38:16, 46:21
**potentially** [3] - 18:5, 41:17, 46:19
**practice** [1] - 11:22
**preparation** [1] - 44:11
**prepare** [1] - 15:22
**prepared** [11] - 4:3, 13:25, 14:1, 14:18, 18:7, 35:3, 35:10, 44:3, 45:12, 47:6, 47:8
**present** [1] - 3:11
**presented** [1] - 49:5
**presumably** [2] - 22:8, 39:4
**pretty** [3] - 27:20, 35:6, 48:14
**prima** [1] - 19:2
**principle** [4] - 12:6, 13:12, 13:15, 17:14
**printouts** [1] - 7:2
**privilege** [37] - 6:14, 6:24, 7:7, 7:9, 7:11, 7:14, 7:18, 7:25, 8:2, 8:5, 8:8, 8:11, 8:15, 8:18, 8:20, 8:21, 8:23, 8:24, 9:2, 9:6, 9:8, 9:9, 9:12, 9:13, 9:18, 10:5, 13:22,

13:23, 14:2, 14:12,
14:17, 14:19, 15:3,
15:23, 16:11, 17:20,
18:6
**privileged** [4] - 7:19,
7:21, 9:22, 17:24
**problem** [1] - 28:17
**problems** [1] - 41:22
**procedure** [1] - 32:17
**proceeding** [1] - 49:15
**proceeds** [1] - 40:11
**process** [2] - 29:1,
46:4
**produce** [3] - 8:14,
16:21, 21:5
**produced** [11] - 7:23,
8:18, 14:12, 17:20,
23:16, 32:9, 33:18,
34:3, 35:24, 46:24,
46:25
**producing** [2] - 21:8,
35:18
**product** [2] - 31:3,
44:13
**production** [8] - 4:25,
5:18, 6:6, 7:20,
16:15, 18:4, 18:9,
18:13
**Professor** [4] - 34:2,
42:12, 48:23, 49:3
**profit** [2] - 37:12,
46:11
**profiting** [1] - 31:13
**prognosticated** [1] -
29:20
**prongs** [1] - 29:5
**property** [4] - 32:22,
32:23, 34:10, 47:17
**proposed** [1] - 38:17
**prosecuted** [2] - 7:23,
14:9
**prosecuting** [5] -
7:23, 14:13, 15:5,
16:6, 18:5
**proud** [1] - 37:18
**provide** [7] - 4:7, 5:10,
19:11, 23:13, 35:19,
42:6, 44:21
**provided** [7] - 4:8,
4:21, 14:18, 15:4,
43:10, 43:13, 43:17
**provides** [1] - 34:1
**providing** [1] - 44:23
**PTO** [2] - 20:15, 21:14
**pursuant** [3] - 43:21,
45:19, 47:1
**pursuing** [1] - 34:9
**put** [4] - 19:8, 20:12,
38:14, 43:21
**putting** [1] - 23:4

### Q

**questions** [9] - 8:12,
12:17, 16:12, 25:25,
31:24, 36:2, 44:1,
44:2, 46:25
**quick** [1] - 39:7
**quickly** [4] - 26:21,
36:18, 39:8, 48:4
**quite** [1] - 38:13
**quote** [2] - 41:9, 45:12
**quoting** [1] - 39:12

### R

**Rader** [12] - 3:19,
3:20, 11:16, 16:25,
17:4, 26:18, 34:8,
34:23, 36:5, 38:2,
41:4, 43:20
**RADER** [22] - 2:16,
11:17, 11:25, 14:3,
14:24, 15:11, 15:20,
16:23, 17:4, 26:19,
26:21, 27:14, 28:17,
29:2, 31:15, 33:19,
41:4, 41:7, 43:2,
43:5, 44:6, 48:11
**raise** [3] - 22:7, 27:2,
27:10
**raised** [6] - 22:3,
22:17, 22:21, 27:23,
38:8, 39:4
**raises** [1] - 15:25
**raising** [2] - 26:24,
38:4
**rather** [1] - 35:4
**reached** [1] - 42:13
**reaches** [1] - 40:10
**read** [5] - 6:1, 21:16,
21:17, 37:2, 44:8
**reality** [1] - 32:2
**realized** [1] - 3:24
**really** [16] - 11:19,
13:9, 24:22, 30:7,
31:21, 31:25, 32:4,
35:2, 39:18, 39:22,
40:18, 44:9, 45:5,
45:9, 45:14, 49:6
**reason** [6] - 26:10,
27:2, 30:6, 30:10,
31:5, 31:7
**reasonable** [1] - 17:22
**reasons** [1] - 41:20
**receive** [4] - 8:21,
43:9, 46:17, 48:14
**received** [6] - 4:21,
6:22, 20:20, 23:15,
40:14, 43:9, 44:25,
46:17

**receives** [1] - 40:20
**recipient** [1] - 16:1
**recognize** [5] - 29:21,
29:25, 30:12, 36:9,
45:22
**recognized** [1] - 29:24
**recognizes** [1] - 46:6
**recognizing** [1] - 49:5
**record** [3] - 17:3, 25:8,
49:7
**reference** [1] - 7:8
**referenced** [3] - 6:13,
6:23, 7:13
**referred** [1] - 7:10
**referring** [4] - 6:12,
7:9, 7:12, 31:16
**refused** [5] - 4:18,
4:24, 5:10, 10:13,
35:20
**refuses** [1] - 5:4
**refusing** [1] - 5:6
**regard** [1] - 35:15
**regarding** [4] - 18:4,
24:22, 43:15, 49:11
**reject** [1] - 28:13
**rejected** [1] - 36:11
**relate** [2] - 12:9, 32:20
**related** [2] - 12:13,
15:1
**relates** [1] - 8:21
**relating** [3] - 8:23,
46:17, 46:19
**relationship** [3] - 9:20,
9:24, 46:5
**relationships** [1] -
33:24
**relevant** [1] - 21:5
**relief** [1] - 40:7
**relies** [1] - 45:23
**rely** [1] - 21:20
**relying** [1] - 27:23
**remember** [6] - 15:16,
15:24, 19:14, 35:1,
35:4, 43:22
**remembered** [1] -
15:13
**repeatedly** [1] - 35:13
**reply** [1] - 47:22
**report** [3] - 34:1,
39:20, 42:22
**reported** [1] - 42:21
**reporter** [1] - 17:2
**Reporter** [1] - 49:17
**reports** [3] - 34:4,
39:19, 42:19
**represent** [3] - 13:10,
15:22, 17:17
**representations** [3] -
18:6, 24:24, 25:7

**representative** [1] -
12:17
**represented** [1] -
14:11
**request** [11] - 6:10,
10:17, 14:25, 32:25,
34:9, 35:8, 35:12,
35:21, 36:2, 45:17,
47:16
**requested** [3] - 43:8,
46:15, 48:1
**requesting** [1] - 23:25
**requests** [19] - 4:19,
4:25, 5:18, 5:24, 6:1,
6:6, 11:11, 12:5,
12:8, 14:20, 16:14,
16:15, 18:13, 24:23,
26:14, 32:20, 33:14,
33:16
**require** [4] - 17:22,
18:2, 18:3, 18:12
**required** [2] - 21:25,
43:24
**requires** [3] - 27:19,
30:18, 44:11
**reserved** [1] - 13:18
**resolved** [1] - 19:5
**respect** [2] - 13:20,
18:1
**respond** [12] - 4:11,
4:23, 6:2, 6:18,
11:19, 11:21, 13:11,
13:14, 13:19, 35:20,
41:5, 45:7
**responded** [3] - 11:10,
12:5, 21:18
**responding** [1] - 6:15
**response** [12] - 6:4,
6:6, 6:9, 6:14, 6:22,
18:2, 23:17, 26:25,
27:3, 28:4, 31:6,
47:20
**responses** [2] - 10:15,
18:12
**responsibility** [1] -
43:23
**rest** [1] - 42:24
**retained** [1] - 34:5
**retains** [1] - 33:21
**return** [3] - 32:17,
39:25, 41:14
**returned** [1] - 34:1
**returning** [2] - 24:11,
41:17
**revenue** [3] - 20:8,
43:9, 46:17
**revenues** [2] - 33:17,
34:4
**revised** [2] - 37:18,
37:19

**revival** [8] - 12:9,
12:12, 12:24, 13:4,
14:10, 31:1, 37:17,
37:20
**revive** [5] - 20:5,
21:13, 35:25, 37:8,
46:10
**revived** [1] - 27:24
**RFA** [1] - 12:13
**RFA's** [6] - 4:18, 11:6,
11:9, 11:20, 11:21,
18:3
**RFP** [2] - 6:19, 9:14
**RFP's** [7] - 5:10, 10:3,
10:6, 10:7, 10:9,
10:21, 10:23
**rights** [9] - 25:15,
25:22, 25:24, 39:11,
41:13, 41:20, 42:9,
42:14, 42:16
**road** [1] - 41:17
**ROLAND** [1] - 2:4
**Roland** [1] - 3:4
**role** [2] - 30:13, 48:23
**round** [2] - 22:15,
23:19
**rounds** [1] - 17:15
**Rule** [4] - 12:3, 13:14,
43:22, 47:2
**rules** [1] - 13:12
**ruling** [1] - 30:3

### S

**SACKS** [1] - 2:15
**Samuel** [1] - 15:7
**sandbag** [1] - 38:21
**sandbagged** [1] - 38:6
**satisfy** [1] - 23:1
**scheduled** [1] - 35:11
**scheme** [1] - 37:23
**Schubert** [46] - 20:5,
20:23, 21:5, 21:8,
21:13, 22:4, 22:19,
24:19, 24:21, 25:1,
25:15, 25:19, 25:22,
26:3, 27:25, 28:2,
30:25, 32:6, 32:10,
32:12, 33:20, 34:2,
34:14, 34:24, 35:25,
37:18, 38:9, 39:4,
39:5, 39:10, 39:15,
39:17, 39:19, 39:25,
40:10, 40:12, 40:15,
42:1, 42:4, 42:13,
43:15, 43:18, 46:10,
46:19, 48:23, 49:3
**SCHUBERT** [1] - 1:4
**Schubert 's** [6] - 20:9,
20:25, 22:20, 25:14,

26:9, 38:24
**scope** [3] - 23:24, 32:1, 46:14
**scrap** [1] - 43:17
**scribble** [1] - 36:22
**search** [3] - 16:21, 17:11, 17:14
**searched** [2] - 17:6, 17:9
**searches** [1] - 18:9
**searching** [3] - 17:8, 17:15, 17:22
**second** [15] - 4:24, 6:22, 10:7, 10:8, 10:21, 11:11, 16:14, 20:4, 22:5, 22:19, 31:5, 40:22, 43:3, 43:14, 44:20
**secondly** [1] - 41:21
**Section** [1] - 37:7
**seeking** [1] - 24:6
**selecting** [1] - 32:7
**sell** [3] - 41:19, 42:5, 42:15
**semi** [1] - 14:18
**semi-automatically** [1] - 14:18
**sense** [2] - 16:2, 45:14
**sent** [3] - 39:20, 40:12, 42:19
**separate** [3] - 14:11, 17:15, 45:11
**separately** [3] - 10:20, 11:8, 13:16
**served** [1] - 14:8
**service** [2] - 28:25, 46:4
**set** [15] - 4:18, 4:25, 5:9, 6:6, 10:3, 10:6, 10:7, 10:8, 10:11, 10:12, 10:23, 11:9, 11:11, 16:14
**setting** [1] - 45:8
**settlement** [4] - 20:21, 40:4, 40:11, 40:15
**seven** [2] - 7:13, 10:5
**SGS** [8] - 7:10, 8:1, 10:4, 15:1, 15:5, 15:8, 16:17, 16:20
**SHAW** [1] - 2:12
**Shaw** [1] - 3:17
**short** [1] - 41:8
**show** [1] - 19:2
**showed** [8] - 8:16, 9:6, 9:8, 15:2, 15:25, 16:5, 16:10, 16:13
**shows** [1] - 21:7
**sides** [1] - 21:20
**significant** [1] - 21:7
**simple** [1] - 27:21

**simply** [3] - 4:21, 15:16, 19:8
**sincerely** [1] - 16:12
**six** [4] - 4:16, 5:9, 39:7, 40:14
**sixth** [1] - 5:17
**someone** [2] - 26:12, 29:13
**someplace** [1] - 8:3
**soon** [1] - 48:15
**sorry** [3] - 5:25, 9:4, 36:21
**sort** [1] - 32:23
**sought** [1] - 22:4
**sounds** [3] - 8:5, 34:19, 48:3
**speaking** [1] - 48:21
**specific** [24] - 4:17, 4:22, 6:18, 6:20, 6:23, 7:22, 13:21, 24:7, 24:9, 24:23, 27:17, 27:18, 29:6, 30:17, 32:25, 33:10, 33:13, 35:21, 37:23, 43:7, 44:11, 44:22, 47:5
**specifically** [9] - 4:12, 5:20, 5:24, 6:21, 6:23, 7:25, 8:22, 30:2, 40:7
**specifics** [1] - 8:6
**specify** [1] - 47:7
**spelling** [1] - 36:20
**St** [1] - 37:14
**stage** [1] - 19:3
**standard** [5] - 32:17, 33:22, 33:23, 33:24, 39:23
**standing** [1] - 39:6
**start** [5] - 4:4, 14:24, 16:25, 19:7, 34:22
**started** [1] - 25:20
**state** [6] - 12:21, 26:11, 29:7, 29:8, 29:13, 29:19
**STATES** [1] - 1:1
**states** [1] - 46:3
**States** [1] - 1:16
**status** [2] - 39:20, 39:22
**statute** [9] - 28:25, 29:3, 29:4, 29:5, 29:6, 29:12, 46:4, 46:5, 46:7
**stay** [1] - 22:15
**stayed** [2] - 22:9, 22:13
**stenographic** [1] - 49:15
**step** [3] - 14:5, 28:24,

46:2
**still** [7] - 5:3, 5:6, 9:1, 25:15, 30:20, 30:21, 35:18
**stipulation** [2] - 48:7, 49:11
**Stocker** [1] - 41:25
**strange** [1] - 15:21
**Street** [1] - 1:13
**strong** [2] - 38:22, 39:3
**strongly** [1] - 13:15
**stuff** [7] - 7:2, 7:4, 11:8, 12:10, 21:19, 22:13, 33:1
**subject** [3] - 12:6, 13:6, 19:10
**subjects** [1] - 19:8
**submitting** [1] - 12:12
**subpoena** [12] - 5:2, 5:3, 5:5, 6:4, 6:9, 10:17, 12:15, 14:8, 23:17, 35:15, 43:6, 43:8
**subsequent** [3] - 30:6
**substance** [3] - 16:14, 19:22, 23:5
**substantial** [3] - 20:20, 24:16, 40:15
**substantive** [2] - 11:8, 13:13
**successfully** [1] - 24:20
**successor** [1] - 13:1
**sue** [4] - 25:24, 39:16, 42:2, 42:12
**sued** [1] - 46:11
**sufficient** [1] - 46:13
**suggest** [1] - 25:16
**suggestion** [1] - 26:23
**suing** [1] - 39:17
**suit** [3] - 7:24, 37:9, 37:16
**sum** [1] - 16:14
**summary** [1] - 5:12
**sums** [1] - 24:16
**supplement** [2] - 47:20, 49:7
**supplemental** [5] - 23:13, 23:19, 38:16, 42:14, 47:22
**supplementation** [2] - 48:6, 49:11
**supposed** [1] - 22:12
**supposedly** [1] - 41:9
**Supreme** [1] - 30:17
**surprise** [1] - 38:23
**surprised** [1] - 49:4
**surrounding** [1] - 12:9
**Susmita** [1] - 3:19

**SUSMITA** [1] - 2:16
**swept** [1] - 48:25

## T

**table** [1] - 27:17
**tailored** [1] - 24:1
**talks** [1] - 29:6
**TAYLOR** [1] - 2:3
**Taylor** [1] - 3:6
**tech** [4] - 12:24, 13:2, 44:19, 44:20
**Teleconference** [2] - 1:11, 49:13
**ten** [5] - 20:1, 20:9, 24:12, 24:14, 33:21
**term** [1] - 20:5
**terms** [6] - 11:8, 18:8, 21:24, 29:15, 34:14, 34:15
**test** [10] - 8:2, 8:4, 8:19, 8:24, 9:2, 9:11, 14:2, 19:7, 26:4, 26:7
**testify** [1] - 47:8
**testimony** [1] - 18:7
**testing** [1] - 9:18
**THE** [65] - 1:1, 1:2, 1:15, 2:22, 3:4, 3:14, 3:21, 5:13, 5:25, 6:17, 6:25, 7:16, 8:3, 8:13, 9:1, 9:7, 9:23, 10:2, 10:10, 10:14, 10:17, 10:19, 10:25, 11:3, 11:6, 11:15, 11:18, 13:20, 14:23, 15:10, 15:19, 16:16, 16:22, 16:25, 17:25, 18:22, 19:12, 21:16, 22:9, 22:12, 23:6, 23:23, 26:17, 26:20, 27:12, 28:14, 28:22, 31:9, 33:16, 34:7, 34:13, 36:6, 36:23, 37:2, 38:20, 40:24, 41:3, 41:6, 43:1, 43:4, 43:20, 45:15, 48:12, 48:17, 49:9
**theory** [4] - 23:1, 28:6, 28:12, 28:15, 28:19, 29:3, 29:8, 29:21, 30:13, 31:7, 36:10, 36:12, 36:13, 36:17, 45:20, 45:22, 45:24, 46:6
**therefore** [2] - 13:17, 29:24
**they've** [12] - 5:19, 6:8, 10:13, 12:23, 12:24, 16:4, 32:3,

32:10, 32:17, 44:18, 44:19, 45:11
**thin** [1] - 45:5
**thinking** [1] - 11:19
**third** [6] - 11:12, 15:11, 18:4, 18:5, 20:7, 40:6
**third-party** [1] - 40:6
**three** [10] - 5:2, 7:14, 7:15, 14:20, 14:25, 16:14, 25:4, 25:18, 25:21, 32:2, 33:2, 39:15, 39:18, 39:21
**threshold** [4] - 11:25, 30:3, 31:5, 31:7
**Thursday** [1] - 8:10
**Thursday's** [1] - 8:24
**timing** [2] - 48:3, 48:18
**tip** [1] - 40:17
**tipped** [1] - 11:18
**today** [3] - 3:18, 48:8, 49:5
**took** [1] - 13:3
**topic** [6] - 12:15, 43:14, 43:19, 44:7, 44:11, 44:16
**topics** [12] - 5:4, 5:6, 5:21, 12:8, 12:14, 13:7, 18:1, 34:20, 43:7, 44:7, 46:25, 47:3
**tort** [2] - 29:7, 29:13
**transcript** [3] - 48:14, 48:18, 49:15
**transfer** [11] - 12:25, 13:3, 24:3, 24:17, 24:18, 25:22, 41:18, 42:11, 44:19, 44:20, 47:15
**transferred** [1] - 27:25
**transferring** [3] - 25:24, 42:2, 43:16
**transfers** [1] - 39:16
**treated** [1] - 40:6
**tried** [2] - 24:18, 40:19
**triple** [1] - 23:21
**troll** [1] - 42:7
**Troutman** [1] - 3:1
**TROUTMAN** [1] - 1:22
**true** [4] - 19:4, 20:15, 37:15, 49:15
**try** [2] - 39:2, 43:24
**trying** [2] - 7:17, 44:1
**turn** [2] - 37:5, 40:22
**two** [18] - 4:24, 5:8, 15:16, 19:5, 21:12, 25:3, 25:9, 25:19, 25:23, 28:11, 32:19, 37:22, 39:14, 41:9,

41:15, 44:8
**type** [1] - 29:16
**types** [2] - 28:8, 28:9

## U

**U.S** [1] - 49:18
**unclear** [2] - 7:24, 13:23
**uncovered** [1] - 44:5
**under** [6] - 19:24, 21:24, 26:7, 30:12, 45:6, 46:6
**underlies** [1] - 30:15
**underlying** [2] - 19:20, 21:24
**understood** [2] - 4:6, 6:10
**unintentional** [2] - 12:13, 12:22
**uninterested** [1] - 40:20
**UNITED** [1] - 1:1
**United** [1] - 1:16
**University** [5] - 2:18, 3:17, 3:20, 4:7, 4:18
**University's** [1] - 3:13
**unless** [1] - 31:23
**unquote** [2] - 41:9, 45:12
**unrelated** [2] - 33:8, 33:11
**unstayed** [1] - 22:18
**up** [27] - 8:16, 9:6, 9:8, 15:2, 15:20, 15:25, 16:5, 16:8, 16:10, 16:13, 23:11, 28:5, 29:15, 32:16, 36:5, 37:4, 37:10, 38:10, 38:16, 40:24, 41:1, 41:21, 43:21, 44:10, 47:10, 48:25
**Updegrove** [2] - 14:8, 15:7
**upfront** [1] - 40:1
**uses** [1] - 38:17
**usual** [1] - 40:2

## V

**variants** [1] - 26:4
**various** [2] - 28:9, 48:24
**vendor** [1] - 16:1
**venue** [1] - 46:21
**versus** [1] - 12:3
**via** [1] - 48:7
**view** [1] - 42:10
**Virginia** [1] - 28:2

## W

**waited** [2] - 16:6, 22:6
**waived** [2] - 26:23, 38:3
**wall** [1] - 37:18
**wants** [2] - 47:5, 47:11
**week** [13] - 5:3, 10:1, 12:16, 13:1, 13:5, 21:19, 23:11, 23:14, 23:22, 32:11, 35:10, 35:18, 43:6
**weekend** [1] - 49:12
**weeks** [4] - 25:19, 25:23, 38:11, 39:14
**weigh** [1] - 38:25
**Westlaw** [1] - 31:16
**whatsoever** [1] - 32:14
**whole** [3] - 5:14, 32:19, 36:20
**Wilmington** [1] - 1:13
**withheld** [1] - 34:6
**witness** [14] - 16:9, 16:12, 35:3, 35:10, 43:12, 43:18, 43:21, 44:3, 44:15, 44:21, 44:23, 45:10, 45:12, 47:6
**witnesses** [3] - 13:24, 32:10, 32:12
**Wolf** [1] - 3:19
**WOLF** [1] - 2:15
**word** [5] - 26:23, 28:7, 38:15, 38:22, 39:4
**words** [2] - 13:2, 20:12
**wrap** [2] - 40:24, 41:1
**writing** [2] - 43:11, 43:13
**wrote** [2] - 44:25, 45:10

## Y

**year** [4] - 27:5, 33:24, 34:2, 39:19
**years** [2] - 21:9, 42:21
**yesterday** [2] - 4:17, 4:24
**York** [3] - 28:2, 42:19, 42:23