## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| E. FRED SCHUBERT, | ) |
| | ) |
| Plaintiff and Counterclaim-Defendant, | ) |
| | ) C.A. No. 1:12-cv-924-MN |
| v. | ) |
| | ) **JURY TRIAL DEMANDED** |
| LUMILEDS LLC, | ) |
| | ) |
| Defendant and Counterclaimant. | ) **Confidential – Filed Under Seal** |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

### LUMILEDS LLC'S OPENING BRIEF IN SUPPORT OF ITS MOTIONS:

**(1) FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT**

**(2) FOR SUMMARY JUDGMENT OF INVALIDITY DUE TO ANTICIPATION**

**(3) FOR SUMMARY JUDGMENT OF UNENFORCEABILITY DUE TO INEQUITABLE CONDUCT**

**(4) TO PRECLUDE EXPERT OPINIONS OF JOEL WACEK ON DAMAGES**

**(5) TO PRECLUDE EXPERT OPINIONS OF E. FRED SCHUBERT ON VALIDITY**

**(6) TO PRECLUDE EXPERT OPINIONS OF JAMES SHEALY ON INFRINGEMENT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENTS ........................................................ 1

NATURE AND STAGE OF PROCEEDINGS ................................................................... 2

I.    MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT ...................... 2

    A.    BACKGROUND ................................................................................ 3

        1.    The Subject Matter of the '475 Patent ...................................... 3

        2.    The Asserted Claims and Exemplary Embodiments ................................ 4

        3.    Lumileds' Accused Products and Processes ...................................... 5

        4.    Plaintiff's "Evidence" of Infringement ...................................... 7

    B.    ARGUMENT ................................................................................ 8

        1.    Schubert Did Not Plead a Viable Infringement Theory........................ 8

        2.    Schubert Has Not Satisfied His Burden to Prove Infringement on a Representative Basis ...................................................... 9

        3.    Lumileds Does Not Expose a "Non-c-Plane" Surface............................ 10

        4.    Lumileds' Etches Are Not "Crystallographic" .............................. 13

        5.    Shealy Provides No Opinion that Lumileds' Products "Obtain Crystallographic Plane Surfaces" .......................................... 22

II.   MOTION FOR SUMMARY JUDGMENT OF INVALIDITY ................................ 23

    A.    BACKGROUND ................................................................................ 23

    B.    ARGUMENT ................................................................................ 25

        1.    Marasina Anticipates Claims 11-14 & 16.................................... 25

        2.    Youtsey Anticipates All Asserted Claims.................................... 29

III.  MOTION FOR SUMMARY JUDGMENT OF INEQUITABLE CONDUCT ............. 32

    A.    The Certification of "Unintentional Delay" was False ........................ 33

    B.    The False Certification Was Material .......................................... 35

    C.    The False Certification Was Made with Intent to Deceive.................... 35

        1.    Connors' Intent to Deceive ................................................ 36

        2.    Schubert's Intent to Deceive .............................................. 37

        3.    Lee's and Stevens' Intent to Deceive...................................... 37

IV.   MOTION TO PRECLUDE DAMAGES OPINIONS OF MR. WACEK ...................... 38

    A.    Wacek's Opinions Relying on the BU-Cree and Cree-Bridgelux Agreements Are Unreliable and Divorced from the Facts.................................... 39

# TABLE OF CONTENTS
(continued)

|  |  |  |  |
|---|---|---|---|
|  | 1. | Wacek Has Never Seen the Agreements | 39 |
|  | 2. | Wacek Did Not Establish Comparability | 40 |
|  | 3. | Wacek Fails to Account for Critical Differences | 41 |
| B. | | Equating Light Output to Profit Is Nonsensical and Unaccepted | 42 |
| C. | | Wacek Should Be Precluded from Relying on ███████████ ███████ | 44 |
| D. | | Wacek's Unsupported Opinion About the Signify Program Should Be Precluded | 45 |
| V. | | MOTION TO PRECLUDE EXPERT TESTIMONY OF DR. SCHUBERT | 45 |
| A. | | Schubert's Direct Financial Interest in the Result Disqualifies Him | 45 |
| B. | | Schubert Cannot Testify About Secondary Considerations | 46 |
|  | 1. | Schubert Is Not Qualified to Opine on Commercial Success, Licensing, or Long-Felt Need | 46 |
|  | 2. | Schubert Has Not Established a Nexus Between the Claimed Invention and Secondary Considerations of Non-Obviousness | 48 |
| C. | | Schubert Cannot Opine on Infringement Because He Cannot See Materials Showing the Allegedly Infringing Process | 49 |
| D. | | Schubert's Opinions on the Marasina and Seelman-Eggebert References Depend on Impermissible Claim Constructions | 49 |
| VI. | | MOTION TO PRECLUDE INFRINGEMENT OPINIONS OF DR. SHEALY | 50 |
| CONCLUSION | | | 50 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3D Med. Imaging Sys. LLC v. Visage Imaging, Inc.*,
   228 F.Supp.3d 1331 (N.D. Ga. 2017) ...............................................................35, 37

*Alloc, Inc. v. Pergo, L.L.C.*,
   751 F. Supp. 2d 1049 (E.D. Wis. 2010), *aff'd*, 426 F. App'x 909 (Fed. Cir.
   2011) ..................................................................................................................10

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
   239 F.3d 1343 (Fed. Cir. 2001)..............................................................................16

*Aptix Corp. v. Quickturn Design Sys.*,
   269 F.3d 1369 (Fed. Cir. 2001)..............................................................................37

*Aventis Pharma SA v. Hospira, Inc.*,
   675 F. 3d 1324 (Fed. Cir. 2012).............................................................................13

*AVM Techs., LLC v. Intel Corp.*,
   927 F. Supp. 2d 139 (D. Del. 2013)........................................................................41

*Bayer CropScience AG v. Dow AgroSciences LLC*,
   728 F.3d 1324 (Fed. Cir. 2013)..............................................................................13

*Bio-Rad Labs., Inc. v. 10X Genomic Inc.*,
   967 F.3d 1353 (Fed. Cir. 2020)..............................................................................40

*Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*,
   246 F.3d 1368 (Fed. Cir. 2001)..............................................................................25

*Cargill, Inc. v. Canbra Foods, Ltd.*,
   476 F.3d 1359 (Fed. Cir. 2007)..............................................................................35

*Chapco, Inc. v. Woodway USA, Inc.*,
   282 F. Supp. 3d 472 (D. Conn. 2017)......................................................................9

*Cot'n Wash, Inc. v. Henkel Corp.*,
   56 F. Supp. 3d 626 (D. Del. 2014)..........................................................................49

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993)...............................................................................1, 38, 46

*Del. Display Grp. LLC v. VIZIO, Inc.*,
   2017 WL 784988 (D. Del. Mar. 1, 2017) ...............................................................38

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*EMI Grp. N. Am., Inc. v. Cypress Semiconductor Corp.*,
  268 F.3d 1342 (Fed. Cir. 2001)......................................................................................25

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*,
  879 F.3d 1332 (Fed. Cir. 2018)......................................................................................43

*Graham v. John Deere Co. of Kansas City*,
  383 U.S. 1 (1966).........................................................................................................46

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
  527 F.3d 1379 (Fed. Cir. 2008)......................................................................................22

*Iron Grip Barbell Co. v. USA Sports, Inc.*,
  392 F.3d 1317 (Fed. Cir. 2004)......................................................................................49

*Kraft Foods Grp. Brands LLC v. TC Heartland, LLC*,
  232 F. Supp. 3d 632 (D. Del. 2017)...............................................................................50

*L & W, Inc. v. Shertech, Inc.*,
  471 F.3d 1311 (Fed. Cir. 2006)........................................................................................9

*Limelight Networks, Inc. v. XO Commc'ns, LLC*,
  2018 WL 678245 (E.D. Va. Feb. 2, 2018)..........................................................40, 41, 45

*Lucent Techs. Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009)..............................................................................40, 41

*M2M Solutions LLC v. Enfora, Inc.*,
  167 F. Supp. 3d 665 (D. Del. 2016)........................................................................38, 40

*M2M Solutions LLC v. Motorola Solutions LLC*,
  2016 U.S. Dist. LEXIS 22944 (D. Del. Feb. 25, 2016) ...............................................41, 45

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)........................................................................................................2

*Ormco Corp. v. Align Tech., Inc.*,
  463 F.3d 1299 (Fed. Cir. 2006)......................................................................................48

*In re Paulsen*,
  30 F.3d 1475 (Fed. Cir. 1994)................................................................................25, 29

*Perfect 10 v. Giganews, Inc.*,
  2014 U.S. Dist. LEXIS 185066 (C.D. Cal. Oct. 31, 2014).............................................45, 46

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Ravo v. Covidien LP*,
  55 F. Supp. 3d 766 (W.D. Pa. 2014) ........................................................................40

*In re Rembrandt Techs. LP Patent Litig.*,
  899 F.3d 1254 ........................................................................32, 34, 35, 37

*S3g Tech. v. Unikey Techs.*,
  2018 WL 4387660 (E.D. Tex. May 8, 2018) ........................................................40, 49

*Therasense, Inc. v. Becton, Dickinson & Co.*,
  649 F.3d 1276 (Fed. Cir. 2011) ........................................................................32

*Thorner v. Sony Computer Ent. Am. LLC*,
  669 F.3d 1362 (2012) ........................................................................11, 12

*Ulead Sys., Inc. v. Lex Computer & Mgmt. Corp.*,
  351 F.3d 1139 (Fed. Cir. 2003) ........................................................................32

*Wonderland Nurserygoods Co., Ltd. v. Thorley Indus. LLC*,
  2015 WL 5021416 (W.D. Pa. Aug. 21, 2015) ........................................................47

*Wordtech Sys. v. Integrated Networks Solutions, Inc.*,
  609 F.3d 1308 (Fed. Cir. 2010) ........................................................................41, 44

*Wyers v. Master Lock Co.*,
  616 F.3d 1231 (Fed. Cir. 2010) ........................................................................48

**Statutes**

35 U.S.C. § 102(a) ........................................................................24

35 U.S.C. § 102(b) ........................................................................24

35 U.S.C. § 271 ........................................................................8

35 U.S.C. § 271(a) ........................................................................2, 8

35 U.S.C. § 271(g) ........................................................................1, 2, 8

35 U.S.C. § 285 ........................................................................34

2011 Leahy-Smith America Invents Act ........................................................................24

## INTRODUCTION AND SUMMARY OF ARGUMENTS

Schubert seeks to enforce a fraudulently revived patent. His infringement theory directly contradicts his theory of validity. His experts deliver opinions on technologies they've never seen, licenses they've never reviewed, and claim constructions at war with this Court's and ordinary usage. As Lumileds' six motions demonstrate, this ill-founded action should come to an end.

(1) **Motion for Summary Judgment of Noninfringement.** Plaintiff Schubert now asserts 35 U.S.C. § 271(g) but did not plead this theory and so cannot pursue it. And his expert, Dr. Shealy, did not examine any of the 41 families of accused products, yet treated them as identical without explanation. What little analysis he performed was based on incorrect claim constructions.

(2) **Motion for Summary Judgment of Invalidity.** Schubert's attempts to distinguish the prior art cannot be reconciled with his infringement arguments. Plaintiff bases his infringement theory on the supposed scientific principle ███████ *necessarily* crystallographically etches any face of GaN other than the Ga-polar c-plane surface. But the prior art discloses that type of etching.

(3) **Motion for Summary Judgment of Inequitable Conduct.** Although Boston University ("BU") told Schubert "we can't revive [the patent] because it was intentionally abandoned" (Ex. 13), they did. BU's counsel who falsely certified "unintentional" delay knew the underlying facts or was willfully blind. Either constitutes inequitable conduct.

(4) **Motion to Preclude Mr. Wacek's Expert Testimony.** Ignoring all ███████ ███████, Wacek based his royalty range on a noncomparable exclusive license agreement that he never saw. His checks were equally inapt: he relied on another unseen agreement, used his unqualified technical conclusion about product performance as a proxy for gross profits, and offered a "new" opinion relying on the ███████ he had labeled "not instructive."

(5) **Motion to Preclude Dr. Schubert's Expert Testimony**. Schubert's bias disqualifies him from offering "expert" validity opinions. Further, his opinions fail *Daubert* because he (a) is

unqualified to opine on commercial success, licensing, and long-felt need; (b) has not offered a nexus between the invention and commercial success or industry praise; and (c) has not seen Lumileds' allegedly infringing process, so cannot opine that Lumileds infringes.

**(6) Motion to Preclude Dr. Shealy's Expert Testimony.**  Shealy improperly construes four claim terms.  The Court should preclude all opinions applying those constructions.

## NATURE AND STAGE OF PROCEEDINGS

Plaintiff asserted U.S. Patent No. 6,294,475 ("'475 Patent") (Ex. 5) against Lumileds, Cree, and Osram in 2012.  Only Lumileds completed discovery, forcing Schubert to assert infringement and validity positions, and produce smoking-gun inequitable conduct evidence no other defendant had.

## I.    MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).  *Id.* at 587 (quotations omitted).

Plaintiff's infringement allegations fail as a matter of law for two reasons.  First, Lumileds cannot infringe under 35 U.S.C. § 271(a), the only theory pleaded.  Second, Schubert has presented no evidence that Lumileds' manufacturing processes practice any claim of the patent-in-suit.

Because Lumileds does not perform the accused processes in the United States, it cannot infringe under 35 U.S.C. § 271(a), the only theory Schubert pleaded.  Thus, his infringement allegations fail as a matter of law. After eight years of litigation, and shortly before discovery closed, Schubert for the first time raised an infringement theory under 35 U.S.C. § 271(g).  He did not plead that theory and it should be disregarded.

2

The new theory is futile because there is no evidence that Lumileds' manufacturing processes practice the asserted claims. Plaintiff's expert, Dr. Shealy, treats as identical dozens of different Lumileds processes, corresponding to numerous different products. But he neither identifies nor justifies any representative process. Shealy did not analyze even a single accused product, instead basing his opinions on academic papers relating to processes and materials different from those Lumileds uses. Moreover, Shealy bases his analysis on incorrect claim constructions. His new opinions repeatedly contradict both his prior testimony in the IPR of the '475 Patent and Schubert's own expert opinions.

## A.    BACKGROUND

### 1.    The Subject Matter of the '475 Patent

The patent-in-suit is directed to a method of processing III-Nitride epitaxial layers formed on a substrate. *See* '475 Patent at Abstract. "III-Nitrides" are materials that comprise nitrogen and an element from group III of the periodic table. Ex. 5 at 1:21-24; Ex. 45 ¶ 14[1]. III-Nitrides include gallium nitride ("GaN"), aluminum nitride, and indium nitride. Ex. 45 ¶ 14. "Epitaxial layers" are grown layer-by-layer on a substrate. *See id.* The '475 Patent generally discloses exposing "non-c-plane" epitaxial layer surfaces, and then "crystallographically etching" the exposed surfaces to obtain crystallographic plane surfaces. *Id.* ¶ 13.

III-Nitride epitaxial layers typically form crystals, formed of repeating "unit cells." *Id.* ¶¶ 15-16. "Wurtzite" is a common crystal structure for GaN. *Id.* ¶¶ 17-18. The wurtzite unit cell is depicted at right. *Id.* ¶ 18.

It is undisputed that, at the time of the invention, both the top and bottom unit cell planes, each of which is at a right angle to the c-axis, were called "c-planes" in the art. *See, e.g.,* Ex. 52 at

---

[1] Exhibits to this brief are attached to the Declaration of Michael Molano, filed herewith.

39:23-40:7, 83:2-13.  Other planes have names designated by other letters, such as "a-planes" or "s-planes."  Ex. 45 ¶ 25. III-N crystals can be grown in different orientations.  *See* Ex. 61 ¶¶ 134-35. As Shealy concedes, the "top" surface of an epitaxial GaN crystal can be either c-plane, or another plane entirely, such as an "r-plane."  *See* Ex. 52 at 53:9-20, 55:7-23.

Each "dot" in the wurtzite unit cell corresponds to one or more atoms; in GaN these are gallium and nitrogen. Ex. 45 ¶ 19. Although the atoms on the exterior of a GaN wurtzite structure don't change, the interior atoms have two possible internal arrangements, or "polarities." Ex. 45 ¶ 26.  While it is now understood that the GaN crystal has both "Ga-polar" and "N-polar" c-plane faces with different chemical properties, *id.* ¶ 27, it is undisputed that at the time of the invention it was not known that there was any difference in the ability of the Ga-polar and N-polar faces to be etched, *id.* ¶ 196; D.I. 136 at 29:4-8; *see also* Ex. 52 at 40:9-41:2, 72:21-73:8.

"Miller notation" is used to identify planes and directions in a crystal, using series of digits. Ex. 45 ¶¶ 21-22. Parentheses () indicate a single plane. *Id.* ¶ 22. Overbars denote negative digits. *Id.* ¶ 186.  Thus, in the image excerpted above, the top plane is (0001), and the bottom plane is (000$\bar{1}$).  *Id.*  "Curly brackets" {} denote families of equivalent planes—*e.g.*, {0001} refers to both (0001) and (000$\bar{1}$) planes.  *Id.* ¶ 22.  Similarly, <abcd> denotes families of directions.  *Id.*

### 2.    The Asserted Claims and Exemplary Embodiments

Schubert asserts independent claims 1, 11, and 13 (and dependent claims 2, 4, 12, 14, and 16) against Lumileds.  Claim 1 recites both the "exposing" and "crystallographic etching steps:"

1. A method of processing a III-Nitride epitaxial layer system provided on a substrate, comprising:
exposing non-c-plane surfaces of said III-Nitride epitaxial layer system; and
crystallographically etching said epitaxial layer system in order to obtain crystallographic plane surfaces.

4

Ex. 5.  Claims 11 and 13 do not explicitly recite the exposing step  (though claim 11 requires etching "along non-c-plane crystal directions").  They state:

> 11. A method of processing a III-Nitride epitaxial layer system comprising:
> providing a III-Nitride epitaxial layer system on a substrate; and
> wet chemical crystallographic etching said epitaxial layer system along non-c-plane crystal directions.

> 13. A method of processing a III-Nitride epitaxial layer system comprising:
> providing a III-Nitride epitaxial layer system on a substrate; and
> crystallographically etching said epitaxial layer system by immersing said epitaxial layer system into a liquid chemical.

The '475 Patent discusses the results of several experiments, each involving etching of GaN where a c-plane is on "top."  Ex. 5 at 3:15-23, 4:6-8.  However, it is undisputed that the independent claims cover processing of systems that do not contain GaN.  *See* Ex. 52 at 44:5-24, 45:24-46:10, 46:22-47:8.   When discussing the "c-plane," the '475 Patent's specification consistently uses the {} and <> Miller notations that designate families of planes and directions. Ex. 5 at 4:6-8 ("the c-plane {0001}"), 3:15-17 ("the c-plane or <0001> plane").

### 3.    Lumileds' Accused Products and Processes

Schubert accuses all Lumileds GaN-based LEDs that are "subject to a liquid chemical etch to roughen or texture one or more GaN-based surface(s)."  Ex. 32, at 2.  This includes 41 different "thin film flip chip" (TFFC) LED product families.  *See* Ex. 43 ¶ 59; D.I. 1 ¶ 16. The accused products differ in important ways.  TFFC products are grown on either "███████████" substrates or ████████████████████████████ Ex. 45 ¶ 49; Ex. 9  at 1 & 43-45; Ex. 40 at 197:2-12. ███████████████████████ that significantly affects GaN growth, and crystal defects near the interface between the substrate and the GaN epitaxial layers.  Ex. 45 ¶ 50.  The different surfaces that result from etching ██████████ products reflect these differences. From left to right, the images below show GaN grown on a █████████████, and "whisker-like" GaN grown █████:

5



| Ex. 54 | Ex. 56 | Ex. 55 |

*See* Ex. 45 ¶¶ 51-52.  Shealy does not address ▉ products in either of his reports.

After epitaxial layer growth, Lumileds performs "▉

▉.  Ex. 45 ¶¶ 57-58; Ex. 58.  Subsequently, Lumileds performs a ▉

▉ on the ▉ to the substrate.  Ex. 9

at 1; Ex. 59 at 1; Ex. 40 at 115:5-116:6. ▉. Ex. 45

¶ 59; Ex. 9, at 1 & 43-45; Ex. 60. ▉ etching process.  Ex. 45 ¶¶ 74-76.

With respect to the accused products, no record evidence shows that any etching of any kind occurs

when ▉ is not applied to the system.  Lumileds has not observed any such "▉."

Ex. 45 ¶ 103.

Lumileds' ▉ etches occur in a bath of ▉.

Ex. 45 ¶ 90; Ex. 9 at 1 & 43-45; Ex. 59 at 1; Ex. 60.  The "process recipes" differ from product to

product, and are set forth in a series of technical specifications.  Ex. 45 ¶¶ 92-94; Ex. 9 at 43-45;

Ex. 60.  Differences include the concentrations of ▉ etch times, ▉, and

chemicals.  Ex. 45 ¶ 95; Ex. 9 at 43-45; Ex. 60.  There are dozens of variations in these parameters

across the Accused Products.  Ex. 45 ¶ 95; Ex. 9 at 43-45; Ex. 60.  Lumileds' process documents

for the Accused Products specify bath times ranging from ▉. *See* Ex. 45 ¶ 95; Ex.

9 at 43-45; Ex. 60.

### 4.    Plaintiff's "Evidence" of Infringement

Dr. Shealy, Plaintiff's infringement expert, did not examine even a single Lumileds product. Ex. 52 at 27:17-28:9. And despite the large number of accused products, Shealy presents just a single conclusory infringement analysis treating all accused products as one and the same. He never explains why that is appropriate, and provides no justification for ignoring the differences in the accused process flows.  In fact, his analysis is not specific to any accused process flow. And it admittedly does not address ███████.  Ex. 52 at 147:23-148:12.

Instead, Shealy relies on three scientific papers (which he calls "Gao-I," "Gao-II," and "Jung", Exs. 7, 6 and 20, respectively) to argue that ████████████████████████, *necessarily* crystallographically etches any face of GaN other than Ga-polar c-plane surface.  *See* Ex. 43 ¶ 88; Ex. 45 ¶¶ 214-15.  None of the papers apply to Lumileds' processes. Only Gao-II even refers to "crystallographic etching."  Ex. 45 ¶ 228.  But as Shealy admits, Gao-II's etching process is not representative of Lumileds':  Gao-II's epitaxial GaN system was grown with a "not conventional" process that Lumileds does not use, was oriented differently than Lumileds' (*i.e.*, without a ██████████████), and resulted in a structure having "many differences" to Lumileds'.  Ex. 52 at 182:20-185:22; *see also* Ex. 61 ¶¶ 339-344.  And Gao-II relied on the different, clean appearance of its resulting structures to conclude that the etching was crystallographic.  *See* Ex. 61 ¶¶ 327-329.[2]

---

[2] Although Gao-I refers to a "strong crystallographic component," it similarly explains that the crystallographic "component" is evidenced through resulting smooth "hexagonal pyramids," which are not present in Lumileds' products.  *See* Ex. 45 ¶¶ 216-22.  In addition, neither Gao reference gives any indication that it interpreted crystallographic etching to exclude defect-revealing etching. In fact, Gao-I suggests that defects are revealed.  *See id*. ¶¶ 226-29.  Finally, Jung says nothing about crystallographic etching at all.  *See id*. ¶ 223.

### B.    ARGUMENT

### 1.    Schubert Did Not Plead a Viable Infringement Theory

The only pleaded theory of infringement appears in Paragraph 16 of Schubert's Complaint: "Philips makes, uses, offers to sell, sells, and/or imports products in the United States that infringe the '475 patent. For example, Philips is manufacturing, marketing, distributing, using, selling, and/or offering to sell high-brightness GaN-based LEDs, including, without limitation, LEDs incorporating 'Thin Film Flip Chips' or 'TFFCs.'" Although the Complaint does not invoke any particular paragraph of 35 U.S.C. § 271, that language tracks 35 U.S.C. § 271(a)'s imposition of liability on "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States, or imports into the United States any patented invention."

It is undisputed that Lumileds is not liable under Section 271(a).  The asserted claims are method claims.  Lumileds performs the accused laser lift-off and etching processes exclusively overseas.  *See* Ex. 40 at 152:4-153:25, 104:3-105:22; Ex. 38 at 156:25-158:1.  Yet Section 271(a) applies only to use "within the United States." 35 U.S.C. § 271(a).  Lumileds therefore cannot be liable for Section 271(a) infringement.

In discovery correspondence last July 31, as discovery neared its end, Schubert first broached 35 U.S.C. § 271(g) as the basis for a new infringement theory. Ex. 36 at 1.  In certain circumstances, Section 271(g) imposes liability for "import[ing] into the United States … a product which is made by a process patented in the United States." But Schubert has not pleaded Section 271(g) infringement.

As the Court recognized in denying Schubert's request for Section 271(g)-related damages discovery, Schubert's complaint "is generic" and "doesn't mention 271, let alone 271(g)."  D.I. 232 at 27:23-24.  It says nothing about "inducement or contributory infringement or indirect infringement." *Id.* at 27:24-28:1.  "[N]either 271(g) nor indirect infringement was part of

8

Plaintiff's infringement contentions," *id.* at 28:1-2, served in many sets over eight years of litigation. *See* Exs. 26, 30 and 32.

The Court concluded that "Plaintiff essentially sat on its rights, not asserting 271(g) or indirect infringement in its complaint or in its contentions ***and it is too late to do so now***." D.I. 232 at 28:8-11 (emphasis added).

For similar reasons, the Court should grant summary judgment of noninfringement. *See Chapco, Inc. v. Woodway USA, Inc.*, 282 F. Supp. 3d 472, 480 (D. Conn. 2017) (summary judgment of no indirect infringement because plaintiff did not "provide notice of its indirect infringement theory in its infringement contentions").

### 2. Schubert Has Not Satisfied His Burden to Prove Infringement on a Representative Basis

Even if Lumileds could be liable for its overseas manufacturing processes, Schubert cannot prove that any of those processes infringes. Schubert accuses 41 different product families of infringement. There is no dispute that these products are etched according to different process recipes. But Shealy does not account for any of those differences, instead treating all 41 processes as identical while analyzing none of them specifically.

A plaintiff who asserts infringement of multiple products "cannot simply 'assume' that all of [the defendant's] products" are alike. *L & W, Inc. v. Shertech, Inc.*, 471 F.3d 1311, 1318 (Fed. Cir. 2006). Rather, for a single infringement analysis to support multiple products, the plaintiff must provide a basis for treating them the same. Shealy did nothing of the sort; his infringement opinions provide no basis for treating all product families as one.

To start, the result of etching ██████████████████ look nothing alike. *See* Ex. 45 ¶¶ 51-52 (showing ████████ on the left, ██████ on the right). Yet Shealy's report does not address ████████ at all. For example, with respect to the "crystallographic etch"

limitation, Shealy refers only to a single image of a ███████████ product taken from Lumileds'
*Markman* brief.  Ex. 43 ¶ 77.

The Federal Circuit affirmed summary judgment of noninfringement granted on 21
untested products where neither plaintiff nor its expert provided evidence "indicating how the
testing of only three products provides evidence of infringement for the remaining, untested
products." *Alloc, Inc. v. Pergo, L.L.C.*, 751 F. Supp. 2d 1049, 1059 (E.D. Wis. 2010), *aff'd*, 426 F.
App'x 909 (Fed. Cir. 2011).  Here, the unrebutted record reveals important differences between
████████████████████████ beyond their appearance, including the manner in which crystal
defects are formed at and propagate in the epitaxial GaN, and the resulting surface morphology.
*See* Ex. 45 ¶¶ 50-53, 113. Because Shealy has neither addressed those differences nor provided a
basis for disregarding them, summary judgment is warranted with respect to ████████.

Summary judgment is also warranted with respect to the ██████████ products because
Shealy's infringement analysis is not specific to any actual etching recipe for any particular
product. Lumileds' expert Dr. Jokerst explains that even slight differences in process recipes can
significantly affect the resulting etch. *See* Ex. 45 ¶ 113.  Shealy's infringement analysis is therefore
insufficient to raise a genuine dispute of material fact that any product infringes.

### 3. Lumileds Does Not Expose a "Non-c-Plane" Surface

Much of Shealy's analysis is based on the use of incorrect claim constructions when there
is no dispute that Lumileds' processes do not meet certain limitations properly construed.  "Non-
c-plane" is one such term.  The method recited in independent claim 1 (and thus dependent claims
2 and 4) requires "exposing non-c-plane surfaces of said III-Nitride epitaxial layer system." Claim
11 (and thus claim 12) similarly requires etching "along non-c-plane crystal directions."  It is
undisputed that Lumileds' ██████████ processes reveal the ██████████ face of GaN. *E.g.*,
Ex. 40 at 115:5-116:6. Because the ██████████ is a c-plane, Lumileds cannot infringe claim 1.

And because Lumileds etches towards the ████, which Schubert maintains is the ***c-direction*** (and thus not a non-c-direction), Lumileds cannot infringe claim 11. *See* Ex. 46 ¶ 106.

During the *Markman* stage of this case, the Court deferred construing "non-c-plane," and invited the parties to raise the issue during summary judgment. D.I. 140 at 1 & n.1. The parties' proposed constructions are:

| Plaintiff's Proposal | Defendants' Proposal |
|---|---|
| "a plane other than the positive c-plane (0001)" | "a plane with a designation other than 'c'" |

The dispute is whether the only "c-plane" within the meaning of the '475 Patent is the "positive c-plane" (*i.e.*, the Ga-polar face), or whether the "negative c-plane" (*i.e.*, the N-polar face) is also a "c-plane" (and thus *not* a "non-c-plane"). It is undisputed that Lumileds cannot infringe claim 1 if a "c-plane" includes the ████ plane. *See* Ex. 52 at 52:15-53:8. Lumileds' *Markman* briefing demonstrates why its construction is correct, and why Schubert's attempt to limit the "c-plane" to the Ga-polar face contradicts the intrinsic and extrinsic record.

Expert discovery reinforced Lumileds' position. It is undisputed that, in the art, the term "c-plane" refers to both the Ga- and N-polar faces. *See, e.g.*, Ex. 52 at 39:23-40:7, 83:2-13; Ex. 45 ¶¶ 186-87 (providing examples of this usage in the art); Ex. 61 ¶¶ 85-86, 88, 93-95, 108-121 (same). It follows that the plain and ordinary meaning of "non-c-plane" is simply "not a c plane," *i.e.*, "a plane with a designation other than 'c.'" Accordingly, for Schubert to prevail in overriding this meaning to redefine "non-c-plane" to include a c-plane, he must show that he "act[ed] as [his] own lexicographer" by "clearly set[ting] forth a definition of the disputed claim term other than its plain and ordinary meaning." *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (2012) (quotation omitted). That is a high bar: "It is not enough for a patentee to simply disclose

a single embodiment or use a word in the same manner in all embodiments, the patentee must clearly express an intent to redefine the term."  *Id.* (quotation omitted).

Schubert cannot meet that standard.  He and Shealy point only to a few sentences in the specification describing results of particular experiments performed "[i]n accordance with ***one embodiment*** of the process of the invention."  Ex. 5 at 3:3-4 (emphasis added).  For example, Schubert relies on the sentence "[e]pitaxial GaN has commonly a hexagonal crystal structure, and the top surface plane is the c-plane or <0001> plane." *Id.* at 3:15-17.  That statement is not definitional but is expressly directed to just "one embodiment" of the invention.  *Id.* at 3:3-4.[3] That passage is limited to GaN, a limit absent from the claims.  *See* Ex. 52 at 44:5-24, 45:24-46:10, 46:22-47:8.  That excerpt is also specific to an experiment using GaN with a c-plane as the "top surface plane."  But as Shealy admits, GaN can be grown in other orientations—as disclosed, for example, in the Gao-II paper on which he relies.  *Id.* at 55:7-23, 182:20-183:22 (discussing Gao-II), 59:16-60:22.  Yet Shealy did not consider any other materials or orientations when forming his opinion on the meaning of "non-c-plane."  *Id.* at 68:3-69:5, 61:19-62:4, 65:7-67:5.[4]

Schubert also relies on the following statement:   "Because the c-plane {0001} is impervious to all of these chemicals except at defect sites where etch pits occur, it is also an etch plane, with a negligibly small etch rate."  Ex. 5 at 4:6-8.  Schubert argues that this necessarily refers only to the top surface or positive c-plane because the '475 Patent discloses that the "top surface" is impervious to etching.  Again, this logically fails because the "top surface" can be

---

[3] Surrounding language clarifies that this refers to an exemplary embodiment.  *Id.* at 3:9-11 ("The samples used were grown on c-plane sapphire substrates, and include n-type GaN epilayers…."), 3:19-21.
[4] Schubert also relies on a sentence a few lines later in the specification that similarly refers to exemplary experimental results that were specific to GaN oriented with a c-plane on top.  *See* Ex. 5 at 3:21-23 ("The c-plane, the top surface of the GaN crystal, is impervious to all of the chemicals with which etching had been attempted.").

something other than a c-plane.  *See* Ex. 52 at 55:7-23.  Moreover, Schubert, his counsel, and Shealy have all admitted that, at the time of the invention, it was not known in the art that the Ga-polar face etched differently than the N-polar face.  *See* Ex. 52 at 40:9-41:2, 72:21-73:8; Ex. 51 at 262:21-263:17; D.I. 136 at 29:4-8 ("We don't know of any knowledge before the patent that the negative c-plane could be crystallographically etched.").

The '475 Patent's use of Miller indices also supports Lumileds. As shown in the examples above, the specification consistently states that the "c-plane" is the "<0001> plane" (Ex. 5 at 3:14-17) or "{0001}" plane (*id.* at 4:6-8).  Miller notation uses () and [] to refer to single planes and directions. Ex. 45 ¶ 22  But the inventors chose to exclusively use the notation that refers to multiple planes and directions: "<0001>" and "{0001}." *Id.* The literature is replete with references showing that {0001} refers to both positive and negative c-planes, including references using {0001} to refer to two planes of different polarities, such as the Ga- and N-faces of GaN. Ex. 61 ¶¶ 85, 88-92.[5]

There is accordingly nothing close to the strong and unambiguous intrinsic evidence needed to turn the term "non-c-plane" on its head to deviate from its "strong accepted scientific meaning." *Bayer CropScience AG v. Dow AgroSciences LLC*, 728 F.3d 1324, 1330 (Fed. Cir. 2013); *see Aventis Pharma SA v. Hospira, Inc.*, 675 F. 3d 1324, 1330-32 (Fed. Cir. 2012) (patentee did not act as his own lexicographer because there was no clear redefinition of term).

### 4.     Lumileds' Etches Are Not "Crystallographic"

All asserted claims require "crystallographic etching." Schubert provides no evidence that Lumileds' etching is crystallographic; it is clear from the products themselves and other evidence

---

[5] When faced with these references at his expert deposition, Schubert defended his construction on the basis that he is "a person having a skill in the art that *exceeds* the average person." Ex. 51 at 196:7-197:10.  As a matter of law, however, claims are construed from the perspective of a person having ordinary skill in the art.

that it is not. Schubert fails to present a genuine dispute of material fact with respect to this limitation for three independent reasons: (1) Lumileds' etches are "defect-revealing"; (2) Shealy ignores Lumileds' products, and instead relies solely on three inapposite papers without justifying any relevance to Lumileds' processes; and (3) there is no record evidence that Lumileds' etches "proceed in directions dictated by the crystallographic planes." Faced with those shortcomings, Schubert has not articulated any coherent theory of how Lumileds could satisfy this limitation. Not only do Shealy's opinions vary between his reports and his deposition, they depend on incorrect claim constructions and unsupported positions that directly contradict both his own prior opinions and Schubert's invalidity opinions.[6]

*The Court's Construction of "Crystallographic Etching" Excludes Etches that Reveal Defects*. The Court's construction of "crystallographically etching" reflects the parties' agreement that defect-revealing etching is not crystallographic: "'etching (removal of material) that proceeds in directions dictated by the crystallographic planes of the material being etched at a rate which depends on the particular plane', and *does not include defect-revealing etching*." D.I. 140 at 1 (emphasis added). Lumileds made clear during *Markman* proceedings that it interpreted a "defect-revealing etch" as simply an "etch that reveals defects." D.I. 88 at 38. Schubert did not object, and agreed to the defect-revealing exclusion that Lumileds demanded.

Yet Shealy now opines that an etch is "defect-revealing" only if it (i) is done with the *intent* to evaluate the number of defects in the epitaxy; *and* (ii) accurately counts *every* defect. Ex. 52 at 261:19-262:9, 265:12-266:22; *see also* Ex. 43 ¶¶ 101, 103. This untimely, unsupported construction contradicts both the Court's construction and Shealy's *Markman* opinions.

---

[6] That Shealy's reports contradict opinions he has previously offered is less surprising because he didn't write his infringement reports—Schubert's lawyers did. Ex. 52 at 19:11-21:15.

Shealy's opinion contradicts the parties' agreed-upon construction.  During the 2019 claim construction proceedings, Schubert's initial proposed construction of "crystallographic etching" did not exclude defect-revealing etches (though he proposed excluding them in 2013, when trying to avoid IPR prior art).  D.I. 88 at 28-29 (2019); D.I. 43 at 4 (2013).  Lumileds proposed that exclusion, making clear that it was interpreting a "defect-revealing etch" as an "etch that reveals defects," and noting that "Dr. Schubert previously told this Court that crystallographic etching *excludes etching that reveals defects*." D.I. 88 at 38 (emphasis added); *id.* at 58 (noting that Schubert had "agree[d] to a construction that likewise references a result (*not revealing defects*)").

After the parties filed their opening briefing in 2019, Schubert added "defect-revealing etching is not crystallographic etching" to his proffered alternative construction, while refusing to drop his earlier proposal omitting this clause. *Id.* at 49-50.  But Schubert never disagreed with Lumileds' interpretation of "defect-revealing etching."  The Court recognized the parties' agreement, including it in its construction of "crystallographic etching."  And Schubert never informed Lumileds or the Court that there was no agreement.  Now, however, Shealy opines that etching can be crystallographic "whether defects are exposed or not." Ex. 43 ¶ 104.  That contradicts Shealy's and Schubert's prior agreement to Lumileds' proposal to exclude defect-revealing etching (which Lumileds interpreted as "etching that reveals defects") from the scope of the claims.

Shealy's belated construction also contradicts his own prior testimony.  Shealy now opines that defect-revealing etching is a "diagnostic tool" and a "defined and narrow technique used to reveal defects so that the quality of the crystal can be assessed." *Id.* ¶ 101.  He also opines that the diagnostic intent is what distinguishes defect-revealing etching from crystallographic etching: "[Crystallographic etching] is dictated by the crystal planes of the material while the latter is

designed to detect weaknesses (defects) in the crystal lattices of the material—as a diagnostic tool." *Id.* ¶ 39.  Shealy's newfound reliance on the intent behind the etch contradicts his prior opinions. For example, during *Markman* proceedings, Shealy testified that what matters are the physical properties of the etch, not the intent behind it:  "Crystallographic etching is dictated by the crystal planes of the material being etching… while defect-revealing etching is instead dictated by structural defects in the crystal lattice of the material …."  D.I. 89-22 ¶ 14.

Shealy's intent-based construction is also contrary to Federal Circuit precedent rejecting any reading that "injects subjective notions into the infringement analysis" and declining to  assign "a meaning to a patent claim that depends on the state of mind of the accused infringer." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1353 (Fed. Cir. 2001).  And Shealy provides no support for his intent-based construction.  He cites nothing from the '475 Patent suggesting that a POSITA at the time of the invention would interpret "defect-revealing etching" in such a limited fashion.  Nor does he cite any examples from the art that apply his construction, even though he contends that "[d]efect-revealing etching is a term of art and a diagnostic tool for semiconductor crystals."  Ex. 43 ¶ 101.  In fact, even Schubert disagrees with Shealy's narrow interpretation, saying that "defect-revealing etching is an etching process capable of revealing defects." Ex. 51 at 212:18-213:2.

In contrast, Dr. Jokerst supports her interpretation of the claim.  She considered the plain and ordinary meaning of the words "defect," "revealing," and "etching," relying on both knowledge in the field and general dictionaries.  Ex. 45 ¶¶ 136-147.  Dr. Jokerst concluded that "'defect-revealing etching' is removal of III-N material in such a way that information about imperfections in the crystal structure of that material are made known."  *Id.* ¶ 142; *see also id.* ("The information that is made known can include things like the shape, type, size, or location of

the defect.").  That is fully consistent with Lumileds' interpretation during claim construction of "etching that reveals defects."  III-N material is etched (*i.e.*, removed) in a manner that reveals (*i.e.*, makes known) defects (*i.e.*, information about imperfections in the crystal structure).

Accordingly, the Court should adhere to the plain and ordinary meaning that a "defect-revealing etch" is an "etch that reveals defects."

***Lumileds' Etches Reveal Defects.*** Under the proper construction, there is no genuine dispute that Lumileds' etches are defect-revealing, and thus noninfringing. Shealy does not seriously dispute that Lumileds' etching processes reveal defects.

First, Dr. Jokerst explains in detail that Lumileds reveals defects. She discusses the extensive literature showing that ▮ etching is universally recognized in the art as an etch that reveals defects.  *See, e.g.*, Ex. 45 ¶¶ 232-321.  And Dr. Jokerst actually examined Lumileds' products and found defects. She reviewed TEM images that show defects in the accused products. *See id.* ¶¶ 323-30.  Not content to rely on pre-existing images, Dr. Jokerst went further and requested that additional TEMs be prepared for both ▮ products.  *Id.* ¶¶ 331-33.  The images plainly show defects.  For example, images of the ▮ products (left) ▮ (right) products shows dislocations (highlighted in red):



*Id.* ¶¶ 334, 339-41; *see also* ¶¶ 335-38.

Shealy offers no real rebuttal to either the literature or Dr. Jokerst's images showing defects. He concedes that the "Weyher" references discuss defect-revealing ████████████ ████████ — ████████████████████. Ex. 48 ¶ 29.  More important, Shealy does not opine that Dr. Jokerst's TEM images fail to show defects.  Instead, he argues—for the ██ ████████ images only—that Dr. Jokerst *undercounted* defects.  *See id.* ¶¶ 32-33.  He does not address the ████████████ at all.  His deposition testimony showed that he wasn't sure how to interpret the TEM images and find defects in them.  *See* Ex. 52 at 322:17-325:2, 325:24-330:2. Shealy's failure to conduct his own tests or verify Dr. Jokerst's results does not create an issue of fact.  Dr. Jokerst spoke with the individuals at the third-party laboratory who produced the images about the procedures used to create them.  Ex. 45 ¶ 331.  No evidence suggests that Dr. Jokerst does not know how to interpret them; Shealy's inability leaves her testimony unrebutted.

Accordingly, there is no genuine dispute that, properly construed, Lumileds performs "defect-revealing etching," and thus cannot infringe any asserted claim.

***The Gao and Jung Papers Are Not Evidence of Lumileds' Etching Processes***.  Shealy did not examine any Lumileds product. Instead, for the "crystallographic etching" limitations, he relies on two references by Gao and one by Jung—none of which discusses any Lumileds product. Shealy admits that there are significant differences between Lumileds' etches and those described by Gao and Jung.  But he never explains how Gao and Jung could be evidence of Lumileds' processes.  His analysis does not create a genuine dispute of material fact.

Again, the Court construed "crystallographic etching" to (1) require that the direction of etching is dictated by the crystallographic planes, and (2) exclude defect-revealing etching.  D.I. 140 at 1. Schubert must therefore identify crystallographic planes in Lumileds' products, show that etching proceeded in a direction dictated by one of them, and show that defects have not been

revealed.  Shealy attempts to do all that through the Gao and Jung papers, which disclose results of experiments performed on entirely different materials. His attempt fails as a matter of law.

Schubert himself has testified that it is improper to simply apply the results of epitaxial GaN etches reported in the literature to other such etches.  Throughout his invalidity expert report, Schubert repeatedly states that the results of an etch of epitaxial GaN cannot be predicted from the literature, due to the "unpredictability of chemistry." Ex. 46 ¶ 338 ("The unpredictability of chemistry means that we cannot predict a chemical reaction. It means that we cannot predict if a crystallographic etching reaction will occur in a certain crystal."), ¶ 120 ("Crystallographic wet chemical etching is a specific chemical etching process.  Chemistry is well known as an unpredictable field. Unknown chemical reactions cannot be predicted."), ¶¶ 337, 340.  But that is exactly what Shealy has done.  *See* Ex. 43, ¶ 88 (opining that the Gao and Jung papers show, without qualification, that "the use of ████████████████████, produced crystallographic etching of the ████ of GaN").

Further undermining Shealy's approach are the significant differences between Lumileds' etching processes and those reported by Gao and Jung.  Again, only one of the three papers—Gao-II—even mentions crystallographic etching.  And it is undisputed that Gao-II used a completely different epitaxial structure than Lumileds does (with the c-planes running █████, rather than ████████), and obtained a very different resulting surface.  *See* Ex. 52 at 182:20-185:22 (discussing Gao-II). Moreover, Gao-II relied on the appearance of the resulting surfaces, which are admittedly different from Lumileds', to conclude that crystallographic etching had occurred. Ex. 61 ¶¶ 327-29.  Nor does Gao-II address the Court's defect-revealing exclusion. Ex. 45 ¶¶ 226-29.  Shealy provides no scientific basis for ignoring those differences.

Shealy's entire analysis amounts to (1) pointing to papers that conclude, based on the appearance of other etched surfaces, that crystallographic etching occurs, and then (2) arguing that those papers show that Lumileds, whose etched surfaces look nothing like those obtained in the papers, must also crystallographically etch. As explained above, Schubert himself repeatedly says that such an analytical jump is improper. And Dr. Jokerst explains in detail why the results reported by Gao and Jung cannot be applied to Lumileds. *See* Ex. 45 ¶¶ 211-31. Thus, the record is unrebutted that Gao and Jung are not probative evidence of Lumileds' etching processes. Shealy's reliance on them therefore cannot create a triable issue of infringement.

***Lumileds' Etching Processes Do Not "Proceed in Directions Dictated by the Crystallographic Planes."*** As explained above, Lumileds performs ▮▮▮ etching of ▮▮▮▮▮▮▮ GaN using ▮▮▮▮▮▮▮▮▮. Ex. 45 ¶ 90. It is undisputed that a ▮▮▮ etch is driven by ▮▮▮▮, not crystal planes. Ex. 43 ¶ 90; Ex. 45 ¶ 59. Schubert thus concedes that ▮▮▮ etching is not crystallographic, at least because it is not dictated by crystallographic planes. D.I. 44 at 17 n.8 ("a non-crystallographic etching technique, such as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮) etching"); Ex. 43 ¶ 89. To salvage infringement, Shealy points to the period—▮▮▮▮▮▮ for some products—in which the GaN is exposed to ▮▮▮▮▮▮▮▮, to opine that a second, crystallographic etching mechanism is present. Ex. 43 ¶ 84 There are two flaws with this theory.

First, there is ***no evidence*** that any etching of any Lumileds product occurs ▮▮▮▮▮. Shealy identifies none, summarily opining that ▮▮▮▮ period "necessarily performs crystallographic etching." Ex. 43 ¶ 84. Dr. Jokerst, meanwhile, spoke to Lumileds' Rule 30(b)(6) designee Dr. Epler, who informed her that the reason for the ▮▮▮▮▮▮▮ is merely to ensure that the system in not in a transient state before the start of the etch, and that Lumileds "had observed no etching while ▮▮▮▮▮▮." Ex. 45 ¶¶ 102-103. Even Schubert argues that

the Youtsey prior art reference, which, ███████████████████████, ***does not etch in***

███████. *See* Ex. 51 at 231:24-232:3, 233:1-7.  Shealy's only response is to say that he doesn't

believe Dr. Epler.  Ex. 48 ¶ 42.  But Dr. Epler has first-hand knowledge of Lumileds' processes

and materials, and Schubert does not.  No evidence supports a contrary conclusion. It is undisputed

that the etching driven by ██████—the only etching that appears in the record—is not

crystallographic. Schubert has accordingly failed to raise a genuine dispute of material fact.

Second, even if any etching did occur ████████, it remains uncontroverted that such

etching does not proceed in directions "dictated by crystallographic planes."  Shealy's theory is

that the "████" crystallographic etching mechanism occurs even while the █████████

mechanism is at work.  *E.g.*, Ex. 52 at 244:23-245:2 ("in the ████, it's pure crystallographic; when

it's ███████ it still has a crystallographic component").  Yet Shealy admitted that the "[t]he

crystallographic component is smaller than ██████ component."  *Id.* at 246:22-248:14.  Thus, even

accepting that some etching occurs ████████, Lumileds etching processes remain predominantly

driven by ████, not by crystal planes. There can accordingly be no argument that the direction of

Lumileds' etching processes are "***dictated by*** crystallographic planes."

At his deposition, Shealy announced for the first time that he had construed "dictated by"

to mean "depends on."  Ex. 52 at 251:7-20.  There is no support for doing so.  The Court's

construction of crystallographic etching requires etching to proceed in "directions ***dictated by*** the

crystallographic planes of the material being etched at a rate which ***depends on*** the particular

plane."  D.I. 140 at 1.  Because the Court did not construe the terms "dictated by" or "depends on,"

their plain and ordinary meaning applies.  Dr. Jokerst explains in detail why a POSITA would not

equate the two, and would instead understand "dictates" to require a greater level of control than

"depends."  Ex. 45 ¶¶ 174-83.  That is consistent with the maxim that different words in a claim

are presumed to have different meanings.  *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008).  Shealy's reports do not explain that he was treating the two as equivalent, and provide no basis for doing so.  There is accordingly no support in the record that the plain and ordinary meaning of "dictated by" is "depends on."

Here, the difference is dispositive. It is undisputed that the non-crystallographic etch driven by ▮▮▮▮ is the largest component (if not the only component) of Lumileds' processes. In opining that Lumileds' processes proceed in directions that "***depend on***" crystal planes, Shealy relies entirely on what is, at most, a tiny factor in the process, and does not address the required analysis of whether the crystal planes "***dictate***" the direction of the etch. Summary judgment of noninfringement is therefore warranted.

### 5.   Shealy Provides No Opinion that Lumileds' Products "Obtain Crystallographic Plane Surfaces"

Claim 1 recites the method step of "crystallographically etching said epitaxial layer system *in order to obtain crystallographic plane surfaces*."  With respect to the latter half of that term, Shealy's reports alternate between suggesting that there are not and need not be such plane surfaces in Lumileds' products, or claiming that he can see them just by looking at a few images cited in Dr. Jokerst's report.  Ultimately, Shealy merely states in conclusory fashion that "crystallographic plane surfaces are obtained."  Ex. 43 ¶ 96. The Court should disregard this conclusory testimony and grant summary judgment of non-infringement.

Despite the plain claim language, Shealy maintains that crystallographic plane surfaces need not actually be obtained.  *See* Ex. 52 at 113:16-117:7 ("you don't necessarily have to result in the plane surfaces"); Ex. 43 ¶¶ 98-99 (opining that "crystallographic plane surfaces are obtained only in a rudimentary manner").  He insists that crystallographic etching may occur "without necessarily resulting in a symmetrical crystal planar surface."  Ex. 43 ¶ 74.  Shealy took the exact

opposite position in IPR: "I'd like to see the majority, if not all, of that surface dominated by planes of equivalent symmetry and that's not what you see here." Ex. 27 at 69:11-24; *cf.* Ex. 52 at 156:12-157:16 (disagreeing with that IPR testimony). Shealy provides no support for his about-face or position that crystallographic plane surfaces need not be obtained, despite the plain language of the claim.

Dr. Jokerst explains in detail why crystallographic plane surfaces do not result from Lumileds' etching processes. *See* Ex. 45 ¶¶ 400-10. Shealy did not even try to find crystallographic plane surfaces in Lumileds' products until his Reply Report. And his attempt amounts to drawing some boxes on one image of a ███████ product, and opining that he can see the crystallographic surfaces with his naked eye. *See* Ex. 48 ¶¶ 49-50; Ex. 52 at 122:5-21. In doing so, he does not address the high standard he set in the IPR. If the Court is inclined to consider Shealy's self-contradictory testimony, it should at minimum find that for ████████, for which Shealy did not try to find crystal plane surfaces, no crystallographic plane surfaces are obtained.

## II.     MOTION FOR SUMMARY JUDGMENT OF INVALIDITY

As explained above, Schubert and Shealy mischaracterize three academic papers as saying that ████ must *necessarily crystallographically etch* any face of GaN other than the Ga-polar c-plane surface. The prior art, however, discloses using ████ to etch those surfaces. In other words, Schubert's position on the literature depends on whether he is arguing infringement or validity. His infringement and invalidity positions irreconcilably conflict.

### A.     BACKGROUND

The application that led to the '475 Patent was filed on June 23, 1999 and claims priority to a provisional application filed on June 23, 1998. As explained in detail above, the '475 Patent relates to crystallographic wet etching of III-nitride materials, including GaN. The wet etching of III-nitride materials, such as GaN-based epitaxial layers grown on substrates, was well known in

23

the art before June 23, 1998.  Lumileds focuses on two references that disclose the limitations of each asserted claim: Marasina and Youtsey.

*Marasina*.  The full title of the Marasina reference is *Chemical Etching of Gallium Nitride, Transactions of the V.I. Ulyanov (Lenin) Order of Lenin Leningrad Electrotechnical Institute, Collection of Scientific Papers*, No. 338, 1984, L.A. Marasina et. al. Ex. 1. Marasina was published in 1984 by the Ministry of Higher and Secondary Special Education RSFSR. *Id.* Marasina is therefore prior art under 35 U.S.C. § 102(a) and (b).[7]

Marasina discloses a study of the kinetics of processes involving the etching of epitaxial GaN. Ex. 1 at 35. The GaN epitaxial layers used in Marasina's experiments were "obtained with a chloride-hydride system on sapphire substrates and had an orientation along planes (0001) and $(11\overline{2}0)$." *Id.*  Marasina also discloses the use of ███ as an etchant, and that etch rates depended on plane orientations. *Id.* at 36.

*Youtsey*.  The full title of the Youtsey reference is "*Highly anisotropic photoenhanced wet etching of* n-*type GaN*," Applied Physics Letters, 71 (15), Youtsey et. al. Ex. 2. Youtsey was published on October 13, 1997. *Id.* Youtsey is therefore prior art under at least 35 U.S.C. § 102(a). Youtsey discloses photoenhanced wet etching of epitaxially grown *n*-type GaN, using a 0.04 M ███ solution. Ex. 2 at 2151. It is also undisputed that Youtsey discloses using that ███ solution to etch a "non-c-plane" surface: the "undercut" or sidewalls shown in Youtsey's Figure 3 (annotated with red and yellow arrows):

---

[7] Because the '475 Patent's priority date pre-dates the 2011 Leahy-Smith America Invents Act ("AIA"), the pre-AIA version of the statute applies.




FIG. 3. GaN etch profile (2.5 μm etch depth).        FIG. 3. GaN etch profile (2.5 μm etch depth).

### B.    ARGUMENT

"A prior art reference anticipates a patent claim if the reference discloses, either expressly or inherently, all of the limitations of the claim." *EMI Grp. N. Am., Inc. v. Cypress Semiconductor Corp.*, 268 F.3d 1342, 1350 (Fed. Cir. 2001); *see also Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1378 (Fed. Cir. 2001) ("[T]hat which would literally infringe if later anticipates if earlier.").  In assessing whether a reference anticipates a claim, the reference must be "considered together with the knowledge of one of ordinary skill in the pertinent art" at the time the patent application was filed.  *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994) (citations omitted).  Marasina and Youtsey anticipate the asserted claims.

### 1.    Marasina Anticipates Claims 11-14 & 16

Marasina discloses each limitation of claims 11-14 & 16.  *See* Ex. 41 ¶ 189 & C-11. Dr. Schubert (serving as his own invalidity expert) does not dispute that. Instead, he opines only that the etching results disclosed by Marasina are wrong. That opinion is irrelevant.  First, to reach that conclusion, Dr. Schubert reads in limitations not found in the asserted claims.  Second, any error by Marasina is irrelevant to the claims as written, and, as Dr. Schubert admits, would not have been known to a person of ordinary skill in the art at the time of the invention.

*Claim 11*. Marasina anticipates claim 11. First, Marasina discloses "A method of processing a III-Nitride epitaxial layer system." *See* Ex. 1 at 35; Ex. 41 at C11-1. Marasina also discloses the step of "providing a III-Nitride epitaxial layer system on a substrate,"[8] specifically GaN epitaxial layers on sapphire substrates. *Id*.

And Marasina discloses "wet chemical crystallographic etching said epitaxial layer system along non-c-plane crystal directions." It teaches "wet chemical etching" in both orthophosporic acid and aqueous KOH. Ex. 1 at 36-37; *see* Ex. 41 at C11-1, C11-2. Marasina also discloses that crystallographic etching proceeds along the non-c-plane $(11\overline{2}0)$ crystal direction. *See* Ex. 1 at 37 ("When the temperature increases beyond that point, hexagonal etching figures appear on the surface of the layers for the orientation (0001), and near ellipsoidal figures appear for the orientation $(11\overline{2}0)$."); *see also* Ex. 41 at C11-1, C11-2. Importantly, Marasina discloses that etching proceeds at different rates depending on the crystal plane being etched:

| Orientation of layer | Activation energy $\Delta E$, kJ/mol | | **Etch rate** $V_e$, μm/hr | |
|---|---|---|---|---|
| | Mode | | | |
| | static | dynamic | static T=180°C | dynamic T = 140°C |
| (0001) | 47.7±4.6 | 48.4±5.9 | 15.8 | 8.8 |
| (1120) | 33.1±1.7 | 56.3±5.0 | 12.6 | 3.6 |

Ex. 1 at 36 (emphasis added). The disclosure of hexagonal features, and varying etch rates, discloses etching that proceeds in directions dictated by the crystal planes at rates that depend on the plane being etched. Ex. 41 at C11-1, C11-2; Ex. 52 at 179:13-180:16. And, as discussed above, Shealy insists that etching non-C-planes surfaces (such as the $(11\overline{2}0)$ plane) ███████, which Marasina discloses, *necessarily* results in crystallographic etching. Ex. 43 ¶¶ 84, 88.

---

[8] The Court construed "substrate" according to its plain and ordinary meaning of "support material for epitaxial layers." D.I. 140 at 1. The invalidity arguments presented in this motion do not turn on that construction.

*Claim 12*.  As discussed with respect to claim 11, Marasina discloses the sole limitation of claim 12, "wherein said epitaxial layer system comprises GaN."  Ex. 41 at C11-2.

*Claim 13*.  Marasina anticipates claim 13 for the same reasons it anticipates claim 11. Claim 13 recites the identical preamble and "providing" step as does claim 11. The only unique limitation recites, "crystallographically etching said epitaxial layer system by immersing said epitaxial layer system into a liquid chemical."  Marasina's disclosure of etching in orthophosphoric acid and aqueous KOH along the (0001) and (11$\overline{2}$0) directions, as excerpted above with respect to claim 11's second method step, equally satisfies claim 13.  Ex. 41 at C11-3, C11-4.

*Claim 14*. Like claim 12, claim 14 simply recites, "wherein said epitaxial layer system comprises GaN."  Again, Marasina's disclosures are specific to epitaxial GaN.  *Id*. at C11-4.

*Claim 16*. Claim 16 recites: "The method of claim 13, wherein said liquid chemical is heated." Marasina discloses heating its orthophosphoric and KOH etching liquids. *See, e.g.*, Ex. 1 at 35 ("The temperature range for etching the epitaxial layers of GaN (20-200º) for $H_3PO_4$ and (20-120º) for KOH) [sic] was selected . . . ."); *id.* at 36 (disclosing etching results at 180ºC and 140ºC).

***Schubert Failed to Rebut Marasina's Teachings***.  Schubert effectively acknowledges that Marasina discloses the asserted method steps, including the crystallographic etching.  He opines that Marasina's published results should be disregarded, however, because Marasina's disclosure of a non-zero etch rate for the (0001) plane (*i.e.*, the Ga-face) is "completely contrary to crystallographic etching." Ex. 46 ¶ 299.  But Schubert concedes that Marasina ***could*** have obtained crystallographic etching of the (0001) plane. *Id.* ¶ 301; *see also* Ex. 61 ¶ 289.  Instead, his criticism of Marasina merely amounts to an irrelevant discussion of how GaN material quality has improved over the years since 1984, when Marasina was published.  Schubert opines that in 1984, "neither

27

GaN commercial products nor high-quality epitaxial GaN was available" (Ex. 46 ¶ 296), and that Marasina's etching of the top surface indicates "poor material quality" (*id.* ¶ 303). He attempts to discredit Marasina, claiming that its results are "necessarily not applicable to high-quality GaN as available since the early 1990s." *Id.* ¶ 301. But the '475 Patent claims are not limited to any particular quality of GaN, or GaN at all. Rather, they cover any "III-nitride epitaxial layer system." Because Schubert does not dispute that Marasina's published results show crystallographic etching of such a system, as claimed, summary judgment is warranted.

Moreover, any error in Marasina is irrelevant. Marasina's alleged mistake is its disclosure of etching the (0001) plane. Schubert bases that opinion on his own patent: "The '475 patent teaches that the (0001) c-plane surface of epitaxial GaN is impervious to crystallographic etching . . . ." Ex. 46 ¶ 299. But a person of ordinary skill in the art when the '475 Patent application was filed did not have access to Schubert's yet-to-be-published application, and could easily have confused the (0001) and $(000\bar{1})$ planes; it is undisputed that when Marasina was published, people in the art had no understanding that the (0001) and $(000\bar{1})$ planes had different etching properties. *See, e.g.*, Ex. 52 at 72:21-73:8. Schubert himself acknowledged that "the fact that the c-plane is impervious was only understood when the invention had been made." Ex. 51 at 262:21-23; *see* D.I. 136 at 29:4-8; *see also* Ex. 52 at 40:9-41:2. Thus, Schubert does not rebut Dr. Jokerst's opinion that a person of ordinary skill in the art ***at the time of the invention*** would have read Marasina to disclose each limitation of claims 11-14 and 16.

Nor is Marasina's purported error relevant. Even if Marasina mistook the N-face surface for the Ga-face surface, the reference still demonstrates etching that produces hexagonal features on one face, and that etched one of the c-planes at a rate different from that of the $(11\bar{2}0)$ plane,

*i.e.*, crystallographic etching.  And Marasina discloses that the (11$\overline{2}$0) is exposed to, and etched

████████, which Shealy says *necessarily* results in crystallographic etching. Ex. 43 ¶¶ 84, 88.

Because Schubert does not dispute that Marasina's published results show the crystallographic etching steps recited in claims 11-14 and 16, there is no genuine dispute of material fact that Marasina anticipates those claims.  *See, e.g.*, *In re Paulsen*, 30 F.3d at 1480.

### 2.    Youtsey Anticipates All Asserted Claims

Schubert's only challenge to Youtsey is that it does not disclose crystallographic etching. But Youtsey discloses the exact etching mechanism—exposing ███████████████████— that Schubert argues *necessarily* results in crystallographic etching for infringement purposes. Schubert's invalidity opinion therefore cannot be squared with his own infringement theory.

*Claim 1*. To the extent claim 1's preamble is limiting, Youtsey teaches "[a] method of processing a III-Nitride epitaxial layer system provided on a substrate."  *See, e.g.*, Ex. 2 at 2151 ("The samples for this experiment consisted of 3.5-µm thick $n^+$ ($n{\sim}10^{18}$) GaN layers grown on 6H SiC substrates by metal organic chemical vapor deposition (MOCVD) using an AlN buffer layer."); Ex. 61 ¶ 197.  Next, Youtsey discloses the first claimed method step of "exposing non-c-plane surfaces of said III-Nitride epitaxial layer system."[9]  In particular, Youtsey's experiment involved exposing the non-c-plane surfaces (the vertical walls) highlighted in red in Figure 5:

---

[9] The Court construed "exposing" to mean "revealing and thus making accessible for etching." D.I. 140 at 1.  The parties' invalidity positions do not turn on that construction.



FIG. 5. High anisotropic GaN etch profile (3.5 μm etch depth).

*See, e.g.*, Ex. 2 at 2153; Ex. 61 ¶ 197.  Schubert admitted at his deposition that these vertical walls are non-c-plane surfaces and are exposed during the etching process.  *See* Ex. 51 at 219:19-223:13, Ex. 2 at Fig. 3.

Given Plaintiff's infringement theory, Youtsey must also disclose "crystallographically etching said epitaxial layer system in order to obtain crystallographic plane surfaces."  Youtsey discloses an anisotropic wet ▊ etch with a horizontal component that produces an "undercut" on the vertical walls.  That undercut has a crystallographic plane surface, as can be seen in the red highlighting in Figure 5.  *See* Ex. 61 ¶ 197 at 60-61; Ex. 2 at 2153 ("[A] wet ▊▊▊▊▊▊ etching process has been developed for etching ▊▊▊▊▊▊▊▊ solution and Hg arc lamp illumination. The process provides high anisotropy and high etch rates (>300 nm/min)); *id.* ("[I]ncreased etch time provided a further improvement in the verticality of the etch, with minimal increase in undercutting of the etch mask.").  Schubert concedes that ▊ etching creates the undercut seen in Figure 5.  Ex. 51 at 226:2-11 ("The material that was where the undercut is, where now the undercut is has been removed by the ▊ etching, yes."), 225:4-7 (agreeing "that undercutting occurs because material is etched away").

Given Schubert's infringement theory, the undercut etch must also be crystallographic. The '475 Patent itself teaches that "[a] crystallographic etch produces undercut walls . . . ."  Ex. 5 at

5:13-15, Fig. 10C.  More important, because Schubert has not examined a single Lumileds product to see if crystallographic etching in fact occurs, his entire infringement theory depends ████ ████ of non-c-plane surfaces ***necessarily*** being crystallographic.  Both Shealy and Schubert have opined as much.  *See, e.g.* Ex. 43 ¶ 84 ("This period of ██████████ etching of N-face GaN-based material necessarily performs crystallographic etching of the epitaxial layer system."); ¶ 95 ("The presence ██████ under the conditions of Lumileds' etching process, results in etching that is crystallographic, and, accordingly, meets the 'crystallographic etching' limitation in the claim."); Ex. 46 ¶ 132 ("However, when ████ etching is used on non-c-planes of a GaN epitaxial layer system, the ████ etching is widely acknowledged to be crystallographic in nature.").

Youtsey discloses a ████ etch in ████ of non-c-plane surfaces of GaN.  Ex. 2. ██████

████████████████████████████████████████████████

████ . Accordingly, Youtsey anticipates claim 1.

***Claim 2***.  As just explained, Youtsey's "epitaxial layer system comprises GaN." Youtsey therefore anticipates claim 2.

***Claim 4***.  As also just explained, Youtsey discloses a wet ████ etch of epitaxial GaN in a ████ solution, and therefore anticipates claim 4's requirement that "said crystallographically etching step comprises immersing said epitaxial layer system in a crystallographic etching chemical." *See* Ex. 61 ¶ 197 at pp. 65-66.

***Claims 11-14***. For these claims, the parties' positions overlap entirely with the issues discussed above with respect to claims 1 and 2.  Youtsey therefore anticipates claims 11-14 for the same reasons it anticipates claims 1 and 2.  *See id*. ¶ 197 at pp. 66-72.

***Claim 16***. Youtsey inherently discloses "said liquid chemical is heated." Youtsey expressly discloses using an Hg arc lamp to illuminate the ████ etching solution.  *See* Ex. 2 at 2153 ("In

31

conclusion, a wet photoelectrochemical etching process has been developed for etching n-type GaN films using KOH solution and Hg arc lamp illumination."), 2151 ("An unfiltered Hg arc lamp provided uniform illumination over the entire surface of the sample . . . ."). Dr. Jokerst explains that a person skilled in the art would understand that illuminating the fluid heats it. *See* Ex. 61 ¶ 197 at pp. 72-73.

### III.    MOTION FOR SUMMARY JUDGMENT OF INEQUITABLE CONDUCT

BU, the original patent owner, allowed the '475 Patent to expire after Schubert said he wasn't interested in buying it. When Schubert changed his mind months later, BU knew it could not lawfully undo its intentional decision to let the patent lapse. But months after that, BU certified to the PTO that the entire 7-month delay in paying the maintenance fee was "unintentional," even though BU already had truthfully told other government agencies what the undisputed documents show: BU abandoned the patent because there was no commercial interest in it when it expired.

To establish inequitable conduct, the accused infringer must prove that the patentee or someone involved with the patent's prosecution or revival "misrepresented or omitted material information with the specific intent to deceive the PTO." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011). A patent may become unenforceable where "inequitable conduct has occurred after the patent has issued and during the course of establishing and paying the appropriate maintenance fee." *Ulead Sys., Inc. v. Lex Computer & Mgmt. Corp.*, 351 F.3d 1139, 1144 (Fed. Cir. 2003); *see also In re Rembrandt Techs. LP Patent Litig.*, 899 F.3d 1254, 1273 n.** (Fed. Cir. 2018).

The '475 Patent—and this lawsuit—exist only because of a lie that the undisputed evidence makes transparent. BU's inequitable conduct renders the patent unenforceable, and summary judgment should be granted on that ground.

### A.     The Certification of "Unintentional Delay" was False

The PTO can reinstate a patent that expired for failure to timely pay maintenance fees only if the patent owner files a petition to revive.  The petition form requires a certification that the **entire** delay in timely paying maintenance fees was "unintentional."

Undisputed evidence shows the opposite.  In September 2009, BU wrote Schubert that it planned to abandon the '475 Patent to avoid paying the maintenance fee, and offered to sell him the patent.  Exs. 12 and 53.  Schubert immediately replied that he "would not be interested."  Ex. 12 at BU001361. BU did not pay the fee and the patent expired on September 25, 2009.  Ex. 10. BU subsequently wrote to the federal government agencies that funded Schubert's underlying research that the "decision was made due to lack of commercial interest in the invention."  Ex. 11.

Several months after declining the patent, Schubert changed his mind and asked BU about reviving and transferring it.  Dr. Sean Lee replied on December 3, 2009:

> I checked on the possibility of reviving the case after the missed due date, and have to deliver the bad news that we can't revive it **_because it was intentionally abandoned_**.  The patent office allows for reviving only if it can be explained in good faith that the abandonment was unintentional.

Ex. 13  (emphasis added).[10]

A week later, Dr. Lee changed his message:  ██████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████ Ex. 15 at BU001367.  Dr. Stevens testified at deposition that, around this time, he told BU's outside patent counsel, former PTO Examiner Matthew Connors, the desire to revive the patent and the facts underlying the nonpayment of maintenance fees.  Ex. 39 at 90:291:19; 137:8-138:5; 147:7-151:11.

---

[10] Schubert did not produce this email until June 18, 2020, eight years into this litigation, having told the Court at least a month earlier that Lumileds already possessed the facts relevant to inequitable conduct.  D.I. 122 at 4; Ex. 31 at 92:25-94:4.

In February 2010, BU formally decided to sell Schubert the '475 Patent, hoping to "generate significant revenue." Ex. 18. But Connors did not file a petition to revive the patent until April 22 (the "Petition"). In the Petition, Connors and BU falsely certified that the *entire* 7-month delay in payment was "unintentional." Ex. 19 at BU000291. The Petition was automatically granted. *Id.*; Ex. 42 ¶¶ 68, 161. BU assigned the '475 Patent to Schubert, allowing him to bring this lawsuit. Exs. 21-23.

Written PTO guidance in effect long before BU and Connors filed the Petition made clear that BU's delay in paying fees was "intentional," as the Federal Circuit explained in *Rembrandt*. Like BU, the prior patent owner in that case "decided that the expected value of the [ ] patents did not justify paying their maintenance fees, and it therefore let the patents lapse." 899 F.3d at 1261. Also like BU, "[f]ollowing some third-party interest in acquiring the [ ] patents," the prior owner petitioned the PTO to revive the patents, representing that the delay was "unintentional." *Id.*

The Federal Circuit affirmed an "exceptional case" finding under 35 U.S.C. § 285, quoting the PTO's "clear guidance on the precise issue" from 1997: "[w]here the applicant deliberately permits an application to become abandoned (e.g., due to a conclusion that … **the invention lacks sufficient commercial value** to justify continued prosecution), the abandonment of such application is considered to be a deliberately chosen course of action, and **the resulting delay cannot be considered as 'unintentional.'**" 899 F.3d at 1272-73 (citing Ex. 3, Changes to Patent Practice and Procedure, 62 Fed. Reg. 53,132, 53,158-59 (Oct. 10, 1997)) (emphasis added). The Notice further explains: "[a]n intentional delay resulting from a deliberate course of action … is not affected by: (1) The correctness of the applicant's (or applicant's representative's) decision to abandon the application … or (3) the discovery of new information or evidence, or other change in circumstances subsequent to the abandonment…." *Id.* at 1273. The Federal Circuit also

34

explained that the "definition of 'unintentional' in relation to abandoned applications applies with equal force to issued patents," citing a 2007 written PTO opinion. *Id*. at 1273. Accordingly, the Federal Circuit characterized the patentee's asserted "mistake of fact" as "no defense" at all. *Id*.

### B.    The False Certification Was Material

In *Rembrandt*, the Federal Circuit also confirmed that a false certification of "unintentional" delay is a material misrepresentation for purposes of inequitable conduct. *Id*. at 1273. The court of appeals explained, "the PTO would not have revived the patents if it had known that [the patent owner] consciously allowed them to expire. In other words, the statement was material to patentability—or at least continued enforceability." *Id.* So it was here.

### C.    The False Certification Was Made with Intent to Deceive

The false certification of "unintentional" delay and improper revival could not have happened unless Connors, Schubert, and BU employees Drs. Stevens and Lee intended to deceive the PTO. "[I]ntent rarely can be, and need not be, proven by direct evidence. Instead, an intent to deceive is usually inferred from the facts and circumstances surrounding the conduct at issue." *Cargill, Inc. v. Canbra Foods, Ltd*., 476 F.3d 1359, 1364 (Fed. Cir. 2007).

Rather than defend the revival, each involved witness disclaimed responsibility for it. Dr. Stevens testified that he told Connors the facts underlying the delay. Ex. 39 at 137:8-138:5; 147:7-151:11. Though Connors claimed he couldn't remember, he could not and would not defend the decision. Ex. 34 at 260:10-261:12, 264:1-265:5. "[W]illful blindness" in certifying "unintentional delay" is enough to support summary judgment of inequitable conduct. *3D Med. Imaging Sys. LLC v. Visage Imaging, Inc.*, 228 F.Supp.3d 1331 (N.D. Ga. 2017). Here, Connors either knew the facts or—at best—was willfully blind. Drs. Schubert, Stevens, and Lee each knew the delay in paying the maintenance fee was intentional, foreclosing revival, but contributed to the deception needed to revive the patent.

35

### 1.    Connors' Intent to Deceive

Connors signed the false Petition.  Ex. 19 at BU000292.  He admitted that, looking back, he "might have done it a little different."  Ex. 34 at 263:21-264:7.  Dr. Stevens testified at deposition that, around December 2009, he told Connors the facts underlying the nonpayment of fees and Schubert's desire to buy and revive the patent.  Ex. 39 at 90:2- 91:19; 137:8-138:5; 147:7-151:11.  Dr. Stevens also testified that Connors' response led Dr. Stevens to believe there was "a potential pathway by which the patent could be revived."  *Id*. at 121:14-124:11, 203:10-204:9, 211:3-12.  BU blocked access to Connors' response, asserting the attorney-client privilege.  *Id*. at 208:15-23.  This forecloses Schubert from relying on Connors' rationale, whatever it was, as a defense to inequitable conduct.[11]

Five months before Connors filed the April 2010 Petition to revive, he knew that BU and Schubert wanted to revive the patent.  Even if Connors unreasonably believed in December 2009 that the first two-month delay in paying maintenance fees was "unintentional," he knew when filing the petition that the additional delay until April 2010 was not "unintentional."  Yet he certified that the **entire** 7-month delay was unintentional.  That he could not have believed.

Connors had an on-going duty of candor and disclosure to the PTO.  37 C.F.R § 1.56; Ex. 34 at 51:19-23.  He also had a duty to undertake "a reasonable investigation of the circumstances surrounding the abandonment of the application."  Ex. 3 at Cmt. 6; 37 C.F.R. § 11.18.  At deposition, Connors could not explain how the facts supported his certification of "unintentional" delay.  Ex. 34 at 105:5-106:11, 108:14-109:5, 264:1-265:5.

---

[11] This Court denied Lumileds' motion to overrule BU's privilege objections or foreclose BU from relying on Connors' advice as a defense to inequitable conduct, but without prejudice to "rais[ing] this again either as a motion to compel or you can move to preclude the use if that's appropriate."  D.I. 232 at 34:3-35:10.

Connors either knew the underlying facts and knew the certification was false, or was willfully blind.  Either constitutes intent to deceive.  *See 3D Med. Imaging*, 228 F. Supp. 3d at 1338 (finding intent to deceive through patent owner's admission that he certified unintentional delay without knowledge of circumstances of non-payment); *Aptix Corp. v. Quickturn Design Sys.*, 269 F.3d 1369, 1382 (Fed. Cir. 2001) ("willful blindness to another's wrongful acts and continued reliance upon them could rise to the level of intentional or unconscionable conduct").

## 2. Schubert's Intent to Deceive

The decision to file the false Petition was made at Schubert's behest and for his benefit. He therefore owed a duty of candor to the PTO.  Ex. 42 ¶¶ 198-204.  He knew, before the Petition was filed, that: (1) BU did not pay the maintenance fee; (2) BU's actions constituted "intentional" abandonment, both because a layperson understands that a deliberate decision is not "unintentional," and because of Dr. Lee's December 3, 2009 email stating that "we can't revive it because it was intentionally abandoned."  Ex. 13.  After the petition was filed, and although Lumileds put him on notice in 2013 that the delay was intentional and material, Schubert did not try to correct the record with the PTO.[12]  Ex. 42 ¶¶ 215-223.  And he did not produce Dr. Lee's December 3, 2009 email until 8 years into the litigation, further evidencing deceptive intent.  *See Rembrandt*, 899 F.3d at 1274.

## 3. Lee's and Stevens' Intent to Deceive

Both Dr. Lee and Dr. Stevens had extensive experience in patent practice, and were aware of the circumstances surrounding BU's intentional abandonment of the '475 Patent.  Ex. 39 at 16:5-16, 47:14-48:11, 90:2-91:19, 137:8-138:5, 147:7-151:11.  Yet both allowed Connors to certify that the patent had been unintentionally abandoned.  Ex. 35 at 217:4-219:20.  Dr. Lee

---

[12] To correct the record, Schubert could have requested a supplemental examination (Ex. 42 ¶¶ 215-222) or disclaimed the patent (*id.* ¶ 213).  He did neither.

emailed Schubert in December 2009, telling him "we can't revive" the patent, and discussed the issue with Dr. Stevens. ████████████████████████████████████ ████████████████████████████████████████████ Ex. 16; Ex. 18.  Two months later, Schubert e-mailed Dr. Lee to remind him that he "would be prepared to take all steps necessary to acquire the patent."  Ex. 8 at BU001118.  One day later, Connors filed the false petition.  Ex. 19.

Intent to deceive is clear on this record.

## IV.    MOTION TO PRECLUDE DAMAGES OPINIONS OF MR. WACEK

The Third Circuit has set forth a "trilogy of restrictions on expert testimony:  qualification, reliability, and fit." *M2M Solutions LLC v. Enfora, Inc.*, 167 F. Supp. 3d 665, 669 (D. Del. 2016). "Qualification refers to the requirement that the witness possess specialized expertise." *Id*.  To be reliable, testimony "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his o[r] her belief." *Id*.  "Finally, Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Id*. at 669-670; *see also* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

"The party offering expert testimony bears the burden of proving its admissibility by a preponderance of the evidence," *M2M,* 167 F. Supp. 3d at 670, which includes demonstrating "that the expert's opinions are reliable." *Del. Display Grp. LLC v. VIZIO, Inc.*, 2017 WL 784988, at *2 (D. Del. Mar. 1, 2017).

Schubert's damages expert Wacek opined that the ███████████████████████ ██████████████████████████████████████████ Ex. 44 at 16-18, 37.  To inflate damages, he relied on an exclusive license agreement (and its amendment) between BU and Cree ("BU-Cree Agreement"), and used a settlement/supply agreement between Cree and Bridgelux

("Cree-Bridgelux Agreement") as a check.  Wacek has never seen either agreement, and assigned

zero value to almost all of the licensed patents without considering their scope or comparability.

As another check, Wacek rendered a **technical** conclusion about patent-related product

performance improvements that he was not qualified to give, and used that as a proxy for gross

profitability.

After Lumileds' damages expert relied on ████████████████████████████████,

Wacek provided an admittedly "new" opinion.  Ex. 50 at 160:2-163:17, 139:17-142:14.  That

untimely opinion relies on ████████████████████████████████████████████████████

████████████████████████████████████████.  Wacek's opinions are unreliable,

divorced from the facts, and untimely, and should be precluded in their entirety.

### A.  Wacek's Opinions Relying on the BU-Cree and Cree-Bridgelux Agreements Are Unreliable and Divorced from the Facts

Wacek formed his opinions by opining that the BU-Cree Agreement had an "effective"

royalty rate range of ████████████████████████████████████████████████████████

████  Ex. 44 at 38, 40; Ex. 49 at 31.  He opines that the Cree-Bridgelux Agreement's 3-6% royalty

range ████████████████████████████████.  Ex. 49 at 21.

### 1.  Wacek Has Never Seen the Agreements

Wacek has never seen either the BU-Cree or Cree-Bridgelux Agreement.  Ex. 50 at 60:5-

10, 62:16-22, 112:19-112:24.  He does not know the full scope of these agreements, and explained

"[y]ou don't know what you don't know."  *Id*. at 60:24-68:20, 69:23-70:22.  Wacek relies on them

without knowing all of their terms, yet claims that language in ████████████████████████

████████████████████████████  rendered *that* agreement unreliable.  Ex. 44 at 18.

This blind reliance on the unknown should preclude Wacek's opinions in their entirety, because

his royalty rate range principally relied on the BU-Cree Agreement.  *See S3g Tech. v. Unikey*

*Techs.,* 2018 WL 4387660, at \*4 (E.D. Tex. May 8, 2018) (precluding damages expert from relying

on licensing agreement he could not review); *Ravo v. Covidien LP*, 55 F. Supp. 3d 766, 775-78

(W.D. Pa. 2014) (precluding expert from testifying from memory about patent licenses that were

not produced); *Limelight Networks, Inc. v. XO Commc'ns, LLC*, 2018 WL 678245, at \*8 (E.D.

Va. Feb. 2, 2018) (precluding "internally inconsistent methodology").

## 2.      Wacek Did Not Establish Comparability

Wacek did not establish that the BU-Cree and Cree-Bridgelux Agreements are comparable.

"The testimony of a damages expert in a patent suit who relies on non-comparable licenses in

reaching his royalty rate should be excluded." *M2M,* 167 F. Supp. 3d at 175-76 (citation omitted).

"Assessing the comparability of licenses requires a consideration of whether the license at issue

involves comparable technology, is economically comparable, and arises under comparable

circumstances as the hypothetical negotiation." *Bio-Rad Labs., Inc. v. 10X Genomic Inc.*, 967 F.3d

1353, 1372-73 (Fed. Cir. 2020).   The party relying on allegedly comparable licenses has the

"burden to prove that the licenses [a]re sufficiently comparable." *Lucent Techs. Inc. v. Gateway,

Inc.*, 580 F.3d 1301, 1329 (Fed. Cir. 2009).

Wacek cannot carry that burden.   The BU-Cree Agreement is an exclusive portfolio license

with a complicated compensation structure:   minimum royalties, lump sums, running royalties,

and several options for sublicenses.   Ex. 44 at 31.   It arose under non-comparable circumstances:

Cree wanted to assert BU patents against LED industry leaders such as Nichia.   Ex. 50 at 81:20-

84:9; *see also* Ex. 47 ¶¶ 169-175.   At his deposition, Wacek admitted that "the circumstances have

some clear distinctions.   They're different.   They are non-comparable in some ways, such as the

presence of Nichia, and the motivation to have access to the patent and sublicense to Nichia."   Ex.

50 at 83:16-84:9.   And when asked whether the agreement is economically comparable, Wacek

could not "answer that accurately yes or no."  *Id.* at 74:21-75:18.

Nor can Wacek establish that the Cree-Bridgelux Agreement is comparable.  "[A] single settlement agreement on a different patent without any analysis of the settlement context is not a reliable method for calculating damages."  *AVM Techs., LLC v. Intel Corp*., 927 F. Supp. 2d 139, 144 (D. Del. 2013).  Yet at his deposition, Wacek would not take any concrete position on comparability.  Ex. 50 at 103:21-112:17.  That invalidates his opinion.

### 3.      Wacek Fails to Account for Critical Differences

"[C]omparisons of past patent licenses to the infringement must account for the technological and economic differences between them."  *Wordtech Sys. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010) (quotations omitted).  Wacek did not do this.

The BU-Cree Agreement licensed three patents, and the Cree-Bridgelux Agreement licensed six.  Ex. 50 at 55:20-56:24, 123:16-124:2.  Yet Wacek assigned the entire value of both Agreements to a single patent.  Ex. 44 at 31, 33, 37.  He did not consider the other seven patents' technological comparability.  Ex. 50 at 124:3-126:13, 118:1-121:1; Ex. 49 at 20.  This type of omission is sufficient to preclude damages testimony.  An expert's "failure to even attempt to reference the economic value of the patented technology in any specificity … renders his damages opinion fatally insufficient."  *M2M Solutions LLC v. Motorola Solutions, Inc.*, 2016 U.S. Dist. LEXIS 22944, at *29-30 (D. Del. Feb. 25, 2016).   Another court precluded an expert who (a) assigned all value to only one patent in group of patents because he considered that patent "fundamental," and (b) failed to "independently value" other licensed technologies.  *Limelight*, 2018 WL 678245, at *8.

As for the Cree-Bridgelux Agreement, Wacek "can't say" how the inclusion of a chip supply agreement affected his royalty range.  Ex. 50 at 113:2-15.  *Lucent v. Gateway*, 580 F.3d 1301, 1331 (Fed. Cir. 2009) (precluding opinion where "jury had little to no testimony explaining how [agreement's] complexity would have affected the hypothetical negotiation").

## B.   Equating Light Output to Profit Is Nonsensical and Unaccepted

Wacek uses one measure of device performance as a proxy for Lumileds' profits from the patented technology versus alternative technologies.  Wacek apparently created this methodology for this case, so it has never been accepted by or even presented to a court.  He (1) concludes that using the '475 Patent results in a light output improvement over alternative technologies ranging from ███████; (2) assumes this percentage equates to gross profit percentage, *i.e.*, X% output improvement = X% gross profits; and (3) takes a █████████████████ range and multiplies it by Lumileds' gross profit margin to estimate profits from the accused process.  Ex. 44 at 21-26, 34-36; Ex. 49 at 24-25.

Wacek concludes with so-called "additional profit ranges" of ████████ that he would apply to **total** LED chip **revenue** (not profits).  Ex. 44 at 38; Ex. 49 at 25.  Yet he never opines that the patent provides Lumileds with █████████████ (*i.e.*, incremental) LED chip revenue or gross profit.  Rather, he opines that ███████ of Lumileds' **total gross profit** from accused LED chips is attributable to the '475 Patent merely because the products are purportedly ████████ brighter.  Ex. 49 at 20.  Wacek's novel methodology is unreliable and divorced from the facts.

In asserting specific percentage increases in light output (brightness) from the accused manufacturing process, Wacek offers technical opinions that he is not qualified to provide.  He opines that "the contributions of the patented etching technologies to the accused products … increase light extraction by at least ████████████."  Ex. 44 at 26, 35.  This conflicts with Plaintiff's technical experts' opined ranges of ██████.  Ex. 46 ¶ 352; Ex. 43 ¶¶ 51-55.

In equating light output improvement percentage to gross profit percentage, Wacek ignores most of his claimed ████████ output improvement range.  He chooses output gains of (a) ████ ████████████████████████████████████████████████████ ██████████████████████████.  Ex. 44 at 35-36; Ex. 49 at 24-25.  Even Wacek's

cherry-picked range of ███ varies too widely to be reliably equated to profits or helpful to a jury.  It is as if a doctor asked a patient how many days she exercises each year, and the patient answered ████████.

More important, equating light output gain to gross profit fails simple testing.  If it were reliable, it would work over the entire range.  It doesn't.  For a ██ brighter LED, ██ of its gross profit would be attributed to improved brightness, with remaining profit attributed to other product aspects.  But for a ██ brighter LED, ██ of the LED's gross profits (more than all the profits) would be attributed to brightness gain, and zero to other product aspects.

Nor has Wacek provided a factual basis to equate light output gain to profit.  He does not know whether light output directly correlates to profit (Ex. 50 at 247:16-248:2), and concedes that ██████████████████████████████████ (Ex. 44 at 34).  He does not claim that light output is the **only** driver of demand.  Ex. 44 at 34; Ex. 50 at 43:8-15, 44:10-45:13.  And he admits that only a subset of the manufacturing process is accused.  Ex. 44 at 6-7.  Thus, the accused steps cannot account for even 100% of profits.  That is why Wacek chooses improvement percentages under ██ and ignores the rest.  But that is not enough.  The Federal Circuit rejects that notion that "using an allegedly low royalty rate alone supports the admissibility of the expert's reasonable royalty opinion."  *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1351 (Fed. Cir. 2018).

Additionally, Wacek admitted that he does not even know whether one of the two asserted alternative technologies, ██, would infringe.  Ex. 50 at 297:10-300:24, 303:20-306:24.  Yet his stated goal was to compare "the accused products to existing, non-infringing products."  Ex. 44 at 34; *see also* Ex. 50 at 297:19-299:7.

---

13 ████████████████████████████████████████

**C.    Wacek Should Be Precluded from Relying on** ███████████████
███████████

Wacek also should be precluded from relying on the ███████████████

███████, for three reasons.  First, his professed reliance was untimely.  In his opening report,

Wacek opined that these agreements were not instructive or reliable.  Ex. 44 at 16, 18, 37.  After

Lumileds' expert relied **only** on ███████████ (Ex. 47 ¶¶ 97-107), and the Court foreclosed

Schubert from seeking damages for Lumileds' ███████ (D.I. 232 at 17:17-28:11, 3:21-4:5),

Wacek offered an admittedly "new" opinion in his reply report relying on both the ███████████

███████ (Ex. 50 at 161:1-14; Ex. 49 at 31).  Wacek's untimely disclosure contravenes the

Scheduling Order (D.I. 70) and his tardy reliance should be precluded.

Second, Wacek failed to account for the scope of the ███████████████

███████, both of which ██████████████████████████████████

███. Ex. 25 at §§ 2.01, 2.02(B); Ex. 29 at § 2; Ex. 44 at 16-17; Ex. 49 at 8.  That is a critical

difference from the hypothetical negotiation, which would not include ███████████.  *See*

*Wordtech*, 609 F.3d at 1320.

Third, Wacek failed to consider the technological comparability and independent value of

██████████████████████████████████████████

███████ Ex. 50 at 166:14-168:24.

██████████████████ *Id*. at 172:17-175:19.  By his own account, however, he did

not consider information necessary to do this. *Id*. at 169:1-175:19. ███████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████ *Id*. at 155:11-158:4. ███████████████

██████████████ *Id*. at 165:22-168:24.  Thus, he has not reliably applied

his own principles or accounted for this difference from the hypothetical negotiation. *See Limelight*, 2018 WL 678245, at *8; *M2M Solutions*, 2016 U.S. Dist. LEXIS 22944, at *29-30.

### D.    Wacek's Unsupported Opinion About the Signify Program Should Be Precluded

Without asserting comparability, Wacek attempts to support his royalty range with a conclusory reference to a licensing program for a portfolio of 2,900+ patents that he did not consider. Ex. 44 at 30; Ex. 50 at 134:10-137:2. This falls far short of the legal standard for reliability, and would be more prejudicial than probative. *See M2M*, 2016 U.S. Dist. LEXIS 22944, at *25-32.[14]

## V.    MOTION TO PRECLUDE EXPERT TESTIMONY OF DR. SCHUBERT

Schubert submitted the sole expert rebuttal report asserting the '475 Patent's validity. Schubert Report. His expert testimony should be precluded on four independent grounds.

### A.    Schubert's Direct Financial Interest in the Result Disqualifies Him

Wacek maintains that Schubert's entitled to as much as ███████ in damages if Schubert prevails. Ex. 49 at 31. That contingency disqualifies Schubert as an expert. Most courts exclude testimony from an expert whose compensation is contingent on the outcome of the case. *See, e.g.*, *Perfect 10 v. Giganews, Inc.*, 2014 U.S. Dist. LEXIS 185066, *10-19 (C.D. Cal. Oct. 31, 2014) (collecting cases) (exercising court's inherent authority to exclude an expert's opinion due to his direct financial stake in the outcome). Moreover, "testimony from experts who have a *direct financial stake* in the outcome of litigation is 'against public policy.'" *Id.* (quoting *Accrued Fin Svcs., Inc. v. Prime Retail, Inc.*, 298 F.3d 291, 300 (4th Cir. 2002)). "Once the expert obtains a direct financial interest in the outcome of the litigation (whether by his or her status as a party, by

---

[14] Wacek should also be precluded from testifying about commercial success. As explained in the following motion to preclude Schubert's testimony, Wacek fails to explain his basis for any opinions on commercial success, as does Schubert. *See* Ex. 44 at 20; Ex. 49 at 13.

contingency fee agreement, or otherwise), any semblance of independence or promise of intellectual rigor that normally adheres to an expert witness is fatally wounded." *Id.* Schubert's direct financial interest in the outcome of this litigation should disqualify him from offering "expert" testimony.

### B. Schubert Cannot Testify About Secondary Considerations

Even if the Court does not preclude Schubert's expert testimony in full, it should preclude Schubert's opinions in paragraphs 342-355 relating to "secondary considerations of non-obviousness." Ex. 46; *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966). Schubert opines that "these secondary considerations weigh against a finding that the claimed invention of the '475 patent is obvious." These paragraphs fail the *Daubert* test of reliability because (1) as a *technical*—not financial or industry—expert Schubert is unqualified to opine on commercial success (Ex. 46 at ¶¶ 349-354), licensing (*id.* at ¶ 346) and long-felt need (*id.* at ¶ 345); (2) he has not established a nexus between the claimed invention and secondary considerations of commercial success (*id.* at ¶¶ 349-354) and industry praise (*id.* at ¶ 344); and (3) he has not viewed Lumileds' allegedly infringing process so his opinion that "the accused products by Lumileds use the inventive process of the '475 Patent" (*id.* at ¶ 347) is unreliable.

### 1. Schubert Is Not Qualified to Opine on Commercial Success, Licensing, or Long-Felt Need

Schubert is offered only as a technical expert. There is no foundation to offer him as an expert in law, finance, or the LED industry. To the contrary, Schubert specifically limited his expertise to semiconductor technology, and disclaimed any expertise in licensing or legal agreements at his expert deposition. Ex. 51 at 65:14-16, 65:23-66:5.

It is well-settled that a technical expert cannot opine on commercial success because that topic is outside the range of technical expertise. *Wonderland Nurserygoods Co., Ltd. v. Thorley*

*Indus. LLC*, 2015 WL 5021416 at *13 (W.D. Pa. Aug. 21, 2015) (collecting cases) (excluding the testimony of a product design expert concerning commercial success in a patent case because he lacked expertise in finance).

Yet Schubert's expert report offers two general opinions on commercial success. First, he states that "I understand from speaking with Mr. Joel Wacek that the accused products by Lumileds are commercially successful." Ex. 46 ¶ 349. Second, he states his "opinion that commercial success of Lumileds' accused products is related to the features claimed in the '475 patent" (*id.* at 350), but provides no explanation as to why those specific features led to the commercial success of the Lumileds products (*id.* at ¶¶ 351-54). Paragraph 349 should be excluded because, as "a technical expert with expertise in semiconductor technology" (Ex. 51 at 65:23-66:5), Schubert lacks qualifications to opine on commercial success.

Schubert also lacks foundation to opine on commercial success. He admitted: "[W]ith respect to commercial success, I have not performed an analysis on my own." *Id.* at 107:4-12. Schubert claims to rely on Wacek for his opinion on commercial success. But neither Schubert nor Wacek ever explains the basis for Wacek's conclusion that "the accused products by Lumileds are commercially successful." Wacek's opening report mentions "commercial success" only in a point heading with no analysis. Ex. 44 at 20. Wacek's reply report credits *Schubert* for the conclusion that "the commercial success of Lumileds' accused products 'is related to the features claimed in the '475 patent.'" Ex. 49 at 13. Each expert relies on the other for the conclusion that the features claimed in the '475 Patent led to the commercial success of Lumileds' products, but neither explains the basis for that conclusion. This hot potato approach leaves each without foundation for his commercial success opinion. For this reason, paragraphs 349-354 of the Schubert Report (Ex. 46) should be excluded as unreliable.

Paragraph 346 should be excluded because Schubert opines ███████████████

████████████████████████████████████████████████████████.”

Schubert admitted at deposition (as cited above) that he is not a licensing expert.

Paragraph 345 should be excluded because Schubert opines on a long-felt need for the process of the patent-in-suit, but lacks relevant expertise.  Schubert opines that "[m]ajor LED companies employ crystallographic etching, as claimed in the '475 patent, in the fabrication of LEDs." Ex. 46 ¶ 345.  These opinions about the needs and practices of the industry have nothing to do with *technical* expertise.  Schubert provides no foundation on the companies or their products and offers no other basis for this opinion in expertise or factual investigation. Paragraph 345 should therefore be excluded as unreliable.

### 2.	Schubert Has Not Established a Nexus Between the Claimed Invention and Secondary Considerations of Non-Obviousness

Schubert's testimony in paragraphs 350-54, 346 and 344 should also be precluded as unreliable because he failed to establish the required nexus between the claimed invention and the secondary considerations of commercial success, industry praise, and licensing.

Federal Circuit case law "clearly establishes that the patentee must establish a nexus between the evidence of commercial success and the patented invention." *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010).  If a device's commercial success is due to an unclaimed feature (or a feature that was known in the prior art), commercial success is irrelevant.  *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311–12 (Fed. Cir. 2006).  But Schubert does not identify any nexus between the features identified in paragraph 350-354 and the commercial success of any Lumileds product.

Similarly, "an expert must establish a nexus between the industry praise and the patented technology." *Cot'n Wash, Inc. v. Henkel Corp.*, 56 F. Supp. 3d 626, 650 (D. Del. 2014).  Praise

related to the entire product—and not specifically the claimed invention—is inadmissible.  *Id.* (citing *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1351 (Fed. Cir. 2012)).  The industry praise in paragraph 344 (where "later articles credit the inventors of the '475 patent") provides no nexus between that praise and the claimed invention, and should be excluded.

Evidence of licensing likewise has "little weight … if the patentee does not demonstrate a nexus between the merits of the invention and the licenses of record."  *Iron Grip Barbell Co. v. USA Sports, Inc.,* 392 F.3d 1317, 1324 (Fed. Cir. 2004).  ████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████.

### C.   Schubert Cannot Opine on Infringement Because He Cannot See Materials Showing the Allegedly Infringing Process

Paragraph 347 of the Schubert report states his "opinion that the accused products by Lumileds use the inventive process of the '475 patent."  This is unreliable because Schubert has never seen the highly confidential Lumileds process: he is not permitted to do so under the Protective Order in this action.  D.I. 25 (Protective Order) at ¶¶ 2.9, 7.3.  Courts have precluded experts from offering opinions as to materials that they have not, and cannot see, for confidentiality reasons.  *See, e.g.*, *See S3g Tech,* 2018 WL 4387660, at \*4.  Schubert admitted at deposition that he has never "review[ed] the detailed manufacturing process of Lumileds" and thus cannot opine on infringement.  Ex. 51 at 116:8-11.  Yet paragraph 347 does exactly that and should be excluded.

### D.   Schubert's Opinions on the Marasina and Seelman-Eggebert References Depend on Impermissible Claim Constructions

The Court should also exclude Schubert's invalidity opinions that only "high quality" or "device quality" epitaxial GaN can invalidate the '475 Patent, because no such limitation appears in the claims.  As explained above, Schubert complains that Marasina's results indicate "poor

material quality" and are "necessarily not applicable to high-quality GaN as available since the early 1990s." Ex. 46 ¶¶ 301, 303.  For Seelman-Eggebert, he opines that the N-face GaN it discloses has "*never* produced device quality material," and that "LEDs with viable properties have *never* been reported for N-face GaN epitaxial layers systems." *Id.* ¶ 258.  But the claims do not require high-quality GaN (or any GaN at all), or commercially viable LEDs (or any LEDs, whatsoever).  "[E]xpert testimony that is inconsistent with the Court's claim construction is unreliable and unhelpful to the finder of fact."  *Kraft Foods Grp. Brands LLC v. TC Heartland, LLC*, 232 F. Supp. 3d 632, 635 (D. Del. 2017).  Because Schubert's opinions on Marasina and Seelman-Eggebert apply an improper claim construction, they should be excluded.

## VI.     MOTION TO PRECLUDE INFRINGEMENT OPINIONS OF DR. SHEALY

As discussed in the noninfringement motion above, Shealy improperly construes the claim terms "non-c-plane," "defect-revealing," "dictated by," and "in order to obtain crystallographic plane surfaces."  Because his opinion that Lumileds infringes depends on those incorrect claim constructions, the Court should exclude his testimony that Lumileds: (1) exposes a "non-c-plane" surface; (2) performs etching "that proceeds in directions dictated by the direction of crystal planes;" (3) does not perform "defect-revealing etching;" and (4) need not "obtain crystallographic plane surfaces" in order to infringe claims 1, 2, or 4.  *See Kraft Foods*, 232 F. Supp. 3d at 635.

## CONCLUSION

For the foregoing reasons, the Court should grant Lumileds' motions.

DATED: January 29, 2021

**OF COUNSEL**

Mayer Brown LLP

Edward D. Johnson

**COOCH AND TAYLOR**

By:  */s/ Blake A. Bennett*
     C. Scott Reese (#2036)
     Blake A. Bennett (#5133)
     The Nemours Building,
     1007 N. Orange Street, Ste. 1120

Donald M. Falk
Michael A. Molano
Cliff A. Maier
Graham (Gray) M. Buccigross
Two Palo Alto Square, Ste. 300
3000 El Camino Real
Palo Alto, CA 94306
Tel: 650-331-2000

Gregory J. Apgar
1221 Avenue of the Americas
New York, NY 10020
Tel: 212-506-2500

Priya A. Desai
71 S. Wacker Drive
Chicago, IL 60611
Tel: 312-782-0600

Wilmington, DE 19899-1680
Tel: (302) 984-3800

*Attorneys for Defendant Lumileds LLC*