# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| E. FRED SCHUBERT,<br><br>      Plaintiff and Counterclaim-Defendant,<br><br>    v.<br><br>LUMILEDS LLC,<br><br>      Defendant and Counterclaimant. | C.A. No. 1:12-cv-924-MN<br><br>**JURY TRIAL DEMANDED**<br><br>**PUBLIC REDACTED VERSION** |

## LUMILEDS LLC'S APPENDIX TO ITS OPENING BRIEF IN SUPPORT OF ITS MOTIONS FOR SUMMARY JUDGMENT AND TO PRECLUDE EXPERT OPINIONS

DATED: January 29, 2021

**OF COUNSEL**

Mayer Brown LLP

Edward D. Johnson
Donald M. Falk
Michael A. Molano
Cliff A. Maier
Graham (Gray) M. Buccigross
Two Palo Alto Square, Ste. 300
3000 El Camino Real
Palo Alto, CA 94306
Tel: 650-331-2000

Gregory J. Apgar
1221 Avenue of the Americas
New York, NY 10020
Tel: 212-506-2500

Priya A. Desai
71 S. Wacker Drive
Chicago, IL 60611
Tel: 312-782-0600

**COOCH AND TAYLOR**

By:  */s/ Blake A. Bennett*
    C. Scott Reese (#2036)
    Blake A. Bennett (#5133)
    The Nemours Building,
    1007 N. Orange Street, Ste. 1120
    Wilmington, DE 19899-1680
    Tel: (302) 984-3800

    *Attorneys for Defendant Lumileds LLC*

# TABLE OF CONTENTS

| Exhibit No. | Date | Description | Starting Page |
|---|---|---|---|
| 1 | 1984 | Marasina L.A., et al. "Chemical Etching of Gallium Nitride" (PHILIPS-SCHUBERT000672-676) | A-0001 |
| 2 | 04/23/1997 | Youtsey, C. et al. "Highly Anisotropic Photoenhanced Wet Etching of n-type GaN" (PHILIPS-SCHUBERT000640-642) | A-0006 |
| 3 | 10/10/1997 | U.S. Patent and Trademark Office Changes to Patent Practice and Procedure, Federal Register Vol. 62, No. 197 (1997) (PHILIPS-SCHUBERT018823-97) | A-0009 |
| 4 | 06/12/2000 | Inventor Assignment to Boston University ("BU") (BU000338-341) | A-0084 |
| 5 | 09/25/2001 | U.S. Patent No. 6,294,475 ("'475 Patent") (D.I. 1-1) | A-0088 |
| 6 | 02/27/2004 | Gao II (Ex. 12 to Opening Expert Report of James R. Shealy) | A-0100 |
| 7 | 04/16/2004 | Gao I (Ex. 11 to Opening Expert Report of James R. Shealy) | A-0105 |
| 8 | 09/18/2006 | Correspondence between BU and '475 Patent Inventors (Schubert and Dr. Dean Stocker) re: '475 Patent (BU001117-42) | A-0110 |
| 9 | | **SEALED** | A-0136 |
| 10 | 10/26/2009 | Notice of Patent Expiration (BU000270) | A-0199 |
| 11 | 11/27/2009 | Letter from BU (Janine Anderson) to Office of Naval Research and National Science Foundation (BU000451) | A-0200 |
| 12 | 12/03/2009 | E-mail from Schubert to Dr. Sean Lee (BU) re: BU98-11 (BU001360-63) | A-0201 |
| 13 | 12/03/2009 | **SEALED** | A-0205 |
| 14 | 01/12/2010 | E-mail between Schubert and Dr. Sean Lee (BU), Dr. Ashley Stevens (BU), and Janine Anderson (BU) re: Jan. 15, 2010 Meeting (BU001147-1229) | A-0206 |
| 15 | 01/18/2010 | **SEALED** | A-0289 |
| 16 | 02/02/2010 | **SEALED** | A-0292 |
| 17 | 02/02/2010 | Memorandum from Schubert to Dr. Sean Lee (BU) re: "BU Patent '475 by Schubert and Stocker" (BU000450) | A-0295 |
| 18 | 02/22/2010 | Memorandum from Dr. Ashley Stevens (BU) to BU Patent Committee re: Return of BU98-11 Invention (BU000447-48) | A-0296 |
| 19 | 04/22/2010 | Petition to Accept Unintentionally Delayed Payment of Maintenance Fee on the '475 Patent (BU000289-293) | A-0298 |
| 20 | 04/28/2010 | Jung (Ex. 10 to Opening Expert Report of James R. Shealy) | A-0303 |
| 21 | 07/16/2010 | Letter from Vinit Nijhawan (BU) to Schubert re: BU 98-11 Invention Disclosure (BU000424-428) | A-0306 |
| 22 | 11/04/2010 | E-mail enclosing Assignment of '475 Patent from BU to Schubert (BU000399-408) | A-0311 |
| 23 | 07/02/2012 | Supplemental Assignment of '475 Patent from BU to Schubert (BU000391-392) | A-0322 |
| 24 | 09/11/2012 | U.S. Pat. No. 8,263,424 | A-0324 |
| 25 | | **SEALED** | A-0343 |

| Exhibit No. | Date | Description | Starting Page |
|---|---|---|---|
| 26 | | **SEALED** | A-0358 |
| 27 | | **SEALED** | A-0366 |
| 28 | 08/25/2015 | Li, et al. "Computing Equilibrium Shapes of Wurtzite Crystals: The Example of GaN" | A-0368 |
| 29 | | **SEALED** | A-0373 |
| 30 | | **SEALED** | A-0382 |
| 31 | 05/18/2020 | Excerpt from Transcript of 2020 *Markman* Hearing | A-0396 |
| 32 | | **SEALED** | |
| 33 | 07/13/2020 | Plaintiff's Second Supplemental Objections and Responses to Defendant's First Set of Interrogatories (Nos. 1-2) | A-0418 |
| 34 | 07/21/2020 | Excerpts from Deposition of Matthew E. Connors (BU Patent Counsel) | A-0433 |
| 35 | 07/31/2020 | Excerpts from Deposition of Janine Anderson (BU) | A-0447 |
| 36 | | **SEALED** | A-0464 |
| 37 | | **SEALED** | A-0473 |
| 38 | | **SEALED** | A-0487 |
| 39 | 08/05/2020 | Excerpts from Deposition of Dr. Ashley Stevens (BU) | A-0492 |
| 40 | | **SEALED** | A-0519 |
| 41 | | **SEALED** | A-0530 |
| 42 | | **SEALED** | A-0803 |
| 43 | | **SEALED** | A-0867 |
| 44 | | **SEALED** | A-0910 |
| 45 | | **SEALED** | A-0956 |
| 46 | | **SEALED** | A-1112 |
| 47 | | **SEALED** | A-1264 |
| 48 | | **SEALED** | A-1390 |
| 49 | | **SEALED** | A-1415 |
| 50 | | **SEALED** | A-1448 |
| 51 | | **SEALED** | A-1530 |
| 52 | | **REDACTED VERSION** Excerpts from Expert Deposition of James R. Shealy | A-1557 |
| 53 | | Extract of BU's FileMaker Pro Patent Database (BU001145-46) | A-1623 |
| 54 | | **SEALED** | A-1625 |
| 55 | | **SEALED** | A-1626 |
| 56 | | **SEALED** | A-1627 |
| 57 | | **SEALED** | A-1628 |
| 58 | | **SEALED** | A-1659 |
| 59 | | **SEALED** | A-1694 |
| 60 | | **SEALED** | A-1734 |
| 61 | | **SEALED** | A-1759 |
| 62 | 2020 | **SEALED** | A-1990 |

Ministry of Higher and Secondary Special Education RSFSR

V.I. Ulyanov (Lenin) Order of Lenin Leningrad Electrotechnical Institute

TRANSACTIONS
OF THE V.I. ULYANOV (LENIN)
ORDER OF LENIN
LENINGRAD
ELECTROTECHNICAL
INSTITUTE

Collection of Scientific Papers

No. 338

Promising materials
on electronics

[illegible stamp]

UB/TIB Hannover  89
103 705 589
[bar code]
      ZZ 1271(338)

Leningrad
1984

PHILIPS-SCHUBERT000672

[...]

UDC 621.315.592.4

L.A. Marasina, I.G. Pichugin, Chang Hi Bin [name not confirmed]

### CHEMICAL ETCHING OF GALLIUM NITRIDE

Although a discussion of the chemical stability of gallium nitride is found in the references to this paper [1–8], there has been, to date, no detailed study of the process associated with the etching of epitaxial layers of GaN. The purpose of this work was to study the kinetics of the process involving the etching of GaN in various etching media and to select, on the basis of that study, polishing and selective etchants for epitaxial layers of GaN with various orientations.

The solvents used consisted of 85% $H_3PO_4$ and an aqueous solution of KOH, because those solvents are typical etchants for the nitride class as a whole, as well as because, according to Schoonmaker [5] and Shitani and Minagawa [8], those solvents have been used successfully for etching GaN.

The epitaxial layers of GaN used in the experiments were obtained with a chloride–hydride system on sapphire substrates and had an orientation along planes (0001) and (1120). The etching was performed both in a static mode with an immobile sample holder and in a dynamic mode with the holder rotated by a geared DC motor.

The temperature range for etching the epitaxial layers of GaN (20–200°) for $H_3PO_4$ and (20–120°) for KOH)



Fig. 1

was selected to preclude the possibility of any variation in the composition of the etchants and any undercutting of the sapphire substrates during the etching.

PHILIPS-SCHUBERT000673

The dependence of the etch rate for the layers of GaN in $H_3PO_4$ on temperature is of an exponential nature, which is why one can assess the activation energy of the process from the slant of the curves plotted in the coordinates of $\ln V_e = f(1/T)$ (Fig. 1). The results of the determination of the activation energy are given in the table.

| Orientation of layer | Activation energy $\Delta E$, kJ/mol | | Etch rate $V_e$, μm/hr | |
|---|---|---|---|---|
| | Mode | | | |
| | static | dynamic | static $T=180°C$ | dynamic $T=140°C$ |
| (0001) | 47.7±4.6 | 48.4±5.9 | 15.8 | 8.8 |
| (1120) | 33.1±1.7 | 56.3±5.0 | 12.6 | 3.6 |

The large amount of activation energy in the etching process for the GaN layers with orientation (0001), which remains virtually unchanged when moving from the static to the dynamic etching mode, makes it possible to assume that, in the temperature range under study, the process lies in the kinetic region. For the (11$\bar{2}$0) orientation of the GaN layers, observed are both a growth in activation energy and a drop in etch rate that is greater than that for the (0001) orientation when moving from the static to the dynamic etching mode, which indicates a change in the nature of the limiting stage of the process and its shift to the kinetic region.

The difference in the $\Delta E$ values for the two orientations may be due to the different atomic packing density on the planes, as well as the difference in the bond of surface atoms with the volume.

Substitution of an acid etchant with an alkali etchant (KOH) raises the etch rate and lowers the temperature of the beginning of the process. If in $H_3PO_4$ the etching of GaN proceeds at a market rate only when the temperature is on the order of 50°C, the process in the KOH is already beginning at room temperature, and increasing the percentage content of KOH in the aqueous solution increases the etch rate, as shown in Figure 2.

PHILIPS-SCHUBERT000674

The nature of the temperature dependence of the etch rate in the 40% solution of KOH is the same as in the case for the $H_3PO_4$.



Fig. 2

The rather large activation energy values obtained from the analysis of the experimental data both in the static mode (50.7 kJ/mol) and in the dynamic mode (45.6 kJ/mol) indicate that the etching process in the KOH solution proceeds in the kinetic region.

With etching in orthophosphoric acid, the nonselective nature of the process remains at temperatures up to 180°C. When the temperature increases beyond that point, hexagonal etching figures appear on the surface of the layers for the orientation (0001), and near-ellipsoidal figures appear for the orientation $(11\bar{2}0)$.

With the use of an alkali etchant, the optimal temperature for selective etching is 110°C.

Also studied was the effect of the process parameters of the growth and thickness of the epitaxial layers on the process of their etching. A tendency toward a higher etch rate was found as thickness increased, which may be explained by the influence of mechanical stresses arising in the heteroepitaxial layers as a result of differing values of the thermal expansion coefficients for the sapphire substrate and the layer of gallium nitride.

The reduced etch rate for the GaN layers obtained at growth temperatures in the vicinity of 1040–1080°C, as well as for low growth rates, is likely due to the high degree of their structural perfection, which is confirmed by the data of electron diffraction analysis.

The work done enabled the following conclusions:

1. $H_3PO_4$ is a suitable etchant for GaN layers. GaN layers can also be etched in an alkali etchant, but the etch rate is higher, and that prevents precise control of the etching process.

- 37 -

PHILIPS-SCHUBERT000675

A-0004

2. For the etchant selected, the polishing nature of the etching process is clearly observed in the temperature range of 120–160°C. The optimal temperature for selective etching is 200°C.

3. The etching process depends on the process parameters of epitaxial growth and thickness of the layer.

References

1. F.F. Grekov, A.M. Zykov, G.S. Savin. "Producing gallium nitride." *Izv. AN SSSR* [Transactions of the Academy of Sciences of the USSR]. Inorganic Materials Series, 1973, Vol. 9, No. 3, pp. 496–497.

2. M.D. Lyutaya and V.F. Bukhanevich. "Chemical and thermal resistance of nitrides of group III elements." *ZhPKh* [Journal of Applied Chemistry], 1962, Vol. 7, No. 11, pp. 2487–2494.

3. T.L. Chu. "Gallium nitride films." *J. Electrochem. Soc.,* 1971, Vol. 118, No. 7, p. 1200.

4. W.C. Johnson, J.B. Parsons, M.C. Crew. "Nitrogen compounds of gallium." *J. Phys. Chem.,* 1932, Vol. 36, No. 10, p. 2651.

5. J. Morimoto. "Few characteristics of epitaxial GaN—etching and thermal decomposition." *J. Electrochem. Soc.,* 1974, Vol. 121, No. 10, pp. 16–20.

6. J.I. Pankovo. "Electrolitical [sic] etching of GaN." *J. Electrochem. Soc.,* 1972, Vol. 119, No. 18, p. 1118.

7. R.C. Schoonmaker and C.E. Burton. "Gallium nitride." *Inorg. Synt.,* 1963, Vol. 7, p. 16.

8. A. Shintani and S. Minagawa. "Etching of GaN using phosphoric acid." *J. Electrochem. Soc.,* 1976, Vol. 123, No. 5, pp. 706–713.

[…]

- 38 -

PHILIPS-SCHUBERT000676

# Highly anisotropic photoenhanced wet etching of *n*-type GaN

C. Youtsey[a)] and I. Adesida
*Microelectronics Laboratory and Department of Electrical and Computer Engineering,*
*University of Illinois, Urbana, Illinois 61801*

G. Bulman
*CREE Research Incorporated, Durham, North Carolina 27713*

(Received 23 April 1997; accepted for publication 7 August 1997)

A room-temperature photoelectrochemical etching process for *n*-type GaN films using a 0.04 M KOH solution and Hg arc lamp illumination is described. The process provides highly anisotropic etch profiles and high etch rates (>300 nm/min) at moderate light intensities (50 mW/cm² @365 nm). The etch rate and photocurrent are characterized as a function of stirred and unstirred solutions, and the etch process is found to be diffusion limited for light intensities greater than 20 mW/cm² @365 nm. A reaction mechanism for the etch process is proposed. © *1997 American Institute of Physics.* [S0003-6951(97)02041-X]

GaN and the related group III nitrides continue to grow in importance as the basis of a new generation of electronic and optoelectronic devices. The group III nitrides are distinguished by their unusual chemical stability, a characteristic which has posed unique challenges for device processing. The removal of surface material is a fundamental device processing step, and the most successful etching of GaN has been accomplished using dry etching methods, including reactive ion etching (RIE),[1] electron cyclotron resonance (ECR) RIE,[2] inductively coupled plasma (ICP) RIE,[3] low energy electron enhanced etching (LE4),[4] and chemically assisted ion beam etching (CAIBE).[5] Dry etching techniques generally utilize a strong physical etch component, which can lead to ion-induced damage of the semiconductor. Wet chemical etching is an important complement to dry etching methods by providing low damage etching, low cost and complexity, and selective etching of different materials. However, to date, only very low etch rates have been reported for GaN films using wet chemical etchants, on the order of several tens of angstroms per minute.[6,7]

Photoenhanced wet etching of GaN has recently been identified as a means of greatly improving the chemical reactivity of GaN at room temperature. Ultraviolet illumination is used to generate electron-hole pairs at the semiconductor surface, which enhance the oxidation and reduction reactions within an electrochemical cell. Minsky *et al.*[8] first reported localized electrochemical etching of unintentionally doped GaN layers using HeCd laser illuminations (325 nm). Etch rates of approximately 400 nm/min using KOH solutions were obtained. Lu *et al.*[9] described a photoassisted anodic etching process using Hg lamp illumination and a buffered aqueous solution of tartaric acid and ethylene glycol to produce etch rates of 160 nm/min in unintentionally doped GaN. We have previously reported a photoenhanced wet etching process for *n*⁺ (*n* ∼ 10¹⁸)and unintentionally doped GaN using Hg lamp illumination and KOH solution.[10] In this work, we discuss for the first time a careful study of the photoelectrochemical etch process and the attainment of highly isotropic etch profiles with high etch rates (>300 nm/min) in *n*-type GaN.

The samples for this experiment consisted of 3.5-µm-thick *n*⁺ (*n* ∼ 10¹⁸) GaN layers grown on 6H SiC substrates by metal organic chemical vapor deposition (MOCVD) using an AlN buffer layer. 100 nm of Ti was patterned by standard metal lift-off techniques. The Ti served to provide electrical contact to the sample as well as an etch mask. The Ti metal contacts were unannealed. Characterization of the etched samples was carried out using a Cambridge S360 scanning electron microscope and a Tencor alpha-step profilometer.

Figure 1 shows the experimental apparatus used for this study. The samples were clipped to a Teflon base using a nickel washer. A Pt wire was used as the system cathode. An ammeter was used to monitor the current flowing within the electrochemical cell. No bias was applied between the sample and the Pt cathode. An unfiltered Hg arc lamp provided uniform illumination over the entire surface of the sample with an intensity that could be varied over the range of 5–50 mW/cm² at 365 nm. A KOH solution concentration of 0.04 M was used throughout this study.

Figure 2 shows a plot of the current conducted through the electrochemical cell during a 30 min etch. Intensities of 33.5 and 17.4 mW/cm² were recorded at wavelengths of 405 and 365 nm, respectively. The instances at which the illumination was begun and ceased are noted in the plot. Less than



FIG. 1. Schematic of etching apparatus.

[a)]Electronic mail: cyoutsey@uiuc.edu

Appl. Phys. Lett. **71** (15), 13 October 1997     0003-6951/97/71(15)/2151/3/$10.00     © 1997 American Institute of Physics     2151
Downloaded 15 Aug 2003 to 130.126.32.13. Redistribution subject to AIP license or copyright, see http://ojps.aip.org/aplo/aplcr.jsp

PHILIPS-SCHUBERT000640



FIG. 2. Plot of time evolution of photocurrent.

100 nA of current flow was observed without sample illumination. Correspondingly, the "dark" etch rate was found to be negligible, as less than 100 Å of material was removed after 12 h of etching. The onset of illumination corresponded with a rapid increase in current flow, followed by a steady increase to a maximum within 3 min. For the remaining duration of the etch, the photocurrent decreased approximately exponentially, and ceased when the illumination was removed. According to Faraday's law of electrolysis, the current flow between the sample (anode) and Pt cathode is proportional to the reaction rate at the semiconductor/electrolyte interface, and therefore provides an instantaneous measure of the etch rate of the semiconductor. The decrease in current flow may reflect a decrease in etch rate due to variations in material quality of the GaN epilayer at increasing depths. Figure 3 shows a scanning electron microscope (SEM) micrograph of the etched surface corresponding to the plot in Fig. 2.

Minsky *et al.*[8] proposed that the photoelectrochemical (PEC) etching of GaN occurs through oxidative decomposition, in which photogenerated holes assist in the oxidation and subsequent dissolution of the semiconductor into aqueous solution. The PEC etching of GaAs in various solutions has been well documented,[11–13] and the surface oxidation reaction for GaAs has been represented by van de Ven and Nabben[14] as follows:

$$GaAs + 6h^+ \rightarrow Ga^{3+} + As^{3+}. \tag{1}$$

In order to investigate the etching mechanism in this work, GaN samples were patterned such that exposed areas for etching measured 1 $mm^2$. The current profile in Fig. 2 was measured for a sample with surface area of 1 $mm^2$ uniformly etched to a depth of 2.5 $\mu m$. The integration of the



FIG. 3. GaN etch profile (2.5 $\mu m$ etch depth).





FIG. 4. (a) Plot of etch rate vs light intensity for stirred and unstirred solutions. (b) Plot of photocurrent vs light intensity for stirred and unstirred solutions.

current in Fig. 2 yields a value of $5.1 \times 10^{-2}$ C, which is the total charge that passed through the electrochemical cell during the etching. Assuming a GaN density of 6.1 $g/cm^3$, the total charge required to remove one GaN entity was approximately $2.8e^-$. Consequently, we postulate that the following oxidation reaction is responsible the decomposition of GaN:

$$2GaN + 6h^+ \rightarrow 2Ga^{3+} + N_2. \tag{2}$$

During etching, the formation of bubbles was observed on the sample surface. We believe that this is the release of $N_2$. No bubbles were observed in the absence of sample illumination.

In Fig. 4, the etch rate and photocurrent are plotted as a function of light intensity, for the cases of stirred and unstirred solutions. The photocurrent curves were both measured from a single sample as the light intensity was varied, while the etch rates curves were measured by etching each sample to a depth of approximately 2 $\mu m$ at each light intensity. The close correlation between the photocurrent and etch rate is clearly observed. The stirred solution showed an approximately linear relationship between light intensity and etch rate. A similar dependence was reported by Minsky *et al.*,[8] and is characteristic of photoenhanced etch processes in which the etch rate depends upon the number of photogenerated carriers. The unstirred solution exhibited a saturation in etch rate at higher light intensities, which indicates that the etch process becomes diffusion limited for the increased reaction rates in this high intensity regime. Minsky *et al.*[8] did not use a stirrer while etching, but used a KOH solution with a significantly higher concentration than was used in this

Downloaded 15 Aug 2003 to 130.126.32.13. Redistribution subject to AIP license or copyright, see http://ojps.aip.org/aplo/aplcr.jsp

PHILIPS-SCHUBERT000641



FIG. 5. High anisotropic GaN etch profile (3.5 $\mu$m etch depth).

work. It is noted in Fig. 4(a) that when the etch solution is stirred, etch rates in excess of 300 nm/min were readily obtained at moderate light intensities of 50 mW/cm$^2$ @365 nm. These etch rates are comparable to etch rates usually observed for dry etch processes.

Figure 5 illustrates the high anisotropy that is possible with the photoenhanced etch process. The sample in this figure was etched to a depth of $\sim$3.5 $\mu$m, through the entire thickness of the GaN epilayer, and overetched by a factor of approximately 3. Comparison with Fig. 2 illustrates that the increased etch time provided a further improvement in the verticality of the etch, with minimal increase in undercutting of the etch mask. In both Figs. 2 and 5, the original Ti mask is present. It was reported previously that no photoelectrochemical etching of $p$-type GaN etching occurs.[10] It may be possible to utilize a $p$-type etch-stop layer to achieve the high anisotropy of Fig. 5 at any desired etch depth.

The etch anisotropy obtained during photoenhanced wet etching arises in part from the collimation of the incident light, but may also be influenced by the high density of vertical dislocations present in the GaN layer. It is well known that GaN films contain high densities of defects, with typical dislocation densities on the order of $10^8 - 10^{10}$ cm$^2$. We believe that such defects may play a role in the formation of the surface roughness evident in Figs. 3 and 5, and we are presently exploring methods for minimizing such roughness. In addition, the etched sidewalls of the etched GaN features exhibit dense vertical striations which were not present in the original mask. These etch striations may also be a conse-quence of the dislocations present in the film, which generally propagate along the growth direction. Further clarifica-tion of the mechanism for the high anisotropy obtained in Fig. 5 remains an important topic for future studies.

In conclusion, a wet photoelectrochemical etching pro-cess has been developed for etching $n$-type GaN films using KOH solution and Hg arc lamp illumination. The process provides high anisotropy and high etch rates (>300 nm/min). The etch rate and photocurrent have been characterized as a function of light intensity. For intensities greater than 20 mW/cm$^2$ @365 nm and a solution concentration of 0.04 M, the etch rate becomes diffusion limited and stirring of the solution provides a significant increase in etch rate. A present limitation of the etch process is that etched surfaces tend to be somewhat rough, an effect that is believed to be due to the high defect density of the GaN material. The PEC etching technique provides the highest wet chemical etch rates reported for broad-area etching of GaN films to date and should be a useful method for low damage processing of GaN devices.

The authors are grateful to M. Arafa, P. Fay, L. Romano, and K. Youtsey for their conversations and contributions to this work. This research was supported by National Science Foundation Grant No. ECS 95-21671 and DARPA Grant No. F19628-96-C-0066.

[1] I. Adesida, A. Mahajan, E. Andideh, M. A. Kahn, D. T. Olson, and J. N. Kuznia, Appl. Phys. Lett. **63**, 2777 (1993).
[2] S. J. Pearton, C. R. Abernathy, F. Ren, J. R. Lothian, P. W. Wisk, and A. Katz, J. Vac. Sci. Technol. A **11**, 1772 (1993).
[3] R. J. Shul, G. B. McClellan, S. A. Casalnuovo, D. J. Rieger, S. J. Pearton, C. Constantine, C. Barratt, R. F. Karlicek, Jr., C. Tran, and M. Schurman, Appl. Phys. Lett. **69**, 1119 (1996).
[4] H. P. Gillis, D. A. Choutov, and K. P. Martin, J. Mater. **48**, 50 (1996).
[5] A. T. Ping, I. Adesida, and M. A. Khan, Appl. Phys. Lett. **67**, 1250 (1995).
[6] S. J. Pearton, C. R. Abernathy, F. Ren, J. R. Lothian, P. W. Wisk, and A. Katz, J. Vac. Sci. Technol. A **11**, 1772 (1993).
[7] J. R. Mileham, S. J. Pearton, C. R. Abernathy, J. D. MacKenzie, R. J. Shul, and S. P. Kilcoyne, J. Vac. Sci. Technol. A **14**, 836 (1996).
[8] M. S. Minsky, M. White, and E. L. Hu, Appl. Phys. Lett. **68**, 1531 (1996).
[9] H. Lu, Z. Wu, and I. Bhat, J. Electrochem. Soc. **144**, L8 (1997).
[10] C. Youtsey, I. Adesida, and G. Bulman, Electron. Lett. **33**, 245 (1997).
[11] R. W. Haisty, J. Electrochem. Soc. **108**, 790 (1961).
[12] R. Khare and E. L. Hu, J. Electrochem. Soc. **138**, 1516 (1991).
[13] M. Ruberto, X. Zhang, R. Scarmozzino, A. E. Willner, D. V. Podlesnik, and R. M. Osgood, Jr., J. Electrochem. Soc. **138**, 1174 (1991).
[14] J. van de Ven and H. J. P. Nabben, J. Electrochem. Soc. **137**, 1603 (1990).

Downloaded 15 Aug 2003 to 130.126.32.13. Redistribution subject to AIP license or copyright, see http://ojps.aip.org/aplo/aplcr.jsp

PHILIPS-SCHUBERT000642

A-0008

## DEPARTMENT OF COMMERCE

### Patent and Trademark Office

**37 CFR Parts 1, 3, 5, 7, and 10**

**[Docket No. : 960606163–7130–02]**

**RIN 0651–AA80**

### Changes to Patent Practice and Procedure

**AGENCY:** Patent and Trademark Office, Commerce.

**ACTION:** Final rule.

**SUMMARY:** The Patent and Trademark Office (Office) is amending the rules of practice to simplify the requirements of the rules, rearrange portions of the rules for better context, and eliminate unnecessary rules or portions thereof as part of a government-wide effort to reduce the regulatory burden on the American public. Exemplary changes include: simplification of the procedure for filing continuation and divisional applications; amendment of a number of rules to permit the filing of a statement that errors were made without deceptive intent, without a requirement for a further showing of facts and circumstances; and elimination of the requirement that the inventorship be named in an application on the day of its filing, which eliminates the need for certain petitions to correct inventorship.

**EFFECTIVE DATE:** December 1, 1997.

**FOR FURTHER INFORMATION CONTACT:** Hiram H. Bernstein or Robert W. Bahr, Senior Legal Advisors, by telephone at (703) 305–9285, or by mail addressed to: Box Comments— Patents, Assistant Commissioner for Patents, Washington, DC 20231 marked to the attention of Mr. Bernstein or by facsimile to (703) 308–6916.

**SUPPLEMENTARY INFORMATION:** This rule change implements the Administration's program of reducing the regulatory burden on the American public in accordance with the changes proposed in the Notice of Proposed Rulemaking entitled "1996 Changes to Patent Practice and Procedure" (Notice of Proposed Rulemaking), published in the **Federal Register** at 61 FR 49819 (September 23, 1996), and in the *Official Gazette* at 1191 *Off. Gaz. Pat. Office* 105 (October 22, 1996). The changes involve: (1) simplification of procedures for filing continuation and divisional applications, establishing lack of deceptive intent in reissues, petition practice, and in the filing of papers correcting improperly requested small entity status; (2) elimination of unnecessary requirements, such as certain types of petitions to correct

inventorship under § 1.48; (3) removal of rules and portions thereof that merely represent instructions as to the internal management of the Office more appropriate for inclusion in the Manual of Patent Examining Procedure (MPEP); (4) rearrangement of portions of rules to improve their context; and (5) clarification of rules to aid in understanding of the requirements that they set forth.

Changes to Proposed Rules: This Final Rule contains a number of changes to the text of the rules as proposed for comment. The significant changes (as opposed to additional grammatical corrections) are discussed below. Familiarity with the Notice of Proposed Rulemaking is assumed.

*Discussion of Specific Rules and Response to Comments:* Forty-three written comments were received in response to the Notice of Proposed Rulemaking. The written comments have been analyzed. For contextual purposes, the comment on a specific rule and response to the comment are provided with the discussion of the specific rule. Comments in support of proposed rule changes generally have not been reported in the responses to comments sections.

Title 37 of the Code of Federal Regulations, Parts 1, 3, 5, 7, and 10 are amended as follows:

### Part 1

#### *Section 1.4*

Section 1.4, paragraphs (d)(1) and (2), are amended to be combined into § 1.4 paragraphs (d)(1)(i) and (d)(1)(ii). Section 1.4(d)(1)(ii) is also amended to include the phrase "direct or indirect copy" to clarify that the copy of the document(s) constituting the correspondence submitted to the Office may be a copy of a copy (of any generation) of the original document(s), or a direct copy of the original document(s).

Section 1.4(d)(2) is amended to provide that the presentation to the Office (whether by signing, filing, submitting, or later advocating) of any paper by a party, whether a practitioner or non-practitioner, constitutes a certification under § 10.18(b), and that violations of § 10.18(b)(2) may subject the party to sanctions under § 10.18(c). That is, by presenting a paper to the Office, the party is making the certifications set forth in § 10.18(b), and is subject to sanctions under § 10.18(c) for violations of § 10.18(b)(2), regardless of whether the party is a practitioner or non-practitioner. The sentence "[a]ny practitioner violating § 10.18(h) may also be subject to disciplinary action"

clarifies that a practitioner may be subject to disciplinary action in lieu of or in addition to sanctions under § 10.18(c) for violations of § 10.18(b).

Section 1.4(d)(2) is amended so that the certifications set forth in § 10.18(b) are automatically made upon presenting any paper to the Office by the party presenting the paper. The amendments to §§ 1.4(d) and 10.18 support the amendments to §§ 1.6, 1.8, 1.10, 1.27, 1.28, 1.48, 1.52, 1.55, 1.69, 1.102, 1.125, 1.137, 1.377, 1.378, 1.804, 1.805, (§§ 1.821 and 1.825 will be reviewed at a later date in connection with other matters), 3.26, and 5.4 that delete the requirement for verification (MPEP 602) of statements of facts by applicants and other parties who are not registered to practice before the Office. The absence of a required verification has been a source of delay in the prosecution of applications, particularly where such absence is the only defect noted. The change to §§ 1.4(d) and 10.18 automatically incorporates required averments thereby eliminating the necessity for a separate verification for each statement of facts that is to be presented, except for those instances where the verification requirement is retained. Similarly, the amendments to §§ 1.4(d) and 10.18 support an amendment to § 1.97 (§§ 1.637 and 1.673 will be reviewed at a later date in connection with other matters) that changes the requirements for certifications to requirements for statements. This change in practice does *not* affect the separate verification requirement for an oath or declaration under § 1.63, affidavits or declarations under §§ 1.130, 1.131, and 1.132, or statements submitted in support of a petition under § 5.25 for a retroactive license. The statements in §§ 1.494(e) and 1.495(f) that verification of translations of documents filed in a language other than English may be required is also maintained, as such requirements are made rarely and only when deemed necessary (*e.g.*, when persons persist in translations which appear on their face to be inaccurate). The requirements for certification of service on parties in §§ 1.248, 1.510, 1.637 and 10.142 are also maintained.

Section 1.4 is also amended to add a new paragraph (g) related to an applicant who has not made of record a registered attorney or agent being required to state whether assistance was received in the preparation or prosecution of a patent application. This is transferred from § 1.33(b) for consistent contextual purposes.

PHILIPS-SCHUBERT018823

*Section 1.6*

Section 1.6(d)(3) is amended to provide that continued prosecution applications under § 1.53(d) may be transmitted to the Office by facsimile. However, the procedures described in § 1.8 do not apply to, and no benefit under § 1.8 will be given to, a continued prosecution application under § 1.53(d). That is, an applicant may file a continued prosecution application by facsimile transmission, but the filing date accorded such continued prosecution application will be the date the complete transmission of the continued prosecution application is received in the Office. For example, a continued prosecution application transmitted by facsimile from California at 10:30 p.m. (Pacific time) on November 18, 1997, and received in the Office at 1:30 a.m. (Eastern time) on November 19, 1997, will be accorded a filing date of November 19, 1997. An applicant filing a continued prosecution application by facsimile transmission bears the responsibility of transmitting such application in a manner and at a time that will ensure its complete and timely (§ 1.53(d)(1)(ii)) receipt in the Office.

An applicant filing an application under § 1.53(d) (a continued prosecution application) by facsimile must include an authorization to charge (at least) the basic filing fee to a deposit account, or the application must be treated under § 1.53(f) as having been filed without the basic filing fee (as fees cannot otherwise be transmitted by facsimile). To avoid paying the late filing surcharge under § 1.16(e), an application (including an application under § 1.53(d)) must include the basic filing fee (§ 1.16(e)). As such, payment of the basic filing fee for an application under § 1.53(d) on any date later than the filing date of the application under § 1.53(d) (even if paid within the period for reply to the last action in the prior application) is ineffective to avoid the late filing surcharge under § 1.16(e). Therefore, unless an application under § 1.53(d) filed by facsimile includes an authorization to charge the basic filing fee to a deposit account, the applicant will be given a notification requiring payment of the appropriate filing fee (§ 1.53(d)(3)) and the late filing surcharge under § 1.16(e) to avoid abandonment of the § 1.53(d) application.

Section 1.6(d)(3) is also amended to delete the reference to § 1.8(a)(2)(ii)(D) as this paragraph was deleted in the Final Rule entitled "Communications with the Patent and Trademark Office" ("Communications with the Office"),

published in the **Federal Register** at 61 FR 56439, 56443 (November 1, 1996), and in the *Official Gazette* at 1192 *Off. Gaz. Pat. Office* 95 (November 26, 1996).

Section 1.6(d)(6) is amended to reflect the transfer of material from §§ 5.6, 5.7, and 5.8 to §§ 5.1 through 5.5.

Section 1.6(e)(2) is amended to remove the requirement that the statement be verified in accordance with the change to §§ 1.4(d)(2) and 10.18.

Section 1.6(f) is added to provide for the situation in which the Office has no evidence of receipt of an application under § 1.53(d) (a continued prosecution application) transmitted to the Office by facsimile transmission. Section 1.6(f) requires that a showing thereunder include, *inter alia,* a copy of the sending unit's report confirming transmission of the application under § 1.53(d) or evidence that came into being after the complete transmission of the application under § 1.53(d) and within one business day of the complete transmission of the application under § 1.53(d). Therefore, applicants are advised to retain copies of the sending unit's reports in situations in which such unit is used to transmit applications under § 1.53(d) to the Office or otherwise maintain a log book of the transmission of any application under § 1.53(d) to the Office. *See also* "Communications with the Patent and Trademark Office" Final Rule.

No comments were received regarding the proposed change to § 1.6.

*Section 1.8*

Section 1.8(a)(2)(i)(A) is amended to specifically refer to a request for a continued prosecution application under § 1.53(d) as a correspondence filed for the purposes of obtaining an application filing date, which is excluded by § 1.8(a)(2)(i)(A) from the procedure set forth in § 1.8. The purpose of this amendment is to render it clear that, notwithstanding that a continued prosecution application under § 1.53(d) may be filed by facsimile transmission, the procedure set forth in § 1.8 does not apply to a request for a continued prosecution application under § 1.53(d) (or any correspondence filed for the purpose of obtaining an application filing date). That is, the date on the certificate of transmission (§ 1.8(a)) of an application under § 1.53(d) is not controlling (or even relevant), in that an application under § 1.53(d) (a continued prosecution application) filed by facsimile transmission will not be accorded a filing date as of the date on the certificate of transmission (§ 1.8(a)), unless Office records indicate, or applicant otherwise establishes pursuant to § 1.6(f), receipt in the Office

of the complete application under § 1.53(d) on the date on the certificate of transmission, and that date is not a Saturday, Sunday, or Federal holiday.

Section 1.8(b)(3) is amended to remove the requirement that the statement be verified in accordance with the change to §§ 1.4(d)(2) and 10.18.

*Section 1.9*

Section 1.9(d) is amended to define a small business concern as used in 37 CFR Chapter I as any business concern meeting the size standards set forth in 13 CFR Part 121 to be eligible for reduced patent fees. The regulations of the Small Business Administration (SBA) set forth the size standards of a business concern to be eligible for reduced patent fees. *See* 13 CFR 121.802. Thus, the language in § 1.9(d) duplicating such size standards is deleted as redundant, and to avoid confusion in the event that such size standards are subsequently changed by the SBA. The MPEP will include SBA's regulations concerning size standards for a business concern to be eligible for reduced patent fees.

Section 1.9(f) is amended to add the phrase "eligible for reduced patent fees" to clarify that a small entity as used in 37 CFR Chapter I is limited to an independent inventor, a small business concern or a non-profit organization that is eligible for reduced patent fees under 35 U.S.C. 41(h)(1).

*Section 1.10*

Sections 1.10 (d) and (e) are amended to remove the requirement for a statement that is verified.

*Comment 1:* One comment suggested that § 1.10 be amended to clearly set forth the controlling date for correspondence filed by "Express Mail" under § 1.10.

*Response:* Section 1.10 was substantially amended in the "Communications with the Office" Rule Final (discussed *supra*). Section 1.10(a) as amended in the aforementioned Final Rule provides that: (1) correspondence received by the Office that was delivered by the "Express Mail Post Office to Addressee" service of the United States Postal Service (USPS) under § 1.10 will be considered filed in the Office on the date of deposit with the USPS; (2) the date of deposit with the USPS is shown by the "date-in" on the "Express Mail" mailing label or other official USPS notation; and (3) if the USPS deposit date cannot be determined, the correspondence will be accorded the Office receipt date as the filing date.

PHILIPS-SCHUBERT018824

**53134** Federal Register / Vol. 62, No. 197 / Friday, October 10, 1997 / Rules and Regulations

### Section 1.11

Section 1.11(b) is amended to provide that the filing of a continued prosecution application under § 1.53(d) of a reissue application will not be announced in the *Official Gazette.* Although the filing of a continued prosecution application of a reissue application constitutes the filing of a reissue application, the announcement of the filing of such continued prosecution application would be redundant in view of the announcement of the filing of the prior reissue application in the *Official Gazette.*

### Section 1.14

Section 1.14(a) is amended to: (1) clarify the provisions of § 1.14(a); (2) provide that copies of an application-as-filed may be provided to any person on written request accompanied by the fee set forth in § 1.19(b), without notice to the applicant, if the application is incorporated by reference in a U.S. patent; and (3) treat applications in the file jacket of a pending application under § 1.53(d) as pending rather than abandoned in determining whether copies of, and access to, such applications will be granted.

Under current practice, the public is entitled to access to the original disclosure (or application-as-filed) of an application, when the application is incorporated by reference into a U.S. patent. *See In re Gallo,* 231 USPQ 496 (Comm'r Pat. 1986). Section 1.14(a)(2) is added to avoid the need for a petition under § 1.14(e) to obtain a copy of the original disclosure (or application-as-filed) of an application that is incorporated by reference into a U.S. patent.

Section 1.14 is also amended to add a paragraph (f) to recognize the change to § 1.47 (a) and (b) which add exceptions to maintaining pending applications in confidence by providing public notice to nonsigning inventors of the filing of a patent application.

*Comment 2:* One comment stated that the change from "applications preserved in secrecy" to "applications preserved in confidence" suggests a lower level of security for the applications permitting greater discovery by third parties.

*Response:* The term "secrecy" in § 1.14 was changed to "confidence" in the Final Rule entitled "Miscellaneous Changes in Patent Practice" ("Miscellaneous Changes in Patent Practice"), published in the **Federal Register** at 61 FR 42790 (August 19, 1996), and in the *Official Gazette* at 1190 *Off. Gaz. Pat. Office* 67 (September 17, 1996). This change did not represent a change in practice, but merely

conformed the language of § 1.14 to that of 35 U.S.C. 122 (the term "secrecy" is a term of art in regard to matters of national security, and its former use in § 1.14 was inappropriate).

### Section 1.16

Section 1.16 is amended to add new paragraphs (m) and (n) including the unassociated text following paragraphs (d) and (l).

No comments were received concerning § 1.16.

### Section 1.17

Section 1.17 (and § 1.136(a)) adds a recitation to an extension of time fee payment for a reply filed within a fifth month after a nonstatutory or shortened statutory period for reply was set.

Section 1.17(a) is subdivided into paragraphs (a)(1) through (a)(5), with paragraphs (a)(1) through (a)(4) setting forth the amounts for one-month through four-month extension fees. Section 1.17(a)(5) provides the small entity and other than small entity amounts for the new fifth-month extension fee.

Section 1.17(a) is being amended to permit a petition for a fifth-month extension of time. As the Office may set a shortened statutory period for reply of one-month or thirty days, whichever is longer, this authority for a petition under § 1.136(a) will permit an applicant to extend the period for reply until the six-month statutory maximum (35 U.S.C. 133) without resorting to a petition under § 1.136(b), or to extend by five months, pursuant to § 1.136(a), a non-statutory period for taking action (*e.g.,* the time period in § 1.192(a) for filing an appeal brief).

Section 1.17 paragraphs (e), (f), and (g) are rewritten as § 1.17 paragraphs (b), (c), and (d).

Section 1.17(h) is amended to delete references to petitions under §§ 1.47, 1.48, and 1.84. Sections 1.47, 1.48, and 1.84 (a) and (b) are amended to contain a reference to the petition fee set forth in § 1.17(i), rather than the petition fee set forth in § 1.17(h).

Section 1.17(i) is amended to: (1) add a petition under § 1.41 to supply the name(s) of the inventor(s) after the filing date without an oath or declaration as prescribed by § 1.63, except in provisional applications; (2) add a petition under § 1.47 for filing by other than all the inventors or a person not the inventor; (3) add a petition under § 1.48 for correction of inventorship; (4) add a petition under § 1.59 for expungement and return of information; (5) delete the references to petitions under §§ 1.60 and 1.62 in view of the

deletion of §§ 1.60 and 1.62; (6) add a petition under § 1.84 for accepting color drawings or photographs; and (7) add a petition under § 1.91 for entry of a model or exhibit.

Section 1.17(q) is amended to add a petition under § 1.41 to supply the name(s) of the inventor(s) after the filing date without a cover sheet as prescribed by § 1.51(c)(1) in a provisional application.

Section 1.17, as well as §§ 1.103, 1.112, 1.113, 1.133, 1.134, 1.135, 1.136, 1.142, 1.144, 1.146, 1.191, 1.192, 1.291, 1.294, 1.484, 1.485, 1.488, 1.494, 1.495, (§§ 1.530, 1.550, 1.560, 1.605, 1.617, 1.640, and 1.652 will be reviewed at a later date in connection with other matters), 1.770, 1.785, (§ 1.821 will be reviewed at a later date in connection with other matters), and 5.3 are also amended to replace the phrases "response" and "respond" with the phrase "reply" for consistency with § 1.111.

*Comment 3:* One comment questioned why the terms "respond" and "response" in the rules of practice were being replaced with the term "reply."

*Response:* It is appropriate to use a single term ("reply") throughout the rules of practice, to the extent possible, to refer to that "reply" by an applicant to an Office action required to avoid abandonment and continue prosecution.

*Comment 4:* At least one comment noted that there is no statutory authority under 35 U.S.C. 41(a)(8)(C) for the $2,010 amount set for the fifth month extension of time.

*Response:* While the Notice of Proposed Rulemaking proposed a fifth month extension fee of $2010, a Notice of Proposed Rulemaking entitled "Revision of Patent and Trademark Fees for Fiscal Year 1998" ("1998 Fee Revision"), published in the **Federal Register** at 62 FR 24865 (May 7, 1997), and in the *Official Gazette* at 1198 *Off. Gaz. Pat. Office* 97 (May 27, 1997), proposed that this fee be set at $2060. The Office is now adopting the $2060 fifth month extension fee as proposed in the "1998 Fee Revision" Notice of Proposed Rulemaking.

Under 35 U.S.C. 41(a)(8)(C) (1991), the Commissioner is authorized to charge $340 for any third or subsequent petition for a one-month extension of time. However, under 35 U.S.C. 41(f), the additional fee established pursuant to 35 U.S.C. 41(a)(8)(C) for a subsequent petition for a one-month extension of time has been increased to $560 (*i.e.,* $560 is the current difference (established under 35 U.S.C. 41(a)(8)(C)) between the $1510 fee for a four-month extension of time and the $950 three-month extension of time). The $1510 fee

PHILIPS-SCHUBERT018825

for a four-month extension of time plus the $560 fee for an additional month is $2070 (this differs from the $2060 fee proposed in the "1998 Fee Revision" Notice of Proposed Rulemaking due to rounding). Therefore, the Office is authorized under 35 U.S.C. 41(a)(8) to establish a fee of $2060 for a five-month extension of time.

### Section 1.21

Section 1.21(l) is amended for consistency with § 1.53, and § 1.21(n) is amended to change the reference to an improper application under §§ 1.60 or 1.62 to a reference to an application in which proceedings are terminated pursuant to § 1.53(e).

No comments were received regarding the proposed change to § 1.21.

### Section 1.26

Section 1.26(a) is amended to better track the statutory language of 35 U.S.C. 42(d) and to add back language relating to refunds of fees paid that were not "required" that was inadvertently dropped in the July 1, 1993, publication of title 37 CFR, and from subsequent publications.

No comments were received regarding the proposed change to § 1.26.

### Section 1.27

Section 1.27 paragraphs (a) through (d) are amended to remove the requirement that a statement filed thereunder be "verified," and to replace "aver" and "averring" with "state" and "stating." See comments relating to § 1.4(d). Section 1.27(b) is also amended for clarification with the movement of a clause relating to "any verified statement" within a sentence.

No comments were received regarding the proposed change to § 1.27.

### Section 1.28

Section 1.28(a) is amended to remove the requirement for a statement that is "verified." See comments relating to § 1.4(d).

Section 1.28(a) is also amended to provide that a new small entity statement is not required for a continuing or reissue application where small entity status is still proper and reliance is placed on a reference to a small entity statement filed in a prior application or patent or a copy thereof is supplied. Section 1.28(a) is further amended to state that the payment of a small entity basic statutory filing fee in a nonprovisional application, which claims benefit under 35 U.S.C. 119(e), 120, 121, or 365(c) of a prior application (including a continued prosecution application) or in a reissue application, where the prior application or the

patent has small entity status, will constitute a reference in the continuing or reissue application to the small entity statement in the prior application or in the patent, thereby establishing small entity status in such a nonprovisional application.

Section 1.28(a) is also amended to require a new determination of continued entitlement to small entity status for continued prosecution applications filed under § 1.53(d) and to clarify that the refiling of applications as continuations, divisions and continuation-in-part applications and the filing of reissue applications also require a new determination of continued entitlement to small entity status prior to reliance on small entity status in a prior application or patent.

*Comment 5:* One comment asked whether the change to § 1.28 regarding small entity requires that a small entity statement be filed with each continuing application.

*Response:* While the filing of a continuing application requires a new determination of entitlement to small entity status, § 1.28(a) continues to permit reliance on a small entity statement filed in a prior application for nonprovisional continuing applications.

Section 1.28(c) is amended to remove the requirement for a statement of facts explaining how an error in payment of a small entity fee(s) occurred in good faith and how and when the error was discovered. A fee deficiency payment under § 1.28(c) must include the difference between fee(s) originally paid as a small entity and the other than small entity fee(s) in effect at the time of payment of the complete fee deficiency. A fee deficiency payment under § 1.28(c) will be treated as a representation by the party submitting the payment that small entity status was established in good faith and that the original payment of small entity fees was made in good faith. Any paper submitted under § 1.28(c) will be placed in the appropriate file without review after the processing of any check or the charging of any fee deficiency payment specifically authorized.

*Comment 6:* One comment suggested that § 1.28(c) be amended to clarify current Office practice regarding the acceptance of papers under § 1.28(c)(2) in light of two recent District Court decisions: (1) *Haden Schweitzer Corp.* v. *Arthur B. Myr Industries, Inc.,* 901 F. Supp. 1235, 36 USPQ2d 1020 (E.D. Mich. 1995); and (2) *DH Technology, Inc.* v. *Synergstex International, Inc.,* 937 F. Supp. 902, 40 USPQ2d 1754 (N.D. Cal. 1996).

*Response:* The Office is also aware of a recent District Court decision in

*Jewish Hospital of St. Louis* v. *Idexx Laboratories,* 951 F. Supp 1, 42 USPQ2d 1720 (D. Me. 1996), that relies on § 1.28(c)(2) exclusively. The changes to § 1.28(c) are not directed to the issue of whether § 1.28(c)(2) must be viewed as the exclusive remedy. Nevertheless, an applicant or patentee can avoid undesirable results by not claiming small entity status unless it is absolutely certain that the applicant or patentee is entitled to small entity status (*i.e.,* resolving any doubt, uncertainty, or lack of information in favor of payment of the full fee). See MPEP 509.03 ("Small entity status must not be established unless the person or persons signing the * * * statement can *unequivocally* make the required self-certification" (emphasis added)).

### Section 1.33

Section 1.33 is amended to no longer provide that the required residence and post office address of the applicant can appear elsewhere than in the oath or declaration under § 1.63. Section 1.63(a)(3) is amended to require that the post office address as well as the residence be identified therein and not elsewhere. Permitting the residence to be elsewhere in the application other than the oath or declaration, as was in § 1.33(a), would be inconsistent with unamended § 1.63(c) that states that the residence must appear in the oath or declaration. The requirement for placement of the post office address is equivalent to the requirement for the residence to eliminate confusion between the two, which often are the same destination and are usually provided in the oath or declaration. The reference in § 1.33(a) to the assignee providing a correspondence address has been moved within § 1.33(a) for clarification. Other clarifying language includes a reference to § 1.34(b), use of the terms "provided," "furnished" rather than "notified," and "application" rather than "case," and deletion of the expression "of which the Office."

The former language of § 1.33(b) is transferred to new § 1.4(g). Section 1.33(b) is amended to set forth the signature requirement for papers filed in an application (formerly in § 1.33(a)). Section 1.33(b) is specifically amended to provide that amendments and other papers filed in an application must be signed by: (1) an attorney or agent of record appointed in compliance with § 1.34(b); (2) a registered attorney or agent not of record who acts in a representative capacity under the provisions of § 1.34(a); (3) the assignee of record of the entire interest (if there is such); (4) an assignee of record of an

PHILIPS-SCHUBERT018826

undivided part interest (if there is such), so long as the amendment or other paper is also signed by any assignee(s) of the remaining interest and any applicant retaining an interest; or (5) all of the applicants, including applicants under §§ 1.42, 1.43 and 1.47, unless there is an assignee of record of the entire interest and such assignee has chosen to prosecute the application to the exclusion of the applicant(s), and, as such, has taken action in the application in accordance with §§ 3.71 and 3.73. This is not a change in practice, but simply a clarification of current signature requirements.

No comments were received regarding the proposed change to § 1.33.

*Section 1.41*

Section 1.41(a) (and § 1.53) is amended to no longer require that a patent be applied for in the name of the actual inventors for an application for patent to be accorded a filing date. The requirement for use of full names is moved to § 1.63(a) for better context. Section 1.41(a) is specifically amended: (1) To provide that a patent is applied for in the name(s) of the actual inventor(s); (2) to add paragraphs (a)(1) and (a)(2) indicating how the inventorship is set forth in a nonprovisional and provisional application; and (3) to add paragraph (a)(3) indicating the need for an identifier consisting of alphanumeric characters if no name of an actual inventor is provided.

Section 1.41(a)(1) provides that the inventorship of a nonprovisional application is that inventorship set forth in the oath or declaration as prescribed by § 1.63, except as provided for in §§ 1.53(d)(4) and 1.63(d). Section 1.41(a)(1) also provides that if an oath or declaration as prescribed by § 1.63 is not filed during the pendency of a nonprovisional application, the inventorship is that inventorship set forth in the application papers filed pursuant to § 1.53(b), unless a petition under this paragraph accompanied by the fee set forth in § 1.17(i) is filed supplying the name(s) of the inventor(s).

Section 1.41(a)(2) provides that the inventorship of a provisional application is that inventorship set forth in the cover sheet as prescribed by § 1.51(c)(1). Section 1.41(a)(2) also provides that if a cover sheet as prescribed by § 1.51(c)(1) is not filed during the pendency of a provisional application, the inventorship is that inventorship set forth in the application papers filed pursuant to § 1.53(c), unless a petition under this paragraph accompanied by the fee set forth in

§ 1.17(q) is filed supplying the name(s) of the inventor(s).

35 U.S.C. 120 and § 1.78(a) require, *inter alia,* that an application have at least one inventor in common with a prior application to obtain the benefit of the filing date of such application. Considering the executed oath or declaration (or cover sheet in a provisional application) the sole mechanism for naming the inventor(s) would operate as a trap in the event that an application were abandoned prior to the filing of an oath or declaration in favor of a continuing application (or in the event that a cover sheet was not filed in a provisional application). To avoid this result, § 1.41 as adopted provides that the inventorship is that inventorship named in an executed oath or declaration under § 1.63 (or in the cover sheet under § 1.51(c)(1) in a provisional application), but that if no executed oath or declaration under § 1.63 (or cover sheet under § 1.51(c)(1) in a provisional application) is filed during the pendency of the application, the inventorship will be considered to be the inventor(s) named in the original application papers.

In the peculiar situation in which no inventor is named in the original application papers (or the correct inventor(s) are not named in the original application papers), and no executed oath or declaration under § 1.63 (or cover sheet under § 1.51(c)(1) in a provisional application) is filed during the pendency of the application, it will be necessary for the applicant to file a petition under § 1.41(a) (and appropriate fee) to name the inventor(s). No explanation (other than that the paper is supplying or changing the name(s) of the inventor(s)) or showing of facts concerning the inventorship or any delay in naming the inventorship is required or desired in a petition under § 1.41(a). The petition fee is required to cover (or defray in a provisional application) the costs of updating the Office's records for the application.

Where no inventor(s) is named on filing, the Office requests that an identifying name be submitted for the application. The use of very short identifiers should be avoided to prevent confusion. Without supplying at least a unique identifying name the Office may have no ability or only a delayed ability to match any papers submitted after filing of the application and before issuance of an identifying application number with the application file. Any identifier used that is not an inventor's name should be specific, alphanumeric characters of reasonable length, and should be presented in such a manner that it is clear to application processing

personnel what the identifier is and where it is to be found. It is strongly suggested that applications filed without an executed oath or declaration under § 1.63 or 1.175 include the name of the person(s) believed to be the inventor for identification purposes. Failure to apprise the Office of the application identifier being used may result in applicants having to resubmit papers that could not be matched with the application and proof of the earlier receipt of such papers where submission was time dependent.

As any inventor(s) named in the original application papers is considered to be the inventor(s) only when no oath or declaration under § 1.63 is filed in a nonprovisional application or cover sheet under § 1.51(c)(1) filed in a provisional application, the recitation of the inventorship in an application submitted under § 1.53 (b) or (d) without an executed oath or declaration or cover sheet, respectively, for purposes of identification may be changed merely by the later submission of an oath or declaration executed by a different inventive entity without recourse to a petition under § 1.41 or 1.48.

*Comment 7:* One comment noted that when an application is filed only an alphanumeric identifier may be used, which would of necessity require a correction of inventorship, and questioned how a verified statement under § 1.48(a) could be filed as there would be no person to sign such statement, whether the Office will require that the name(s) of the inventor(s) be submitted within a specified period, and whether the filing date will be lost if the name(s) of the inventor(s) is not submitted within such period.

*Response:* The name(s) of the inventor(s) in a nonprovisional application are provided in the oath or declaration under § 1.63 (§ 1.41(a)(2)) and the name(s) of the inventor(s) in a provisional application are provided in the cover sheet (§ 1.41(a)(3)). Thus, an application filed without the name(s) of the inventor(s) must also have been filed without an oath or declaration under § 1.63 (nonprovisional) or cover sheet (provisional).

The Office will set a time period in a nonprovisional application filed without an oath or declaration under § 1.63 for the filing of such an oath or declaration (§ 1.53(f)). The Office will set a time period in a provisional application filed without a cover sheet for the filing of such cover sheet (§ 1.53(g)). The subsequently filed oath or declaration or cover sheet will

PHILIPS-SCHUBERT018827

provide the name(s) of the inventor(s). No petition under § 1.48(a) would be required where there was an alphanumeric identifier (and not a name of a person) or where the person(s) set forth as the inventor(s) was incorrect.

In the event that an oath or declaration or cover sheet is not timely filed, the application will become abandoned and the inventorship will be considered to be the inventor(s) named in the original application papers. The failure to timely file an oath or declaration, cover sheet, or the name(s) of the inventor(s) is not a filing date issue.

*Comment 8:* One comment thought that the proposed change eliminating the need to identify any inventor would lead to sloppy filing procedures and that it should in almost all cases be possible for practitioners to correctly identify the inventors at the time of filing.

*Response:* Experience has demonstrated that a significant number of applications filed under § 1.53(b) without an executed oath or declaration have been filed with incorrect inventorships with explanations running from "there was no time to investigate the inventorship" to "the inventors contacted either did not understand the inventorship requirements under U.S. patent law or did not appreciate that the claims as filed included or did not include the contribution of the omitted or erroneously added inventor." Additionally, Office experience is that while almost all § 1.48(a) petitions concerning such matters are eventually granted, only a small percentage are granted on the initial petition thereby causing a prolonged prosecution period, which is undesirable in view of the amendment to 35 U.S.C. 154 contained in the Uruguay Round Agreements Act (URAA), Pub. L. 103–465, 108 Stat. 4809 (1994).

*Section 1.47*

Section 1.47 paragraphs (a) and (b) are amended, pursuant to 35 U.S.C. 116 and 35 U.S.C 118, to provide for publication in the *Official Gazette* of a notice of filing for all applications, except for continued prosecution applications under § 1.53(d), submitted under this section rather than only when notice to the nonsigning inventor(s) is returned to the Office undelivered or when the address of the nonsigning inventor(s) is unknown. The information to be published, after grant of the § 1.47 petition, will include: The application number, filing date, invention title and name(s) of the nonsigning inventor(s). Letters returned as undeliverable are difficult to match with the related

application file, and when matched with the file, the applications are burdensome to flag as requiring further action by the Office. Accordingly, the return of letters is not a desirable means of triggering publication of a notice to a nonsigning inventor as to the filing of the application. Furthermore, when a returned letter is used as such a trigger, another review of the application must be made for returned correspondence. As the best time for review of returned letters is after allowance, but before issuance, of an application, processing of the application would be delayed and done at a time that could be best used for printing related processing requirements. Printing of notice of the filing of all applications wherein § 1.47 status is granted does not require any such review to be made. In order to best balance the obligation of providing notice to inventors and efficient processing of applications, notice in the *Official Gazette* of the filing of § 1.47 applications will be prepared essentially at the same time that the letter notice is directly sent to the nonsigning inventor.

Paragraphs (a) and (b) of this section are also amended to exclude the filing of continued prosecution applications under § 1.53(d) from the notice requirement.

Section 1.47 is also amended for clarification purposes. A reference to an "omitted inventor" in § 1.47(a) is replaced with "nonsigning inventor." The statements in § 1.47 paragraphs (a) and (b) that a patent will be granted upon a satisfactory showing to the Commissioner are deleted as unnecessary. Section 1.47(b) is amended to clarify that it applies only where none of the inventors are willing or can be found to sign the oath or declaration by substitution of "an inventor" by "all the inventors." The use of "must state" in regard to the last known address is deleted as redundant in view of the explicit requirement for such address in the rule. The sentence in § 1.47(b) referring to the filing of the assignment, written agreement to assign or other evidence of proprietary interest is deleted as redundant in view of the requirement appearing earlier in § 1.47(b) calling for "proof of pertinent facts."

*Comment 9:* One comment believed that the amendment to § 1.47(b) results in a change in practice permitting an assignee to proceed thereunder only where all the inventors refuse to sign, and that the assignee should not be precluded from making the required declaration where only one inventor refuses to cooperate as the other inventors may not have personal knowledge of the facts.

*Response:* While the specific language of § 1.47(b) is amended to recite the condition that "all the inventors refuse to execute an application" the prior use of the term "inventor" was intended to mean and was interpreted as meaning all inventors. *See* MPEP 409.03(b). Accordingly, the language clarification is not a change in practice.

Although it is unclear as to what particular "facts" the comment is addressed to that the other inventors would not have personal knowledge of, facts as to the inventorship of the noncooperating inventor would better lie with the other inventors who are after all required to be joint inventors, 35 U.S.C. 116, and therefore the other inventors should have the best knowledge of the facts required for a declaration under § 1.63. Any declaration of facts, in support of the petition, to show, *e.g.*, that an inventor has refused to sign a declaration after having been given an opportunity to do so, should be made by someone with first-hand knowledge of the events, such as the attorney who presented the inventor with the application papers.

*Section 1.48*

Section 1.48 provides for correction of inventorship in an application (other than a reissue application). Section 1.324 provides for correction of inventorship in a patent. Sections 1.171 and 1.175 provide for correction of inventorship in a patent *via* a reissue application.

Section 1.48 is amended in its title to clarify that the section concerns patent applications, other than reissue applications, and not patents. Where a patent names an incorrect inventive entity, the inventorship error may be corrected by reissue. *See* MPEP 1402. Where a reissue application names an incorrect inventive entity in the executed reissue oath or declaration (whether the reissue application is filed for the sole purpose or in-part to correct the inventorship, or is filed for purposes other than correction of the inventorship), a new reissue oath or declaration in compliance with § 1.175 may be submitted with the correct inventorship without a petition under § 1.48. This is because it is the inventorship of the patent being reissued that is being corrected (*via* a reissue application).

35 U.S.C. 251, ¶ 3, provides that the provisions of title 35, U.S.C., relating to applications apply to reissue applications. 35 U.S.C. 116, ¶ 3, authorizes the Commissioner to permit correction of inventorship in an application under such terms as the Commissioner prescribes. The

PHILIPS-SCHUBERT018828

**53138**     Federal Register / Vol. 62, No. 197 / Friday, October 10, 1997 / Rules and Regulations

Commissioner has determined that correction of inventorship in a reissue application may be accomplished under 35 U.S.C. 251 *via* the reissue oath or declaration, without resort to a petition under § 1.48. Therefore, § 1.48 has been amended to specifically exclude its applicability to correction of inventorship in a reissue application.

Section 1.48(a) will not require correction of the inventorship if the inventorship or other identification under § 1.41 was set forth in error on filing of the application. Section 1.48(a) is amended to apply only to correction of inventor or inventors, in applications, other than reissue applications, from that named in an originally filed executed oath or declaration and not to the naming of inventors or others for identification purposes under § 1.41. The statement to be submitted will be required only from the person named in error as an inventor or from the person who through error was not named as an inventor rather than from all the original named inventors so as to comply with 35 U.S.C. 116. The requirement that any amendment of the inventorship under § 1.48(a) be "diligently" made has been removed. The applicability of a rejection under 35 U.S.C. 102(f) or (g) against an application with the wrong inventorship set forth therein and any patent that would issue thereon is a sufficient motivation for prompt correction of the inventorship without the need for a separate requirement for diligence.

*Comment 10:* Two comments expressed opposition to deletion of the diligence requirement in § 1.48 paragraphs (a) through (c) in that removal thereof would seem to promote delay in correction of the inventorship and decrease the importance of having the correct inventorship.

*Response:* In addition to the motivation noted in the explanation of the rules for not allowing a patent to issue with improper inventorship, the criteria for correction of the inventorship becomes more restrictive subsequent to issuance under § 1.324 (having a statutory basis under 35 U.S.C. 256) than under § 1.48(a) (having a statutory basis under 35 U.S.C. 116). 35 U.S.C. 256 requires participation by all the parties including each original named inventor, which participation may be harder to obtain after the patent has issued. Petitions under § 1.48(a) filed earlier while the application is pending may seek waiver under § 1.183 of participation of some of the parties needed to participate. Additionally, petitions under § 1.48 in pending applications are not entered as a matter of right in rejected (the criteria of § 1.116 applies) or allowed (the criteria

of § 1.312 applies) applications. *See* § 1.48(a) and MPEP 201.03.

A clarifying reference to § 1.634 is added in § 1.48(a) for instances when inventorship correction is necessary during an interference and has been moved from § 1.48(a)(4) for improved contextual purposes.

The § 1.48(a)(1) statement requires a statement only as to the lack of deceptive intent rather than a statement of facts to establish how the inventorship error was discovered and how it occurred, since the latter requirement is deleted. Additionally, the persons from whom a statement is required now includes any person who through error was not named as an inventor but limits statements from the original named inventors to only those persons named in error as inventors rather than all persons originally named as inventors including those correctly named. The paragraph is amended to remove the requirement that the statement be verified in accordance with the change to §§ 1.4(d)(2) and 10.18.

*Comment 11:* One comment opposed the removal of the Office from examining the issue of inventorship as substantive law invalidates patents that have issued in the names of incorrect inventors and the Office is charged with the duty of examining applications for the purpose of denying issue to those applications that do not meet the standards of patentability. Where an oath has originally been filed asserting the proper inventor is one entity and a subsequent paper asserts that the proper inventor is another, under such circumstances "the facts are inherently suspect" and an investigation by the Office is warranted and required by statute.

*Response:* The amendments to § 1.48 have otherwise received overwhelming support.

The Office has pursued the existence of improper inventorship in applications by rejection under 35 U.S.C. 102(f) or (g) and will continue to do so independent of the change in the verified statement requirements under § 1.48 paragraphs (a) or (c). A request to change inventorship, however, often requested by the current inventors or assignee on their own initiative is not seen to be inherently fraught with deceptive intent as to warrant a close and detailed examination absent more. A statement that the error was made without deceptive intent is seen to be a sufficient investigation complying with the statutory requirement under 35 U.S.C. 116, particularly as most petitions are eventually granted or an application can be refiled naming the new desired inventive entity. Refiling of

the application to change the inventorship will not cause the Office, absent more, to initiate an investigation as to the correct inventorship or cause a rejection under 35 U.S.C. 102(f) or (g) to be made. Additionally, it should be noted that the Office views a petition under § 1.48 to be a procedural matter and not to represent a substantive determination as to the actual inventorship. *See* MPEP 201.03, Verified Statement of Facts.

For those situations where there was deceptive intent, the Office is lacking certain necessary tools for a thorough inquiry (*e.g.*, subpoena authority) to ascertain the truth thereof (as in other situations under §§ 1.28 and 1.56). However, the inquiry cannot be waived by the Office due to the statutory requirement under 35 U.S.C. 116. There is no other reasonable course of action than to accept as an explanation for the execution of a § 1.63 oath or declaration setting forth an erroneous inventive entity that the inventor did not remember the contribution of the omitted inventor at the time the oath or declaration was executed (absent subpoena power and *inter partes* hearings), and therefore further inquiries into the matter other than a statement of lack of deceptive intent is a waste of Office resources.

*Comment 12:* One comment suggested that in limiting the submission of a verified statement of facts to only the parties being added or deleted as inventors, agreement of the original named inventors should also be obtained as is currently done when verified statements of facts from all the original named inventors are required.

*Response:* Agreement or acquiescence of the original named inventors, to the extent that they remain as inventors, to the new inventorship will be obtained through the retained requirement that the actual inventive entity complete a new oath or declaration under § 1.63, which must set forth the new inventive entity. Additionally, through the rule changes to this section and §§ 1.28 and 1.175 the Office is decreasing its investigation of claims relating to a lack of deceptive intent. The remaining purpose of these rules is to force the applicant(s) to merely make an assertion as to a lack of deceptive intent thereby permitting subsequent reviewers (tribunals or otherwise) to determine, in light of all the available facts, whether the applicant(s) complied with the statute.

Section 1.48(a)(2) is amended for clarification purposes to indicate the availability of §§ 1.42, 1.43 or 1.47 in meeting the requirement for an executed oath or declaration under § 1.63 from

PHILIPS-SCHUBERT018829

each actual inventor. Section 1.47 is only applicable to the person to be added as an inventor (inventors named in an application transmittal letter can be deleted without petition). For those persons already having submitted an executed oath or declaration under § 1.63, a petition under § 1.183, requesting waiver of reexecution of an oath or declaration, may be an appropriate remedy. The requirement for an oath or declaration is maintained in § 1.48(a) notwithstanding its replacement in § 1.324 for issued patents by a statement of agreement or lack of disagreement with the requested change in view of the need to satisfy the duty of disclosure requirement in a pending application that is set forth in a § 1.63 oath or declaration.

Section 1.48(a)(4) is amended to include a citation to § 3.73(b) to clarify the requirements for submitting a written consent of assignee, which is subject to the requirement under § 3.73(b), and to delete the reference to an application involved in an interference, which is being moved to § 1.48(a). Section 1.48(a)(4) is also amended to clarify that the assignee required to submit its written consent is only the existing assignee of the original named inventors at the time the petition is filed and not any party that would become an assignee based on the grant of the inventorship correction.

Section 1.48(b) is also amended to remove the requirement that a petition thereunder be diligently filed. The applicability of a rejection under 35 U.S.C. 102 (f) or (g) against an application with the wrong inventorship set forth therein and any patent that would issue thereon is sufficient motivation for prompt correction of the inventorship without the need for a separate requirement for diligence.

Section 1.48(b) is amended to have a clarifying reference to § 1.634 added for instances when inventorship correction is necessary during an interference.

*Comment 13:* A comment noted that the literal wording of § 1.48(b) permits correction thereunder only where the correct inventors were named on filing thereby excluding correction under § 1.48(b) where an incorrect inventorship was named on filing that was subsequently corrected under § 1.48(a) and, subsequent to the correction prosecution of the application, required additional correction under § 1.48(b).

*Response:* The comment is accepted and § 1.48(b) has been modified to delete "when filed" after "nonprovisional application" for clarification purposes. Additionally, the term "originally" in the first sentence of

paragraph (b) has been replaced with "currently."

Section 1.48(c) is amended so that a petition thereunder no longer needs to meet the current requirements of § 1.48(a), which are also changed. A statement from each inventor being added that the inventorship amendment is necessitated by amendment of the claims and that the error occurred without deceptive intent is required under § 1.48(c)(1) rather than the previous requirement of a statement from each original named inventor. The previous requirements of § 1.48(a) for an oath or declaration, the written consent of an assignee and the written consent of any assignee are retained, but are now separately set forth in §§ 1.48 paragraphs (c)(2) through (c)(4). The particular circumstances of a petition under this paragraph, adding an inventor due to an amendment of the claims that incorporates material attributable to the inventor to be added, is seen to be indicative of a lack of deceptive intent in the original naming of inventors. Accordingly, all that must be averred to is that an amendment of the claims has necessitated correction of the inventorship and that the inventorship error existing in view of the claim amendment occurred without deceptive intent. The previous requirement for diligence in filing the petition based on an amendment to the claims is not retained as applicants have the right, prior to final rejection or allowance, to determine when particular subject matter is to be claimed. Applicants should note that any petition under § 1.48 submitted after allowance is subject to the requirements of § 1.312, and a petition submitted after final rejection is not entered as a matter of right.

Section 1.48(c)(2) is amended to clarify the availability of §§ 1.42, 1.43 and 1.47 in meeting the requirement for an executed oath or declaration under § 1.63. Section 1.47 is only applicable to the person to be added as an inventor. For those persons already having an executed oath or declaration under § 1.63, a petition under § 1.183, requesting waiver of reexecution of an oath or declaration, may be an appropriate remedy.

Section 1.48(c)(4) is amended to clarify that the assignee required to submit its written consent is only the existing assignee of the original named inventors at the time the petition is filed and not any party that would become an assignee based on the grant of the inventorship correction. A citation to § 3.73(b) is presented.

Section 1.48(d) is amended by addition of "their part" to replace "the

part of the actual inventor or inventors" and of "omitted" to replace "actual" to require statements from the inventors to be added rather than from all the actual inventors so as to comply with 35 U.S.C. 116.

Section 1.48(d)(1) is also clarified to specify that the error to be addressed is the inventorship error. It is not expected that the party filing a provisional application will normally need to correct an error in inventorship under this paragraph by adding an inventor therein except when necessary under § 1.78 to establish an overlap of inventorship with a continuing application.

Section 1.48(d)(1) is also amended to remove the requirement that the statement be verified in accordance with the change to §§ 1.4(d)(2) and 10.18.

Section 1.48(e)(1) is amended to replace a requirement in provisional applications that the required statement be one "of facts" directed towards "establishing that the error" being corrected "occurred without deceptive intention," requiring only a statement that the inventorship error occurred without deceptive intent. Paragraph (e)(1) is also amended to remove the requirement that the statement be verified in accordance with the change to §§ 1.4(d)(2) and 10.18. It is not expected that the party filing a provisional application would need to file a petition under this paragraph since the application will go abandoned by operation of law (35 U.S.C. 111(b)(5)), and the need to delete an inventor will not affect the overlap of inventorship needed to claim priority under § 1.78(a)(3) for any subsequently filed nonprovisional application.

Section 1.48(c)(3) is amended to clarify that the assignee required to submit its written consent is only the prior existing assignee before correction of the inventorship is granted and not any party that would become an assignee based on the grant of the inventorship correction. A reference to § 3.73(b) is added.

Section 1.48(f) is added to provide that the later filing of an executed oath or declaration (or cover sheet (§ 1.51(c)(1)) in a provisional application) during the pendency of the application would act to correct the inventorship without a specific petition for such correction and will be used to further process the application notwithstanding any inventorship or other identification name earlier presented.

Section 1.48(g) is added to specifically recognize that the Office may require such other information as may be deemed appropriate under the

PHILIPS-SCHUBERT018830

**53140**   **Federal Register** / Vol. 62, No. 197 / Friday, October 10, 1997 / Rules and Regulations

particular circumstances surrounding a correction of the inventorship.

*Section 1.51*

Section 1.51, paragraphs (a)(1) and (a)(2), are re-written as § 1.51, paragraphs (b) and (c), respectively, and § 1.51(b) is re-written as § 1.51(d). Section 1.51(c) covering the use of an authorization to charge a deposit account is removed as unnecessary in view of § 1.25(b).

No comments were received regarding the proposed change to § 1.51.

*Section 1.52*

Section 1.52, paragraphs (a) and (d), are amended to remove the requirement that the translation be verified in accordance with the change to §§ 1.4(d)(2) and 10.18. Section 1.52, paragraph (c), is amended to remove the reference to §§ 1.123 through 1.125 to: (1) reflect a transfer of material from §§ 1.123 and 1.124 to § 1.121; (2) further clarify that § 1.125 is not a vehicle amendment of an application; and (3) to clarify that alterations to application papers may be made on, as well as before, the signing of the oath or declaration. Section 1.52, paragraphs (a) and (d), are also amended to clarify the need for a statement that the translation being offered is an accurate translation, as in § 1.69(b).

*Comment 14:* Two comments were received asking whether the attorney can sign the statement that the translation is accurate, and how much firsthand knowledge does a practitioner need to know that the translation is accurate.

*Response:* The Office will accept a statement that the translation is accurate from any party. However, any party signing such statement must keep in mind the averments that are made under §§ 1.4(d) and 10.18. The actual firsthand knowledge needed by a practitioner is that amount of knowledge to comply with the averments in §§ 1.4(d) and 10.18.

*Comment 15:* A comment questioned whether there is any difference between the previous language of "verified translation" and the present language of "accurate translation."

*Response:* The previous language was directed at a verification that the translation is accurate. A verification requirement is now unnecessary due to the amendments to §§ 1.4(d) and 10.18. Thus, § 1.52 is amended to include the more direct term "accurate."

*Section 1.53*

Section 1.53 is amended to include headings for each paragraph for purposes of clarity.

Section 1.53(a) is amended to state that "[a]ny papers received in the Patent and Trademark Office which purport to be an application for a patent will be assigned an application number for identification purposes." That is, the Office will refer to papers purporting to be an application for a patent as an "application" and assign such "application" an application number for identification purposes. This reference, however, does not imply that such papers meet the requirements in § 1.53(b) to be accorded a filing date or constitute an "application" within the meaning of 35 U.S.C. 111.

Section 1.53(b) is amended to provide that: (1) the filing date of an application for patent filed under § 1.53(b) is the date on which a specification as prescribed by 35 U.S.C. 112 containing a description pursuant to § 1.71 and at least one claim pursuant to § 1.75, and any drawing required by § 1.81(a) are filed in the Office; (2) no new matter may be introduced into an application after its filing date; (3) a continuation or divisional application filed by all or by fewer than all of the inventors named in a prior nonprovisional application may be filed under § 1.53(b) or (d); and (4) a continuation or divisional application naming an inventor not named in the prior nonprovisional application or a continuation-in-part application must be filed under § 1.53(b).

Section 1.53(c) is amended to provide for provisional applications (formerly provided for in § 1.53(b)(2)). Section 1.53(c) includes the language of former § 1.53(b)(2), with certain changes for purposes of clarity. Section 1.53(c)(i), for example, includes language requiring either the provisional application cover sheet required by § 1.51(c)(1) or a cover letter identifying the application as a provisional application. The cover letter may be an application transmittal letter or some other paper identifying the accompanying papers as a provisional application.

Section 1.53(d) is amended to provide for continued prosecution applications. Section 1.53(d)(1) provides that a continuation or divisional application, but not a continuation-in-part, of a prior nonprovisional application may be filed as a continued prosecution application under § 1.53(d), subject to the conditions specified in paragraph (d)(1)(i) and (d)(1)(ii). That is, an application under § 1.53(d) cannot be a continuation-in-part application, and the prior application cannot be a provisional application.

Section 1.53(d)(1)(i) specifies that the prior application be either: (1) Complete as defined by § 1.51(b) and filed on or

after June 8, 1995; or (2) the national stage of an international application in compliance with 35 U.S.C. 371 and filed on or after June 8, 1995. The phrase "prior" application in § 1.53(d)(1) means the application immediately prior to the continued prosecution application under § 1.53(d), in that a continued prosecution application under § 1.53(d) may claim the benefit under 35 U.S.C. 120, 121, or 365(c) of applications filed prior to June 8, 1995 so long as the application that is immediately prior to the continued prosecution application under § 1.53(d) was filed on or after June 8, 1995.

Section 1.53(d)(1)(ii) specifies that the application under § 1.53(d) be filed before the earliest of: (1) Payment of the issue fee on the prior application, unless a petition under § 1.313(b)(5) is granted in the prior application; (2) abandonment of the prior application; or (3) termination of proceedings on the prior application.

Section 1.53(d)(2) provides that the filing date of a continued prosecution application is the date on which a request on a separate paper for an application under § 1.53(d) is filed. That is, a request for an application under § 1.53(d) cannot be submitted within papers filed for another purpose (e.g., the filing of a "conditional" request for a continued prosecution application within an amendment after final for the prior application is an improper request for a continued prosecution application under § 1.53(d)).

In addition, a "conditional" request for a continued prosecution application will not be permitted. Any "conditional" request for a continued prosecution application submitted (as a separate paper) with an amendment after final in an application will be treated as an unconditional request for a continued prosecution application of such application. This will result (by operation of § 1.53(d)(2)(v)) in the abandonment of such (prior) application, and (if so instructed in the request for a continued prosecution application) the amendment after final in the prior application will be treated as a preliminary amendment in the continued prosecution application.

Section 1.53(d)(2) further provides that an application filed under § 1.53(d): (1) Must identify the prior application (§ 1.53(d)(ii)); (2) discloses and claims only subject matter disclosed in the prior application (i.e., is a continuation or divisional, but not a continuation-in-part) (§ 1.53(d)(1)(ii)); (3) names as inventors the same inventors named in the prior application on the date the application under § 1.53(d) was filed, except as provided in § 1.53(d)(4)

PHILIPS-SCHUBERT018831

(§ 1.53(d)(2)(iii)); (4) includes the request for an application under § 1.53(d), will utilize the file jacket and contents of the prior application, including the specification, drawings and oath or declaration, from the prior application to constitute the new application, and will be assigned the application number of the prior application for identification purposes (§ 1.53(d)(2)(iv)); and (5) is a request to expressly abandon the prior application as of the filing date of the request for an application under § 1.53(d) (§ 1.53(d)(2)(v)).

Section 1.53(d)(3) provides that the filing fee for a continued prosecution application filed under § 1.53(d) is: (1) The basic filing fee as set forth in § 1.16; and (2) any additional § 1.16 fee due based on the number of claims remaining in the application after entry of any amendment accompanying the request for an application under § 1.53(d) and entry of any amendments under § 1.116 not entered in the prior application which applicant has requested to be entered in the continued prosecution application. *See* 35 U.S.C. 41(a) (1)–(4).

Section 1.53(d)(4) provides that an application filed under § 1.53(d) may be filed by fewer than all the inventors named in the prior application, provided that the request for an application under § 1.53(d) when filed is accompanied by a statement requesting deletion of the name or names of the person or persons who are not inventors of the invention being claimed in the new application, and that no person may be named as an inventor in an application filed under § 1.53(d) who was not named as an inventor in the prior application on the date the application under § 1.53(d) was filed, except by way of a petition under § 1.48. Thus, an application under § 1.53(d) must name as inventors either the same as (§ 1.53(d)(2)(iii)) or fewer than all of (§ 1.53(d)(4)) the inventors named in the prior application. A request for an application under § 1.53(d) purporting to name as an inventor a person not named as an inventor in the prior application (even if accompanied by a new oath or declaration under § 1.63 listing that person as an inventor) will be treated as naming the same inventors named in the prior application (§ 1.53(d)(2)(iii)).

Section 1.53(d)(5) provides that: (1) Any new change must be made in the form of an amendment to the prior application; (2) no amendment in an application under § 1.53(d) (a continued prosecution application) may introduce new matter or matter that would have been new matter in the prior

application; and (3) any new specification filed with the request for an application under § 1.53(d) will not be considered part of the original application papers, but will be treated as a substitute specification in accordance with § 1.125. Pursuant to the provisions of § 1.53(d)(5), where applicant desires entry of an amendment in the application under § 1.53(d) that was previously denied entry under § 1.116 in the prior application, the applicant must request its entry (and pay any additional claims fee required by § 1.53(d)(3)(ii)) in the application under § 1.53(d) prior to action by the Office in the application under § 1.53(d). Any amendment submitted with the request for an application under § 1.53(d) that seeks to add matter that would have been new matter in the prior application will be objected to under § 1.53(d), and the applicant will be required to cancel the subject matter that would have been new matter in the prior application.

Section 1.53(d)(6) provides that the filing of a continued prosecution application under § 1.53(d) will be construed to include a waiver of confidentiality by the applicant under 35 U.S.C. 122 to the extent that any member of the public who is entitled under the provisions of § 1.14 to access to, copies of, or information concerning either the prior application or any continuing application filed under the provisions of this paragraph may be given similar access to, copies of, or similar information concerning, the other application(s) in the application file.

Section 1.53(d)(7) provides that a request for an application under § 1.53(d) is a specific reference under 35 U.S.C. 120 to every application assigned the application number identified in such request, and that no amendment in a continued prosecution application under § 1.53(d) shall delete this specific reference to any prior application. That is, other than the identification of the prior application in the request required by § 1.53(d) for a continued prosecution application, a continued prosecution application needs no further identification of or reference to the prior application (or any prior application assigned the application number of such application under § 1.53(d)) under 35 U.S.C. 120 and § 1.78(a)(2).

Section 1.53(d)(8) provides that in addition to identifying the application number of the prior application, applicant is urged to furnish in the request for an application under § 1.53(d) the following information relating to the prior application to the best of his or her ability: (1) Title of

invention; (2) name of applicant(s); and (3) correspondence address.

Section 1.53(d)(9) provides that: (1) Envelopes containing only requests and fees for filing an application under § 1.53(d) should be marked "Box CPA" and (2) requests for an application under § 1.53(d) filed by facsimile transmission should be clearly marked "Box CPA."

Section 1.53(e)(1) provides that if an application deposited under § 1.53 paragraphs (b), (c), or (d) does not meet the respective requirements in § 1.53 paragraphs (b), (c), or (d) to be entitled to a filing date, applicant will be so notified, if a correspondence address has been provided, and given a time period within which to correct the filing error.

Section 1.53(e)(2) provides that: (1) Any request for review of an application pursuant to § 1.53(e)(1), or a notification that the original application papers lack a portion of the specification or drawing(s), must be by way of a petition pursuant to § 1.53(e); (2) any petition under § 1.53(e) must be accompanied by the fee set forth in § 1.17(i) in an application filed under § 1.53 paragraphs (b) or (d), and the fee set forth in § 1.17(q) in an application filed under § 1.53(c); and (3) in the absence of a timely (§ 1.181(f)) petition pursuant to this paragraph, the filing date of an application in which the applicant was notified of a filing error pursuant to paragraph (e)(1) of this section will be the date the filing error is corrected.

Section 1.53(e)(3) provides that if an applicant is notified of a filing error pursuant to § 1.53(e)(1), but fails to correct the filing error within the given time period or otherwise timely (§ 1.181(f)) take action pursuant to § 1.53(e)(2), proceedings in the application will be considered terminated, and that where proceedings in an application are terminated pursuant to § 1.53(e)(3), the application may be disposed of, and any filing fees, less the handling fee set forth in § 1.21(n), will be refunded.

Section 1.53(f) is amended to include the language of former § 1.53(d)(1) and to provide that the oath or declaration required for a continuation or divisional application under § 1.53(b) may be a copy of the executed oath or declaration filed in the prior application (under § 1.63(d)).

Section 1.53 paragraphs (g), (h), (i), and (j) are added and include the language of former § 1.53 paragraphs (d)(2), (e)(1), (e)(2), and (f), respectively.

*Comment 16:* The majority of the comments supported the deletion of §§ 1.60 and 1.62 in favor of the proposed amendment to § 1.53.

PHILIPS-SCHUBERT018832

*Response:* The Office is deleting §§ 1.60 and 1.62 in favor of an amended § 1.53.

*Comment 17:* Several comments suggested that the Office adopt a continued prosecution procedure for applications filed on or after June 8, 1995 similar to the practice set forth in § 1.129(a), rather than the continued prosecution application practice set forth in § 1.53(d).

*Response:* Section 532(a)(2)(A) of Pub. L. 103–465 provides specific authorization for the practice set forth in § 1.129(a). There is currently no statutory authority for the Office to simply charge the patent fees set forth in 35 U.S.C. 41(a) for further examination of an application. 35 U.S.C. 41(d) would authorize the Office to further examine an application for a fee that recovers the estimated average cost to the Office of such further examination; however, as 35 U.S.C. 41(h) is applicable only to fees under 35 U.S.C. 41 (a) and (b), the Office would not be authorized to provide a small entity reduction in regard to such fee. Thus, the only mechanism by which the Office may provide further examination for a fee to which the small entity reduction is applicable is *via* a continuing application.

Section 209 of H.R. 3460, 104th Cong., 2d Sess. (1996), would have provided statutory authority for the further reexamination of an application for a fee to which the small entity reduction was applicable. Section 209 of H.R. 400, 105th Cong., 1st Sess. (1997), if enacted, will provide statutory authority for the further reexamination of an application for a fee to which the small entity reduction will be applicable.

*Comment 18:* One comment stated that the combination of §§ 1.53, 1.60, and 1.62 into a single § 1.53 was complex and confusing. Another comment suggested that § 1.53 be split into a number of sections, or that headings be used in § 1.53 in the manner that headings are used in §§ 1.84 and 1.96.

*Response:* Placing the provisions of § 1.53 into multiple sections, rather than multiple paragraphs of a single section, would not result in a simplification of its provisions. The Office considers it appropriate to place the filing provisions concerning all applications (nonprovisional, provisional, and continued prosecution) into a single section to reduce the confusion as to the filing requirements for any application for patent. Section 1.53 as adopted includes headings in each paragraph of § 1.53 to indicate the subject to which each of these paragraphs pertains.

*Comment 19:* One comment suggested amending § 1.53 to require applicants to indicate changes to the disclosure in a continuation or divisional application.

*Response:* The suggestion is not adopted. The Office did not propose to amend § 1.53 to require applicants to indicate changes to the disclosure in any continuing application. Thus, adopting a change to impose this additional burden on an applicant is not considered appropriate in this Final Rule.

*Comment 20:* One comment suggested that the Office permit applicants to file a statement requesting deletion of an inventor in a continuation or divisional application any time prior to or coincident with the mailing of an issue fee payment. The comment questioned whether the time period in § 1.53(e)(1) addresses this issue.

*Response:* Unless a statement requesting the deletion of the names of the person or persons who are not inventors in the continuation or divisional application accompanies the copy of the executed oath or declaration submitted in accordance with § 1.63(d) in an application filed pursuant to § 1.53(b), or accompanies the request for an application under § 1.53(d) in an application filed pursuant to § 1.53(d), the inventorship of the continuation or divisional application filed under § 1.53(b) using a copy of the oath or declaration of the prior application pursuant to § 1.63(d) or filed under § 1.53(d) will be considered identical to that in the prior application, and correction of the inventorship (if appropriate) must be by way of § 1.48. Identification of the inventorship is necessary to the examination of an application (*e.g.,* 35 U.S.C. 102(f) and (g)). As such, the Office must require identification of the inventorship prior to examination of an application.

Section 1.53(e)(1) applies in those instances in which papers filed as an application under § 1.53 (b), (c), or (d) do not meet the respective requirements of § 1.53 (b), (c), or (d) to be entitled to a filing date. Submitting an oath or declaration is not a filing date issue, and naming the inventors is no longer a filing date issue. Thus, the provisions of § 1.53(e) do not apply to the filing of a statement requesting deletion of an inventor in a continuation or divisional application.

*Comment 21:* One comment questioned whether § 1.53(d) applies only to applications filed on or after June 8, 1995, and questioned whether § 1.53(d) should be made applicable to pending applications filed prior to June 8, 1995. The comment also questioned

the relationship between § 1.129(a) and § 1.53(d).

*Response:* Section § 1.53(d), by its terms, permits the filing of a continuation or divisional thereunder of only a nonprovisional application that, *inter alia,* is either: (1) Complete as defined by § 1.51(b) and filed on or after June 8, 1995 or; (2) resulted from entry into the national stage of an international application in compliance with 35 U.S.C. 371 filed on or after June 8, 1995. While § 1.53(d) and § 1.129(a) both provide for the continued prosecution of an application, these sections are distinct in that they apply to a virtually mutually exclusive class of applications and have separate requirements (*e.g.,* a request for a § 1.53(d) application may be filed subsequent to the filing of an appeal brief, so long as the request is filed before the earliest of: (1) Payment of the issue fee on the prior application, unless a petition under § 1.313(b)(5) is granted in the prior application; (2) abandonment of the prior application; or (3) termination of proceedings on the prior application).

*Comment 22:* One comment suggested that the rules of practice permit the execution of copies of an oath or declaration by fewer than all of the inventors, without cross-reference to the other copies to facilitate contemporaneous executions by geographically separated inventors.

*Response:* The suggestion is not adopted. Section 1.63(a)(3) requires that an oath (or declaration), *inter alia,* identify each inventor. The rules of practice permit inventors to execute separate oaths (or declarations), so long as each oath (or declaration) sets forth all of the inventors (the necessary cross-reference). That is, § 1.63(a)(3) prohibits the execution of separate oaths (or declarations) in which each oath (or declaration) sets forth only the name of the executing inventor. An amendment to the rules of practice to permit an inventor to execute an oath or declaration that does not set forth each inventor would not only lead to confusion as to the inventorship of an application, but would be inconsistent with the requirement in 35 U.S.C. 115 that the applicant make an oath (or declaration) that the applicant believes himself (or herself) to be the original and first inventor of the subject matter for which a patent is sought, as the oaths or declarations would conflict as to the inventorship of the application.

*Comment 23:* Several comments suggested that the statement required under 35 U.S.C. 120 in a continued prosecution application will be confusing as the continued prosecution

PHILIPS-SCHUBERT018833

application will have the same application number as the prior application. One comment indicated that this will cause confusion: (1) As to which application is being referenced in a 35 U.S.C. 120 statement in the divisional application when a divisional application under § 1.53(b) and a continued prosecution application filed under § 1.53(d) are filed from the same prior application; and (2) in docketing applications as most commercially available software identify applications by application number. Another comment questioned what sentence was required pursuant to § 1.78(a)(2) in a continued prosecution application.

Response: 35 U.S.C. 120 provides that an application may obtain the benefit of the filing date of an earlier filed application if, *inter alia*, the application "contains or is amended to contain a specific reference to the earlier filed application." Section 1.78(a) requires that this specific reference be in the first sentence of the specification and identify each earlier filed application by application number or international application number and international filing date and relationship of the applications. Thus, while a "specific reference to the earlier filed application" is a requirement of statute (35 U.S.C. 120), the particulars of this specific reference (by application number, filing date, and relationship) is a requirement of regulation (§ 1.78(a)), not the patent statute.

The purpose of the "specific reference" requirement of 35 U.S.C. 120 is to provide notice to the public of the filing date upon which a patentee may rely to support the validity of the patent:

[35 U.S.C. 120] embodies an important public policy. The information required to be disclosed is information that would enable a person searching the records of the Patent Office to determine with a minimum of effort the exact filing date upon which a patent applicant is relying to support the validity of his application or the validity of a patent issued on the basis of one of a series of applications. In cases such as this, in which two or more applications have been filed and the validity of a patent rests upon the filing date of an application other than that upon which the patent was issued, a person, even if he had conducted a search of the Patent Office records, could unwittingly subject himself to exactly this type of infringement suit unless the later application adequately put him on notice that the applicant was relying upon a filing date different from that stated in the later application.

*Sampson* v. *Ampex Corp.*, 463 F.2d 1042, 1045, 174 USPQ 417, 419 (2d Cir. 1972); *see also Sticker Indus. Supply Corp.* v. *Blaw-Knox Co.*, 405 F.2d 90, 93, 160 USPQ 177, 179 (7th Cir. 1968)("Congress may well have thought

that [35 U.S.C.] 120 was necessary to eliminate the burden on the public to engage in long and expensive search of previous applications in order to determine the filing date of a later patent * * *. The inventor is the person best suited to understand the relation of his applications, and it is no hardship to require him to disclose this information").

To reduce the delay in processing a continued prosecution application, the Office will maintain in its records (*e.g.*, in the Patent Application Locating and Monitoring (PALM) records for an application) for identification purposes the application number and filing date of the prior application. Thus, in a continued prosecution application, the application number of the continued prosecution application will be the application number of the prior application, and the filing date indicated on any patent issuing from a continued prosecution application will be the filing date of the prior application (or, in a chain of continued prosecution applications, the filing date of the application immediately preceding the first continued prosecution application in the chain). In addition, as a continued prosecution application will use the file wrapper of the prior application, the prior application will be available upon inspection of the continued prosecution application.

Unless excepted from § 1.78(a)(2), the first sentence of a continued prosecution application would consist of a reference to that application as a continuation or divisional of an application having the identical application number and the effective filing date of (the filing date to be printed on any patent issuing from) the continued prosecution application. Such a sentence would provide no useful information to the public.

Therefore, § 1.53(d)(7) as adopted provides that a request for an application under § 1.53(d) is a specific reference under 35 U.S.C. 120 to every application assigned the application number identified in such request, and § 1.78(a)(2) as adopted provides that the request for a continued prosecution application under § 1.53(d) is the specific reference under 35 U.S.C. 120 to the prior application. That is, the continued prosecution application includes the request for an application under § 1.53(d) (§ 1.53(d)(2)(iv)), and the recitation of the application number of the prior application in such request (as required by § 1.53(d)) is the "specific reference to the earlier filed application" required by 35 U.S.C. 120. No further amendment to the specification is required by 35 U.S.C.

120 or § 1.78(a) for a continued prosecution application for such continued prosecution application to contain the required specific reference to the prior application, as well as any other application assigned the application number of the prior application (*e.g.*, in instances in which a continued prosecution application is the last in a chain of continued prosecution applications).

Where an application claims a benefit under 35 U.S.C. 120 of a chain of applications, the application must make a reference to the first (earliest) application and every intermediate application. *See Sampson*, 463 F.2d at 1044–45, 174 USPQ at 418–19; *Sticker Indus. Supply Corp.*, 405 F.2d at 93, 160 USPQ at 179; *Hovlid* v. *Asari*, 305 F.2d 747, 751, 134 USPQ 162, 165 (9th Cir. 1962); *see also* MPEP 201.11. In addition, every intermediate application must also make a reference to the first (earliest) application and every application after the first application and before such intermediate application.

In the situation in which there is a chain of continued prosecution applications, each continued prosecution application in the chain will, by operation of § 1.53(d)(7), contain the required specific reference to its immediate prior application, as well as every other application assigned the application number identified in such request. Put simply, a specific reference to a continued prosecution application by application number and filing date will constitute a specific reference to: (1) The non-continued prosecution application originally assigned such application number (the prior application as to the first continued prosecution application in the chain); and (2) every continued prosecution application assigned the application number of such non-continued prosecution application.

Where the non-continued prosecution application originally assigned such application number itself claims the benefit of a prior application or applications under 35 U.S.C. 120, 121, or 365(c), § 1.78(a)(2) continues to require that such application contain in its first sentence a reference to any such prior application(s). As a continued prosecution application uses the specification of the prior application, such a specific reference in the prior application (as to the continued prosecution application) will constitute such a specific reference in the continued prosecution application, as well as every continued prosecution application in the event that there is a

PHILIPS-SCHUBERT018834

chain of continued prosecution applications.

Where an applicant in an application filed under § 1.53(b) seeks to claim the benefit of an application filed under § 1.53(d) under 35 U.S.C. 120 or 121 (as a continuation, divisional, or continuation-in-part), § 1.78(a)(2) requires a reference to the continued prosecution application by application number in the first sentence of such application. Section 1.78(a)(2) has been amended to also provide that "[t]he identification of an application by application number under this section is the specific reference required by 35 U.S.C. 120 to every application assigned that application number." Thus, where a referenced continued prosecution application is in a chain of continued prosecution applications, this reference will constitute a reference under 35 U.S.C. 120 and § 1.78(a)(2) to every continued prosecution application in the chain as well as the non-continued prosecution application originally assigned such application number.

Therefore, regardless of whether an application is filed under § 1.53(b) or (d), a claim under 35 U.S.C. 120 to the benefit of a continued prosecution application is, by operation of § 1.53(d)(7) and § 1.78(a)(2), a claim to every application assigned the application number of such continued prosecution application. In addition, applicants will not be permitted to choose to delete such a claim as to certain applications assigned that application number (e.g., for patent term purposes).

Finally, while it is recognized that using a common application number (and file wrapper) for a continued prosecution application and its prior application (which may also be a continued prosecution application) will necessitate docketing modifications (as well as the Office's PALM system), the burden of such modifications is outweighed by the benefits that will result from the elimination of the initial processing of such applications.

*Comment 24:* One comment suggested that the phrase "now refiled" be used in lieu of "now abandoned" to reflect the status of the prior application.

*Response:* Under 35 U.S.C. 120, the status of an application is one of three conditions: (1) pending; (2) patented; or (3) abandoned. *See In re Morganroth,* 6 USPQ2d 1802, 1803 (Comm'r Pat. 1988). As the filing of a continued prosecution application under § 1.53(d) operates to expressly abandon the prior application under § 1.53(d)(2)(v), the status of the prior application is appropriately designated as "abandoned."

*Comment 25:* Several comments suggested that the proposed continued prosecution application practice be made applicable in instances in which the prior application was filed prior to June 8, 1995, to expedite the prosecution of such applications.

*Response:* Permitting the continued prosecution application practice to be applicable in instances in which the prior application was filed prior to June 8, 1995, would result in confusion as to whether the patent issuing from the continued prosecution application is entitled to the provisions of 35 U.S.C. 154(c). As the continued prosecution application practice was not in effect prior to June 8, 1995, no patent issuing from a continued prosecution application is entitled to the provisions of 35 U.S.C. 154(c).

As discussed *supra,* the application number of a continued prosecution application will be the application number of the prior application, and the filing date indicated on any patent issuing from a continued prosecution application will be the filing date of the prior application (or, in a chain of continued prosecution applications, the filing date of the application immediately preceding the first continued prosecution application in the chain). Thus, any patent issuing from a continued prosecution application, where the prior application was filed prior to June 8, 1995, will indicate that the filing date of the application for that patent was prior to June 8, 1995, which will confuse the public (and possible the patentee) into believing that such patent is entitled to the provisions of 35 U.S.C. 154(c).

The Office has implemented § 532(a)(2)(A) of Pub. L. 103–465 in § 1.129(a) to conclude the examination of applications pending at least two years as of June 8, 1995, taking into account any reference made in such application to any earlier filed application under 35 U.S.C. 120, 121, and 365(c). Further examination of any application may be obtained *via* the filing of a continuing application under § 1.53(b). Requiring applications filed prior to June 8, 1995, that are not eligible for the transitional procedure set forth in § 1.129(a) to obtain further examination *via* the filing of a continuing application under § 1.53(b) is a reasonable requirement to avoid confusion as to whether a patent issuing from a continued prosecution (§ 1.53(d)) application is entitled to the provisions of 35 U.S.C. 154(c).

*Comment 26:* One comment suggested that the phrase "most immediate prior national application" rather than "prior application" was confusing. The comment further stated that if the prior application was one filed under § 1.62, there is no copy in that complete application of the (oath or) declaration filed in the application under § 1.62.

*Response:* The phrase "most immediate prior national application for which priority is claimed under 35 U.S.C. 120, 121 or 365(c)" is changed to "prior application." An application under §§ 1.53(d), 1.60, or 1.62 must ultimately be a continuing application of an application filed under § 1.53(b). Where the prior application is an application under § 1.60, the oath or declaration is the copy of the oath or declaration from the prior application *vis-à-vis* the application under § 1.60 submitted in accordance with § 1.60(b)(2). Where the prior application is an application under §§ 1.62 or 1.53(d), the oath or declaration is the oath or declaration from the prior application *vis-à-vis* the application under §§ 1.62 or 1.53(d). Where there is a chain of applications under §§ 1.62 or 1.53(d) preceding the prior application to an application under § 1.53(d), the oath or declaration of the prior application will be the oath or declaration of the application under §§ 1.53 or 1.60 immediately preceding the chain of applications under §§ 1.62 or 1.53(d), as each application in the chain of applications under §§ 1.62 or 1.53(d) utilizes the oath or declaration of the prior application.

*Comment 27:* One comment suggested that applications filed under § 1.53(d) should be taken up as amended applications, rather than as newly filed applications.

*Response:* The comment implies that taking up a continued prosecution application as an amended application may result in the examiner acting on the application in a more timely manner than if the application were accounted for as a new application. The matter is under consideration along with other administrative issues, and a decision shall be made in due course.

*Comment 28:* One comment suggested that § 1.129(a) be amended so as not to be limited to applications under final rejection, such that an applicant in an application in which a notice of allowance under § 1.311 has been mailed may obtain entry of an information disclosure statement without regard to the requirements of § 1.97(d).

*Response:* The Notice of Proposed Rulemaking did not propose to amend § 1.129(a). While the language of § 532(a)(2)(A) of Pub. L. 103–465 does not expressly exclude the further examination of an application that has been allowed (as opposed to an

PHILIPS-SCHUBERT018835

application under a final rejection), § 102(d) of Pub. L. 103–465 provides that "[t]he statement of administrative action approved by the Congress under section 101(a) shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." The statement of administrative action specifies that such further examination is to facilitate the completion of prosecution of applications pending before the Office, and to permit applicants to present a submission after the Office has issued a final rejection on an application. *See* H.R. Rep. 826(i), 103rd Cong., 2nd Sess. 1005–06, *reprinted* in 1984 U.S.C.C.A.N. 3773, 4298.

Upon mailing of a notice of allowance under § 1.311, prosecution of an application before the Office is concluded. The proposed amendment to obtain further examination pursuant to § 1.129(a) after allowance would nullify (rather than facilitate) the completion of prosecution of the above-identified application, and, as such, would be inconsistent with the purpose for the provisions of § 532(a)(2)(A) of Pub. L. 103–465.

*Comment 29:* One comment questioned how the filing of a continued prosecution application would result in less delay than the filing of a continuing application under § 1.53(b), as a continued prosecution application would be subject to pre-examination processing delays.

*Response:* The Office will not issue a new filing receipt for a continued prosecution application under § 1.53(d). *See* § 1.54(b). By not issuing a filing receipt for a continued prosecution application, the Office will be able to perform the pre-examination of any continued prosecution application in the examining group to which the prior application was assigned. Likewise, § 1.6(d) has been amended to permit an applicant to file a continued prosecution application under § 1.53(d) by facsimile, and the use of this means of filing a continued prosecution application will avoid the delay inherent in routing an application (or any paper) from the mailroom to the appropriate examining group. These provisions will enable the Office to process a continued prosecution application in the manner that a submission under § 1.129(a) is processed.

*Comment 30:* One comment questioned whether the filing date of a continued prosecution application is the

filing date for determining patent term, or is significant only in establishing copendency. Another comment questioned what filing date was relevant for determining patent term.

*Response:* Notwithstanding that a continued prosecution application is assigned the application number of the prior application, the filing date of the continued prosecution application is the date on which the request for such continued prosecution application was filed (§ 1.53(d)). While the filing date of the continued prosecution application is relevant to establishing the copendency required by 35 U.S.C. 120 and § 1.78(a) between the continued prosecution application and the prior application, the filing date of a continued prosecution application will never be relevant to the term under 35 U.S.C. 154(b) of any patent issuing from the continued prosecution application.

Any continued prosecution application under § 1.53(d) will be filed on or after June 8, 1995, and will claim the benefit of an earlier application as a continuation or divisional application. Section 1.53(d)(7) specifically provides that:

A request for an application under this paragraph is the specific reference required by 35 U.S.C. 120 to every application assigned the application number identified in such request. No amendment in an application under this paragraph may delete this specific reference to any prior application.

Thus, an application under § 1.53(d) cannot be amended to delete the specific reference to the prior application, as well as the specific reference to any application to which the prior application contains a specific reference under 35 U.S.C. 120, 121, and 365(c). As an application under § 1.53(d) will also contain a specific reference to at least one other application under 35 U.S.C. 120, 121, and 365(c), the expiration date under 35 U.S.C. 154(b)(2) of any patent issuing from the application under § 1.53(d) will be based upon the filing date of the prior application (or the earliest application to which the prior application contains a specific reference under 35 U.S.C. 120, 121, and 365(c)).

*Comment 31:* One comment argued that the Office should address not only the filing requirements for continuing applications, but also the cause of the filing of continuing applications. The comment specifically argued that the current second action final practice should be reevaluated as an applicant no longer has an incentive to delay the prosecution of an application due to Pub. L. 103–465.

*Response:* The suggestion is being taken under advisement as part of a comprehensive effort by the Office to reengineer the entire patent process. However, it should be noted that any changes to the current second action final practice to provide additional examination of an application prior to a final Office action would necessitate a corresponding increase in patent fees.

*Comment 32:* One comment suggested that the Office simply eliminate the "true copy" requirement of § 1.60, rather than add new provisions permitting the use of a copy of the oath or declaration of a prior application. The comment also suggested that the Office simply amend § 1.62 to eliminate the requirement that the Office assign a new application number to the application, rather than add a new § 1.53(d).

*Response:* The amendments to § 1.53 do not simply make minor changes to §§ 1.60 and 1.62. Sections 1.60 and 1.62 are anachronisms that have outlived their usefulness. A significant number of applications filed under § 1.60 do not meet the requirements of § 1.60 (and, as such are improper), but would be proper under § 1.53 (in the absence of a reference to § 1.60). The elimination of § 1.60 will result in a reduction in the Office's burden in treating and the applicant's burden in correcting these improper applications under § 1.60, as such applications would generally have been proper applications if filed under § 1.53 (without a reference to § 1.60). Section 1.63(d) retains most of the benefits of § 1.60, but eliminates the filing "traps" of § 1.60.

Section 1.62 practice also causes problems concerning its prohibition against including a new or substitute specification, and its permitting the filing of a continuation-in-part. To avoid continued prosecution application practice under § 1.53(d) being confused with the former file-wrapper-continuation practice under § 1.62, the Office has deemed it advisable to use a new § 1.53(d) rather than § 1.62 in regard to continued prosecution application practice.

*Comment 33:* One comment stated that the Office should anticipate the filing of applications containing a reference to § 1.60 or § 1.62 for some period.

*Response:* That applications containing a reference to §§ 1.60 or 1.62 will continue to be filed has been anticipated. The treatment of such applications is discussed *infra* with respect to the elimination of §§ 1.60 and 1.62.

*Comment 34:* One comment stated that the safeguard in § 1.60 concerning

PHILIPS-SCHUBERT018836

the filing of an application lacking all of the pages of specification or sheets of drawings of the prior application has not been retained in § 1.53(b). The comment suggested that § 1.53 contain a presumption that a continuation or divisional be presumed, absent evidence to the contrary, to be the filing of an application identical to the prior application.

*Response:* The Court of Customs and Patent Appeals (CCPA) has held that a mere reference to another application, patent, or publication is not an incorporation of anything therein into the application containing such reference. *See In re de Seversky,* 474 F.2d 671, 177 USPQ 144 (CCPA 1973); *see also Dart Industries* v. *Banner,* 636 F.2d 684, 207 USPQ 273 (CCPA 1980)(related decision). These decisions relied upon *In re Lund,* 376 F.2d 982, 153 USPQ 625 (CCPA 1967), which considered the incorporation by reference issue in the context of whether a prior art patent adequately incorporated by reference a prior application. The court, in *Lund,* specifically stated:

There is little in the term "continuation-in-part" which would suggest to the reader of the patent that a disclosure of the nature of Example 2 is present in the earlier application and should be considered a part of the patent specification. Thus, we cannot agree that the subject matter of claim 3 is tacitly "described" in the Margerison patent within the meaning of § 102(e).

*Id.* at 989, 153 USPQ 631–32 (footnote discussing the definition of "continuation-in-part" as set forth in MPEP 201.08 omitted). While the holdings in *Dart Industries, de Seversky* and *Lund* appear to be based upon the definitions of the various categories of continuing applications set forth in the MPEP (and thus could be changed by a revision to the MPEP), the Office is not at this time inclined to disturb settled law in this area.

Nevertheless, an applicant may incorporate by reference the prior application by including, in the continuing application-as-filed, a statement that such specifically enumerated prior application or applications are "hereby incorporated herein by reference." The inclusion of this incorporation by reference of the prior application(s) will permit an applicant to amend the continuing application to include any subject matter in such prior application(s), without the need for a petition.

*Section 1.54*

Section 1.54(b) is amended to add the phrase "unless the application is an application filed under § 1.53(d)." To minimize application processing delays in applications filed under § 1.53(d), such applications will not be processed by the Office of Initial Patent Examination as new applications.

No comments were received regarding the proposed change to § 1.54.

*Section 1.55*

Section 1.55(a) is amended to remove the requirement that the statement be verified in accordance with the change to §§ 1.4(d)(2) and 10.18.

No comments were received regarding the proposed change to § 1.55.

*Section 1.59*

Section 1.59 is amended: (1) By revising the title to indicate that expungement of information from an application file would come under this section; (2) by revising the existing paragraph and designating it as paragraph (a)(1); and (3) by adding paragraphs (a)(2), (b) and (c). Section 1.59(a)(1) retains the general prohibition on the return of information submitted in an application, but no longer limits that prohibition to an application that has been accorded a filing date under § 1.53. The portion of the paragraph relating to the Office furnishing copies of application papers has been shifted to new paragraph (c). Section 1.59(a)(2) makes explicit that information, forming part of the original disclosure (*i.e.,* written specification including the claims, drawings, and any preliminary amendment specifically incorporated into an executed oath or declaration under §§ 1.63 and 1.175) will not be expunged from the application file.

Section 1.59(b) provides an exception to the general prohibition of paragraph (a) on the expungement and return of information and would allow for such when it is established to the satisfaction of the Commissioner that the requested expungement and return is appropriate. Section 1.59(b) covers the current practice set forth in MPEP 724.05 where information is submitted as part of an information disclosure statement and the submitted information has initially been identified as trade secret, proprietary, and/or subject to a protective order and where applicant may file a petition for its expungement and return but that will be granted upon a determination by the examiner that the information is not material to patentability. Any such petition should be submitted in reply to an Office action closing prosecution so that the examiner can make a determination of materiality based on a closed record. Any petition submitted earlier than close of prosecution may be dismissed as premature or returned unacted upon. In the event pending legislation for pre-grant publication of applications, which provides public access to the application file, is enacted, then the timing of petition submissions under this section will be reconsidered.

Petitions to expunge were formerly considered under § 1.182, with the Office of Petitions consulting with the examiner on the materiality of the information at issue prior to rendering a decision. A possible result of the amendment to § 1.59 would be to have petitions under § 1.59 to expunge simply decided by the examiner who determines the materiality of the information.

*Comment 35:* One comment suggested that petitions to expunge under § 1.59 should be decided by Group Directors or officials in the Office of Petitions, rather than by examiners. The comment argued that any individual examiner would decide such a petition so rarely that it would be difficult to produce uniform and consistent decisions.

*Response:* The preamble has been amended to reflect that a possible result of the rule change is to have petitions under § 1.59 decided by the examiners. The heart of most petitions to expunge is a determination as to whether the material sought to be expunged is material to examination, a matter that is now referred to examiners prior to a decision on the petition. Given the major role examiners now play in expungement matters, it is not clear why examiners would be rendering inconsistent decisions, particularly as so many other matters are routinely assigned to examiners including petitions under § 1.48. Nevertheless, the comment is not germane to § 1.59 as proposed (or adopted), but concerns the internal Office delegation of such petitions for consideration. Moreover, a petition to expunge a part of the original disclosure would have to be filed under § 1.183 and would continue to be decided in the Office of Petitions.

*Comment 36:* A comment in requesting some examples of things that may be expunged asked whether a design code listing as an appendix in an application may be expunged.

*Response:* The standard set forth in paragraph (b) of § 1.59 permits information other than what is enumerated in paragraph (a) of the section to be expunged if it is established to the satisfaction of the Commissioner that the return of the information is appropriate. The types of information and rationales why the information may be returned are varied and will be evaluated on a case-by-case basis with the basic inquiry being whether the information is material to

PHILIPS-SCHUBERT018837

examination of the application. However, to the extent that an appendix to a specification of an application is considered part of the original disclosure it cannot be expunged from the file under § 1.59(a)(2).

Section 1.59(b) also covers information that was unintentionally submitted in an application, provided that: (1) The Office can effect such return prior to the issuance of any patent on the application in issue; (2) it is stated that the information submitted was unintentionally submitted and the failure to obtain its return would cause irreparable harm to the party who submitted the information or to the party in interest on whose behalf the information was submitted; (3) the information has not otherwise been made public; (4) there is a commitment on the part of the petitioner to retain such information for the period of any patent with regard to which such information is submitted; and (5) it is established to the satisfaction of the Commissioner that the information to be returned is not material information under § 1.56. A request to return information that has not been clearly identified as information that may be later subject to such a request by marking and placement in a separate sealed envelope or container shall be treated on a case-by-case basis. It should be noted that the Office intends to start electronic scanning of all papers filed in an application, and the practicality of expungement from the electronic file created by a scanning procedure is not as yet determinable. Applicants should also note that unidentified information that is a trade secret, proprietary, or subject to a protective order that is submitted in an Information Disclosure Statement may inadvertently be placed in an Office prior art search file by the examiner due to the lack of such identification and may not be retrievable.

Section 1.59(b) also covers the situation where an unintended heading has been placed on papers so that they are present in an incorrect application file. In such a situation, a petition should request return of the papers rather than transfer of the papers to the correct application file. The grant of such a petition will be governed by the factors enumerated above in regard to the unintentional submission of information. Where the Office can determine the correct application file that the papers were actually intended for, based on identifying information in the heading of the papers (*e.g.,* Application number, filing date, title of invention and inventor(s) name(s)), the Office will transfer the papers to the

correct application file for which they were intended without the need of a petition.

Section 1.59(c) retains the practice that copies of application papers will be furnished by the Office upon request and payment of the cost for supplying such copies.

*Section 1.60*

Section 1.60 is removed and reserved.

Section 1.60 is now unnecessary due to the amendment to § 1.63(d) to expressly permit the filing in a continuation or divisional application using a copy of the oath or declaration filed in the prior application, and to provide (§ 1.63(d)(2)) for the filing of a continuation or divisional application by all or by fewer than all the inventors named in a prior application.

See comments relating to § 1.53.

*Section 1.62*

Section 1.62 is removed and reserved.

Section 1.62 is unnecessary due to the addition of § 1.53(d) to permit the filing of a continued prosecution application.

It is anticipated that applications purporting to be applications filed under §§ 1.60 or 1.62 will be filed until the deletion of §§ 1.60 and 1.62 become well known among patent practitioners. An application purporting to be an application filed under § 1.60 will simply be treated as a new application filed under § 1.53 (*i.e.,* the reference to § 1.60 will simply be ignored).

Applications purporting to be an application filed under § 1.62 will be treated as continued prosecution applications under § 1.53(d), and those applications that do not meet the requirements of § 1.53(d) (*e.g.,* continuation-in-part applications or continuations or divisional of applications filed before June 8, 1995) will be treated as improper continued prosecution applications under § 1.53(d). Such an improper application under § 1.53(d) may be accepted and treated as a proper application under § 1.53(b) by way of petition under § 1.53(e) (and submission of the $130 fee pursuant to § 1.17(i)).

A petition under § 1.53(e) to accept and treat an improper application under § 1.53(d) as a proper application under § 1.53(b) must include: (1) The $130 petition fee; (2) a true copy of the complete application designated as the prior application in the purported § 1.62 application papers; (3) any amendments entered in the prior application; and (4) any amendments submitted but not entered in the prior application and directed to be entered in the purported § 1.62 application papers. In an application purporting to be a

continuation or divisional application under § 1.62, the true copy of the prior application will constitute the original disclosure of the application under § 1.53(b), and any amendments entered in the prior application or not entered in the prior application but directed to be entered in the purported § 1.62 application papers and submitted with the § 1.53(e) petition will be entered in the application under § 1.53(b) and considered by the examiner for new matter under 35 U.S.C. 112, ¶ 1, and 132. In an application purporting to be a continuation-in-part application under § 1.62, the true copy of the prior application, any amendments entered in the prior application or not entered in the prior application but directed to be entered in the purported § 1.62 application papers and submitted with the § 1.53(e) petition, and any preliminary amendment submitted with the purported § 1.62 application will constitute the original disclosure of the application under § 1.53(b).

See comments relating to § 1.53.

*Section 1.63*

Section 1.63(a)(3) is amended to require the post office address to appear in the oath or declaration and to have the requirement from § 1.41(a) for the full names of the inventors placed therein.

*Comment 37:* Two comments raised the issue regarding the continued requirement that both a post office address and a residence be supplied and indicated that the residence is not required by statute, the post office address is sufficient for communication purposes, and that the burden of submitting both far outweighs the infrequent need to contact any particular inventor bypassing counsel so that the residence alone should be sufficient.

*Response:* Under the proposed comment the applicants would still be required to submit either the residence or post office address. To request that they also supply the other or state that both are the same is not seen to be a significant burden as the information is to be supplied on the oath or declaration form that they must sign anyway and spaces can be provided to ensure that the information is supplied. While neither the residence nor the post office address are statutory requirements, the Office requires this information for the applicant's benefit. As more than one person may have the same name, a person's name is often not sufficient to provide a unique identification of the inventor. Thus, the Office also requires an inventor's residence (which is not required to be sufficiently detailed to

PHILIPS-SCHUBERT018838

suffice as a post office address) to specifically identify the person(s) named in the oath or declaration as the inventor(s), which is a common practice for legal documents. The post office address is also required in the event that the Office finds it necessary to directly contact the inventor(s). It is not uncommon for an inventor to revoke a power of attorney or authorization of agent in a paper providing no address for future correspondence from the Office. Also, the Office will need to directly contact the inventor if the Office is notified of the death of a sole attorney or agent of record (MPEP 406).

Section 1.63(d) is amended to: (1) relocate its current language in a new § 1.63(e); and (2) provide that a newly executed oath or declaration is not required under § 1.51(b)(2) and 1.53(f) in a continuation or divisional application filed by all or by fewer than all of the inventors named in a prior nonprovisional application containing an oath or declaration as prescribed by § 1.63, provided that a copy of the executed oath or declaration filed in the prior application is submitted for the continuation or divisional application and the specification and drawings filed in the continuation or divisional application contain no matter that would have been new matter in the prior application. The copy of the oath or declaration must show the signature of the inventor(s) or contain an indication thereon that the oath or declaration was signed (*e.g.*, the notation "'/s/'" on the line provided for the signature).

A continuation or divisional application may be filed under 35 U.S.C. 111(a) using the procedures set forth in § 1.53(b), by providing either: (1) A copy of the prior application, including a copy of the oath or declaration in such prior application, as filed; or (2) a new specification and drawings and a copy of the oath or declaration as filed in the prior application so long as no matter is included in the new specification and drawings that would have been new matter in the prior application. The specification and drawings of a continuation or divisional application is not limited to a reproduction or "true copy" of the prior application, but may be revised for clarity or contextual purposes *vis-à-vis* the prior application in the manner that an applicant may file a substitute specification (§ 1.125) or amend the drawings of an application so long as it does not result in the introduction of new matter. Of course, 35 U.S.C. 115 requires that a supplemental oath or declaration meeting the requirements of § 1.63 be

filed in the continuation or divisional application, if a claim is allowed in the continuation or divisional application which is drawn to subject matter originally shown or described in the prior application but not substantially embraced in the statement of the invention or claims originally presented in the prior application as filed. *See* § 1.67(b).

The patent statute and rules of practice do not require that an oath or declaration include a date of execution, and the Examining Corps has been directed not to object to an oath or declaration as lacking either a recent date of execution or any date of execution. The applicant's duty of candor and good faith including compliance with the duty of disclosure requirements of § 1.56 is continuous and applies to the continuing application.

A new application containing a copy of an oath or declaration under § 1.63 referring to an attached specification is indistinguishable from a continuation or divisional application containing a copy of an oath or declaration from a prior application submitted pursuant to § 1.63(d). Unless an application is submitted with a statement that the application is a continuation or divisional application (§ 1.78(a)(2)), the Office will process such application as a new non-continuing application. Applicants are advised to clearly designate any continuation or divisional application as such to avoid the issuance of a filing receipt that does not indicate that the application is a continuation or divisional.

To continue the practice in § 1.60(b)(4) of permitting the filing of a continuation or divisional application by all or by fewer than all of the inventors named in a prior application without a newly executed oath or declaration, new § 1.63(d)(2) provides that the copy of the oath or declaration submitted for a continuation or divisional application under § 1.63(d) must be accompanied by a statement from applicant, counsel for applicant or other authorized party requesting the deletion of the names of the person or persons who are not inventors in the continuation or divisional application. Where the continuation or divisional application and copy of the oath or declaration from the prior application is filed without a statement from an authorized party requesting deletion of the names of any person or persons named in the prior application, the continuation or divisional application will be treated as naming as inventors the person or persons named in the copy of the executed oath or declaration from the prior application. Accordingly,

if a petition under § 1.48 (a) or (c) was granted in the prior application, an oath or declaration filed in a continuation or divisional application pursuant to § 1.63(d) should be the oath or declaration also executed by the added inventor(s). For situations where an inventor or inventors are to be added in a continuation or divisional application, see § 1.63(d)(5).

The statement requesting the deletion of the names of the person or persons who are not inventors in the continuation or divisional application must be signed by person(s) authorized pursuant to § 1.33(b) to sign an amendment in the continuation or divisional application.

Section 1.63(d)(3) provides for the situation in which the executed oath or declaration of which a copy is submitted for a continuation or divisional application was originally filed in a prior application accorded status under § 1.47. Section 1.63(d)(3)(i) requires a copy of any decision granting a petition to accord § 1.47 status to such application, unless each nonsigning inventor(s) or legal representative (pursuant to § 1.42 or 1.43) has filed an oath or declaration to join in an application of which the continuation or divisional application claims a benefit under 35 U.S.C. 120, 121 or 365(c). Where a nonsigning inventor or legal representative (pursuant to § 1.42 or 1.43) subsequently joins in any application of which the continuation or divisional application claims a benefit under 35 U.S.C. 120, 121 or 365(c), § 1.63(d)(3)(ii) also requires a copy of any oath or declaration filed by an inventor or legal representative to subsequently join in such application.

Section 1.63(d)(4) provides that where the power of attorney (or authorization of agent) or correspondence address was changed during the prosecution of the prior application, the change in power of attorney (or authorization of agent) or correspondence address must be identified in the continuation or divisional application, or the Office may not recognize in the continuation or divisional application the change of power of attorney (or authorization of agent) or correspondence address during the prosecution of the prior application.

A newly executed oath or declaration will continue to be required in a continuation or divisional application naming an inventor not named in the prior application, or a continuation-in-part application, and § 1.63(d)(5) expressly states that a newly executed oath or declaration must be filed in a continuation or divisional application naming an inventor not named in the prior application.

PHILIPS-SCHUBERT018839

New § 1.63(e) provides that a newly executed oath or declaration must be filed in a continuation-in-part application, which application may name all, more, or fewer than all of the inventors named in the prior application, and includes the language relocated from former § 1.63(d) concerning an oath or declaration in a continuation-in-part application.

*Comment 38:* One comment suggested that the practice of permitting the use of an executed oath or declaration of a prior application creates a trap for the unwary in the situation in which an applicant believes in error that no new matter has been added in the "continuation" application and does not file a new declaration.

*Response:* The situation outlined in the comment is less of a trap for the unwary than the situation in which an applicant files a substitute specification and believes in error that no new matter has been added, in that the error in the "continuation" may be corrected by redesignation of the application as a continuation-in-part and the filing of a new oath or declaration. Nevertheless, it remains the applicant's responsibility to review any substitute specification or new specification submitted for a continuation application to determine that it contains no new matter. *See* MPEP 608.01(q). An applicant is advised to simply file a continuing application with a newly executed oath or declaration when it is questionable as to whether the continuing application adds material that would have been new matter if presented in the prior application.

*Comment 39:* One comment suggested that the option of submitting "a copy of an unexecuted oath or declaration, and a statement that the copy is a true copy of the oath or declaration that was subsequently executed and filed to complete * * * the most immediate prior national application for which priority is claimed under 35 U.S.C. 120, 121 or 365(c)" was strange at best as the applicant or representative should have a copy of the oath or declaration that was filed to complete the prior application or could obtain one from Office records.

*Response:* The suggestion is adopted. Section 1.63(d) as adopted provides that: "[a] newly executed oath or declaration is not required under § 1.51(b)(2) and § 1.53(f) in a continuation or divisional application filed by all or by fewer than all of the inventors named in a prior nonprovisional application containing an oath or declaration as prescribed by paragraphs (a) through (c) of this section, provided that a copy of the executed oath or declaration filed in the prior application is submitted for the continuation or divisional application."

*Comment 40:* One comment questioned whether § 1.53 (or § 1.63) is consistent with § 1.48 as to whether the oath or declaration filed in a continuing application adding an inventor must be executed by all of the inventors, or just the added inventor.

*Response:* The oath or declaration filed in a continuing application adding an inventor or a continuation-in-part application must name and be executed by all of the inventors. Sections 1.48 and 1.63(e) are consistent in this regard.

*Comment 41:* One comment questioned whether, in a continuation or divisional application following a chain of continuation or divisional applications, the copy of the executed oath or declaration may be a copy of the oath or declaration filed in the immediate prior application (which may itself be a copy of an oath or declaration from a prior application), or must be a direct copy of the originally executed oath or declaration.

*Response:* Section 1.63(d) requires a copy of the oath or declaration from the prior application. In instances in which the oath or declaration filed in the prior application is itself a copy of an oath or declaration from a prior application, either a copy of the copy of the oath or declaration in the prior application or a direct copy of the original oath or declaration is acceptable, as both are a copy of the oath or declaration in the prior application. *See* § 1.4(d)(1)(ii).

### Section 1.67

Section 1.67 paragraph (b) is amended to change "§ 1.53(d)(1)" to "§ 1.53(f)" for consistency with § 1.53.

No comments were received regarding § 1.67.

### Section 1.69

Section 1.69(b) is amended to remove the requirement that the translation be verified in accordance with the change to §§ 1.4(d)(2) and 10.18. Section 1.69(b) is also amended to clarify the need for a statement that the translation being offered is an accurate translation, as in § 1.52 paragraphs (a) and (d).

Two comments were received in regard to § 1.69 that also raised similar issues in regard to § 1.52, which comments are treated with § 1.52.

### Section 1.78

Section 1.78(a)(1) is amended to remove the references to §§ 1.60 and 1.62 in view of the deletion of §§ 1.60 and 1.62, and to include a reference to an "international application entitled to a filing date in accordance with PCT Article 11 and designating the United States of America." Section 1.78(a)(2) is amended for consistency with the changes to § 1.53, and to provide that "[t]he identification of an application by application number under this section is the specific reference required by 35 U.S.C. 120 to every application assigned that application number."

No comments were received regarding the proposed change to § 1.78.

### Section 1.84

Section 1.84(b) is amended by removing references to the filing of black and white photographs in design applications as unnecessary in view of the reference in § 1.152 to § 1.84(b). Section 1.84 paragraphs (c) and (g) are amended for consistency in regard to the English equivalents (5/8 inch.) for 1.5 cm.

No adverse comments were received regarding the proposed change to § 1.84.

### Section 1.91

The title of § 1.91 is amended to clarify that a certain type of material is not generally admitted in the file record by substitution of "admitted" for "required."

Section 1.91 is also amended to clarify the type of material that is not generally admitted into the file record of an application. Section 1.91(a) specifically requires a petition (with the fee set forth in § 1.17(i)) including an appropriate showing why entry of the model or exhibit into the file record is necessary to demonstrate patentability, unless the model or exhibit: (1) substantially conforms with § 1.52 or § 1.84; or (2) was required by the Office.

Section 1.91 is also amended to state that a model, working model or other physical exhibit, whose submission by applicants is generally not permitted, may be required by the Office if deemed necessary for any purpose in the examination of the application. This language is moved from § 1.92.

*Comment 42:* Several adverse comments were received expressing concern that the addition of the term "exhibits" to the bar against admission of models, unless specifically required by the Office, would prevent applicants from making their best possible case for patentability, and that exhibits would be interpreted by the Office as barring two-dimensional as well as three-dimensional exhibits.

*Response:* The preamble of the proposed rule indicated that the change to the rule is in the nature of a clarification and not a change in practice. Further clarification has been added to the rule by reference to § 1.52

PHILIPS-SCHUBERT018840

or § 1.84 and to the instant discussion of the rule to indicate that the use of the term "exhibits" is in the nature of other three-dimensional models, such as videos, and will not bar two-dimensional exhibits currently being accepted. Additionally, a petition route has been added to the rule that would permit entry of three-dimensional models or exhibits where they are necessary to establish patentability. Section 1.91 is also amended to expressly provide for the filing of a petition thereunder (rather than to require the filing of a petition under § 1.183) such that an applicant may gain entry of a model or exhibit, without a showing of an extraordinary situation where justice requires grant of the relief sought.

The fact that a three-dimensional model or exhibit will not generally be entered in the record absent an appropriate showing does not prevent an applicant from showing the exhibit to the examiner for purposes of clarifying the examiner's understanding of the invention and reducing the model or exhibit to two-dimensional conformance with § 1.52 or § 1.84 for entry of that reduction to the record (which issues are separate and distinct from the questions as to whether the later presented material was originally required for an understanding of the invention and its subsequent addition being subject to a new matter objection under 35 U.S.C. 132).

Due to the unusual difficulties of storage for three-dimensional materials and little demonstrated need for their presence in the file record over what would be provided for *via* petition under § 1.91, it is not seen to be appropriate to permit unrestricted entry of three-dimensional exhibits in the file record.

*Section 1.92*

Section 1.92 is removed and reserved and the language transferred to § 1.91(b) for improved contextual purposes.

No comments were received regarding the proposed change to § 1.92.

*Section 1.97*

Sections 1.97 (c) through (e) are amended by replacement of "certification" by "statement" (see comments relating to § 1.4(d)), and by clarifying the current use of "statement" by the terms "information disclosure."

Section 1.97(e)(2) is further amended to replace "or" by "and" to require that no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of

the person signing the statement, after making reasonable inquiry, no item of information contained in the information disclosure was known to any individual designated in § 1.56(c) more than three months prior to the filing of the information disclosure statement. The use of "and" rather than "or" is in keeping with the intent of the rule as expressed in the MPEP 609(B)(2)(ii), that the conjunction be conjunctive rather than disjunctive. The mere absence of an item of information from a foreign patent office communication was clearly not intended to represent an opportunity to delay the submission of the item when known more than three months prior to the filing of an information disclosure statement to an individual having a duty of disclosure under § 1.56.

No comments were received regarding the proposed change to § 1.97.

*Section 1.101*

Section 1.101 is removed and reserved as relating to internal Office instructions.

*Comment 43:* A number of comments opposed the deletion of the rules that solely govern Office procedure. The reasons given for this opposition are: (1) The Office should subject its procedures to the notice and comment provisions of the Administrative Procedure Act (APA); (2) the inclusion of such procedures in the rules of practice imparts the force and effect of law to such procedures; (3) the greater deference given to procedures set forth in the rules of practice, rather than the MPEP, during court action.

*Response:* The CCPA has held that applicants before the Office are entitled to rely not only on the patent statute and rules of practice, but on the provisions of the MPEP, during the prosecution of an application for patent. *See In re Kaghan*, 387 F.2d 398, 401, 156 USPQ 130, 132 (CCPA 1967). Thus, there is in practice little, if any, benefit to applicants before the Office in having the Office procedure set forth in the rules of practice, rather than the MPEP. In any event, no comment pointed to any specific decision, and the Office is not aware of any decision, in which the result turned on the inclusion of Office procedure in the rules of practice (rather than simply in the MPEP).

Nevertheless, in view of the concern expressed in the comments as to the rules of practice setting forth the fundamentals of the examination of an application, the Office will retain the substance of §§ 1.104 and 1.105 in the rules of practice. *See In re Phillips*, 608 F.2d 879, 883 n.6, 203 USPQ 971, 974 n.6 (CCPA 1979) (although irrelevant to

the result, the Office was criticized for piecemeal examination contrary to §§ 1.104 and 1.105). The substance of §§ 1.104, 1.105, 1.106, 1.107, and 1.109, however, will be combined into § 1.104 paragraphs (a)–(e).

The Office will also retain § 1.351 in the rules of practice, as it has been relied upon as the notice that the Office will provide concerning changes to the rules of practice in 37 CFR Part 1. *See In re Nielson*, 816 F.2d 1567, 1571, 2 USPQ2d 1525, 1527 (Fed. Cir. 1987). Finally, the Office will retain § 1.181 paragraphs (d), (e), and (g) to avoid confusing petition practice, and § 1.325 to avoid confusion as to the requirements for correction of a patent.

The Office, however, will delete §§ 1.101, 1.108, 1.122, 1.184, 1.318, and 1.352 from 37 CFR Part 1. The procedures set forth in §§ 1.101, 1.122, 1.184, and 1.318 do not provide meaningful safeguards to applicants (*e.g.*, § 1.101 does not ensure or give an applicant the right to examination of an application within any reasonably specific time frame). The proscription in § 1.108 is simply an administrative instruction based upon the fact that, unless otherwise publicly available, abandoned applications do not constitute prior art under 35 U.S.C. 102 (and thus 103). Finally, as former § 1.352 included a "whenever required by law" prerequisite, it provided no independent requirement that the Office publish proposed rule changes for comment.

*Section 1.102*

Section 1.102(a) is amended to remove the requirement that the showing be verified in accordance with the change to §§ 1.4(d)(2) and 10.18.

No comments were received regarding the proposed change to § 1.102.

*Section 1.103*

Section 1.103(a) is amended by replacement of "response" with "reply" in accordance with the change to § 1.111.

No comments were received regarding the proposed change to § 1.103.

*Section 1.104*

Section 1.104 is amended to include paragraphs (a) through (e) including the substance of former §§ 1.104, 1.105, 1.106, 1.107, and 1.109. The re-writing of §§ 1.104, 1.105, 1.106, 1.107, and 1.109 as § 1.104 (a) through (e) involves no change in substance.

See comment relating to § 1.101.

PHILIPS-SCHUBERT018841

*Section 1.105*

Section 1.105 is removed and reserved as the subject matter was transferred to § 1.104(b).

See comment relating to § 1.101.

*Section 1.106*

Section 1.106 is removed and reserved as the subject matter was transferred to § 1.104(c).

See comment relating to § 1.101.

*Section 1.107*

Section 1.107 is removed and reserved as the subject matter was transferred to § 1.104(d).

See comment relating to § 1.101.

*Section 1.108*

Section 1.108 is removed and reserved as relating to internal Office instructions.

See comment relating to § 1.101.

*Section 1.109*

Section 1.109 is removed and reserved as the subject matter was transferred to § 1.104(e).

See comment relating to § 1.101.

*Section 1.111*

Section 1.111 is amended to consistently refer to a "reply" to an Office action. The prior section used the term "response" and "reply" in an inconsistent manner and created some confusion. Paragraph (b) of § 1.111 is also amended to explicitly recognize that a reply must be reduced to a writing which must point out the specific distinctions believed to render the claims, including any newly presented claims, patentable. It is noted that an examiner's amendment reducing a telephone interview to writing would comply with § 1.2.

*Comment 44:* One comment asked whether pointing out one distinction is sufficient or must applicant provide an exhaustive list of all distinctions. Additionally, inquiry is made as to whether it is sufficient to point out the impropriety of a rejection under 35 U.S.C. 102 that should have been a rejection under 35 U.S.C. 103, or must a rejection under 35 U.S.C. 103 be anticipated and answered.

*Response:* A distinction should be kept in mind between what is necessary for a reply to be considered sufficient to continue prosecution of the application and what will advance the application to issuance in the most efficient manner. While pointing out only one distinction, such as why a rejection under 35 U.S.C. 102 is inappropriate, would comply with the requirements of § 1.111, advancement of the prosecution of the application would best be served by

pointing out all possible distinctions, so that if the argument for one distinction is not persuasive, another may be. Similarly, anticipation of and argument against a rejection under 35 U.S.C. 103 where a rejection under 35 U.S.C. 102 should have been made under 35 U.S.C. 103 could possibly prevent making of the rejection under 35 U.S.C. 103 by the examiner and an earlier issuance of the application thereby preserving patent term under 35 U.S.C. 154 as amended by Pub. L. 103–465.

*Comment 45:* Three comments pointed to instances where a reply would not necessarily require that distinctions be pointed out, such as: (1) where context and arguments presented make the distinctions clear beyond doubt; (2) where a *prima facie* case has not been established or motivation for modification of a reference is lacking; (3) a secondary reference is from a nonanalogous art improperly combined; or (4) no reference has been applied.

*Response:* The comment has been adopted to the extent that the paragraph (b) of the rule has been amended to refer to "any" rather than "the" applied references. Any argument that would make the distinctions clear beyond doubt would seem to require identification of the distinctions therein. Where a reply contains an argument that motivation for a modification of a reference made by an examiner does not exist, or that a nonanalogous secondary reference has been improperly combined, the identification of the claim element involved and the particular factual basis that makes the modification or combination relating to that claim element inappropriate are necessary elements of a reply. That an applicant considers a rejection, objection, or other requirement in an Office action to be inappropriate does not relieve the applicant of the burden under 35 U.S.C. 133 of prosecuting the application to avoid abandonment.

*Comment 46:* A comment suggested that the requirement for supplying claim distinctions for a newly presented claim is at odds with the Office's burden in the first instance of explaining any objection or rejection of an applicant's claim, and that the existing requirement that an applicant distinctly and specifically point out the errors in the examiner's action and reply to every ground of objection and rejection are sufficient without the added language. Another comment noted that it is believed that the rule already requires that specific distinctions be supplied and questions what new requirements are being added by that additional language.

*Response:* To the extent that the already existing language would require that claim distinctions be presented, the added language is seen to clarify what is required of an applicant in replying to an Office action and is not seen to be at odds with the Office's burden in first going forward with a rejection of the claims. Once a claim is rejected, there is a duty on applicants under § 1.111 to provide an appropriate reply as defined therein for applicant to be entitled to reconsideration or further examination.

*Section 1.112*

Section 1.112 is amended to remove as unnecessary the statement that "any amendments after a second Office action must ordinarily be restricted to the rejection, objections or requirements made in the office action" to reflect actual practice, in which amendments after the second action need not be restricted to the rejection or the objections or requirements set forth in an Office action. The heading of § 1.112 is also amended to add "before final action" to clarify that such reconsideration does not apply after a final Office action.

No comments were received regarding the proposed change to § 1.112.

*Section 1.113*

Section 1.113(a) is amended to add "by the examiner" after "examination or consideration," change "objections to form" to "objections as to form" for clarity, and replace "response" with "reply" in accordance with the change to § 1.111.

Section 1.113(b) is amended to change "clearly stating the reasons therefor" to "clearly stating the reasons in support thereof" for clarity.

*Comment 47:* A number of comments argued that first action final practice should be eliminated without regard to an amendment to § 1.116 as: (1) 35 U.S.C. 132 does not authorize first action final practice; and (2) the filing fee paid in a continuing application should entitle an applicant to an examination and reexamination in the continuing application.

*Response:* The argument that 35 U.S.C. 132 does not authorize first action final practice has been considered by the Office and rejected in *In re Bogese,* 22 USPQ2d 1821 (Comm'r Pat. 1992). Specifically, continuing applications have historically been considered part of a continuous proceeding in regard to the prior application. *Id.* at 1827. First action final practice denies an applicant the delay inherent in an additional Office action in a continuation application, thus compelling the applicant to draft

PHILIPS-SCHUBERT018842

claims in a continuation application in view of the prosecution history of the parent application (*i.e.*, the rejections and prior art of record in the parent application), and thus make a *bona fide* effort to define the issues for appeal or allowance. *Id.* at 1824–25.

In addition, under the current patent fee structure, a significant portion of the Office's costs of examining patent applications is recovered through issue and maintenance fees. That is, the filing fees required by 35 U.S.C. 41(a) (1)–(4) and § 1.16 for an application do not cover the Office's full costs of examining that application pursuant to 35 U.S.C. 131 and 132. Therefore, the argument that first action final practice is inherently unfair in view of the filing fees paid by the applicant fails to appreciate the current patent fee structure.

Due to the overwhelming opposition to the proposed changes to § 1.116 to simplify after final practice, the proposed change to § 1.113 to eliminate first action final practice and the proposed changes to § 1.116 to simplify after final practice are not adopted in this Final Rule. The Office will give further consideration to the elimination of first action final practice.

*Comment 48:* One comment suggested that § 1.113 should be clarified to reflect the intent of the rule change that a first action final rejection not issue in a continuation application.

*Response:* The proposed change to § 1.113 to prohibit a first action final rejection is not being adopted.

### Section 1.115

Section 1.115 has been removed and reserved, rather than amended to contain the material of former §§ 1.117 through 1.118, 1.123 and 1.124. The subject matter proposed to be included in § 1.115 has been transferred to § 1.121. The change does not constitute a change in substance; the material of the deleted sections has simply been rearranged and edited for clarity and contextual purposes in § 1.121. The reference in § 1.115(b)(2) relating to the rejection of claims containing new matter has not been retained in § 1.121 as unnecessary.

*Comment 49:* One comment recognizing that the subject matter of § 1.118 is transferred to § 1.115 (now § 1.121) noted that the particular material of the second and third sentences of paragraph (a) of § 1.118(a) was not so transferred and should be.

*Response:* While the exact language of the second and third sentences of paragraph (a) of § 1.118 was not transferred to 1.121 (§ 1.115 as originally proposed), the concept is

retained in § 1.121, paragraphs (a)(6), (b)(5), and (c)(1), in condensed form.

*Comment 50:* One comment objected to the requirement of paragraph (d) of § 1.115 (now § 1.121) where a disclosure must be amended to secure correspondence between the claims, the specification and the drawings. Forcing the specification to parrot the language of new claims, where only new claims originally use a term not found in the original disclosure and in the original claims, is said to impose an undue burden on applicant and jeopardize the validity of all the claims if the new term is found to be new matter.

*Response:* The comment does not explain why a specification containing a later added expression subsequently found to contain new matter will adversely affect claims that do not contain that expression, particularly if a portion of the specification is retained that provides support for claims not containing that expression. Additionally, the requirement being criticized is not a new requirement but was material transferred from § 1.117. However, the comment was adopted in-part in that § 1.121, paragraphs (a)(5) and (b)(4), require only "substantial correspondence" between the claims, the remainder of the specification, and the drawings.

*Comment 51:* One comment suggested that the term "sketch" in paragraph (e) of § 1.115 (now § 1.121) be broadened to "drawing."

*Response:* Sections 1.121(a)(3)(ii) and 1.121(b)(3)(ii) recite sketch, which has been interpreted by the Office to include a copy. The use of sketch is seen to be the broader term in allowing a handwritten alteration of a copy of the previously submitted drawing to be done without the need for a color copy being obtained.

*Comment 52:* One comment suggested that paragraph (f) of § 1.115 (now § 1.121), requiring no interlineations to appear in a clause as finally presented, is inconsistent with the requirements of § 1.121 requiring brackets and underlining of the subject matter deleted and added.

*Response:* The comment was adopted by clarifying § 1.121(a)(iii) as adopted by reciting that the interlineation prohibition relates to previous amendments being depicted in a subsequent amendment, and to limit its applicability to applications other than reissue applications (thereby also excluding reexamination proceedings) in that all changes from the patent are required to be shown in reissue applications and reexamination proceedings.

### Section 1.116

Section 1.116 is amended by adding the phrase "or appeal" to its heading. This change clarifies the current practice that paragraphs (b) and (c) apply to amendments filed after an appeal, regardless of whether the application was subject to a final rejection prior to the appeal.

Section 1.116(a) is also amended for clarity to limit amendments after a final rejection or other final action (§ 1.113) to those amendments cancelling claims or complying with any requirement of form set forth in a previous Office action, and replaces the phrase "any proceedings relative thereto" with "any related proceedings" for clarity. The amendment does not represent a change in practice under § 1.116(a) as was originally proposed, but merely a clarification of when an applicant is entitled to entry of an amendment under § 1.116(a).

*Comment 53:* Almost every comment relating to the proposed change to § 1.116 to limit entry of amendments after a final Office action based on simplification of issues for appeal opposed the change. The various rationales included: (1) A liberal practice by examiners in entering amendments after final rejection based on a willingness to engage in significant negotiations after final rejection; (2) an increased burden on the Board of Patent Appeals and Interferences (Board); (3) a loss of potential patent term under 35 U.S.C. 154 if refiling an application was routinely required; (4) a loss of clarity by applicant and the examiner of the issues involved, in that it is frequently only after the second action that the issues become clarified, particularly as counsel are not aware of the art that may actually be applied against the claims and therefore do not submit claims that can read over such art; (5) to the extent the need to enter amendments causes refiling of an application, greater resources from the Office are required as opposed to simply entering the amendment in the prior application; (6) there will be an increase in the requests for interviews after first action; (7) the change represents encouragement for examiners to cut down on papers entered particularly in view of the crediting system; and (8) the proposal is not helpful to applicant and is only a revenue generator.

Several alternative suggestions were made including: (1) A fee to have amendments after final entered as a matter of right; (2) discretion for examiners to enter any amendment should be explicitly stated in the rule; (3) consider substantive amendments if

PHILIPS-SCHUBERT018843

submitted at least one month in advance of the end of the reply period; (4) eliminate applicant's concern for expedited handling of § 1.116 amendments by having a new period for appealing or refiling; (5) entry of amendment to solely correct rejections under 35 U.S.C. 112, ¶ 2, should be permitted; (6) first after final submission permitted entry under simplification of issues standard and any subsequent submission would only be permitted under standard as proposed without simplification of issues available; (7) merging of a dependent claim into an independent claim ought to be explicitly permitted as a matter of right; (8) provide a standard of entry dependent upon good and sufficient reason as to why the amendment after final was not made earlier; (9) permit consideration of the amendment for allowable subject matter to save applicant cost of refiling for such determination; and (10) change should be linked with a prohibition on applying a new reference in a final rejection.

*Response:* In view of the issues raised and the alternative suggestions presented, it has been determined that further study is required. The comments have been adopted *solely* to the extent that the proposed change to delete simplification of issues for purpose of appeal, as a basis for entry of an amendment after final rejection, will not be implemented at this time.

### Section 1.117

Section 1.117 is removed and reserved as the subject matter was transferred to § 1.121.

No comments were received regarding the proposed change to § 1.117.

### Section 1.118

Section 1.118 is removed and reserved and its subject matter transferred to § 1.121.

See first comment related to § 1.115.

### Section 1.119

Section 1.119 is removed and reserved as duplicative of the provisions of §§ 1.111 and 1.121.

No comments were received regarding the proposed change to § 1.119.

### Section 1.121

Section 1.121, paragraphs (a) through (f), are replaced with paragraphs (a) through (c), which separately treat amendments in non-reissue nonprovisional applications (paragraph (a)), amendments in reissue applications (paragraph (b)), and amendments in reexamination proceedings (paragraph (c)). The intent of the changes is to

retain amendment practice in regard to non-reissue applications prior to the changes proposed in the Notice of Proposed Rulemaking and to make final the changes in amendment practice in regard to reissue applications proposed in the Notice of Proposed Rulemaking, except for requiring copies of all claims as of the date of submission of an amendment and a constructive cancellation in their absence. Additionally, while retaining the previous amendment practice in non-reissue applications, the regulations have been clarified by deletion of §§ 1.115, 1.117 through 1.118, 1.123, and 1.124 and placement of subject matter thereof in § 1.121.

*Comment 54:* Most comments received on the proposed change in amendment practice as it relates to non-reissue applications to bring it into line with reissue and reexamination amendment practices were very negative. In particular, the proposed changes to present a complete copy of the claims when any amendment to the claims is made, and to hold a constructive cancellation for any claim copy not presented were alarming. However, similar comments were not received in regard to the proposed changes to bring reissue and reexamination practice closer together.

*Response:* The comments were adopted in that the proposed changes, other than clarifications of current practice, will not be implemented now and further study will be undertaken to include suggestions presented in regard to this rule.

*Comment 55:* Several comments offered suggestions and requested clarifications: (1) Whether this was an attempt to push the practice closer to PCT where substitute pages are used; (2) use of different markings such as strikeouts of word processors; (3) only require complete copy of claims at issue; (4) only have a status listing of all claims not complete copy with each response; (5) continuations or divisions should be filed showing markups; (6) require only that new claims pages be substituted; (7) objection to the submission of a separate complete set of claims in addition to the amendments being made; (8) some instances separate set may be appropriate and not too much of a burden; and (9) there should be exception, liberal reinstatement, or rebuttable presumption for constructive cancellation if clerical omission.

*Response:* Paragraphs (a) and (b) of § 1.121 each separately treat amendment of the specification (paragraphs (a)(1) and (b)(1)), and of the claims (paragraphs (a)(2) and (b)(2)). In comparing amendment practice to the

specification for non-reissue and reissue applications, all amendments in the reissue application are to be made relative to (*i.e., vis-à-vis*) the specification (including the claims) and drawings of the original patent as of the date of the filing of the reissue application. Changes are shown using underlining and bracketing relative to the patent specification. In addition, the entire paragraph of disclosure with the changes and the entire claim with the changes must be presented, in making the amendment. On the other hand, amendments in a non-reissue application are to be made relative to prior amendments (with underlining and bracketing in a reproduced claim reflecting changes made relative to the prior amendment), and insertions and deletions can be made without reproducing the entire paragraph of disclosure or the entire claim. Further (for a non-reissue application), in amending the text of the disclosure other than the claims, changes are not shown by underlining and bracketing, even where a paragraph of disclosure is reproduced.

Paragraph (a) of § 1.121 relates to amendments in non-provisional applications, other than reissue applications, and retains a reference to § 1.52. Paragraph (a)(1) relates to the manner of making amendments in the specification, other than in the claims. Paragraph (a)(1)(i) requires the precise point in the specification to be indicated where an addition is to be inserted. Paragraph (a)(1)(ii) requires the precise point in the specification to be indicated where a deletion is to be made. This should be compared to addition or cancellation of material from the patent specification in a reissue application (paragraph (b)(1)(ii)) or in a reexamination proceeding (§ 1.530(d)(1)(ii), *e.g.,* by way of a copy of the rewritten material). An amendment containing deletions mixed with additions will be treated according to both paragraphs (a)(1)(i) and (a)(1)(ii). Amendments to the specification, additions or deletions, do not require markings, only identification of an insertion point. However, where the changes made are not readily apparent the applicant may be requested by the examiner to provide an explanation of the changes or a marked up copy showing the changes made. Paragraph (a)(1)(iii) provides that to reinstate matter previously deleted it must be reinstated by a new amendment inserting the matter.

Paragraph (a)(2) of § 1.121 relates to the manner of making amendments in the claims of a non-reissue application.

PHILIPS-SCHUBERT018844

Paragraph (a)(2)(i) permits amendment by instructions to the Office for a deletion, paragraph (a)(2)(i)(A), or for an addition limited to five words in any one claim, paragraph (a)(2)(i)(B). The ability to provide directions to the Office for the handwritten deletion of five words or less for each claim does not encompass deletion of equations, charts or other non-word material. Paragraph (a)(2)(ii) sets forth that a claim may be amended by a direction to cancel the claim, or by rewriting the claim with markings showing material to be added and deleted. Additionally, previously rewritten claims are required to be so marked and not to have interlineations showing amendment(s) previous to the one currently being submitted.

Paragraph (a)(3) of § 1.121 clarifies that amendments to the original application drawings for non-reissue applications are not permitted and are to be made by way of a substitute sheet for each original drawing sheet that is to be amended. The paragraph contains material from cancelled § 1.115.

Paragraph (a)(4) of § 1.121 requires that any amendment presented in a substitute specification must be presented under the provision of this section either prior to or concurrent with the submission of the substitute specification. The paragraph contains material from cancelled § 1.115.

Paragraph (a)(5) of § 1.121 requires amendment of the disclosure in certain situations (*i.e.*, to correct inaccuracies of description and definition) and to secure substantial correspondence. The paragraph contains material from cancelled § 1.117. The previous requirement for "correspondence" has been modified by use of "substantial correspondence." See comments to § 1.115.

Paragraph (a)(6) prohibits the introduction of new matter into the disclosure of a non-reissue, non-provisional application.

Paragraph (b) of § 1.121 applies to amendments in reissue applications. Paragraph (b)(1) of § 1.121 relates to the manner of making amendments to the specification, other than in the claims, in reissue applications. Paragraph (b)(1)(i) requires that amendments including deletions be made by submission of a copy of one or more newly added or rewritten paragraphs with markings, except that an entire paragraph may be deleted by a statement deleting the paragraph without presentation of the text of the paragraph. Paragraph (b)(1)(ii) requires indication of the precise point in the specification where the paragraph which is being amended is located.

When a change in one sentence, paragraph or page results in only format changes to other pages (*e.g.*, shifting of non-amended text to subsequent pages) not otherwise being amended, such format changes are not to be submitted. Compare to amendments to the specification, other than in the claims, of non-reissue applications wherein deletions are permitted, paragraph (a)(1)(ii) of this section. Paragraph (b)(1)(iii) defines the marking set forth in paragraph (b)(1)(ii) of this section. Proposed paragraph (b)(1)(iii), relating to a requirement for submission of all amendments be presented when any amendment to the specification is made, was not implemented.

Paragraph (b)(2) of § 1.121 relates to the manner of making amendments to the claims in reissue applications. Paragraph (b)(2)(i)(A) of § 1.121 requires the entire text of each patent claim that is being amended by the current amendment and of each claim being added by the current amendment. Requests that the Office hand-enter changes of five or less words, former § 1.121(c)(2), will no longer be permitted. Pending claims, whether previously amended or not, that are not being amended by the current amendment are not to be resubmitted. This procedure is different from § 1.121(a)(2)(i)(B), which permits requests that the Office hand-enter changes of five or less words in a non-reissue application. Additionally, provision is made for the cancellation of a patent claim by a direction to cancel without the need for marking by brackets. Paragraph (b)(2)(i)(B) requires that patent claims not be renumbered. Paragraph (b)(2)(i)(C) identifies the type of marking required by paragraph (b)(2)(i)(A), single underlining for added material and single brackets for material deleted.

Paragraph (b)(2)(ii) of § 1.121 requires that each amendment submission set forth the status (*i.e.*, pending or cancelled) of all patent claims and all added claims as of the date of the submission, as not all claims (non-amended claims) are to be presented with each submission, paragraph (b)(2)(iv). The absence of submission of the claim status would result in an incomplete reply (§ 1.135(c)).

Paragraph (b)(2)(iii) of § 1.121 requires that each claim amendment be accompanied by an explanation of the support in the disclosure of the patent for the amendment. The absence of an explanation would result in an incomplete reply (§ 1.135(c)).

*Comment 56:* One comment requested that the Office clarify how an applicant would satisfy this requirement when the

amendment involves a simple editorial change, or when the amendment uses terms that find no explicit support in the patent.

*Response:* When it is clear that the amendment simply involves an editorial change and does not add material for which support in the disclosure is required, the reply may simply explain that the amendment is merely making an editorial change. When the amendment uses terms that find no explicit support in the specification, the reply must set forth where the specification provides, at least implicitly, support for the amendment as required by 35 U.S.C. 112, ¶ 1. In addition, an amendment to the specification to secure correspondence between the specification and the claims will also be required. *See* § 1.75(d)(1) and MPEP 608.01(o). Obviously, an amendment that does not find either explicit or at least implicit support in the specification as required by 35 U.S.C. 112, ¶ 1, is not permitted. *See* 35 U.S.C. 251, ¶ 1, (last sentence).

Proposed paragraphs (b)(2) (iv) and (v) of this section, relating to a requirement for presentation of all amendments as of the date any amendment to the claims is made, and to the treatment of the failure to submit a copy of any added claim as a direction to cancel that claim, were not implemented.

Paragraph (b)(3) of § 1.121 clarifies that amendments to the patent drawings are not permitted and that any change must be by way of a new sheet of drawings with the amended figures being identified as "amended" and with added figures identified as "new" for each sheet that has changed. The paragraph contains material from cancelled § 1.115.

Paragraph (b)(4) of § 1.121, added in view of the deletion of § 1.115 paragraph (d), requires amendment of the disclosure in certain situations (*i.e.*, to correct inaccuracies of description and definition) and to secure substantial correspondence between the claims, the remainder of the specification, and the drawings. The previous requirement for "correspondence" has been modified by use of "substantial correspondence." See comments to § 1.115.

Paragraph (b)(5) of § 1.121, containing material transferred from proposed paragraph (b)(2)(vi) (now deleted), clarifies that: (1) No reissue patent will be granted enlarging the scope of the claims unless applied for within two years from the grant of the original patent (additional broadening outside the two-year limit is appropriate as long as some broadening occurred within the two-year period, *In re Doll*, 419 F.2d 925, 164 USPQ 218 (CCPA 1970)); and

PHILIPS-SCHUBERT018845

(2) no amendment may introduce new matter or be made in an expired patent.

Paragraph (b)(6) of § 1.121 has been added to clarify that all amendments must be made relative to (*i.e., vis-á-vis*) the specification (including the claims) and drawings of the original patent as of the date of the filing of the reissue application. If there was a prior change to the patent (made *via* a prior reexamination certificate, reissue of the patent, certificate of correction, *etc.*), the first amendment must be made relative to the patent specification as changed by the prior proceeding or other mechanism for changing the patent. In addition, all amendments subsequent to the first amendment must be made relative to the patent specification in effect as of the date of the filing of the reissue application, and not relative to the prior amendment.

Paragraph (c) of § 1.121 clarifies that amendments in reexamination proceedings are to be made in accordance with § 1.530(d).

Section 1.121 as applied to reissue applications does not provide for replacement pages whereby a new page would be physically substituted for a currently existing page.

However, an applicant can direct that a page or pages ("Page(s) _____") be cancelled and that updated materials be inserted in its place.

The wide availability of word processing should enable applicants to more easily submit updated material providing greater accuracy and thereby eliminating the need for the Office to hand-enter amendments. To that end, § 1.125 is amended to reflect current practice that a substitute specification may be submitted in an application, other than a reissue application, at any point up to payment of the issue fee as a matter of right, provided that such substitute specification is submitted in compliance with the requirements set forth in § 1.125.

*Section 1.122*

Section 1.122 is removed and reserved as representing internal Office instruction.

See comments related to § 1.101.

*Section 1.123*

Section 1.123 is removed and reserved and its subject matter transferred to § 1.121 for better context.

No comments were received regarding the proposed change to § 1.123.

*Section 1.124*

Section 1.124 is removed and reserved and its subject matter transferred to § 1.121 for better context.

No comments were received regarding the proposed change to § 1.124.

*Section 1.125*

Section 1.125 is amended by addition of paragraphs (a) through (d). Section 1.125(a) retains the current practice that a substitute specification may be required by the examiner and has been clarified to note that if the legibility of the application papers shall render it difficult to consider the application, the Office may require a substitute specification.

Section 1.125 is amended in view of the continued prosecution application under § 1.53(d), to reflect the current liberalized practice as set forth in MPEP 608.01(q), and to delete the verification requirement for the no new matter statement. See comments to § 1.4(d).

Section 1.125(b) specifically provides for the filing of a substitute specification, excluding the claims, at any point up to payment of the issue fee, if it is accompanied by: (1) A statement that the substitute specification includes no new matter; and (2) a marked-up copy of the substitute specification showing the matter being added to and the matter being deleted from the specification of record (*i.e.,* the specification to be replaced by the substitute specification). While § 1.125(b)(2) requires the marked-up copy show the additions and deletions, it does not require that such additions and deletions be shown by underlining and bracketing. Rather, it permits the use of other indicia (*e.g.,* redlining and strikeouts) to show additions and deletions so that the document-compare feature of conventional word-processing programs can be used to produce the marked-up substitute specification.

Section 1.125(b), as proposed, would have required that a substitute specification contain only changes that were previously or concurrently submitted by an amendment under § 1.121. The Office, however, is not adopting this proposal. Creating a copy of the substitute specification showing the additions and deletions is relatively easy using the document-compare feature of a conventional word-processing program, when compared to the burden of preparing an amendment under § 1.121(a)(1) showing numerous changes to a specification. Thus, the Office is adopting the requirement currently set forth in MPEP 608.01(q) for a marked-up copy of the substitute specification showing the additions and deletions.

*Comment 57:* One comment stated that it is not clear exactly what is to be submitted with the substitute

No comments were received regarding the proposed change to § 1.124.

specification under paragraph (b)(2) of this section even though paragraph (c) requires it to be in clean form without markings.

*Response:* Section 1.125 requires an applicant filing a substitute specification to submit: (1) the substitute specification in clean form without markings (§ 1.125(c)); (2) a marked-up copy showing the additions and deletions relative to the specification it is replacing (§ 1.125(b)(2)); and (3) a statement that the substitute specification includes no new matter (§ 1.125(b)(1)).

Section 1.125(c) is amended to clarify that a substitute specification is to be submitted without markings as to amended material.

Section 1.125(d) does not permit a substitute specification in reissue or reexamination proceedings as markings for changes from the patent are required therein.

*Section 1.126*

Section 1.126 is amended to delete the phrase ", except when presented in accordance with § 1.121(b)" for consistency with the change to § 1.121.

No comments were received regarding § 1.126.

*Section 1.133*

Section 1.133(b) is amended by replacement of "response" with "reply" in accordance with the change to § 1.111.

No comments were received regarding the proposed change to § 1.133.

*Section 1.134*

Section 1.134 is amended by replacement of "response" with "reply" in accordance with the change to § 1.111.

No comments were received regarding the proposed change to § 1.134.

*Section 1.135*

Section 1.135 paragraphs (a) and (c) are amended by replacement of "response" with "reply" in accordance with the change to § 1.111. Section 1.135(b) is amended to clarify that the admission of or refusal to admit any amendment after final rejection, and not just an amendment not responsive to the last Office action, shall not operate to save the application from abandonment.

Section 1.135(c) is amended to provide that a new "time period" under § 1.134 may be given if a reply to a non-final Office action is substantially complete but consideration of some matter or compliance with some requirement has been inadvertently omitted. This replaces the practice in which an applicant may be given an

PHILIPS-SCHUBERT018846

**53156**   **Federal Register** / Vol. 62, No. 197 / Friday, October 10, 1997 / Rules and Regulations

opportunity to supply the omission through the setting of a "time limit" of one month that is not extendable. Under § 1.135(c) as adopted, a one-month shortened statutory time period will generally be set enabling an applicant to petition for extensions of time under § 1.136(a). Where 35 U.S.C. 133 requires a period longer than one month (i.e., actions mailed in the month of February), a shortened statutory period of 30 days will be set.

The setting of a time period for reply under § 1.134 (rather than a time limit) results in the date of abandonment (when no further reply is filed) being the expiration of the new time period rather than the date of expiration of the period of reply set in the original Office action for which an incomplete reply was filed. Thus, the amendment to § 1.135(c) permits the filing of a continuing application as an alternative to completing the reply, whereas the previous practice required an applicant to complete the reply that was held to be incomplete or else the application was held to be abandoned (retroactively) as of the expiration of the original period for reply. Thus, applicants had to file an unnecessary reply to preserve pendency where their only intent was to file a continuing application. Section 1.135(c), as amended, sets forth a new period within which a continuing application can be filed, without the applicant having to supply the omission in the prior application to preserve pendency. In addition, applicant may file any other reply as may be appropriate under § 1.111, regardless of whether a continuing application is filed.

*Comment 58:* Two comments objected to the change on the basis that it is subject to intentional misuse. It is argued that it encourages an applicant to send in piecemeal replies and permits use of the time period as a subterfuge for extending prosecution as § 1.135(c) does not specify how many times an incomplete reply can be given.

*Response:* 35 U.S.C. 154 as amended by Pub. L. 103–465 should provide the necessary incentive for applicants to prosecute an application without undue delay. Additionally, the examiner can determine that the failure to provide a complete reply was not "inadvertent" (especially where an applicant was previously notified of the deficiencies in the reply), and not set a period under § 1.135(c).

*Comment 59:* One comment suggested amending § 1.135(c) from "may" to "shall" so that an examiner must provide an opportunity to an applicant to complete a reply, and that § 1.135(c) should not be limited to replies to non-

final Office actions so that if an application is in condition for allowance except for an inadvertent omission it would be beneficial for all parties to provide the same benefit as for non-final actions.

*Response:* The term "may" is used rather than "shall" to encourage applicants to provide a complete reply, in that an applicant providing an incomplete reply cannot be certain of being provided with an additional time period to prosecute the application.

Section 1.113(a) provides that the only reply to a final Office action effective to avoid abandonment of an application is: (1) an amendment under § 1.116 that *prima facie* places the application in condition for allowance; or (2) a notice of appeal (and appeal fee) under § 1.191. Thus, the only reply under § 1.113(a) that will ensure that abandonment of the application will be avoided is: (1) an amendment under § 1.116 that cancels all of the rejected claims; or (2) a notice of appeal (and appeal fee) under § 1.191 (§ 1.113(a)). That is, an applicant filing a proposed amendment under § 1.116 or arguments in reply to a final Office action has no assurance that such reply will necessarily result in allowance of the application. Given the limited nature of the replies under § 1.113 to a final Office action, it is not appropriate to provide a time period under § 1.135(c) to complete a reply to a final Office action.

Section 1.135(c) is also amended to remove an unnecessary reference to consideration of the question of abandonment and to clarify that the reply for which applicant may be given a new time period to reply to must be a "non-final" Office action.

*Section 1.136*

Section 1.136(a)(1) is amended to recite the availability of a maximum of five rather than four months as an extension of time, subject to any maximum period for reply set by statute. For example, when a one-month or 30-day period is set for reply to a restriction requirement or for completing a reply under § 1.135(c), that period may be extended up to the six-month statutory (35 U.S.C. 133) maximum. In addition, as the two-month period set in § 1.192(a) for filing an appeal brief is not subject to the six-month maximum period specified in 35 U.S.C. 133, the period for filing an appeal brief may be extended up to seven months.

*Comment 60:* At least one comment noted that there is no statutory authority under 35 U.S.C. 41(a)(8)(C) for the

$2,010 amount set for the fifth month extension of time.

*Response:* See the response to comment 5.

Section 1.136(a)(1) is also amended by replacement of "respond" with "reply" in accordance with the change to § 1.111 and for clarification.

Section 1.136(a)(2) is amended by replacement of "respond" with "reply" in accordance with the change to § 1.111 and other clarification changes.

*Comment 61:* One comment questioned whether the addition in paragraph (a)(2) of § 1.136 that requires a reply to be filed prior to the expiration of the period of extension to avoid abandonment of the application will affect the timely filing of a reply under §§ 1.8 or 1.10 where the mail date rather than the receipt date is the end of the period for reply.

*Response:* The referred to addition has been noted to be a clarification and not a change in practice. The added language does not change current practice under §§ 1.8 and 1.10.

Section 1.136 is amended by addition of paragraph (a)(3) that provides for the filing in an application a general authorization to treat any reply requiring a petition for an extension of time for its timely submission as containing a request therefor for the appropriate length of time. The authorization may be filed at any time prior to or with the submission of a reply that would require an extension of time for its timely submission, including submission with the application papers. Previously, the mere presence of a general authorization, submitted prior to or with a reply requiring an extension of time, to charge all required fees does not amount to a petition for an extension of time that reply (MPEP 201.06 and 714.17) and under the proposed amended rule the submission of a reply requiring an extension of time for its timely submission would not be treated as an inherent petition for an extension of time absent an authorization for all necessary extensions of time. The Office will continue to treat all petitions for an extension of time as requesting the appropriate extension period notwithstanding an inadvertent reference to a shorter period for extension and will liberally interpret comparable papers as petitions for an extension of time. Applicants are advised to file general authorizations for payment of fees and petitions for extensions of time as separate papers rather than as sentences buried in papers directed to other matters (such as an application transmittal letter). The use of individual papers directed only

PHILIPS-SCHUBERT018847

to an extension of time or to a general authorization for payment of fees would permit the Office to more readily identify the presence of such items and list them individually on the application file jacket, thus facilitating future identification of these authorizations.

*Comment 62:* Two comments requested that it be clarified whether the reference to submission of a paper with an authorization is to be construed as allowing for submission of a standard sentence in a general reply to an Office action that includes a check box on an application transmittal form.

*Response:* The comments have been adopted and the proposed language of paragraph (a)(3) of § 1.136 modified to replace the reference to "paper" with "written request."

Section 1.136(a)(3) is additionally amended to provide that general authorizations to charge fees are effective to meet not only the requirement for the extension of time fee for replies filed concurrent or subsequent to the authorization but also represent a constructive petition for an extension of time, which is a change from current practice wherein a general authorization to charge additional fees does not represent a petition for an extension of time, which petition must be separately requested.

Section 1.136(a)(3) also includes the sentence "[s]ubmission of the fee set forth in § 1.17(a) will also be treated as a constructive petition for an extension of time in any concurrent reply requiring a petition for an extension of time under this paragraph for its timely submission." This provides for those instances in which an applicant files a reply with a check (or other means of payment under § 1.23) for the requisite fee under § 1.17(a) (1) through (5) for the petition under § 1.136(a) required to render such reply timely, but omits a request (*i.e.,* a petition) for an extension of time under § 1.136(a). In such instances, the mere submission of the appropriate fee will be treated as a constructive petition for the extension of time to render the reply timely.

Section 1.136(b) is amended for clarity and to replace the phrase "response" with the phrase "reply" for consistency with § 1.111.

### Section 1.137

Section 1.137 is amended to, *inter alia,* incorporate revival of abandoned applications and lapsed patents for the failure: (1) to timely reply to an Office requirement in a provisional application (§ 1.139); (2) to timely pay the issue fee for a design application (§ 1.155); (3) to timely pay the issue fee for a utility or

plant application (§ 1.316); or (4) to timely pay any outstanding balance of the issue fee (§ 1.317) (lapsed patents).

Section 1.137(a) is amended to provide: (1) that it is the paragraph that applies to petitions under the "unavoidable" standard; (2) that "where the delay in reply was unavoidable, a petition may be filed to revive an abandoned application or a lapsed patent pursuant to [§ 1.137(a)]"; and (3) the requirements for a grantable petition pursuant to § 1.137(a) in paragraphs (a)(1) through (a)(4).

Section 1.137(a)(1) (and § 1.137(b)(1)) are amended to provide that a grantable petition pursuant to § 1.137(a) must be accompanied by "[t]he required reply, unless previously filed." Section 1.137(a)(1) (and § 1.137(b)(1)) is amended to further provide that "[i]n a nonprovisional application abandoned for failure to prosecute, the required reply may be met by the filing of a continuing application" and that "[i]n an application or patent, abandoned or lapsed for failure to pay the issue fee or any portion thereof, the required reply must be the payment of the issue fee or any outstanding balance thereof."

Under § 1.137(a)(1) (and § 1.137(b)(1)), a continuing application is a permissive (*i.e.,* "may be met") reply in a nonprovisional application abandoned for failure to prosecute, in that an applicant in a nonprovisional application abandoned for failure to prosecute may file a reply under § 1.111 to a non-final Office action or a reply under § 1.113 (*e.g.,* notice of appeal) to a final Office action, or may simply file a continuing application as the required reply. The Office, however, may require a continuing application (or request for further examination pursuant to § 1.129(a)) to meet the reply requirement of § 1.137(a)(1) (or § 1.137(b)(1)) where, under the circumstances of the application, treating a reply under §§ 1.111 or 1.113 would place an inordinate burden on the Office. Exemplary circumstances of when treating a reply under §§ 1.111 or 1.113 may place an inordinate burden on the Office are: (1) an application abandoned for an inordinate period of time; (2) the application file containing multiple or conflicting replies to the last Office action; and (3) the submission of a reply or replies under § 1.137(a)(1) (or § 1.137(b)(1)) that are questionable as to compliance with §§ 1.111 or 1.113.

While the revival of applications abandoned for failure to timely prosecute and for failure to timely pay the issue fee are incorporated together in § 1.137, the statutory provisions for the revival of an application abandoned for failure to timely prosecute and for

failure to timely submit the issue fee are mutually exclusive. *See Brenner* versus *Ebbert,* 398 F.2d 762, 157 USPQ 609 (D.C. Cir.), *cert. denied* 393 U.S. 926, 159 USPQ 799 (1968). 35 U.S.C. 151 authorizes the acceptance of a delayed payment of the issue fee, if the issue fee "is submitted * * * and the delay in payment is shown to have been unavoidable." 35 U.S.C. 41(a)(7) likewise authorizes the acceptance of an "unintentionally delayed payment of the fee for issuing each patent." Thus, 35 U.S.C. 41(a)(7) and 151 each require payment of the issue fee as a condition of reviving an application abandoned or patent lapsed for failure to pay the issue fee. Therefore, the filing of a continuing application without payment of the issue fee or any outstanding balance thereof is not an acceptable proposed reply in an application abandoned or patent lapsed for failure to pay the issue fee or any portion thereof.

The Notice of Allowance requires the timely payment of the issue fee in effect on the date of its mailing to avoid abandonment of the application. In instances in which there is an increase in the issue fee by the time of payment of the issue fee required in the Notice of Allowance, the Office will mail a notice requiring payment of the balance of the issue fee then in effect. *See In re Mills,* 12 USPQ2d 1847 (Comm'r Pat. 1989). The phrase "for failure to pay the issue fee or any portion thereof" applies to those instances in which the applicant fails to pay either the issue fee required in the Notice of Allowance or the balance of the issue fee required in a subsequent notice. In such instances, the proposed reply must be the issue fee then in effect, if no portion of the issue fee was previously submitted, or any outstanding balance of the issue fee then in effect, if a portion of the issue fee was previously submitted.

These changes to § 1.137(a)(1) (and § 1.137(b)(1)) are necessary to incorporate into § 1.137 the revival of abandoned applications and lapsed patents for the failure to: (1) Timely reply to an Office requirement in a provisional application (§ 1.139), (2) timely pay the issue fee (§§ 1.155 and 1.316), or (3) timely pay any outstanding balance of the issue fee (§ 1.317).

Section 1.137(a)(3) is amended to provide that a grantable petition pursuant to § 1.137(a) must be accompanied by "[a] showing to the satisfaction of the Commissioner that the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition pursuant to this paragraph was unavoidable."

PHILIPS-SCHUBERT018848

**53158**    **Federal Register** / Vol. 62, No. 197 / Friday, October 10, 1997 / Rules and Regulations

Section 1.137(a) deletes the requirement that a petition thereunder be "promptly filed after the applicant is notified of, or otherwise becomes aware of, the abandonment." The genesis of the "promptly filed" requirement in § 1.137(a) is the legislative history of Pub. L. 97–247, § 3, 96 Stat. 317 (1982) (which provides for the revival of an "unintentionally" abandoned application), which provides, *inter alia*, that:

In order to prevent abuse and injury to the public the Commissioner could require a terminal disclaimer equivalent to the period of abandonment and could require applicants to act *promptly* after becoming aware of the abandonment.

*See* H.R. Rep. No. 542, 97th Cong., 2d Sess. 7 (1982), *reprinted in* 1982 U.S.C.C.A.N. 771 (emphasis added).

Nevertheless, 35 U.S.C. 133 and 151 each require a showing that the "delay" was "unavoidable," which requires not only a showing that the delay which resulted in the abandonment of the application was unavoidable, but also a showing of unavoidable delay until the filing of a petition to revive. *See In re Application of Takao,* 17 USPQ2d 1155 (Comm'r Pat. 1990). The burden of continuing the process of presenting a grantable petition in a timely manner likewise remains with the applicant until the applicant is informed that the petition is granted. *Id.* Thus, an applicant seeking to revive an "unavoidably" abandoned application must cause a petition under § 1.137(a) to be filed without delay (*i.e.,* promptly upon becoming notified, or otherwise becoming aware, of the abandonment of the application).

An applicant who fails to file a petition under § 1.137(a) "promptly" upon becoming notified, or otherwise becoming aware, of the abandonment of the application will not be able to show that "the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition pursuant to [§ 1.137(a)] was unavoidable." The removal of the language in § 1.137(a) requiring that any petition thereunder be "promptly filed after the applicant is notified of, or otherwise becomes aware of, the abandonment" should *not* be viewed as: (1) Permitting an applicant, upon becoming notified, or otherwise becoming aware, of the abandonment of the application, to delay the filing of a petition under § 1.137(a); or (2) changing (or modifying) the result in *In re Application of S,* 8 USPQ2d 1630 (Comm'r Pat. 1988), in which a petition under § 1.137(a) was denied due to the applicant's deliberate deferral in filing a

petition under § 1.137. An applicant who deliberately chooses to delay the filing of a petition under § 1.137 (as in *Application of S*) will not be able to show that "the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition pursuant to [§ 1.137(a)] was unavoidable" or even make an appropriate statement that "the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition pursuant to [§ 1.137(b)] was unintentional."

Therefore, the requirement in § 1.137(a) that a petition thereunder be "promptly filed after the applicant is notified of, or otherwise becomes aware of, the abandonment" is deleted solely because it is considered redundant in light of the requirement for a showing that the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition pursuant to § 1.137(a) was unavoidable.

Section 1.137(a)(3) (and § 1.137(b)(3)) is further amended to delete the requirement that the showing (statement) must be a verified showing or statement if made by a person not registered to practice before the Patent and Trademark Office. Section 1.56 currently provides that each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith. Sections 1.4(d) and 10.18 are amended to provide that a signature on a paper submitted to the Office constitutes an acknowledgment that willful false statements are punishable under 18 U.S.C. 1001, and may jeopardize the validity of the application or any patent issuing thereon. Therefore, requiring additional verification of a showing or statement under § 1.137 would be redundant. In addition, this requirement results in delays in the treatment of the merits of petitions that include unverified statements.

Section 1.137(a)(4) (and § 1.137(b)(4)) are added to provide that a grantable petition under § 1.137 must be accompanied by "[a]ny terminal disclaimer (and fee as set forth in § 1.20(d)) required pursuant to [§ 1.137(c)]."

Section 1.137(b) is amended to provide: (1) That it is the paragraph that applies to petitions under the "unintentional" standard; (2) that "where the delay in reply was unintentional, a petition may be filed to revive an abandoned application or a lapsed patent pursuant to [§ 1.137(b)]"; and (3) the requirements for a grantable petition pursuant to § 1.137(b) in paragraphs (b)(1) through (b)(4).

Section 1.137(b)(1) is amended (as discussed *supra*) to provide that a grantable petition under § 1.137(b) must be accompanied by "[t]he required reply, unless previously filed." Section 1.137(b)(1) is amended to further provide that "[i]n a nonprovisional application abandoned for failure to prosecute, the required reply may be met by the filing of a continuing application" and that "[i]n an application or patent, abandoned or lapsed for failure to pay the issue fee or any portion thereof, the required reply must be the payment of the issue fee or any outstanding balance thereof."

Section 1.137(b)(3) is amended to provide that a grantable petition under § 1.137(b) must be accompanied by "[a] statement that the entire delay in providing the required reply from the due date for the reply until the filing of a grantable petition pursuant to this paragraph was unintentional" and that "[t]he Commissioner may require additional information where there is a question whether the delay was unintentional." While the Office will generally require only the statement that the entire delay in providing the required reply from the due date for the reply until the filing of a grantable petition pursuant to § 1.137(b) was unintentional, the Office may require an applicant to carry the burden of proof to establish that the delay from the due date for the reply until the filing of a grantable petition was unintentional within the meaning of 35 U.S.C. 41(a)(7) and § 1.137(b) where there is a question whether the entire delay was unintentional. *See In re Application of G,* 11 USPQ2d 1378, 1380 (Comm'r Pat. 1989).

Section 1.137(b)(4) is amended to delete the one-year filing period requirement. Section 1.137(b)(4) is amended to provide that a grantable petition under § 1.137 must be accompanied by "[a]ny terminal disclaimer (and fee as set forth in § 1.20(d)) required pursuant to [§ 1.137(c)]."

*Requirement That the Entire Delay Until the Filing of a Grantable Petition Was Unavoidable (§ 1.137(a)) or Unintentional (§ 1.137(b))*

There are three periods to be considered during the evaluation of a petition under § 1.137: (1) The delay in reply that originally resulted in the abandonment; (2) the delay in filing an initial petition pursuant to § 1.137 to revive the application; and (3) the delay in filing a *grantable* petition pursuant to § 1.137 to revive the application.

Where the applicant deliberately permits an application to become

PHILIPS-SCHUBERT018849

abandoned (*e.g.,* due to a conclusion that the claims are unpatentable, that a rejection in an Office action cannot be overcome, or that the invention lacks sufficient commercial value to justify continued prosecution), the abandonment of such application is considered to be a deliberately chosen course of action, and the resulting delay cannot be considered as "unintentional" within the meaning of § 1.137(b). *See Application of G,* 11 USPQ2d at 1380. Likewise, where the applicant deliberately chooses not to seek or persist in seeking the revival of an abandoned application, or where the applicant deliberately chooses to delay seeking revival of an abandoned application, the resulting delay in seeking revival of the abandoned application cannot be considered as "unintentional" within the meaning of § 1.137(b). An intentional delay resulting from a deliberate course of action chosen by the applicant is not affected by: (1) The correctness of the applicant's (or applicant's representative's) decision to abandon the application or not to seek or persist in seeking revival of the application; (2) the correctness or propriety of a rejection, or other objection, requirement, or decision by the Office; or (3) the discovery of new information or evidence, or other change in circumstances subsequent to the abandonment or decision not to seek or persist in seeking revival. Obviously, delaying the revival of an abandoned application, by a deliberately chosen course of action, until the industry or a competitor shows an interest in the invention (a submarine application) is the antithesis of an "unavoidable" or "unintentional" delay. An intentional abandonment of an application, or an intentional delay in seeking either the withdrawal of a holding of abandonment in or the revival of an abandoned application, precludes a finding of unavoidable or unintentional delay pursuant to § 1.137. *See In re Maldague,* 10 USPQ2d 1477, 1478 (Comm'r Pat. 1988).

The Office does not generally question whether there has been an intentional or otherwise impermissible delay in filing an initial petition pursuant to § 1.137 (a) or (b), when such petition is filed: (1) Within three months of the date the applicant is first notified that the application is abandoned; *and* (2) within one year of the date of abandonment of the application. Thus, an applicant seeking revival of an abandoned application is advised to file a petition pursuant to § 1.137 within three months of the first notification

that the application is abandoned to avoid the question of intentional delay being raised by the Office (or by third parties seeking to challenge any patent issuing from the application).

Where a petition pursuant to § 1.137 (a) or (b) is not filed within three months of the date the applicant is first notified that the application is abandoned, the Office may consider there to be a question as to whether the delay was unavoidable or even unintentional. In such instances, the Office may require: (1) A showing as to how the delay between the date the applicant was first notified that the application was abandoned and the date a § 1.137(a) petition was filed was "unavoidable"; or (2) further information as to the cause of the delay between the date the applicant was first notified that the application was abandoned and the date a § 1.137(b) petition was filed, and how such delay was "unintentional." To avoid delay in the consideration of a petition under § 1.137 (a) or (b) in instances in which such petition was not filed within three months of the date the applicant was first notified that the application was abandoned, applicants should include a showing as to how the delay between the date the applicant is first notified by the Office that the application is abandoned and filing of a petition under § 1.137 was: (1) "Unavoidable" in a petition under § 1.137(a); or (2) "unintentional" in a petition under § 1.137(b).

Where a petition pursuant to § 1.137 (a) or (b) is not filed within one year of the date of abandonment of the application (note that abandonment takes place by operation of law, rather than the mailing of a Notice of Abandonment), the Office may require: (1) Further information as to when the applicant (or the applicant's representative) first became aware of the abandonment of the application; and (2) a showing as to how the delay in discovering the abandoned status of the application occurred despite the exercise of due care or diligence on the part of the applicant (or the applicant's representative) (*see Ex parte Pratt,* 1887 Dec. Comm'r Pat. 31 (1887)). To avoid delay in the consideration of a petition under § 1.137 (a) or (b) in instances in which such petition was not filed within one year of the date of abandonment of the application, applicants should include: (1) The date that the applicant first became aware of the abandonment of the application; and (2) a showing as to how the delay in discovering the abandoned status of the application occurred despite the

exercise of due care or diligence on the part of the applicant.

In either instance, applicant's failure to carry the burden of proof to establish that the "entire" delay was "unavoidable" or "unintentional" may lead to the denial of a petition under § 1.137(a) or § 1.137(b), regardless of the circumstances that originally resulted in the abandonment of the application.

Section 1.137(d) specifies a time period within which a renewed petition pursuant to § 1.137 must be filed to be considered timely. So long as a renewed petition is timely filed under § 1.137(d) (including any properly obtained extensions of time), the Office will consider the delay in filing a renewed petition under § 1.137(a) "unavoidable" under § 1.137(a)(3), and will consider the delay in filing a renewed petition under § 1.137(b) "unintentional" under § 1.137(b)(3). Where an applicant files a renewed petition, request for reconsideration, or other petition seeking review of a prior decision on a petition pursuant to § 1.137 outside the time period specified in § 1.137(d), the Office may require, *inter alia,* a specific showing as to how the entire delay was "unavoidable" (§ 1.137(a)) or "unintentional" (§ 1.137(b)). As discussed *supra,* a delay resulting from the applicant deliberately choosing not to persist in seeking the revival of an abandoned application cannot be considered "unavoidable" or "unintentional" within the meaning of § 1.137, and the correctness or propriety of the decision on the prior petition pursuant to § 1.137, the correctness of the applicant's (or the applicant's representative's) decision not to persist in seeking revival, the discovery of new information or evidence, or other change in circumstances subsequent to the abandonment or decision to not persist in seeking revival are immaterial to such intentional delay caused by the deliberate course of action chosen by the applicant.

*Retroactive Application of § 1.137(b)*

There was no prohibition in former § 1.137(b) against requests for waiver of its one-year filing period requirement; however, waiver of the one-year filing period requirement of former § 1.137(b) was subject to strictly limited conditions (§ 1.183). *See* Final Rule entitled "Changes in Procedures for Revival of Patent Applications and Reinstatement of Patents," published in the **Federal Register** at 58 FR 44277 (August 20, 1993), and in the *Official Gazette* at 1154 *Off. Gaz. Pat. Office* 35 (September 14, 1993). Thus, under the terms of former § 1.137, an applicant in an application abandoned for more than

PHILIPS-SCHUBERT018850

**53160    Federal Register** / Vol. 62, No. 197 / Friday, October 10, 1997 / Rules and Regulations

one year could file either a petition under § 1.137(a) to revive the application on the basis of "unavoidable" delay, or a petition under §§ 1.183 and 1.137(b) to revive the application on the basis of "unintentional" delay. That is, where an application was abandoned for more than one year, and the delay was "unintentional" but not "unavoidable," it was incumbent upon an applicant desiring revival of the application to promptly file a petition under §§ 1.183 and 1.137(b) to revive the application.

While § 1.137(b), as amended, is, by its terms, applicable to applications abandoned prior to its effective date, § 1.137(b) requires, by its terms, "[a] statement that the entire delay in providing the required reply from the due date for the reply until the filing of a grantable petition pursuant to this paragraph was unintentional." Thus, where an applicant (or the applicant's representative) previously chose not to seek revival of an application (e.g., due to the opinion that the former provisions of § 1.137 (a) or (b) did not permit revival thereunder), the resulting delay in seeking revival of the application cannot be considered "unintentional" within the meaning of § 1.137(b). Likewise, where an applicant (or the applicant's representative) previously requested revival of an application, received an adverse decision (e.g., a dismissal or denial), and chose not to persist in seeking revival of the application (e.g., by request for reconsideration or review), the resulting delay in seeking revival of the application likewise cannot be considered "unintentional" within the meaning of § 1.137(b). The elimination of the one-year filing period requirement in § 1.137(b) does not create a new right to overcome any prior intentional delay caused by a deliberate course of action (or inaction) chosen by the applicant. Thus, any applicant filing a petition under § 1.137 after the effective date of this Final Rule, but outside the period set in § 1.137(d) for seeking reconsideration of a prior adverse decision on a request to revive an application will be considered to have acquiesced in the abandonment of the application or lapse of the patent.

Section 1.137(c) is amended to change the introductory phrase "[i]n all applications filed before June 8, 1995, and in all design applications filed on or after June 8, 1995" to "[i]n a design application, a utility application filed before June 8, 1995, or a plant application filed before June 8, 1995" for clarity. Section 1.137(c) is further amended to change the phrase "any petition to revive pursuant to paragraph

(a) of this section" to "any petition to revive pursuant to this section," and the phrase "not filed within six months of the date of abandonment of the applications" is deleted. Section 1.137(c) is further amended to change the phrase "must also apply to any patent granted on any continuing application entitled under 35 U.S.C. 120 to the benefit of the filing date of the application for which revival is sought" to "must also apply to any patent granted on any continuing application that contains a specific reference under 35 U.S.C. 120, 121, or 365(c) to the application for which revival is sought," since it is the claim for, and not the entitlement to, the benefit of the filing date of the application for which revival is sought that triggers the requirement for the filing of a terminal disclaimer in the continuing application.

Section 1.137(d) is amended to change "application" to "abandoned application or lapsed patent" to incorporate into § 1.137 the revival of lapsed patents. In view of the elimination of a time period from § 1.137(b), the provisions of former § 1.137(e) are incorporated into § 1.137(d) as "[u]nless a decision indicates otherwise, this time period may be extended under the provisions of § 1.136."

Section 1.137(e) is amended to expressly provide that a provisional application, abandoned for failure to timely reply to an Office requirement, may be revived pursuant to § 1.137(a) or (b) so as to be pending for a period of no longer than twelve months from its filing date. In accordance with 35 U.S.C. 111(b)(5), § 1.137(e) clearly indicates that "[u]nder no circumstances will a provisional application be regarded as pending after twelve months from its filing date." Prior § 1.139 (a) and (b) each provided that a provisional application may be revived so as to be pending for a period of no longer than twelve months from its filing date, and that under no circumstances will a provisional application be regarded as pending after twelve months from its filing date.

*Comment 63:* The majority of comments opposed amending § 1.137(a) and (b) to include time limits based upon the mail date of a notification of abandonment, as well as the retroactive application of such a change to the rules of practice. While these comments recognized that any filing period requirement § 1.137 is better based upon the date of notification, rather than the date of abandonment, they argued that there will inevitably be instances in which a blameless applicant will not be able to meet the filing period

requirement due to extenuating circumstances. The majority of comments supported amending § 1.137 (a) and (b) to remove the filing period requirement, as well as the retroactive application of such a change to the rules of practice.

*Response:* The Office will adopt a § 1.137 that does not include filing period requirements, and will not limit the retroactive application of § 1.137(b) as adopted, other than by the terms of the rule (as discussed supra).

*Comment 64:* One comment generally supported the change to § 1.137(b) to remove the filing period requirement, but expressed concerns as to the routine revival of abandoned applications. The comment specifically suggested that the Office continue to require a high showing to justify the revival of an abandoned application, especially where the petition was filed substantially after abandonment or applicant's receipt of the notice of abandonment.

*Response:* The Office does not consider the revival of an abandoned application to be a "routine" matter. The Office will require, *inter alia,* a "showing to the satisfaction of the Commissioner that the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition pursuant to [§ 1.137(a)] was unavoidable" as a prerequisite to the grant of any petition based upon unavoidable delay (§ 1.137(a)). The Office will require, *inter alia,* a "statement that the entire delay in filing the required reply until the filing of a grantable petition pursuant to [§ 1.137(b)] was unintentional" by a registered practitioner or other party in interest having firsthand knowledge of the circumstances surrounding the delay as a prerequisite to the grant of any petition based upon unintentional delay (§ 1.137(b)). The Office expects that such statement made by a registered practitioner not having firsthand knowledge of the circumstances surrounding the delay be based upon a reasonable investigation of the circumstances surrounding the abandonment of the application (§ 10.18), and that such statement by any person be consistent with the duty of candor and good faith and the duty to disclose material information to the Office (§ 1.56).

Regardless of the length of the delay, § 1.137(a) requires that the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition pursuant to § 1.137(a) was unavoidable. Likewise, regardless of the length of the delay, § 1.137(b)

PHILIPS-SCHUBERT018851

requires that the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition pursuant to § 1.137(b) was unintentional. As "unintentional" delay does not require that the delay have occurred despite the exercise of due care and diligence (as does "unavoidable" delay), the Office does not routinely require a "showing" of unintentional delay for a petition under § 1.137(b). However, where there may be a question whether the delay was unintentional, the Office may require a showing of unintentional delay for a petition under § 1.137(b). Such question may arise from papers submitted to the Office prior to the petition under § 1.137(b) (e.g., a letter of express abandonment, or other communication evidencing a desire to discontinue prosecution) or from facts set forth in the petition itself. Such question may also arise simply from the length of the delay between the date the applicant was notified of the abandoned status of the application and the date action was taken to revive the abandoned application, or the length of the period of abandonment. Specifically, where there is a delay of three months between the date the applicant was notified of the abandoned status of the application (i.e., the mail date of the notice of abandonment) and the date a petition under § 1.137(b) was filed, or where the application was abandoned for more than one year prior to the date a petition under § 1.137(b) was filed, the Office may require further information and a showing that the delay was unintentional.

Finally, it should be stressed that the mere fact that a petition under § 1.137(b) was filed within three months of the date the applicant was notified of the abandoned status of the application (i.e., the mail date of the notice of abandonment) or within one year of the date of abandonment does not imply that the delay was "unintentional." That is, an applicant who deliberately delays the filing of a petition under § 1.137 until three months from the mail date of the notice of abandonment (or based upon the one-year anniversary of the date of abandonment) cannot appropriately make the statement that "the delay was unintentional." This time frame is provided simply as an indication as to when an applicant should expect the Office to inquire further into the circumstances of the abandonment of an application for which a petition under § 1.137(b) is filed, and in which case the applicant may expedite consideration of such petition by providing information as to

when applicant was notified of the abandoned status of the application, and the cause of the delay between the date of notification and the date a petition under § 1.137 was filed.

*Comment 65:* One comment suggested that the Office include in § 1.137 all of the basic interpretations and guidelines by which the Office applies § 1.137. The comment specifically suggested that § 1.137 include the time periods (e.g., three months) by which the Office measures the applicant's diligence in taking action to revive the application and the differences between post-abandonment delay in taking action to revive the application and any pre-abandonment delay which may have resulted in the abandonment.

*Response:* The Office will adopt a § 1.137 that does not include filing period requirements, but requires that the "entire" delay was "unavoidable" (§ 1.137(a)) or "unintentional" (§ 1.137(b)). The requirements for a petition to revive an abandoned application or lapsed patent are set forth in § 1.137; additionally, the Office will set forth its basic interpretations and guidelines for application of § 1.137 (instructional information) in the MPEP.

Section 1.181 provides the basis for generic requests for relief by petition, and sets forth a two-month time period therein for the timely filing of a petition (§ 1.181(f)). While the three-month time frame employed by the Office during the consideration petitions under § 1.137 exceeds the two-month period in § 1.181(f) for the timely filing of a petition, this three-month period is the most frequently set period for reply by an applicant (see MPEP 710.02(b)). While the Office considers the two-month period in § 1.181(f) to be the appropriate period by which the timeliness of a petition should be determined, it is certainly reasonable to expect that any applicant desiring to restore an abandoned application to pending status will file a petition under § 1.137 to revive such abandoned application no later than three months after notification of abandonment of the application. See In re Kokaji, 1 USPQ2d 2005, 2006 (Comm'r Pat. 1986).

The "three-month" time frame set forth in this Final Rule is a guideline as to when an applicant can expect further inquiry by the Office (and, as such, should attempt to provide the relevant information in the initial petition to avoid delay), in that: (1) it is possible that an applicant is incapable of filing a petition under § 1.137 within three months of the date of notification of abandonment (e.g., pro se applicant incapacitated from date of notification of abandonment until action taken to

revive the application) rendering the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition unavoidable; and (2) it is also possible that an applicant, by a deliberately chosen course of action, delays the filing of a petition under § 1.137 until exactly three months after the date of notification of abandonment to use this period as an extension of time, in which case a statement that "the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition pursuant to this paragraph was unintentional" is not appropriate. To avoid substitution of the three-month time frame for review by the Office for the requirement for unavoidable or unintentional delay, the Office will not amend § 1.137 to include this time frame.

*Comment 66:* One comment indicated that the phrase "the delay was unintentional" is unclear. The comment recited a specific example in which an applicant, under final rejection, submits an amendment or other correspondence which is believed by the applicant to place the application in condition for allowance (and thus constitute a reply within the meaning of § 1.113), and, as such, the applicant, in a deliberate course of action/inaction, takes no further steps to ensure the filing a reply within the meaning of § 1.113 (e.g., a notice of appeal) to the final rejection. The comment suggested that § 1.137 is unclear as to whether the delay in this situation, which may be deliberate or intentional in the literal sense, would constitute an "unintentional" delay within the meaning of § 1.137(b).

*Response:* The Office has amended § 1.137 to require that "the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition" was "unavoidable" (§ 1.137(a)) or "unintentional" (§ 1.137(b)). Thus, intentional delays occurring prior to the due date for reply to avoid abandonment do not preclude relief pursuant to § 1.137. Should the delay in the example given extend past the extendable due date for reply (under § 1.113) to the final rejection, an appropriate statement of unintentional delay could be made as the applicant did not intend to have the deadline for reply under § 1.113 to the final rejection expire.

In addition, there is a distinction between: (1) a delay resulting from an error in judgment as to whether to permit an application to become abandoned (whether to prosecute the application) or whether to seek or persist in seeking the revival of the abandoned application; and (2) a delay

PHILIPS-SCHUBERT018852

**53162**   **Federal Register** / Vol. 62, No. 197 / Friday, October 10, 1997 / Rules and Regulations

resulting from an error in judgment as to the steps necessary to continue the prosecution delay in seeking revival of the application. Where the abandonment and ensuing delay results from an error in judgment as to whether to permit an application to become abandoned (whether to prosecute the application) or whether to seek or persist in seeking the revival of the abandoned application, the abandonment of such application is considered a deliberately chosen course of action, and the resulting delay cannot be considered "unintentional" within the meaning of § 1.137(b). Where, however, an error in judgment as to the steps necessary to continue prosecution results in abandonment of the application, the abandonment of such application is not necessarily considered a deliberately chosen course of action, and the resulting delay may be considered "unintentional" within the meaning of § 1.137(b).

However, §§ 1.116 and 1.135(b) are manifest that proceedings concerning an amendment after final rejection will not operate to avoid abandonment of the application in the absence of a timely and proper appeal. Unless the applicant is informed in writing that the application is allowed prior to the expiration of the period for reply to the final Office action, it is the applicant's responsibility to timely file a notice of appeal (and fee) to avoid the abandonment of the application. The abandonment of an application subject to a final Office action is not "unavoidable" within the meaning of 35 U.S.C. 133 and § 1.137(a) in the situation in which the applicant simply permits the maximum extendable statutory period for reply to a final Office action to expire while awaiting a notice of allowance or other action.

*Comment 67:* One comment opposed the changes to § 1.137 on the bases that: (1) it permits submarine patents, in that an applicant may permit an application to become abandoned and wait to see whether the invention was developed by other entities; and (2) the revival of a long-abandoned application will have an adverse impact on the examiner, in that the examiner who originally examined that application may no longer be at the Office, or will have to reacquaint himself or herself with the application.

*Response:* The change to § 1.137(b) does not permit an applicant to obtain revival where either: (1) the applicant deliberately permitted the application to become abandoned; or (2) the applicant deliberately delayed seeking revival to see whether the invention was developed by other entities. It is well

established that where applicant deliberately permits an application to become abandoned, the abandonment of such application is considered a deliberately chosen course of action, and the resulting delay cannot be considered "unintentional" within the meaning of § 1.137(b). *See Application of G,* 11 USPQ2d at 1380. Likewise, where the applicant deliberately chooses not to either seek or persist in seeking the revival of an abandoned application, the resulting delay in seeking revival of the application cannot be considered "unintentional" within the meaning of § 1.137(b). The intentional abandonment of an application, or an intentional delay in seeking either the withdrawal of a holding of abandonment in or the revival of an abandoned application, precludes a finding of unavoidable or unintentional delay pursuant to § 1.137. *See Maldague,* 10 USPQ2d at 1478.

While it is possible for an applicant to make a misleading statement that the delay was unintentional to obtain revival of an abandoned application, the Office simply must rely upon the candor and good faith of those prosecuting patent applications (*e.g.,* it is equally possible for a party to fabricate evidence and obtain the revival of a long-abandoned application on the basis of unavoidable delay). Any applicant obtaining revival based upon a misleading statement that the delay was unintentional may find the achievement short-lived as a result of the question of intentional delay being raised by third parties challenging any patent issuing from the application.

The revival of any long-abandoned application will have an adverse impact on the examiner; however, long-abandoned applications have been previously revived pursuant to § 1.137(a) on the basis of unavoidable delay. *See In re Lonardo,* 17 USPQ2d 1455 (Comm'r Pat. 1990)(application revived after being abandoned for more than sixteen years). Thus, this change to § 1.137(b) will not create a burden on examiners that did not exist before, and could in fact reduce the burden as a result of the requirement that in applications abandoned for excessive periods of time would have to show that the entire delay was "unavoidable" or "unintentional."

*Comment 68:* One comment suggested that the two-year limitation in 35 U.S.C. 41(c) is a "good compromise" in regard to a filing period for filing petitions to revive based upon unintentional delay.

*Response:* The suggestion is not adopted. Changing the one-year filing period requirement in § 1.137(b) to a two-year filing period requirement

would not substantially change the problem caused by a filing period requirement, namely, that it causes inequitable results in certain instances. In addition, the inclusion of any filing period requirement in § 1.137(a) or (b) will likely induce applicants, or their representatives, to delay the filing of a petition under § 1.137 until the end of such filing period. *See Application of S,* 8 USPQ2d at 1632. The Office has no discretion in regard to the twenty-four month filing period requirement in 35 U.S.C. 41(c), but the presence of a twenty-four month filing period requirement in 35 U.S.C. 41(c) does not imply that the Office must place a twenty-four month filing period requirement into the rules implementing 35 U.S.C. 41(a)(7), which contains no filing period requirement.

*Comment 69:* One comment opposed the changes to § 1.137 on the basis that the right to revive an abandoned application should be limited due to the public's right to practice a technology "that an applicant has abandoned."

*Response:* 35 U.S.C. 41(a)(7) authorizes the Office to revive an abandoned application where the abandonment was unintentional (or unavoidable, the epitome of unintentional), but not where the abandonment was intentional. Section 1.137 does not authorize the revival of an abandoned application where the applicant, by deliberate course of action, has abandoned an application or delayed seeking its revival. Additionally, in many instances the disclosure in a patent maturing from a revived application would not have been disclosed and the technology therein would not be public knowledge, but for the revival of the application.

*Comment 70:* One comment suggested the need for an intervening rights provision to protect innocent infringers.

*Response:* The issue of intervening rights relates to the enforcement of patent rights, which does not directly concern the conduct of proceedings in the Office. Thus, it is unclear whether the Office is authorized under 35 U.S.C. 6 to promulgate regulations including an intervening rights provision.

*Comment 71:* Several comments suggested that § 1.137(b) be amended to include the "promptly filed" requirement of § 1.137(a).

*Response:* The suggestion is effectively adopted, although *via* a different mechanism as explained below. While there is considerable merit to the suggestion for the inclusion of a "promptly filed" requirement in both § 1.137(a) and (b), the Office has eliminated the "promptly filed" requirement from § 1.137(a) to avoid

PHILIPS-SCHUBERT018853

confusion between "promptly filed" and "unavoidable delay." The phrase "promptly filed" has been associated with § 1.137(a) and its requirement for "unavoidable" delay, and, as such, the inclusion of a "promptly filed" requirement in § 1.137(b) might cause confusion in regard to the distinction between the circumstances that constitute unavoidable delay and the circumstances that constitute unintentional delay.

Section 1.137(a)(3) and (b)(3) as adopted requires that "the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition" has been "unavoidable" (§ 1.137(a)) or "unintentional" (§ 1.137(b)) to clarify the requirements for a petition under § 1.137(a) and (b). As discussed *supra*, an applicant who fails to file a petition under § 1.137(a) or (b) "promptly" upon becoming notified, or otherwise becoming aware, of the abandonment of the application will not be able to show that "the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition pursuant to [§ 1.137(a)] was unavoidable," and will probably not even be able to make an appropriate statement that "the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition pursuant to [§ 1.137(b)] was unintentional." Obviously, any petition under § 1.137(a) or (b) should be "promptly filed" upon discovery of abandonment to avoid a question as to whether the filing of such a petition was intentionally delayed.

*Comment 72:* One comment questioned how a patent could lapse for failure to pay the issue fee, as a patent does not issue unless the issue fee is paid.

*Response:* 35 U.S.C. 151 provides that where an applicant timely submits the sum specified in the Notice of Allowance as the issue fee, but a balance of the issue fee remains outstanding (due to a fee increase), the patent will lapse unless the balance of the issue fee is timely paid. See *Mills*, 12 USPQ2d at 1848; *see also Ex parte Crissy*, 201 USPQ 689 (Bd. Pat. App. 1976).

*Comment 73:* One comment suggested that § 1.137(a)(1) and (b)(1) not require a continuing application if the application became abandoned for failure to reply to a non-final Office action.

*Response:* Section 1.137(a)(1) and (b)(1) each provide that a petition thereunder include:

The required reply, unless previously filed. In a nonprovisional application abandoned

for failure to prosecute, the required reply may be met by the filing of a continuing application. In an application or patent, abandoned or lapsed for failure to pay the issue fee or any portion thereof, the required reply must be the payment of the issue fee or any outstanding balance thereof.

As discussed *supra*, there may be circumstances under which the Office may require a continuing application to meet this reply requirement. Nevertheless, in a nonprovisional application abandoned for failure to prosecute, a continuing application is generally a permissive (*i.e.*, "may be met") reply, in that an applicant in a nonprovisional application abandoned for failure to prosecute may file a reply under § 1.111 to a non-final Office action or a reply under § 1.113 (*e.g.*, notice of appeal) to a final Office action, or may simply file a continuing application as the required reply. In an application or patent, abandoned or lapsed for failure to pay any portion of the required issue fee, the issue fee or any outstanding balance thereof is the mandatory (*i.e.*, "must be") reply. As the "continuing application" option is limited to an abandoned nonprovisional application, the reply in an abandoned provisional application must be any outstanding reply to an Office requirement.

*Comment 74:* One comment suggested that § 1.137(c) be amended to take into account the provision in 35 U.S.C. 154(c) that an application (other than a design application) is entitled to a patent term of not less than twenty years from its filing date, or if the application contains a specific reference to an earlier filed application(s) under 35 U.S.C. 120, 121, or 365(c), the date twenty years from the filing date of the earliest such application(s).

*Response:* The suggestion is not adopted. The Office considers this situation to be applicable to a relatively small class of applications, and, as such, does not deem it prudent to introduce into § 1.137(c) the complexity necessary to account for this situation. Applicants in this situation (*e.g.*, instances in which an application filed prior to June 8, 1995, is to be revived solely for purposes of copendency with an application filed on or after June 8, 1995) may file a petition pursuant to § 1.183 requesting that the Office waive the provisions of § 1.137(c) to the extent that § 1.137(c) requires a disclaimer of the period in excess of the date twenty years from the filing date of the application, or if the application contains a specific reference to an earlier filed application(s) under 35 U.S.C. 120, 121, or 365(c), the date twenty years from the filing date of the

earliest such application(s). The Office will refund the § 1.17(h) petition fee if the § 1.183 petition is granted.

*Comment 75:* One comment suggested that the last paragraph of § 1.137 read:

Under no circumstance may a petition to revive a provisional application be filed more than twelve months after the filing date of the provisional application. No application filed more than twelve months after the filing date of a provisional application is entitled to a claim of priority from the provisional [application], notwithstanding the copendency of any petition to revive the provisional application.

*Response:* The suggestion is not adopted. 35 U.S.C. 111(b)(3)(C) authorizes the revival of an abandoned application on the basis of unavoidable or unintentional delay. 35 U.S.C. 111(b)(5) provides that a "provisional application shall be regarded as abandoned 12 months after the filing date of such application and shall not be subject to revival thereafter." 35 U.S.C. 111(b) does not contain any limitation on the filing date of a petition to revive an abandoned provisional application (or the date by which such a petition must be granted), but only a limitation as to the period of pendency of the provisional application. Thus, § 1.137(e) as adopted provides that "[a] provisional application * * * may be revived * * * so as to be pending for a period of no longer than twelve months from its filing date. Under no circumstances will a provisional application be regarded as pending after twelve months from its filing date."

*Section 1.139*

Section 1.139 is removed and reserved and its subject matter added to § 1.137.

No comments were received regarding the proposed change to § 1.139.

*Section 1.142*

Section 1.142 is amended by replacement of "response" with "reply" in accordance with the change to § 1.111.

No comments were received regarding the proposed change to § 1.142.

*Section 1.144*

Section 1.144 is amended for clarification purposes.

No comments were received regarding the proposed change to § 1.144.

*Section 1.146*

Section 1.146 is amended for clarification purposes.

No comments were received regarding the proposed change to § 1.146.

PHILIPS-SCHUBERT018854

**53164**    **Federal Register** / Vol. 62, No. 197 / Friday, October 10, 1997 / Rules and Regulations

*Section 1.152*

Section 1.152 is amended to place its former provisions into paragraphs (a), (a)(1), and (a)(2) for clarification.

Section 1.152 is also amended to remove the prohibition against color drawings and color photographs in design applications. Section 1.152 is amended to permit the use of color photographs and color drawings in design applications subject to the petition requirements of § 1.84(a)(2) inasmuch as color may be an integral element of the ornamental design. While pen and ink drawings may be lined for color, a clear showing of the configuration of the design may be obscured by this drafting method. New technologies, such as holographic designs, fireworks and laser light displays may not be accurately disclosed without the use of color.

The term "article" of § 1.152(a) is replaced by the term "design" as 35 U.S.C. 171 requires that the claim be directed to the "design for an article" not the article, *per se*. Therefore, to comply with the requirements of 35 U.S.C. 112, ¶ 1, it is only necessary that the design as embodied in the article be fully disclosed and not the article itself. The term "must" has been replaced by the term "should" to allow for latitude in the illustration of articles whose configuration may be understood without surface shading. Clarification language has been added to note that the use of solid black surfaces is permitted for representation of the color black as well as color contrast and that photographs and ink drawings must not be combined as formal drawings in one application.

A new § 1.152(b) is added to clarify Office practice concerning details disclosed in the ink drawings, color drawings, or photographs deposited with the original application papers. Specifically, § 1.152(b) provides that any details disclosed in the ink or color drawings, or photographs deposited with the original application papers constitutes an integral part of the disclosed and claimed design, except as otherwise provided in § 1.152(b). Section 1.152(b) further specifies that this detail may include color or contrast, graphic or written indicia, including identifying indicia of a proprietary nature (*e.g.*, a company logo), surface ornamentation on an article, or any combination thereof. The "but not limited to" phrase in § 1.152(b) clarifies that this list is exemplary, not exhaustive.

Section 1.152(b)(1) provides that when any detail shown in informal drawings or photographs does not constitute an integral part of the disclosed and claimed design, a specific disclaimer must appear in the original application papers either in the specification or directly on the drawings or photographs. This specific disclaimer in the original application papers will provide antecedent basis for the omission of the disclaimed detail(s) in later-filed drawings or photographs. That is, in the absence of such a disclaimer, later-filed formal or informal drawings not including any detail disclosed in the original drawings will be considered to contain new matter, and will be treated accordingly. *See* 35 U.S.C. 112, ¶ 1; § 1.121(a)(6).

*Comment 76:* One comment stated that applicant may misunderstand the implications of submitting a design drawing in color and suggested that § 1.152 should explain and give notice of the consequences of submitting an initial color drawing in design applications.

*Response:* The comment has been adopted.

Section 1.152(b)(2) provides that when informal color drawings or photographs are deposited with the original application papers without a disclaimer pursuant to § 1.152(b)(1), formal color drawings or photographs, or a black and white drawing lined to represent color, will be required.

*Section 1.154*

The heading of § 1.154 is amended to read "[a]rrangement of application elements" for consistency with §§ 1.77 and 1.163. Section 1.154 paragraph (a) is amended to clarify that a voluntary submission (see comments under § 1.152 relating to substitution of "design" for "article") may and should be made of "a brief description of the nature and intended use of the article in which the design is embodied." It is current practice for design examiners, in appropriate cases, to inquire as to the nature and intended use of the article in which a claimed design is embodied. The submission of such description will allow for a more accurate initial classification, and aid in providing a proper and complete search at the time of the first action on the merits. In those instances where this feature description is necessary to establish a clear understanding of the article in which the design is embodied, provision of the feature description would help in reducing pendency by eliminating the necessity for time-consuming correspondence. Specifically, requests for information prior to first action would be avoided. Absent an amendment requesting deletion of the description it would be printed on any patent that would issue.

No comments were received regarding the proposed change to § 1.154.

*Section 1.155*

Section 1.155 is amended to include only the language of former § 1.155(a). The subject matter of former paragraphs (b) through (f) of § 1.155 were added to § 1.137.

No comments were received regarding the proposed change to § 1.155.

*Section 1.163*

The heading of § 1.163 is amended to read "[s]pecification and arrangement of application elements" for consistency with §§ 1.77 and 1.154. Section 1.163(b) is amended to remove an unnecessary and outmoded reference to a "legible carbon copy of the original" specification for plant applications.

No comments were received regarding the proposed change to § 1.163.

*Section 1.165*

The proposed amendment to § 1.165 to remove the reference to the artistic and competent execution of plant patent drawings is withdrawn.

*Comment 77:* One comment argued that the language proposed to be deleted was actually relied upon by examiners to obtain new and better illustrations.

*Response:* The comment was adopted to the extent that the proposed change is withdrawn to allow for further study of what language related to the type of plant drawings should appear in § 1.165.

*Section 1.167*

Section 1.167 is amended to include only the language of former § 1.167(a), in that paragraph (b) is removed as unnecessary in view of § 1.132.

*Comment 78:* One comment questioned whether § 1.132 covers paragraph (b) of § 1.167, which paragraph has been deleted.

*Response:* Paragraph (b) of § 1.167 provided for the submission of affidavits by qualified agricultural or horticultural experts regarding the novelty and distinctiveness of the variety of plant. Section 1.132 relates to affidavits traversing grounds of rejection, and is recognized as the appropriate rule under which an affidavit may be submitted which does not fall within or under other specific rules. *See* MPEP 716.

*Section 1.171*

Section 1.171 is amended to no longer require an order for a title report in reissue applications as the requirement for a certification on behalf of all the assignees under concomitantly amended

PHILIPS-SCHUBERT018855

§ 1.172(a) obviates the need for a title report and fee therefor. Section 1.171 is also amended by deletion of the requirement for an offer to surrender the patent, which offer is seen to be redundant in view of § 1.178.

No adverse comments were received regarding the proposed change to § 1.171.

*Section 1.172*

Section 1.172 is amended to require that all assignees establish their ownership interest in compliance with § 3.73(b). The amendment as originally proposed repeated requirements found in § 3.73(b) rather than incorporating § 3.73(b), as assignees of a part interest are frequently involved in reissue applications.

*Comment 79:* One comment noted that the proposed amendment repeated requirements already found in § 3.73(b) and was unnecessary.

*Response:* The comment was adopted, in that § 1.172 is amended to simply reference § 3.73(b). Section 3.73(b) is amended to replace a reference to an assignee of the entire right, title and interest with a reference to an assignee, so as to include assignees of a part interest.

*Section 1.175*

Section 1.175 relating to the content of the reissue oath or declaration (MPEP 1414), as well as §§ 1.48 and 1.324 relating to correction of inventorship in an application and in a patent, respectively, are amended to remove the requirement for a factual showing relating to a matter in which a lack of deceptive intent must be established. A statement as to a lack of deceptive intent is sufficient to meet the statutory requirement under 35 U.S.C. 251 of a lack of deceptive intent relating to the error(s) to be corrected by reissue, and a factual showing of how the error(s) to be corrected by reissue arose or occurred is not required. As the Office no longer investigates fraud and inequitable conduct issues and a reissue applicant's statement of a lack of deceptive intent is normally accepted on its face (See MPEP 1448), the requirement in former § 1.175(a)(5) that it be shown how the error(s) being relied upon arose or occurred without deceptive intent on the part of the applicant appears to be unduly burdensome upon applicants and the Office, and is deleted. This applies to the initially identified error(s), under paragraph (a), and any subsequently identified error(s) under paragraph (b).

*Comment 80:* Although the elimination of the requirement for a factual showing relating to how the

errors arose or occurred enjoyed overwhelming support, three comments cited the need for continued investigation by the Office. One comment, while agreeing that some relaxation of reissue oath or declaration requirements are in order, stated that the Office should not decline to investigate entirely or adopt a *pro forma* requirement that can merely be incanted. Two comments stated that it is hard to get the courts to review this issue and that the courts and the public are at a disadvantage absent an explanation of how the error occurred.

*Response:* Current Office practice is to reject reissue applications only where there is "smoking gun" evidence of deceptive intent, which will not be demonstrated by the type of inquiry limited to a showing of how the error arose or occurred without the ability to subpoena witnesses or evidence. Accordingly, the burden presented on all reissue applicants based on the mere collection of such information for every error is not seen to be warranted.

*Comment 81:* One comment suggested that a final declaration is not needed, and that, as an alternative, counsel should be allowed to submit a statement based on information and belief counsel is not aware of deceptive intent.

*Response:* 35 U.S.C. 251 requires that an error have been made without deceptive intention to be corrected *via* reissue. Accordingly, all errors being corrected by reissue must have been made without deceptive intention, in that an error made with deceptive intention cannot be bootstrapped onto an error made without deceptive intention and corrected *via* reissue. The parties with the best knowledge of the lack of deceptive intention are the patentees and owners of the patent, not counsel for the reissue application.

An initial reissue oath or declaration filed pursuant to § 1.175(a) is limited to identification of the cause(s) of the reissue, and stating generally that all errors being corrected in the reissue application are at the time of filing of the oath or declaration arose without deceptive intent. Paragraph (a)(1) requires the identification of at least one error and only one error may be identified as the basis for reissue. The current practice under § 1.175 (a)(3) and (a)(5) of specifically identifying all errors being corrected at the time of filing the initial oath or declaration is not retained. Although only one error need be identified to provide a basis for reissue, where only one error among more than one is so identified, applicant should carefully monitor that the error is retained or submit a supplemental

oath or declaration identifying another error or errors.

*Comment 82:* One comment suggested that since a reissued patent and a reexamined patent may also be reissued, paragraph (a)(1) of § 1.175 may be clarified to substitute for "original patent," "reissued," or "existing patent" as what is wholly or partly inoperative or invalid.

*Response:* The effect of a reissue or reexamination proceedings is to cause a substitution for the original patent so that the reissued or reexamined patent becomes the original patent.

Paragraph (b)(1) of § 1.175 requires a supplemental reissue oath or declaration for errors corrected that were not covered by an earlier presented reissue oath or declaration, such as the initial oath or declaration pursuant to paragraph (a) of this section or one submitted subsequent thereto (a supplemental oath or declaration under this paragraph), stating generally that all errors being corrected, which are not covered by an earlier presented oath or declaration pursuant to § 1.175 (a) and (b), arose without any deceptive intention on the part of the applicant. A supplemental oath or declaration that refers to all errors that are being corrected, including errors covered by a reissue oath or declaration submitted pursuant to paragraph (a) of this section, would be acceptable. The specific requirement for a supplemental reissue oath or declaration to cover errors sought to be corrected subsequent to the filing of an initial reissue oath or declaration is not a new practice, but merely recognition of a current requirement for a supplemental reissue oath or declaration when additional errors are to be corrected. However, the current practice of specifically identifying all supplemental errors being corrected in a supplemental reissue oath or declaration is not retained.

A supplemental oath or declaration under paragraph (b)(1) must be submitted prior to allowance. The supplemental oath or declaration may be submitted with any amendment prior to allowance, paragraph (b)(1)(i), or in order to overcome a rejection under 35 U.S.C. 251 made by the examiner where there are errors sought to be corrected that are not covered by a previously filed reissue oath or declaration, paragraph (b)(1)(ii). Any such rejection by the examiner will include a statement that the rejection may be overcome by submission of a supplemental oath or declaration, which oath or declaration states that the errors in issue arose without any deceptive intent on the part of the applicant. An

PHILIPS-SCHUBERT018856

examiner ordinarily will be introducing a rejection under 35 U.S.C. 251 based on the lack of a supplemental declaration for the first time in the prosecution once the claims are determined to be otherwise allowable. The introduction of a new ground of rejection under 35 U.S.C. 251 will not prevent an action from being made final, except first actions pursuant to § 1.113(c), because of the combination of the following factors: (1) The finding of the case in condition for allowance is the first opportunity that the examiner has to make the rejection; (2) the rejection is being made in response to an amendment of the application (to deal with the errors in the patent); (3) all applicants are on notice that this rejection will be made upon finding of the case otherwise in condition for allowance where errors have been corrected subsequent to the last oath or declaration filed in the case, therefore, the rejection should have been expected by applicant; and (4) the rejection will not prevent applicant from exercising any rights as to curing the rejection, since applicant need only submit the supplemental oath or declaration with the above-described language, and it will be entered to cure the rejection provided it raises no additional issue, such as an informality or substantive reissue question (e.g., a previously omitted claim for priority under 35 U.S.C. 119).

A supplemental oath or declaration under paragraph (b) of this section would only be required for errors sought to be corrected during prosecution of the reissue application. Where an Office action contains only a rejection under 35 U.S.C. 251 and indicates that a supplemental oath or declaration under this paragraph would overcome the rejection, applicants are encouraged to authorize the payment of the issue fee at the time the supplemental reissue oath or declaration is submitted in view of the clear likelihood that the reissue application will be allowed on the next Office action. Such authorization will reduce the delays in the Office awaiting receipt of the issue fee. Where there are no errors to be corrected over those already covered by an oath or declaration submitted under paragraphs (a) and (b)(1) of this section (e.g., the application is allowed on first action), or where a supplemental oath or declaration has been submitted prior to allowance and no further errors have been corrected, a supplemental oath or declaration under this paragraph, or additional supplemental oath or declaration under paragraph (b)(1), would not be required.

Paragraph (b)(2) provides that for any error sought to be corrected after allowance (e.g., under § 1.312), a supplemental oath or declaration must accompany the requested correction stating that the error(s) to be corrected arose without any deceptive intent on the part of the applicant.

The quotes around lack of deceptive intent, currently found in § 1.175(a)(6), are removed as the exact language is not required. The reference to § 1.56, currently found in § 1.175(a)(7), is removed as unnecessary in view of the reference to § 1.56 in § 1.63 that is also referred to by § 1.175(a). The stated ability of applicant to file affidavits or declarations of others and the ability of the examiner to require additional information, currently found in § 1.175(b), is deleted as unnecessary in view of 35 U.S.C. 131 and 35 U.S.C 132.

New paragraph (c) of § 1.175 has been rewritten to clarify its intent that a subsequently submitted oath or declaration under this section need not identify any errors other than what was identified in the original oath or declaration provided at least one of the originally identified errors to be corrected is retained to provide a basis for the reissue.

In new paragraph (d) of § 1.175 a reference to § 1.53(f) is inserted to clarify that the initial oath or declaration under § 1.175(a) including those requirements under § 1.63 need not be submitted (with the specification, drawing and claims) in order to obtain a filing date.

### Section 1.176

The adoption of a final change to § 1.176 is held in abeyance pending further consideration by the Office of the decision by the Federal Circuit in *In re Graff*, 111 F.3d 874, 42 USPQ2d 1471 (Fed. Cir. 1997). *Graff* involved two issues: (1) whether it is permissible to have a continuation of a reissue application when the reissue application has issued as a reissue patent; and (2) whether broadened claims can be presented more than two years after the original patent date in a reissue application which was filed within two years but did not include any broadened claims. While *Graff* is more directly related to § 1.177 than § 1.176, §§ 1.176 and 1.177 are sufficiently interrelated that the Office considers it appropriate to hold the final changes to both § 1.176 and § 1.177 in abeyance pending further consideration by the Office of the decision in *Graff*.

*Comment 83:* A comment requested clarification regarding how restriction, between claims added in a reissue application and the original patent

claims, by the examiner would be permitted in § 1.176 while § 1.177 would prohibit multiple reissue patents except among the distinct and separate parts of the thing patented.

*Response:* The comment will receive further consideration when a final change to § 1.176 is adopted.

### Section 1.177

Section 1.177 was proposed to be amended to discontinue the current practice that copending reissue applications must be issued simultaneously unless ordered otherwise by the Commissioner pursuant to petition. As discussed *supra,* the adoption of a final change to § 1.177 is held in abeyance pending further consideration by the Office of the decision in *Graff*.

*Comment 84:* One comment would limit the granting of multiple reissue patents on different dates to where a petition for the grant of multiple reissue patents has been approved prior to the issuance of any reissue patent. Another comment thought that only one petition fee should be charged notwithstanding whether a petition in more than one reissue application is required.

*Response:* The comments will receive further consideration when a final change to § 1.177 is adopted.

### Section 1.181

The proposed change to § 1.181 will not be made, see comments relating to § 1.101.

*Comment 85:* One comment requested that the material to be deleted from § 1.181, paragraphs (d), (e), and (g) should be retained as they give fair warning to all and the consequences of failure to pay a petition fee.

*Response:* The comment has been adopted.

### Section 1.182

Section 1.182 is amended by providing that a petition under the section may be granted "subject to such other requirements as may be imposed" by the Commissioner, language similar to that appearing for petitions under § 1.183. The proposal to remove the statement that a decision on a petition thereunder will be communicated to interested parties in writing is withdrawn.

*Comment 86:* One comment opposed the proposal to remove the statement that a decision on a petition under § 1.182 will be communicated to interested parties in writing, arguing that it would not be appropriate for the Office to decide a petition under § 1.182 without communicating the decision to the interested parties in writing.

PHILIPS-SCHUBERT018857

*Response:* The suggestion is adopted. The Office did not propose to remove the statement that a decision on a petition under § 1.182 will be communicated to interested parties in writing because the Office intended to discontinue providing written decisions on petitions under § 1.182 (or any other petition), but because it was considered unnecessary to state as much in the rule itself. While the Office will communicate the decision on any petition under § 1.182 to the interested parties in writing, such decision may not always take the form of a traditional decision on petition. For example, the grant of a petition under § 1.182 to accept the omitted page(s) or drawing(s) in a nonprovisional application and accord the date of such submission as the application filing date will be indicated by the issuance of a new filing receipt stating the filing date accorded the application. *See* Notice entitled "Change in Procedure Relating to an Application Filing Date" published in the **Federal Register** at 61 FR 30041, 30043 (June 13, 1996), and in the *Official Gazette* at 1188 *Off. Gaz. Pat. Office* 48, 50–51 (July 9, 1996).

*Section 1.184*

Section 1.184 is removed and reserved as representing internal instructions.

*Comment 87:* Comments suggested that § 1.184 not be deleted notwithstanding its internal directions. See response to comment relating to § 1.101.

Section 1.184 relates to the refusal of a subsequent Commissioner to reconsider a case once decided by a previous Commissioner, except in accordance with principles which govern the granting of new trials. As the Commissioner is free to waive any requirement of the rules not required by statute, the prohibition against reconsideration is ineffective. Additionally, the deletion of the material does not necessarily represent an intent to engage in reconsideration of matters previously decided.

*Section 1.191*

Section 1.191(a) is amended to permit every applicant, and every owner of a patent under reexamination, any of whose claims have been twice or finally (§ 1.113) rejected (rather than "any of the claims of which have been twice rejected or given a final rejection (§ 1.113)"), to file an appeal to the Board of Patent Appeals and Interferences (Board) to better track the language of 35 U.S.C. 134. Section 1.191(a) is also amended to: (1) explicitly refer to a "notice of appeal" to provide

antecedent for such term in § 1.192; (2) replace "response" with "reply" in accordance with the change to § 1.111; and (3) refer to § 1.17(b) for consistency with the change to § 1.17.

*Comment 88:* One comment argued that the proposed change to § 1.191, limiting the "twice rejected" requirement for appeal to a particular application, was inconsistent with 35 U.S.C. 134, as indicated by the Board in the unpublished decision *Ex parte Lemoine*, Appeal No. 94–0216 (Bd. Pat. App. & Inter., December 27, 1994). A second comment argued that § 1.191 should permit an appeal based on one rejection in a prior application and one rejection in a continuing application to avoid requiring an applicant to file a *pro forma* reply to meet the requirement that the particular application be twice rejected.

*Response:* The comments have been adopted by elimination of the limitation to twice rejected being related to a particular application. To avoid inconsistency between § 1.191 and 35 U.S.C. 134, § 1.191 as adopted tracks the language of 35 U.S.C. 134, except that § 1.191 states "twice or finally (§ 1.113) rejected" rather than "twice rejected." The patent statute and rules of practice do not permit an application to be finally rejected (even under first action final practice) under 35 U.S.C. 132, unless the applicant is one "whose claims have been twice rejected" within the meaning of 35 U.S.C. 134. Thus, the phrase "or finally (§ 1.113)" may be viewed as redundant. Nevertheless, as applicants generally delay appeal until final action (although Pub. L. 103–465 may change this practice), and there has been some confusion as to when 35 U.S.C. 134 and § 1.191 permit an applicant to appeal a rejection, § 1.191(a) as adopted states "twice or finally (§ 1.113) rejected."

Section 1.191(b) is amended to eliminate the requirement for a notice of appeal to: (1) be signed; or (2) identify the appealed claims. These two requirements have been deleted as being redundant of the requirements of § 1.192 for an appeal brief, which is necessary to avoid dismissal of the appeal. Section 1.33 requires that an appeal brief filed in either an application (§ 1.33(b)) or a reexamination proceeding (§ 1.33(c)) be signed. Thus, a signed appeal brief under § 1.192 (which must be filed to avoid dismissal of the appeal) will serve to, in effect, ratify any unsigned notice of appeal under § 1.191. Likewise, the former requirement of § 1.191(b) for an identification of the appealed claims is unnecessary as § 1.192(c)(3) requires that the appeal brief, *inter alia*, identify the "claims appealed." While it is no

longer specifically required by § 1.191(b), an applicant or patent owner should continue to sign notice of appeals under § 1.191(b) (like other papers) and to also identify the claims appealed. The change to § 1.191(b), in effect, permits an appeal brief to constitute an automatic "correction" of a notice of appeal that is not signed or does not identify the appealed claims.

The failure to timely file an appeal brief will result in dismissal of an appeal (§ 1.192(b)). Thus, the failure to timely file an appeal brief (signed in compliance with § 1.33(b) or (c)) after the filing of an unsigned notice of appeal will result in dismissal of the appeal as of the expiration date (including any extensions of time actually obtained) for filing such appeal brief. It will not result in treatment of the application or patent under reexamination as if the notice of appeal had never been filed. This distinction is significant in an application containing allowed claims, in that dismissal of an appeal results in cancellation of the rejected claims and allowance of the application, not abandonment of the application (which would have occurred if the notice of appeal had never been filed).

The Office has eliminated the requirements for a notice of appeal to be signed and to identify the appealed claims to avoid the delay and expense to the applicant and the Office that is involved in treating a defective notice of appeal. These changes were not made to encourage the filing of unsigned notices of appeal or notices of appeal that do not identify the claims being appealed; rather, a notice of appeal should be signed and identify the claims appealed. As the change to § 1.191(b) does not affect other papers submitted with a notice of appeal (*e.g.*, an amendment under § 1.116) or other actions contained within the notice of appeal (*e.g.*, an authorization to charge fees to a deposit account), the failure to sign a notice of appeal (or accompanying papers) may have adverse effects notwithstanding the change to § 1.191(b). For example, an unsigned notice of appeal filed with an authorization (unsigned) to charge the appeal fee to a deposit account as payment of the notice of appeal fee (§ 1.17(b)) will be unacceptable as lacking the appeal fee, as § 1.191(b) applies to the notice of appeal, but not to an authorization to charge a deposit account that happens to be included in the notice of appeal.

*Section 1.192*

Section 1.192(a) is amended by replacement of "response" with "reply"

PHILIPS-SCHUBERT018858

in accordance with the change to § 1.111, and to refer to § 1.17(c) for consistency with the change to § 1.17.

*Comment 89:* One comment suggested that the appeal process could be improved by the imposition of a reasonable page limit on briefs.

*Response:* The suggestion will be reviewed for further consideration.

*Section 1.193*

Section 1.193, as well as §§ 1.194, 1.196, and 1.197, are amended to change "the appellant" to "appellant" for consistency. Section 1.193 is also amended by revision of paragraph (a) into paragraphs (a)(1) and (a)(2) and revision of paragraph (b) into paragraphs (b)(1) and (b)(2). Paragraph (a)(1) retains the subject matter of current paragraph (a), except that the phrase "and a petition from such decision may be taken to the Commissioner as provided in § 1.181" is deleted as superfluous. Section 1.181(a), by its terms, authorizes a petition from any action or requirement of an examiner in the *ex parte* prosecution of an application which is not subject to appeal.

Section 1.193(a)(2) specifically prohibits the inclusion of a new ground of rejection in an examiner's answer, but also expressly provides that when (1) an amendment under § 1.116 proposes to add or amend one or more claims, (2) appellant was advised (in an advisory action) that the amendment under § 1.116 would be entered for purposes of appeal, and (3) the advisory action indicates which individual rejection(s) set forth in the action from which the appeal was taken (*e.g.*, the final rejection) would be used to reject the added or amended claim(s), then (1) the appeal brief must address the rejection(s) of the claim(s) added or amended by the amendment under § 1.116 as indicated in the advisory action, and (2) the examiner's answer may include the rejection(s) of the claim(s) added or amended by the amendment under § 1.116 as indicated in the advisory action. This provision of § 1.193(a)(2) is intended for those situations in which a rejection is stated (*i.e.*, applied to some claim) in the final Office action, but due to an amendment under § 1.116 (after final) such rejection is now applicable to a claim that was added or amended under § 1.116. For example, when an amendment under § 1.116 cancels a claim (the "canceled claim") and incorporates its limitations into the claim upon which it depends or rewrites the claim as a new independent claim (the "appealed claim"), the appealed claim has become the canceled claim since it now contains the limitations of the canceled claim (*i.e.*, the only difference between the appealed claim and the canceled claim is the claim number). In such situations, the appellant has been given a fair opportunity to react to the ground of rejection (albeit to a claim having a different claim number). Thus, the Office does not consider such a rejection to constitute a "new ground of rejection" within the meaning of § 1.193(b). Nevertheless, § 1.193(b)(2) expressly permits such a rejection on appeal and further provides that "[t]he filing of an amendment under § 1.116 which is entered for purposes of appeal represents appellant's consent that when so advised any appeal proceed on those claim(s) added or amended by the amendment under § 1.116 subject to any rejection set forth in the action from which the appeal was taken" to eliminate controversy as to the rejection(s) to which claim(s) added or amended under § 1.116 may be subject on appeal.

The phrase "individual rejections" in § 1.193(a)(2) addresses the situation in which claim 2 (which depends upon claim 1) was rejected under 35 U.S.C. 103 on the basis of A in view of B and claim 3 (which depends upon claim 1) was rejected under 35 U.S.C. 103 on the basis of A in view of C, but no claim was rejected under 35 U.S.C. 103 on the basis of A in view of B and C, and an amendment under § 1.116 proposes to combine the limitations of claims 2 and 3 together into new claim 4. In this situation, the action from which the appeal is taken sets forth no rejection on the basis of A in view of B and C, and, as such, § 1.193(a)(2) does not authorize the inclusion of rejection of newly proposed claim 4 under 35 U.S.C. 103 on the basis of A in view of B and C in the examiner's answer. Of course, as a claim including the limitations of both claim 2 and claim 3 is a newly proposed claim in the application, such an amendment under § 1.116 may properly be refused entry as raising new issues. Conversely, that § 1.193(a)(2) would authorize the rejection in an examiner's answer of a claim sought to be added or amended in an amendment under § 1.116 has no effect on whether the amendment under § 1.116 is entitled to entry. The provisions of § 1.116 control whether an amendment under § 1.116 is entitled to entry; the provisions of § 1.193(a)(2) control the rejections to which a claim added or amended in an amendment under § 1.116 may be subject in an examiner's answer.

While § 1.193(a) generally prohibits a new ground of rejection in an examiner's answer, it does not prohibit the examiner from expanding upon or varying the rationale for a ground of rejection set forth in the action being appealed. That is, the parenthetical definition of "new ground of rejection" in MPEP 1208.01 as including an "other reason for rejection" of the appealed claims means another basis for rejection of the appealed claims, and not simply another argument, rationale, or reason submitted in support of a rejection previously of record.

There is no new ground of rejection when the basic thrust of the rejection remains the same such that an appellant has been given a fair opportunity to react to the rejection. *See In re Kronig*, 539 F.2d 1300, 1302–03, 190 USPQ 425, 426–27 (CCPA 1976). Where the statutory basis for the rejection remains the same, and the evidence relied upon in support of the rejection remains the same, a change in the discussion of or rationale for supporting the rejection does not constitute a new ground of rejection. *Id.* at 1303, 190 USPQ at 427 (reliance upon fewer references in affirming a rejection under 35 U.S.C. 103 does not constitute a new ground of rejection). Where the examiner simply changes (or adds) a rationale for supporting a rejection, but relies upon the same statutory basis and evidence in support of the rejection, there is no new ground of rejection.

In any event, an allegation that an examiner's answer contains an impermissible new ground of rejection is waived if not timely (§ 1.181(f)) raised by way of a petition under § 1.181(a).

Section 1.193(b)(1) provides appellant with a right to file a reply brief in reply to an examiner's answer which is not dependent upon a new point of argument being present in the examiner's answer. The former practice of permitting reply briefs based solely on a finding of a new point of argument, as set forth in former paragraph (b), is eliminated thereby preventing present controversies as to whether a new point of argument has been made by the primary examiner. Appellant would be assured of having the last submission prior to review by the Board. Upon receipt of a reply brief, the examiner would either acknowledge its receipt and entry or reopen prosecution to respond to any new issues raised in the reply brief. Should the Board desire to remand the appeal to the primary examiner for comment on the latest submission by appellant or to clarify an examiner's answer (MPEP 1211, 1211.01, and 1212), appellant would be entitled to submit a reply brief in reply to the answer by the examiner to the Board's inquiry, which answer would be by way of a supplemental examiner's answer.

PHILIPS-SCHUBERT018859

Thus, § 1.193(a)(2) does not permit a new ground of rejection in an examiner's answer, and § 1.193(b)(1) does not, in the absence of a remand by the Board, permit an answer (other than a mere acknowledgment) to a timely filed reply brief. Section 1.193 requires the examiner to reopen prosecution to either: (1) enter a new ground of rejection; or (2) provide a substantive answer to a reply brief.

Section 1.193(b)(2) provides that if appellant desires that the appeal process be reinstated in reply to the examiner's reopening of prosecution under § 1.193(b)(1), appellant would be able to file a request to reinstate the appeal and a supplemental appeal brief as an alternative to filing a reply (under §§ 1.111 or 1.113, as appropriate) to the Office action. Amendments, affidavits or other new evidence, however, would not be entered if submitted with a request to reinstate the appeal. Like a reply brief, a supplemental appeal brief submitted pursuant to § 1.193(b)(2)(ii) need not reiterate the contentions set forth in a previously filed appeal brief (or reply brief), but need only set forth appellant's contention with regard to the new ground of rejection(s) raised in the Office action that reopened prosecution. The supplemental appeal brief will automatically incorporate all issues and arguments raised in the previously filed appeal brief (or reply brief), unless appellant indicates otherwise.

The intent of the change to § 1.193(b) is to give appellant (rather than the examiner) the option to continue the appeal if desired (particularly under Pub. L. 103–465), or to continue prosecution before the examiner in the face of a new ground of rejection. Should a supplemental appeal brief be elected as the reply to the examiner reopening prosecution based on a new ground of rejection under § 1.193(b)(1), the examiner may under § 1.193(a)(1) issue an examiner's answer. Where an appeal is reinstated pursuant to § 1.193(b)(2)(ii), no additional appeal fee is currently required.

*Comment 90:* A number of comments favored permitting appellants to file a reply brief as a matter of right. One comment argued that the Board, rather than the examiner, should determine whether the appellant should be permitted to file a reply brief.

*Response:* Section 1.193 as adopted permits an appellant to file a reply brief as a matter of right. This change eliminates the authority of an examiner to refuse entry of a timely filed reply brief.

*Comment 91:* One comment suggested that a reasonable page limit could be placed on reply briefs.

*Response:* The comment will be studied.

*Comment 92:* A number of comments opposed the proposed change to require a substitute appeal brief, rather than a reply brief. These comments argued that requiring an entirely new brief reiterating previously submitted arguments, rather than a mere reply to the examiner's answer, would result in a less readable and coherent record.

*Response:* Section 1.193 as adopted permits a reply brief (rather than a substitute appeal brief) where the appellant desires to reply to an examiner's answer or and a supplemental appeal brief where the appellant requests reinstatement of an appeal. Contentions (or information) set forth in a previously filed appeal (or reply brief) need not be reiterated in a reply brief or supplemental appeal brief.

*Comment 93:* A number of comments favored prohibiting a new ground of rejection in an examiner's answer.

*Response:* Section 1.193 as adopted prohibits a new ground of rejection in an examiner's answer, except under the limited circumstance specifically provided for in § 1.193(a)(2).

*Comment 94:* Two comments suggested that if the examiner reopens prosecution after an appeal brief has been filed, §§ 1.193 or 1.113 should be amended to state that the action issued by the examiner cannot be made final.

*Response:* The finality of an Office action is determined under MPEP 706.07(a), which states that "any second or subsequent actions on the merits shall be final, except where the examiner introduces a new ground of rejection not necessitated by amendment of the application by applicant." Whether the action subsequent to the reopening of prosecution may be made final will be determined solely by whether such action includes a new ground of rejection not necessitated by amendment of the application by the applicant. Thus, where an amendment under § 1.116 entered as a result of reopening of prosecution necessitates a new ground of rejection, the action immediately subsequent to the reopening of prosecution may be made final. *See* MPEP 706.07(a) and 1208.01.

*Comment 95:* One comment would go further in permitting applicant to reinstate an appeal as a reply to the examiner reopening prosecution by permitting amendments, affidavits and other evidence to address the new ground of rejection. Another comment desired the ability to reply directly to

the Board for any new ground of rejection raised by the Board.

*Response:* The comments amount to having the Board conduct the prosecution of the application and not act as an appellate review. Amended claims, affidavits and other evidence should be seen by the examiner first for a determination as to whether a new search is required, to conduct any newly required search, and also to evaluate the newly submitted and any newly discovered material at the examination level. See comments to § 1.196(d).

*Comment 96:* One comment would further amend § 1.193 to waive any subsequent appeal notice fee and appeal brief fee, and start the time period for extension of patent from the time of first appeal in that if the examiner did his or her duty properly there would be no need to reopen prosecution.

*Response:* Under current practice, a new fee is due for each notice of appeal, each brief, and each request for an oral hearing, *so long as a decision on the merits by the Board resulted from the prior notice of appeal, brief, and request for an oral hearing.* Thus, when an examiner reopens prosecution after appeal but prior to a decision by the Board on the appeal, the fee for the notice of appeal, brief, and request for an oral hearing will apply to a later appeal. The change to § 1.193 in this Final Rule is not germane to patent term extension under 35 U.S.C. 154(b) and § 1.701.

In any event, that prosecution is reopened subsequent to the filing of an appeal brief is not necessarily a concession that the rejection of the appealed claims was in error. It is often the case that prosecution is reopened subsequent to the filing of an appeal brief in the situation in which the examiner considers the rejection of the appealed claims to be appropriate (and thus the appeal to be without merit), but discovers a better basis for rejecting the claims at issue (*e.g.,* even better prior art references). To characterize an examiner, who decides to reopen prosecution to avoid wasting the Board's resources (and the appellant's time) with a rejection that is not the best possible rejection of the appealed claims, as an examiner who is not properly performing his or her duties, would be non-sensical.

*Comment 97:* One comment opposed prohibiting a new ground of rejection in an examiner's answer. The comment argued that this change will result in unnecessary delays in prosecution.

*Response:* The proposal to prohibit a new ground of rejection in an examiner's answer otherwise received overwhelming support. Under Pub. L.

PHILIPS-SCHUBERT018860

**53170**   **Federal Register** / Vol. 62, No. 197 / Friday, October 10, 1997 / Rules and Regulations

103–465, any delay in prosecution resulting from the reopening of prosecution is to the detriment of the applicant. Thus, it is considered appropriate to give the applicant the choice of whether to prosecute the application before the examiner or reinstate the appeal.

*Section 1.194*

Section 1.194(b) is amended to provide that a request for an oral hearing must be filed in a separate paper, and to refer to § 1.17(d) for consistency with the change to § 1.17.

Section 1.194(c) is amended to provide that appellant will be notified when a requested oral hearing is unnecessary (*e.g.*, a remand is required).

*Comment 98:* One comment argued that § 1.194 leaves an open statement as to when the Board may decide that an oral hearing is not necessary, in that this section does not limit considering an oral hearing not necessary to when the application has been remanded to the examiner.

*Response:* The situation in which an application has been remanded to the examiner was simply an exemplary situation of special circumstances in which the Board may determine that an oral hearing is not necessary. Section 1.194 was not meant to limit the discretion of the Board to determine that an oral hearing is not necessary to those situations when the application has been remanded to the examiner.

*Section 1.196*

Section 1.196 paragraphs (b) and (d) are combined by amending paragraph § 1.196(b) to specifically provide therein for a new ground of rejection for both appealed claims and for allowed claims present in an application containing claims that have been appealed rather than the current practice under § 1.196(d) of recommending a rejection of allowed claims that is binding on the examiner. The effect of an explicit rejection of an allowed claim by the Board is not seen to differ from a recommendation of a rejection and would serve to advance the prosecution of the application by having the rejection made at an earlier date by the Board rather than waiting for the application to be forwarded and acted upon by the examiner. The former practice that the examiner is not bound by the rejection should appellant elect to proceed under § 1.196(b)(1) and an amendment or showing of facts not previously of record in the opinion of the examiner overcomes the new ground of rejection, is not changed. A period of two months is now explicitly set forth for a reply to a decision by the Board

containing a new ground of rejection pursuant to § 1.196(b), which would alter the one month previously set forth for replies to recommended rejections of previously allowed claims. *See* MPEP 1214.01. Extensions of time continue to be governed by § 1.196(f) and § 1.136(b) (and not by § 1.136(a)).

The last sentence of § 1.196(b)(2) is amended to clarify that appellants do not have to both appeal and file a request for rehearing where only a rehearing of a portion of the decision is sought. A decision on a request for rehearing will incorporate the earlier decision for purposes of appeal of the earlier decision in situations in which only a partial request for rehearing has been filed. Additionally, it is clarified that decisions on rehearing are final unless noted otherwise in the decision in that under some circumstances it may not be appropriate to make a decision on rehearing final as is currently automatically provided for. Section 1.196(b) is also amended to clarify that the appellant must exercise one of the two options with respect to the new ground of rejection under § 1.196(b) to avoid termination of proceedings (§ 1.197(c)) as to the rejected claims.

Section 1.196(b)(2) (and §§ 1.197(b) and 1.304(a)(1)) are amended to change the phrase "request for reconsideration" to "request for rehearing" for consistency with 35 U.S.C. 7(b). *See In re Alappat*, 33 F.3d 1526, 1533, 31 USPQ2d 1545, 1548 (Fed. Cir. 1994)(en banc)(noting "imprecise regulation drafting" in regard to the phrase "request for reconsideration" in § 1.197).

Section 1.196(d) is amended to provide the Board with explicit authority to have an appellant clarify the record in addition to what is already provided by way of remand to the examiner (MPEP 1211), and appellant's compliance with the requirements of an appeal brief (§ 1.192(d)). Section 1.196(d) specifically provides that an appellant may be required to address any matter that is deemed appropriate for a reasoned decision on the pending appeal, which may include: (1) The applicability of particular case law that has not been previously identified as relevant to an issue in the appeal; (2) the applicability of prior art that has not been made of record; or (3) the availability of particular test data that would be persuasive in rebutting a ground of rejection. Section 1.196(d) also provides that appellant would be given a non-extendable time period (not a time limit) within which to reply to any requirement under § 1.196(d).

*Comment 99:* One comment suggested that § 1.196(b) would appear to

authorize the Board to reverse a restriction requirement, as § 1.196(b) authorizes the Board to reject any pending claim. The comment suggested that § 1.196(b) authorize the Board to reject any examined (rather than pending) claim.

*Response:* Section 1.196(b) authorizes, but does not require, the Board to reject claims not involved in the appeal. The Board has held that a restriction requirement is not an adverse decision within the meaning of 35 U.S.C. 7 and 134 subject to appeal, and the CCPA and Federal Circuit have supported this position. *See In re Hengehold*, 440 F.2d 1395, 169 USPQ 473 (CCPA 1971); *see also In re Watkinson*, 900 F.2d 230, 14 USPQ2d 1407 (Fed. Cir. 1990). Thus, concerns that the Board will use the provisions of § 1.196(b) to review restriction requirements are misguided.

*Comment 100:* Several comments opposed the change to § 1.196(d) on the basis that it places the Board in the position of acting as an examiner in the first instance.

*Response:* Section 1.196(d) authorizes, but does not require, the Board to require an appellant to clarify the record without remanding the application to the examiner. This change will authorize the Board to obtain clarification directly from the appellant in those situations in which the Board considers a remand to or further action by the examiner unnecessary. Where the Board considers action by an examiner in the first instance to be necessary or desirable, the Board retains the authority to remand the application to the examiner for such action. Additionally, after reply to an inquiry under § 1.196(d) (*e.g.*, does there exist test data that would be persuasive in rebutting a particular ground of rejection), a remand to the examiner may be deemed to be appropriate (*e.g.*, to evaluate test data received in reply to an inquiry).

*Section 1.197*

Section 1.197(b) is amended to eliminate its use of the passive voice. Section 1.197(b) is also amended to change "reconsideration or modification" to "rehearing" for consistency with 35 U.S.C. 7(b). For consistency with the two-month period set forth in § 1.196(b), § 1.197(b) is also amended to provide a two-month period (rather than a one-month period) within which an appellant may file the single request for rehearing permitted by § 1.197(b).

No comments were received regarding the proposed change to § 1.197.

PHILIPS-SCHUBERT018861

*Section 1.291*

Section 1.291(c) is amended by removing the blanket limitation of one protest per protestor and would provide for a second or subsequent submission in the form of additional prior art. Mere argument that is later submitted by an initial protestor would continue not to be entered and would be returned unless it is shown that the argument relates to a new issue that could not have been earlier raised. *See* MPEP 1901.07(b). Although later submitted prior art would be made of record by a previous protestor without a showing that it relates to a new issue, it should be noted that entry of later submitted prior art in the file record does not assure its consideration by the examiner if submitted late in the examination process. Accordingly, initial protests should be as complete as possible when first filed.

In view of the amendment to § 1.291(a) in the "Miscellaneous Changes in Patent Practice" Final Rule (discussed *supra*) to require that a protest be filed prior to the mailing of a notice of allowance under § 1.311 to be considered timely (§ 1.291(a)(1)), the restriction of protests by number is deemed unnecessary and is recognized as ineffective, in that a party may effectively file multiple protests by submitting each protest through a third party agent acting on behalf of such party.

*Comment 101:* One comment suggested that permitting more than one submission by a particular party relating to prior art poses a risk that a third party may sequentially submit individual pieces of prior art as a delaying factor.

*Response:* Any delay in submission of a piece of prior art by a third party poses the risk that the later submitted prior art will not be considered, particularly if it is seen as part of a pattern. The review of any piece of prior art, assuming it is not part of a large package, to determine its value is not seen to result in any delay in issuing an Office action. It is recognized that some delay may result where a piece of prior art in a second submission by a third party is utilized in a rejection that could have been made sooner if that art had been submitted earlier; however, on balance the Office would prefer to delay prosecution of an application and consider and apply a newly submitted reference not found by the examiner rather than issue an invalid claim.

Section 1.291(c) is also amended to (1) delete the sentence "[t]he Office may communicate with the applicant regarding any protest and may require the applicant to reply to specific

questions raised by the protest" as superfluous as the Office may communicate with an applicant regarding any matter, and require the applicant to reply to specific questions, concerning the application; (2) replace "respond" with "reply" in accordance with the change to § 1.111.

*Section 1.293*

Section 1.293 paragraph (c) is amended to replace the reference to § 1.106(e) with a reference to § 1.104(c)(5), to reflect a transfer of material.

*Section 1.294*

Section 1.294 paragraph (b) is amended by replacement of "response" with "reply" in accordance with the change to § 1.111.

No comments were received regarding the proposed change to § 1.294.

*Section 1.304*

Section 1.304(a)(1) is amended to replace "consideration" by "reconsideration" to correct a typographical error.

No comments were received regarding the proposed change to § 1.304.

*Section 1.312*

Section 1.312(b) is amended to have a reference to § 1.175(b) added in view of the change in § 1.175(b) referencing § 1.312(b).

No comments were received regarding the proposed change to § 1.312.

*Section 1.313*

Section 1.313 will not be amended with the addition of paragraph (c) informing applicants that unless written notification is received that the application has been withdrawn from issue at least two weeks prior to the projected date of issue, applicants should expect that the application will issue as a patent. The matter will be further studied. It should be noted, however, that once an application has issued, the Office is without authority to grant a request under § 1.313 notwithstanding submission of the request prior to issuance of the patent.

*Section 1.316*

Section 1.316 is amended to include only the language of former § 1.316(a). The subject matter of former paragraphs (b) through (f) of § 1.316 were added to § 1.137.

No comments were received regarding the proposed change to § 1.316.

*Section 1.317*

Section 1.317 is amended to include only the language of former § 1.317(a).

The subject matter of former paragraphs (b), (c), (e) and (f) of § 1.317 were added to § 1.137.

No comments were received regarding the proposed change to § 1.317.

*Section 1.318*

Section 1.318 is removed and reserved as being an internal Office instruction.

See comments relating to § 1.101.

*Section 1.324*

Section 1.324 is amended by creating paragraphs (a) and (b). The requirement for factual showings to establish a lack of deceptive intent is deleted, with a statement to that effect being sufficient, paragraph (a).

Office practice is to require the same type and character of proof of facts as in petitions under § 1.48(a). *See* MPEP 1481. Unlike former § 1.48, former § 1.324 contained no diligence requirement. *See Stark* v. *Advanced Magnetics, Inc.,* 29 F.3d 1570, 1574, 31 USPQ2d 1290, 1293 (Fed. Cir. 1994). Section 1.324 (and § 1.48) as adopted contain no diligence requirement, for the reasons set forth in the discussion of § 1.48.

Section 1.324(b)(1) is amended to explicitly require a statement relating to the lack of deceptive intent only from each person who is being added or deleted as an inventor, as opposed to the current practice of requiring a statement from each original named inventor and any inventor to be added.

The current requirements for an oath or declaration under § 1.63 by each actual inventor is replaced, paragraph (b)(2) of § 1.324, by a statement from the current named inventors who have not submitted a statement under paragraph (b)(1) of § 1.324 either agreeing to the change of inventorship or stating that they have no disagreement in regard to the requested change. Not every original named inventor would necessarily have knowledge of each of the contributions of the other inventors and/or how the inventorship error occurred, in which case their lack of disagreement to the requested change would be sufficient.

Paragraph (b)(3) of § 1.324 requires the written consent of the assignees of all parties who submitted a statement under paragraph (b)(1) and (b)(2) of this section similar to the current practice of consents by the assignees of all the existing patentees. A clarification reference to § 3.73(b) is added.

Paragraph (b)(4) of § 1.324 states the requirement for a petition fee as set forth in § 1.20(b).

No adverse comments were received regarding the proposed change to § 1.324.

PHILIPS-SCHUBERT018862

**53172** **Federal Register** / Vol. 62, No. 197 / Friday, October 10, 1997 / Rules and Regulations

## Section 1.325

The proposed removal of § 1.325 is withdrawn. See comments relating to § 1.101.

## Section 1.351

The proposed removal of § 1.351 is withdrawn. See comments relating to § 1.101.

## Section 1.352

Section 1.352 is removed and reserved as unnecessary as an internal instruction.

See comments relating to § 1.101.

## Section 1.366

Section 1.366(b) is amended to remove the term "certificate" as unnecessary. Section 1.366(c) is amended for clarity by changing "serial number" to "application number," which consists of the serial number and the series code (e.g., "08/").

Paragraph (d) removes the request for the information concerning the issue date of the original patent and filing date of the application for the original patent as unnecessary. The term "serial" is also removed from paragraph (d).

No comments were received regarding the proposed change to § 1.366.

## Section 1.377

Section 1.377(c) is amended to remove the requirement that the petition be verified in accordance with the change to §§ 1.4(d)(2) and 10.18.

No comments were received regarding the proposed change to § 1.377.

## Section 1.378

Section 1.378(d) is amended to remove the requirement that the statement be verified in accordance with the change to §§ 1.4(d)(2) and 10.18.

No comments were received regarding the proposed change to § 1.378.

## Section 1.425

Section 1.425 is amended by removing paragraph (a) and its requirement for proof of the pertinent facts relating to the lack of cooperation or unavailability of the inventor for which status is sought. In addition, § 1.425 is further amended by deleting paragraph (b) and its requirements for proof of the pertinent facts, presence of a sufficient proprietary interest, and a showing that such action is necessary to preserve the rights of the parties or to prevent irreparable damage. Additionally, the requirement that the last known address of the non-signing inventor be stated has been removed. The current requirements are thought to be unnecessary in view of the need for submission of the same information in

a petition under § 1.47 during the national stage. The paragraph added parallels the requirement in PCT Rule 4.15 for a statement explaining to the satisfaction of the Commissioner the lack of the signature concerned for submission of the international application.

No comments were received regarding the proposed change to § 1.425.

## Section 1.484

Section 1.484 paragraphs (d) through (f) are amended by replacement of "response" and "respond" with "reply" in accordance with the change to § 1.111.

No comments were received regarding the proposed change to § 1.484.

## Section 1.485

Section 1.485(a) is amended by replacement of "response" with "reply" in accordance with the change to § 1.111.

No comments were received regarding the proposed change to § 1.485.

## Section 1.488

Section 1.488(b)(3) is amended by replacement of "response" with "reply" in accordance with the change to § 1.111.

No comments were received regarding the proposed change to § 1.488.

## Section 1.492

Section 1.492 is amended to add new paragraph (g). See the amendment to § 1.16 adding a new paragraph (m).

No comments were received regarding the proposed change to § 1.492.

## Section 1.494

Section 1.494(c) is amended by replacement of "response" with "reply" in accordance with the change to § 1.111.

No comments were received regarding the proposed change to § 1.494.

## Section 1.495

Section 1.495(c) is amended by replacement of "response" with "reply" in accordance with the change to § 1.111.

No comments were received regarding the proposed change to § 1.495.

## Section 1.510

Section 1.510(e) is amended to replace a reference to § 1.121(f) with a reference to § 1.530(d), which sets forth the requirements for an amendment in a reexamination proceeding.

No comments were received regarding the proposed change to § 1.510.

## Section 1.530

The title has been changed by the addition of a semicolon to clarify that the section is intended to cover not only amendments submitted with the statement, but also amendments submitted at any other stage of the reexamination proceedings.

Section 1.530(d) is replaced by paragraphs (d)(1) through (d)(7) removing the reference to § 1.121(f) in accordance with the deletion of § 1.121(f). The manner of proposing amendments in reexamination proceedings is governed by § 1.530 (d)(1) through (d)(6). Paragraph (d)(1) is directed to the manner of proposing amendments in the specification, other than in the claims. Paragraph (d)(1)(i) requires that amendments including deletions be made by submission of a copy of one or more newly added or rewritten paragraphs with markings, except that an entire paragraph may be deleted by a statement deleting the paragraph without presentation of the text of the paragraph. Paragraph (d)(1)(ii) requires indication of the precise point in the specification where the paragraph which is being amended is located. When a change in one sentence, paragraph, or page results in only format changes to other pages (e.g., shifting of non-amended text to subsequent pages) not otherwise being amended, such format changes are not to be submitted. Paragraph (d)(1)(iii) defines the markings set forth in paragraph (d)(1)(ii). Proposed paragraph (d)(1)(iii), relating to a requirement for submission of all amendments be presented when any amendment to the specification is made, was not implemented.

Paragraph (d)(2) of § 1.530 relates to the manner of proposing amendments to the claims in reexamination proceedings. Paragraph (d)(2)(i)(A) of § 1.530 requires that a proposed amendment include the entire text of each patent claim which is proposed to be amended by the current amendment and each proposed new claim being added by the current amendment. Additionally, provision has been made for the cancellation of a patent claim or of a previously proposed new claim by a direction to cancel without the need for marking by brackets. Paragraph (d)(2)(i)(B) prohibits the renumbering of the patent claims and requires that any proposed new claims follow the number of the highest numbered patent claim. Paragraph (d)(2)(i)(C) identifies the type of markings required by paragraph (d)(2)(i)(A), single underlining for added material and single brackets for material deleted.

PHILIPS-SCHUBERT018863

Paragraph (d)(2)(ii) requires the patent owner to set forth the status (*i.e.*, pending or cancelled) of all patent claims, and of all currently proposed new claims, as of the date of the submission of each proposed amendment. The absence of claim status would result in a notice of informal response.

Paragraph (d)(2)(iii) of § 1.530 requires an explanation of the support in the disclosure for any amendments to the claims presented for the first time on pages separate from the amendments along with any additional comments. The absence of an explanation would result in a notice of informal response.

Proposed paragraphs (d)(2) (iv) and (v), relating to a requirement for presentation of all amendments as of the date any amendment to the claims is made, and to the treatment of the failure to submit a copy of any added claim as a direction to cancel that claim, were not implemented.

Paragraph (d)(3) of § 1.530 provides that: (1) an amendment may not enlarge the scope of the claims of the patent, (2) no amendment may be proposed for entry in an expired patent, and (3) no amendment will be incorporated into the patent by certificate issued after the expiration of the patent.

Paragraph (d)(4) of § 1.530 provides that amendments proposed to a patent during reexamination proceedings will not be effective until a reexamination certificate is issued. This replaces paragraph (e) of § 1.530, which has been removed and reserved.

Paragraph (d)(5) of § 1.530 provides the criteria for the form of amendments in reexamination proceedings (*i.e.*, paper size must be either letter size or A4 size, and not legal size).

Paragraph (d)(6) of § 1.530 clarifies that proposed amendments to the patent drawing sheets are not permitted and that any change must be by way of a new sheet of drawings with the proposed amended figures being identified as "amended" and with proposed added figures identified as "new" for each sheet that has changed. Material in paragraph (d)(6) has been transferred from cancelled § 1.115.

Paragraph (d)(7) of § 1.530, has been added in view of the deletion of § 1.115 paragraph (d), requires amendment of the disclosure in certain situations (*i.e.*, to correct inaccuracies of description and definition) and to secure substantial correspondence between the claims, the remainder of the specification, and the drawings. The previous requirement for "correspondence" has been modified by use of "substantial correspondence." See comments to § 1.115.

Paragraph (d)(8) of § 1.530 has been added to clarify that all amendments to the patent being reexamined must be made relative to (*i.e.*, vis-à-vis) the patent specification in effect as of the date of the filing of the request for reexamination (the patent specification includes the claims). If there was a prior change to the patent (made *via* a prior reexamination certificate, reissue of the patent, certificate of correction, *etc.*), the first amendment must be made relative to the patent specification as changed by the prior proceeding or other mechanism for changing the patent. In addition, all amendments subsequent to the first amendment must be made relative to the patent specification in effect as of the date of the filing of the request for reexamination, and not relative to the prior amendment.

Paragraph (e) of § 1.530 has been removed with the material formerly contained therein transferred to new paragraph (d)(4) of § 1.530.

The proposed change in §§ 1.530, 1.550, and 1.560 to replace "response," "responses" and "respond" with "reply" in accordance with the change to § 1.111 is not being adopted at this time. As the term "reply" in a reexamination proceeding refers to the "reply" of a third party requester (§ 1.535), the Office is withdrawing for further consideration what term should consistently be used for the "reply" or "response" by the patent owner and what term should consistently be used for the "reply" by a third party requester.

### Section 1.550

Paragraph (a) of § 1.550 is amended to conform the citation to §§ 1.104 through 1.119 to the changes to §§ 1.104 through 1.119. Paragraphs (b) and (c) of § 1.550 are amended for clarification purposes. Paragraph (e) of § 1.550 clarifies present Office practice of requiring, after filing of a request for reexamination by a third party requester, the service of any document filed by either the patent owner or the third party on the other party in the reexamination proceeding in the manner provided in § 1.248.

No comments were received regarding the proposed change to § 1.550.

### Section 1.770

Section 1.770 is amended by replacement of "response" with "reply" in accordance with the change to § 1.111.

No comments were received regarding the proposed change to § 1.770.

### Section 1.785

Section 1.785 is amended by replacement of "response" with "reply"

in accordance with the change to § 1.111.

No comments were received regarding the proposed change to § 1.785.

### Section 1.804

Section 1.804(b) is clarified grammatically by changing "shall state" to "stating" and is amended to delete the requirement that the statement be verified in accordance with the change to §§ 1.4(d)(2) and 10.18.

No comments were received regarding the proposed change to § 1.804.

### Section 1.805

Section 1.805(c) is amended by deleting "verified" in accordance with the change to §§ 1.4(d) and 10.18 and removing unnecessary language noting that an attorney or agent registered to practice need not verify their statements.

No comments were received regarding the proposed change to § 1.805.

## Part 3

Portions of Part 3 are amended to incorporate Part 7, which part is removed and reserved.

No comments were received regarding the proposed change to Part 3.

### Section 3.11

Section 3.11(a) is created for the current subject matter and a new paragraph (b) is added citing Executive Order 9424 of February 18, 1944 (9 FR 1959, 3 CFR 1943–1949 Comp., p. 303) and its requirements that several departments and other executive agencies of the Government forward items for recording.

### Section 3.21

Section 3.21 is amended to replace the reference to "§ 1.53(b)(1)" with a reference to "§ 1.53(b)" and to delete the reference to "§ 1.62" for consistency with the amendment to § 1.53 and the deletion of § 1.62.

### Section 3.26

Section 3.26 is amended to remove the requirement that an English language translation be verified in accordance with the change to §§ 1.4(d)(2) and 10.18.

### Section 3.27

The current subject matter of § 3.27 is designated as paragraph (a), and a paragraph (b) is added to cite Executive Order 9424 and a mailing address therefor.

### Section 3.31

Section 3.31(c) is added to require that: (1) The cover sheet must indicate

PHILIPS-SCHUBERT018864

that the document is to be recorded on the Governmental Register; (2) the document is to be recorded on the Secret Register (if applicable); and (3) the document does not affect title (if applicable).

### Section 3.41

The current subject matter of § 3.41 is designated as paragraph (a), and a paragraph (b) is added to specify when no recording fee is required for documents required to be filed pursuant to Executive Order 9424.

### Section 3.51

Section 3.51 is amended by removing the term "certification" as unnecessary in accordance with the change to §§ 1.4(d)(2) and 10.18.

### Section 3.58

Section 3.58 is added to provide for the maintaining of a Department Register to record Government interests required by Executive Order 9424 in § 3.58(a). New § 3.58(b) provides that the Office maintain a Secret Register to record Government interests also required by the Executive Order.

### Section 3.73

Section 3.73(b) is amended to remove the sentence requiring an assignee to specifically state that the evidentiary documents have been reviewed and to certify that title is in the assignee seeking to take action. The sentence is deemed to be unnecessary in view of the amendment to §§ 1.4(d) and 10.18.

Section 3.73 paragraph (b) has also been amended to replace the language "assignee of the entire right, title and interest" with "assignee." This change provides for the applicability of the paragraph to assignees with a partial interest, such as is often encountered in reissue applications.

Section 3.73(b) is clarified by addition of a reference to an example of documentary evidence that can be submitted.

### Part 5

No comments were received regarding the proposed change to Part 5.

### Section 5.1

Section 5.1 is amended by removing the current subject matter as being duplicative of material in the other sections of this part and is replaced by subject matter deleted from § 5.33.

### Section 5.2

Section 5.2(b) is amended by removing the subject matter as being duplicative of material in the other sections of this part and is replaced with

subject matter of the first sentence from § 5.7. Section 5.2 paragraphs (c) and (d) are removed as repetitive of material in the other sections of this part.

### Section 5.3

Section 5.3 is amended by replacement of "response" with "reply" in accordance with the change to § 1.111.

### Section 5.4

Section 5.4 is amended by removing unnecessary subject matter from paragraph (a), eliminating, in paragraph (d), the requirement that the petition be verified in accordance with the amendment to §§ 1.4(d)(2) and 10.18, and by adding the first and second sentences of § 5.8 to § 5.4(d).

### Section 5.5

Section 5.5 is amended by removing unnecessary subject matter from paragraph (b) and by replacing current § 5.5(e) with subject matter removed from § 5.6(a).

### Section 5.6

Section 5.6 is removed and reserved with the subject matter of § 5.6(a) being placed in § 5.5(e).

### Section 5.7

Section 5.7 is removed and reserved with the first sentence thereof being placed in § 5.2(b).

### Section 5.8

Section 5.8 is removed and reserved with the subject matter from the first and second sentences thereof being placed in § 5.4(d).

### Sections 5.11

Section 5.11, paragraphs (b), (c) and (e), are amended to update the references to other parts of the Code of Federal Regulations.

### Section 5.12

Section 5.12(b) is amended to clarify that the petition fee (§ 1.17(h)) is required only when expedited handling is sought for the petition.

### Section 5.13

Section 5.13 is amended by removing the last two sentences which are considered to be unnecessary. Section 5.13 is also amended to remove the language concerning the requirement for the petition fee (§ 1.17(h)) for expedited handling of a petition under § 5.12(b), which is duplicative of the provisions of § 5.12(b). This amendment does not change current practice.

### Section 5.14

Section 5.14(a) is amended by removing unnecessary subject matter and replacing "serial number" with the more appropriate designation "application number." Section 5.14(a) is also amended to remove the language concerning the requirement for the petition fee (§ 1.17(h)) for expedited handling of a petition under § 5.12(b), which is duplicative of the provisions of § 5.12(b). This amendment does not change current practice.

### Section 5.15

Section 5.15, paragraphs (a), (b), (c), and (e), are amended by removing unnecessary subject matter and to update the references to other parts of the Code of Federal Regulations.

### Section 5.16

Section 5.16 is removed and reserved as unnecessary.

### Section 5.17

Section 5.17 is removed and reserved as unnecessary.

### Section 5.18

Section 5.18 is amended to update the references to other parts of the Code of Federal Regulations.

### Sections 5.19

Sections 5.19 (a) and (b) are amended to update the references to other parts of the Code of Federal Regulations. Section 5.19(c) is removed as unnecessary.

### Section 5.20

Section 5.20 is amended to include only the language of former § 5.20(a).

### Section 5.25

Section 5.25(c) is removed as unnecessary.

### Section 5.31

Section 5.31 is removed and reserved as unnecessary.

### Section 5.32

Section 5.32 is removed and reserved as unnecessary.

### Section 5.33

Section 5.33 is removed and reserved and its subject matter added to § 5.1.

### Part 7

Part 7 is removed and reserved as the substance thereof is incorporated into part 3.

No comments were received regarding the proposed change to Part 7.

PHILIPS-SCHUBERT018865

## Part 10

### Section 10.18

The heading of § 10.18 is amended to read "[s]ignature and certificate for correspondence filed in the Patent and Trademark Office" to reflect that it, as amended, applies to correspondence filed by non-practitioners as well as practitioners.

Section 10.18(a) is amended to provide that for all documents filed in the Office in patent, trademark, and other non-patent matters, except for correspondence that is required to be signed by the applicant or party, each piece of correspondence filed by a practitioner in the Patent and Trademark Office must bear a signature, personally signed by such practitioner, in compliance with § 1.4(d)(1). This amendment is simply a clarification of the requirements of former § 10.18(a).

Section 10.18 is further amended (in § 10.18 paragraphs (b) and (c)) to include the changes proposed to § 1.4 paragraphs (d)(2) and (d)(3). These changes to 37 CFR Part 10 are to avoid a dual standard between 37 CFR Parts 1 and 10 as to practitioners. In addition, by operation of § 1.4(d)(2), the provisions of § 10.18 paragraphs (b) and (c) are applicable to any party (whether a practitioner or non-practitioner) presenting any paper to the Office. As any party (whether a practitioner or non-practitioner) presenting any paper to the Office is subject to the provisions of § 10.18 paragraphs (b) and (c), this change also avoids a dual standard between practitioners and non-practitioners as to the certification provisions of § 10.18(b) and the sanctions provisions of § 10.18(c). The only difference between a practitioner and a non-practitioner as to § 10.18 paragraphs (b) and (c) is that a practitioner may also be subject to disciplinary action for violations of § 10.18(b) in addition to or in lieu of sanctions under § 10.18(c).

Section 10.18(b)(1) is specifically amended to provide that, by presenting to the Office (whether by signing, filing, submitting, or later advocating) any paper, the party presenting such paper (whether a practitioner or non-practitioner) is certifying that all statements made therein of the party's own knowledge are true, all statements made therein on information and belief are believed to be true, and all statements made therein are made with the knowledge that whoever, in any matter within the jurisdiction of the Patent and Trademark Office, knowingly and willfully falsifies, conceals, or covers up by any trick, scheme, or device a material fact, or makes any

false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be subject to the penalties set forth under 18 U.S.C. 1001, and that violations of this paragraph may jeopardize the validity of the application or document, or the validity or enforceability of any patent, trademark registration, or certificate resulting therefrom.

Section 10.18(b)(2) is specifically amended to provide that, by presenting to the Office any paper, the party presenting such paper (whether a practitioner or non-practitioner) is certifying that to the best of the party's knowledge, information and belief, formed after an inquiry reasonable under the circumstances, that: (1) the paper is not being presented for any improper purpose, such as to harass someone or to cause unnecessary delay or needless increase in the cost of prosecution before the Office; (2) the claims and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law; (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the denials of factual contentions are warranted on the evidence, or if specifically so identified, are reasonably based on a lack of information or belief.

As discussed *supra*, the amendments to § 10.18, in combination with the amendment to § 1.4(d), will permit the Office to eliminate the verification requirement for a number of the rules of practice.

Section 10.18(c) specifically provides that violations of § 10.18(b)(1) may jeopardize the validity of the application or document, or the validity or enforceability of any patent, trademark registration, or certificate resulting therefrom, and that violations of any of § 10.18 paragraphs (b)(2)(i) through (iv) are, after notice and reasonable opportunity to respond, subject to such sanctions as deemed appropriate by the Commissioner, or the Commissioner's designee, which may include, but are not limited to, any combination of: (1) holding certain facts to have been established; (2) returning papers; (3) precluding a party from filing a paper, or presenting or contesting an issue; (4) imposing a monetary sanction; (5) requiring a terminal disclaimer for the period of the

delay; or (6) terminating the proceedings in the Patent and Trademark Office.

With regard to the sanctions enumerated in § 10.18(c), 35 U.S.C. 6(a) provides that "[t]he Commissioner * * * may, subject to the approval of the Secretary of Commerce, establish regulations, not inconsistent with law, for the conduct of proceedings in the Patent and Trademark Office." The issue of whether the Office is authorized to impose monetary sanctions is addressed in the rulemaking entitled "Patent Appeal and Interference Practice," published in the **Federal Register** at 60 FR 14488 (March 17, 1995), and in the *Official Gazette* at 1173 *Off. Gaz. Pat. Office* 36 (April 11, 1995).

The Commissioner's authority under 35 U.S.C. 6(a) to impose monetary sanctions is limited to sanctions which are remedial, and does not extend to sanctions that are punitive. *Id.* at 14494–96, 1173 *Off. Gaz. Pat. Office* at 41–43. An enabling statute (35 U.S.C. 6(a)) alone is not the express statutory authorization required for an agency to impose penal monetary sanctions. *See, e.g., Commissioner* v. *Acker,* 361 U.S. 87, 91 (1959); *Gold Kist, Inc.* v. *Department of Agriculture,* 741 F.2d 344, 348 (11th Cir. 1984). Thus, the line of demarcation between permissible and impermissible monetary sanctions under 35 U.S.C. 6(a) is that: (1) the imposition of a monetary sanction to cover the costs incurred by the Office due to the violation of § 10.18(b)(2) is a remedial (and thus permissible) sanction; and (2) the imposition of a monetary sanction that has no relationship to the costs incurred by the Office due to the violation of § 10.18(b)(2) (*e.g.,* a pre-established or arbitrary fine or penalty) is a punitive (and thus impermissible) sanction. *See United States* v. *Frame,* 885 F.2d 1119, 1142–43 (3rd Cir. 1989)(late payment charge no higher than reasonable to cover lost interest and administrative costs incurred in the collection effort is a remedial sanction, and not a penalty, and, as such, is authorized by rulemaking enabling statute), *cert. denied,* 493 U.S. 1094 (1990); *see also Griffin & Dickson* v. *United States,* 16 Cl. Ct. 347, 356–57 (1989)(agency has the inherent authority to manage its caseload by imposing sanctions including precluding party from presenting further evidence, disciplining of representative, or imposing costs against the representative or the party in interest). As the Office is an entirely fee-funded entity, it is reasonable to impose a monetary sanction on a party causing an unnecessary and inordinate expenditure

PHILIPS-SCHUBERT018866

**53176**    **Federal Register** / Vol. 62, No. 197 / Friday, October 10, 1997 / Rules and Regulations

of Office resources to cover the costs incurred by the Office due to such action, rather than impose these costs on the Office's customers in general.

Nevertheless, the Office has amended §§ 1.4(d)(2) and 10.18 with the objective of discouraging the filing of frivolous or patently unwarranted correspondence in the Office, not to routinely review correspondence for compliance with § 10.18(b)(2) and impose sanctions under § 10.18(c). Thus, the amendment to §§ 1.4(d)(2) and 10.18 should cause no concern to practitioners and *pro se* applicants engaging in the ordinary course of business before the Office. The Office anticipates that sanctions under § 10.18(c) will be imposed only in rare situations in which such action is necessary for the Office to halt a clear abuse that is resulting in a needless and inordinate expenditure of Office resources.

Where the circumstances of an application or other proceeding warrant a determination of whether there has been a violation of § 10.18(b), the file or the application or other proceeding will be forwarded to the Office of Enrollment and Discipline (OED) for a determination of whether there has been a violation of § 10.18(b). In the event that OED determines that a provision of § 10.18(b) has been violated, the Commissioner, or the Commissioner's designee, will determine what (if any) sanction(s) under § 10.18(c) is to be imposed in the application or other proceeding. In addition, if OED determines that a provision of § 10.18(b) has been violated by a practitioner, OED will determine whether such practitioner is to be subject to disciplinary action (see §§ 1.4(d)(2) and 10.18(d)). That is, OED will provide a determination of whether there has been a violation of § 10.18(b), and if such violation is by a practitioner, whether such practitioner is to be subject to disciplinary action; however, OED will not be responsible for imposing sanctions under § 10.18(c) in an application or other proceeding.

Section 10.18(d) provides that any practitioner violating the provisions of this section may also be subject to disciplinary action. This paragraph (and the corresponding provision of § 1.4(d)(2)) clarifies that a practitioner may be subject to disciplinary action in lieu of, or in addition to, the sanctions set forth in § 10.18(c) for violations of § 10.18.

*Comment 102:* A number of comments supported the changes to § 1.4(d) to make its certification applicable to all papers signed and submitted to the Office.

*Response:* The Office will adopt the changes to make such a certification applicable to all papers filed in the Office, but will do so by placing the certification requirement in § 10.18, and providing in § 1.4(d) that the presentation of any paper to the Office, whether by a practitioner or non-practitioner, constitutes a certification under § 10.18. Thus, the presentation of a paper to the Office by any person (even a non-practitioner) constitutes a certification under § 10.18.

*Comment 103:* A number of comments opposed the change to § 1.4(d) as increasing the burden on persons presenting papers to the Office, and, as such, inconsistent with the stated goal of reducing the burden on the public. One comment indicated that new burdens in § 1.4(d) on signers of papers submitted to the Office include: (1) conducting a reasonable inquiry concerning the document to be submitted to the Office; (2) not submitting the document to harass or seek a needless increase in the cost of prosecution; and (3) submitting only documents likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

*Response:* The change to §§ 1.4(d) and 10.18 should discourage the filing of frivolous papers in the Office, and thus reduce the cost to the Office of treating such papers, which cost is ultimately borne by the Office's customers. Thus, this change to §§ 1.4(d) and 10.18 will reduce the burden on the public and to the Office's customers in general. There is no reasonable argument as to why a person filing a document in the Office should be permitted to avoid the "burden" of conducting a reasonable inquiry concerning the document to be submitted to the Office, not submitting the document to harass or seek a needless increase in the cost of prosecution, or submitting only documents likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

*Comment 104:* Several comments opposed the addition of § 1.4(d)(2) (now § 10.18(b)(2)) on the basis that the phrase "formed after an inquiry reasonable under the circumstances" was too vague or was unclear as to how much of an inquiry must be made to meet the "reasonable inquiry" requirement.

*Response:* The phrase "formed after an inquiry reasonable under the circumstances" is taken from Rule 11(b) of the Federal Rules of Civil Procedure (Fed. R. Civ. P. 11(b)), which provides that:

Representations to Court. By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances—

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

*See* Fed. R. Civ. P. 11(b)(1993).

Section 10.18(b)(2) tracks the language of Fed. R. Civ. P. 11(b)(1993) to avoid confusion as to what certifications a signature entails. The advisory committee notes to Fed. R. Civ. P. 11(b) provide further information on the "inquiry reasonable under the circumstances" requirement. *See Amendments to the Federal Rules of Civil Procedure* at 50–53 (1993), *reprinted in* 146 F.R.D. 401, 584–87. The "inquiry reasonable under the circumstances" requirement of § 10.18(b)(2) is identical to that in Fed. R. Civ. P. 11(b). The Federal courts have stated in regard to the "reasonable inquiry" requirement of Fed. R. Civ. P. 11:

In requiring reasonable inquiry before the filing of any pleading in a civil case in federal district court, Rule 11 demands "an objective determination of whether a sanctioned party's conduct was reasonable under the circumstances." In effect it imposes a negligence standard, for negligence is a failure to use reasonable care. The equation between negligence and the failure to conduct a reasonable precomplaint inquiry is . . . that "the amount of investigation required by Rule 11 depends on both the time available to investigate and on the probability that more investigation will turn up important evidence; the Rule does not require steps that are not cost-justified."

*Hays* v. *Sony Electronics,* 847 F.2d 412, 418, 7 USPQ2d 1043, 1048 (7th. Cir. 1988)(citations omitted)(decided prior to the 1993 amendment to Fed. R. Civ. P. 11, but discussing a "reasonable under the circumstances" standard).

*Comment 105:* One comment opposed the change in § 1.4(d) to import the verification requirement into any papers signed and submitted to the Office, on

PHILIPS-SCHUBERT018867

the basis that the presence of a verification actually on the paper signed and submitted to the Office would cause the signer to carefully consider what is being signed and submitted to the Office.

*Response:* A separate verification requirement for certain papers results in delays during the examination of an application when such verification is omitted. The Office is convinced that people are inclined to either not make false, misleading or inaccurate statements in documents they sign, or are not deterred from making such statements by the presence of a verification clause in the document. The benefit obtained in the rare instance in which a person otherwise inclined to make a false, misleading or inaccurate statement is persuaded not to do so by a verification clause simply does not outweigh the benefit obtained by the elimination of the delay that results from the requirement for such a verification clause.

*Comment 106:* One comment opposed the change to § 1.4(d) (now § 10.18(b)(2)) on the basis that "reasonable inquiry" requirement therein will expose a practitioner to malpractice liability.

*Response:* Legal malpractice is not an issue of Federal patent (or trademark) law, but of common law sounding in tort. *See Voight* v. *Kraft,* 342 F. Supp 821, 822, 174 USPQ 294, 295 (D. Idaho 1972). Section 10.18(b)(2) does not affect the duty (or create a new duty) on the part of a practitioner to his or her client *vis-à-vis* the submission of papers to the Office.

The party's duties under § 10.18 are not to one's own clients; it is to the public in general, other parties before the Office (the examination of whose applications are delayed while the Office is, and whose fees must be applied to the cost of, responding to frivolous papers), and to the Office. *Cf. Mars Steel Corp.* v. *Continental Bank,* 880 F.2d 928, 932 (7th. Cir. 1989)(just as tort law creates duties to one's client, Fed. R. Civ. P. 11 creates a duty to one's adversary, other litigants in the courts's queue, and the court itself); *Hays,* 847 F.2d at 418, 7 USPQ2d at 1049 (same).

*Comment 107:* One comment indicated that the requirements in § 1.4(d)(2) (now § 10.18(b)(2)) may be onerous as to persons not registered to practice before the Office. Another comment opposed this change on the basis that it would create new issues during litigation, in that few non-lawyers have enough legal knowledge to accurately verify that the documents they sign are consistent with the law. The comment suggested that § 1.4(d)(2)

simply be amended to include the verification statement from § 1.68.

*Response:* There is no reasonable argument as to why the certification for papers submitted to the Office should be any less than the certification required under Fed. R. Civ. P. 11(b) for papers filed in the Federal courts. The Federal Rules of Civil Procedure do not permit a *pro se* litigant to avoid the requirements of Fed. R. Civ. P. 11(b) ("By presenting * * * an attorney or unrepresented party is certifying * * * ." (emphasis added)). It is, however, appropriate to take account of the special circumstances of *pro se* applicants in determining whether sanctions under § 10.18(c) are appropriate. *See* advisory committee notes to Fed. R. Civ. P. 11 (1983), *reprinted in* 97 F.R.D. 165, 198–99 (1983) ("Although the standard is the same for unrepresented parties, who are obligated themselves to sign the [papers], the court has sufficient discretion to take account of the special circumstances that often arise in *pro se* situations").

The Office expects that *pro se* applicants will often submit arguments that evidence little, if any, appreciation of the applicable law or procedure. The Office is not adopting §§ 1.4(d)(2) and 10.18 (b) and (c) for the purpose of imposing, and does not intend to impose, sanctions on *pro se* applicants in situations in which they simply submit arguments lacking an appreciation of the applicable law or procedure. *See Finch* v. *Hughes Aircraft Co.,* 926 F.2d 1574, 1582, 17 USPQ2d 1914, 1921 (Fed. Cir. 1991) ("courts are particularly cautious about imposing sanctions on a *pro se* litigant, whose improper conduct may be attributed to ignorance of the law and proper procedures"); *see also Hornback* v. *U.S.,* 40 USPQ2d 1694, 1697 (Cl. Ct. 1996) (*pro se* without legal training is not held to the same standard as trained counsel).

Where, however, a *pro se* applicant engages in a course of conduct that any reasonable person should have known was improper, and which causes a needless and inordinate expenditure of Office resources, such conduct may result in the imposition of sanctions on the *pro se* applicant. The Federal courts have subjected *pro se* litigants to sanctions for: (1) Taking or persisting in actions that even a non-lawyer should have known were frivolous; (2) taking or persisting in actions that, after engaging in a sufficient course of litigation, the *pro se* litigant should have known were frivolous; or (3) taking or persisting in actions after having been warned by the court that such actions were frivolous.

*See Constant* v. *U.S.,* 929 F.2d 654, 658, 18 USPQ2d 1298, 1301 (Fed. Cir.), *cert. denied,* 501 U.S. 1206 (1991); *Finch,* 926 F.2d at 1582–83, 17 USPQ2d at 1921; *U.S. ex rel. Taylor* v. *Times Herald Record,* 22 USPQ2d 1716, 1718 (S.D.N.Y. 1992), *aff'd,* 990 F.3d 623 (2d Cir. 1993)(table).

*Comment 108:* One comment argued that the change to § 1.4(d) would be particularly difficult to apply in the context of provisional applications.

*Response:* The patent statute and rules of practice do not require any papers other than a disclosure (with or without claims) and a cover sheet for a provisional application (*e.g.,* an applicant need and should not submit legal arguments or other contentions with a provisional application). Thus, it is highly unlikely that the filing of a provisional application will result in a violation of § 10.18(b).

*Comment 109:* One comment opposed the change to § 1.4(d) on the basis that it was not clear whether a practitioner has an obligation in the case of a submission of a statement of facts to inform the party making the statement (or the client) of this certification effect, and the sanctions applicable to noncompliance. Another comment indicated that practitioners will now be placed under the obligation of questioning their clients each time they are given information or instructions.

*Response:* The submission by an applicant of misleading or inaccurate statements of facts during the prosecution of applications for patent has resulted in the patents issuing on such applications being held unenforceable. *See, e.g., Refac International Ltd.* v. *Lotus Development Corp.,* 81 F.3d 1576, 38 USPQ2d 1665 (Fed. Cir. 1996); *Paragon Podiatry Laboratory, Inc.* v. *KLM Laboratories, Inc.,* 984 F.2d 1182, 25 USPQ2d 1561 (Fed. Cir 1993); *Rohm and Haas Corp.* v. *Crystal Chemical Co.,* 722 F.2d 1556, 200 USPQ 289 (Fed. Cir. 1983), *cert. denied,* 469 U.S. 851 (1984); *Ott* v. *Goodpasture,* 40 USPQ2d 1831 (D.N. Tex. 1996); *Herman* v. *William Brooks Shoe Co.,* 39 USPQ2d 1773 (S.D.N.Y. 1996); *Golden Valley Microwave Food Inc.* v. *Weaver Popcorn Co.,* 837 F. Supp. 1444, 24 USPQ2d 1801 (N.D. Ind. 1992), *aff'd,* 11 F.3d 1072 (Fed. Cir. 1993)(table), *cert. denied,* 511 U.S. 1128 (1994). Likewise, false statements by a practitioner in a paper submitted to the Office during the prosecution of an application for patent has resulted in the patent issuing on such application also being held unenforceable. *See General Electro Music Corp.* v. *Samick Music Corp.,* 19 F.3d 1405, 30 USPQ2d 1149 (Fed. Cir. 1994)(false statement in

PHILIPS-SCHUBERT018868

a petition to make an application special constitutes inequitable conduct, and renders the patent issuing on such application unenforceable). In addition, the failure to exercise due care in ascertaining the accuracy of the statements in a certification submitted to the Office has also resulted in a patent being held invalid. *See DH Technology,* 937 F. Supp. at 910; 40 USPQ2d at 1761.

For the above-stated reasons, it is highly advisable for a practitioner to advise a client or third party that any information so provided must be reliable and not misleading, regardless of this amendment to §§ 1.4(d)(2) and 10.18. Nevertheless, §§ 1.4(d)(2) and 10.18 as adopted do not require a practitioner to advise the client (or third party) providing information of this certification effect (or the sanctions applicable to noncompliance), or question the client (or third party) when such information or instructions are provided. When a practitioner is submitting information (*e.g.*, a statement of fact) from the applicant or a third party, or relying in arguments upon information from the applicant or a third party, the Office will consider a practitioner's "inquiry reasonable under the circumstances" duty under § 10.18 met so long as the practitioner has no knowledge of information that is contrary to the information provided by the applicant or third party or would otherwise indicate that the information provided by the applicant or third party was so provided for the purpose of a violation of § 10.18 (*e.g.*, was submitted to cause unnecessary delay).

An applicant has no duty to conduct a prior art search as a prerequisite to filing an application for patent. *See Nordberg, Inc.* v. *Telsmith, Inc.,* 82 F.3d 394, 397, 38 USPQ2d 1593, 1595–96 (Fed. Cir. 1996); *FMC Corp.* v. *Hennessy Indus., Inc.,* 836 F.2d 521, 526 n.6, 5 USPQ2d 1272, 1275–76 n.6 (Fed. Cir. 1987); *FMC Corp.* v. *Manitowoc Co., Inc.,* 835 F.2d 1411, 1415, 5 USPQ2d 1112, 1115 (Fed. Cir. 1987); *American Hoist & Derrick Co.* v. *Sowa & Sons, Inc.,* 725 F.2d 1350, 1362, 220 USPQ 763, 772 (Fed. Cir.), *cert. denied,* 469 U.S. 821, 224 USPQ 520 (1984). The "inquiry reasonable under the circumstances" requirement of § 10.18 does not create any new duty on the part of an applicant for patent to conduct a prior art search. *See* MPEP 609; *cf. Judin* v. *United States,* 110 F.3d 780, 42 USPQ2d 1300 (Fed. Cir 1997)(the failure to obtain and examine the accused infringing device prior to bringing a civil action for infringement violates the 1983 version of Fed. R. Civ. P. 11). The "inquiry reasonable under

the circumstances" requirement of § 10.18, however, will require an inquiry into the underlying facts and circumstances when a practitioner provides conclusive statements to the Office (*e.g.*, a statement that the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition pursuant to § 1.137(b) was unintentional).

*Section 10.23*

Section 10.23 is amended to change the phrase "knowingly signing" to "signing." This amendment to § 10.23 is for consistency with § 10.18, which contains no "knowingly" provision or requirement.

**Review Under the Paperwork Reduction Act of 1995**

This final rule contains information collection requirements which are subject to review by the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*). The principal impact of this Final Rule is: (1) elimination of unnecessary rules of practice; (2) simplification or elimination of certain requirements of the rules of practice; (3) rearrangement of certain rules to improve their context; and (4) clarification of the requirements of the rules of practice.

The title, description and respondent description of each of the information collections are shown below with an estimate of each of the annual reporting burdens. The collections of information in this Final Rule have been reviewed and approved by OMB under the following control numbers: 0651–0016, 0651–0021, 0651–0022, 0651–0027, 0651–0031, 0651–0032, 0651–0033, 0651–0034, 0651–0035, and 0651–0037. Included in each estimate is the time for reviewing instructions, gathering and maintaining the data needed, and completing and reviewing the collection of information.

Notwithstanding any other provision of law, no person is required to respond to nor shall a person be subject to a penalty for failure to comply with a collection of information subject to the requirements of the Paperwork Reduction Act unless that collection of information displays a currently valid OMB control number.

*OMB Number:* 0651–0016.
*Title:* Rules for Patent Maintenance Fees.
*Form Numbers:* PTO/SB/45/46/47/65/66.
*Type of Review:* Approved through July of 1999.
*Affected Public:* Individuals or Households, Business or Other For-

Profit, Not-for-Profit Institutions and Federal Government.
*Estimated Number of Respondents:* 273,800.
*Estimated Time Per Response:* 0.08 hour.
*Estimated Total Annual Burden Hours:* 22,640 hours.
*Needs and Uses:* Maintenance fees are required to maintain a patent, except for design or plant patents, in force under 35 U.S.C. 41(b). Payment of maintenance fees are required at 3½, 7½ and 11½ years after the grant of the patent. A patent number and application number of the patent on which maintenance fees are paid are required in order to ensure proper crediting of such payments.

*OMB Number:* 0651–0021.
*Title:* Patent Cooperation Treaty.
*Form Numbers:* PCT/RO/101,ANNEX/134/144, PTO–1382, PCT/IPEA/401, PCT/IB/328.
*Type of Review:* Approved through May of 2000.
*Affected Public:* Individuals or Households, Business or Other For-Profit, Federal Agencies or Employees, Not-for-Profit Institutions, Small Businesses or Organizations.
*Estimated Number of Respondents:* 102,950.
*Estimated Time Per Response:* 0.9538 hour.
*Estimated Total Annual Burden Hours:* 98,195 hours.
*Needs and Uses:* The information collected is required by the Patent Cooperation Treaty (PCT). The general purpose of the PCT is to simplify the filing of patent applications on the same invention in different countries. It provides for a centralized filing procedure and a standardized application format.

*OMB Number:* 0651–0022.
*Title:* Deposit of Biological Materials for Patent Purposes.
*Form Numbers:* None.
*Type of Review:* Approved through December of 1997.
*Affected Public:* Individuals or Households, State or Local Governments, Farms, Business or Other For-Profit, Federal Agencies or Employees, Not-for-Profit Institutions, Small Businesses or Organizations.
*Estimated Number of Respondents:* 3,325.
*Estimated Time Per Response:* 1.0 hour.
*Estimated Total Annual Burden Hours:* 3,325 hours.
*Needs and Uses:* Information on depositing of biological materials in depositories is required for (1) Office determination of compliance with the

PHILIPS-SCHUBERT018869

patent statute where the invention sought to be patented relies on biological material subject to deposit requirement, which includes notifying interested members of the public where to obtain samples of deposits, and (2) depositories desiring to be recognized as suitable by the Office.

*OMB Number:* 0651–0027.

*Title:* Changes in Patent and Trademark Assignment Practices.

*Form Numbers:* PTO–1618 and PTO–1619, PTO/SB/15/41.

*Type of Review:* Approved through September of 1998.

*Affected Public:* Individuals or Households and Businesses or Other For-Profit.

*Estimated Number of Respondents:* 170,000.

*Estimated Time Per Response:* 0.57 hour.

*Estimated Total Annual Burden Hours:* 97,000 hours.

*Needs and Uses:* The Office records about 170,000 assignments or documents related to ownership of patent and trademark cases each year. The Office requires a cover sheet to expedite the processing of these documents and to ensure that they are properly recorded.

*OMB Number:* 0651–0031.

*Title:* Patent Processing (Updating).

*Form Numbers:* PTO/SB/08–12/21–26/31/32/42/43/61–64/67–69/91–93/96/97.

*Type of Review:* Approved through October of 1999.

*Affected Public:* Individuals or Households, Business or Other For-Profit Institutions and Federal Government.

*Estimated Number of Respondents:* 1,690,690.

*Estimated Time Per Response:* 0.361 hours.

*Estimated Total Annual Burden Hours:* 644,844 hours.

*Needs and Uses:* During the processing for an application for a patent, the applicant/agent may be required or desire to submit additional information to the Office concerning the examination of a specific application. The specific information required or which may be submitted includes: Information Disclosure Statements; Terminal Disclaimers; Petitions to Revive; Express Abandonments; Appeal Notices; Small Entity; Petitions for Access; Powers to Inspect; Certificates of Mailing; Certificates under § 3.73(b); Amendments, Petitions and their Transmittal Letters; and Deposit Account Order Forms.

*OMB Number:* 0651–0032.

*Title:* Initial Patent Application.

*Form Number:* PTO/SB/01–07/17–20/101–109.

*Type of Review:* Approved through September of 1998.

*Affected Public:* Individuals or Households, Business or Other For-Profit, Not-for-Profit Institutions and Federal Government.

*Estimated Number of Respondents:* 243,100.

*Estimated Time Per Response:* 7.88 hours.

*Estimated Total Annual Burden Hours:* 1,915,500 hours.

*Needs and Uses:* The purpose of this information collection is to permit the Office to determine whether an application meets the criteria set forth in the patent statute and regulations. The standard Fee Transmittal form, New Utility Patent Application Transmittal form, New Design Patent Application Transmittal form, New Plant Patent Application Transmittal form, Plant Color Coding Sheet, Declaration, and Plant Patent Application Declaration will assist applicants in complying with the requirements of the patent statute and regulations, and will further assist the Office in processing and examination of the application.

*OMB Number:* 0651–0033.

*Title:* Post Allowance and Refiling.

*Form Numbers:* PTO/SB/13/14/44/50–57; PTOL–85b.

*Type of Review:* Approved through June of 1999.

*Affected Public:* Individuals or Households, Business or Other For-Profit, Not-for-Profit Institutions and Federal Government.

*Estimated Number of Respondents:* 135,190.

*Estimated Time Per Response:* 0.325 hour.

*Estimated Total Annual Burden Hours:* 43,893 hours.

*Needs and Uses:* This collection of information is required to administer the patent laws pursuant to title 35, U.S.C., concerning the issuance of patents and related actions including correcting errors in printed patents, refiling of patent applications, requesting reexamination of a patent, and requesting a reissue patent to correct an error in a patent. The affected public includes any individual or institution whose application for a patent has been allowed or who takes action as covered by the applicable rules.

*OMB Number:* 0651–0034.

*Title:* Secrecy/License to Export.

*Form Numbers:* None.

*Type of Review:* Approved through January of 1998.

*Affected Public:* Individuals or Households, Business or Other For-

Profit, Not-for-Profit Institutions and Federal Government.

*Estimated Number of Respondents:* 2,156.

*Estimated Time Per Response:* 0.5 hour.

*Estimated Total Annual Burden Hours:* 1,129 hours.

*Needs and Uses:* In the interest of national security, patent laws and regulations place certain limitations on the disclosure of information contained in patents and patent applications and on the filing of applications for patent in foreign countries.

*OMB Number:* 0651–0035.

*Title:* Address-Affecting Provisions.

*Form Numbers:* PTO/SB/82/83.

*Type of Review:* Approved through June of 1999.

*Affected Public:* Individuals or Households, Business or Other For-Profit, Not-for-Profit Institutions and Federal Government.

*Estimated Number of Respondents:* 44,850.

*Estimated Time Per Response:* 0.2 hour.

*Estimated Total Annual Burden Hours:* 8,970 hours.

*Needs and Uses:* Under existing law, a patent applicant or assignee may appoint, revoke or change a representative to act in a representative capacity. Also, an appointed representative may withdraw from acting in a representative capacity. This collection includes the information needed to ensure that Office correspondence reaches the appropriate individual.

*OMB Number:* 0651–0037.

*Title:* Provisional Applications.

*Form Numbers:* PTO/SB/16.

*Type of Review:* Approved through January of 1998.

*Affected Public:* Individuals or Households, Business or Other For-Profit, Not-for-Profit Institutions and Federal Government.

*Estimated Number of Respondents:* 6,000.

*Estimated Time Per Response:* 0.2 hour.

*Estimated Total Annual Burden Hours:* 1,200 hours.

*Needs and Uses:* The information included on the provisional application cover sheet is needed by the Office to identify the submission as a provisional application and not some other kind of submission, to promptly and properly process the provisional application, to prepare the provisional application filing receipt which is sent to the applicant, and to identify those provisional applications which must be reviewed by the Office for foreign filing licenses.

PHILIPS-SCHUBERT018870

As required by the Paperwork Reduction Act of 1995 (44 U.S.C. 3507(d)), the Office has submitted a copy of this Final Rule to OMB for its review of these information collections. Interested persons are requested to send comments regarding these information collections, including suggestions for reducing this burden, to the Office of Information and Regulatory Affairs of OMB, New Executive Office Bldg., 725 17th St. NW, rm. 10235, Washington, DC 20503, Attn: Desk Officer for the Patent and Trademark Office.

**Other Considerations**

This Final Rule is in conformity with the requirements of the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*), Executive Order 12612 (October 26, 1987), and the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*). It has been determined that this rulemaking is not significant for the purposes of Executive Order 12866 (September 30, 1993).

The Assistant General Counsel for Legislation and Regulation of the Department of Commerce has certified to the Chief Counsel for Advocacy, Small Business Administration that this Final Rule will not have a significant impact on a substantial number of small entities (Regulatory Flexibility Act, 5 U.S.C. 605(b)). The principal impact of this Final Rule is: (1) elimination of unnecessary rules of practice; (2) simplification or elimination of certain requirements of the rules of practice; (3) rearrangement of certain rules to improve their context; and (4) clarification of the requirements of the rules of practice.

The Office has determined that this Final Rule has no Federalism implications affecting the relationship between the National Government and the States as outlined in Executive Order 12612.

**List of Subjects**

*37 CFR Part 1*

Administrative practice and procedure, Courts, Freedom of information, Inventions and patents, Reporting and recordkeeping requirements, Small businesses.

*37 CFR Part 3*

Administrative practice and procedure, Inventions and patents, Reporting and recordkeeping requirements.

*37 CFR Part 5*

Classified information, Foreign relations, Inventions and patents.

*37 CFR Part 7*

Administrative practice and procedure, Inventions and patents, Reporting and recordkeeping requirements.

*37 CFR Part 10*

Administrative practice and procedure, Inventions and patents, Lawyers, Reporting and recordkeeping requirements.

For the reasons set forth in the preamble, 37 CFR parts 1, 3, 5, 7 and 10 are amended as follows:

**PART 1—RULES OF PRACTICE IN PATENT CASES**

1. The authority citation for 37 CFR part 1 continues to read as follows:

**Authority:** 35 U.S.C. 6, unless otherwise noted.

2. Section 1.4 is amended by revising paragraph (d) and by adding paragraph (g) to read as follows:

**§ 1.4   Nature of correspondence and signature requirements.**

\*   \*   \*   \*   \*

(d)(1) Each piece of correspondence, except as provided in paragraphs (e) and (f) of this section, filed in a patent or trademark application, reexamination proceeding, patent or trademark interference proceeding, patent file or trademark registration file, trademark opposition proceeding, trademark cancellation proceeding, or trademark concurrent use proceeding, which requires a person's signature, must either:

(i) Be an original, that is, have an original signature personally signed in permanent ink by that person; or

(ii) Be a direct or indirect copy, such as a photocopy or facsimile transmission (§ 1.6(d)), of an original. In the event that a copy of the original is filed, the original should be retained as evidence of authenticity. If a question of authenticity arises, the Patent and Trademark Office may require submission of the original.

(2) The presentation to the Office (whether by signing, filing, submitting, or later advocating) of any paper by a party, whether a practitioner or non-practitioner, constitutes a certification under § 10.18(b) of this chapter. Violations of § 10.18(b)(2) of this chapter by a party, whether a practitioner or non-practitioner, may result in the imposition of sanctions under § 10.18(c) of this chapter. Any practitioner violating § 10.18(b) may also be subject to disciplinary action. See §§ 10.18(d) and 10.23(c)(15).

\*   \*   \*   \*   \*

(g) An applicant who has not made of record a registered attorney or agent may be required to state whether assistance was received in the preparation or prosecution of the patent application, for which any compensation or consideration was given or charged, and if so, to disclose the name or names of the person or persons providing such assistance. Assistance includes the preparation for the applicant of the specification and amendments or other papers to be filed in the Patent and Trademark Office, as well as other assistance in such matters, but does not include merely making drawings by draftsmen or stenographic services in typing papers.

3. Section 1.6 is amended by revising paragraphs (d)(3), (d)(6), and (e) and adding paragraph (f) to read as follows:

**§ 1.6   Receipt of correspondence.**

\*   \*   \*   \*   \*

(d) \* \* \*

(3) Correspondence which cannot receive the benefit of the certificate of mailing or transmission as specified in § 1.8(a)(2)(i) (A) through (D) and (F), § 1.8(a)(2)(ii)(A), and § 1.8(a)(2)(iii)(A), except that a continued prosecution application under § 1.53(d) may be transmitted to the Office by facsimile;

\*   \*   \*   \*   \*

(6) Correspondence to be filed in a patent application subject to a secrecy order under §§ 5.1 through 5.5 of this chapter and directly related to the secrecy order content of the application;

\*   \*   \*   \*   \*

(e) *Interruptions in U.S. Postal Service.* If interruptions or emergencies in the United States Postal Service which have been so designated by the Commissioner occur, the Patent and Trademark Office will consider as filed on a particular date in the Office any correspondence which is:

(1) Promptly filed after the ending of the designated interruption or emergency; and

(2) Accompanied by a statement indicating that such correspondence would have been filed on that particular date if it were not for the designated interruption or emergency in the United States Postal Service.

(f) *Facsimile transmission of a patent application under § 1.53(d).* In the event that the Office has no evidence of receipt of an application under § 1.53(d) (a continued prosecution application) transmitted to the Office by facsimile transmission, the party who transmitted the application under § 1.53(d) may petition the Commissioner to accord the application under § 1.53(d) a filing date as of the date the application under

PHILIPS-SCHUBERT018871

§ 1.53(d) is shown to have been transmitted to and received in the Office,

(1) Provided that the party who transmitted such application under § 1.53(d):

(i) Informs the Office of the previous transmission of the application under § 1.53(d) promptly after becoming aware that the Office has no evidence of receipt of the application under § 1.53(d);

(ii) Supplies an additional copy of the previously transmitted application under § 1.53(d); and

(iii) Includes a statement which attests on a personal knowledge basis or to the satisfaction of the Commissioner to the previous transmission of the application under § 1.53(d) and is accompanied by a copy of the sending unit's report confirming transmission of the application under § 1.53(d) or evidence that came into being after the complete transmission and within one business day of the complete transmission of the application under § 1.53(d).

(2) The Office may require additional evidence to determine if the application under § 1.53(d) was transmitted to and received in the Office on the date in question.

4. Section 1.8 is amended by revising paragraphs (a)(2)(i)(A) and (b) to read as follows:

§ 1.8 Certificate of mailing or transmission.

(a) * * *

(2) * * *

(i) * * *

(A) The filing of a national patent application specification and drawing or other correspondence for the purpose of obtaining an application filing date, including a request for a continued prosecution application under § 1.53(d);

* * * * *

(b) In the event that correspondence is considered timely filed by being mailed or transmitted in accordance with paragraph (a) of this section, but not received in the Patent and Trademark Office, and the application is held to be abandoned or the proceeding is dismissed, terminated, or decided with prejudice, the correspondence will be considered timely if the party who forwarded such correspondence:

(1) Informs the Office of the previous mailing or transmission of the correspondence promptly after becoming aware that the Office has no evidence of receipt of the correspondence;

(2) Supplies an additional copy of the previously mailed or transmitted correspondence and certificate; and

(3) Includes a statement which attests on a personal knowledge basis or to the satisfaction of the Commissioner to the previous timely mailing or transmission. If the correspondence was sent by facsimile transmission, a copy of the sending unit's report confirming transmission may be used to support this statement.

* * * * *

5. Section 1.9 is amended by revising paragraphs (d) and (f) to read as follows:

§ 1.9 Definitions.

* * * * *

(d) A small business concern as used in this chapter means any business concern meeting the size standards set forth in 13 CFR Part 121 to be eligible for reduced patent fees. Questions related to size standards for a small business concern may be directed to: Small Business Administration, Size Standards Staff, 409 Third Street, SW, Washington, DC 20416.

* * * * *

(f) A small entity as used in this chapter means an independent inventor, a small business concern, or a non-profit organization eligible for reduced patent fees.

* * * * *

6. Section 1.10 is amended by revising paragraphs (d) and (e) to read as follows:

§ 1.10 Filing of correspondence by "Express Mail."

* * * * *

(d) Any person filing correspondence under this section that was received by the Office and delivered by the "Express Mail Post Office to Addressee" service of the USPS, who can show that the "date-in" on the "Express Mail" mailing label or other official notation entered by the USPS was incorrectly entered or omitted by the USPS, may petition the Commissioner to accord the correspondence a filing date as of the date the correspondence is shown to have been deposited with the USPS, provided that:

(1) The petition is filed promptly after the person becomes aware that the Office has accorded, or will accord, a filing date based upon an incorrect entry by the USPS;

(2) The number of the "Express Mail" mailing label was placed on the paper(s) or fee(s) that constitute the correspondence prior to the original mailing by "Express Mail"; and

(3) The petition includes a showing which establishes, to the satisfaction of the Commissioner, that the requested filing date was the date the correspondence was deposited in the "Express Mail Post Office to Addressee" service prior to the last scheduled

pickup for that day. Any showing pursuant to this paragraph must be corroborated by evidence from the USPS or that came into being after deposit and within one business day of the deposit of the correspondence in the "Express Mail Post Office to Addressee" service of the USPS.

(e) Any person mailing correspondence addressed as set out in § 1.1(a) to the Office with sufficient postage utilizing the "Express Mail Post Office to Addressee" service of the USPS but not received by the Office, may petition the Commissioner to consider such correspondence filed in the Office on the USPS deposit date, provided that:

(1) The petition is filed promptly after the person becomes aware that the Office has no evidence of receipt of the correspondence;

(2) The number of the "Express Mail" mailing label was placed on the paper(s) or fee(s) that constitute the correspondence prior to the original mailing by "Express Mail";

(3) The petition includes a copy of the originally deposited paper(s) or fee(s) that constitute the correspondence showing the number of the "Express Mail" mailing label thereon, a copy of any returned postcard receipt, a copy of the "Express Mail" mailing label showing the "date-in," a copy of any other official notation by the USPS relied upon to show the date of deposit, and, if the requested filing date is a date other than the "date-in" on the "Express Mail" mailing label or other official notation entered by the USPS, a showing pursuant to paragraph (d)(3) of this section that the requested filing date was the date the correspondence was deposited in the "Express Mail Post Office to Addressee" service prior to the last scheduled pickup for that day; and

(4) The petition includes a statement which establishes, to the satisfaction of the Commissioner, the original deposit of the correspondence and that the copies of the correspondence, the copy of the "Express Mail" mailing label, the copy of any returned postcard receipt, and any official notation entered by the USPS are true copies of the originally mailed correspondence, original "Express Mail" mailing label, returned postcard receipt, and official notation entered by the USPS.

* * * * *

7. Section 1.11 is amended by revising paragraph (b) to read as follows:

§ 1.11 Files open to the public.

* * * * *

(b) All reissue applications, all applications in which the Office has accepted a request to open the complete

PHILIPS-SCHUBERT018872

**53182**   **Federal Register** / Vol. 62, No. 197 / Friday, October 10, 1997 / Rules and Regulations

application to inspection by the public, and related papers in the application file, are open to inspection by the public, and copies may be furnished upon paying the fee therefor. The filing of reissue applications, other than continued prosecution applications under § 1.53(d) of reissue applications, will be announced in the *Official Gazette*. The announcement shall include at least the filing date, reissue application and original patent numbers, title, class and subclass, name of the inventor, name of the owner of record, name of the attorney or agent of record, and examining group to which the reissue application is assigned.

\*   \*   \*   \*   \*

8. Section 1.14 is amended by revising paragraph (a) and adding a new paragraph (f) to read as follows:

### § 1.14   Patent applications preserved in confidence.

(a) Patent applications are generally preserved in confidence pursuant to 35 U.S.C. 122. No information will be given concerning the filing, pendency, or subject matter of any application for patent, and no access will be given to, or copies furnished of, any application or papers relating thereto, except as set forth in this section.

(1) Status information includes information such as whether the application is pending, abandoned, or patented, as well as the application number and filing date (or international filing date or date of entry into the national stage).

(i) Status information concerning an application may be supplied:

(A) When copies of, or access to, the application may be provided pursuant to paragraph (a)(3) of this section;

(B) When the application is identified by application number or serial number and filing date in a published patent document or in a U.S. application open to public inspection; or

(C) When the application is the national stage of an international application in which the United States of America has been indicated as a Designated State.

(ii) Status information concerning an application may also be supplied when the application claims the benefit of the filing date of an application for which status information may be provided pursuant to paragraph (a)(1)(i) of this section.

(2) Copies of an application-as-filed may be provided to any person, upon written request accompanied by the fee set forth in § 1.19(b)(1), without notice to the applicant, if the application is incorporated by reference in a U.S. patent.

(3) Copies of (upon payment of the fee set forth in § 1.19(b)(2)), and access to, an application file wrapper and contents may be provided to any person, upon written request, without notice to the applicant, when the application file is available and:

(i) It has been determined by the Commissioner to be necessary for the proper conduct of business before the Office or warranted by other special circumstances;

(ii) The application is open to the public as provided in § 1.11(b);

(iii) Written authority in that application from the applicant, the assignee of the application, or the attorney or agent of record has been granted; or

(iv) The application is abandoned, but not if the application is in the file jacket of a pending application under § 1.53(d), and is:

(A) Referred to in a U.S. patent;

(B) Referred to in a U.S. application open to public inspection;

(C) An application which claims the benefit of the filing date of a U.S. application open to public inspection; or

(D) An application in which the applicant has filed an authorization to lay open the complete application to the public.

\*   \*   \*   \*   \*

(f) Information as to the filing of an application will be published in the *Official Gazette* in accordance with § 1.47(a) and (b).

9. Section 1.16 is amended by revising paragraphs (d) and (l) to read as follows:

### § 1.16   National application filing fees.

\*   \*   \*   \*   \*

(d) In addition to the basic filing fee in an original application, except provisional applications, if the application contains, or is amended to contain, a multiple dependent claim(s), per application:

By a small entity (§ 1.9(f))........................135.00
By other than a small entity ....................270.00

\*   \*   \*   \*   \*

(l) Surcharge for filing the basic filing fee or cover sheet (§ 1.51(c)(1)) on a date later than the filing date of the provisional application:

By a small entity (§ 1.9(f)).........................25.00
By other than a small entity ......................50.00

\*   \*   \*   \*   \*

10. Section 1.17 is amended by removing and reserving paragraphs (e) through (g) and revising paragraphs (a) through (d), (h), (i) and (q) to read as follows:

### § 1.17   Patent application processing fees.

(a) Extension fees pursuant to § 1.136(a):

(1) For reply within first month:

By a small entity (§ 1.9(f))......................\$55.00

By other than a small entity ..................110.00

(2) For reply within second month:

By a small entity (§ 1.9(f))......................200.00
By other than a small entity ..................400.00

(3) For reply within third month:

By a small entity (§ 1.9(f))......................475.00
By other than a small entity ..................950.00

(4) For reply within fourth month:

By a small entity (§ 1.9(f))......................755.00
By other than a small entity ...............1,510.00

(5) For reply within fifth month:

By a small entity (§ 1.9(f))...................1,030.00
By other than a small entity ...............2,060.00

(b) For filing a notice of appeal from the examiner to the Board of Patent Appeals and Interferences:

By a small entity (§ 1.9(f))......................155.00
By other than a small entity ..................310.00

(c) In addition to the fee for filing a notice of appeal, for filing a brief in support of an appeal:

By a small entity (§ 1.9(f))......................155.00
By other than a small entity ..................310.00

(d) For filing a request for an oral hearing before the Board of Patent Appeals and Interferences in an appeal under 35 U.S.C. 134:

By a small entity (§ 1.9(f))......................135.00
By other than a small entity ..................270.00

(e) [Reserved]

(f) [Reserved]

(g) [Reserved]

(h) For filing a petition to the Commissioner under a section listed below which refers to

this paragraph .........................................130.00

§ 1.182—for decision on a question not specifically provided for.

§ 1.183—to suspend the rules.

§ 1.295—for review of refusal to publish a statutory invention registration.

§ 1.377—for review of decision refusing to accept and record payment of a maintenance fee filed prior to expiration of a patent.

§ 1.378(e)—for reconsideration of decision on petition refusing to accept delayed payment of maintenance fee in an expired patent.

§ 1.644(e)—for petition in an interference.

§ 1.644(f)—for request for reconsideration of a decision on petition in an interference.

§ 1.666(c)—for late filing of interference settlement agreement.

§ 5.12—for expedited handling of a foreign filing license.

§ 5.15—for changing the scope of a license.

§ 5.25—for retroactive license.

(i) For filing a petition to the Commissioner under a section listed below which refers to this paragraph .........................................130.00

§ 1.12—for access to an assignment record.

§ 1.14—for access to an application.

§ 1.41—to supply the name or names of the inventor or inventors after the filing date without an oath or declaration as prescribed by § 1.63, except in provisional applications.

§ 1.47—for filing by other than all the inventors or a person not the inventor.

§ 1.48—for correction of inventorship, except in provisional applications.

§ 1.53—to accord a filing date, except in provisional applications.

§ 1.55—for entry of late priority papers.

PHILIPS-SCHUBERT018873

§ 1.59—for expungement and return of information.

§ 1.84—for accepting color drawings or photographs.

§ 1.91—for entry of a model or exhibit.

§ 1.97(d)—to consider an information disclosure statement.

§ 1.102—to make an application special.

§ 1.103—to suspend action in application.

§ 1.177—for divisional reissues to issue separately.

§ 1.312—for amendment after payment of issue fee.

§ 1.313—to withdraw an application from issue.

§ 1.314—to defer issuance of a patent.

§ 1.666(b)—for access to an interference settlement agreement.

§ 3.81—for a patent to issue to assignee, assignment submitted after payment of the issue fee.

\*    \*    \*    \*    \*

(q) For filing a petition to the Commissioner under a section listed below which refers to this paragraph.................50.00

§ 1.41—to supply the names or names of the inventor or inventors after the filing date without a cover sheet as prescribed by § 1.51(c)(1) in a provisional application.

§ 1.48—for correction of inventorship in a provisional application.

§ 1.53—to accord a provisional application a filing date or to convert a nonprovisional application filed under § 1.53(b) to a provisional application under § 1.53(c).

\*    \*    \*    \*    \*

11. Section 1.21 is amended by revising paragraphs (l) and (n) to read as follows:

## § 1.21  Miscellaneous fees and charges.

\*    \*    \*    \*    \*

(l) For processing and retaining any application abandoned pursuant to § 1.53(f), unless the required basic filing fee (§ 1.16) has been paid ........................................130.00

\*    \*    \*    \*    \*

(n) For handling an application in which proceedings are terminated pursuant to § 1.53(e) ..................................................130.00

\*    \*    \*    \*    \*

12. Section 1.26 is amended by revising paragraph (a) to read as follows:

## § 1.26  Refunds.

(a) Any fee paid by actual mistake or in excess of that required will be refunded, but a mere change of purpose after the payment of money, as when a party desires to withdraw an application, an appeal, or a request for oral hearing, will not entitle a party to demand such a return. Amounts of twenty-five dollars or less will not be returned unless specifically requested within a reasonable time, nor will the payer be notified of such amounts; amounts over twenty-five dollars may be returned by check or, if requested, by credit to a deposit account.

\*    \*    \*    \*    \*

13. Section 1.27 is revised to read as follows:

## § 1.27  Statement of status as small entity.

(a) Any person seeking to establish status as a small entity (§ 1.9(f) of this part) for purposes of paying fees in an application or a patent must file a statement in the application or patent prior to or with the first fee paid as a small entity. Such a statement need only be filed once in an application or patent and remains in effect until changed.

(b) When establishing status as a small entity pursuant to paragraph (a) of this section, any statement filed on behalf of an independent inventor must be signed by the independent inventor except as provided in § 1.42, § 1.43, or § 1.47 of this part and must state that the inventor qualifies as an independent inventor in accordance with § 1.9(c) of this part. Where there are joint inventors in an application, each inventor must file a statement establishing status as an independent inventor in order to qualify as a small entity. Where any rights have been assigned, granted, conveyed, or licensed, or there is an obligation to assign, grant, convey, or license, any rights to a small business concern, a nonprofit organization, or any other individual, a statement must be filed by the individual, the owner of the small business concern, or an official of the small business concern or nonprofit organization empowered to act on behalf of the small business concern or nonprofit organization identifying their status. For purposes of a statement under this paragraph, a license to a Federal agency resulting from a funding agreement with that agency pursuant to 35 U.S.C. 202(c)(4) does not constitute a license as set forth in § 1.9 of this part.

(c)(1) Any statement filed pursuant to paragraph (a) of this section on behalf of a small business concern must:

(i) Be signed by the owner or an official of the small business concern empowered to act on behalf of the concern;

(ii) State that the concern qualifies as a small business concern as defined in § 1.9(d); and

(iii) State that the exclusive rights to the invention have been conveyed to and remain with the small business concern or, if the rights are not exclusive, that all other rights belong to small entities as defined in § 1.9.

(2) Where the rights of the small business concern as a small entity are not exclusive, a statement must also be filed by the other small entities having rights stating their status as such. For purposes of a statement under this paragraph, a license to a Federal agency resulting from a funding agreement with

that agency pursuant to 35 U.S.C. 202(c)(4) does not constitute a license as set forth in § 1.9 of this part.

(d)(1) Any statement filed pursuant to paragraph (a) of this section on behalf of a nonprofit organization must:

(i) Be signed by an official of the nonprofit organization empowered to act on behalf of the organization;

(ii) State that the organization qualifies as a nonprofit organization as defined in § 1.9(e) of this part specifying under which one of § 1.9(e) (1), (2), (3), or (4) of this part the organization qualifies; and

(iii) State that exclusive rights to the invention have been conveyed to and remain with the organization or if the rights are not exclusive that all other rights belong to small entities as defined in § 1.9 of this part.

(2) Where the rights of the nonprofit organization as a small entity are not exclusive, a statement must also be filed by the other small entities having rights stating their status as such. For purposes of a statement under this paragraph, a license to a Federal agency pursuant to 35 U.S.C. 202(c)(4) does not constitute a conveyance of rights as set forth in this paragraph.

14. Section 1.28 is amended by revising paragraphs (a) and (c) to read as follows:

## § 1.28  Effect on fees of failure to establish status, or change status, as small entity.

(a)(1) The failure to establish status as a small entity (§§ 1.9(f) and 1.27 of this part) in any application or patent prior to paying, or at the time of paying, any fee precludes payment of the fee in the amount established for small entities. A refund pursuant to § 1.26 of this part, based on establishment of small entity status, of a portion of fees timely paid in full prior to establishing status as a small entity may only be obtained if a statement under § 1.27 and a request for a refund of the excess amount are filed within two months of the date of the timely payment of the full fee. The two-month time period is not extendable under § 1.136. Status as a small entity is waived for any fee by the failure to establish the status prior to paying, at the time of paying, or within two months of the date of payment of, the fee.

(2) Status as a small entity must be specifically established in each application or patent in which the status is available and desired. Status as a small entity in one application or patent does not affect any other application or patent, including applications or patents which are directly or indirectly dependent upon the application or patent in which the status has been

PHILIPS-SCHUBERT018874

established. The refiling of an application under § 1.53 as a continuation, division, or continuation-in-part (including a continued prosecution application under § 1.53(d)), or the filing of a reissue application requires a new determination as to continued entitlement to small entity status for the continuing or reissue application. A nonprovisional application claiming benefit under 35 U.S.C. 119(e), 120, 121, or 365(c) of a prior application, or a reissue application may rely on a statement filed in the prior application or in the patent if the nonprovisional application or the reissue application includes a reference to the statement in the prior application or in the patent or includes a copy of the statement in the prior application or in the patent and status as a small entity is still proper and desired. The payment of the small entity basic statutory filing fee will be treated as such a reference for purposes of this section.

(3) Once status as a small entity has been established in an application or patent, the status remains in that application or patent without the filing of a further statement pursuant to § 1.27 of this part unless the Office is notified of a change in status.

\*     \*     \*     \*     \*

(c) If status as a small entity is established in good faith, and fees as a small entity are paid in good faith, in any application or patent, and it is later discovered that such status as a small entity was established in error or that through error the Office was not notified of a change in status as required by paragraph (b) of this section, the error will be excused upon payment of the deficiency between the amount paid and the amount due. The deficiency is based on the amount of the fee, for other than a small entity, in effect at the time the deficiency is paid in full.

\*     \*     \*     \*     \*

15. Section 1.33 is amended by revising paragraphs (a) and (b) to read as follows:

### § 1.33   Correspondence respecting patent applications, reexamination proceedings, and other proceedings.

(a) The applicant, the assignee(s) of the entire interest (see §§ 3.71 and 3.73) or an attorney or agent of record (see § 1.34(b)) may supply a correspondence address to which communications about the application are to be directed. All notices, official letters, and other communications in the application will be directed to the correspondence address or, if no such correspondence address is specified, to an attorney or agent of record (see § 1.34(b)), or, if no

attorney or agent is of record, to the applicant, so long as a post office address has been furnished in the application. Double correspondence with an applicant and an attorney or agent, or with more than one attorney or agent, will not be undertaken. If more than one attorney or agent is made of record and a correspondence address has not been specified, correspondence will be held with the one last made of record.

(b) Amendments and other papers filed in the application must be signed by:

(1) An attorney or agent of record appointed in compliance with § 1.34(b);

(2) A registered attorney or agent not of record who acts in a representative capacity under the provisions of § 1.34(a);

(3) The assignee of record of the entire interest, if there is an assignee of record of the entire interest;

(4) An assignee of record of an undivided part interest, and any assignee(s) of the remaining interest and any applicant retaining an interest, if there is an assignee of record of an undivided part interest; or

(5) All of the applicants (§§ 1.42, 1.43 and 1.47) for patent, unless there is an assignee of record of the entire interest and such assignee has taken action in the application in accordance with §§ 3.71 and 3.73.

\*     \*     \*     \*     \*

16. Section 1.41 is amended by revising paragraph (a) to read as follows:

### § 1.41   Applicant for patent.

(a) A patent is applied for in the name or names of the actual inventor or inventors.

(1) The inventorship of a nonprovisional application is that inventorship set forth in the oath or declaration as prescribed by § 1.63, except as provided for in § 1.53(d)(4) and § 1.63(d). If an oath or declaration as prescribed by § 1.63 is not filed during the pendency of a nonprovisional application, the inventorship is that inventorship set forth in the application papers filed pursuant to § 1.53(b), unless a petition under this paragraph accompanied by the fee set forth in § 1.17(i) is filed supplying or changing the name or names of the inventor or inventors.

(2) The inventorship of a provisional application is that inventorship set forth in the cover sheet as prescribed by § 1.51(c)(1). If a cover sheet as prescribed by § 1.51(c)(1) is not filed during the pendency of a provisional application, the inventorship is that inventorship set forth in the application papers filed pursuant to § 1.53(c), unless

a petition under this paragraph accompanied by the fee set forth in § 1.17(q) is filed supplying or changing the name or names of the inventor or inventors.

(3) In a nonprovisional application filed without an oath or declaration as prescribed by § 1.63 or a provisional application filed without a cover sheet as prescribed by § 1.51(c)(1), the name or names of person or persons believed to be the actual inventor or inventors should be provided for identification purposes when the application papers pursuant to § 1.53(b) or (c) are filed. If no name of a person believed to be an actual inventor is so provided, the application should include an applicant identifier consisting of alphanumeric characters.

\*     \*     \*     \*     \*

17. Section 1.47 is revised to read as follows:

### § 1.47   Filing when an inventor refuses to sign or cannot be reached.

(a) If a joint inventor refuses to join in an application for patent or cannot be found or reached after diligent effort, the application may be made by the other inventor on behalf of himself or herself and the nonsigning inventor. The oath or declaration in such an application must be accompanied by a petition including proof of the pertinent facts, the fee set forth in § 1.17(i) and the last known address of the nonsigning inventor. The Patent and Trademark Office shall, except in a continued prosecution application under § 1.53(d), forward notice of the filing of the application to the nonsigning inventor at said address and publish notice of the filing of the application in the *Official Gazette*. The nonsigning inventor may subsequently join in the application on filing an oath or declaration complying with § 1.63.

(b) Whenever all of the inventors refuse to execute an application for patent, or cannot be found or reached after diligent effort, a person to whom an inventor has assigned or agreed in writing to assign the invention or who otherwise shows sufficient proprietary interest in the matter justifying such action may make application for patent on behalf of and as agent for all the inventors. The oath or declaration in such an application must be accompanied by a petition including proof of the pertinent facts, a showing that such action is necessary to preserve the rights of the parties or to prevent irreparable damage, the fee set forth in § 1.17(i), and the last known address of all of the inventors. The Office shall, except in a continued prosecution application under § 1.53(d), forward

PHILIPS-SCHUBERT018875

notice of the filing of the application to all of the inventors at the addresses stated in the application and publish notice of the filing of the application in the *Official Gazette*. An inventor may subsequently join in the application on filing an oath or declaration complying with § 1.63.

18. Section 1.48 is revised to read as follows:

**§ 1.48   Correction of inventorship in a patent application, other than a reissue application.**

(a) If the inventive entity is set forth in error in an executed § 1.63 oath or declaration in an application, other than a reissue application, and such error arose without any deceptive intention on the part of the person named as an inventor in error or on the part of the person who through error was not named as an inventor, the application may be amended to name only the actual inventor or inventors. When the application is involved in an interference, the amendment must comply with the requirements of this section and must be accompanied by a motion under § 1.634. Such amendment must be accompanied by:

(1) A petition including a statement from each person being added as an inventor and from each person being deleted as an inventor that the error in inventorship occurred without deceptive intention on his or her part;

(2) An oath or declaration by the actual inventor or inventors as required by § 1.63 or as permitted by §§ 1.42, 1.43 or 1.47;

(3) The fee set forth in § 1.17(i); and

(4) If an assignment has been executed by any of the original named inventors, the written consent of the assignee (see § 3.73(b)).

(b) If the correct inventors are named in a nonprovisional application, other than a reissue application, and the prosecution of the application results in the amendment or cancellation of claims so that fewer than all of the currently named inventors are the actual inventors of the invention being claimed in the application, an amendment must be filed deleting the name or names of the person or persons who are not inventors of the invention being claimed. When the application is involved in an interference, the amendment must comply with the requirements of this section and must be accompanied by a motion under § 1.634. Such amendment must be accompanied by:

(1) A petition including a statement identifying each named inventor who is being deleted and acknowledging that

the inventor's invention is no longer being claimed in the application; and

(2) The fee set forth in § 1.17(i).

(c) If a nonprovisional application, other than a reissue application, discloses unclaimed subject matter by an inventor or inventors not named in the application, the application may be amended to add claims to the subject matter and name the correct inventors for the application. When the application is involved in an interference, the amendment must comply with the requirements of this section and must be accompanied by a motion under § 1.634. Such amendment must be accompanied by:

(1) A petition including a statement from each person being added as an inventor that the amendment is necessitated by amendment of the claims and that the inventorship error occurred without deceptive intention on his or her part;

(2) An oath or declaration by the actual inventor or inventors as required by § 1.63 or as permitted by §§ 1.42, 1.43 or 1.47;

(3) The fee set forth in § 1.17(i); and

(4) If an assignment has been executed by any of the original named inventors, the written consent of the assignee (see § 3.73(b)).

(d) If the name or names of an inventor or inventors were omitted in a provisional application through error without any deceptive intention on the part of the omitted inventor or inventors, the provisional application may be amended to add the name or names of the omitted inventor or inventors. Such amendment must be accompanied by:

(1) A petition including a statement that the inventorship error occurred without deceptive intention on the part of the omitted inventor or inventors; and

(2) The fee set forth in § 1.17(q).

(e) If a person or persons were named as an inventor or inventors in a provisional application through error without any deceptive intention on the part of such person or persons, an amendment may be filed in the provisional application deleting the name or names of the person or persons who were erroneously named. Such amendment must be accompanied by:

(1) A petition including a statement by the person or persons whose name or names are being deleted that the inventorship error occurred without deceptive intention on the part of such person or persons;

(2) The fee set forth in § 1.17(q); and

(3) If an assignment has been executed by any of the original named inventors,

the written consent of the assignee (see § 3.73(b)).

(f)(1) If the correct inventor or inventors are not named on filing a nonprovisional application under § 1.53(b) without an executed oath or declaration under § 1.63, the later submission of an executed oath or declaration under § 1.63 during the pendency of the application will act to correct the earlier identification of inventorship.

(2) If the correct inventor or inventors are not named on filing a provisional application without a cover sheet under § 1.51(c)(1), the later submission of a cover sheet under § 1.51(c)(1) during the pendency of the application will act to correct the earlier identification of inventorship.

(g) The Office may require such other information as may be deemed appropriate under the particular circumstances surrounding the correction of inventorship.

19. Section 1.51 is revised to read as follows:

**§ 1.51   General requisites of an application.**

(a) Applications for patents must be made to the Commissioner of Patents and Trademarks.

(b) A complete application filed under § 1.53(b) comprises:

(1) A specification as prescribed by 35 U.S.C. 112, including a claim or claims, see §§ 1.71 to 1.77;

(2) An oath or declaration, see § 1.63 and § 1.68;

(3) Drawings, when necessary, see §§ 1.81 to 1.85; and

(4) The prescribed filing fee, see § 1.16.

(c) A complete provisional application filed under § 1.53(c) comprises:

(1) A cover sheet identifying:

(i) The application as a provisional application,

(ii) The name or names of the inventor or inventors, (see § 1.41(a)(2)),

(iii) The residence of each named inventor,

(iv) The title of the invention,

(v) The name and registration number of the attorney or agent (if applicable),

(vi) The docket number used by the person filing the application to identify the application (if applicable),

(vii) The correspondence address, and

(viii) The name of the U.S. Government agency and Government contract number (if the invention was made by an agency of the U.S. Government or under a contract with an agency of the U.S. Government);

(2) A specification as prescribed by the first paragraph of 35 U.S.C. 112, see § 1.71;

PHILIPS-SCHUBERT018876

(3) Drawings, when necessary, see §§ 1.81 to 1.85; and

(4) The prescribed filing fee, see § 1.16.

(d) Applicants are encouraged to file an information disclosure statement in nonprovisional applications. See § 1.97 and § 1.98. No information disclosure statement may be filed in a provisional application.

20. Section 1.52 is amended by revising paragraphs (a), (c) and (d) to read as follows:

### § 1.52  Language, paper, writing, margins.

(a) The application, any amendments or corrections thereto, and the oath or declaration must be in the English language except as provided for in § 1.69 and paragraph (d) of this section, or be accompanied by a translation of the application and a translation of any corrections or amendments into the English language together with a statement that the translation is accurate. All papers which are to become a part of the permanent records of the Patent and Trademark Office must be legibly written either by a typewriter or mechanical printer in permanent dark ink or its equivalent in portrait orientation on flexible, strong, smooth, non-shiny, durable, and white paper. All of the application papers must be presented in a form having sufficient clarity and contrast between the paper and the writing thereon to permit the direct reproduction of readily legible copies in any number by use of photographic, electrostatic, photo-offset, and microfilming processes and electronic reproduction by use of digital imaging and optical character recognition. If the papers are not of the required quality, substitute typewritten or mechanically printed papers of suitable quality will be required. See § 1.125 for filing substitute typewritten or mechanically printed papers constituting a substitute specification when required by the Office.

*    *    *    *    *

(c) Any interlineation, erasure, cancellation or other alteration of the application papers filed should be made on or before the signing of any accompanying oath or declaration pursuant to § 1.63 referring to those application papers and should be dated and initialed or signed by the applicant on the same sheet of paper. Application papers containing alterations made after the signing of an oath or declaration referring to those application papers must be supported by a supplemental oath or declaration under § 1.67(c). After the signing of the oath or declaration referring to the application papers,

amendments may only be made in the manner provided by § 1.121.

(d) An application may be filed in a language other than English. An English translation of the non-English-language application, a statement that the translation is accurate, and the fee set forth in § 1.17(k) are required to be filed with the application or within such time as may be set by the Office.

21. Section 1.53 is revised to read as follows:

### § 1.53  Application number, filing date, and completion of application.

(a) *Application number.* Any papers received in the Patent and Trademark Office which purport to be an application for a patent will be assigned an application number for identification purposes.

(b) *Application filing requirements— Nonprovisional application.* The filing date of an application for patent filed under this section, except for a provisional application under paragraph (c) of this section or a continued prosecution application under paragraph (d) of this section, is the date on which a specification as prescribed by 35 U.S.C. 112 containing a description pursuant to § 1.71 and at least one claim pursuant to § 1.75, and any drawing required by § 1.81(a) are filed in the Patent and Trademark Office. No new matter may be introduced into an application after its filing date. A continuing application, which may be a continuation, divisional, or continuation-in-part application, may be filed under the conditions specified in 35 U.S.C. 120, 121 or 365(c) and § 1.78(a).

(1) A continuation or divisional application that names as inventors the same or fewer than all of the inventors named in the prior application may be filed under this paragraph or paragraph (d) of this section.

(2) A continuation-in-part application (which may disclose and claim subject matter not disclosed in the prior application) or a continuation or divisional application naming an inventor not named in the prior application must be filed under this paragraph.

(c) *Application filing requirements— Provisional application.* The filing date of a provisional application is the date on which a specification as prescribed by the first paragraph of 35 U.S.C. 112, and any drawing required by § 1.81(a) are filed in the Patent and Trademark Office. No amendment, other than to make the provisional application comply with the patent statute and all applicable regulations, may be made to the provisional application after the

filing date of the provisional application.

(1) A provisional application must also include the cover sheet required by § 1.51(c)(1) or a cover letter identifying the application as a provisional application. Otherwise, the application will be treated as an application filed under paragraph (b) of this section.

(2) An application for patent filed under paragraph (b) of this section may be converted to a provisional application and be accorded the original filing date of the application filed under paragraph (b) of this section,

(i) Provided that a petition requesting the conversion, with the fee set forth in § 1.17(q), is filed prior to the earliest of:

(A) Abandonment of the application filed under paragraph (b) of this section;

(B) Payment of the issue fee on the application filed under paragraph (b) of this section;

(C) Expiration of twelve months after the filing date of the application filed under paragraph (b) of this section; or

(D) The filing of a request for a statutory invention registration under § 1.293 in the application filed under paragraph (b) of this section.

(ii) The grant of any such petition will not entitle applicant to a refund of the fees which were properly paid in the application filed under paragraph (b) of this section.

(3) A provisional application is not entitled to the right of priority under 35 U.S.C. 119 or 365(a) or § 1.55, or to the benefit of an earlier filing date under 35 U.S.C. 120, 121 or 365(c) or § 1.78 of any other application. No claim for priority under § 1.78(a)(3) may be made in a design application based on a provisional application. No request under § 1.293 for a statutory invention registration may be filed in a provisional application. The requirements of §§ 1.821 through 1.825 regarding application disclosures containing nucleotide and/or amino acid sequences are not mandatory for provisional applications.

(d) *Application filing requirements— Continued prosecution (nonprovisional) application.* (1) A continuation or divisional application (but not a continuation-in-part) of a prior nonprovisional application may be filed as a continued prosecution application under this paragraph, provided that:

(i) The prior nonprovisional application is either:

(A) Complete as defined by § 1.51(b) and filed on or after June 8, 1995; or

(B) The national stage of an international application in compliance with 35 U.S.C. 371 and filed on or after June 8, 1995; and

PHILIPS-SCHUBERT018877

(ii) The application under this paragraph is filed before the earliest of:

(A) Payment of the issue fee on the prior application, unless a petition under § 1.313(b)(5) is granted in the prior application;

(B) Abandonment of the prior application; or

(C) Termination of proceedings on the prior application.

(2) The filing date of a continued prosecution application is the date on which a request on a separate paper for an application under this paragraph is filed. An application filed under this paragraph:

(i) Must identify the prior application;

(ii) Discloses and claims only subject matter disclosed in the prior application;

(iii) Names as inventors the same inventors named in the prior application on the date the application under this paragraph was filed, except as provided in paragraph (d)(4) of this section;

(iv) Includes the request for an application under this paragraph, will utilize the file jacket and contents of the prior application, including the specification, drawings and oath or declaration from the prior application, to constitute the new application, and will be assigned the application number of the prior application for identification purposes; and

(v) Is a request to expressly abandon the prior application as of the filing date of the request for an application under this paragraph.

(3) The filing fee for a continued prosecution application filed under this paragraph is:

(i) The basic filing fee as set forth in § 1.16; and

(ii) Any additional § 1.16 fee due based on the number of claims remaining in the application after entry of any amendment accompanying the request for an application under this paragraph and entry of any amendments under § 1.116 unentered in the prior application which applicant has requested to be entered in the continued prosecution application.

(4) An application filed under this paragraph may be filed by fewer than all the inventors named in the prior application, provided that the request for an application under this paragraph when filed is accompanied by a statement requesting deletion of the name or names of the person or persons who are not inventors of the invention being claimed in the new application. No person may be named as an inventor in an application filed under this paragraph who was not named as an inventor in the prior application on the

date the application under this paragraph was filed, except by way of a petition under § 1.48.

(5) Any new change must be made in the form of an amendment to the prior application as it existed prior to the filing of an application under this paragraph. No amendment in an application under this paragraph (a continued prosecution application) may introduce new matter or matter that would have been new matter in the prior application. Any new specification filed with the request for an application under this paragraph will not be considered part of the original application papers, but will be treated as a substitute specification in accordance with § 1.125.

(6) The filing of a continued prosecution application under this paragraph will be construed to include a waiver of confidentiality by the applicant under 35 U.S.C. 122 to the extent that any member of the public, who is entitled under the provisions of § 1.14 to access to, copies of, or information concerning either the prior application or any continuing application filed under the provisions of this paragraph, may be given similar access to, copies of, or similar information concerning the other application or applications in the file jacket.

(7) A request for an application under this paragraph is the specific reference required by 35 U.S.C. 120 to every application assigned the application number identified in such request. No amendment in an application under this paragraph may delete this specific reference to any prior application.

(8) In addition to identifying the application number of the prior application, applicant should furnish in the request for an application under this paragraph the following information relating to the prior application to the best of his or her ability:

(i) Title of invention;

(ii) Name of applicant(s); and

(iii) Correspondence address.

(9) Envelopes containing only requests and fees for filing an application under this paragraph should be marked "Box CPA." Requests for an application under this paragraph filed by facsimile transmission should be clearly marked "Box CPA."

(e) *Failure to meet filing date requirements.* (1) If an application deposited under paragraph (b), (c), or (d) of this section does not meet the requirements of such paragraph to be entitled to a filing date, applicant will be so notified, if a correspondence address has been provided, and given a

time period within which to correct the filing error.

(2) Any request for review of a notification pursuant to paragraph (e)(1) of this section, or a notification that the original application papers lack a portion of the specification or drawing(s), must be by way of a petition pursuant to this paragraph. Any petition under this paragraph must be accompanied by the fee set forth in § 1.17(i) in an application filed under paragraphs (b) or (d) of this section, and the fee set forth in § 1.17(q) in an application filed under paragraph (c) of this section. In the absence of a timely (§ 1.181(f)) petition pursuant to this paragraph, the filing date of an application in which the applicant was notified of a filing error pursuant to paragraph (e)(1) of this section will be the date the filing error is corrected.

(3) If an applicant is notified of a filing error pursuant to paragraph (e)(1) of this section, but fails to correct the filing error within the given time period or otherwise timely (§ 1.181(f)) take action pursuant to this paragraph, proceedings in the application will be considered terminated. Where proceedings in an application are terminated pursuant to this paragraph, the application may be disposed of, and any filing fees, less the handling fee set forth in § 1.21(n), will be refunded.

(f) *Completion of application subsequent to filing—Nonprovisional (including continued prosecution) application.* If an application which has been accorded a filing date pursuant to paragraph (b) of this section, including a continuation, divisional, or continuation-in-part application, does not include the appropriate filing fee or an oath or declaration by the applicant pursuant to § 1.63 or § 1.175, or, if an application which has been accorded a filing date pursuant to paragraph (d) of this section does not include the appropriate filing fee, applicant will be so notified, if a correspondence address has been provided, and given a period of time within which to file the fee, oath or declaration, and the surcharge as set forth in § 1.16(e) in order to prevent abandonment of the application. See § 1.63(d) concerning the submission of a copy of the oath or declaration from the prior application for a continuation or divisional application. If the required filing fee is not timely paid, or if the processing and retention fee set forth in § 1.21(l) is not paid within one year of the date of mailing of the notification required by this paragraph, the application may be disposed of. The notification pursuant to this paragraph may be made simultaneously with any notification pursuant to paragraph (e) of

PHILIPS-SCHUBERT018878

this section. If no correspondence address is included in the application, applicant has two months from the filing date to file the basic filing fee, the oath or declaration in an application under paragraph (b) of this section, and the surcharge as set forth in § 1.16(e) in order to prevent abandonment of the application; or, if no basic filing fee has been paid, one year from the filing date to pay the processing and retention fee set forth in § 1.21(l) to prevent disposal of the application.

(g) *Completion of application subsequent to filing—Provisional application.* If a provisional application which has been accorded a filing date pursuant to paragraph (c) of this section does not include the appropriate filing fee or the cover sheet required by § 1.51(c)(1), applicant will be so notified, if a correspondence address has been provided, and given a period of time within which to file the fee, cover sheet, and the surcharge as set forth in § 1.16(l) in order to prevent abandonment of the application. If the required filing fee is not timely paid, the application may be disposed of. The notification pursuant to this paragraph may be made simultaneously with any notification pursuant to paragraph (e) of this section. If no correspondence address is included in the application, applicant has two months from the filing date to file the basic filing fee, cover sheet, and the surcharge as set forth in § 1.16(l) in order to prevent abandonment of the application.

(h) *Subsequent treatment of application—Nonprovisional (including continued prosecution) application.* An application for a patent filed under paragraphs (b) or (d) of this section will not be placed on the files for examination until all its required parts, complying with the rules relating thereto, are received, except that certain minor informalities may be waived subject to subsequent correction whenever required.

(i) *Subsequent treatment of application—Provisional application.* A provisional application for a patent filed under paragraph (c) of this section will not be placed on the files for examination and will become abandoned no later than twelve months after its filing date pursuant to 35 U.S.C. 111(b)(1).

(j) *Filing date of international application.* The filing date of an international application designating the United States of America is treated as the filing date in the United States of America under PCT Article 11(3), except as provided in 35 U.S.C. 102(e).

22. Section 1.54 is revised to read as follows:

**§ 1.54   Parts of application to be filed together; filing receipt.**

(a) It is desirable that all parts of the complete application be deposited in the Office together; otherwise, a letter must accompany each part, accurately and clearly connecting it with the other parts of the application. See § 1.53 (f) and (g) with regard to completion of an application.

(b) Applicant will be informed of the application number and filing date by a filing receipt, unless the application is an application filed under § 1.53(d).

23. Section 1.55 is amended by revising paragraph (a) to read as follows:

**§ 1.55   Claim for foreign priority.**

(a) An applicant in a nonprovisional application may claim the benefit of the filing date of one or more prior foreign applications under the conditions specified in 35 U.S.C. 119 (a) through (d) and 172. The claim to priority need be in no special form and may be made by the attorney or agent if the foreign application is referred to in the oath or declaration as required by § 1.63. The claim for priority and the certified copy of the foreign application specified in 35 U.S.C. 119(b) must be filed in the case of an interference (§ 1.630), when necessary to overcome the date of a reference relied upon by the examiner, when specifically required by the examiner, and in all other situations, before the patent is granted. If the claim for priority or the certified copy of the foreign application is filed after the date the issue fee is paid, it must be accompanied by a petition requesting entry and by the fee set forth in § 1.17(i). If the certified copy is not in the English language, a translation need not be filed except in the case of interference; or when necessary to overcome the date of a reference relied upon by the examiner; or when specifically required by the examiner, in which event an English language translation must be filed together with a statement that the translation of the certified copy is accurate.

*   *   *   *   *

24. Section 1.59 is revised to read as follows:

**§ 1.59   Expungement of information or copy of papers in application file.**

(a) (1) Information in an application will not be expunged and returned, except as provided in paragraph (b) of this section. See § 1.618 for return of unauthorized and improper papers in interferences.

(2) Information forming part of the original disclosure (*i.e.,* written specification including the claims, drawings, and any preliminary

amendment specifically incorporated into an executed oath or declaration under §§ 1.63 and 1.175) will not be expunged from the application file.

(b) Information, other than what is excluded by paragraph (a)(2) of this section, may be requested to be expunged and returned to applicant upon petition under this paragraph and payment of the petition fee set forth in § 1.17(i). Any petition to expunge and return information from an application must establish to the satisfaction of the Commissioner that the return of the information is appropriate.

(c) Upon request by an applicant and payment of the fee specified in § 1.19(b), the Office will furnish copies of an application, unless the application has been disposed of (see § 1.53 (e), (f) and (g)). The Office cannot provide or certify copies of an application that has been disposed of.

**§ 1.60   [Removed and reserved]**

25. Section 1.60 is removed and reserved.

**§ 1.62   [Removed and reserved]**

26. Section 1.62 is removed and reserved.

27. Section 1.63 is amended by revising paragraphs (a) and (d) and adding a paragraph (e) to read as follows:

**§ 1.63   Oath or declaration.**

(a) An oath or declaration filed under § 1.51(b)(2) as a part of an application must:

(1) Be executed in accordance with either § 1.66 or § 1.68;

(2) Identify the specification to which it is directed;

(3) Identify each inventor by: full name, including the family name, and at least one given name without abbreviation together with any other given name or initial, and the residence, post office address and country of citizenship of each inventor; and

(4) State whether the inventor is a sole or joint inventor of the invention claimed.

*   *   *   *   *

(d)(1) A newly executed oath or declaration is not required under § 1.51(b)(2) and § 1.53(f) in a continuation or divisional application, provided that:

(i) The prior nonprovisional application contained an oath or declaration as prescribed by paragraphs (a) through (c) of this section;

(ii) The continuation or divisional application was filed by all or by fewer than all of the inventors named in the prior application;

(iii) The specification and drawings filed in the continuation or divisional

PHILIPS-SCHUBERT018879

application contain no matter that would have been new matter in the prior application; and

(iv) A copy of the executed oath or declaration filed in the prior application, showing the signature or an indication thereon that it was signed, is submitted for the continuation or divisional application.

(2) The copy of the executed oath or declaration submitted under this paragraph for a continuation or divisional application must be accompanied by a statement requesting the deletion of the name or names of the person or persons who are not inventors in the continuation or divisional application.

(3) Where the executed oath or declaration of which a copy is submitted for a continuation or divisional application was originally filed in a prior application accorded status under § 1.47, the copy of the executed oath or declaration for such prior application must be accompanied by:

(i) A copy of the decision granting a petition to accord § 1.47 status to the prior application, unless all inventors or legal representatives have filed an oath or declaration to join in an application accorded status under § 1.47 of which the continuation or divisional application claims a benefit under 35 U.S.C. 120, 121, or 365(c); and

(ii) If one or more inventor(s) or legal representative(s) who refused to join in the prior application or could not be found or reached has subsequently joined in the prior application or another application of which the continuation or divisional application claims a benefit under 35 U.S.C. 120, 121, or 365(c), a copy of the subsequently executed oath(s) or declaration(s) filed by the inventor or legal representative to join in the application.

(4) Where the power of attorney (or authorization of agent) or correspondence address was changed during the prosecution of the prior application, the change in power of attorney (or authorization of agent) or correspondence address must be identified in the continuation or divisional application. Otherwise, the Office may not recognize in the continuation or divisional application the change of power of attorney (or authorization of agent) or correspondence address during the prosecution of the prior application.

(5) A newly executed oath or declaration must be filed in a continuation or divisional application naming an inventor not named in the prior application.

(e) A newly executed oath or declaration must be filed in any continuation-in-part application, which application may name all, more, or fewer than all of the inventors named in the prior application. The oath or declaration in any continuation-in-part application must also state that the person making the oath or declaration acknowledges the duty to disclose to the Office all information known to the person to be material to patentability as defined in § 1.56 which became available between the filing date of the prior application and the national or PCT international filing date of the continuation-in-part application.

28. Section 1.67 is amended by revising paragraph (b) to read as follows:

### § 1.67 Supplemental oath or declaration.
\*      \*      \*      \*      \*

(b) A supplemental oath or declaration meeting the requirements of § 1.63 must be filed when a claim is presented for matter originally shown or described but not substantially embraced in the statement of invention or claims originally presented or when an oath or declaration submitted in accordance with § 1.53(f) after the filing of the specification and any required drawings specifically and improperly refers to an amendment which includes new matter. No new matter may be introduced into a nonprovisional application after its filing date even if a supplemental oath or declaration is filed. In proper situations, the oath or declaration here required may be made on information and belief by an applicant other than the inventor.
\*      \*      \*      \*      \*

29. Section 1.69 is amended by revising paragraph (b) to read as follows:

### § 1.69 Foreign language oaths and declarations.
\*      \*      \*      \*      \*

(b) Unless the text of any oath or declaration in a language other than English is a form provided or approved by the Patent and Trademark Office, it must be accompanied by an English translation together with a statement that the translation is accurate, except that in the case of an oath or declaration filed under § 1.63, the translation may be filed in the Office no later than two months from the date applicant is notified to file the translation.

30. Section 1.78 is amended by revising paragraph (a) to read as follows:

### § 1.78 Claiming benefit of earlier filing date and cross-references to other applications.

(a)(1) A nonprovisional application may claim an invention disclosed in one or more prior filed copending

nonprovisional applications or copending international applications designating the United States of America. In order for a nonprovisional application to claim the benefit of a prior filed copending nonprovisional application or copending international application designating the United States of America, each prior application must name as an inventor at least one inventor named in the later filed nonprovisional application and disclose the named inventor's invention claimed in at least one claim of the later filed nonprovisional application in the manner provided by the first paragraph of 35 U.S.C. 112. In addition, each prior application must be:

(i) An international application entitled to a filing date in accordance with PCT Article 11 and designating the United States of America; or

(ii) Complete as set forth in § 1.51(b); or

(iii) Entitled to a filing date as set forth in § 1.53(b) or § 1.53(d) and include the basic filing fee set forth in § 1.16; or

(iv) Entitled to a filing date as set forth in § 1.53(b) and have paid therein the processing and retention fee set forth in § 1.21(l) within the time period set forth in § 1.53(f).

(2) Except for a continued prosecution application filed under § 1.53(d), any nonprovisional application claiming the benefit of one or more prior filed copending nonprovisional applications or international applications designating the United States of America must contain or be amended to contain in the first sentence of the specification following the title a reference to each such prior application, identifying it by application number (consisting of the series code and serial number) or international application number and international filing date and indicating the relationship of the applications. The request for a continued prosecution application under § 1.53(d) is the specific reference required by 35 U.S.C. 120 to the prior application. The identification of an application by application number under this section is the specific reference required by 35 U.S.C. 120 to every application assigned that application number. Cross-references to other related applications may be made when appropriate (see § 1.14(a)).

(3) A nonprovisional application other than for a design patent may claim an invention disclosed in one or more prior filed copending provisional applications. Since a provisional application can be pending for no more than twelve months, the last day of pendency may occur on a Saturday,

PHILIPS-SCHUBERT018880

**53190**   **Federal Register** / Vol. 62, No. 197 / Friday, October 10, 1997 / Rules and Regulations

Sunday, or Federal holiday within the District of Columbia which for copendency would require the nonprovisional application to be filed on or prior to the Saturday, Sunday, or Federal holiday. In order for a nonprovisional application to claim the benefit of one or more prior filed copending provisional applications, each prior provisional application must name as an inventor at least one inventor named in the later filed nonprovisional application and disclose the named inventor's invention claimed in at least one claim of the later filed nonprovisional application in the manner provided by the first paragraph of 35 U.S.C. 112. In addition, each prior provisional application must be:

(i) Complete as set forth in § 1.51(c); or

(ii) Entitled to a filing date as set forth in § 1.53(c) and include the basic filing fee set forth in § 1.16(k).

(4) Any nonprovisional application claiming the benefit of one or more prior filed copending provisional applications must contain or be amended to contain in the first sentence of the specification following the title a reference to each such prior filed provisional application, identifying it as a provisional application, and including the provisional application number (consisting of series code and serial number).

\*    \*    \*    \*    \*

31. Section 1.84 is amended by revising paragraphs (a)(2)(i), (b), (c) and (g) to read as follows:

**§ 1.84   Standards for drawings.**

(a) \* \* \*

(2) \* \* \*

(i) The fee set forth in § 1.17(i);

\*    \*    \*    \*    \*

(b) *Photographs*—(1) *Black and white*. Photographs are not ordinarily permitted in utility patent applications. However, the Office will accept photographs in utility patent applications only after the granting of a petition filed under this paragraph which requests that photographs be accepted. Any such petition must include the following:

(i) The fee set forth in § 1.17(i); and

(ii) Three (3) sets of photographs. Photographs must either be developed on double weight photographic paper or be permanently mounted on bristol board. The photographs must be of sufficient quality so that all details in the drawings are reproducible in the printed patent.

(2) Color. Color photographs will be accepted in utility patent applications if the conditions for accepting color

drawings have been satisfied. See paragraph (a)(2) of this section.

(c) *Identification of drawings*. Identifying indicia, if provided, should include the application number or the title of the invention, inventor's name, docket number (if any), and the name and telephone number of a person to call if the Office is unable to match the drawings to the proper application. This information should be placed on the back of each sheet of drawings a minimum distance of 1.5 cm. (⅝ inch) down from the top of the page. In addition, a reference to the application number, or, if an application number has not been assigned, the inventor's name, may be included in the left-hand corner, provided that the reference appears within 1.5 cm. (⅝ inch) from the top of the sheet.

\*    \*    \*    \*    \*

(g) *Margins*. The sheets must not contain frames around the sight (*i.e.,* the usable surface), but should have scan target points (*i.e.,* cross-hairs) printed on two catercorner margin corners. Each sheet must include a top margin of at least 2.5 cm. (1 inch), a left side margin of at least 2.5 cm. (1 inch), a right side margin of at least 1.5 cm. (⅝ inch), and a bottom margin of at least 1.0 cm. (⅜ inch), thereby leaving a sight no greater than 17.0 cm. by 26.2 cm. on 21.0 cm. by 29.7 cm. (DIN size A4) drawing sheets, and a sight no greater than 17.6 cm. by 24.4 cm. (6¹⁵⁄₁₆ by 9⅝ inches) on 21.6 cm. by 27.9 cm. (8½ by 11 inch) drawing sheets.

\*    \*    \*    \*    \*

32. Section 1.91 is revised to read as follows:

**§ 1.91   Models or exhibits not generally admitted as part of application or patent.**

(a) A model or exhibit will not be admitted as part of the record of an application unless it:

(1) Substantially conforms to the requirements of § 1.52 or § 1.84;

(2) Is specifically required by the Office; or

(3) Is filed with a petition under this section including:

(i) The petition fee as set forth in § 1.17(i); and

(ii) An explanation of why entry of the model or exhibit in the file record is necessary to demonstrate patentability.

(b) Notwithstanding the provisions of paragraph (a) of this section, a model, working model, or other physical exhibit may be required by the Office if deemed necessary for any purpose in examination of the application.

**§ 1.92   [Removed and reserved]**

33. Section 1.92 is removed and reserved.

34. Section 1.97 is amended by revising paragraphs (c) through (e) to read as follows:

**§ 1.97   Filing of information disclosure statement.**

\*    \*    \*    \*    \*

(c) An information disclosure statement shall be considered by the Office if filed by the applicant after the period specified in paragraph (b) of this section, provided that the information disclosure statement is filed before the mailing date of either a final action under § 1.113, or a notice of allowance under § 1.311, whichever occurs first, and is accompanied by either:

(1) A statement as specified in paragraph (e) of this section; or

(2) The fee set forth in § 1.17(p).

(d) An information disclosure statement shall be considered by the Office if filed by the applicant after the period specified in paragraph (c) of this section, provided that the information disclosure statement is filed on or before payment of the issue fee and is accompanied by:

(1) A statement as specified in paragraph (e) of this section;

(2) A petition requesting consideration of the information disclosure statement; and

(3) The petition fee set forth in § 1.17(i).

(e) A statement under this section must state either:

(1) That each item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement; or

(2) That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the statement after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in § 1.56(c) more than three months prior to the filing of the information disclosure statement.

\*    \*    \*    \*    \*

**§ 1.101   [Removed and reserved]**

35. Section 1.101 is removed and reserved.

36. Section 1.102 is amended by revising paragraph (a) to read as follows:

PHILIPS-SCHUBERT018881

### §1.102 Advancement of examination.

(a) Applications will not be advanced out of turn for examination or for further action except as provided by this part, or upon order of the Commissioner to expedite the business of the Office, or upon filing of a request under paragraph (b) of this section or upon filing a petition under paragraphs (c) or (d) of this section with a showing which, in the opinion of the Commissioner, will justify so advancing it.

\* \* \* \* \*

37. Section 1.103 is amended by revising paragraph (a) to read as follows:

### §1.103 Suspension of action.

(a) Suspension of action by the Office will be granted for good and sufficient cause and for a reasonable time specified upon petition by the applicant and, if such cause is not the fault of the Office, the payment of the fee set forth in § 1.17(i). Action will not be suspended when a reply by the applicant to an Office action is required.

\* \* \* \* \*

38. Section 1.104 is revised to read as follows:

### §1.104 Nature of examination.

(a) *Examiner's action.* (1) On taking up an application for examination or a patent in a reexamination proceeding, the examiner shall make a thorough study thereof and shall make a thorough investigation of the available prior art relating to the subject matter of the claimed invention. The examination shall be complete with respect both to compliance of the application or patent under reexamination with the applicable statutes and rules and to the patentability of the invention as claimed, as well as with respect to matters of form, unless otherwise indicated.

(2) The applicant, or in the case of a reexamination proceeding, both the patent owner and the requester, will be notified of the examiner's action. The reasons for any adverse action or any objection or requirement will be stated and such information or references will be given as may be useful in aiding the applicant, or in the case of a reexamination proceeding the patent owner, to judge the propriety of continuing the prosecution.

(3) An international-type search will be made in all national applications filed on and after June 1, 1978.

(4) Any national application may also have an international-type search report prepared thereon at the time of the national examination on the merits, upon specific written request therefor and payment of the international-type search report fee set forth in § 1.21(e).

The Patent and Trademark Office does not require that a formal report of an international-type search be prepared in order to obtain a search fee refund in a later filed international application.

(5) Copending applications will be considered by the examiner to be owned by, or subject to an obligation of assignment to, the same person if:

(i) The application files refer to assignments recorded in the Patent and Trademark Office in accordance with part 3 of this chapter which convey the entire rights in the applications to the same person or organization; or

(ii) Copies of unrecorded assignments which convey the entire rights in the applications to the same person or organization are filed in each of the applications; or

(iii) An affidavit or declaration by the common owner is filed which states that there is common ownership and states facts which explain why the affiant or declarant believes there is common ownership, which affidavit or declaration may be signed by an official of the corporation or organization empowered to act on behalf of the corporation or organization when the common owner is a corporation or other organization; or

(iv) Other evidence is submitted which establishes common ownership of the applications.

(b) *Completeness of examiner's action.* The examiner's action will be complete as to all matters, except that in appropriate circumstances, such as misjoinder of invention, fundamental defects in the application, and the like, the action of the examiner may be limited to such matters before further action is made. However, matters of form need not be raised by the examiner until a claim is found allowable.

(c) *Rejection of claims.* (1) If the invention is not considered patentable, or not considered patentable as claimed, the claims, or those considered unpatentable will be rejected.

(2) In rejecting claims for want of novelty or for obviousness, the examiner must cite the best references at his or her command. When a reference is complex or shows or describes inventions other than that claimed by the applicant, the particular part relied on must be designated as nearly as practicable. The pertinence of each reference, if not apparent, must be clearly explained and each rejected claim specified.

(3) In rejecting claims the examiner may rely upon admissions by the applicant, or the patent owner in a reexamination proceeding, as to any matter affecting patentability and, insofar as rejections in applications are

concerned, may also rely upon facts within his or her knowledge pursuant to paragraph (d)(2) of this section.

(4) Subject matter which is developed by another person which qualifies as prior art only under 35 U.S.C. 102(f) or (g) may be used as prior art under 35 U.S.C. 103 against a claimed invention unless the entire rights to the subject matter and the claimed invention were commonly owned by the same person or organization or subject to an obligation of assignment to the same person or organization at the time the claimed invention was made.

(5) The claims in any original application naming an inventor will be rejected as being precluded by a waiver in a published statutory invention registration naming that inventor if the same subject matter is claimed in the application and the statutory invention registration. The claims in any reissue application naming an inventor will be rejected as being precluded by a waiver in a published statutory invention registration naming that inventor if the reissue application seeks to claim subject matter:

(i) Which was not covered by claims issued in the patent prior to the date of publication of the statutory invention registration; and

(ii) Which was the same subject matter waived in the statutory invention registration.

(d) *Citation of references.* (1) If domestic patents are cited by the examiner, their numbers and dates, and the names of the patentees must be stated. If foreign published applications or patents are cited, their nationality or country, numbers and dates, and the names of the patentees must be stated, and such other data must be furnished as may be necessary to enable the applicant, or in the case of a reexamination proceeding, the patent owner, to identify the published applications or patents cited. In citing foreign published applications or patents, in case only a part of the document is involved, the particular pages and sheets containing the parts relied upon must be identified. If printed publications are cited, the author (if any), title, date, pages or plates, and place of publication, or place where a copy can be found, shall be given.

(2) When a rejection in an application is based on facts within the personal knowledge of an employee of the Office, the data shall be as specific as possible, and the reference must be supported, when called for by the applicant, by the affidavit of such employee, and such affidavit shall be subject to contradiction or explanation by the

PHILIPS-SCHUBERT018882

**53192    Federal Register** / Vol. 62, No. 197 / Friday, October 10, 1997 / Rules and Regulations

affidavits of the applicant and other persons.

(e) *Reasons for allowance.* If the examiner believes that the record of the prosecution as a whole does not make clear his or her reasons for allowing a claim or claims, the examiner may set forth such reasoning. The reasons shall be incorporated into an Office action rejecting other claims of the application or patent under reexamination or be the subject of a separate communication to the applicant or patent owner. The applicant or patent owner may file a statement commenting on the reasons for allowance within such time as may be specified by the examiner. Failure to file such a statement does not give rise to any implication that the applicant or patent owner agrees with or acquiesces in the reasoning of the examiner.

### §1.105    [Removed and reserved]

39. Section 1.105 is removed and reserved.

### §1.106    [Removed and reserved]

40. Section 1.106 is removed and reserved.

### §1.107    [Removed and reserved]

41. Section 1.107 is removed and reserved.

### §1.108    [Removed and reserved]

42. Section 1.108 is removed and reserved.

### §1.109    [Removed and reserved]

43. Section 1.109 is removed and reserved.

44. Section 1.111 is amended by revising paragraph (b) to read as follows:

### §1.111    Reply by applicant or patent owner.

\*    \*    \*    \*    \*

(b) In order to be entitled to reconsideration or further examination, the applicant or patent owner must reply to the Office action. The reply by the applicant or patent owner must be reduced to a writing which distinctly and specifically points out the supposed errors in the examiner's action and must reply to every ground of objection and rejection in the prior Office action. The reply must present arguments pointing out the specific distinctions believed to render the claims, including any newly presented claims, patentable over any applied references. If the reply is with respect to an application, a request may be made that objections or requirements as to form not necessary to further consideration of the claims be held in abeyance until allowable subject matter is indicated. The applicant's or patent owner's reply must appear throughout to be a *bona fide* attempt to advance the

application or the reexamination proceeding to final action. A general allegation that the claims define a patentable invention without specifically pointing out how the language of the claims patentably distinguishes them from the references does not comply with the requirements of this section.

\*    \*    \*    \*    \*

45. Section 1.112 is revised to read as follows:

### §1.112    Reconsideration before final action.

After reply by applicant or patent owner (§ 1.111) to a non-final action, the application or patent under reexamination will be reconsidered and again examined. The applicant or patent owner will be notified if claims are rejected, or objections or requirements made, in the same manner as after the first examination. Applicant or patent owner may reply to such Office action in the same manner provided in § 1.111, with or without amendment, unless such Office action indicates that it is made final (§ 1.113).

46. Section 1.113 is revised to read as follows:

### §1.113    Final rejection or action.

(a) On the second or any subsequent examination or consideration by the examiner the rejection or other action may be made final, whereupon applicant's or patent owner's reply is limited to appeal in the case of rejection of any claim (§ 1.191), or to amendment as specified in § 1.116. Petition may be taken to the Commissioner in the case of objections or requirements not involved in the rejection of any claim (§ 1.181). Reply to a final rejection or action must include cancellation of, or appeal from the rejection of, each rejected claim. If any claim stands allowed, the reply to a final rejection or action must comply with any requirements or objections as to form.

(b) In making such final rejection, the examiner shall repeat or state all grounds of rejection then considered applicable to the claims in the application, clearly stating the reasons in support thereof.

### §1.115    [Removed and Reserved]

47. Section 1.115 is removed and reserved.

48. Section 1.116 is amended by revising its heading and paragraph (a) to read as follows:

### §1.116    Amendments after final action or appeal.

(a) After a final rejection or other final action (§ 1.113), amendments may be

made cancelling claims or complying with any requirement of form expressly set forth in a previous Office action. Amendments presenting rejected claims in better form for consideration on appeal may be admitted. The admission of, or refusal to admit, any amendment after final rejection, and any related proceedings, will not operate to relieve the application or patent under reexamination from its condition as subject to appeal or to save the application from abandonment under § 1.135.

\*    \*    \*    \*    \*

### §1.117    [Removed and reserved]

49. Section 1.117 is removed and reserved.

### §1.118    [Removed and reserved]

50. Section 1.118 is removed and reserved.

### §1.119    [Removed and reserved]

51. Section 1.119 is removed and reserved.

52. Section 1.121 is revised to read as follows:

### §1.121    Manner of making amendments.

(a) *Amendments in nonprovisional applications, other than reissue applications*: Amendments in nonprovisional applications, excluding reissue applications, are made by filing a paper, in compliance with § 1.52, directing that specified amendments be made.

(1) *Specification other than the claims.* Except as provided in § 1.125, amendments to add matter to, or delete matter from, the specification, other than to the claims, may only be made as follows:

(i) Instructions for insertions: The precise point in the specification must be indicated where an insertion is to be made, and the matter to be inserted must be set forth.

(ii) Instructions for deletions: The precise point in the specification must be indicated where a deletion is to be made, and the matter to be deleted must be set forth or otherwise indicated.

(iii) Matter deleted by amendment can be reinstated only by a subsequent amendment presenting the previously deleted matter as a new insertion.

(2) *Claims.* Amendments to the claims may only be made as follows:

(i) Instructions for insertions and deletions: A claim may be amended by specifying only the exact matter to be deleted or inserted by an amendment and the precise point where the deletion or insertion is to be made, where the changes are limited to:

(A) Deletions and/or

PHILIPS-SCHUBERT018883

(B) The addition of no more than five (5) words in any one claim; or

(ii) Claim cancellation or rewriting: A claim may be amended by directions to cancel the claim or by rewriting such claim with underlining below the matter added and brackets around the matter deleted. The rewriting of a claim in this form will be construed as directing the deletion of the previous version of that claim. If a previously rewritten claim is again rewritten, underlining and bracketing will be applied relative to the previous version of the claim, with the parenthetical expression "twice amended," "three times amended," *etc.*, following the original claim number. The original claim number followed by that parenthetical expression must be used for the rewritten claim. No interlineations or deletions of any prior amendment may appear in the currently submitted version of the claim. A claim canceled by amendment (not deleted and rewritten) can be reinstated only by a subsequent amendment presenting the claim as a new claim with a new claim number.

(3) *Drawings.* (i) Amendments to the original application drawings are not permitted. Any change to the application drawings must be by way of a substitute sheet of drawings for each sheet changed submitted in compliance with § 1.84.

(ii) Where a change to the drawings is desired, a sketch in permanent ink showing proposed changes in red, to become part of the record, must be filed for approval by the examiner and should be in a separate paper.

(4) Any amendment to an application that is present in a substitute specification submitted pursuant to § 1.125 must be presented under the provisions of this paragraph either prior to or concurrent with submission of the substitute specification.

(5) The disclosure must be amended, when required by the Office, to correct inaccuracies of description and definition, and to secure substantial correspondence between the claims, the remainder of the specification, and the drawings.

(6) No amendment may introduce new matter into the disclosure of an application.

(b) *Amendments in reissue applications:* Amendments in reissue applications are made by filing a paper, in compliance with § 1.52, directing that specified amendments be made.

(1) *Specification other than the claims.* Amendments to the specification, other than to the claims, may only be made as follows:

(i) Amendments must be made by submission of the entire text of a newly added or rewritten paragraph(s) with markings pursuant to paragraph (b)(1)(iii) of this section, except that an entire paragraph may be deleted by a statement deleting the paragraph without presentation of the text of the paragraph.

(ii) The precise point in the specification must be indicated where the paragraph to be amended is located.

(iii) Underlining below the subject matter added to the patent and brackets around the subject matter deleted from the patent are to be used to mark the amendments being made.

(2) *Claims.* Amendments to the claims may only be made as follows:

(i)(A) The amendment must be made relative to the patent claims in accordance with paragraph (b)(6) of this section and must include the entire text of each claim which is being amended by the current amendment and of each claim being added by the current amendment with markings pursuant to paragraph (b)(2)(i)(C) of this section, except that a patent claim or added claim should be cancelled by a statement cancelling the patent claim or added claim without presentation of the text of the patent claim or added claim.

(B) Patent claims must not be renumbered and the numbering of any claims added to the patent must follow the number of the highest numbered patent claim.

(C) Underlining below the subject matter added to the patent and brackets around the subject matter deleted from the patent are to be used to mark the amendments being made. If a claim is amended pursuant to paragraph (b)(2)(i)(A) of this section, a parenthetical expression "amended," "twice amended," *etc.*, should follow the original claim number.

(ii) Each amendment submission must set forth the status (*i.e.*, pending or cancelled) as of the date of the amendment, of all patent claims and of all added claims.

(iii) Each amendment when originally submitted must be accompanied by an explanation of the support in the disclosure of the patent for the amendment along with any additional comments on page(s) separate from the page(s) containing the amendment.

(3) *Drawings.* (i) Amendments to the original patent drawings are not permitted. Any change to the patent drawings must be by way of a new sheet of drawings with the amended figures identified as "amended" and with added figures identified as "new" for each sheet changed submitted in compliance with § 1.84.

(ii) Where a change to the drawings is desired, a sketch in permanent ink

showing proposed changes in red, to become part of the record, must be filed for approval by the examiner and should be in a separate paper.

(4) The disclosure must be amended, when required by the Office, to correct inaccuracies of description and definition, and to secure substantial correspondence between the claims, the remainder of the specification, and the drawings.

(5) No reissue patent shall be granted enlarging the scope of the claims of the original patent unless applied for within two years from the grant of the original patent, pursuant to 35 U.S.C. 251. No amendment to the patent may introduce new matter or be made in an expired patent.

(6) All amendments must be made relative to the patent specification, including the claims, and drawings, which is in effect as of the date of filing of the reissue application.

(c) *Amendments in reexamination proceedings:* Any proposed amendment to the description and claims in patents involved in reexamination proceedings must be made in accordance with § 1.530(d).

### § 1.122   [Removed and reserved]

53. Section 1.122 is removed and reserved.

### § 1.123   [Removed and reserved]

54. Section 1.123 is removed and reserved.

### § 1.124   [Removed and reserved]

55. Section 1.124 is removed and reserved.

56. Section 1.125 is revised to read as follows:

### § 1.125   Substitute specification.

(a) If the number or nature of the amendments or the legibility of the application papers renders it difficult to consider the application, or to arrange the papers for printing or copying, the Office may require the entire specification, including the claims, or any part thereof, be rewritten.

(b) A substitute specification, excluding the claims, may be filed at any point up to payment of the issue fee if it is accompanied by:

(1) A statement that the substitute specification includes no new matter; and

(2) A marked-up copy of the substitute specification showing the matter being added to and the matter being deleted from the specification of record.

(c) A substitute specification submitted under this section must be submitted in clean form without markings as to amended material.

PHILIPS-SCHUBERT018884

**53194**   **Federal Register** / Vol. 62, No. 197 / Friday, October 10, 1997 / Rules and Regulations

(d) A substitute specification under this section is not permitted in a reissue application or in a reexamination proceeding.

57. Section 1.126 is revised to read as follows:

### § 1.126   Numbering of claims.

The original numbering of the claims must be preserved throughout the prosecution. When claims are canceled the remaining claims must not be renumbered. When claims are added, they must be numbered by the applicant consecutively beginning with the number next following the highest numbered claim previously presented (whether entered or not). When the application is ready for allowance, the examiner, if necessary, will renumber the claims consecutively in the order in which they appear or in such order as may have been requested by applicant.

58. Section 1.133 is amended by revising paragraph (b) to read as follows:

### § 1.133   Interviews.

\*     \*     \*     \*     \*

(b) In every instance where reconsideration is requested in view of an interview with an examiner, a complete written statement of the reasons presented at the interview as warranting favorable action must be filed by the applicant. An interview does not remove the necessity for reply to Office actions as specified in §§ 1.111 and 1.135.

### Subpart B—[Amended]

59. The undesignated center heading in Subpart B—National Processing Provisions, following § 1.133 is revised to read as follows:

### Time for Reply by Applicant; Abandonment of Application

60. Section 1.134 is revised to read as follows:

### § 1.134   Time period for reply to an Office action.

An Office action will notify the applicant of any non-statutory or shortened statutory time period set for reply to an Office action. Unless the applicant is notified in writing that a reply is required in less than six months, a maximum period of six months is allowed.

61. Section 1.135 is revised to read as follows:

### § 1.135   Abandonment for failure to reply within time period.

(a) If an applicant of a patent application fails to reply within the time period provided under § 1.134 and § 1.136, the application will become

abandoned unless an Office action indicates otherwise.

(b) Prosecution of an application to save it from abandonment pursuant to paragraph (a) of this section must include such complete and proper reply as the condition of the application may require. The admission of, or refusal to admit, any amendment after final rejection or any amendment not responsive to the last action, or any related proceedings, will not operate to save the application from abandonment.

(c) When reply by the applicant is a *bona fide* attempt to advance the application to final action, and is substantially a complete reply to the non-final Office action, but consideration of some matter or compliance with some requirement has been inadvertently omitted, applicant may be given a new time period for reply under § 1.134 to supply the omission.

62. Section 1.136 is revised to read as follows:

### § 1.136   Extensions of time.

(a)(1) If an applicant is required to reply within a nonstatutory or shortened statutory time period, applicant may extend the time period for reply up to the earlier of the expiration of any maximum period set by statute or five months after the time period set for reply, if a petition for an extension of time and the fee set in § 1.17(a) are filed, unless:

(i) Applicant is notified otherwise in an Office action;

(ii) The reply is a reply brief submitted pursuant to § 1.193(b);

(iii) The reply is a request for an oral hearing submitted pursuant to § 1.194(b);

(iv) The reply is to a decision by the Board of Patent Appeals and Interferences pursuant to § 1.196, § 1.197 or § 1.304; or

(v) The application is involved in an interference declared pursuant to § 1.611.

(2) The date on which the petition and the fee have been filed is the date for purposes of determining the period of extension and the corresponding amount of the fee. The expiration of the time period is determined by the amount of the fee paid. A reply must be filed prior to the expiration of the period of extension to avoid abandonment of the application (§ 1.135), but in no situation may an applicant reply later than the maximum time period set by statute, or be granted an extension of time under paragraph (b) of this section when the provisions of this paragraph are available. See § 1.136(b) for extensions of time relating

to proceedings pursuant to §§ 1.193(b), 1.194, 1.196 or 1.197; § 1.304 for extension of time to appeal to the U.S. Court of Appeals for the Federal Circuit or to commence a civil action; § 1.550(c) for extension of time in reexamination proceedings; and § 1.645 for extension of time in interference proceedings.

(3) A written request may be submitted in an application that is an authorization to treat any concurrent or future reply, requiring a petition for an extension of time under this paragraph for its timely submission, as incorporating a petition for extension of time for the appropriate length of time. An authorization to charge all required fees, fees under § 1.17, or all required extension of time fees will be treated as a constructive petition for an extension of time in any concurrent or future reply requiring a petition for an extension of time under this paragraph for its timely submission. Submission of the fee set forth in § 1.17(a) will also be treated as a constructive petition for an extension of time in any concurrent reply requiring a petition for an extension of time under this paragraph for its timely submission.

(b) When a reply cannot be filed within the time period set for such reply and the provisions of paragraph (a) of this section are not available, the period for reply will be extended only for sufficient cause and for a reasonable time specified. Any request for an extension of time under this paragraph must be filed on or before the day on which such reply is due, but the mere filing of such a request will not effect any extension under this paragraph. In no situation can any extension carry the date on which reply is due beyond the maximum time period set by statute. See § 1.304 for extension of time to appeal to the U.S. Court of Appeals for the Federal Circuit or to commence a civil action; § 1.645 for extension of time in interference proceedings; and § 1.550(c) for extension of time in reexamination proceedings.

63. Section 1.137 is revised to read as follows:

### § 1.137   Revival of abandoned application or lapsed patent.

(a) *Unavoidable.* Where the delay in reply was unavoidable, a petition may be filed to revive an abandoned application or a lapsed patent pursuant to this paragraph. A grantable petition pursuant to this paragraph must be accompanied by:

(1) The required reply, unless previously filed. In a nonprovisional application abandoned for failure to prosecute, the required reply may be met by the filing of a continuing

PHILIPS-SCHUBERT018885

application in an application or patent, abandoned or lapsed for failure to pay the issue fee or any portion thereof, the required reply must be the payment of the issue fee or any outstanding balance thereof;

(2) The petition fee as set forth in § 1.17(l);

(3) A showing to the satisfaction of the Commissioner that the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition pursuant to this paragraph was unavoidable; and

(4) Any terminal disclaimer (and fee as set forth in § 1.20(d)) required pursuant to paragraph (c) of this section.

(b) *Unintentional.* Where the delay in reply was unintentional, a petition may be filed to revive an abandoned application or a lapsed patent pursuant to this paragraph. A grantable petition pursuant to this paragraph must be accompanied by:

(1) The required reply, unless previously filed. In a nonprovisional application abandoned for failure to prosecute, the required reply may be met by the filing of a continuing application. In an application or patent, abandoned or lapsed for failure to pay the issue fee or any portion thereof, the required reply must be the payment of the issue fee or any outstanding balance thereof;

(2) The petition fee as set forth in § 1.17(m);

(3) A statement that the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition pursuant to this paragraph was unintentional. The Commissioner may require additional information where there is a question whether the delay was unintentional; and

(4) Any terminal disclaimer (and fee as set forth in § 1.20(d)) required pursuant to paragraph (c) of this section.

(c) In a design application, a utility application filed before June 8, 1995, or a plant application filed before June 8, 1995, any petition to revive pursuant to this section must be accompanied by a terminal disclaimer and fee as set forth in § 1.321 dedicating to the public a terminal part of the term of any patent granted thereon equivalent to the period of abandonment of the application. Any terminal disclaimer pursuant to this paragraph must also apply to any patent granted on any continuing application that contains a specific reference under 35 U.S.C. 120, 121, or 365(c) to the application for which revival is sought. The provisions of this paragraph do not apply to lapsed patents.

(d) Any request for reconsideration or review of a decision refusing to revive

an abandoned application or lapsed patent upon petition filed pursuant to this section, to be considered timely, must be filed within two months of the decision refusing to revive or within such time as set in the decision. Unless a decision indicates otherwise, this time period may be extended under the provisions of § 1.136.

(e) A provisional application, abandoned for failure to timely respond to an Office requirement, may be revived pursuant to this section so as to be pending for a period of no longer than twelve months from its filing date. Under no circumstances will a provisional application be regarded as pending after twelve months from its filing date.

### § 1.139   [Removed and reserved]

64. Section 1.139 is removed and reserved.

65. Section 1.142 is amended by revising paragraph (a) to read as follows:

### § 1.142   Requirement for restriction.

(a) If two or more independent and distinct inventions are claimed in a single application, the examiner in an Office action will require the applicant in the reply to that action to elect an invention to which the claims will be restricted, this official action being called a requirement for restriction (also known as a requirement for division). Such requirement will normally be made before any action on the merits; however, it may be made at any time before final action.

\*   \*   \*   \*   \*

66. Section 1.144 is revised to read as follows:

### § 1.144   Petition from requirement for restriction.

After a final requirement for restriction, the applicant, in addition to making any reply due on the remainder of the action, may petition the Commissioner to review the requirement. Petition may be deferred until after final action on or allowance of claims to the invention elected, but must be filed not later than appeal. A petition will not be considered if reconsideration of the requirement was not requested (see § 1.181).

67. Section 1.146 is revised to read as follows:

### § 1.146   Election of species.

In the first action on an application containing a generic claim to a generic invention (genus) and claims to more than one patentably distinct species embraced thereby, the examiner may require the applicant in the reply to that action to elect a species of his or her

invention to which his or her claim will be restricted if no claim to the genus is found to be allowable. However, if such application contains claims directed to more than a reasonable number of species, the examiner may require restriction of the claims to not more than a reasonable number of species before taking further action in the application.

68. Section 1.152 is revised to read as follows:

### § 1.152   Design drawings.

(a) The design must be represented by a drawing that complies with the requirements of § 1.84, and must contain a sufficient number of views to constitute a complete disclosure of the appearance of the design.

(1) Appropriate and adequate surface shading should be used to show the character or contour of the surfaces represented. Solid black surface shading is not permitted except when used to represent the color black as well as color contrast. Broken lines may be used to show visible environmental structure, but may not be used to show hidden planes and surfaces which cannot be seen through opaque materials. Alternate positions of a design component, illustrated by full and broken lines in the same view are not permitted in a design drawing.

(2) Color photographs and color drawings are not permitted in design applications in the absence of a grantable petition pursuant to § 1.84(a)(2). Photographs and ink drawings are not permitted to be combined as formal drawings in one application. Photographs submitted in lieu of ink drawings in design patent applications must comply with § 1.84(b) and must not disclose environmental structure but must be limited to the design for the article claimed.

(b) Any detail shown in the ink or color drawings or photographs (formal or informal) deposited with the original application papers constitutes an integral part of the disclosed and claimed design, except as otherwise provided in this paragraph. This detail may include, but is not limited to, color or contrast, graphic or written indicia, including identifying indicia of a proprietary nature, surface ornamentation on an article, or any combination thereof.

(1) When any detail shown in informal drawings or photographs does not constitute an integral part of the disclosed and claimed design, a specific disclaimer must appear in the original application papers either in the specification or directly on the drawings or photographs. This specific disclaimer

PHILIPS-SCHUBERT018886

in the original application papers will provide antecedent basis for the omission of the disclaimed detail(s) in later-filed drawings or photographs.

(2) When informal color drawings or photographs are deposited with the original application papers without a disclaimer pursuant to paragraph (b)(1) of this section, formal color drawings or photographs, or a black and white drawing lined to represent color, will be required.

69. Section 1.154 is amended by revising its heading and paragraph (a)(3) as to read follows:

### §1.154   Arrangement of application elements.

(a) * * *

(3) Preamble, stating name of the applicant, title of the design, and a brief description of the nature and intended use of the article in which the design is embodied.

*   *   *   *   *

70. Section 1.155 is revised to read as follows:

### §1.155   Issue of design patents.

If, on examination, it appears that the applicant is entitled to a design patent under the law, a notice of allowance will be sent to the applicant, or applicant's attorney or agent, calling for the payment of the issue fee (§ 1.18(b)). If this issue fee is not paid within three months of the date of the notice of allowance, the application shall be regarded as abandoned.

71. Section 1.163 is amended by revising its heading and paragraph (b) to read as follows:

### §1.163   Specification and arrangement of application elements.

*   *   *   *   *

(b) Two copies of the specification (including the claim) must be submitted, but only one signed oath or declaration is required.

*   *   *   *   *

72. Section 1.167 is revised to read as follows:

### §1.167   Examination.

Applications may be submitted by the Patent and Trademark Office to the Department of Agriculture for study and report.

73. Section 1.171 is revised to read as follows:

### §1.171   Application for reissue.

An application for reissue must contain the same parts required for an application for an original patent, complying with all the rules relating thereto except as otherwise provided, and in addition, must comply with the requirements of the rules relating to reissue applications.

74. Section 1.172 is amended by revising paragraph (a) to read as follows:

### §1.172   Applicants, assignees.

(a) A reissue oath must be signed and sworn to or declaration made by the inventor or inventors except as otherwise provided (see §§ 1.42, 1.43, 1.47), and must be accompanied by the written consent of all assignees, if any, owning an undivided interest in the patent, but a reissue oath may be made and sworn to or declaration made by the assignee of the entire interest if the application does not seek to enlarge the scope of the claims of the original patent. All assignees consenting to the reissue must establish their ownership interest in the patent by filing in the reissue application a submission in accordance with the provisions of § 3.73(b) of this chapter.

*   *   *   *   *

75. Section 1.175 is revised to read as follows:

### §1.175   Reissue oath or declaration.

(a) The reissue oath or declaration in addition to complying with the requirements of § 1.63, must also state that:

(1) The applicant believes the original patent to be wholly or partly inoperative or invalid by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than the patentee had the right to claim in the patent, stating at least one error being relied upon as the basis for reissue; and

(2) All errors being corrected in the reissue application up to the time of filing of the oath or declaration under this paragraph arose without any deceptive intention on the part of the applicant.

(b)(1) For any error corrected, which is not covered by the oath or declaration submitted under paragraph (a) of this section, applicant must submit a supplemental oath or declaration stating that every such error arose without any deceptive intention on the part of the applicant. Any supplemental oath or declaration required by this paragraph must be submitted before allowance and may be submitted:

(i) With any amendment prior to allowance; or

(ii) In order to overcome a rejection under 35 U.S.C. 251 made by the examiner where it is indicated that the submission of a supplemental oath or declaration as required by this paragraph will overcome the rejection.

(2) For any error sought to be corrected after allowance, a supplemental oath or declaration must accompany the requested correction stating that the error(s) to be corrected arose without any deceptive intention on the part of the applicant.

(c) Having once stated an error upon which the reissue is based, as set forth in paragraph (a)(1), unless all errors previously stated in the oath or declaration are no longer being corrected, a subsequent oath or declaration under paragraph (b) of this section need not specifically identify any other error or errors being corrected.

(d) The oath or declaration required by paragraph (a) of this section may be submitted under the provisions of § 1.53(f).

76. Section 1.182 is revised to read as follows:

### §1.182   Questions not specifically provided for.

All situations not specifically provided for in the regulations of this part will be decided in accordance with the merits of each situation by or under the authority of the Commissioner, subject to such other requirements as may be imposed, and such decision will be communicated to the interested parties in writing. Any petition seeking a decision under this section must be accompanied by the petition fee set forth in § 1.17(h).

77. Section 1.184 is removed and reserved.

### §1.184   [Removed and reserved]

78. Section 1.191 is amended by revising paragraphs (a) and (b) to read as follows:

### §1.191   Appeal to Board of Patent Appeals and Interferences.

(a) Every applicant for a patent or for reissue of a patent, and every owner of a patent under reexamination, any of whose claims has been twice or finally (§ 1.113) rejected, may appeal from the decision of the examiner to the Board of Patent Appeals and Interferences by filing a notice of appeal and the fee set forth in § 1.17(b) within the time period provided under §§ 1.134 and 1.136 for reply.

(b) The signature requirement of § 1.33 does not apply to a notice of appeal filed under this section.

*   *   *   *   *

79. Section 1.192 is amended by revising paragraph (a) to read as follows:

### §1.192   Appellant's brief.

(a) Appellant must, within two months from the date of the notice of appeal under § 1.191 or within the time allowed for reply to the action from which the appeal was taken, if such

PHILIPS-SCHUBERT018887

time is later, file a brief in triplicate. The brief must be accompanied by the fee set forth in § 1.17(c) and must set forth the authorities and arguments on which appellant will rely to maintain the appeal. Any arguments or authorities not included in the brief will be refused consideration by the Board of Patent Appeals and Interferences, unless good cause is shown.

\* \* \* \* \*

80. Section 1.193 is revised to read as follows:

**§ 1.193  Examiner's answer and reply brief.**

(a) (1) The primary examiner may, within such time as may be directed by the Commissioner, furnish a written statement in answer to appellant's brief including such explanation of the invention claimed and of the references and grounds of rejection as may be necessary, supplying a copy to appellant. If the primary examiner finds that the appeal is not regular in form or does not relate to an appealable action, the primary examiner shall so state.

(2) An examiner's answer must not include a new ground of rejection, but if an amendment under § 1.116 proposes to add or amend one or more claims and appellant was advised that the amendment under § 1.116 would be entered for purposes of appeal and which individual rejection(s) set forth in the action from which the appeal was taken would be used to reject the added or amended claim(s), then the appeal brief must address the rejection(s) of the claim(s) added or amended by the amendment under § 1.116 as appellant was so advised and the examiner's answer may include the rejection(s) of the claim(s) added or amended by the amendment under § 1.116 as appellant was so advised. The filing of an amendment under § 1.116 which is entered for purposes of appeal represents appellant's consent that when so advised any appeal proceed on those claim(s) added or amended by the amendment under § 1.116 subject to any rejection set forth in the action from which the appeal was taken.

(b) (1) Appellant may file a reply brief to an examiner's answer within two months from the date of such examiner's answer. See § 1.136(b) for extensions of time for filing a reply brief in a patent application and § 1.550(c) for extensions of time for filing a reply brief in a reexamination proceeding. The primary examiner must either acknowledge receipt and entry of the reply brief or withdraw the final rejection and reopen prosecution to respond to the reply brief. A supplemental examiner's answer is not permitted, unless the application has

been remanded by the Board of Patent Appeals and Interferences for such purpose.

(2) Where prosecution is reopened by the primary examiner after an appeal or reply brief has been filed, appellant must exercise one of the following two options to avoid abandonment of the application:

(i) File a reply under § 1.111, if the Office action is not final, or a reply under § 1.113, if the Office action is final; or

(ii) Request reinstatement of the appeal. If reinstatement of the appeal is requested, such request must be accompanied by a supplemental appeal brief, but no new amendments, affidavits (§§ 1.130, 1.131 or 1.132) or other evidence are permitted.

81. Section 1.194 is revised to read as follows:

**§ 1.194  Oral hearing.**

(a) An oral hearing should be requested only in those circumstances in which appellant considers such a hearing necessary or desirable for a proper presentation of the appeal. An appeal decided without an oral hearing will receive the same consideration by the Board of Patent Appeals and Interferences as appeals decided after oral hearing.

(b) If appellant desires an oral hearing, appellant must file, in a separate paper, a written request for such hearing accompanied by the fee set forth in § 1.17(d) within two months from the date of the examiner's answer. If appellant requests an oral hearing and submits therewith the fee set forth in § 1.17(d), an oral argument may be presented by, or on behalf of, the primary examiner if considered desirable by either the primary examiner or the Board. See § 1.136(b) for extensions of time for requesting an oral hearing in a patent application and § 1.550(c) for extensions of time for requesting an oral hearing in a reexamination proceeding.

(c) If no request and fee for oral hearing have been timely filed by appellant, the appeal will be assigned for consideration and decision. If appellant has requested an oral hearing and has submitted the fee set forth in § 1.17(d), a day of hearing will be set, and due notice thereof given to appellant and to the primary examiner. A hearing will be held as stated in the notice, and oral argument will be limited to twenty minutes for appellant and fifteen minutes for the primary examiner unless otherwise ordered before the hearing begins. If the Board decides that a hearing is not necessary, the Board will so notify appellant.

82. Section 1.196 is amended by revising paragraphs (b) and (d) to read as follows:

**§ 1.196  Decision by the Board of Patent Appeals and Interferences.**

\* \* \* \* \*

(b) Should the Board of Patent Appeals and Interferences have knowledge of any grounds not involved in the appeal for rejecting any pending claim, it may include in the decision a statement to that effect with its reasons for so holding, which statement constitutes a new ground of rejection of the claim. A new ground of rejection shall not be considered final for purposes of judicial review. When the Board of Patent Appeals and Interferences makes a new ground of rejection, the appellant, within two months from the date of the decision, must exercise one of the following two options with respect to the new ground of rejection to avoid termination of proceedings (§ 1.197(c)) as to the rejected claims:

(1) Submit an appropriate amendment of the claims so rejected or a showing of facts relating to the claims so rejected, or both, and have the matter reconsidered by the examiner, in which event the application will be remanded to the examiner. The new ground of rejection is binding upon the examiner unless an amendment or showing of facts not previously of record be made which, in the opinion of the examiner, overcomes the new ground of rejection stated in the decision. Should the examiner reject the claims, appellant may again appeal pursuant to §§ 1.191 through 1.195 to the Board of Patent Appeals and Interferences.

(2) Request that the application be reheard under § 1.197(b) by the Board of Patent Appeals and Interferences upon the same record. The request for rehearing must address the new ground of rejection and state with particularity the points believed to have been misapprehended or overlooked in rendering the decision and also state all other grounds upon which rehearing is sought. Where request for such rehearing is made, the Board of Patent Appeals and Interferences shall rehear the new ground of rejection and, if necessary, render a new decision which shall include all grounds of rejection upon which a patent is refused. The decision on rehearing is deemed to incorporate the earlier decision for purposes of appeal, except for those portions specifically withdrawn on rehearing, and is final for the purpose of judicial review, except when noted otherwise in the decision.

\* \* \* \* \*

PHILIPS-SCHUBERT018888

(d) The Board of Patent Appeals and Interferences may require appellant to address any matter that is deemed appropriate for a reasoned decision on the pending appeal. Appellant will be given a non-extendable time period within which to respond to such a requirement.

\*   \*   \*   \*   \*

83. Section 1.197 is amended by revising paragraphs (a) and (b) to read as follows:

### § 1.197   Action following decision.

(a) After decision by the Board of Patent Appeals and Interferences, the application will be returned to the examiner, subject to appellant's right of appeal or other review, for such further action by appellant or by the examiner, as the condition of the application may require, to carry into effect the decision.

(b) Appellant may file a single request for rehearing within two months from the date of the original decision, unless the original decision is so modified by the decision on rehearing as to become, in effect, a new decision, and the Board of Patent Appeals and Interferences so states. The request for rehearing must state with particularity the points believed to have been misapprehended or overlooked in rendering the decision and also state all other grounds upon which rehearing is sought. See § 1.136(b) for extensions of time for seeking rehearing in a patent application and § 1.550(c) for extensions of time for seeking rehearing in a reexamination proceeding.

\*   \*   \*   \*   \*

84. Section 1.291 is amended by revising paragraph (c) to read as follows:

### § 1.291   Protests by the public against pending applications.

\*   \*   \*   \*   \*

(c) A member of the public filing a protest in an application under paragraph (a) of this section will not receive any communications from the Office relating to the protest, other than the return of a self-addressed postcard which the member of the public may include with the protest in order to receive an acknowledgment by the Office that the protest has been received. In the absence of a request by the Office, an applicant has no duty to, and need not, reply to a protest. The limited involvement of the member of the public filing a protest pursuant to paragraph (a) of this section ends with the filing of the protest, and no further submission on behalf of the protestor will be considered, except for additional prior art, or unless such submission raises new issues which could not have been earlier presented.

85. Section 1.293 is amended by revising paragraph (c) to read as follows:

### § 1.293   Statutory invention registration.

\*   \*   \*   \*   \*

(c) A waiver filed with a request for a statutory invention registration will be effective, upon publication of the statutory invention registration, to waive the inventor's right to receive a patent on the invention claimed in the statutory invention registration, in any application for an original patent which is pending on, or filed after, the date of publication of the statutory invention registration. A waiver filed with a request for a statutory invention registration will not affect the rights of any other inventor even if the subject matter of the statutory invention registration and an application of another inventor are commonly owned. A waiver filed with a request for a statutory invention registration will not affect any rights in a patent to the inventor which issued prior to the date of publication of the statutory invention registration unless a reissue application is filed seeking to enlarge the scope of the claims of the patent. See also § 1.104(c)(5).

86. Section 1.294 is amended by revising paragraph (b) to read as follows:

### § 1.294   Examination of request for publication of a statutory invention registration and patent application to which the request is directed.

\*   \*   \*   \*   \*

(b) Applicant will be notified of the results of the examination set forth in paragraph (a) of this section. If the requirements of § 1.293 and this section are not met by the request filed, the notification to applicant will set a period of time within which to comply with the requirements in order to avoid abandonment of the application. If the application does not meet the requirements of 35 U.S.C. 112, the notification to applicant will include a rejection under the appropriate provisions of 35 U.S.C. 112. The periods for reply established pursuant to this section are subject to the extension of time provisions of § 1.136. After reply by the applicant, the application will again be considered for publication of a statutory invention registration. If the requirements of § 1.293 and this section are not timely met, the refusal to publish will be made final. If the requirements of 35 U.S.C. 112 are not met, the rejection pursuant to 35 U.S.C. 112 will be made final.

\*   \*   \*   \*   \*

87. Section 1.304 is amended by revising paragraph (a)(1) to read as follows:

### § 1.304   Time for appeal or civil action.

(a)(1) The time for filing the notice of appeal to the U.S. Court of Appeals for the Federal Circuit (§ 1.302) or for commencing a civil action (§ 1.303) is two months from the date of the decision of the Board of Patent Appeals and Interferences. If a request for rehearing or reconsideration of the decision is filed within the time period provided under § 1.197(b) or § 1.658(b), the time for filing an appeal or commencing a civil action shall expire two months after action on the request. In interferences, the time for filing a cross-appeal or cross-action expires:

(i) 14 days after service of the notice of appeal or the summons and complaint; or

(ii) Two months after the date of decision of the Board of Patent Appeals and Interferences, whichever is later.

\*   \*   \*   \*   \*

88. Section 1.312 is amended by revising paragraph (b) to read as follows:

### § 1.312   Amendments after allowance.

\*   \*   \*   \*   \*

(b) Any amendment pursuant to paragraph (a) of this section filed after the date the issue fee is paid must be accompanied by a petition including the fee set forth in § 1.17(i) and a showing of good and sufficient reasons why the amendment is necessary and was not earlier presented. For reissue applications, see § 1.175(b), which requires a supplemental oath or declaration to accompany the amendment.

89. Section 1.316 is revised to read as follows:

### § 1.316   Application abandoned for failure to pay issue fee.

If the issue fee is not paid within three months from the date of the notice of allowance, the application will be regarded as abandoned. Such an abandoned application will not be considered as pending before the Patent and Trademark Office.

90. Section 1.317 is revised to read as follows:

### § 1.317   Lapsed patents; delayed payment of balance of issue fee.

If the issue fee paid is the amount specified in the notice of allowance, but a higher amount is required at the time the issue fee is paid, any remaining balance of the issue fee is to be paid within three months from the date of notice thereof and, if not paid, the patent will lapse at the termination of the three-month period.

### § 1.318   [Removed and reserved]

91. Section 1.318 is removed and reserved.

PHILIPS-SCHUBERT018889

92. Section 1.324 is revised to read as follows:

### §1.324 Correction of inventorship in patent.

(a) Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent and such error arose without any deceptive intention on his or her part, the Commissioner may, on petition, or on order of a court before which such matter is called in question, issue a certificate naming only the actual inventor or inventors. A petition to correct inventorship of a patent involved in an interference must comply with the requirements of this section and must be accompanied by a motion under § 1.634.

(b) Any petition pursuant to paragraph (a) of this section must be accompanied by:

(1) A statement from each person who is being added as an inventor and from each person who is being deleted as an inventor that the inventorship error occurred without any deceptive intention on his or her part;

(2) A statement from the current named inventors who have not submitted a statement under paragraph (b)(1) of this section either agreeing to the change of inventorship or stating that they have no disagreement in regard to the requested change;

(3) A statement from all assignees of the parties submitting a statement under paragraphs (b)(1) and (b)(2) of this section agreeing to the change of inventorship in the patent, which statement must comply with the requirements of § 3.73(b) of this chapter; and

(4) The fee set forth in § 1.20(b).

### §1.352   [Removed and reserved]

93. Section 1.352 is removed and reserved.

94. Section 1.366 is amended by revising paragraphs (b) through (d) to read as follows:

### §1.366   Submission of maintenance fees.

\*    \*    \*    \*    \*

(b) A maintenance fee and any necessary surcharge submitted for a patent must be submitted in the amount due on the date the maintenance fee and any necessary surcharge are paid. A maintenance fee or surcharge may be paid in the manner set forth in § 1.23 or by an authorization to charge a deposit account established pursuant to § 1.25. Payment of a maintenance fee and any necessary surcharge or the authorization to charge a deposit account must be submitted within the periods set forth in

§ 1.362 (d), (e), or (f). Any payment or authorization of maintenance fees and surcharges filed at any other time will not be accepted and will not serve as a payment of the maintenance fee except insofar as a delayed payment of the maintenance fee is accepted by the Commissioner in an expired patent pursuant to a petition filed under § 1.378. Any authorization to charge a deposit account must authorize the immediate charging of the maintenance fee and any necessary surcharge to the deposit account. Payment of less than the required amount, payment in a manner other than that set forth § 1.23, or in the filing of an authorization to charge a deposit account having insufficient funds will not constitute payment of a maintenance fee or surcharge on a patent. The procedures set forth in § 1.8 or § 1.10 may be utilized in paying maintenance fees and any necessary surcharges.

(c) In submitting maintenance fees and any necessary surcharges, identification of the patents for which maintenance fees are being paid must include the following:

(1) The patent number; and

(2) The application number of the United States application for the patent on which the maintenance fee is being paid.

(d) Payment of maintenance fees and any surcharges should identify the fee being paid for each patent as to whether it is the 3½-, 7½-, or 11½-year fee, whether small entity status is being changed or claimed, the amount of the maintenance fee and any surcharge being paid, and any assigned customer number. If the maintenance fee and any necessary surcharge is being paid on a reissue patent, the payment must identify the reissue patent by reissue patent number and reissue application number as required by paragraph (c) of this section and should also include the original patent number.

\*    \*    \*    \*    \*

95. Section 1.377 is amended by revising paragraph (c) to read as follows:

### §1.377   Review of decision refusing to accept and record payment of a maintenance fee filed prior to expiration of patent.

\*    \*    \*    \*    \*

(c) Any petition filed under this section must comply with the requirements of § 1.181(b) and must be signed by an attorney or agent registered to practice before the Patent and Trademark Office, or by the patentee, the assignee, or other party in interest.

96. Section 1.378 is amended by revising paragraph (d) to read as follows:

### §1.378   Acceptance of delayed payment of maintenance fee in expired patent to reinstate patent.

\*    \*    \*    \*    \*

(d) Any petition under this section must be signed by an attorney or agent registered to practice before the Patent and Trademark Office, or by the patentee, the assignee, or other party in interest.

\*    \*    \*    \*    \*

97. Section 1.425 is revised to read as follows:

### §1.425   Filing by other than inventor.

Where an international application which designates the United States of America is filed and where one or more inventors refuse to sign the Request for the international application or cannot be found or reached after diligent effort, the Request need not be signed by such inventor if it is signed by another applicant. Such international application must be accompanied by a statement explaining to the satisfaction of the Commissioner the lack of the signature concerned.

98. Section 1.484 is amended by revising paragraphs (d) through (f) to read as follows:

### §1.484   Conduct of international preliminary examination.

\*    \*    \*    \*    \*

(d) The International Preliminary Examining Authority will establish a written opinion if any defect exists or if the claimed invention lacks novelty, inventive step or industrial applicability and will set a non-extendable time limit in the written opinion for the applicant to reply.

(e) If no written opinion under paragraph (d) of this section is necessary, or after any written opinion and the reply thereto or the expiration of the time limit for reply to such written opinion, an international preliminary examination report will be established by the International Preliminary Examining Authority. One copy will be submitted to the International Bureau and one copy will be submitted to the applicant.

(f) An applicant will be permitted a personal or telephone interview with the examiner, which must be conducted during the non-extendable time limit for reply by the applicant to a written opinion. Additional interviews may be conducted where the examiner determines that such additional interviews may be helpful to advancing the international preliminary examination procedure. A summary of any such personal or telephone interview must be filed by the applicant as a part of the reply to the written

PHILIPS-SCHUBERT018890

opinion or, if applicant files no reply, be made of record in the file by the examiner.

99. Section 1.485 is amended by revising paragraph (a) to read as follows:

**§ 1.485 Amendments by applicant during international preliminary examination.**

(a) The applicant may make amendments at the time of filing of the Demand and within the time limit set by the International Preliminary Examining Authority for reply to any notification under § 1.484(b) or to any written opinion. Any such amendments must:

(1) Be made by submitting a replacement sheet for every sheet of the application which differs from the sheet it replaces unless an entire sheet is cancelled; and

(2) Include a description of how the replacement sheet differs from the replaced sheet.

\* \* \* \* \*

100. Section 1.488 is amended by revising paragraph (b)(3) to read as follows:

**§ 1.488 Determination of unity of invention before the International Preliminary Examining Authority.**

\* \* \* \* \*

(b) \* \* \*

(3) If applicant fails to restrict the claims or pay additional fees within the time limit set for reply, the International Preliminary Examining Authority will issue a written opinion and/or establish an international preliminary examination report on the main invention and shall indicate the relevant facts in the said report. In case of any doubt as to which invention is the main invention, the invention first mentioned in the claims and previously searched by an International Searching Authority shall be considered the main invention.

\* \* \* \* \*

101. Section 1.492 is amended by adding a new paragraph (g) to read as follows:

**§ 1.492 National stage fees.**

\* \* \* \* \*

(g) If the additional fees required by paragraphs (b), (c), and (d) of this section are not paid on presentation of the claims for which the additional fees are due, they must be paid or the claims cancelled by amendment, prior to the expiration of the time period set for reply by the Office in any notice of fee deficiency.

102. Section 1.494 is amended by revising paragraph (c) to read as follows:

**§ 1.494 Entering the national stage in the United States of America as a Designated Office.**

\* \* \* \* \*

(c) If applicant complies with paragraph (b) of this section before expiration of 20 months from the priority date but omits:

(1) A translation of the international application, as filed, into the English language, if it was originally filed in another language (35 U.S.C. 371(c)(2)); and/or

(2) The oath or declaration of the inventor (35 U.S.C. 371(c)(4); see § 1.497), applicant will be so notified and given a period of time within which to file the translation and/or oath or declaration in order to prevent abandonment of the application. The payment of the processing fee set forth in § 1.492(f) is required for acceptance of an English translation later than the expiration of 20 months after the priority date. The payment of the surcharge set forth in § 1.492(e) is required for acceptance of the oath or declaration of the inventor later than the expiration of 20 months after the priority date. A copy of the notification mailed to applicant should accompany any reply thereto submitted to the Office.

\* \* \* \* \*

103. Section 1.495 is amended by revising paragraph (c) to read as follows:

**§ 1.495 Entering the national stage in the United States of America as an Elected Office.**

\* \* \* \* \*

(c) If applicant complies with paragraph (b) of this section before expiration of 30 months from the priority date but omits:

(1) A translation of the international application, as filed, into the English language, if it was originally filed in another language (35 U.S.C. 371(c)(2)); and/or

(2) The oath or declaration of the inventor (35 U.S.C. 371(c)(4); see § 1.497), applicant will be so notified and given a period of time within which to file the translation and/or oath or declaration in order to prevent abandonment of the application. The payment of the processing fee set forth in § 1.492(f) is required for acceptance of an English translation later than the expiration of 30 months after the priority date. The payment of the surcharge set forth in § 1.492(e) is required for acceptance of the oath or declaration of the inventor later than the expiration of 30 months after the priority date. A copy of the notification mailed to applicant should accompany any reply thereto submitted to the Office.

\* \* \* \* \*

104. Section 1.510 is amended by revising paragraph (e) to read as follows:

**§ 1.510 Request for reexamination.**

\* \* \* \* \*

(e) A request filed by the patent owner may include a proposed amendment in accordance with § 1.530(d).

\* \* \* \* \*

105. Section 1.530 is amended by removing paragraph (e) and revising the section heading and paragraph (d) to read as follows:

**§ 1.530 Statement; amendment by patent owner.**

\* \* \* \* \*

(d) *Amendments in reexamination proceedings.* Amendments in reexamination proceedings are made by filing a paper, in compliance with paragraph (d)(5) of this section, directing that specified amendments be made.

(1) *Specification other than the claims.* Amendments to the specification, other than to the claims, may only be made as follows:

(i) Amendments must be made by submission of the entire text of a newly added or rewritten paragraph(s) with markings pursuant to paragraph (d)(1)(iii) of this section, except that an entire paragraph may be deleted by a statement deleting the paragraph without presentation of the text of the paragraph.

(ii) The precise point in the specification must be indicated where the paragraph to be amended is located.

(iii) Underlining below the subject matter added to the patent and brackets around the subject matter deleted from the patent are to be used to mark the amendments being made.

(2) *Claims.* Amendments to the claims may only be made as follows:

(i)(A) The amendment must be made relative to the patent claims in accordance with paragraph (d)(8) of this section and must include the entire text of each claim which is being proposed to be amended by the current amendment and each proposed new claim being added by the current amendment with markings pursuant to paragraph (d)(2)(i)(C) of this section, except that a patent claim or previously proposed new claim should be cancelled by a statement cancelling the patent claim or proposed new claim without presentation of the text of the patent claim or proposed new claim.

(B) Patent claims must not be renumbered and the numbering of any new claims proposed to be added to the patent must follow the number of the highest numbered patent claim.

(C) Underlining below the subject matter added to the patent and brackets around the subject matter deleted from the patent are to be used to mark the

PHILIPS-SCHUBERT018891

amendments being made. If a claim is amended pursuant to paragraph (d)(2)(i)(A) of this section, a parenthetical expression "amended," "twice amended," *etc.*, should follow the original claim number.

(ii) Each amendment submission must set forth the status (*i.e.*, pending or cancelled) as of the date of the amendment, of all patent claims and of all new claims currently or previously proposed.

(iii) Each amendment, when submitted for the first time, must be accompanied by an explanation of the support in the disclosure of the patent for the amendment along with any additional comments on page(s) separate from the page(s) containing the amendment.

(3) No amendment may enlarge the scope of the claims of the patent or introduce new matter. No amendment may be proposed for entry in an expired patent. Moreover, no amendment will be incorporated into the patent by certificate issued after the expiration of the patent.

(4) Although the Office actions will treat proposed amendments as though they have been entered, the proposed amendments will not be effective until the reexamination certificate is issued.

(5) The form of amendments other than to the patent drawings must be in accordance with the following requirements. All amendments must be in the English language and must be legibly written either by a typewriter or mechanical printer in at least 11 point type in permanent dark ink or its equivalent in portrait orientation on flexible, strong, smooth, non-shiny, durable, white paper. All amendments must be presented in a form having sufficient clarity and contrast between the paper and the writing thereon to permit the direct reproduction of readily legible copies in any number by use of photographic, electrostatic, photo-offset, and microfilming processes and electronic reproduction by use of digital imaging or optical character recognition. If the amendments are not of the required quality, substitute typewritten or mechanically printed papers of suitable quality will be required. The papers, including the drawings, must have each page plainly written on only one side of a sheet of paper. The sheets of paper must be the same size and either 21.0 cm. by 29.7 cm. (DIN size A4) or 21.6 cm. by 27.9 cm. (8½ by 11 inches). Each sheet must include a top margin of at least 2.0 cm. (¾ inch), a left side margin of at least 2.5 cm. (1 inch), a right side margin of at least 2.0 cm. (¾ inch), and a bottom margin of at least 2.0 cm. (¾ inch), and no holes should

be made in the sheets as submitted. The lines must be double spaced, or one and one-half spaced. The pages must be numbered consecutively, starting with 1, the numbers being centrally located, preferably below the text, or above the text.

(6) *Drawings.* (i) The original patent drawing sheets may not be altered. Any proposed change to the patent drawings must be by way of a new sheet of drawings with the amended figures identified as "amended" and with added figures identified as "new" for each sheet change submitted in compliance with § 1.84.

(ii) Where a change to the drawings is desired, a sketch in permanent ink showing proposed changes in red, to become part of the record, must be filed for approval by the examiner and should be in a separate paper.

(7) The disclosure must be amended, when required by the Office, to correct inaccuracies of description and definition and to secure substantial correspondence between the claims, the remainder of the specification, and the drawings.

(8) All amendments to the patent must be made relative to the patent specification, including the claims, and drawings, which is in effect as of the date of filing of the request for reexamination.

106. Section 1.550 is amended by revising paragraphs (a), (b) and (e) to read as follows:

### § 1.550   Conduct of reexamination proceedings.

(a) All reexamination proceedings, including any appeals to the Board of Patent Appeals and Interferences, will be conducted with special dispatch within the Office. After issuance of the reexamination order and expiration of the time for submitting any responses thereto, the examination will be conducted in accordance with §§ 1.104, 1.110 through 1.113 and 1.116, and will result in the issuance of a reexamination certificate under § 1.570.

(b) The patent owner will be given at least thirty days to respond to any Office action. Such response may include further statements in response to any rejections or proposed amendments or new claims to place the patent in a condition where all claims, if amended as proposed, would be patentable.

\*      \*      \*      \*      \*

(e) The reexamination requester will be sent copies of Office actions issued during the reexamination proceeding. After filing of a request for reexamination by a third party requester, any document filed by either the patent owner or the third party

requester must be served on the other party in the reexamination proceeding in the manner provided by § 1.248. The document must reflect service or the document may be refused consideration by the Office.

(1) The active participation of the reexamination requester ends with the reply pursuant to § 1.535, and no further submissions on behalf of the reexamination requester will be acknowledged or considered. Further, no submissions on behalf of any third parties will be acknowledged or considered unless such submissions are:

(i) In accordance with § 1.510; or

(ii) Entered in the patent file prior to the date of the order to reexamine pursuant to § 1.525.

(2) Submissions by third parties, filed after the date of the order to reexamine pursuant to § 1.525, must meet the requirements of and will be treated in accordance with § 1.501(a).

107. Section 1.770 is revised to read as follows:

### § 1.770   Express withdrawal of application for extension of patent term.

An application for extension of patent term may be expressly withdrawn before a determination is made pursuant to § 1.750 by filing in the Office, in duplicate, a written declaration of withdrawal signed by the owner of record of the patent or its agent. An application may not be expressly withdrawn after the date permitted for reply to the final determination on the application. An express withdrawal pursuant to this section is effective when acknowledged in writing by the Office. The filing of an express withdrawal pursuant to this section and its acceptance by the Office does not entitle applicant to a refund of the filing fee (§ 1.20(j)) or any portion thereof.

108. Section 1.785 is amended by revising paragraph (d) to read as follows:

### § 1.785   Multiple applications for extension of term of the same patent or of different patents for the same regulatory review period for a product.

\*      \*      \*      \*      \*

(d) An application for extension shall be considered complete and formal regardless of whether it contains the identification of the holder of the regulatory approval granted with respect to the regulatory review period. When an application contains such information, or is amended to contain such information, it will be considered in determining whether an application is eligible for an extension under this section. A request may be made of any applicant to supply such information

**53202**   **Federal Register** / Vol. 62, No. 197 / Friday, October 10, 1997 / Rules and Regulations

within a non-extendable period of not less than one month whenever multiple applications for extension of more than one patent are received and rely upon the same regulatory review period. Failure to provide such information within the period for reply set shall be regarded as conclusively establishing that the applicant is not the holder of the regulatory approval.

\* \* \* \* \*

109. Section 1.804 is amended by revising paragraph (b) to read as follows:

§ 1.804   Time of making an original deposit.

\* \* \* \* \*

(b) When the original deposit is made after the effective filing date of an application for patent, the applicant must promptly submit a statement from a person in a position to corroborate the fact, stating that the biological material which is deposited is a biological material specifically identified in the application as filed.

110. Section 1.805 is amended by revising paragraph (c) to read as follows:

§ 1.805   Replacement or supplement of deposit.

\* \* \* \* \*

(c) A request for a certificate of correction under this section shall not be granted unless the request is made promptly after the replacement or supplemental deposit has been made and the request:

(1) Includes a statement of the reason for making the replacement or supplemental deposit;

(2) Includes a statement from a person in a position to corroborate the fact, and stating that the replacement or supplemental deposit is of a biological material which is identical to that originally deposited;

(3) Includes a showing that the patent owner acted diligently—

(i) In the case of a replacement deposit, in making the deposit after receiving notice that samples could no longer be furnished from an earlier deposit; or

(ii) In the case of a supplemental deposit, in making the deposit after receiving notice that the earlier deposit had become contaminated or had lost its capability to function as described in the specification;

(4) Includes a statement that the term of the replacement or supplemental deposit expires no earlier than the term of the deposit being replaced or supplemented; and

(5) Otherwise establishes compliance with these regulations.

\* \* \* \* \*

PART 3—ASSIGNMENT, RECORDING AND RIGHTS OF ASSIGNEE

111. The authority citation for 37 CFR part 3 continues to read as follows:

**Authority:** 15 U.S.C. 1123; 35 U.S.C. 6.

112. Section 3.11 is revised to read as follows:

§ 3.11   Documents which will be recorded.

(a) Assignments of applications, patents, and registrations, accompanied by completed cover sheets as specified in §§ 3.28 and 3.31, will be recorded in the Office. Other documents, accompanied by completed cover sheets as specified in §§ 3.28 and 3.31, affecting title to applications, patents, or registrations, will be recorded as provided in this part or at the discretion of the Commissioner.

(b) Executive Order 9424 of February 18, 1944 (9 FR 1959, 3 CFR 1943–1948 Comp., p. 303) requires the several departments and other executive agencies of the Government, including Government-owned or Government-controlled corporations, to forward promptly to the Commissioner of Patents and Trademarks for recording all licenses, assignments, or other interests of the Government in or under patents or patent applications. Assignments and other documents affecting title to patents or patent applications and documents not affecting title to patents or patent applications required by Executive Order 9424 to be filed will be recorded as provided in this part.

113. Section 3.21 is revised to read as follows:

§ 3.21   Identification of patents and patent applications.

An assignment relating to a patent must identify the patent by the patent number. An assignment relating to a national patent application must identify the national patent application by the application number (consisting of the series code and the serial number, e.g., 07/123,456). An assignment relating to an international patent application which designates the United States of America must identify the international application by the international application number (e.g., PCT/US90/01234). If an assignment of a patent application filed under § 1.53(b) is executed concurrently with, or subsequent to, the execution of the patent application, but before the patent application is filed, it must identify the patent application by its date of execution, name of each inventor, and title of the invention so that there can be no mistake as to the patent application intended. If an assignment

of a provisional application under § 1.53(c) is executed before the provisional application is filed, it must identify the provisional application by name of each inventor and title of the invention so that there can be no mistake as to the provisional application intended.

114. Section 3.26 is revised to read as follows:

§ 3.26   English language requirement.

The Office will accept and record non-English language documents only if accompanied by an English translation signed by the individual making the translation.

115. Section 3.27 is revised to read as follows:

§ 3.27   Mailing address for submitting documents to be recorded.

(a) Except as provided in paragraph (b) of this section, documents and cover sheets to be recorded should be addressed to the Commissioner of Patents and Trademarks, Box Assignment, Washington, D.C. 20231, unless they are filed together with new applications or with a petition under § 3.81(b).

(b) A document required by Executive Order 9424 to be filed which does not affect title and is so identified in the cover sheet (see § 3.31(c)(2)) must be addressed and mailed to the Commissioner of Patents and Trademarks, Box Government Interest, Washington, D.C. 20231.

116. Section 3.31 is amended by adding paragraph (c) to read as follows:

§ 3.31   Cover sheet content.

\* \* \* \* \*

(c) Each patent cover sheet required by § 3.28 seeking to record a governmental interest as provided by § 3.11(b) must:

(1) Indicate that the document is to be recorded on the Governmental Register, and, if applicable, that the document is to be recorded on the Secret Register (see § 3.58); and

(2) Indicate, if applicable, that the document to be recorded is not a document affecting title (see § 3.41(b)).

117. Section 3.41 is revised to read as follows:

§ 3.41   Recording fees.

(a) All requests to record documents must be accompanied by the appropriate fee. Except as provided in paragraph (b) of this section, a fee is required for each application, patent and registration against which the document is recorded as identified in the cover sheet. The recording fee is set in § 1.21(h) of this chapter for patents

PHILIPS-SCHUBERT018893

and in § 2.6(q) of this chapter for trademarks.

(b) No fee is required for each patent application and patent against which a document required by Executive Order 9424 is to be filed if:

(1) The document does not affect title and is so identified in the cover sheet (see § 3.31(c)(2)); and

(2) The document and cover sheet are mailed to the Office in compliance with § 3.27(b).

118. Section 3.51 is revised to read as follows:

### § 3.51  Recording date.

The date of recording of a document is the date the document meeting the requirements for recording set forth in this part is filed in the Office. A document which does not comply with the identification requirements of § 3.21 will not be recorded. Documents not meeting the other requirements for recording, for example, a document submitted without a completed cover sheet or without the required fee, will be returned for correction to the sender where a correspondence address is available. The returned papers, stamped with the original date of receipt by the Office, will be accompanied by a letter which will indicate that if the returned papers are corrected and resubmitted to the Office within the time specified in the letter, the Office will consider the original date of filing of the papers as the date of recording of the document. The procedure set forth in § 1.8 or § 1.10 of this chapter may be used for resubmissions of returned papers to have the benefit of the date of deposit in the United States Postal Service. If the returned papers are not corrected and resubmitted within the specified period, the date of filing of the corrected papers will be considered to be the date of recording of the document. The specified period to resubmit the returned papers will not be extended.

119. Section 3.58 is added to read as follows:

### § 3.58  Governmental registers.

(a) The Office will maintain a Departmental Register to record governmental interests required to be recorded by Executive Order 9424. This Departmental Register will not be open to public inspection but will be available for examination and inspection by duly authorized representatives of the Government. Governmental interests recorded on the Departmental Register will be available for public inspection as provided in § 1.12.

(b) The Office will maintain a Secret Register to record governmental

interests required to be recorded by Executive Order 9424. Any instrument to be recorded will be placed on this Secret Register at the request of the department or agency submitting the same. No information will be given concerning any instrument in such record or register, and no examination or inspection thereof or of the index thereto will be permitted, except on the written authority of the head of the department or agency which submitted the instrument and requested secrecy, and the approval of such authority by the Commissioner of Patents and Trademarks. No instrument or record other than the one specified may be examined, and the examination must take place in the presence of a designated official of the Patent and Trademark Office. When the department or agency which submitted an instrument no longer requires secrecy with respect to that instrument, it must be recorded anew in the Departmental Register.

### § 3.61  [Amended]

120. The undesignated center heading in Part 3—Assignment, Recording and Rights of Assignee, following § 3.61 is revised to read as follows:

### Action Taken by Assignee

121. Section 3.73 is amended by revising its heading and paragraph (b) to read as follows:

### § 3.73  Establishing right of assignee to take action.

\*    \*    \*    \*    \*

(b) When an assignee seeks to take action in a matter before the Office with respect to a patent application, trademark application, patent, registration, or reexamination proceeding, the assignee must establish its ownership of the property to the satisfaction of the Commissioner. Ownership is established by submitting to the Office, in the Office file related to the matter in which action is sought to be taken, documentary evidence of a chain of title from the original owner to the assignee (*e.g.,* copy of an executed assignment submitted for recording) or by specifying (*e.g.,* reel and frame number) where such evidence is recorded in the Office. The submission establishing ownership must be signed by a party authorized to act on behalf of the assignee. Documents submitted to establish ownership may be required to be recorded as a condition to permitting the assignee to take action in a matter pending before the Office.

## PART 5—SECRECY OF CERTAIN INVENTIONS AND LICENSES TO EXPORT AND FILE APPLICATIONS IN FOREIGN COUNTRIES

122. The authority citation for 37 CFR Part 5 continues to read as follows:

**Authority:** 35 U.S.C. 6, 41, 181–188, as amended by the Patent Law Foreign Filing Amendments Act of 1988, Pub. L. 100–418, 102 Stat. 1567; the Arms Export Control Act, as amended, 22 U.S.C. 2751 *et seq.;* the Atomic Energy Act of 1954, as amended, 42 U.S.C. 2011 *et seq.;* and the Nuclear Non-Proliferation Act of 1978, 22 U.S.C. 3201 *et seq.;* and the delegations in the regulations under these Acts to the Commissioner (15 CFR 370.10(j), 22 CFR 125.04, and 10 CFR 810.7).

123. Section 5.1 is revised to read as follows:

### § 5.1  Correspondence.

All correspondence in connection with this part, including petitions, must be addressed to "Assistant Commissioner for Patents (Attention Licensing and Review), Washington, DC 20231."

124. Section 5.2 is amended by removing paragraphs (c) and (d) and revising paragraph (b) to read as follows:

### § 5.2  Secrecy order.
\*    \*    \*    \*    \*

(b) Any request for compensation as provided in 35 U.S.C. 183 must not be made to the Patent and Trademark Office, but directly to the department or agency which caused the secrecy order to be issued.

125. Section 5.3 is amended by revising paragraph (c) to read as follows:

### § 5.3  Prosecution of application under secrecy orders; withholding patent.
\*    \*    \*    \*    \*

(c) When the national application is found to be in condition for allowance except for the secrecy order the applicant and the agency which caused the secrecy order to be issued will be notified. This notice (which is not a notice of allowance under § 1.311 of this chapter) does not require reply by the applicant and places the national application in a condition of suspension until the secrecy order is removed. When the secrecy order is removed the Patent and Trademark Office will issue a notice of allowance under § 1.311 of this chapter, or take such other action as may then be warranted.

\*    \*    \*    \*    \*

126. Section 5.4 is amended by revising paragraphs (a) and (d) to read as follows:

PHILIPS-SCHUBERT018894

### §5.4   Petition for rescission of secrecy order.

(a) A petition for rescission or removal of a secrecy order may be filed by, or on behalf of, any principal affected thereby. Such petition may be in letter form, and it must be in duplicate.

\*    \*    \*    \*    \*

(d) Appeal to the Secretary of Commerce, as provided by 35 U.S.C. 181, from a secrecy order cannot be taken until after a petition for rescission of the secrecy order has been made and denied. Appeal must be taken within sixty days from the date of the denial, and the party appealing, as well as the department or agency which caused the order to be issued, will be notified of the time and place of hearing.

127. Section 5.5 is amended by revising paragraphs (b) and (e) to read as follows:

### §5.5   Permit to disclose or modification of secrecy order.

\*    \*    \*    \*    \*

(b) Petitions for a permit or modification must fully recite the reason or purpose for the proposed disclosure. Where any proposed disclosee is known to be cleared by a defense agency to receive classified information, adequate explanation of such clearance should be made in the petition including the name of the agency or department granting the clearance and the date and degree thereof. The petition must be filed in duplicate.

\*    \*    \*    \*    \*

(e) Organizations requiring consent for disclosure of applications under secrecy order to persons or organizations in connection with repeated routine operation may petition for such consent in the form of a general permit. To be successful such petitions must ordinarily recite the security clearance status of the disclosees as sufficient for the highest classification of material that may be involved.

### §5.6   [Removed and reserved]

128. Section 5.6 is removed and reserved.

### §5.7   [Removed and reserved]

129. Section 5.7 is removed and reserved.

### §5.8   [Removed and reserved]

130. Section 5.8 is removed and reserved.

131. Section 5.11 is amended by revising paragraphs (b), (c) and (e)(3) to read as follows:

### §5.11   License for filing in a foreign country an application on an invention made in the United States or for transmitting international application.

\*    \*    \*    \*    \*

(b) The license from the Commissioner of Patents and Trademarks referred to in paragraph (a) would also authorize the export of technical data abroad for purposes relating to the preparation, filing or possible filing and prosecution of a foreign patent application without separately complying with the regulations contained in 22 CFR parts 121 through 130 (International Traffic in Arms Regulations of the Department of State), 15 CFR part 779 (Regulations of the Office of Export Administration, International Trade Administration, Department of Commerce) and 10 CFR part 810 (Foreign Atomic Energy Programs of the Department of Energy).

(c) Where technical data in the form of a patent application, or in any form, is being exported for purposes related to the preparation, filing or possible filing and prosecution of a foreign patent application, without the license from the Commissioner of Patents and Trademarks referred to in paragraphs (a) or (b) of this section, or on an invention not made in the United States, the export regulations contained in 22 CFR parts 120 through 130 (International Traffic in Arms Regulations of the Department of State), 15 CFR part 768–799 (Export Administration Regulations of the Department of Commerce) and 10 CFR part 810 (Assistance to Foreign Atomic Energy Activities Regulations of the Department of Energy) must be complied with unless a license is not required because a United States application was on file at the time of export for at least six months without a secrecy order under §5.2 being placed thereon. The term "exported" means export as it is defined in 22 CFR part 120, 15 CFR part 779 and activities covered by 10 CFR part 810.

\*    \*    \*    \*    \*

(e) \* \* \*

(3) For subsequent modifications, amendments and supplements containing additional subject matter to, or divisions of, a foreign patent application if:

(i) A license is not, or was not, required under paragraph (e)(2) of this section for the foreign patent application;

(ii) The corresponding United States application was not required to be made available for inspection under 35 U.S.C. 181; and

(iii) Such modifications, amendments, and supplements do not, or did not, change the general nature of the

invention in a manner which would require any corresponding United States application to be or have been available for inspection under 35 U.S.C. 181.

\*    \*    \*    \*    \*

132. Section 5.12 is amended by revising paragraph (b) to read as follows:

### §5.12   Petition for license.

\*    \*    \*    \*    \*

(b) Petitions for license should be presented in letter form, and must include the petitioner's address and full instructions for delivery of the requested license when it is to be delivered to other than the petitioner. If expedited handling of the petition under this paragraph is sought, the petition must also include the fee set forth in §1.17(h).

133. Section 5.13 is revised to read as follows:

### §5.13   Petition for license; no corresponding application.

If no corresponding national or international application has been filed in the United States, the petition for license under §5.12(b) must also be accompanied by a legible copy of the material upon which a license is desired. This copy will be retained as a measure of the license granted.

134. Section 5.14 is amended by revising paragraph (a) to read as follows:

### §5.14   Petition for license; corresponding U.S. application.

(a) When there is a corresponding United States application on file, a petition for license under §5.12(b) must also identify this application by application number, filing date, inventor, and title, but a copy of the material upon which the license is desired is not required. The subject matter licensed will be measured by the disclosure of the United States application.

\*    \*    \*    \*    \*

135. Section 5.15 is amended by revising paragraphs (a), (b), (c) and (e) to read as follows:

### §5.15   Scope of license.

(a) Applications or other materials reviewed pursuant to §§5.12 through 5.14, which were not required to be made available for inspection by defense agencies under 35 U.S.C. 181, will be eligible for a license of the scope provided in this paragraph. This license permits subsequent modifications, amendments, and supplements containing additional subject matter to, or divisions of, a foreign patent application, if such changes to the application do not alter the general nature of the invention in a manner

PHILIPS-SCHUBERT018895

which would require the United States application to have been made available for inspection under 35 U.S.C. 181. Grant of this license authorizing the export and filing of an application in a foreign country or the transmitting of an international application to any foreign patent agency or international patent agency when the subject matter of the foreign or international application corresponds to that of the domestic application. This license includes authority:

(1) To export and file all duplicate and formal application papers in foreign countries or with international agencies;

(2) To make amendments, modifications, and supplements, including divisions, changes or supporting matter consisting of the illustration, exemplification, comparison, or explanation of subject matter disclosed in the application; and

(3) To take any action in the prosecution of the foreign or international application provided that the adding of subject matter or taking of any action under paragraphs (a)(1) or (2) of this section does not change the general nature of the invention disclosed in the application in a manner which would require such application to have been made available for inspection under 35 U.S.C. 181 by including technical data pertaining to:

(i) Defense services or articles designated in the United States Munitions List applicable at the time of foreign filing, the unlicensed exportation of which is prohibited pursuant to the Arms Export Control Act, as amended, and 22 CFR parts 121 through 130; or

(ii) Restricted Data, sensitive nuclear technology or technology useful in the production or utilization of special nuclear material or atomic energy, dissemination of which is subject to restrictions of the Atomic Energy Act of 1954, as amended, and the Nuclear Non-Proliferation Act of 1978, as implemented by the regulations for Unclassified Activities in Foreign Atomic Energy Programs, 10 CFR part 810, in effect at the time of foreign filing.

\*     \*     \*     \*     \*

(b) Applications or other materials which were required to be made available for inspection under 35 U.S.C. 181 will be eligible for a license of the scope provided in this paragraph. Grant of this license authorizes the export and filing of an application in a foreign country or the transmitting of an international application to any foreign patent agency or international patent agency. Further, this license includes

authority to export and file all duplicate and formal papers in foreign countries or with foreign and international patent agencies and to make amendments, modifications, and supplements to, file divisions of, and take any action in the prosecution of the foreign or international application, provided subject matter additional to that covered by the license is not involved.

(c) A license granted under § 5.12(b) pursuant to § 5.13 or § 5.14 shall have the scope indicated in paragraph (a) of this section, if it is so specified in the license. A petition, accompanied by the required fee (§ 1.17(h)), may also be filed to change a license having the scope indicated in paragraph (b) of this section to a license having the scope indicated in paragraph (a) of this section. No such petition will be granted if the copy of the material filed pursuant to § 5.13 or any corresponding United States application was required to be made available for inspection under 35 U.S.C. 181. The change in the scope of a license will be effective as of the date of the grant of the petition.

\*     \*     \*     \*     \*

(e) Any paper filed abroad or transmitted to an international patent agency following the filing of a foreign or international application which changes the general nature of the subject matter disclosed at the time of filing in a manner which would require such application to have been made available for inspection under 35 U.S.C. 181 or which involves the disclosure of subject matter listed in paragraphs (a)(3)(i) or (ii) of this section must be separately licensed in the same manner as a foreign or international application. Further, if no license has been granted under § 5.12(a) on filing the corresponding United States application, any paper filed abroad or with an international patent agency which involves the disclosure of additional subject matter must be licensed in the same manner as a foreign or international application.

\*     \*     \*     \*     \*

### § 5.16   [Removed and reserved]

136. Section 5.16 is removed and reserved.

### § 5.17   [Removed and reserved]

137. Section 5.17 is removed and reserved.

138. Section 5.18 is revised to read as follows:

### § 5.18   Arms, ammunition, and implements of war.

(a) The exportation of technical data relating to arms, ammunition, and implements of war generally is subject to the International Traffic in Arms

Regulations of the Department of State (22 CFR parts 120 through 130); the articles designated as arms, ammunitions, and implements of war are enumerated in the U.S. Munitions List (22 CFR part 121). However, if a patent applicant complies with regulations issued by the Commissioner of Patents and Trademarks under 35 U.S.C. 184, no separate approval from the Department of State is required unless the applicant seeks to export technical data exceeding that used to support a patent application in a foreign country. This exemption from Department of State regulations is applicable regardless of whether a license from the Commissioner is required by the provisions of §§ 5.11 and 5.12 (22 CFR part 125).

(b) When a patent application containing subject matter on the Munitions List (22 CFR part 121) is subject to a secrecy order under § 5.2 and a petition is made under § 5.5 for a modification of the secrecy order to permit filing abroad, a separate request to the Department of State for authority to export classified information is not required (22 CFR part 125).

139. Section 5.19 is revised to read as follows:

### § 5.19   Export of technical data.

(a) Under regulations (15 CFR 770.10(j)) established by the Department of Commerce, a license is not required in any case to file a patent application or part thereof in a foreign country if the foreign filing is in accordance with the regulations (§§ 5.11 through 5.25) of the Patent and Trademark Office.

(b) An export license is not required for data contained in a patent application prepared wholly from foreign-origin technical data where such application is being sent to the foreign inventor to be executed and returned to the United States for subsequent filing in the U.S. Patent and Trademark Office (15 CFR 779A.3(e)).

140. Section 5.20 is revised to read as follows:

### § 5.20   Export of technical data relating to sensitive nuclear technology.

Under regulations (10 CFR 810.7) established by the United States Department of Energy, an application filed in accordance with the regulations (§§ 5.11 through 5.25) of the Patent and Trademark Office and eligible for foreign filing under 35 U.S.C. 184, is considered to be information available to the public in published form and a generally authorized activity for the purposes of the Department of Energy regulations.

PHILIPS-SCHUBERT018896

**53206**   **Federal Register** / Vol. 62, No. 197 / Friday, October 10, 1997 / Rules and Regulations

**§ 5.25   [Amended]**

141. Section 5.25 is amended by removing paragraph (c).

**§ 5.31   [Removed and reserved]**

142. Section 5.31 is removed and reserved.

**§ 5.32   [Removed and reserved]**

143. Section 5.32 is removed and reserved.

**§ 5.33   [Removed and reserved]**

144. Section 5.33 is removed and reserved.

**PART 7—REGISTER OF GOVERNMENT INTERESTS IN PATENTS [REMOVED AND RESERVED]**

145. Part 7 is removed and reserved.

**PART 10—REPRESENTATION OF OTHERS BEFORE THE PATENT AND TRADEMARK OFFICE**

146. The authority citation for 37 CFR part 10 continues to read as follows:

**Authority:** 5 U.S.C. 500, 15 U.S.C. 1123; 35 U.S.C. 6, 31, 32, 41.

147. Section 10.18 is revised to read as follows:

**§ 10.18   Signature and certificate for correspondence filed in the Patent and Trademark Office.**

(a) For all documents filed in the Office in patent, trademark, and other non-patent matters, except for correspondence that is required to be signed by the applicant or party, each piece of correspondence filed by a practitioner in the Patent and Trademark Office must bear a signature, personally signed by such practitioner, in compliance with § 1.4(d)(1) of this chapter.

(b) By presenting to the Office (whether by signing, filing, submitting, or later advocating) any paper, the party

presenting such paper, whether a practitioner or non-practitioner, is certifying that—

(1) All statements made therein of the party's own knowledge are true, all statements made therein on information and belief are believed to be true, and all statements made therein are made with the knowledge that whoever, in any matter within the jurisdiction of the Patent and Trademark Office, knowingly and willfully falsifies, conceals, or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be subject to the penalties set forth under 18 U.S.C. 1001, and that violations of this paragraph may jeopardize the validity of the application or document, or the validity or enforceability of any patent, trademark registration, or certificate resulting therefrom; and

(2) To the best of the party's knowledge, information and belief, formed after an inquiry reasonable under the circumstances, that—

(i) The paper is not being presented for any improper purpose, such as to harass someone or to cause unnecessary delay or needless increase in the cost of prosecution before the Office;

(ii) The claims and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(iii) The allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(iv) The denials of factual contentions are warranted on the evidence, or if

specifically so identified, are reasonably based on a lack of information or belief.

(c) Violations of paragraph (b)(1) of this section by a practitioner or non-practitioner may jeopardize the validity of the application or document, or the validity or enforceability of any patent, trademark, or certificate resulting therefrom. Violations of any of paragraphs (b)(2) (i) through (iv) of this section are, after notice and reasonable opportunity to respond, subject to such sanctions as deemed appropriate by the Commissioner, or the Commissioner's designee, which may include, but are not limited to, any combination of—

(1) Holding certain facts to have been established;

(2) Returning papers;

(3) Precluding a party from filing a paper, or presenting or contesting an issue;

(4) Imposing a monetary sanction;

(5) Requiring a terminal disclaimer for the period of the delay; or

(6) Terminating the proceedings in the Patent and Trademark Office.

(d) Any practitioner violating the provisions of this section may also be subject to disciplinary action. See § 10.23(c)(15).

148. Section 10.23 is amended by revising paragraph (c)(15) to read as follows:

**§ 10.23   Misconduct.**

\*   \*   \*   \*   \*

(c) \* \* \*

(15) Signing a paper filed in the Office in violation of the provisions of § 10.18 or making a scandalous or indecent statement in a paper filed in the Office.

\*   \*   \*   \*   \*

Dated: September 26, 1997.

**Bruce A. Lehman,**

*Assistant Secretary of Commerce and Commissioner of Patents and Trademarks.*

[FR Doc. 97–26339 Filed 10–9–97; 8:45 am]

**BILLING CODE 3510–16–P**

PHILIPS-SCHUBERT018897



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
ASSISTANT SECRETARY AND COMMISSIONER
OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

JUNE 12, 2000

PTAS

SAMUELS, GAUTHIER & STEVENS LLP
MATTHEW E. CONNORS
225 FRANKLIN STREET
SUITE 3300
BOSTON, MA   02110



\*101320959A\*

UNITED STATES PATENT AND TRADEMARK OFFICE
NOTICE OF RECORDATION OF ASSIGNMENT DOCUMENT

THE ENCLOSED DOCUMENT HAS BEEN RECORDED BY THE ASSIGNMENT DIVISION OF
THE U.S. PATENT AND TRADEMARK OFFICE.  A COMPLETE MICROFILM COPY IS
AVAILABLE AT THE ASSIGNMENT SEARCH ROOM ON THE REEL AND FRAME NUMBER
REFERENCED BELOW.

PLEASE REVIEW ALL INFORMATION CONTAINED ON THIS NOTICE.   THE
INFORMATION CONTAINED ON THIS RECORDATION NOTICE REFLECTS THE DATA
PRESENT IN THE PATENT AND TRADEMARK ASSIGNMENT SYSTEM.   IF YOU SHOULD
FIND ANY ERRORS OR HAVE QUESTIONS CONCERNING THIS NOTICE, YOU MAY
CONTACT THE EMPLOYEE WHOSE NAME APPEARS ON THIS NOTICE AT 703-308-9723.
PLEASE SEND REQUEST FOR CORRECTION TO:  U.S. PATENT AND TRADEMARK OFFICE,
ASSIGNMENT DIVISION, BOX ASSIGNMENTS, CG-4, 1213 JEFFERSON DAVIS HWY,
SUITE 320, WASHINGTON, D.C. 20231.

RECORDATION DATE: 03/20/2000          REEL/FRAME: 010687/0578
                                      NUMBER OF PAGES: 3

BRIEF: ASSIGNMENT OF ASSIGNOR''S INTEREST (SEE DOCUMENT FOR DETAILS).

ASSIGNOR:
   SCHUBERT, E. FRED                 DOC DATE: 02/07/2000

ASSIGNOR:
   STOCKER, DEAN A.                  DOC DATE: 02/07/2000

ASSIGNEE:
   TRUSTEES OF BOSTON UNIVERSITY
   108 BAY STATE ROAD
   BOSTON, MASSACHUSETTS 02118

SERIAL NUMBER: 09338709              FILING DATE: 06/23/1999
PATENT NUMBER:                       ISSUE DATE:


LENELL MACKALL, PARALEGAL
ASSIGNMENT DIVISION
OFFICE OF PUBLIC RECORDS

BU000338

Form PTO-1595

04-17-2000

BU4458

||||||||||||||||||||||||||||||||

**HONORABLE COMMISSIONER OF PATENTS AND TRADEMARKS WASHINGTON, D.C. 20231**

101320959

2 0

SIR:

PLEASE RECORD THE ATTACHED ORIGINAL DOCUMENT(S) OR COPY(IES) THEREOF.

| 1. NAME OF CONVEYING PARTY(IES)  3-20-00 | 2. NAME(S) AND ADDRESS(ES) OF RECEIVING PARTY(IES) |
|---|---|
| E. Fred Schubert<br>Canton, Massachusetts<br>and<br>Dean A. Stocker<br>Jamaica Plain, Massachusetts | Trustees of Boston University<br>108 Bay State Road<br>Boston, MA 02118<br><br>Additional name(s) of receiving party(ies) attached? No |
| Additional name(s) of conveying party(ies) attached? No | |

**3. NATURE OF CONVEYANCE**

X    Assignment        Execution Date:
\_\_\_    Security Agreement
\_\_\_    Merger             February 7, 2000
\_\_\_    Change of Name
\_\_\_    Other

**4. APPLICATION NUMBER(S) OR PATENT NUMBER(S)**

If this document is being filed together with a new application, the execution date of the application is: _____

A. Patent Application No(s): \_\_\_09/338,709_____        B. Patent No(s): _____

C. Issue Batch No.: _____        D. Issue Date: _____

Additional numbers attached? No.

| 5. NAME AND ADDRESS OF PARTY TO WHOM CORRESPONDENCE CONCERNING DOCUMENT SHOULD BE DIRECTED: | 6. TOTAL NUMBER OF APPLICATIONS AND PATENTS INVOLVED: \_\_1\_\_ |
|---|---|
| | 7. TOTAL FEE DUE: $40.00 (Enclosed) |
| Matthew E. Connors<br>Samuels, Gauthier & Stevens LLP<br>225 Franklin Street, Suite 3300<br>Boston, Massachusetts 02110<br>(617) 426-9180, Extension 112 | If any additional fee(s) are due, the Commissioner is hereby authorized to charge the Deposit Order Account noted in item 8.<br><br>8. DEPOSIT ACCOUNT NUMBER: 19-0079 |

**9. STATEMENT AND SIGNATURE**

To the best of my knowledge and belief, the foregoing information is true and correct and any attached copy is a true copy of the original document.

04/17/2000 TTON11    00000247 09338709

01 FC:581    MATTHEW E. CONNORS    40.00 OP             3/16/00
Printed Name                  Signature                Date

I hereby certify that this paper (along with any paper referred to as being attached or enclosed) is being deposited with the United States Postal Service on the date shown below with sufficient postage as first class mail in an envelope addressed to the Commissioner of Patents and Trademarks, Washington, D.C. 20231.

Date: 3-16-00            Tracy O. Higgins

BU000339

BU4458

## ASSIGNMENT

Know all men by these presents

THAT WHEREAS WE, E. Fred Schubert and Dean A. Stocker,

of Canton, MA and Jamaica Plain, MA, have made an invention for

### CRYSTALLOGRAPHIC WET CHEMICAL ETCHING OF III-NITRIDE MATERIAL

described in the application filed with the United States Patent and Trademark Office on June 23, 1999, as Serial No. 09/338,709, which claims priority from United States Provisional Patent Application Serial No. 60/090,409, filed June 23, 1998; and

WHEREAS Trustees of Boston University, a corporation duly organized and existing under the laws of Massachusetts and having a place of business at 108 Bay State Road, Boston, Massachusetts 02118, for the benefit of itself, its successors and assigns, all inclusively hereinafter referred to as the Assignee, is desirous of acquiring the entire right, title and interest in and to the said invention, the said application, all inventions disclosed in said application, and any and all Letters Patent of the United States and of all other countries which may be granted for the said invention or inventions, or any of them;

NOW, THEREFORE, for good and valuable consideration provided by said Assignee, the receipt whereof is hereby acknowledged, we do hereby sell, assign and transfer to the said Assignee the entire right, title and interest in and to the said invention, inventions and application, including all priority rights arising therefrom, all inventions disclosed in said application, and any and all Letters Patent of the United States, and of all other countries, together with the right to apply for such Letters Patent, which may be granted for the said invention, inventions or any of them.

TO HAVE, HOLD AND ENJOY the said invention, the said application, and the said Letters Patent, to said

### TRUSTEES OF BOSTON UNIVERSITY

its successors and assigns, to its and their own use and behoof to the full end of the term or terms for which the said Letters Patent may be granted, as fully and entirely as the same would have been held and enjoyed by us had this assignment and sale not been made.

BU000340

AND we hereby authorize and request the Commissioner of Patents of the United States and the appropriate officers of all foreign patent offices to issue any and all Letters Patent which may be granted on the said application or applications above referred to, or for the said invention, or any of them, to the said Assignee in accordance with the terms or this instrument.

AND we hereby agree to execute and sign without further consideration any other legal document and any other assignments and any divisional, continuing, renewal, reissue or other application in and for all patents that may be appropriate and may be deemed necessary by the Assignee fully to secure to said Assignee its interests as aforesaid in and to the said invention or any part thereof and in and to the said patents or any of them.

AND we further covenant and agree that we will at any time upon request communicate to the said Assignee, its successors, assigns or other legal representatives, any facts known to us relating to the said invention and any patent that may be granted thereon, and will testify as to the same in any interference or litigation when requested to do so.

AND we do hereby covenant for ourselves and our legal representatives that we have not hitherto assigned or granted any license to make, use or sell said invention, and that we will not henceforth purport to assign, license or execute any instrument to that effect in conflict with this assignment.

IN WITNESS WHEREOF we have hereunto set our hands and seal this 7th day of February , 2000.

E. Fred Schubert

Dean A. Stocker

- 2 -

BU000341

US006294475B1

(12) **United States Patent**
Schubert et al.

(10) **Patent No.: US 6,294,475 B1**
(45) **Date of Patent: Sep. 25, 2001**

(54) **CRYSTALLOGRAPHIC WET CHEMICAL ETCHING OF III-NITRIDE MATERIAL**

(75) Inventors: **E. Fred Schubert**, Canton; **Dean A. Stocker**, Jamaica Plain, both of MA (US)

(73) Assignee: **Trustees of Boston University**, Boston, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/338,709**

(22) Filed: **Jun. 23, 1999**

**Related U.S. Application Data**

(60) Provisional application No. 60/090,409, filed on Jun. 23, 1998.

(51) **Int. Cl.$^7$** ................................................. **H01L 21/20**
(52) **U.S. Cl.** .......................... **438/712**; 438/718; 438/749
(58) **Field of Search** ..................................... 438/712, 718, 438/749

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,397,711 | * | 8/1983 | Donnelly et al. | ..................... 156/643 |
| 5,059,552 | * | 10/1991 | Harder et al. | ......................... 437/129 |
| 5,880,485 | * | 3/1999 | Marx et al. | ............................. 257/94 |

FOREIGN PATENT DOCUMENTS

0383215    8/1990 (EP) .

OTHER PUBLICATIONS

Kim, B.J., J.W. Lee, H.S. Park, Y. Park and T.I. Kim, "Wet Etching of (0001) GaN/Al$_2$O$_3$ Grown by MOVPE", *Journal of Electronic Materials*, vol. 27, No. 5, 1998, pp. L32–L34.

Rotter, T., D. Uffmann, J. Ackermann, J. Aderhold, J. Stemmer and J. Graul, "Current Controlled Photoelectrochemical Etching of GaN Leaving Smooth Surfaces", *Nitride Semiconductors Symposium*, Dec. 1–5, 1997, pp. 1003–1008.

Weyher, J.L., S. Müller, I. Grzegory and S. Porowski, "Chemical Polishing of Bulk and Epitaxial GaN", *Journal of Crystal Growth*, vol. 182, 1997, pp. 17–22.

* cited by examiner

*Primary Examiner*—Robert Kunemund
(74) *Attorney, Agent, or Firm*—Samuels, Gauthier & Stevens, LLP

(57) **ABSTRACT**

A method of processing III-Nitride epitaxial layer system on a substrate. The process includes exposing non-c-plane surfaces of the III-nitride epitaxial layer system, for example by etching to a selected depth or cleaving, and crystallographical etching the epitaxial layer system in order to obtain crystallographic plane surfaces. In an exemplary embodiment, the III-Nitride epitaxial layer system includes GaN. In accordance with one aspect of the exemplary embodiment, the etching step includes reactive ion etching in a chlorine-based plasma, PEC etching in a KOH solution or cleaving, and the crystallographical etching step includes immersing the epitaxial layer system in a crystallographic etching chemical, such as phosphoric acid, molten KOH, KOH dissolved in ethylene glycol, sodium hydroxide dissolved in ethylene glycol, tetraethyl ammonium hydroxide, or tetramethyl ammonium hydroxide. Specific etching planes are chosen in accordance with varying the orientation of the exposing step, the etching chemical, and the temperature at which the epitaxial layer system is etched.

**20 Claims, 8 Drawing Sheets**





1. CLEAVED ON SPINEL
2. CLEAVED ON SiC
3. POLISHED
4. CAIBE
5. CLEAVED ON SAPPHIRE
6. RIE
7. CAIBE

## FIG. 1



## FIG. 3

Case 1:21-cv-00920-MN Document 2-1 Filed 07/18/21 Page 93 of 282 PageID #: 11488



*FIG. 2*

| CHEMICAL | TEMPERATURE (°C) | ETCH RATE (μm/min) | ETCHING PLANES OBSERVED |
|---|---|---|---|
| PHOSPHORIC ACID ($H_3PO_4$) | 108 – 195 | 0.013 – 3.2 | $\{10\bar{1}2\};\{10\bar{1}3\}$ |
| POTASSIUM HYDROXIDE (KOH), MOLTEN | 150 – 247 | 0.003 – 2.3 | $\{10\bar{1}0\};\{10\bar{1}\bar{1}\}$ |
| 10-50% KOH IN ETHYLENE GLYCOL ($CH_2OHCH_2OH$) | 90 –182 | 0.0015 – 1.3 | $\{10\bar{1}0\}$ |
| 20% NaOH IN ETHYLENE GLYCOL | 178 | 0.67 – 1.0 | NONE |
| TETRAETHYL AMMONIUM HYDROXIDE (TEAH) | 91 | 0.007 | $\{10\bar{1}\bar{1}\}$ |
| TETRAMETHYL AMMONIUM HYDROXIDE (TMAH) | 76 | 0.013 | $\{10\bar{1}\bar{1}\}$ |

*FIG. 4*

Case 1:14-cv-02926-MDoc 271-1 Filed 02/05/18 Page 95 of 282 PageID #: 11490



*FIG. 5A*



*FIG. 5B*



*FIG. 5C*



*FIG. 5D*



*FIG. 6*

CaseCase2:12-00920092M-MDDocumentn27t21-1Fileid02051812P12ggeage9 of 182PagePgeID #:11493



*FIG. 7*



*FIG. 8*



LASER DIODE

MASK, 900

902

904

DEPOSIT A MASK

*FIG. 9A*

BIPOLAR TRANSISTOR

1000

MASK

1002

1004

DEPOSIT A MASK

*FIG. 10A*

LASER DIODE

900

906

902

904

REACTIVE ION ETCH, LEAVING ROUGH, NON-VERTICAL FACETS

*FIG. 9B*

BIPOLAR TRANSISTOR

1000

1006

1008

1002

1004

PHOTOENHANCED WET ETCH, LEAVING NEARLY VERTICAL WALLS AND ROUGH SURFACES

*FIG. 10B*

LASER DIODE

900

908

910

904

CRYSTALLOGRAPHIC ETCH WITH CHEMISTRY CHOSEN TO PRODUCE ATOMICALLY SMOOTH VERT FACETS

*FIG. 9C*

BIPOLAR TRANSISTOR

1000

1010

1014

1012

1004

CRYSTALLOGRAPHIC ETCH WITH CHEMISTRY CHOSEN TO PRODUCE UNDERCUT WALLS AND SMOOTH SURFACES

*FIG. 10C*

US 6,294,475 B1

**1**

# CRYSTALLOGRAPHIC WET CHEMICAL ETCHING OF III-NITRIDE MATERIAL

## PRIORITY INFORMATION

This application claims priority from provisional application Ser. No. 60/090,409 filed Jun. 23, 1998.

## SPONSORSHIP INFORMATION

This invention was developed with funding from the Office of Naval Research under grant no. N00014-98-1-0194 and from the National Science Foundation under grant no. ECS-9714047. The government has certain rights in the invention.

## BACKGROUND OF THE INVENTION

The invention relates to the field of semiconductor etching, and in particular to a process of crystallographic wet chemical etching of III-Nitride material, and in particular gallium nitride.

The III-Nitride materials system, gallium nitride (GaN) and its indium- and aluminum-containing alloys, shows great promise for producing high-speed electronic devices that operate efficiently at high temperatures. III-Nitrides are the material of choice for producing light-emitting devices including LEDs and lasers that operate at wavelengths throughout the visible and UV parts of the electromagnetic spectrum. These materials are extremely stable, allowing them to be used in high temperature and corrosive environments. Because of this stability, it is difficult to find methods for etching of III-Nitrides.

Most processing of the III-Nitrides is currently done by dry plasma etching. There are several disadvantages to dry etching, including rough surface profiles, ion-induced damage in the exposed surface areas and difficulty in obtaining smooth etched sidewalls, which are required for lasers, the expense of the equipment required.

Photoenhanced electro-chemical (PEC) wet etching has also been used for etching of GaN. PEC etching has the advantage of low surface damage and relatively low equipment cost, but there has not yet been found a method for producing smooth etched vertical sidewalls, which are required for lasers.

Even what seems to be a very small roughness can have a large effect on the reflectivity of a laser facet. FIG. 1 illustrates this point, showing a graph of the maximum reflectivity of a laser facet as a function of surface roughness in a typical InGaN/GaN laser structure. The best published roughness results from several different experimental groups are indicated by arrows in the figure. Note that most etching techniques produce a roughness of approximately 50 nm, allowing a maximum specular reflectivity of less than 1%. Production of laser facets using an etching technique is preferable to using cleaving or polishing because an entire wafer of several thousand lasers can be produced at one time by etching, but cleaving must be done on individual rows of devices, and polishing is an even more labor-intensive technique.

Recently, researchers at Xerox Corp. fabricated a laser using chemically assisted ion beam etching (CAIBE), producing sidewalls with a roughness of 4–6 nm. This is the lowest sidewall roughness ever reported for etching in the III-Nitride material system, but even with this roughness the reflectivity is only 60–70% of the ideal reflectivity, and the roughness is enough to cause interference fringes in the emitted laser beam.

**2**

It would be very beneficial to take advantage of the crystal structure of the III-Nitride material itself to produce atomically smooth crystallographic planes without damaging the surface. Such crystallographic planes would have reflectivities greater than 99% of the ideal reflectivity, given by the well known Fresnel formula, as compared to the above values of 1% and 60–70% for plasma etching and CAIBE, respectively. Improvement in facet reflectivity corresponds to higher output power and a better defined laser spot. Wet chemical etching has been used for producing atomically smooth crystallographic planes in other semiconductor materials systems, such as silicon, gallium arsenide, and gallium phosphide. Previously, prior to the invention, this had never been achieved in the III-Nitride materials system.

## SUMMARY OF THE INVENTION

The invention provides a method of processing a III-Nitride epitaxial layer system on a substrate. The process includes exposing non-c-plane surfaces of the III-Nitride epitaxial layer system, for example by etching to a selected depth or cleaving, and crystallographically etching the epitaxial layer system in order to obtain crystallographic plane surfaces. In an exemplary embodiment, the III-Nitride epitaxial layer system includes GaN. In accordance with one aspect of the exemplary embodiment, the exposing step includes reactive ion etching in a chlorine-based plasma, PEC etching in a KOH solution or cleaving, and the crystallographically etching step includes immersing the epitaxial layer system in a crystallographic etching chemical, such as phosphoric acid, molten KOH, KOH dissolved in ethylene glycol, sodium hydroxide dissolved in ethylene glycol, tetraethyl ammonium hydroxide, or tetramethyl ammonium hydroxide. Specific etching planes are chosen in accordance with varying the orientation of the exposing step, the etching chemical, and the temperature at which the epitaxial layer system is etched.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a graph of the maximum reflectivity of a laser facet as a function of surface roughness in a typical InOaN/GaN laser structure;

FIG. 2 is a high-resolution field effect SEM image of dislocation etch pits in the c-plane of GaN;

FIG. 3 is a flowchart showing the process of the invention;

FIG. 4 is a table summarizing etch rates and crystal planes observed for various chemicals used in accordance with the invention;

FIGS. 5A–5D are SEM images of several illustrative examples of GaN epilayers crystallographically wet etched after cleaving;

FIG. 6 is an Arrhenius plot of GaN etch rates in KOH and 30% KOH dissolved in ethylene glycol;

FIG. 7 is an Arrhenius plot of etch rates for GaN in $H_3PO_4$;

FIG. 8 is a plot of GaN etch rate as a function of KOH concentration in ethylene glycol at 170° C.;

FIGS. 9A–9C are stepwise block diagrams illustrating the processing of a laser diode in accordance with the invention; and

FIGS. 10A–10C are stepwise block diagrams illustrating the processing of a bipolar transistor in accordance with the invention.

## DETAILED DESCRIPTION OF THE MENTION

The invention is directed to a method for achieving crystallographic wet chemical etching in the III-Nitrides.

US 6,294,475 B1

3

While KOH-based solutions have been found to etch AlN and IneAlN, no acid or base solution had previously been identified that is able to etch high-quality GaN. In accordance with one embodiment of the process of the invention, ethylene glycol, instead of water, is used as a solvent for KOH and NaOH so that temperatures between 90° C. and 180° C. are able to be employed. These temperatures exceed the boiling point of water and are considerably higher than the temperatures used in previous processes. The samples used were grown on c-plane sapphire substrates, and include n-type GaN epilayers grown by metal-organic chemical vapor deposition (MOCVD), MOCVD-grown ptype GaN epilayers, MOCVD-grown AlGaN/GaN heterostructures, and MOCVD-grown InGaN/GaN heterostructures on thick GaN layers grown by hydride vapor phase epitaxy. Epitaxial GaN has commonly a hexagonal crystal structure, and the top surface plane is the c-plane or <0001> plane.

Molten KOH is known to form pits at dislocations in the c-plane of GaN. What was observed in accordance with the invention, however, was that non-c-planes can be crystallographically etched by molten KOH. The c-plane, the top surface of the GaN crystal, is impervious to all of the chemicals with which etching had been attempted. By employing an initial processing step, however, less stable crystal planes are exposed that are susceptible to various chemicals. This unexpected result has been explored in several experiments by the applicants, and applicants have identified other etching solutions that are able to etch various crystallographic planes not only GaN, but also InGaN and AlGaN. From these experiments, a two-step process for crystallographic etching of the III-Nitrides has been developed.

As described before, molten KOH and hot phosphoric acid ($H_3PO_4$) have previously been shown to etch pits at defect sites in the c-plane of GaN. Applicants have now observed the formation of etch pits with facets that correspond to various GaN crystal faces by etching in $H_3PO_4$ above 160° C., in molten KOH above 180° C., in KOH dissolved in ethylene glycol above 135° C., and in NaOH dissolved in ethylene glycol at 180° C. All of the hexagonal etch pits share a common base, i.e. the <11$\bar{2}$0> direction, but intersect the c-plane at a wide variety of angles. This is because the faces are actually produced by two or more competing etch planes, as can be seen in FIG. 2. FIG. 2 is a high-resolution field effect SEM image of dislocation etch pits in the c-plane of GaN, produced by etching in 10% KOH by weight, dissolved in ethylene glycol at 165° C. The etchant temperatures are monitored using a thermocouple, and are accurate to within 5° C. The etch pit density is approximately $2 \times 10^6$ cm$^{-2}$ in $H_3PO_4$ and $6 \times 10^7$ cm$^{-2}$ in hydroxide-containing etchants.

FIG. 3 is a flowchart showing the process of the invention. The first of the two steps in the crystallographic etching process, exposing non-c-plane surfaces, can be used to establish the etching depth (step 300), and it can be performed by several common processing methods. For the first step, several different processing methods have been used, including reactive ion etching in a chlorine-based plasma, PEC etching in a KOH solution, and cleaving. The second step is done by immersion in a chemical that is able to crystallographically etch GaN (step 302). This etching step can produce smooth crystallographic surfaces, and the specific etching planes can be chosen by varying the orientation of the first step, the chemical agents, and the temperature. The etch rates and crystal planes observed for all chemicals used in this work are summarized in the table of FIG. 4. Crystallographic etching has been achieved using phospho-

4

ric acid, molten potassium hydroxide (KOH), KOH dissolved in ethylene glycol, sodium hydroxide dissolved in ethylene glycol, tetraethyl ammonium hydroxide (TEAH), and tetramehyl ammonium hydroxide (TMAH). The etching planes listed in this table are those that appear during the etch. Because the c-plane {0001} is impervious to all of these chemicals except at defect sites where etch pits occur, it is also an etch plane, with a negligibly small etch rate.

FIGS. 5A–5D are SEM images of several illustrative examples of GaN epilayers that have been crystallographically wet etched after cleaving. FIGS. 5A and 5B show samples etched in $H_3PO_4$ at 132° C. The {10$\bar{1}$3} plane shown in FIG. 5A appears along the side of the sample cleaved along the GaN a-plane {11$\bar{2}$0}. The {10$\bar{1}$2} plane shown in FIG. 5B appears along the side of the sample cleaved along the GaN m-plane. The {10$\bar{1}$0} plane shown in FIG. 5C was produced by etching in 10% KOH by weight dissolved in ethylene glycol at 165° C. This plane has been examined using an FESEM with a resolution of 5 nm at 2.5 kV, and the surface appears perfectly smooth at this resolution. The {10$\bar{1}$1} plane shown in FIG. 5D was produced by etching in molten KOH at 184° C.

The activation energies for etching in these various solutions is 0.9 eV, or 21 kcal/mol, as inferred from the Arrhenius plots in FIGS. 6 and 7. Note that this is equal to the calculated heat of formation of GaN, 0.90 eV. The activation energy indicates that the etch is reaction-rate limited. If the etching were diffusion limited, an activation energy in the 1–6 kcal/mol range would be expected.

FIG. 6 is an Arrhenius plot of GaN etch rates in KOH and 30% KOH dissolved in ethylene glycol. Solid and hollow symbols represent etch rates measured along cleaved edges parallel to the {11$\bar{2}$0} a-plane and the {10$\bar{1}$0} m-plane, respectively.

FIG. 7 is an Arrhenius plot of etch rates for GaN in $H_3PO_4$.

FIG. 8 is a plot of GaN etch rate as a function of KOH concentration in ethylene glycol at 170° C. Solid and hollow symbols represent etch rates measured along cleaved edges parallel to the {11$\bar{2}$0} a-plane and the {10$\bar{1}$0} m-plane, respectively.

The etch rates shown in FIGS. 6–8 are measured perpendicular to the growth direction, i.e. in the "horizontal" c-plane. For "vertical" planes, such as the {10$\bar{1}$0} plane, the actual etch rate of the plane is equal to the etch rate measured. For non-vertical planes, however, the etch rate of the plane is actually less than the measured etch rate. The etch rate perpendicular to the {10$\bar{1}$2} plane, for instance, is the etch rate shown in FIG. 7 multiplied by cos(46°), because the {10$\bar{1}$2} plane intersects the vertical {10$\bar{1}$0} plane at an angle of 46°.

It is interesting to note that the etch rate of KOH dissolved in ethylene glycol is higher than the etch rate of molten KOH at the same temperature. In fact, the etch rate as a function of concentration peaks at a value of 40% KOH by weight in ethylene glycol, as can be seen in FIG. 8. It is believed that this is due to high solubility of the etch products in ethylene glycol.

Because the c-plane is impervious to all of the chemicals used in this study, no etch mask is required for the crystallographic etching step. The c-plane itself acts as a mask. An etch mask may be necessary, however, if long etching times are used, to prevent the development of etch pits at defect sites. For this purpose we have successfully used titanium masks after annealing at 900° C. for 30 seconds and nickel masks after annealing at 650° C. for 2 minutes.

US 6,294,475 B1

5

FIGS. **9A–9C** are step-wise block diagrams illustrating the processing of a laser diode in accordance with the invention. Initially, a mask **900** is deposited on a III-Nitride device structure **902**, which is configured on a sapphire substrate **904**. A reactive ion etch leaves rough, non-vertical facets **906** in the structure. A crystallographic etch produces atomically smooth vertical facets **908, 910**.

FIGS. **10A–10C** are step-wise block diagrams illustrating the processing of a bipolar transistor in accordance with the invention. Initially, a mask **1000** is deposited on a III-Nitride device structure **1002**, which is configured on a sapphire substrate **1004**. A photoenhanced wet etch leaves nearly vertical walls **1006** and rough surfaces **1008**. A crystallographic etch produces undercut walls **1010, 1012** and atomically smooth surfaces **1014**.

In conclusion, a powerful anisotropic wet chemical etching technique is presented. Etch rates as high as 3 $\mu$m/min have been demonstrated. Because the etch is crystallographic in nature, we demonstrate smooth vertical sidewalls with an RMS roughness smaller than the 5 nm resolution of the FESEM. This is the smallest reported roughness for etched GaN sidewalls, indicating the usefulness of this etch for high-reflectivity laser facets. The ability to undercut is also important for decreasing capacitance in applications such as bipolar transistors.

Although the present invention has been shown and described with respect to several preferred embodiments thereof, various changes, omissions and additions to the form and detail thereof, may be made therein, without departing from the spirit and scope of the invention.

What is claimed is:

**1**. A method of processing a III-Nitride epitaxial layer system provided on a substrate, comprising:

exposing non-c-plane surfaces of said III-Nitride epitaxial layer system; and

crystallographically etching said epitaxial layer system in order to obtain crystallographic plane surfaces.

**2**. The method of claim **1**, wherein said III-Nitride epitaxial layer system comprises GaN.

**3**. The method of claim **1**, wherein said exposing step comprises reactive ion etching in a chlorine-based plasma, PEC etching in a KOH solution or cleaving.

**4**. The method of claim **1**, wherein said crystallographically etching step comprises immersing said epitaxial layer system in a crystallographic etching chemical.

**5**. The method of claim **4**, wherein said chemical comprises phosphoric acid, molten KOH, KOH dissolved in ethylene glycol, sodium hydroxide dissolved in ethylene glycol, tetraethyl ammonium hydroxide or tetramethyl ammonium hydroxide.

**6**. The method of claim **4**, wherein specific etching planes are chosen in accordance with varying the orientation of said first etching step, said etching chemical, and the temperature at which said epitaxial layer system is etched.

**7**. The method of claim **1**, wherein a laser diode is processed.

**8**. The method of claim **1**, wherein a bipolar transistor is processed.

**9**. A method of processing a III-Nitride epitaxial layer system provided on a substrate to produce a laser diode, comprising:

6

reactive etching said III-Nitride epitaxial layer system to a selected depth; and

crystallographically etching said epitaxial layer system in order to obtain substantially atomically smooth vertical surfaces.

**10**. A method of processing a III-Nitride epitaxial layer system provided on a substrate to produce a bipolar transistor, comprising:

photoenhanced wet etching said III-Nitride epitaxial layer system to a selected depth; and

crystallographically etching said epitaxial layer system in order to obtain undercut walls and substantially atomically smooth surfaces.

**11**. A method of processing a III-Nitride epitaxial layer system comprising:

providing a III-Nitride epitaxial layer system on a substrate; and

wet chemical crystallographic etching said epitaxial layer system along non-c-plane crystal directions.

**12**. The method of claim **11**, wherein said epitaxial layer system comprises GaN.

**13**. A method of processing a III-Nitride epitaxial layer system comprising:

providing a III-Nitride epitaxial layer system on a substrate; and

crystallographically etching said epitaxial layer system by immersing said epitaxial layer system into a liquid chemical.

**14**. The method of claim **13**, wherein said epitaxial layer system comprises GaN.

**15**. The method of claim **13**, wherein said liquid chemical includes molten KOH, KOH dissolved in ethylene glycol, NaOH dissolved in ethylene glycol, phosphoric acid, tetraethyl ammonium hydroxide, or tetramethyl ammonium hydroxide.

**16**. The method of claim **13**, wherein said liquid chemical is heated.

**17**. A method of processing a III-Nitride epitaxal material system comprising:

providing a III-Nitride epitaxial layer system on a substrate;

etching said epitaxial layer system along c-plane crystal directions; and

wet chemical crystallographic etching said epitaxial layer system along non-c-plane crystal directions.

**18**. The method of claim **17**, wherein said epitaxial layer system comprises GaN.

**19**. The method of claim **17**, wherein said first etching step comprises reactive ion etching, ion milling, low-energy electron enhanced etching, photo-electrochemical etching, chemically assisted ion beam etching, or enhanced forms of reactive ion etching.

**20**. A method of processing a GaN layer in order to produce semiconductor laser facets comprising:

providing a GaN on a substrate; and

wet chemical crystallographic etching said GaN layer in order to obtain substantially atomically flat surfaces.

* * * * *

# Opening Expert Report of Professor James R. Shealy, Ph.D.

# **Exhibit 12**



# EXHIBIT 9

HTML ABSTRACT + LINKS
Case 1:12-cv-00996-MN Document 399 Filed 02/05/25 Page 105 of 282 PageID #: 13500

APPLIED PHYSICS LETTERS          VOLUME 84, NUMBER 17          26 APRIL 2004

# Dislocation- and crystallographic-dependent photoelectrochemical wet etching of gallium nitride

Y. Gao,[a] M. D. Craven, J. S. Speck, S. P. DenBaars, and E. L. Hu
*Department of Materials and ERATO/JST UCSB Group, University of California, Santa Barbara, California 93106-5050*

(Received 23 October 2003; accepted 27 February 2004)

Polarity and dislocation dependence study of photoelectrochemical wet etching on GaN was carried out on lateral epitaxial overgrown nonpolar $(11\bar{2}0)a$-GaN/$(1\bar{1}02)r$-plane sapphire substrate. This LEO nonpolar GaN sample has low dislocation density Ga- and N-faces exposed horizontally in opposite directions, which can be exposed to identical etching conditions for both polarity and dislocation dependence study. It is observed that N-face GaN is essentially much chemically active than Ga-face GaN, which shows the hexagonal pyramids with $\{10\bar{1}1\}$ facets on the etched N face. No obvious etching was observed on Ga face in the same etch condition. As for dislocation dependence, the "wing" (low dislocation density) region was etched faster than the "window" (high dislocation density) region. Smooth etched surfaces were formed with the $(11\bar{2}2)$ facet as an etch stop plane both on Ga and N-wing region. © *2004 American Institute of Physics.*
[DOI: 10.1063/1.1719281]

Photoenhancement of a wet chemical etch has proven to be a useful tool in the fabrication and analysis of group III-nitride materials. Above band-gap illumination of III-nitrides immersed in electrolytes such as KOH has resulted in substantial augmentation of etch rates in both the vertical and lateral directions,[1] allowing the formation of electronic,[2] optical,[3] and mechanical devices.[4] In general, photoenhanced wet etching of semiconductors depends on the wavelength and intensity of the illumination source, the nature of the electrolyte, and the doping and band gap of the semiconductor. In the case of III-nitride materials, the high density of threading dislocations of the material also exercises a critical influence on the etch rate and morphology of the etch process. In fact, PEC etching has been used to delineate the density of threading dislocations in GaN due to the behavior of dislocation-trapping holes.[5,6] This latter fact has limited the smoothness of the etched surface obtainable, even with the incorporation of an etch-stop layer. Such etch-stops layers include GaN, when selectively etching the lower bandgap InGaN (Refs. 3 and 4) and $p$-GaN when selectively etching $n$-GaN.[7,8] In order to better understand and apply the PEC etching to GaN device fabrication, it is important to understand the relative influence exercised by the photodriven component compared to the chemically reactive component, and to better understand the influence of the defects and dislocations in the material. In addition, it is also interesting to explore the dramatically different chemical reactivities of the Ga and N face.[9,10]

This work helps to elucidate such issues through etching of substrate materials formed by lateral epitaxial overgrowth (LEO) of nonpolar $(11\bar{2}0)a$-GaN grown on an $(1\bar{1}02)r$-plane sapphire substrate. The films used in these studies have two principal distinguishing features: (1) they were formed by metalorganic chemical vapor deposition (MOCVD) growth on a $(1\bar{1}02)r$-plane sapphire substrate,

producing a planar $(11\bar{2}0)a$-GaN film and (2) essentially low dislocation density material was produced by lateral epitaxial overgrowth. The resulting material appeared as shown in Fig. 1(a), with the nonpolar $a$-plane of GaN along the growth direction, and the polar Ga and N faces exposed as shown. These substrates allowed us to determine the etch rate and morphology of dislocation-dependent etching (low defect density versus high defect density) and crystallographic-dependent etching (Ga-face vs N-face GaN) carried out under the same etch conditions.

The conventional lateral overgrowth technique shown here includes an intermediate processing step between two growth steps. Initially, a planar $(11\bar{2}0)a$-GaN film was heteroepitaxially grown on $(1\bar{1}02)r$-plane sapphire substrate in a vertical MOCVD reactor using a two-step technique.[11] The as-grown nonpolar GaN film was coated with 200 nm $SiO_2$, which was subsequently patterned with parallel 5 $\mu$m wide mask openings (windows) spaced 15 $\mu$m apart and crystallographically aligned to $[1\bar{1}00]_{GaN}$, perpendicular to the $c$ axis. The sample was subjected to MOCVD regrowth using the same condition as planar growth.[12] During selective epitaxial regrowth, the GaN grew vertically through the window and laterally over the mask. The regrowth time was kept short, forming an uncoalesced stripe morphology. This pro-



FIG. 1. (a) Cross-section SEM image of as-grown lateral epitaxial overgrown (LEO) nonpolar $(11\bar{2}0)a$-GaN/$(1\bar{1}02)r$-plane sapphire, with Ga-and N face exposed horizontally, (b) schematic illustration of patterned LEO stripe. Ti/Au/Pt is patterned perpendicular to the LEO stripe as a metal contact for PEC etching.

a)Electronic mail: yangao@engineering.ucsb.edu

A-0102

Case 1:12-cv-00934-MN Document 89-5 Filed 10/21/15 Page 3 of 4 PageID #: 1746



FIG. 2. Cross-section SEM image of etched LEO stripe: (a) after 10 min etch in 0.004 M KOH; (b) magnified view of the etched N face defined by the dashed box on part (a) shows hexagonal pyramids with {1011} facets; (c) after 10 min etch in 0.55 M KOH; (d) magnified view of the etched N face defined by the dashed box on part (c) shows etched cones with variable sizes and shapes than in (a). An etch-stop plane appears at the bottom of the N face; (e) schematic illustration of etch morphology of the low dislocation density N-face wing; (f) schematic illustration of surface morphology as the etch proceeds into the highly dislocated window region.



FIG. 3. Etching morphology after 60 min etch in 0.004 M KOH: (a) the window (highly dislocated) region was etched more slowly than the wing (low dislocation density) region; (b) SEM shows the smooth (1122) etched surface in the Ga-wing region; (c) schematic illustration shows (1122) plane, at an angle of 58° with (0001) Ga face.

vided regrowth "wings" formed under the same growth conditions, with the Ga- and N-face exposed. The polarity of each side has been verified by convergent beam electron diffraction (CBED) analysis.[13] The wing with the Ga-face exposed grows at a rate almost one order of magnitude faster than the wing with N-face exposed.

Metal contact stripes with Ti/Au/Pt (30/50/50 nm) were patterned perpendicular to the LEO stripes (which are along the $[1100]_{GaN}$ direction). Figure 1(b) shows a schematic illustration of the patterned LEO stripe, which was then subject to photoelectrochemical wet etching. Note that the GaN LEO stripe has three regions: (1) a narrow, low dislocation density region (called the "wing") terminated by the N face, (2) a wider low dislocation density wing terminated by the Ga face, and (3) a high dislocation "window" region.[8] KOH electrolyte was used (0.004–2.2 M) and the illumination source is a 1000 W Xe lamp. The detailed PEC etch setup has been described elsewhere.[1] Front-side illumination was used for all experiments in this article. The etching morphology was observed using a JEOL 6340F field emission scanning electron microscope (FE-SEM) operated at 2 kV with an emission current of 12 $\mu$A.

Figures 2(a) and 2(b) show the lateral etching morphology after 10 min etch in 0.004 M KOH. The exposed N face on the shorter wing shows clear evidence of etching, with the development of cones of similar size and shape. Under higher magnification, the cones were observed to be formed of hexagonal pyramids, defined by the {1011} planes. The angle between the {1011} and (0001) planes is ∼62°. The hexagonal pyramid shape is consistent with other chemical etching studies of *c*-plane N-face GaN.[10] Indeed, the hexagonal inverted pyramid structure was observed as the V-defect structure observed in InGaN/GaN QW growth by MOCVD.[14] In contrast, no measurable etching was observed on the Ga face by comparison to the as-grown Ga face

shown in Fig. 1(a). This result is consistent with previous polarity dependent studies. In chemical mechanical polishing (CMP) studies of GaN, the N-face polishing rate can be as fast as 1.1 $\mu$m per hour, while no obvious polishing was observed on the as-grown Ga face.[15] Lithographic patterning and MBE regrowth was used to define different lateral regions of Ga- and N-terminated GaN.[10] These regions also exhibited large difference in etch rate in a KOH solution. Further studies should be done to determine the reasons underlying the difference in etch rates between the Ga-face and N-face GaN.

As the etching proceeded into the highly dislocated window region, the cones on the N-face showed a greater variability of shape and size. This can be seen in Figs. 2(c) and 2(d), which shows the etch morphology after a 10 min etch in higher (0.55 M) KOH concentration. The higher KOH concentration resulted in a chemical greater reactivity. Within 10 min, the etch extends into the high dislocation region. We believe that the change in the uniformity of the cone structures arises as the etch proceeds from a kinetically controlled crystallographic etching of the low dislocation density N-face material to a dislocation-mediated etch process. Dislocations can serve as hole traps, and thus slow the etch rate of a PEC process. In the immediate vicinity of the dislocations, this mechanism in turn modifies the etch morphology, as suggested in Figs. 2(e) and 2(f). In all cases discussed, no measurable etching was observed on the chemically stable Ga face.

As the etching from the N-face progressed, an etch-stop plane gradually developed, as can be seen in Fig. 2(c). This stable crystallographic plane is believed to be the (1122) plane, and is also observed in the etching of the Ga wing. Although no etching was observed on the Ga face, the top of the Ga wing region was etched, with a slow-etching plane that also corresponds to the (1122) plane, shown in Figs. 3(a) and 3(b). The sample shown was etched for 60 min in 0.004 M KOH. Figure 3(c) illustrates that the (1122) plane forms an angle of 58° with the (0001) Ga face. Note the smoothness of the etched surface in the low dislocation density material. Figure 3(a) also shows the clear difference in etch morphologies between the low dislocation density ("wing" region) and highly dislocated regions ("window" region). The low dislocation density material has



FIG. 4. Etch morphology under chemical etching without illumination in 2.2 M KOH for 24 h (a) large hexagonal structure is shown on the N face; (b) ($1\bar{1}22$) plane is shown as smooth etch-stop plane.

clearly been etched more rapidly than the highly dislocated window region. The morphology on the Ga-face wing near the smooth etched plane, showing an undulating surface, may indicate the mixture of both the *a* plane {$11\bar{2}0$} and *m* plane {$10\bar{1}0$} from a geometric standpoint. This crystallographic etch morphology in the Ga wing region indicates that with the achievement of high quality, low-dislocation material in the future, we may similarly be able to find smooth, crystallographic chemical etching processes for GaN.

To further understand the role of illumination on the polarity dependence and dislocation dependence etching of GaN, we also subjected this material to simple etching in KOH without illumination. Figures 4(a) and 4(b) show the etching after 24 h in 2.2 M KOH without illumination. Since no illumination was applied, the dislocations do not affect the etch process by trapping photogenerated holes. Thus no dramatic difference between low dislocation areas (wing) and high dislocation (window) regions is observed. No obvious etching was observed on the top of the Ga wing and Ga face under this etching condition. As for the N-face GaN without illumination, etching still takes place, but at an etch rate more than two orders of magnitude lower than obtained in the presence of illumination. The etching morphology on the N face still displays the hexagonal pyramids, similar in shape to those shown in Figs. 2(a) and 2(b). Purely chemical wet etching also shows the ($1\bar{1}22$) etch-stop plane on the N face.

In conclusion, we have explored photoelectrochemical wet etching on nonpolar, *a*-plane GaN formed by lateral epitaxial overgrowth. The different etch behavior in the high dislocation "window" region compared to the low dislocation "wing" region, clearly showed the effect of threading dislocations on etch rate and etch morphology. Crystallographic etching was observed in the low dislocation density GaN material. N-face etching shows a cone-like etching morphology bounded by hexagonal pyramids, which are believed to be {$10\bar{1}1$} facets. A very smooth etched surface

($1\bar{1}22$) was observed in the low dislocation density Ga-wing region. However, no obvious etching was observed on the Ga face under our etching conditions. These preliminary observations indicate that the Ga face may be the most chemically inert plane. It should be noted that this has also been the predominant GaN face utilized in etch studies to date.

The observation of crystallographic etching of the N face in the low dislocation density material provides a straightforward means of surface texturing that might be important for applications such as enhanced light extraction in GaN-based LEDs.[16] The observation of the atomically smooth ($1\bar{1}22$) chemically etched surface may provide an important regrown surface on the etched high quality GaN in LEO *a*-plane GaN wing region, which is observed as the stacking fault free materials.[12] All these studies are currently under exploration.

This work was supported by the Solid State Lighting and Display Center at the University of California, Santa Barbara. The authors would like to thank the Nitride Community at UCSB, especially to Ben Haskell for many helpful discussions.

[1] Y. Gao, I. Ben-Yaacov, U. Mishra, and E. Hu, *to be published in "International Journal of High Speed Electronics and Systems," Book Series "Selected Topics in Electronics and Systems,"* 2004.

[2] Y. Gao, A. R. Stonas, I. Ben-Yaacov, U. Mishra, S. P. DenBaars, and E. L. Hu, Electron. Lett. **39**, 148 (2003).

[3] A. R. Stonas, T. Margalith, S. P. DenBaars, L. A. Coldren, and E. L. Hu, Appl. Phys. Lett. **78**, 1945 (2001).

[4] A. R. Stonas, N. C. MacDonald, K. L. Turner, S. P. DenBaars, and E. L. Hu, J. Vac. Sci. Technol. B **19**, 2838 (2001).

[5] C. Youtsey, L. T. Romano, and I. Adesida, Appl. Phys. Lett. **73**, 797 (1998).

[6] C. Youtsey, L. T. Romano, R. J. Molnar, and I. Adesida, Appl. Phys. Lett. **74**, 3537 (1999).

[7] A. R. Stonas, P. Kozodoy, H. Marchand, P. Fini, S. P. DenBaars, U. K. Mishra, and E. L. Hu, Appl. Phys. Lett. **77**, 2610 (2000).

[8] C. Youtsey, G. Bulman, and I. Adesida, J. Electron. Mater. **27**, 282 (1998).

[9] D. S. Green, E. Haus, F. Wu, C. L. , U. K. Mishra, and J. S. Speck, J. Vac. Sci. Technol. B **21**, 1 (2003).

[10] H. M. Ng, N. G. Weimann, and A. Chowdhury, J. Appl. Phys. **94**, 650 (2003).

[11] M. D. Craven, S. H. Lim, F. Wu, J. S. Speck, and S. P. DenBaars, Appl. Phys. Lett. **81**, 469 (2002).

[12] M. D. Craven, S. H. Lim, F. Wu, J. S. Speck, and S. P. DenBaars, Appl. Phys. Lett. **81**, 1201 (2002).

[13] F. Wu, M. D. Craven, S. H. Lim, and J. S. Speck, J. Appl. Phys. **94**, 942 (2003).

[14] X. H. Wu, C. R. Elsass, A. Abare, M. Mack, S. Keller, P. M. Petroff, S. P. DenBaars, J. S. Speck, and S. J. Rosner, Appl. Phys. Lett. **72**, 692 (1998).

[15] P. R. Tavernier, T. Margalith, L. A. Coldren, S. P. DenBaars, and D. R. Clarke, Electrochem. Solid State Lett. **5**, G61 (2002).

[16] T. Fujii, Y. Gao, R. Sharma, E. L. Hu, S. P. DenBaars, and S. Nakamura, Appl. Phys. Lett. **84**, 855 (2004).

# Opening Expert Report of Professor James R. Shealy, Ph.D.

# **Exhibit 11**

# EXHIBIT 8

Japanese Journal of Applied Physics
Vol. 43, No. 5A, 2004, pp. L637–L639
©2004 The Japan Society of Applied Physics

# Roughening Hexagonal Surface Morphology on Laser Lift-Off (LLO) N-Face GaN with Simple Photo-Enhanced Chemical Wet Etching

Yan Gao[1,*], Tetsuo Fujii[2], Rajat Sharma[1], Kenji Fujito[2], Steven P. DenBaars[1,2], Shuji Nakamura[1,2] and Evelyn L. Hu[1]

[1]Materials Department, University of California, Santa Barbara CA, 93106-5050, U. S. A.
[2]NICP/ERATO JST, UCSB Group, University of California, Santa Barbara, CA 93106-5050, U. S. A.

(Received March 1, 2004; accepted March 17, 2004; published April 16, 2004)

A photo-enhanced chemical wet etching technique is presented to form a roughened surface morphology with hexagonal symmetry on laser lift-off (LLO) N-face GaN grown by metalorganic chemical vapor deposition (MOCVD). An aqueous solution of KOH was used as etch electrolyte. The etched surface showed cones with hexagonal pyramid structures bound by $\{10\bar{1}\bar{1}\}$ facets. A detailed analysis of the etch rates and time-evolution of the surface morphology is described as a function of KOH concentration (1.25 M to 8.8 M). The comparison between $(000\bar{1})$ N-face and Ga-face GaN etch morphology is discussed. This roughened hexagonal surface morphology can be applied to enhance the external efficiency in GaN based light-emitting diodes (LEDs). [DOI: 10.1143/JJAP.43.L637]

KEYWORDS: N-face GaN, roughening, hexagonal pyramid, photo-enhanced, chemical wet etching

Recently, III-nitrides have promoted great advances in light-emitting diodes (LEDs), lasers, and detectors in the blue-UV range of spectrum.[1] High efficiency GaN-based LEDs attract exceptional interest for applications such as displays, traffic signals, back lighting for cell phones and white-light sources. However, the total light output from these LEDs is still rather low. Enhancing the efficiency of GaN-based LEDs is an area of active study.[2] In particular, much improvement can be achieved in the external quantum efficiency ($\eta_{ext}$), which is primarily limited by the total internal reflection of the light generated from the active region at the semiconductor-air interface. Due to the large refractive index difference between GaN ($n \sim 2.5$) and air ($n = 1$), the critical angle for light extraction is only around 23 degrees. Many approaches have been carried out to increase the external efficiency, including roughening the surface of the LED.[3] Some increase in extraction efficiency was observed with these methods. However, these approaches typically require complicated processes involving lithographic patterning and subsequent dry etching, or a high temperature annealing process.

Since Minsky demonstrated photoelectrochemical (PEC) wet etching on GaN in 1996,[4] PEC etching of III-Nitrides materials has been investigated as an interesting wet etching technique for the family of GaN materials. Most PEC etching studies have been carried out on Ga-face (0001) GaN. This article describes the photochemical wet etching of N-face $(000\bar{1})$ GaN by differing etch parameters. The resulting etched surface morphology proves to be useful for enhancing the extraction efficiency of LEDs, increasing the light extraction efficiency by a factor of 2–3 times.[5]

A layer of $3 \mu$m-thick Si doped GaN ($\sim 1 \times 10^{18}$ cm$^3$) was grown on (0001) sapphire (Namiki Precision Jewel Company, Ltd.) by metalorganic chemical vapor deposition (MOCVD). A layer of Ti/Au was deposited on the GaN surface by using an e-beam evaporator. A thin layer of tin (Sn) was subsequently evaporated on the sample in a thermal evaporator. The wafer was flipped and bonded onto a Au-coated Si submount at around 280°C temperature. At this temperature, Au and Sn form an alloy, providing firm adhesion between the GaN wafer and the Si submount prior to the sapphire removal. A KrF excimer laser (248 nm) was used in the laser lift-off (LLO) process. The laser illuminated the GaN thin film through the transparent sapphire substrate, resulting in the local decomposition of GaN at the interface between GaN and sapphire. After the laser was scanned on the whole sample, the sapphire substrate was subsequently removed, and finally the remaining gallium droplets on the transferred GaN surface were etched away in dilute HCl. The remaining GaN epitaxial film on the Si submount displayed a N-face $(000\bar{1})$ surface. This was the sample that was subjected to photochemical wet etching.

A 1000 W Xe lamp was used as illumination source in this photo-enhanced chemical wet etching.[6] Dilute potassium hydroxide (KOH) solution served as the etch electrolyte. The solution volume was fixed at 250 milliliters, and no stirring was applied during the etch process. The etch rate and morphology were systematically studied as a function of time (2 to 10 min) and concentration (0.004M to 8.8M). The etching morphology was observed using a JEOL 6340F field emission scanning electron microscope (FE-SEM) operated at 2 kV with an emission current of $12 \mu$A.

Figure 1 shows SEM images of the etch morphology after an etch time of 2 min (a, c) and 10 min (b, d) in 2.2 M KOH electrolyte. SEM images shown in (a) and (b) were taken at an angle of 75 degrees from the perpendicular direction of the etched surface. These figures highlight the cone-like surface morphology of the etched N-face GaN. The SEM images shown in (c) and (d) were taken at a 15 degrees angle view from the perpendicular direction of etched surface. These figures reveal the roughness of the etched surface, with some amount of smooth, $(000\bar{1})$ N-face GaN (the dark, planar areas in the figure). In comparing Fig. 1(c) with Fig. 1(d), it is evident that the density of etched cones decreases as the etch proceeds in time. After 2 min etch time, the density of cones was measured to be $\sim 10^9$–$10^{10}$/cm$^2$, which is comparable to the dislocation density of GaN on sapphire. Very early in the etch process, the small cones were observed on the surface of the material and represent sites where the initiation of the etch process has taken place. As the etch proceeds, with a crystallographic preference, the cones coalesce: the area encompassed by the bases of the

*E-mail address: yangao@engineering.ucsb.edu

A-0107





Fig. 3. SEM images of the N-face GaN etch morphology in (a) 1.25 M and (b) 8.8 M KOH after an etch time of 10 min. The base size, height and vertical etch rate of the cones increased with the KOH concentration.



Fig. 1. SEM images of the N-face GaN etch morphology after an etch time of 2 min (a, c) and 10 min (b, d) in 2.2 M KOH. (a) and (b) are taken at an angle of 75 degrees from the perpendicular to the etched surface. (c) and (d) are taken at an angle of 15 degrees from the perpendicular direction of the etched surface. The base size and height of the cones increase with etch time.

Fig. 2. High magnification image of the N-face GaN etched hexagonal pyramids structure after 10 min in 2.2 M KOH. $\{10\bar{1}\bar{1}\}$ facets were defined.

etched cones increases from ~80 nm–100 nm to ~300 nm–400 nm when the etch time was increased from 2 to 10 min. The corresponding average heights of the cones (or the etch depth) increased from ~100 nm to ~400 nm. Figure 2 shows a high magnification image of the sample etched for 10 min in 2.2 M KOH, which reveals structures with hexagonal symmetry defined by $\{10\bar{1}1\}$ facets. The hexagonal pyramids have been previously observed in V-defects of MOCVD-grown Ga-face GaN.[7] This hexagonal symmetry and the corresponding slow-etch $\{10\bar{1}1\}$ planes were also observed in other wet etching studies of N-face GaN either grown by molecular beam epitaxy (MBE)[8] or grown on Si substrates.[9] As the etch time increases from 2 to 10 min, the total amount of $(000\bar{1})$ N-face surface area diminishes, as the bases of the pyramidal structures increase.

Systematic variation of the KOH concentration was also

carried out. The evolution of the surface morphology with time is similar to that described above, as the concentration was varied (1.25 M, 2.2 M, 5.5 M and 8.8 M KOH). Figures 3(a) and 3(b) show the surface morphology in 1.25 M and 8.8 M KOH after 10 min etching. The bases of the cones increase (~100 nm to ~400 nm) as well as the heights of the cones (~120 nm to ~700 nm) with increasing KOH concentration from 1.25 M to 8.8 M. The vertical etch rate also increases with the KOH concentration.

Under similar photochemical wet etching conditions, the etch rate and etch morphology of Ga-face (0001) GaN are quite different from that of the N-face $(000\bar{1})$ GaN. Using the etch conditions described in this paper, no significant etching of the Ga-face (0001) GaN surface can be achieved without the addition of metal contacts to the GaN surface. In some cases, it is necessary to apply an additional bias to the sample in order to achieve appreciable etch rates. Without above bandgap illumination, no obvious etching of the Ga face was observed. By contrast, our own and other works have demonstrated the much more rapid etch rate of N-face $(000\bar{1})$ GaN, either by wet chemical etching[8,10] or by chemical mechanical polishing (CMP).[11] Our studies have also revealed room temperature etching of the N-face surface in low-dislocation density material even in the absence of illumination.[10] The reason for the dramatically different etch rates between Ga-face and N-face in GaN is still under investigation. The difference in the polarization charge at the two surfaces (Ga-face and N-face) may influence the etching, and steric differences may affect the ability of the reactants to access the material.

In addition to etch rate comparison, the etched surface morphology of Ga-face GaN appears very different from the N-face GaN observed here.[10] Figure 4 shows the two standard etching morphologies observed on the Ga-face GaN. Figure 4(a) shows the SEM image of whiskers formed in low concentration KOH. Figure 4(b) shows the SEM image of the hillocks that were formed in high concentration KOH.[6,12] The whisker formation at low concentration has been correlated by Youtsey *et al.*[12] with decoration of threading dislocations in the GaN. The dislocations serve as recombination sites for the photogenerated holes, and thus diminish the rate of photoelectrochemical etching in the surrounding volume. The etch morphology represents a competition between the rate of recombination of the holes and the rate of chemical reactivity that is determined by conditions such as the concentration and nature of the

Case 1:13-cv-00924-NDocument 27239Filed 02/05/19 Page 112 of 282 Page ID #7311507

Jpn. J. Appl. Phys., Vol. 43, No. 5A (2004)

Y. Gao et al.     L 639



Fig. 4.  SEM images of the Ga-face GaN etch morphology using PEC etching in (a) low concentration KOH and (b) high concentration KOH. The low concentration case shows a whisker-like structure, while the high concentration case shows a hillock-like structure.

surrounding electrolyte. We believe that threading dislocations as well as other defects may also play an important role in the etching of the N-face $(000\bar{1})$ surface. They may serve as nucleation points for the etch process. However, the relative importance of photo-illumination and chemical reactivity (provided by the choice and concentration of the electrolyte) are different for the N-face and Ga-face (0001) face surfaces. Etching of the N-face $(000\bar{1})$ surface can take place (though at a slow rate) in KOH of sufficiently high concentration (2.2 M) even in the absence of light. The additional above-bandgap illumination increases the etch rate substantially, as high as two orders of magnitude faster. With or without photo-illumination, the etch morphology of the N-face $(000\bar{1})$ shows a strong crystallographic component, producing hexagonal pyramids bound by the stable $\{10\bar{1}\bar{1}\}$ facets.[8,10]

In summary, a systematic study of the hexagonal etched morphology on N-face GaN was carried out using a simple photo-enhanced chemical wet etch in KOH. The vertical etch rate, the size and density of the cones that comprised the etch morphology were observed to depend strongly on the

etching conditions (etching time and KOH concentration). The critical etch mechanisms and etch morphologies of the N-face $(000\bar{1})$ GaN and the Ga-face (0001) GaN are **dramatically different. The simple achievement of the** textured surface of the N-face $(000\bar{1})$ GaN is expected to be useful for a variety of applications in the fabrication of optical devices in GaN materials.

This work is supported by the Solid Stage Lighting and Display Center (SSLDC) at the University of California, Santa Barbara. The authors acknowledge fruitful discussions with the Nitride Community in UCSB.

1) S. Nakamura: *The Blue Laser Diode* (Springer, Berlin, 1997).
2) J. J. Wierer, D. A. Steigerwald, M. R. Krames, J. J. O'shea, M. J. Ludowise, G. Christenson, Y.-C. Shen, C. Lowery, P. S. Martin, S. Subramanya, W. Gotz, N. F. Gardner, R. S. Kern and S. A. Stockman: Appl. Phys. Lett., **78** (2001) 3379.
3) C. Huh, K.-S. Lee, E.-J. Kang and S.-J. Park: J. Appl. Phys. **93** (2003) 9383.
4) M. S. Minsky, M. White and E. L. Hu: Appl. Phys. Lett. **68** (1996) 1531.
5) T. Fujii, Y. Gao, R. Sharma, E. L. Hu, S. P. DenBaars and S. Nakamura: Appl. Phys. Lett. **84** (2004) 855.
6) Y. Gao, I. Ben-Yaacov, U. Mishra and E. Hu: to be published in Int. J. High Speed Electron. & Syst., Book Ser. Selected Topics in Electronics & Systems, 2004.
7) X. H. Wu, C. R. Elsass, A. Abare, M. Mack, S. Keller, P. M. Petroff, S. P. DenBaars, J. S. Speck and S. J. Rosner: Appl. Phys. Lett. **72** (1998) 692.
8) H. M. Ng, N. G. Weimann and A. Chowdhury: J. Appl. Phys. **94** (2003) 650.
9) T. Palacios, F. Calle, M. Varela, C. Ballesteros, E. Monroy, F. B. Naranjo, M. A. Sanchez-Garcia, E. Calleja and E. Munoz: Semicond. Sci. Technol. **15** (2000) 996.
10) Y. Gao, M. Craven, J. Speck, S. P. DenBaars and E. L. Hu: to be published in Appl. Phys. Lett.
11) P. R. Tavernier, T. Margalith, L. A. Coldren, S. P. DenBaars and D. R. Clarke: Electrochem. Solid State Lett. **5** (2002) G61.
12) C. Youtsey, L. T. Romano and I. Adesida: Appl. Phys. Lett. **73** (1998) 797.

| From: | Lee, Sean |
|---|---|
| To: | "Dean Stocker" |
| Cc: | Jensen, Jonathan J |
| Subject: | RE: Crystallographic etching patent (BU95-69) |
| Date: | Monday, September 18, 2006 10:10:18 AM |

Hi Dean,

To be honest, I had to look it up myself in our database; it is still an active, unlicensed case, but there has been no activity, so thanks for bringing it to my attention! (Fred Schubert is no longer here at BU)

At some point we would like to contact you in process of looking to see if we can license it. In the meantime, if you have any information along those lines, it would be great if you could send it to me.

Thanks, and Best Regards,
Sean

Sean Lee, Ph.D
Licensing Associate
Office of Technology Development
Boston University
108 Bay State Road
Boston, MA 02215
Ph: 617-353-4567
Fax: 617-353-6141

---

**From:** Dean Stocker [mailto:dean_stocker@yahoo.com]
**Sent:** Sunday, September 17, 2006 1:30 AM
**To:** Lee, Sean
**Subject:** Crystallographic etching patent

Dear Mr. Lee,

I was doing a patent search last week and was surprised to find that I have a patent from my days at BU (Number 6,294,475, Crystallographic wet chemical etching of III-nitride material). I know that we filed an invention disclosure for it and were submitting an application, but I never heard that anything actually came of it. I am curious to know whether anyone has been interested in licensing it?

Thanks,

Dean Stocker

BU001117

| From: | Lee, Sean |
| --- | --- |
| To: | Schubert, E. Fred |
| Cc: | Jensen, Jonathan J; Anderson, Janine B; Mulrean, Susan M |
| Subject: | RE: Etching patent |
| Date: | Thursday, April 22, 2010 9:12:00 PM |

Hi Fred,

Sorry I wasn't reachable yesterday and today, I'm out of the office until Monday.

As we have been shifting responsibilities and portfolios in the office, my esteemed and extremely able colleague Jon Jensen (copied here) is handling the return of the invention to you. Jon is briefed on status and next steps needed and will be getting in touch with you.

Best Regards,
Sean

Sean Lee, Ph.D
Director, Business Development
Boston University
Technology Development Office
Phone: 617-353-4567

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Wednesday, April 21, 2010 1:34 PM
**To:** Lee, Sean
**Subject:** Etching patent

Sean:

Greetings! I have tried to call you during the last couple of days for an update on the BU etching patent (Fred Schubert and Dean Stocker) but, unfortunately, was unable to reach you. As I indicated earlier, I am still very much interested in becoming the assignee of the patent and also would be prepared to take all steps necessary to make the transfer possible in a timely manner. I understand that you have sent a letter to Dean Stocker gaging his potential interest in the patent and I also understand that you planned to contact Federal Agencies. So would there be a good time that I could call you for an update?

Regards, Fred

BU001118

| | |
|---|---|
| **From:** | Schubert, E. Fred |
| **To:** | Jensen, Jonathan J |
| **Subject:** | Re: Etching patent |
| **Date:** | Friday, April 23, 2010 7:00:43 PM |

Jon:

Greetings! I would like to introduce myself: I am Fred Schubert, formerly on the faculty of Boston University (from 1995 - 2002). As I understand, Sean has updated you on me having responded positively to a verbal offer from BU on the return of a patent to me. Since I have not done such a transaction in the past, I would be interested in talking with you about the next steps in the process. Either a telephone conversation or, if you prefer, a meeting at BU would be fine with me (I live in the Troy NY area and could drive to Boston). Could you please let me know what you think?

Best regards, Fred

On Thu, Apr 22, 2010 at 9:11 PM, Lee, Sean <seanlee@bu.edu> wrote:

> Hi Fred,
>
> Sorry I wasn't reachable yesterday and today, I'm out of the office until Monday.
>
> As we have been shifting responsibilities and portfolios in the office, my esteemed and extremely able colleague Jon Jensen (copied here) is handling the return of the invention to you. Jon is briefed on status and next steps needed and will be getting in touch with you.
>
> Best Regards,
>
> Sean
>
> Sean Lee, Ph.D
>
> Director, Business Development
>
> Boston University
>
> Technology Development Office
>
> Phone: 617-353-4567

BU001119

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Wednesday, April 21, 2010 1:34 PM
**To:** Lee, Sean
**Subject:** Etching patent

Sean:

Greetings! I have tried to call you during the last couple of days for an update on
the BU etching patent (Fred Schubert and Dean Stocker) but, unfortunately, was
unable to reach you. As I indicated earlier, I am still very much interested in
becoming the assignee of the patent and also would be prepared to take all steps
necessary to make the transfer possible in a timely manner. I understand that you
have sent a letter to Dean Stocker gaging his potential interest in the patent and I
also understand that you planned to contact Federal Agencies. So would there be
a good time that I could call you for an update?

Regards, Fred

--
E. Fred Schubert, Rensselaer Polytechnic Institute
110 Eighth Street, Troy, New York 12180
Office: 518-276-8775  Email: EFSchubert@rpi.edu
Assistant: Gina Moore 518-276-8072  Email: gina@ecse.rpi.edu

BU001120

| | |
|---|---|
| **From:** | Jensen, Jonathan J |
| **To:** | Schubert, E. Fred |
| **Cc:** | Anderson, Janine B; Lee, Sean |
| **Subject:** | RE: Etching patent |
| **Date:** | Wednesday, April 28, 2010 9:21:02 AM |

Hi Fred,

Thanks for the e-mail. I'm happy to talk anytime.  I don't think a trip to Boston is necessary at this point as the attorneys are still working on this. Let's shoot for a call sometime next week to touch base. We should have another call after May 10th when Janine (our patent manager) is back in the office.

Next week I'm available:
Mon 5/3: before 1:30pm
Tues 5/4: before 12 noon
Wed 5/6: anytime
Thurs 5/7: after 10:30am
Fri 5/8: before 1:30pm

Let me know what works for you.

Best,
Jon

_____

Jonathan J. Jensen
Director, Business Development
Technology Development
Boston University
53 Bay State Road
Boston, MA 02215
Ph: 617-358-3795
Fax: 617-353-6141
www.linkedin.com/in/jonathanjensen
www.bu.edu/otd/transfer/license.html

This email message and any attachments are confidential and may be privileged. It is intended only for the individual(s) to whom it is addressed and may not be saved, copied, printed, disclosed or otherwise used by anyone else. If you are not the intended recipient, kindly notify the sender and delete this email and any attachments immediately.

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Friday, April 23, 2010 7:00 PM
**To:** Jensen, Jonathan J
**Subject:** Re: Etching patent

BU001121

Jon:

Greetings! I would like to introduce myself: I am Fred Schubert, formerly on the faculty of Boston University (from 1995 - 2002). As I understand, Sean has updated you on me having responded positively to a verbal offer from BU on the return of a patent to me. Since I have not done such a transaction in the past, I would be interested in talking with you about the next steps in the process. Either a telephone conversation or, if you prefer, a meeting at BU would be fine with me (I live in the Troy NY area and could drive to Boston). Could you please let me know what you think?

Best regards, Fred

On Thu, Apr 22, 2010 at 9:11 PM, Lee, Sean <seanlee@bu.edu> wrote:
Hi Fred,

Sorry I wasn't reachable yesterday and today, I'm out of the office until Monday.

As we have been shifting responsibilities and portfolios in the office, my esteemed and extremely able colleague Jon Jensen (copied here) is handling the return of the invention to you. Jon is briefed on status and next steps needed and will be getting in touch with you.

Best Regards,
Sean

Sean Lee, Ph.D
Director, Business Development
Boston University
Technology Development Office
Phone: 617-353-4567

---

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Wednesday, April 21, 2010 1:34 PM
**To:** Lee, Sean
**Subject:** Etching patent

Sean:

Greetings! I have tried to call you during the last couple of days for an update on the BU etching patent (Fred Schubert and Dean Stocker) but, unfortunately, was unable to reach you. As I indicated earlier, I am still very much interested in becoming the assignee of the patent and also would be prepared to take all steps necessary to make the transfer possible in a timely manner. I understand that you have sent a letter to Dean Stocker gaging his potential interest in the patent and I also understand that you planned to contact Federal Agencies. So would there be a good time that I could call you for an update?

Regards, Fred

--

BU001122

E. Fred Schubert, Rensselaer Polytechnic Institute
110 Eighth Street, Troy, New York 12180
Office: 518-276-8775  Email: EFSchubert@rpi.edu
Assistant: Gina Moore 518-276-8072  Email: gina@ecse.rpi.edu

BU001123

| From: | Schubert, E. Fred |
|---|---|
| To: | Jensen, Jonathan J |
| Cc: | Anderson, Janine B; Lee, Sean |
| Subject: | Re: Etching patent |
| Date: | Wednesday, April 28, 2010 3:26:00 PM |

Thank you, Jon, I am glad that we finally connected. --- I also want to confirm our teleconference this coming Monday; I will call you at 10:00 AM at 617-358-3795.

Regards, Fred

On Wed, Apr 28, 2010 at 9:21 AM, Jensen, Jonathan J <jjensen@bu.edu> wrote:

Hi Fred,

Thanks for the e-mail. I'm happy to talk anytime.  I don't think a trip to Boston is necessary at this point as the attorneys are still working on this. Let's shoot for a call sometime next week to touch base. We should have another call after May 10th when Janine (our patent manager) is back in the office.

Next week I'm available:

Mon 5/3: before 1:30pm

Tues 5/4: before 12 noon

Wed 5/6: anytime

Thurs 5/7: after 10:30am

Fri 5/8: before 1:30pm

Let me know what works for you.

Best,

Jon

_____

Jonathan J. Jensen

Director, Business Development

BU001124

Technology Development

Boston University

53 Bay State Road

Boston, MA 02215

Ph: 617-358-3795

Fax: 617-353-6141

www.linkedin.com/in/jonathanjensen

www.bu.edu/otd/transfer/license.html


This email message and any attachments are confidential and may be
privileged. It is intended only for the individual(s) to whom it is
addressed and may not be saved, copied, printed, disclosed or otherwise
used by anyone else. If you are not the intended recipient, kindly notify
the sender and delete this email and any attachments immediately.

---

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Friday, April 23, 2010 7:00 PM
**To:** Jensen, Jonathan J
**Subject:** Re: Etching patent


Jon:


Greetings! I would like to introduce myself: I am Fred Schubert, formerly on the
faculty of Boston University (from 1995 - 2002). As I understand, Sean has
updated you on me having responded positively to a verbal offer from BU on the
return of a patent to me. Since I have not done such a transaction in the past, I
would be interested in talking with you about the next steps in the process. Either
a telephone conversation or, if you prefer, a meeting at BU would be fine with me
(I live in the Troy NY area and could drive to Boston). Could you please let me
know what you think?


Best regards, Fred

On Thu, Apr 22, 2010 at 9:11 PM, Lee, Sean <seanlee@bu.edu> wrote:

BU001125

Hi Fred,

Sorry I wasn't reachable yesterday and today, I'm out of the office until Monday.

As we have been shifting responsibilities and portfolios in the office, my esteemed and extremely able colleague Jon Jensen (copied here) is handling the return of the invention to you. Jon is briefed on status and next steps needed and will be getting in touch with you.

Best Regards,

Sean

Sean Lee, Ph.D

Director, Business Development

Boston University

Technology Development Office

Phone: 617-353-4567

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Wednesday, April 21, 2010 1:34 PM
**To:** Lee, Sean
**Subject:** Etching patent

Sean:

Greetings! I have tried to call you during the last couple of days for an update on the BU etching patent (Fred Schubert and Dean Stocker) but, unfortunately, was unable to reach you. As I indicated earlier, I am still very much interested in becoming the assignee of the patent and also would be prepared to take all steps necessary to make the transfer possible in a timely manner. I understand that you have sent a letter to Dean Stocker gaging his potential interest in the patent and I also understand that you planned to contact Federal Agencies. So would there be a good time that I could call you for an update?

BU001126

Regards, Fred

--
E. Fred Schubert, Rensselaer Polytechnic Institute
110 Eighth Street, Troy, New York 12180
Office: 518-276-8775  Email: EFSchubert@rpi.edu
Assistant: Gina Moore 518-276-8072  Email: gina@ecse.rpi.edu

--
E. Fred Schubert, Rensselaer Polytechnic Institute
110 Eighth Street, Troy, New York 12180
Office: 518-276-8775  Email: EFSchubert@rpi.edu
Assistant: Gina Moore 518-276-8072  Email: gina@ecse.rpi.edu

BU001127

| | |
|---|---|
| **From:** | Schubert, E. Fred |
| **To:** | Jensen, Jonathan J; Anderson, Janine B |
| **Subject:** | Thursday |
| **Date:** | Tuesday, June 01, 2010 11:21:13 AM |

Jon, Janine

I will be in Boston this week. Would it be possible to meet with you on Thursday morning? Please advise. Any time in the morning would be fine with me.

Regards, Fred

BU001128

| | |
|---|---|
| **From:** | Anderson, Janine B |
| **To:** | Jensen, Jonathan J; "efredschubert@gmail.com" |
| **Subject:** | RE: Thursday |
| **Date:** | Tuesday, June 01, 2010 11:34:32 AM |

Same for me.

Janine

---

**From:** Jensen, Jonathan J
**Sent:** Tuesday, June 01, 2010 11:23 AM
**To:** 'efredschubert@gmail.com'; Anderson, Janine B
**Subject:** Re: Thursday

Sure, anytime between 10am and 12 noon works for me.


----------------------------------------
Jon Jensen
Please excuse typos, sent from my Blackberry

---

**From:** Schubert, E. Fred
**To:** Jensen, Jonathan J; Anderson, Janine B
**Sent:** Tue Jun 01 11:19:22 2010
**Subject:** Thursday
Jon, Janine

I will be in Boston this week. Would it be possible to meet with you on Thursday morning?
Please advise. Any time in the morning would be fine with me.

Regards, Fred

BU001129

| | |
|---|---|
| **From:** | Schubert, E. Fred |
| **To:** | Anderson, Janine B; Jensen, Jonathan J |
| **Subject:** | Re: Thursday |
| **Date:** | Tuesday, June 01, 2010 11:51:41 AM |

Great, thanks to both of you, I will come to your office at BU on this Thursday 10:00 AM.

Regards, Fred

On Tue, Jun 1, 2010 at 11:34 AM, Anderson, Janine B <jandersn@bu.edu> wrote:

> Same for me.
>
>
> Janine
>
>
> _____
>
> **From:** Jensen, Jonathan J
> **Sent:** Tuesday, June 01, 2010 11:23 AM
> **To:** 'efredschubert@gmail.com'; Anderson, Janine B
> **Subject:** Re: Thursday
>
>
> Sure, anytime between 10am and 12 noon works for me.
>
> --------------------------------------
> Jon Jensen
> Please excuse typos, sent from my Blackberry
> _____
>
> **From**: Schubert, E. Fred
> **To:** Jensen, Jonathan J; Anderson, Janine B
> **Sent**: Tue Jun 01 11:19:22 2010
> **Subject**: Thursday
>
> Jon, Janine
>
>
> I will be in Boston this week. Would it be possible to meet with you on Thursday morning? Please advise. Any time in the morning would be fine with me.
>
>
> Regards, Fred

BU001130

--
E. Fred Schubert, Rensselaer Polytechnic Institute
110 Eighth Street, Troy, New York 12180
Office: 518-276-8775  Email: EFSchubert@rpi.edu
Assistant: Gina Moore 518-276-8072  Email: gina@ecse.rpi.edu

BUO01131

| From: | Schubert, E. Fred |
|---|---|
| **To:** | Jensen, Jonathan J; Anderson, Janine B |
| **Subject:** | IP / Patent |
| **Date:** | Tuesday, June 08, 2010 8:53:34 AM |

Jon, Janine

Just a short note of appreciation: Thank you very much for our productive meeting last Thursday. Please keep me posted on the patent / title transfer. If you need anything from my side, please let me know.

Regards, Fred

BU001132

| From: | Jensen, Jonathan J |
|---|---|
| To: | Schubert, E. Fred |
| Cc: | Anderson, Janine B |
| Subject: | RE: IP / Patent |
| Date: | Tuesday, June 08, 2010 9:55:15 AM |

Glad we could be of help Fred. It was a pleasure meeting you.

Congrats again on your son's wedding.

Best,
Jon

_____

Jonathan J. Jensen
Director, Business Development
Technology Development
Boston University
53 Bay State Road
Boston, MA 02215
Ph: 617-358-3795
Fax: 617-353-6141
www.linkedin.com/in/jonathanjensen
www.bu.edu/otd/transfer/license.html

This email message and any attachments are confidential and may be
privileged. It is intended only for the individual(s) to whom it is addressed
and may not be saved, copied, printed, disclosed or otherwise used by anyone
else. If you are not the intended recipient, kindly notify the sender and
delete this email and any attachments immediately.

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Tuesday, June 08, 2010 8:52 AM
**To:** Jensen, Jonathan J; Anderson, Janine B
**Subject:** IP / Patent

Jon, Janine

Just a short note of appreciation: Thank you very much for our productive meeting last
Thursday. Please keep me posted on the patent / title transfer. If you need anything from my
side, please let me know.

Regards, Fred

BU001133

| From: | Jensen, Jonathan J |
|---|---|
| To: | Anderson, Janine B |
| Subject: | letter to Fred Schubert |
| Date: | Wednesday, June 16, 2010 11:06:26 AM |

Hi Janine,

So Fred got to me ☺

He's planning to be in Washington next week and is considering visiting the agencies, but will not do so if he doesn't have the letter by then. I let him know we would scan the letter in and e-mail it to him as soon as it's signed. He's hoping to receive it by the end of the week. I told him we'd do the best we can but didn't make any promises.

Thanks,
Jon

---

master-logo

**Jonathan J. Jensen**
*Director, Business Development*
**Boston University | Technology Development**
53 Bay State Road, Boston, MA 02215
Phone: (617) 358-3795 • Fax: (617) 353-6141
Web Site: http://www.bu.edu/otd/
LinkedIn: http://www.linkedin.com/in/jonathanjensen

This email message and any attachments are confidential and may be privileged. It is intended only for the individual(s) to whom it is addressed and may not be saved, copied, printed, disclosed or otherwise used by anyone else. If you are not the intended recipient, kindly notify the sender and delete this email and any attachments immediately.

BU001134

| **From:** | Anderson, Janine B |
| **To:** | Schubert, E. Fred |
| **Cc:** | Ruckenstein, Andrei E; Talley, Crystal D; Jensen, Jonathan J; "Matthew E. Connors" |
| **Subject:** | BU98-11 invention return letter |
| **Date:** | Friday, June 18, 2010 2:12:29 PM |
| **Attachments:** | BU98-11 Schubert 1b ltr 6-16-10.pdf |

Dear Fred,

Scanned copy of our letter returning BU98-11 invention to you attached.  Original going out today via FedEx.

Best,
Janine


Janine B. Anderson
Patent Manager, Technology Transfer
Boston University
Technology Development Office
53 Bay State Road
Boston, MA 02215
Tel: (617) 358-0238
Fax: (617) 353-6141
email: jandersn@bu.edu
Web: www.bu.edu/otd/

BU001135



**Boston University** Technology Development

53 Bay State Road
Boston, Massachusetts 02215
T 617-353-4550 F 617-353-6141

**Vinit Nijhawan**
**Managing Director, Technology Development Office**
**Lecturer School of Management & Director Enterprise Programs, ITEC**
**T 617-353-0606**
**vinit@bu.edu**

July 16, 2010

VIA EMAIL (efredschubert@gmail.com and FEDEX

Dr. E. Fred Schubert
17 Eaton Road
Troy, NY 12180

Dear Fred:

> Re:     BU98-11 Invention Disclosure
> "Crystallographic Wet Chemical Etching of III-Nitride Material"
> U.S. Application No. 09/338,709 filed June 23, 1999
> U.S. Patent No. 6,294,475 issued September 25, 2001
> Inventors: E. Fred Schubert and Dean A. Stocker

I am pleased to be able to inform you that the Charles River Campus Patent Committee approved your request that the above -referenced invention be returned to you under the Charles River Campus Patent Policy, subject to the stipulations set out below.

The invention will be returned solely to you. On April 5, 2010 we sent a Certified Mail, Return Receipt Requested letter to Dean Stocker notifying him that Boston University is no longer supporting the patent costs for this invention and asking if he was interested in having the invention returned to him. The letter was received and signed for by Dean on April 12, 2010. We indicated in our letter that if we received no response by April 16 we would treat the matter as closed regarding his potential interest in the invention. As of this date, we have not received a response from him. Nevertheless, Dean Stocker may continue to have rights in this invention under U.S. patent law.

Because the U.S. application was assigned to Trustees of Boston University, we will need to file an assignment of it to you. The law firm of Gauthier and Connors is preparing such an Assignment for execution by Martin J. Howard on behalf of the Trustees of Boston University.

Since you used federal funding in the course of research that led to the Patent Rights, the University must obtain the consent of the Office of Naval Research and the National Science Foundation to assign the Patent Rights to you. We are notifying the ONR and the NSF that we are relinquishing our rights to the invention and returning the invention to the ONR and the NSF. You now need to request title of this invention from the ONR and NSF and your request should be directed to John Karasek at the ONR and Robin Fritsch at the NSF (contact details below). They will then send you the appropriate paperwork for electing title to the invention.

BU001136

E. Fred Schubert
Page 2
June 15, 2010

ONR Grant No. N00014-98-1-0194
John Karasek
Tel:      (703) 696-4007
Email:   john.karasek@navy.mil

NSF Grant No. ECS 9714047
Robin Fritsch
Tel:      (703) 292-8060
Email:   rfritsch@nsf.gov

The University's expenditures on the case to date total $27,272.32. This amount does not include the $3,771.00 for reviving the patent which we invoiced you for on June 14, 2010. In consideration for the assignment of the Patent Rights, you agree to pay the University 25% of any future income stream arising from the Patent Rights until these costs are reimbursed and 10% thereafter.

You also agree that, upon notification from the ONR and the NSF that they have granted your request for election of title to the invention, you will reimburse Trustees of Boston University $10,000.00 to cover previous prosecution costs.

You agree not to assert any patent that may be issued against Boston University, Boston Medical Center or any other educational or non-profit research institution that is conducting non-commercial research using the Patent Rights.

THE UNIVERSITY MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR WITH RESPECT TO (1) THE SCOPE OR VALIDITY OF ANY OF THE PATENT RIGHTS; (2) WHETHER THE PATENT RIGHTS MAY BE EXPLOITED BY YOU OR ANY SUBLICENSEE WITHOUT INFRINGING THE RIGHTS (INCLUDING PATENT RIGHTS) OF OTHERS;  OR (3) THE RESULTS TO BE OBTAINED BY USE OF THE PATENT RIGHTS.  THE PATENT RIGHTS ARE DELIVERED "AS IS" IN EVERY RESPECT.

You agree to defend, indemnify and hold the University and its affiliated hospital, Boston Medical Center Corporation, their trustees, officers, employees, agents and harmless from and against all claims, suits, demands, liability and expenses, including legal expenses and reasonable attorneys' fees, arising out of or relating to the Patent Rights and any product, service or process relating to or developed using the Patent Rights

You agree to provide us with a short annual report on your utilization of the technology by January 31 of each year commencing in 2011, until such time as you abandon the intellectual property.  This report will be for our internal purposes only and will be considered a confidential document.

Boston University appreciates having had the opportunity to work with you on this case and wishes you success with it in the future.

BU001137

E. Fred Schubert
Page 3
June 15, 2010

Please signify you agreement to these conditions by countersigning this letter below and returning one copy to me, retaining the other for your files.

Yours sincerely,

Vinit Nijhawan

cc     Andre Ruckenstein *(email only)*
       Christy Talley *(email only)*
       Janine Anderson
       Jon Jensen
       Matt Connors    Gauthier & Connors (*email and mail*)

Acknowledged and Agreed:

_____
E. Fred Schubert

BU001138

| From: | Schubert, E. Fred |
|---|---|
| To: | Anderson, Janine B |
| Cc: | Jensen, Jonathan J |
| Subject: | Re: BU98-11 invention return letter |
| Date: | Friday, June 18, 2010 3:07:40 PM |

Dear Janine

Thank you very much for the electronic advance copy of the letter. Once I receive the hard copy of the letter, I will sign it and send one signed copy back to you along with the first payment ($ 3771).

Best regards, Fred


On Fri, Jun 18, 2010 at 2:12 PM, Anderson, Janine B <jandersn@bu.edu> wrote:

Dear Fred,


Scanned copy of our letter returning BU98-11 invention to you attached. Original going out today via FedEx.


Best,

Janine



Janine B. Anderson

Patent Manager, Technology Transfer

Boston University

Technology Development Office

53 Bay State Road

Boston, MA 02215

Tel: (617) 358-0238

Fax: (617) 353-6141

email: jandersn@bu.edu

Web: www.bu.edu/otd/

BU001139

--
E. Fred Schubert, Rensselaer Polytechnic Institute
110 Eighth Street, Troy, New York 12180
Office: 518-276-8775  Email: EFSchubert@rpi.edu
Assistant: Gina Moore 518-276-8072  Email: gina@ecse.rpi.edu

BU001140

| **From:** | Anderson, Janine B |
| **To:** | "Schubert, E. Fred" |
| **Cc:** | Jensen, Jonathan J |
| **Subject:** | RE: BU98-11 invention return letter |
| **Date:** | Friday, June 18, 2010 3:09:18 PM |

Hi Fred,

You're entirely welcome.  Good luck with the agencies!

Best,
Janine

---

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Friday, June 18, 2010 3:07 PM
**To:** Anderson, Janine B
**Cc:** Jensen, Jonathan J
**Subject:** Re: BU98-11 invention return letter

Dear Janine

Thank you very much for the electronic advance copy of the letter. Once I receive the hard copy of the letter, I will sign it and send one signed copy back to you along with the first payment ($ 3771).

Best regards, Fred

On Fri, Jun 18, 2010 at 2:12 PM, Anderson, Janine B <jandersn@bu.edu> wrote:
Dear Fred,

Scanned copy of our letter returning BU98-11 invention to you attached.  Original going out today via FedEx.

Best,
Janine

Janine B. Anderson
Patent Manager, Technology Transfer
Boston University
Technology Development Office
53 Bay State Road
Boston, MA 02215
Tel: (617) 358-0238
Fax: (617) 353-6141
email: jandersn@bu.edu

BU001141

Web: www.bu.edu/otd/


--
E. Fred Schubert, Rensselaer Polytechnic Institute
110 Eighth Street, Troy, New York 12180
Office: 518-276-8775  Email: EFSchubert@rpi.edu
Assistant: Gina Moore 518-276-8072  Email: gina@ecse.rpi.edu

BU001142



**UNITED STATES PATENT AND TRADEMARK OFFICE**

RECEIVED

NOV 09 2009

GAUTHIER & CONNORS LLP

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA  22313-1450
www.uspto.gov

P75M

SAMUELS GAUTHIER & STEVENS LLP
225 FRANKLIN STREET
SUITE 3300
BOSTON  MA  02110

DATE PRINTED

10/26/09



# NOTICE OF PATENT EXPIRATION

According to the records of the U.S. Patent and Trademark Office (USPTO), payment of the maintenance fee for the patent(s) listed below has not been received timely prior to the end of the six-month grace period in accordance with 37 CFR 1.362(e). THE PATENT(S) LISTED BELOW HAS THEREFORE EXPIRED AS OF THE END OF THE GRACE PERIOD. 35 U.S.C. 41(b). Notice of the expiration will be published in the USPTO Official Gazette.

Expired patents may be reinstated in accordance with 37 CFR 1.378 if upon petition, the maintenance fee and the surcharge set forth in 37 CFR 1.20(i) are paid, AND the delay in payment of the maintenance fee is shown to the satisfaction of the Director to have been unavoidable or unintentional. 35 U.S.C. 41(c)(1).

If the Director accepts payment of the maintenance fee and surcharge upon petition under 37 CFR 1.378, the patent shall be considered as not having expired but would be subject to the intervening rights and conditions set forth in 35 U.S.C. 41(c)(2).

For instructions on filing a petition under 37 CFR 1.378 to reinstate an expired patent, customers should call the Office of Petitions Help Desk at 571-272-3282 or refer to the USPTO Web site at www.uspto.gov/web/offices/pac/dapp/petitionspractice.html. The USPTO also permits reinstatement under 37 CFR 1.378(c) by electronic petition (e-petition) using EFS-Web; e-petitions may be automatically granted if all the eligibility requirements are met. For further information on filing an e-petition, please call the Electronic Business Center (EBC) at 866-217-9197 (toll-free) or 571-272-4100 or refer to the EBC's e-petition guide at www.uspto.gov/ebc/portal/efs/petition_quickstart.pdf.

| PATENT NUMBER | U.S. APPLICATION NUMBER | PATENT ISSUE DATE | APPLICATION FILING DATE | EXPIRATION DATE | ATTORNEY DOCKET NUMBER |
|---|---|---|---|---|---|
| 6294475 | 09338709 | 09/25/01 | 06/23/99 | 09/25/09 | 4458 |

NOTE: This notice was automatically generated based on the amount of time that elapsed since the date a patent was granted. It is possible that the patent term may have ended or been shortened due to a terminal disclaimer that was filed in the application. Also, for any patent that issued from an application filed on or after June 8, 1995 containing a specific reference to an earlier filed application or applications under 35 U.S.C. 120, 121, or 365(c), the patent term ends 20 years from the date on which the earliest such application was filed, unless the term was adjusted or extended under 35 U.S.C. 154 or 156.

MA441D (11/2006)

BU000270



**Boston University** Technology Development

53 Bay State Road
Boston, Massachusetts 02215
T 617-353-4550  F 617-353-6141

Janine B. Anderson
Patent Manager, Technology Transfer
T: 617-358-0238
jandersn@bu.edu

November 27, 2009

Ms. Carol Petrosky                           Ms. Walda J. Jacobs
Associate Counsel                            Patent Assistant
Office of Naval Research                      National Science Foundation
Department of the Navy                        Office of the General Counsel
800 N. Quincy Street                          4201 Wilson Blvd., Rm. 1265
Arlington, VA  22217-5660                     Arlington, VA  22230

Re:   Grant Number (ONR):N00014-98-1-0194
      Grant Number (NSF): ECS 9714047
      Boston University Case Number: BU98-11
      U.S. Patent No.6,294,475 B1
      Issued: September 25, 2001
      U.S. Application Serial No. 09/338,709
      Filed: June 23, 1999
      Title   :CRYSTALLOGRAPHIC WET CHEMICAL ETCHING OF III-
              NITRIDE MATERIAL
      By     E. Fred Schubert and Dean A. Stocker

Dear Ms. Petrosky and Ms. Jacobs:

Boston University decided not to pay the 2nd year U.S. maintenance due September 25, 2009 for
the above-referenced patent (copy enclosed). This decision was made due to lack of commercial
interest in the invention.

We apologize for the lateness of this notice. Please do not hesitate to contact me should you
have any questions or require additional information.

Sincerely yours,

Janine B. Anderson

Enclosure

BU000451

**CONFIDENTIAL**

| | |
|---|---|
| **Subject:** | Re: BU98-11 "Crystallographic Wet Chemical Etching of GaN" |
| **Start:** | Thu 12/3/2009 4:00 PM |
| **End:** | Thu 12/3/2009 4:30 PM |
| **Recurrence:** | (none) |

------------

From:   efredschubert@gmail.com on behalf of Schubert, E. Fred [EFSchubert@rpi.edu]
Sent:   Wednesday, December 02, 2009 8:46 AM
To:     Lee, Sean
Subject:Re: BU98-11 "Crystallographic Wet Chemical Etching of GaN"
Attachments:   image001.jpg

Sorry, my fault. I will call you at 4:15 PM.

Regards, Fred

On Wed, Dec 2, 2009 at 8:44 AM, Lee, Sean <seanlee@bu.edu <mailto:seanlee@bu.edu> > wrote:

Hi Fred, sorry I wasn't clear: I need to leave here at 2pm for a 2pm-4pm meeting, so just before 2 or just after 4 would work

Thanks

Sean

From: efredschubert@gmail.com <mailto:efredschubert@gmail.com> [mailto:efredschubert@gmail.com <mailto:efredschubert@gmail.com> ] On Behalf Of Schubert, E. Fred
Sent: Wednesday, December 02, 2009 8:42 AM

To: Lee, Sean
Subject: Re: BU98-11 "Crystallographic Wet Chemical Etching of GaN"

Thank you Sean. So --- I confirm, I will call you tomorrow, Thursday, December 3, at 2:00 PM, at the number you indicated.

1
**BU001360**

**CONFIDENTIAL**

Regards, Fred

On Wed, Dec 2, 2009 at 8:38 AM, Lee, Sean <seanlee@bu.edu <mailto:seanlee@bu.edu> > wrote:

Fred, sure thing; tomorrow afternoon (except 2–4pm) would be best – 617-353-4567.

Cheers,
Sean


From: efredschubert@gmail.com <mailto:efredschubert@gmail.com>  [mailto:efredschubert@gmail.com <mailto:efredschubert@gmail.com> ] On Behalf Of Schubert, E. Fred
Sent: Wednesday, December 02, 2009 5:14 AM
To: Lee, Sean
Subject: Re: BU98-11 "Crystallographic Wet Chemical Etching of GaN"


Sean


I would like to follow up on our email conversation of September this year (below). I have a couple of questions and wonder if I could I give you a call? How about today, Wednesday, maybe in the afternoon?


Regards, Fred


On Wed, Sep 2, 2009 at 3:22 PM, Schubert, E. Fred <EFSchubert@rpi.edu <mailto:EFSchubert@rpi.edu> > wrote:

Sean


Thank you very much for the offer. Infortunately, I would not be interested.


Regards, Fred


On Wed, Sep 2, 2009 at 3:34 PM, Lee, Sean <seanlee@bu.edu <mailto:seanlee@bu.edu> > wrote:

Dear Fred,

I'm the case manager for the physical sciences cases in the technology development and we are in the process of consolidating our active portfolio.

Your invention from 1998, BU98-11 "Crystallographic Wet Chemical Etching of GaN" issued as a US patent in 2001 (US6,294,475 B1). We have paid the first maintenance fee but as part of effort to reduce our portfolio we are planning on not paying the second fee of $1,300 due Sept. 25, 2009.

If you are interested in having the invention returned to you, we can return it back to the original federal funding agency (NSF) and you can petition them to have it assigned to you. Our patent committee would have to approve this, but they have done so in the past under the condition that the inventor reimburse BU for the sunk patent costs ($27,000) and a 10% royalty from any future income the patent generates.

If you'd like to proceed along that route, please let me I'll be happy to discuss further.

Best,

Sean

master-logo

Sean Lee, Ph.D
Licensing Manager - Physical Sciences
Boston University | Technology Development
53 Bay State Road, Boston, MA 02215
Phone: (617) 353-4567 • Mobile: 617-981-1646 • Fax: (617) 353-6141
Email: seanlee@bu.edu <mailto:seanlee@bu.edu> • Web Site: http://www.bu.edu/otd/

--
E. Fred Schubert, Rensselaer Polytechnic Institute
110 Eighth Street, Troy, New York 12180
Office: 518-276-8775  Email: EFSchubert@rpi.edu <mailto:EFSchubert@rpi.edu>

CONFIDENTIAL

Assistant: Gina Moore 518-276-8072  Email: gina@ecse.rpi.edu <mailto:gina@ecse.rpi.edu>

--

E. Fred Schubert, Rensselaer Polytechnic Institute
110 Eighth Street, Troy, New York 12180
Office: 518-276-8775  Email: EFSchubert@rpi.edu <mailto:EFSchubert@rpi.edu>
Assistant: Gina Moore 518-276-8072  Email: gina@ecse.rpi.edu <mailto:gina@ecse.rpi.edu>

--

E. Fred Schubert, Rensselaer Polytechnic Institute
110 Eighth Street, Troy, New York 12180
Office: 518-276-8775  Email: EFSchubert@rpi.edu <mailto:EFSchubert@rpi.edu>
Assistant: Gina Moore 518-276-8072  Email: gina@ecse.rpi.edu <mailto:gina@ecse.rpi.edu>

--

E. Fred Schubert, Rensselaer Polytechnic Institute
110 Eighth Street, Troy, New York 12180
Office: 518-276-8775  Email: EFSchubert@rpi.edu <mailto:EFSchubert@rpi.edu>
Assistant: Gina Moore 518-276-8072  Email: gina@ecse.rpi.edu <mailto:gina@ecse.rpi.edu>

| | |
|---|---|
| **From:** | efredschubert@gmail.com [efredschubert@gmail.com] |
| **on behalf of** | Schubert, E. Fred [EFSchubert@rpi.edu] |
| **Sent:** | 12/3/2009 6:15:24 PM |
| **To:** | Lee, Sean [seanlee@bu.edu] |
| **Subject:** | Re: Invention BU98-11 |

Sean

Thank you for the timely response. I would like to call you again about this, maybe I could call you tomorrow (Friday) afternoon?

Regards, Fred

On Thu, Dec 3, 2009 at 5:09 PM, Lee, Sean <seanlee@bu.edu> wrote:

> Hi Fred,
>
> I checked on the possibility of reviving the case after the missed due date, and have to deliver the bad news that we can't revive it because it was intentionally abandoned. The patent office allows for reviving only if it can be explained in good faith that the abandonment was unintentional. As our patent manager, Janine is a notary, and so is perhaps more honor bound than most to be truthful to the patent office. Sorry for the disappointing news….
>
> Best Regards,
>
> Sean

> **Sean Lee, Ph.D**
> *Licensing Manager - Physical Sciences*
> Boston University | Technology Development
> 53 Bay State Road, Boston, MA 02215
> Phone: (617) 353-4567 • Mobile: 617-981-1646 • Fax: (617) 353-6141
> Email: seanlee@bu.edu • Web Site: http://www.bu.edu/otd/

--
E. Fred Schubert, Rensselaer Polytechnic Institute
110 Eighth Street, Troy, New York 12180
Office: 518-276-8775  Email: EFSchubert@rpi.edu
Assistant: Gina Moore 518-276-8072  Email: gina@ecse.rpi.edu

CONFIDENTIAL

EFS00027270

| | |
|---|---|
| **From:** | efredschubert@gmail.com on behalf of Schubert, E. Fred |
| **To:** | OTD, Pearce Conference Room; Lee, Sean |
| **Cc:** | Stevens, Ashley J; Anderson, Janine B |
| **Subject:** | Re: Meeting with Prof. Fred Schubert |
| **Date:** | Tuesday, January 12, 2010 1:42:30 PM |

I am confirmed! See you Friday.

Regards, Fred

On Tue, Jan 12, 2010 at 1:36 PM, OTD, Pearce Conference Room
<otdconf@bu.edu> wrote:

When: Friday, January 15, 2010 3:00 PM-4:30 PM (GMT-05:00) Eastern Time (US & Canada).

Where: 5th floor conf. room, 53 Bay State Road

Note: The GMT offset above does not reflect daylight saving time adjustments.

*~*~*~*~*~*~*~*~*~*

To discuss revival and return of invention, currently abandoned at USPTO.

--
E. Fred Schubert, Rensselaer Polytechnic Institute
110 Eighth Street, Troy, New York 12180
Office: 518-276-8775  Email: EFSchubert@rpi.edu
Assistant: Gina Moore 518-276-8072  Email: gina@ecse.rpi.edu

**BU001147**

| From: | Schubert, E. Fred |
|---|---|
| To: | Fritsch, Robin |
| Cc: | Anderson, Janine B |
| Subject: | Return of patent to inventor |
| Date: | Tuesday, June 01, 2010 12:25:58 PM |

Dear Ms. Fritsch

I am Fred Schubert, formerly a faculty member at Boston University (BU). I am contacting you in regards to a US patent that Boston University offered to return to me, the inventor. The patent, US-6-294-475, was issued in 2001, and it is my understanding that the patent was invented with the support of NSF and ONR. I have expressed my willingness to accept the return of the patent to me. Last week, Ms. Janine Anderson of BU informed me that you would be the contact person at NSF associated with this return. Therefore, could you please advise me on the process / procedure that needs to be followed to facilitate the return? I would be willing to travel to Arlington and meet with you at NSF so that we could discuss the return.

Thank you in advance.

Sincerely, Fred Schubert

| From: | Fritsch, Robin C. |
|---|---|
| To: | Schubert, E. Fred |
| Cc: | Anderson, Janine B; Fritsch, Robin C. |
| Subject: | RE: Return of patent to inventor |
| Date: | Tuesday, June 01, 2010 1:10:37 PM |

I need to know the name of the invention, the University ID number, and the NSF Grant Number so that I can pull the file.  Do you know if NSF or ONR is primary?  ONR will also need to be contacted. Thanks, Robin

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Tuesday, June 01, 2010 12:24 PM
**To:** Fritsch, Robin C.
**Cc:** Anderson, Janine B
**Subject:** Return of patent to inventor

Dear Ms. Fritsch

I am Fred Schubert, formerly a faculty member at Boston University (BU). I am contacting you in regards to a US patent that Boston University offered to return to me, the inventor. The patent, US-6-294-475, was issued in 2001, and it is my understanding that the patent was invented with the support of NSF and ONR. I have expressed my willingness to accept the return of the patent to me. Last week, Ms. Janine Anderson of BU informed me that you would be the contact person at NSF associated with this return.  Therefore, could you please advise me on the process / procedure that needs to be followed to facilitate the return? I would be willing to travel to Arlington and meet with you at NSF so that we could discuss the return.

Thank you in advance.

Sincerely, Fred Schubert

| | |
|---|---|
| **From:** | Schubert, E. Fred |
| **To:** | Fritsch, Robin C. |
| **Cc:** | Anderson, Janine B |
| **Subject:** | Re: Return of patent to inventor |
| **Date:** | Tuesday, June 01, 2010 2:27:02 PM |
| **Attachments:** | 2001-US-6-294-475-Crystallographic-wet-chemical-etching.pdf |
| | 1997-10-01 NSF BU Award 9714047-EFSchubert-Enhancementof acceptor doping.pdf |

Dear Ms. Fritsch

Here is the information you requested:

US Patent number: US-6-294-475
US Patent title: Crystallographic wet chemical etching of III-nitride material
I have attached a copy of the patent.

NSF award number: 9714047
NSF award title: "Enhancement of deep acceptor activation in semiconductors by superlattice doping"
NSF award start date: October 1, 1997
Principal Investigator: E. Fred Schubert
I have attached a print-out of the NSF award.

Boston University case number of the patent: BU-98-11.
Presently, I do not know if ONR or NSF was the primary contract under which the invention was conceived. However, I plan to meet with Ms. Janine Anderson on Thursday this week and we may be able to identify the primary contract at that time.
I plan to contact ONR as well. I do not yet have a contact person at ONR but expect to receive that information soon.

Thank you.

Sincerely, Fred Schubert

On Tue, Jun 1, 2010 at 1:10 PM, Fritsch, Robin C. <rfritsch@nsf.gov> wrote:

I need to know the name of the invention, the University ID number, and the NSF Grant Number so that I can pull the file. Do you know if NSF or ONR is primary? ONR will also need to be contacted. Thanks, Robin

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Tuesday, June 01, 2010 12:24 PM
**To:** Fritsch, Robin C.
**Cc:** Anderson, Janine B

BU001150

**Subject:** Return of patent to inventor

Dear Ms. Fritsch

I am Fred Schubert, formerly a faculty member at Boston University (BU). I am contacting you in regards to a US patent that Boston University offered to return to me, the inventor. The patent, US-6-294-475, was issued in 2001, and it is my understanding that the patent was invented with the support of NSF and ONR. I have expressed my willingness to accept the return of the patent to me. Last week, Ms. Janine Anderson of BU informed me that you would be the contact person at NSF associated with this return. Therefore, could you please advise me on the process / procedure that needs to be followed to facilitate the return? I would be willing to travel to Arlington and meet with you at NSF so that we could discuss the return.

Thank you in advance.

Sincerely, Fred Schubert

--
E. Fred Schubert, Rensselaer Polytechnic Institute
110 Eighth Street, Troy, New York 12180
Office: 518-276-8775  Email: EFSchubert@rpi.edu
Assistant: Gina Moore 518-276-8072  Email: gina@ecse.rpi.edu

**BU001151**

US006294475B1

(12) **United States Patent**　　　　　　　(10) **Patent No.:**　　**US 6,294,475 B1**
Schubert et al.　　　　　　　　　　　　　(45) **Date of Patent:**　　　**Sep. 25, 2001**

(54) **CRYSTALLOGRAPHIC WET CHEMICAL ETCHING OF III-NITRIDE MATERIAL**

(75) Inventors: **E. Fred Schubert**, Canton; **Dean A. Stocker**, Jamaica Plain, both of MA (US)

(73) Assignee: **Trustees of Boston University**, Boston, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/338,709**

(22) Filed: **Jun. 23, 1999**

**Related U.S. Application Data**

(60) Provisional application No. 60/090,409, filed on Jun. 23, 1998.

(51) Int. Cl.[7] .................................................. **H01L 21/20**
(52) U.S. Cl. .......................... **438/712**; 438/718; 438/749
(58) Field of Search .................................. 438/712, 718, 438/749

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,397,711 | * | 8/1983 | Donnelly et al. .................... 156/643 |
| 5,059,552 | * | 10/1991 | Harder et al. ........................ 437/129 |
| 5,880,485 | * | 3/1999 | Marx et al. ............................. 257/94 |

FOREIGN PATENT DOCUMENTS

0383215　8/1990　(EP) .

OTHER PUBLICATIONS

Kim, B.J., J.W. Lee, H.S. Park, Y. Park and T.I. Kim, "Wet Etching of (0001) GaN/Al$_2$O$_3$ Grown by MOVPE", *Journal of Electronic Materials*, vol. 27, No. 5, 1998, pp. L32–L34.

Rotter, T., D. Uffmann, J. Ackermann, J. Aderhold, J. Stemmer and J. Graul, "Current Controlled Photoelectrochemical Etching of GaN Leaving Smooth Surfaces", *Nitride Semiconductors Symposium*, Dec. 1–5, 1997, pp. 1003–1008.

Weyher, J.L., S. Müller, I. Grzegory and S. Porowski, "Chemical Polishing of Bulk and Epitaxial GaN", *Journal of Crystal Growth*, vol. 182, 1997, pp. 17–22.

* cited by examiner

*Primary Examiner*—Robert Kunemund
(74) *Attorney, Agent, or Firm*—Samuels, Gauthier & Stevens, LLP

(57) **ABSTRACT**

A method of processing III-Nitride epitaxial layer system on a substrate. The process includes exposing non-c-plane surfaces of the III-nitride epitaxial layer system, for example by etching to a selected depth or cleaving, and crystallographical etching the epitaxial layer system in order to obtain crystallographic plane surfaces. In an exemplary embodiment, the III-Nitride epitaxial layer system includes GaN. In accordance with one aspect of the exemplary embodiment, the etching step includes reactive ion etching in a chlorine-based plasma, PEC etching in a KOH solution or cleaving, and the crystallographical etching step includes immersing the epitaxial layer system in a crystallographic etching chemical, such as phosphoric acid, molten KOH, KOH dissolved in ethylene glycol, sodium hydroxide dissolved in ethylene glycol, tetraethyl ammonium hydroxide, or tetramethyl ammonium hydroxide. Specific etching planes are chosen in accordance with varying the orientation of the exposing step, the etching chemical, and the temperature at which the epitaxial layer system is etched.

**20 Claims, 8 Drawing Sheets**



EXPOSING
NON-C-PLANE SURFACES
(ETCHING OR CLEAVING) — *300*

CRYSTALLOGRAPHIC
WET CHEMICAL
ETCH — *302*

BU001152



*FIG. 1*



*FIG. 3*

BU001153



*FIG. 2*

| CHEMICAL | TEMPERATURE (°C) | ETCH RATE (µm/min) | ETCHING PLANES OBSERVED |
|---|---|---|---|
| PHOSPHORIC ACID ($H_3PO_4$) | 108 – 195 | 0.013 – 3.2 | $\{10\bar{1}2\}, \{10\bar{1}3\}$ |
| POTASSIUM HYDROXIDE (KOH), MOLTEN | 150 – 247 | 0.003 – 2.3 | $\{10\bar{1}0\}, \{10\bar{1}\bar{1}\}$ |
| 10-50% KOH IN ETHYLENE GLYCOL ($CH_2OHCH_2OH$) | 90 –182 | 0.0015 – 1.3 | $\{10\bar{1}0\}$ |
| 20% NaOH IN ETHYLENE GLYCOL | 178 | 0.67 –1.0 | NONE |
| TETRAETHYL AMMONIUM HYDROXIDE (TEAH) | 91 | 0.007 | $\{10\bar{1}\bar{1}\}$ |
| TETRAMETHYL AMMONIUM HYDROXIDE (TMAH) | 76 | 0.013 | $\{10\bar{1}\bar{1}\}$ |

*FIG. 4*

BU001155



*FIG. 5A*



*FIG. 5B*



*FIG. 5C*



*FIG. 5D*

**BU001157**

A-0216



## *FIG. 6*



*FIG. 7*



*FIG. 8*

**BU001159**



FIG.10A

DEPOSIT A MASK

BIPOLAR TRANSISTOR

1000    MASK

1002

1004

FIG.10B

PHOTOENHANCED WET ETCH, LEAVING NEARLY VERTICAL WALLS AND ROUGH SURFACES

BIPOLAR TRANSISTOR

1000    1008

1006

1002

1004

FIG.10C

CRYSTALLOGRAPHIC ETCH WITH CHEMISTRY CHOSEN TO PRODUCE UNDERCUT WALLS AND SMOOTH SURFACES

BIPOLAR TRANSISTOR

1000    1010

1014    1004

1012

FIG.9A

DEPOSIT A MASK

LASER DIODE

MASK, 900

902

904

FIG.9B

REACTIVE ION ETCH, LEAVING ROUGH, NON-VERTICAL FACETS

LASER DIODE

900    906

902

904

FIG.9C

CRYSTALLOGRAPHIC ETCH WITH CHEMISTRY CHOSEN TO PRODUCE ATOMICALLY SMOOTH VERT FACETS

LASER DIODE

900    908

910

904

US 6,294,475 B1

**1**

# CRYSTALLOGRAPHIC WET CHEMICAL ETCHING OF III-NITRIDE MATERIAL

## PRIORITY INFORMATION

This application claims priority from provisional application Ser. No. 60/090,409 filed Jun. 23, 1998.

## SPONSORSHIP INFORMATION

This invention was developed with funding from the Office of Naval Research under grant no. N00014-98-1-0194 and from the National Science Foundation under grant no. ECS-9714047. The government has certain rights in the invention.

## BACKGROUND OF THE INVENTION

The invention relates to the field of semiconductor etching, and in particular to a process of crystallographic wet chemical etching of III-Nitride material, and in particular gallium nitride.

The III-Nitride materials system, gallium nitride (GaN) and its indium- and aluminum-containing alloys, shows great promise for producing high-speed electronic devices that operate efficiently at high temperatures. III-Nitrides are the material of choice for producing light-emitting devices including LEDs and lasers that operate at wavelengths throughout the visible and UV parts of the electromagnetic spectrum. These materials are extremely stable, allowing them to be used in high temperature and corrosive environments. Because of this stability, it is difficult to find methods for etching of III-Nitrides.

Most processing of the III-Nitrides is currently done by dry plasma etching. There are several disadvantages to dry etching, including rough surface profiles, ion-induced damage in the exposed surface areas and difficulty in obtaining smooth etched sidewalls, which are required for lasers, the expense of the equipment required.

Photoenhanced electro-chemical (PEC) wet etching has also been used for etching of GaN. PEC etching has the advantage of low surface damage and relatively low equipment cost, but there has not yet been found a method for producing smooth etched vertical sidewalls, which are required for lasers.

Even what seems to be a very small roughness can have a large effect on the reflectivity of a laser facet. FIG. **1** illustrates this point, showing a graph of the maximum reflectivity of a laser facet as a function of surface roughness in a typical InGaN/GaN laser structure. The best published roughness results from several different experimental groups are indicated by arrows in the figure. Note that most etching techniques produce a roughness of approximately 50 nm, allowing a maximum specular reflectivity of less than 1%. Production of laser facets using an etching technique is preferable to using cleaving or polishing because an entire wafer of several thousand lasers can be produced at one time by etching, but cleaving must be done on individual rows of devices, and polishing is an even more labor-intensive technique.

Recently, researchers at Xerox Corp. fabricated a laser using chemically assisted ion beam etching (CAIBE), producing sidewalls with a roughness of 4–6 nm. This is the lowest sidewall roughness ever reported for etching in the III-Nitride material system, but even with this roughness the reflectivity is only 60–70% of the ideal reflectivity, and the roughness is enough to cause interference fringes in the emitted laser beam.

**2**

It would be very beneficial to take advantage of the crystal structure of the III-Nitride material itself to produce atomically smooth crystallographic planes without damaging the surface. Such crystallographic planes would have reflectivities greater than 99% of the ideal reflectivity, given by the well known Fresnel formula, as compared to the above values of 1% and 60–70% for plasma etching and CAIBE, respectively. Improvement in facet reflectivity corresponds to higher output power and a better defined laser spot. Wet chemical etching has been used for producing atomically smooth crystallographic planes in other semiconductor materials systems, such as silicon, gallium arsenide, and gallium phosphide. Previously, prior to the invention, this had never been achieved in the III-Nitride materials system.

## SUMMARY OF THE INVENTION

The invention provides a method of processing a III-Nitride epitaxial layer system on a substrate. The process includes exposing non-c-plane surfaces of the III-Nitride epitaxial layer system, for example by etching to a selected depth or cleaving, and crystallographically etching the epitaxial layer system in order to obtain crystallographic plane surfaces. In an exemplary embodiment, the III-Nitride epitaxial layer system includes GaN. In accordance with one aspect of the exemplary embodiment, the exposing step includes reactive ion etching in a chlorine-based plasma, PEC etching in a KOH solution or cleaving, and the crystallographically etching step includes immersing the epitaxial layer system in a crystallographic etching chemical, such as phosphoric acid, molten KOH, KOH dissolved in ethylene glycol, sodium hydroxide dissolved in ethylene glycol, tetraethyl ammonium hydroxide, or tetramethyl ammonium hydroxide. Specific etching planes are chosen in accordance with varying the orientation of the exposing step, the etching chemical, and the temperature at which the epitaxial layer system is etched.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a graph of the maximum reflectivity of a laser facet as a function of surface roughness in a typical InOaN/GaN laser structure;

FIG. **2** is a high-resolution field effect SEM image of dislocation etch pits in the c-plane of GaN;

FIG. **3** is a flowchart showing the process of the invention;

FIG. **4** is a table summarizing etch rates and crystal planes observed for various chemicals used in accordance with the invention;

FIGS. **5A–5D** are SEM images of several illustrative examples of GaN epilayers crystallographically wet etched after cleaving;

FIG. **6** is an Arrhenius plot of GaN etch rates in KOH and 30% KOH dissolved in ethylene glycol;

FIG. **7** is an Arrhenius plot of etch rates for GaN in $H_3PO_4$;

FIG. **8** is a plot of GaN etch rate as a function of KOH concentration in ethylene glycol at 170° C.;

FIGS. **9A–9C** are stepwise block diagrams illustrating the processing of a laser diode in accordance with the invention; and

FIGS. **10A–10C** are stepwise block diagrams illustrating the processing of a bipolar transistor in accordance with the invention.

## DETAILED DESCRIPTION OF THE MENTION

The invention is directed to a method for achieving crystallographic wet chemical etching in the III-Nitrides.

BU001161

US 6,294,475 B1

3

While KOH-based solutions have been found to etch AlN and IneAlN, no acid or base solution had previously been identified that is able to etch high-quality GaN. In accordance with one embodiment of the process of the invention, ethylene glycol, instead of water, is used as a solvent for KOH and NaOH so that temperatures between 90° C. and 180° C. are able to be employed. These temperatures exceed the boiling point of water and are considerably higher than the temperatures used in previous processes. The samples used were grown on c-plane sapphire substrates, and include n-type GaN epilayers grown by metal-organic chemical vapor deposition (MOCVD), MOCVD-grown p-type GaN epilayers, MOCVD-grown AlGaN/GaN heterostructures, and MOCVD-grown InGaN/GaN heterostructures on thick GaN layers grown by hydride vapor phase epitaxy. Epitaxial GaN has commonly a hexagonal crystal structure, and the top surface plane is the c-plane or <0001> plane.

Molten KOH is known to form pits at dislocations in the c-plane of GaN. What was observed in accordance with the invention, however, was that non-c-planes can be crystallographically etched by molten KOH. The c-plane, the top surface of the GaN crystal, is impervious to all of the chemicals with which etching had been attempted. By employing an initial processing step, however, less stable crystal planes are exposed that are susceptible to various chemicals. This unexpected result has been explored in several experiments by the applicants, and applicants have identified other etching solutions that are able to etch various crystallographic planes into not only GaN, but also InGaN and AlGaN. From these experiments, a two-step process for crystallographic etching of the III-Nitrides has been developed.

As described before, molten KOH and hot phosphoric acid ($H_3PO_4$) have previously been shown to etch pits at defect sites in the c-plane of GaN. Applicants have now observed the formation of etch pits with facets that correspond to various GaN crystal faces by etching in $H_3PO_4$ above 160° C., in molten KOH above 180° C., in KOH dissolved in ethylene glycol above 135° C., and in NaOH dissolved in ethylene glycol at 180° C. All of the hexagonal etch pits share a common base, i.e. the <11$\bar{2}$0> direction, but intersect the c-plane at a wide variety of angles. This is because the faces are actually produced by two or more competing etch planes, as can be seen in FIG. 2. FIG. 2 is a high-resolution field effect SEM image of dislocation etch pits in the c-plane of GaN, produced by etching in 10% KOH by weight, dissolved in ethylene glycol at 165° C. The etchant temperatures are monitored using a thermocouple, and are accurate to within 5° C. The etch pit density is approximately $2 \times 10^6$ cm$^{-2}$ in $H_3PO_4$ and $6 \times 10^7$ cm$^{-2}$ in hydroxide-containing etchants.

FIG. 3 is a flowchart showing the process of the invention. The first of the two steps in the crystallographic etching process, exposing non-c-plane surfaces, can be used to establish the etching depth (step 300), and it can be performed by several common processing methods. For the first step, several different processing methods have been used, including reactive ion etching in a chlorine-based plasma, PEC etching in a KOH solution, and cleaving. The second step is done by immersion in a chemical that is able to crystallographically etch GaN (step 302). This etching step can produce smooth crystallographic surfaces, and the specific etching planes can be chosen by varying the orientation of the first step, the chemical agents, and the temperature. The etch rates and crystal planes observed for all chemicals used in this work are summarized in the table of FIG. 4. Crystallographic etching has been achieved using phospho-

4

ric acid, molten potassium hydroxide (KOH), KOH dissolved in ethylene glycol, sodium hydroxide dissolved in ethylene glycol, tetraethyl ammonium hydroxide (TEAH), and tetramethyl ammonium hydroxide (TMAH). The etching planes listed in this table are those that appear during the etch. Because the c-plane {0001} is impervious to all of these chemicals except at defect sites where etch pits occur, it is also an etch plane, with a negligibly small etch rate.

FIGS. 5A–5D are SEM images of several illustrative examples of GaN epilayers that have been crystallographically wet etched after cleaving. FIGS. 5A and 5B show samples etched in $H_3PO_4$ at 132° C. The {10$\bar{1}$3} plane shown in FIG. 5A appears along the side of the sample cleaved along the GaN a-plane {11$\bar{2}$0}. The {10$\bar{1}$2} plane shown in FIG. 5B appears along the side of the sample cleaved along the GaN m-plane. The {10$\bar{1}$0} plane shown in FIG. 5C was produced by etching in 10% KOH by weight dissolved in ethylene glycol at 165° C. This plane has been examined using an FESEM with a resolution of 5 nm at 2.5 kV, and the surface appears perfectly smooth at this resolution. The {10$\bar{1}\bar{1}$} plane shown in FIG. 5D was produced by etching in molten KOH at 184° C.

The activation energies for etching in these various solutions is 0.9 eV, or 21 kcal/mol, as inferred from the Arrhenius plots in FIGS. 6 and 7. Note that this is equal to the calculated heat of formation of GaN, 0.90 eV. The activation energy indicates that the etch is reaction-rate limited. If the etching were diffusion limited, an activation energy in the 1–6 kcal/mol range would be expected.

FIG. 6 is an Arrhenius plot of GaN etch rates in KOH and 30% KOH dissolved in ethylene glycol. Solid and hollow symbols represent etch rates measured along cleaved edges parallel to the {11$\bar{2}$0} a-plane and the {10$\bar{1}$0} m-plane, respectively.

FIG. 7 is an Arrhenius plot of etch rates for GaN in $H_3PO_4$.

FIG. 8 is a plot of GaN etch rate as a function of KOH concentration in ethylene glycol at 170° C. Solid and hollow symbols represent etch rates measured along cleaved edges parallel to the {11$\bar{2}$0} a-plane and the {10$\bar{1}$0} m-plane, respectively.

The etch rates shown in FIGS. 6–8 are measured perpendicular to the growth direction, i.e. in the "horizontal" c-plane. For "vertical" planes, such as the {10$\bar{1}$0} plane, the actual etch rate of the plane is equal to the etch rate measured. For non-vertical planes, however, the etch rate of the plane is actually less than the measured etch rate. The etch rate perpendicular to the {10$\bar{1}$2} plane, for instance, is the etch rate shown in FIG. 7 multiplied by cos(46°), because the {10$\bar{1}$2} plane intersects the vertical {10$\bar{1}$0} plane at an angle of 46°.

It is interesting to note that the etch rate of KOH dissolved in ethylene glycol is higher than the etch rate of molten KOH at the same temperature. In fact, the etch rate as a function of concentration peaks at a value of 40% KOH by weight in ethylene glycol, as can be seen in FIG. 8. It is believed that this is due to high solubility of the etch products in ethylene glycol.

Because the c-plane is impervious to all of the chemicals used in this study, no etch mask is required for the crystallographic etching step. The c-plane itself acts as a mask. An etch mask may be necessary, however, if long etching times are used, to prevent the development of etch pits at defect sites. For this purpose we have successfully used titanium masks after annealing at 900° C. for 30 seconds and nickel masks after annealing at 650° C. for 2 minutes.

BU001162

US 6,294,475 B1

**5**

FIGS. 9A–9C are step-wise block diagrams illustrating the processing of a laser diode in accordance with the invention. Initially, a mask 900 is deposited on a III-Nitride device structure 902, which is configured on a sapphire substrate 904. A reactive ion etch leaves rough, non-vertical facets 906 in the structure. A crystallographic etch produces atomically smooth vertical facets 908, 910.

FIGS. 10A–10C are step-wise block diagrams illustrating the processing of a bipolar transistor in accordance with the invention. Initially, a mask 1000 is deposited on a III-Nitride device structure 1002, which is configured on a sapphire substrate 1004. A photoenhanced wet etch leaves nearly vertical walls 1006 and rough surfaces 1008. A crystallographic etch produces undercut walls 1010, 1012 and atomically smooth surfaces 1014.

In conclusion, a powerful anisotropic wet chemical etching technique is presented. Etch rates as high as 3 $\mu m$/min have been demonstrated. Because the etch is crystallographic in nature, we demonstrate smooth vertical sidewalls with an RMS roughness smaller than the 5 nm resolution of the FESEM. This is the smallest reported roughness for etched GaN sidewalls, indicating the usefulness of this etch for high-reflectivity laser facets. The ability to undercut is also important for decreasing capacitance in applications such as bipolar transistors.

Although the present invention has been shown and described with respect to several preferred embodiments thereof, various changes, omissions and additions to the form and detail thereof, may be made therein, without departing from the spirit and scope of the invention.

What is claimed is:

1. A method of processing a III-Nitride epitaxial layer system provided on a substrate, comprising:

   exposing non-c-plane surfaces of said III-Nitride epitaxial layer system; and

   crystallographically etching said epitaxial layer system in order to obtain crystallographic plane surfaces.

2. The method of claim 1, wherein said III-Nitride epitaxial layer system comprises GaN.

3. The method of claim 1, wherein said exposing step comprises reactive ion etching in a chlorine-based plasma, PEC etching in a KOH solution or cleaving.

4. The method of claim 1, wherein said crystallographically etching step comprises immersing said epitaxial layer system in a crystallographic etching chemical.

5. The method of claim 4, wherein said chemical comprises phosphoric acid, molten KOH, KOH dissolved in ethylene glycol, sodium hydroxide dissolved in ethylene glycol, tetraethyl ammonium hydroxide or tetramethyl ammonium hydroxide.

6. The method of claim 4, wherein specific etching planes are chosen in accordance with varying the orientation of said first etching step, said etching chemical, and the temperature at which said epitaxial layer system is etched.

7. The method of claim 1, wherein a laser diode is processed.

8. The method of claim 1, wherein a bipolar transistor is processed.

9. A method of processing a III-Nitride epitaxial layer system provided on a substrate to produce a laser diode, comprising:

**6**

   reactive etching said III-Nitride epitaxial layer system to a selected depth; and

   crystallographically etching said epitaxial layer system in order to obtain substantially atomically smooth vertical surfaces.

10. A method of processing a III-Nitride epitaxial layer system provided on a substrate to produce a bipolar transistor, comprising:

   photoenhanced wet etching said III-Nitride epitaxial layer system to a selected depth; and

   crystallographically etching said epitaxial layer system in order to obtain undercut walls and substantially atomically smooth surfaces.

11. A method of processing a III-Nitride epitaxial layer system comprising:

   providing a III-Nitride epitaxial layer system on a substrate; and

   wet chemical crystallographic etching said epitaxial layer system along non-c-plane crystal directions.

12. The method of claim 11, wherein said epitaxial layer system comprises GaN.

13. A method of processing a III-Nitride epitaxial layer system comprising:

   providing a III-Nitride epitaxial layer system on a substrate; and

   crystallographically etching said epitaxial layer system by immersing said epitaxial layer system into a liquid chemical.

14. The method of claim 13, wherein said epitaxial layer system comprises GaN.

15. The method of claim 13, wherein said liquid chemical includes molten KOH, KOH dissolved in ethylene glycol, NaOH dissolved in ethylene glycol, phosphoric acid, tetraethyl ammonium hydroxide, or tetramethyl ammonium hydroxide.

16. The method of claim 13, wherein said liquid chemical is heated.

17. A method of processing a III-Nitride epitaxal material system comprising:

   providing a III-Nitride epitaxial layer system on a substrate;

   etching said epitaxial layer system along c-plane crystal directions; and

   wet chemical crystallographic etching said epitaxial layer system along non-c-plane crystal directions.

18. The method of claim 17, wherein said epitaxial layer system comprises GaN.

19. The method of claim 17, wherein said first etching step comprises reactive ion etching, ion milling, low-energy electron enhanced etching, photo-electrochemical etching, chemically assisted ion beam etching, or enhanced forms of reactive ion etching.

20. A method of processing a GaN layer in order to produce semiconductor laser facets comprising:

   providing a GaN on a substrate; and

   wet chemical crystallographic etching said GaN layer in order to obtain substantially atomically flat surfaces.

\* \* \* \* \*

BU001163

## National Science Foundation
WHERE DISCOVERIES BEGIN

SEARCH

NSF Web Site

| HOME | FUNDING | **AWARDS** | DISCOVERIES | NEWS | PUBLICATIONS | STATISTICS | ABOUT | FastLane |

### Award Abstract #9714047

### Enhancement of Deep Acceptor Activation in Semiconductors by Superlattice Doping

| | |
|---|---|
| **NSF Org:** | ECCS<br>Division of Electrical, Communications and Cyber Systems |
| **Initial Amendment Date:** | September 25, 1997 |
| **Latest Amendment Date:** | March 27, 2001 |
| **Award Number:** | 9714047 |
| **Award Instrument:** | Standard Grant |
| **Program Manager:** | Filbert J. Bartoli<br>ECCS Division of Electrical, Communications and Cyber Systems<br>ENG Directorate for Engineering |
| **Start Date:** | October 1, 1997 |
| **Expires:** | June 30, 2001 (Estimated) |
| **Awarded Amount to Date:** | $278116 |
| **Investigator(s):** | E. Schubert EFSchubert@rpi.edu (Principal Investigator) |
| **Sponsor:** | Trustees of Boston University<br>881 COMMONWEALTH AVE<br>BOSTON, MA 02215 617/353-4365 |
| **NSF Program(s):** | ELECT, PHOTONICS, & DEVICE TEC |
| **Field Application(s):** | 0206000 Telecommunications |
| **Program Reference Code(s):** | OTHR, 0000 |
| **Program Element Code(s):** | 1517 |

### ABSTRACT

9714047 Schubert Research in III-V nitride material system has resulted in significant improvements in material quality over the last few years, and has resulted in the demonstration of high temperature transistors, efficient light emitting diodes, and lasers emitting in the ultraviolet and blue regions of the optical spectrum. However, in order to produce, reliable GaN-based devices, several materials challenges must yet be overcome, including increasing the p-type dopant concentrations attainable in these structures. In this work, Prof. Schubert and his graduate student propose to overcome this p-doping limitation by means of "superlattice doping". Superlattice doping, the short period compositional modulation of uniformly doped semiconductors, promises to decrease the effective activation energy of acceptors in GaN, thereby enhancing the free hole concentration by approximately one order of magnitude. Abrupt and parabolically graded composition modulation in the AlGaN/GaN material system will be investigated and the influence of the grading on in-plane and perpendicular hole transport will be studied. ***

BU001164

A-0223

| | |
|---|---|
| **From:** | Fritsch, Robin C. |
| **To:** | Schubert, E. Fred |
| **Cc:** | Anderson, Janine B |
| **Subject:** | RE: Return of patent to inventor |
| **Date:** | Tuesday, June 01, 2010 2:43:10 PM |

I'll try to find it in our files to determine who was primary.  R.

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Tuesday, June 01, 2010 2:27 PM
**To:** Fritsch, Robin C.
**Cc:** Anderson, Janine B
**Subject:** Re: Return of patent to inventor

Dear Ms. Fritsch

Here is the information you requested:

US Patent number: US-6-294-475
US Patent title: Crystallographic wet chemical etching of III-nitride material
I have attached a copy of the patent.

NSF award number: 9714047
NSF award title: "Enhancement of deep acceptor activation in semiconductors by superlattice doping"
NSF award start date: October 1, 1997
Principal Investigator: E. Fred Schubert
I have attached a print-out of the NSF award.

Boston University case number of the patent: BU-98-11.
Presently, I do not know if ONR or NSF was the primary contract under which the invention was conceived. However, I plan to meet with Ms. Janine Anderson on Thursday this week and we may be able to identify the primary contract at that time.
I plan to contact ONR as well. I do not yet have a contact person at ONR but expect to receive that information soon.

Thank you.

Sincerely, Fred Schubert

On Tue, Jun 1, 2010 at 1:10 PM, Fritsch, Robin C. <rfritsch@nsf.gov> wrote:
I need to know the name of the invention, the University ID number, and the NSF Grant Number so that I can pull the file.  Do you know if NSF or ONR is primary?  ONR will also need to be contacted.  Thanks, Robin

**BU001165**

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Tuesday, June 01, 2010 12:24 PM
**To:** Fritsch, Robin C.
**Cc:** Anderson, Janine B

**Subject:** Return of patent to inventor

Dear Ms. Fritsch

I am Fred Schubert, formerly a faculty member at Boston University (BU). I am contacting you in regards to a US patent that Boston University offered to return to me, the inventor. The patent, US-6-294-475, was issued in 2001, and it is my understanding that the patent was invented with the support of NSF and ONR. I have expressed my willingness to accept the return of the patent to me. Last week, Ms. Janine Anderson of BU informed me that you would be the contact person at NSF associated with this return. Therefore, could you please advise me on the process / procedure that needs to be followed to facilitate the return? I would be willing to travel to Arlington and meet with you at NSF so that we could discuss the return.

Thank you in advance.

Sincerely, Fred Schubert

--
E. Fred Schubert, Rensselaer Polytechnic Institute
110 Eighth Street, Troy, New York 12180
Office: 518-276-8775  Email: EFSchubert@rpi.edu
Assistant: Gina Moore 518-276-8072  Email: gina@ecse.rpi.edu

| From: | Fritsch, Robin C. |
|---|---|
| To: | Schubert, E. Fred |
| Cc: | Anderson, Janine B; Petrosky, Carol; Fritsch, Robin C. |
| Subject: | RE: Return of patent to inventor |
| Date: | Wednesday, June 02, 2010 9:37:12 AM |

Dr. Schubert:

I've spoken to Carol Petrosky at ONR and they are the lead agency on this matter.  Carol will provide you guidance on obtaining principal rights to the patent from ONR.

Thanks,

Robin

---

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Tuesday, June 01, 2010 8:43 PM
**To:** Fritsch, Robin C.
**Cc:** Anderson, Janine B
**Subject:** Re: Return of patent to inventor

Thank you - I appreciate it.

Sincerely, Fred Schubert

On Tue, Jun 1, 2010 at 2:44 PM, Fritsch, Robin C. <rfritsch@nsf.gov> wrote:
I'll try to find it in our files to determine who was primary.  R.

---

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Tuesday, June 01, 2010 2:27 PM

**To:** Fritsch, Robin C.
**Cc:** Anderson, Janine B
**Subject:** Re: Return of patent to inventor

Dear Ms. Fritsch

Here is the information you requested:

US Patent number: US-6-294-475
US Patent title: Crystallographic wet chemical etching of III-nitride material
I have attached a copy of the patent.

NSF award number: 9714047
NSF award title: "Enhancement of deep acceptor activation in semiconductors by superlattice doping"
NSF award start date: October 1, 1997
Principal Investigator: E. Fred Schubert
I have attached a print-out of the NSF award.

**BU001167**

Boston University case number of the patent: BU-98-11.
Presently, I do not know if ONR or NSF was the primary contract under which the invention
was conceived. However, I plan to meet with Ms. Janine Anderson on Thursday this week
and we may be able to identify the primary contract at that time.
I plan to contact ONR as well. I do not yet have a contact person at ONR but expect to
receive that information soon.

Thank you.

Sincerely, Fred Scbubert

On Tue, Jun 1, 2010 at 1:10 PM, Fritsch, Robin C. <rfritsch@nsf.gov> wrote:
I need to know the name of the invention, the University ID number, and the NSF Grant Number
so that I can pull the file. Do you know if NSF or ONR is primary? ONR will also need to be
contacted. Thanks, Robin

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Tuesday, June 01, 2010 12:24 PM
**To:** Fritsch, Robin C.
**Cc:** Anderson, Janine B

**Subject:** Return of patent to inventor

Dear Ms. Fritsch

I am Fred Schubert, formerly a faculty member at Boston University (BU). I am contacting
you in regards to a US patent that Boston University offered to return to me, the inventor.
The patent, US-6-294-475, was issued in 2001, and it is my understanding that the patent was
invented with the support of NSF and ONR. I have expressed my willingness to accept the
return of the patent to me. Last week, Ms. Janine Anderson of BU informed me that you
would be the contact person at NSF associated with this return. Therefore, could you please
advise me on the process / procedure that needs to be followed to facilitate the return? I
would be willing to travel to Arlington and meet with you at NSF so that we could discuss
the return.

Thank you in advance.

Sincerely, Fred Schubert

--
E. Fred Schubert, Rensselaer Polytechnic Institute

**BU001168**

110 Eighth Street, Troy, New York 12180
Office: 518-276-8775 Email: EFSchubert@rpi.edu
Assistant: Gina Moore 518-276-8072 Email: gina@ecse.rpi.edu


--
E. Fred Schubert, Rensselaer Polytechnic Institute
110 Eighth Street, Troy, New York 12180
Office: 518-276-8775 Email: EFSchubert@rpi.edu
Assistant: Gina Moore 518-276-8072 Email: gina@ecse.rpi.edu

**BU001169**

A-0228

| | |
|---|---|
| **From:** | Fritsch, Robin C. |
| **To:** | Schubert, E. Fred |
| **Cc:** | Anderson, Janine B; Petrosky, Carol |
| **Subject:** | RE: US Patent 6,294,475 |
| **Date:** | Sunday, June 20, 2010 11:19:28 AM |
| **Attachments:** | schubert #1 patent.pdf |
| | schubert #2 patent.pdf |

Hi Dr. Schubert:

I believe you, I, Janine Anderson from Boston University and Carol Petrosky from ONR corresponded about this patent in early June (see attached email notes). ONR is the lead agency on this patent. Therefore, you will need to follow their procedures for reassignment of principal rights from the University to you, the inventor. Carol Petrosky is my ONR patent contact, and I have copied her on this note. All the best,

Robin Clay


Robin Clay
NSF Patent Assistant
National Science Foundation
703 292-7854
fax: 703 292-9041


**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Saturday, June 19, 2010 8:56 AM
**To:** Fritsch, Robin C.
**Subject:** US Patent 6,294,475

To:     Ms. Robin Fritsch, National Science Foundation
        4201 Wilson Boulevard, Arlington, Virginia 22230
        Email: < rfritsch@nsf.gov >

From:   Dr. E. Fred Schubert, 17 Eaton Road, Troy NY 12180
        Email: < EFredSchubert@gmail.com >
        Telephone: 518-271-2044; Mobile: 518-810-6915

Subject:   US Patent 6,294,475

Date:   June 19, 2010

Subject:   US Patent 6,294,475


Dear Ms. Fritsch

This communication concerns US Patent 6,294,475 (copy attached). I am one of the inventors of the patent. In a recent letter from Boston University's Vinit Nijhawan, Managing Director,

**BU001170**

Technology Development Office, the University informed me of the following:

"Since you [Dr. Schubert] used federal funding in the course of research that led to the Patent Rights, the University must obtain the consent of the Office of Naval Research and the National Science Foundation to assign the Patent Rights to you. We are notifying the ONR and the NSF that we are relinquishing our rights to the invention and returning the invention to the ONR and the NSF. You now need to request title of this invention from the ONR and NSF and your request should be directed to John Karasek at the ONR and Robin Fritsch at the NSF."

In accordance with the above statement, I hereby request the title to the US Patent 6,294,475.

I will be in the Washington area next week (week of June 21, 2010), and would be happy to meet with you, if this could be helpful in the title transfer.

If you need any additional information from my side, please do not hesitate to contact me.

Thank you in advance.

Sincerely, E. Fred Schubert

## Fritsch, Robin C.

| | |
|---|---|
| **From:** | Fritsch, Robin C. |
| **Sent:** | Wednesday, June 02, 2010 9:38 AM |
| **To:** | 'Schubert, E. Fred' |
| **Cc:** | Anderson, Janine B; 'Petrosky, Carol'; Fritsch, Robin C. |
| **Subject:** | RE: Return of patent to inventor |

Dr. Schubert:

I've spoken to Carol Petrosky at ONR and they are the lead agency on this matter. Carol will provide you guidance on obtaining principal rights to the patent from ONR.

Thanks,

Robin

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Tuesday, June 01, 2010 8:43 PM
**To:** Fritsch, Robin C.
**Cc:** Anderson, Janine B
**Subject:** Re: Return of patent to inventor

Thank you - I appreciate it.

Sincerely, Fred Schubert

On Tue, Jun 1, 2010 at 2:44 PM, Fritsch, Robin C. <rfritsch@nsf.gov> wrote:

I'll try to find it in our files to determine who was primary. R.

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Tuesday, June 01, 2010 2:27 PM

**To:** Fritsch, Robin C.
**Cc:** Anderson, Janine B
**Subject:** Re: Return of patent to inventor

Dear Ms. Fritsch

Here is the information you requested:

US Patent number: US-6-294-475

US Patent title: Crystallographic wet chemical etching of III-nitride material

I have attached a copy of the patent.


NSF award number: 9714047

NSF award title: "Enhancement of deep acceptor activation in semiconductors by superlattice doping"

NSF award start date: October 1, 1997

Principal Investigator: E. Fred Schubert

I have attached a print-out of the NSF award.


Boston University case number of the patent: BU-98-11.

Presently, I do not know if ONR or NSF was the primary contract under which the invention was conceived. However, I plan to meet with Ms. Janine Anderson on Thursday this week and we may be able to identify the primary contract at that time.

I plan to contact ONR as well. I do not yet have a contact person at ONR but expect to receive that information soon.


Thank you.


Sincerely, Fred Schubert


On Tue, Jun 1, 2010 at 1:10 PM, Fritsch, Robin C. <rfritsch@nsf.gov> wrote:

I need to know the name of the invention, the University ID number, and the NSF Grant Number so that I can pull the file.  Do you know if NSF or ONR is primary?  ONR will also need to be contacted.  Thanks, Robin

---

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Tuesday, June 01, 2010 12:24 PM
**To:** Fritsch, Robin C.
**Cc:** Anderson, Janine B

**Subject:** Return of patent to inventor

Dear Ms. Fritsch

I am Fred Schubert, formerly a faculty member at Boston University (BU). I am contacting you in regards to a US patent that Boston University offered to return to me, the inventor. The patent, US-6-294-475, was issued in 2001, and it is my understanding that the patent was invented with the support of NSF and ONR. I have expressed my willingness to accept the return of the patent to me. Last week, Ms. Janine Anderson of BU informed me that you would be the contact person at NSF associated with this return.  Therefore, could you please advise me on the process / procedure that needs to be followed to facilitate the return? I would be willing to travel to Arlington and meet with you at NSF so that we could discuss the return.

Thank you in advance.

Sincerely, Fred Schubert

--
E. Fred Schubert, Rensselaer Polytechnic Institute
110 Eighth Street, Troy, New York 12180
Office: 518-276-8775  Email: EFSchubert@rpi.edu
Assistant: Gina Moore 518-276-8072  Email: gina@ecse.rpi.edu

--
E. Fred Schubert, Rensselaer Polytechnic Institute
110 Eighth Street, Troy, New York 12180
Office: 518-276-8775  Email: EFSchubert@rpi.edu
Assistant: Gina Moore 518-276-8072  Email: gina@ecse.rpi.edu

## Fritsch, Robin C.

| | |
|---|---|
| **From:** | Anderson, Janine B [jandersn@bu.edu] |
| **Sent:** | Wednesday, June 02, 2010 9:55 AM |
| **To:** | Fritsch, Robin C.; Schubert, E. Fred |
| **Cc:** | Petrosky, Carol |
| **Subject:** | RE: Return of patent to inventor |
| | |
| **Importance:** | High |

Dear Carol,

This is the invention I contacted you about.  You referred me to John Karasek and provided me with his email address.  I have emailed him several times inquiring as to the procedures Boston University should follow in returning this invention to Dr. Schubert and have not heard back from him.  Can you assist in expediting this process.

Robin – thank you for assistance in this matter.  We will be sending Dr. Schubert a letter notifying him that Boston University has approved his request to have the invention returned to him and will copy you on our letter to him.

Many thanks.
Best,
Janine

Janine B. Anderson
Patent Manager, Technology Transfer
Boston University
Technology Development Office
53 Bay State Road
Boston, MA 02215
Tel: (617) 358-0238
Fax: (617) 353-6141
email: jandersn@bu.edu
Web: www.bu.edu/otd/

---

**From:** Fritsch, Robin C. [mailto:rfritsch@nsf.gov]
**Sent:** Wednesday, June 02, 2010 9:38 AM
**To:** Schubert, E. Fred
**Cc:** Anderson, Janine B; Petrosky, Carol; Fritsch, Robin C.
**Subject:** RE: Return of patent to inventor

Dr. Schubert:

I've spoken to Carol Petrosky at ONR and they are the lead agency on this matter.  Carol will provide you guidance on obtaining principal rights to the patent from ONR.

Thanks,

Robin

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Tuesday, June 01, 2010 8:43 PM
**To:** Fritsch, Robin C.
**Cc:** Anderson, Janine B
**Subject:** Re: Return of patent to inventor

Thank you - I appreciate it.

Sincerely, Fred Schubert

On Tue, Jun 1, 2010 at 2:44 PM, Fritsch, Robin C. <rfritsch@nsf.gov> wrote:

I'll try to find it in our files to determine who was primary. R.

From: Schubert, E. Fred [mailto:efredschubert@gmail.com]
Sent: Tuesday, June 01, 2010 2:27 PM

To: Fritsch, Robin C.
Cc: Anderson, Janine B
Subject: Re: Return of patent to inventor

Dear Ms. Fritsch

Here is the information you requested:

US Patent number: US-6-294-475

US Patent title: Crystallographic wet chemical etching of III-nitride material

I have attached a copy of the patent.

NSF award number: 9714047

NSF award title: "Enhancement of deep acceptor activation in semiconductors by superlattice doping"

NSF award start date: October 1, 1997

Principal Investigator: E. Fred Schubert

I have attached a print-out of the NSF award.

Boston University case number of the patent: BU-98-11.

Presently, I do not know if ONR or NSF was the primary contract under which the invention was conceived. However, I plan to meet with Ms. Janine Anderson on Thursday this week and we may be able to identify the primary contract at that time.

I plan to contact ONR as well. I do not yet have a contact person at ONR but expect to receive that information soon.

Thank you.

Sincerely, Fred Schubert

On Tue, Jun 1, 2010 at 1:10 PM, Fritsch, Robin C. <rfritsch@nsf.gov> wrote:

I need to know the name of the invention, the University ID number, and the NSF Grant Number so that I can pull the file. Do you know if NSF or ONR is primary? ONR will also need to be contacted. Thanks, Robin

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Tuesday, June 01, 2010 12:24 PM
**To:** Fritsch, Robin C.
**Cc:** Anderson, Janine B

**Subject:** Return of patent to inventor

Dear Ms. Fritsch

I am Fred Schubert, formerly a faculty member at Boston University (BU). I am contacting you in regards to a US patent that Boston University offered to return to me, the inventor. The patent, US-6-294-475, was issued in 2001, and it is my understanding that the patent was invented with the support of NSF and ONR. I have expressed my willingness to accept the return of the patent to me. Last week, Ms. Janine Anderson of BU informed me that you would be the contact person at NSF associated with this return. Therefore, could you please advise me on the process / procedure that needs to be followed to facilitate the return? I would be willing to travel to Arlington and meet with you at NSF so that we could discuss the return.

Thank you in advance.

Sincerely, Fred Schubert

--
E. Fred Schubert, Rensselaer Polytechnic Institute
110 Eighth Street, Troy, New York 12180
Office: 518-276-8775  Email: EFSchubert@rpi.edu
Assistant: Gina Moore 518-276-8072  Email: gina@ecse.rpi.edu

--
E. Fred Schubert, Rensselaer Polytechnic Institute
110 Eighth Street, Troy, New York 12180
Office: 518-276-8775  Email: EFSchubert@rpi.edu
Assistant: Gina Moore 518-276-8072  Email: gina@ecse.rpi.edu

| **From:** | Schubert, E. Fred |
|---|---|
| **To:** | Anderson, Janine B |
| **Subject:** | US Patent 6,294,475 |
| **Date:** | Friday, October 08, 2010 2:37:27 PM |
| **Attachments:** | 2010-09-29A ONR-to-EFSchubert Patent BU Wet Etching-Transfer of Title to EFS.pdf |
| | 2010-09-29B EFSchubert-to-ONR Patent BU Wet Etching-License for ONR.pdf |
| | 2010-10-08 NSF-to-EFSchubert-Patent BU Wet Etching-Transfer of Title to EFS.pdf |

Dear Ms. Anderson,

This email is in further communication regarding the assignment of the patent rights of US Patent 6,294,475 to me, E. Fred Schubert.

The letter from Mr. Nijhawan Vinit, dated July 16, 2010, indicates that Boston University (BU) will file the assignment of the patent rights of US Patent 6,294,475 to me once the Office of Naval Research (ONR) and the National Science Foundation (NSF) have given consent.

ONR has now approved Boston University's assignment of its rights of US Patent 6,294,475 to me. Ms. Robin Clay from the NSF informed me that ONR is the designated lead agency in this invention and as such makes the determination regarding the transfer of principal rights to the inventor on behalf of the government. I have attached the documents from ONR and NSF to this email.

I would appreciate if you could provide me with a copy of the letter from BU to co-inventor Dean Stocker that he received and signed for on April 12, 2010.

Please let me know if you need further information to complete the assignment of the patent rights to me.

Thank you in advance.

Best regards, Fred Schubert

**BU001179**

A-0238

# NATIONAL SCIENCE FOUNDATION
**4201 Wilson Boulevard**
**Arlington, VA  22230**
**(703) 292-8060**
**October 8, 2010**



Office of the
General Counsel

Fred E. Schubert
17 Eaton Road
Troy NY  12180

Re: US Patent 6,294,475
NSF Patent Number:  9714047
BU Number:  98-11
Inventor:  Schubert, Fred

Dear Dr. Schubert:

This confirms our email correspondence regarding US Patent 6,294,475, "Crystallographic Wet Chemical Etching of III-Nitride Material", which was first conceived or reduced to practice under Federal assistance awards from the Office of Naval Research and the National Science Foundation.  The Office of Naval Research is the lead agency for this patent, and as such, will make the determination regarding the transfer of principal rights to the inventor on behalf of the Federal Government.  I coordinated lead agency for response to your request for principal rights to the patent with Carol Petrosky of ONR.

Sincerely,

Robin Clay
NSF Patent Assistant

**BU001180**

## Confirmatory Non-Exclusive License

Dr. E. Fred Schubert, of 17 Eaton Road, Troy, NY 12180, as the owner of all right, title, and interest in and to the invention described in U.S. Patent No. 6,294,475 (Serial No. 09/338,709) entitled "Crystallographic Wet Chemical Etching of III-Nitride Material," hereby grants to the Office of Naval Research, for or on behalf of the United States Government a non-exclusive, non-transferable, irrevocable, paid-up license to practice or have practiced the invention throughout the world.

Signed this __29__ day of __Sept.__, 2010

___E Fred Schubert___

Dr. E. Fred Schubert

BU001181

Dear Dr. Schubert,

After you have signed the Confirmatory Non-Exclusive License, please send it to the address below:

Keith J. Bae
Associate Patent Counsel
Office of Naval Research
Office of Counsel
One Liberty Center
875 N. Randolph Street #517
Arlington, VA 22203-1995



**DEPARTMENT OF THE NAVY**
OFFICE OF NAVAL RESEARCH
BOSTON REGIONAL OFFICE
495 SUMMER STREET ROOM 627
BOSTON MA 02210-2109

IN REPLY REFER TO:

September 22, 2010

Dr. E. Fred Schubert
17 Eaton Road
Troy, NY 12180

RE: N00014-98-1-0194 and U.S. Patent No. 6294475

Dear Dr. Schubert:

On June 22, 2010, the Office of Naval Research ("ONR") received a copy of a letter dated June 16, 2010, sent to you from Boston University, indicating their decision to assign to you their interest in the invention, described in U.S. Patent No. 6,294,475 (Serial No. 09/338,709) entitled "Crystallographic Wet Chemical Etching of III-Nitride Material." It is understood that Dean Stocker, joint inventor to said invention, has declined his interest in this assignment.

Pursuant to 35 U.S.C. 202 (c)(7), ONR approves Boston University's assignment of its rights in the subject invention to you, Dr. E. Fred Schubert, subject to the attached non-exclusive, non-transferable, irrevocable, paid-up license to ONR for or on behalf of the U.S. Government.

Richard Ortisi
Contract Administrator
Office of Naval Research

**BU001183**

| From: | Schubert, E. Fred |
|---|---|
| To: | Anderson, Janine B |
| Cc: | Gildea, Brian D |
| Subject: | Re: US Patent 6,294,475 - ONR and NSF approval |
| Date: | Tuesday, October 12, 2010 10:45:38 AM |

Dear Janine

Thank you --- we have put the $ 10,000 check into the mail today (addressed to you, payable to the Trustees of BU) --- please let me know when you receive it.

Best regards, Fred


On Tue, Oct 12, 2010 at 9:26 AM, Anderson, Janine B <jandersn@bu.edu> wrote:

Dear Fred,


Good news on receiving approval from the  ONR and NSF on returning the invention to you!


Per our agreement, you will reimburse Boston University $10,000 for previous patent costs.  Please make the check payable to Trustees of Boston University and send to me.  Upon receipt of your check, we will have the assignment of patent rights to you executed by Martin J. Howard on behalf of the Trustees of Boston University and then record the assignment with the USPTO.  I will provide you with a copy of the executed assignment for your files.


Per your request, attached is a copy of our April 5, 2010 letter to Dean Stocker sent via Certified Mail, Return Receipt Requested and the Return Receipt signed by Dean Stocker on April 12, 1010.


All the best,

Janine


---

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Friday, October 08, 2010 2:36 PM
**To:** Anderson, Janine B
**Subject:** US Patent 6,294,475

Dear Ms. Anderson,

This email is in further communication regarding the assignment of the patent rights of US Patent 6,294,475 to me, E. Fred Schubert.

The letter from Mr. Nijhawan Vinit, dated July 16, 2010, indicates that Boston University (BU) will file the assignment of the patent rights of US Patent 6,294,475 to me once the Office of Naval Research (ONR) and the National Science Foundation (NSF) have given consent.

ONR has now approved Boston University's assignment of its rights of US Patent 6,294,475 to me. Ms. Robin Clay from the NSF informed me that ONR is the designated lead agency in this invention and as such makes the determination regarding the transfer of principal rights to the inventor on behalf of the government. I have attached the documents from ONR and NSF to this email.

I would appreciate if you could provide me with a copy of the letter from BU to co-inventor Dean Stocker that he received and signed for on April 12, 2010.


Please let me know if you need further information to complete the assignment of the patent rights to me.

Thank you in advance.

Best regards, Fred Schubert


--
E. Fred Schubert, Rensselaer Polytechnic Institute
110 Eighth Street, Troy, New York 12180
Office: 518-276-8775  Email: EFSchubert@rpi.edu
Assistant: Gina Moore 518-276-8072  Email: gina@ecse.rpi.edu

BU001185

| From: | Schubert, E. Fred |
| To: | OTD, IP and Licensing Admin |
| Cc: | Anderson, Janine B |
| Subject: | Re: Requested materials from OTD |
| Date: | Friday, October 15, 2010 1:46:00 PM |

Thank you very much. One question: Is this (the 98 pages) the **complete** prosecution history of the Stocker / Schubert 475 patent? Thank you in advance.

Best regards, Fred Schubert

On Fri, Oct 15, 2010 at 1:37 PM, OTD, IP and Licensing Admin <otdipl1@bu.edu> wrote:

Hello,

This file contains the requested materials from Janine.

Thank you,

OTD Admin

Office of Technology Development

--
E. Fred Schubert, Rensselaer Polytechnic Institute
110 Eighth Street, Troy, New York 12180
Office: 518-276-8775  Email: EFSchubert@rpi.edu
Assistant: Gina Moore 518-276-8072  Email: gina@ecse.rpi.edu

BU001186

| | |
|---|---|
| **From:** | Schubert, E. Fred |
| **To:** | Anderson, Janine B |
| **Subject:** | Re: Assignment of US Patent 6,294,475 |
| **Date:** | Thursday, October 21, 2010 8:57:52 AM |

Dear Janine,

One question came to my mind regarding the Assignment document: In the Assignment document, should there be any reference to the BU letter from Mr. Vinit Nijhawan, dated July 16, 2010, and the conditions outlined in the letter?

Thanks in advance, Fred

On Tue, Oct 19, 2010 at 7:53 PM, Schubert, E. Fred <efredschubert@gmail.com> wrote:

Dear Janine,

Thank you very much for the Assignment document. It looks good to me. Please go ahead.

Best regards, Fred

On Tue, Oct 19, 2010 at 3:36 PM, Anderson, Janine B <jandersn@bu.edu> wrote:

Dear Fred,

We received your check yesterday.  Thanks!

Attached is the Assignment prepared by Brian Gildea, our Executive Director of IP & Licensing, who is also a patent attorney.  Please review the assignment and let us know if you have any questions or concerns before we send it to Martin Howard for signature on behalf of the Trustees of Boston University.

Best,

Janine

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Tuesday, October 12, 2010 10:44 AM

**BU001187**

A-0246

**To:** Anderson, Janine B
**Cc:** Gildea, Brian D
**Subject:** Re: US Patent 6,294,475 - ONR and NSF approval

Dear Janine

Thank you --- we have put the $ 10,000 check into the mail today (addressed to you, payable to the Trustees of BU) --- please let me know when you receive it.

Best regards, Fred

On Tue, Oct 12, 2010 at 9:26 AM, Anderson, Janine B <jandersn@bu.edu> wrote:

Dear Fred,

Good news on receiving approval from the  ONR and NSF on returning the invention to you!

Per our agreement, you will reimburse Boston University $10,000 for previous patent costs.  Please make the check payable to Trustees of Boston University and send to me.  Upon receipt of your check, we will have the assignment of patent rights to you executed by Martin J. Howard on behalf of the Trustees of Boston University and then record the assignment with the USPTO.  I will provide you with a copy of the executed assignment for your files.

Per your request, attached is a copy of our April 5, 2010 letter to Dean Stocker sent via Certified Mail, Return Receipt Requested and the Return Receipt signed by Dean Stocker on April 12, 1010.

All the best,

Janine

BU001188

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Friday, October 08, 2010 2:36 PM
**To:** Anderson, Janine B
**Subject:** US Patent 6,294,475

Dear Ms. Anderson,

This email is in further communication regarding the assignment of the patent rights of US Patent 6,294,475 to me, E. Fred Schubert.

The letter from Mr. Nijhawan Vinit, dated July 16, 2010, indicates that Boston University (BU) will file the assignment of the patent rights of US Patent 6,294,475 to me once the Office of Naval Research (ONR) and the National Science Foundation (NSF) have given consent.

ONR has now approved Boston University's assignment of its rights of US Patent 6,294,475 to me. Ms. Robin Clay from the NSF informed me that ONR is the designated lead agency in this invention and as such makes the determination regarding the transfer of principal rights to the inventor on behalf of the government. I have attached the documents from ONR and NSF to this email.

I would appreciate if you could provide me with a copy of the letter from BU to co-inventor Dean Stocker that he received and signed for on April 12, 2010.

Please let me know if you need further information to complete the assignment of the patent rights to me.

Thank you in advance.

Best regards, Fred Schubert

**BU001189**

| | |
|---|---|
| **From:** | Gildea, Brian D |
| **To:** | Anderson, Janine B; Schubert, E. Fred |
| **Subject:** | RE: Assignment of US Patent 6,294,475 |
| **Date:** | Thursday, October 21, 2010 11:46:13 AM |

Fred and Janine,

The assignment is a transfer of a property right. We've conditioned the transfer of the property right on your (Fred's) acceptance of the terms in Vinit's letter. This forms a contact where you (Fred) are obligated to perform the agreed to conditions once the property right is transferred.

The assignment document itself however need not and preferably does not contain any mention of these conditions as those are embodied in the letter you signed acknowledging acceptance of those terms.

Regards,
Brian

**From:** Anderson, Janine B
**Sent:** Thursday, October 21, 2010 8:59 AM
**To:** Schubert, E. Fred; Gildea, Brian D
**Subject:** RE: Assignment of US Patent 6,294,475

Fred, I don't think so.
Brian, do you agree?

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Thursday, October 21, 2010 8:57 AM
**To:** Anderson, Janine B
**Subject:** Re: Assignment of US Patent 6,294,475

Dear Janine,

One question came to my mind regarding the Assignment document: In the Assignment document, should there be any reference to the BU letter from Mr. Vinit Nijhawan, dated July 16, 2010, and the conditions outlined in the letter?

Thanks in advance, Fred


On Tue, Oct 19, 2010 at 7:53 PM, Schubert, E. Fred <efredschubert@gmail.com> wrote:
Dear Janine,

Thank you very much for the Assignment document. It looks good to me. Please go ahead.

Best regards, Fred


**BU001190**

Case 1:12-cv-00924-MN Document 272 Filed 02/05/21 Page 190 of 282 PageID #: 11585

On Tue, Oct 19, 2010 at 3:36 PM, Anderson, Janine B <jandersn@bu.edu> wrote:
Dear Fred,

We received your check yesterday. Thanks!

Attached is the Assignment prepared by Brian Gildea, our Executive Director of IP & Licensing, who is also a patent attorney. Please review the assignment and let us know if you have any questions or concerns before we send it to Martin Howard for signature on behalf of the Trustees of Boston University.

Best,
Janine

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Tuesday, October 12, 2010 10:44 AM
**To:** Anderson, Janine B
**Cc:** Gildea, Brian D
**Subject:** Re: US Patent 6,294,475 - ONR and NSF approval

Dear Janine

Thank you --- we have put the $ 10,000 check into the mail today (addressed to you, payable to the Trustees of BU) --- please let me know when you receive it.

Best regards, Fred

On Tue, Oct 12, 2010 at 9:26 AM, Anderson, Janine B <jandersn@bu.edu> wrote:
Dear Fred,

Good news on receiving approval from the ONR and NSF on returning the invention to you!

Per our agreement, you will reimburse Boston University $10,000 for previous patent costs. Please make the check payable to Trustees of Boston University and send to me. Upon receipt of your check, we will have the assignment of patent rights to you executed by Martin J. Howard on behalf of the Trustees of Boston University and then record the assignment with the USPTO. I will provide you with a copy of the executed assignment for your files.

Per your request, attached is a copy of our April 5, 2010 letter to Dean Stocker sent via Certified Mail, Return Receipt Requested and the Return Receipt signed by Dean Stocker on April 12, 1010.

All the best,
Janine

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Friday, October 08, 2010 2:36 PM
**To:** Anderson, Janine B
**Subject:** US Patent 6,294,475

**BU001191**

A-0250

Dear Ms. Anderson,

This email is in further communication regarding the assignment of the patent rights of US Patent 6,294,475 to me, E. Fred Schubert.

The letter from Mr. Nijhawan Vinit, dated July 16, 2010, indicates that Boston University (BU) will file the assignment of the patent rights of US Patent 6,294,475 to me once the Office of Naval Research (ONR) and the National Science Foundation (NSF) have given consent.

ONR has now approved Boston University's assignment of its rights of US Patent 6,294,475 to me. Ms. Robin Clay from the NSF informed me that ONR is the designated lead agency in this invention and as such makes the determination regarding the transfer of principal rights to the inventor on behalf of the government. I have attached the documents from ONR and NSF to this email.

I would appreciate if you could provide me with a copy of the letter from BU to co-inventor Dean Stocker that he received and signed for on April 12, 2010.

Please let me know if you need further information to complete the assignment of the patent rights to me.

Thank you in advance.

Best regards, Fred Schubert

| | |
|---|---|
| **From:** | Schubert, E. Fred |
| **To:** | Anderson, Janine B |
| **Subject:** | Return of other patents |
| **Date:** | Monday, October 25, 2010 8:00:19 AM |

Janine

Would there be the possibility that BU would also return to me other patents (other than the '475 patent) that I invented or co-invented at BU?

Regards, Fred

--
E. Fred Schubert, Rensselaer Polytechnic Institute
110 Eighth Street, Troy, New York 12180
Office: 518-276-8775
Assistant: Gina Moore 518-276-8072  Email: gina@ecse.rpi.edu

| | |
|---|---|
| **From:** | Schubert, E. Fred |
| **To:** | Anderson, Janine B |
| **Subject:** | Re: Assignment of patents rights BU to Schubert |
| **Date:** | Friday, November 05, 2010 7:49:13 AM |

Thank you, Janine, I appreciate it. --- Regards, Fred

On Thu, Nov 4, 2010 at 4:29 PM, Anderson, Janine B <jandersn@bu.edu> wrote:

Dear Fred,

Attached, for your files, is a PDF of the executed assignment of patents rights of USP 6,294,475 from Boston University to you. Also attached is the Notice of Recordation of Assignment which shows that the assignment for this patent was recorded by the USPTO on October 25, 2010 at Reel 025178, Frame 0715.

Please be aware that the 3rd and final maintenance fee for this patent is due March 25, 2013. Instructions for paying the maintenance fee are on the USPTO website at: https://ramps.uspto.gov/eram/.

All the best,

Janine

Janine B. Anderson

Patent Manager, Technology Transfer

Boston University

Technology Development Office

53 Bay State Road

Boston, MA 02215

Tel: (617) 358-0238

Fax: (617) 353-6141

email: jandersn@bu.edu

Web: www.bu.edu/otd/

BU001194

--
E. Fred Schubert, Rensselaer Polytechnic Institute
110 Eighth Street, Troy, New York 12180
Telephone: 518-276-8775 Assistance: 518-276-8072

BU001195

| | |
|---|---|
| **From:** | Schubert, E. Fred |
| **To:** | Lee, Sean; Anderson, Janine B |
| **Subject:** | Annual report - 2010 |
| **Date:** | Friday, December 31, 2010 10:16:09 AM |
| **Attachments:** | 2010-12-31 EFSchubert-to-BostonUniversity--Report-on-475-patent.pdf |

Sean, Janine --- please see attached report --- Regards, Fred

BU001196

To:       Mr. Sean Lee, Director, Business Development <seanle@bu.edu>
             Ms. Janine Anderson, Manager, IP, and Licensing <jandesn@bu.edu>
             Boston University, 53 Bay State Road, Boston MA 02215

From:     E. Fred Schubert, 12 Eaton Road, Troy NY 12180 <EFredShubert@gmail.com>

Re:       Annual report on patent returned by BU to inventor

Date:     December 31, 2010

Classfication: Confidential

This report concerns the US patent 6,294,475 entitled "Crystallographic wet chemical etching of III nitride material". The inventors are Dean A. Stocker (a BU alumnus, and I (E. Fred Schubert), a former faculty member of BU. In 2010, the patent was returned from BU to the two inventors, Stocker (Dr. Schubert). The contractual terms of the return included stipulations that obligated me to submit an annual report to BU and to pay to BU 10% of all patent revenue.

**Status**:   In 2010, I engaged a law firm (Goutman Sanders LLP) to assist with the licensing effort. The patent is being evaluated at the present time; no additional effort by the law firm and me.

**Licensing**:  The patent has not been licensed in 2010.

**Revenue**:  No revenue has been collected in 2010.

Should you have questions, please do not hesitate to contact me. Thank you.

Sincerely, E F Schubert

**BU001197**

| From: | Schubert, E. Fred |
|---|---|
| To: | Anderson, Janine B |
| Subject: | U.S. Patent No. 6,294,475 |
| Date: | Wednesday, October 12, 2011 6:17:19 PM |
| Attachments: | 2010-06-21 BU to EFS Patent Wet Etching-Letter-EFS signed.pdf |

Dear Janine,

This communication concerns my licensing efforts with respect to the U.S. Patent No. 6,294,475. The licensing effort is proceeding as planned and I will update you later this year through the annual report. One question came up: From our agreement, dated July 16, 2010, it is my understanding that payments from me to Boston University will come from income arising from licensing.

I would like to consider the following scenarios:

(A) I may license the patent to a company. My income from licensing the patent would be a one-time payment of $ 500,000. However, the company may derive an income of $ 5,000,000 from the patent. It is my understanding that payments from me to BU would be based on my income, i.e. $ 500,000.

(B) I may sell my Patent Rights to an Intellectual Property (IP) Firm (Troll company). I would receive a one-time payment of $ 500,000 from the IP Firm for the Patent Rights. The IP Firm may enforce the Patent Rights via a lawsuit and may receive $ 5,000,000 from which I would receive nothing. It is my understanding that payments to BU would be based on my income, i.e. $ 500,000.

(C) I may litigate against one or multiple companies for infringement on the patent with the assistance of a law firm. As a result, a settlement or verdict would be reached. I would receive $ 500,000. An additional $ 500,000 would be paid by the companies to the law firm assisting me. It is my understanding that payments to BU would be based on my income, i.e. $ 500,000.

I would very much appreciate if you could please let me know that my understanding is congruent with the understanding of the BU Technology Transfer Office. For your convenience, I have attached BU's Letter / Agreement concerning this Patent. Thank you very much in advance.

Best regards, Fred

**BU001198**



**Boston University** Technology Development

53 Bay State Road
Boston, Massachusetts 02215
T 617 353-4550 F 617-353-6141

**Vinit Nijhawan**
**Managing Director, Technology Development Office**
**Lecturer School of Management & Director Enterprise Programs, ITEC**
**T 617-353-0606**
**vinit@bu.edu**

July 16, 2010

VIA EMAIL (efredschubert@gmail.com and FEDEX

Dr. E. Fred Schubert
17 Eaton Road
Troy, NY 12180

Dear Fred:

> Re: BU98-11 Invention Disclosure
> "Crystallographic Wet Chemical Etching of III-Nitride Material"
> U.S. Application No. 09/338,709 filed June 23, 1999
> U.S. Patent No. 6,294,475 issued September 25, 2001
> Inventors: E. Fred Schubert and Dean A. Stocker

I am pleased to be able to inform you that the Charles River Campus Patent Committee approved your request that the above -referenced invention be returned to you under the Charles River Campus Patent Policy, subject to the stipulations set out below.

The invention will be returned solely to you. On April 5, 2010 we sent a Certified Mail, Return Receipt Requested letter to Dean Stocker notifying him that Boston University is no longer supporting the patent costs for this invention and asking if he was interested in having the invention returned to him. The letter was received and signed for by Dean on April 12, 2010. We indicated in our letter that if we received no response by April 16 we would treat the matter as closed regarding his potential interest in the invention. As of this date, we have not received a response from him. Nevertheless, Dean Stocker may continue to have rights in this invention under U.S. patent law.

Because the U.S. application was assigned to Trustees of Boston University, we will need to file an assignment of it to you. The law firm of Gauthier and Connors is preparing such an Assignment for execution by Martin J. Howard on behalf of the Trustees of Boston University.

Since you used federal funding in the course of research that led to the Patent Rights, the University must obtain the consent of the Office of Naval Research and the National Science Foundation to assign the Patent Rights to you. We are notifying the ONR and the NSF that we are relinquishing our rights to the invention and returning the invention to the ONR and the NSF. You now need to request title of this invention from the ONR and NSF and your request should be directed to John Karasek at the ONR and Robin Fritsch at the NSF (contact details below). They will then send you the appropriate paperwork for electing title to the invention.

E. Fred Schubert
Page 2
June 15, 2010

ONR Grant No. N00014-98-1-0194
John Karasek
Tel:     (703) 696-4007
Email:  john.karasek@navy.mil

NSF Grant No. ECS 9714047
Robin Fritsch
Tel:     (703) 292-8060
Email:  rfritsch@nsf.gov

The University's expenditures on the case to date total $27,272.32. This amount does not include the
$3,771.00 for reviving the patent which we invoiced you for on June 14, 2010. In consideration for the
assignment of the Patent Rights, you agree to pay the University 25% of any future income stream arising
from the Patent Rights until these costs are reimbursed and 10% thereafter.

You also agree that, upon notification from the ONR and the NSF that they have granted your request for
election of title to the invention, you will reimburse Trustees of Boston University $10,000.00 to cover
previous prosecution costs.

You agree not to assert any patent that may be issued against Boston University, Boston Medical Center
or any other educational or non-profit research institution that is conducting non-commercial research
using the Patent Rights.

THE UNIVERSITY MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EITHER
EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, WARRANTIES OF
MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR WITH RESPECT TO (1)
THE SCOPE OR VALIDITY OF ANY OF THE PATENT RIGHTS; (2) WHETHER THE PATENT
RIGHTS MAY BE EXPLOITED BY YOU OR ANY SUBLICENSEE WITHOUT INFRINGING THE
RIGHTS (INCLUDING PATENT RIGHTS) OF OTHERS; OR (3) THE RESULTS TO BE OBTAINED
BY USE OF THE PATENT RIGHTS. THE PATENT RIGHTS ARE DELIVERED "AS IS" IN EVERY
RESPECT.

You agree to defend, indemnify and hold the University and its affiliated hospital, Boston Medical Center
Corporation, their trustees, officers, employees, agents and harmless from and against all claims, suits,
demands, liability and expenses, including legal expenses and reasonable attorneys' fees, arising out of or
relating to the Patent Rights and any product, service or process relating to or developed using the Patent
Rights

You agree to provide us with a short annual report on your utilization of the technology by January 31 of
each year commencing in 2011, until such time as you abandon the intellectual property. This report will
be for our internal purposes only and will be considered a confidential document.

Boston University appreciates having had the opportunity to work with you on this case and wishes you
success with it in the future.

**BU001200**

E. Fred Schubert
Page 3
June 15, 2010

Please signify you agreement to these conditions by countersigning this letter below and returning one copy to me, retaining the other for your files.

Yours sincerely,

Vinit Nijhawan

cc    Andre Ruckenstein *(email only)*
       Christy Talley *(email only)*
       Janine Anderson
       Jon Jensen
       Matt Connors   Gauthier & Connors *(email and mail)*

Acknowledged and Agreed:

E. Fred Schubert

BU001201

| From: | Schubert, E. Fred |
| --- | --- |
| To: | Pratt, Michael J |
| Cc: | Gildea, Brian D; Anderson, Janine B |
| Subject: | Re: FW: U.S. Patent No. 6,294,475 |
| Date: | Wednesday, November 23, 2011 1:08:30 PM |

Dear Michael

A few weeks ago, I sent a query to BU that is shown in the email from me to Janine below. Janine forwarded my email to you. Could you please let me know your view on my query? Thank you in advance.

Happy Thanksgiving! --- Fred


On Wed, Oct 12, 2011 at 6:24 PM, Anderson, Janine B <jandersn@bu.edu> wrote:

Dear Fred,


By copy of this email, I am asking Michael Pratt , Executive Director of Business Development, to respond to your email.


Best,

Janine


**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Wednesday, October 12, 2011 5:09 PM
**To:** Anderson, Janine B
**Subject:** U.S. Patent No. 6,294,475


Dear Janine,

This communication concerns my licensing efforts with respect to the U.S. Patent No. 6,294,475. The licensing effort is proceeding as planned and I will update you later this year through the annual report. One question came up: From our agreement, dated July 16, 2010, it is my understanding that payments from me to Boston University will come from income arising from licensing.


I would like to consider the following scenarios:


**BU001202**

(A)   I may license the patent to a company. My income from licensing the patent would be a one-time payment of $ 500,000. However, the company may derive an income of $ 5,000,000 from the patent. It is my understanding that payments from me to BU would be based on my income, i.e. $ 500,000.

(B)   I may sell my Patent Rights to an Intellectual Property (IP) Firm (Troll company). I would receive a one-time payment of $ 500,000 from the IP Firm for the Patent Rights. The IP Firm may enforce the Patent Rights via a lawsuit and may receive $ 5,000,000 from which I would receive nothing.  It is my understanding that payments to BU would be based on my income, i.e. $ 500,000.

(C) I may litigate against one or multiple companies for infringement on the patent with the assistance of a law firm. As a result, a settlement or verdict would be reached. I would receive $ 500,000. An additional $ 500,000 would be paid by the companies to the law firm assisting me. It is my understanding that payments to BU would be based on my income, i.e. $ 500,000.

I would very much appreciate if you could please let me know that my understanding is congruent with the understanding of the BU Technology Transfer Office. For your convenience, I have attached BU's Letter / Agreement concerning this Patent. Thank you very much in advance.

Best regards, Fred

| | |
|---|---|
| **From:** | Schubert, E. Fred |
| **To:** | Pratt, Michael J |
| **Cc:** | Gildea, Brian D; Anderson, Janine B |
| **Subject:** | Re: FW: U.S. Patent No. 6,294,475 |
| **Date:** | Thursday, December 01, 2011 1:37:24 PM |

Dear Michael

It was good talking with you earlier this week, after not having talked with you for an extended period of time, I think we may not have had a conversation since I left Boston University in 2002. Also, congratulations on the promotion to Director (my wishes may come late, but it is only now that I learn that you have been promoted to Director).

I would like to confirm that, based on the contract that governs the return of the '475 and ▮▮▮ patents to me, you and I have the joint understanding that BU will receive 10% of the net revenue that I personally receive by licensing / selling these patents. BU would not receive a share from revenue that may be received by any third parties, e.g., an LED company, a troll company, or a law firm.

The second inventor on the '475 patent, Dr. Dean Stocker, would be compensated by BU based on the applicable BU policies that govern the compensation of BU inventors. I would not be compensated by BU. I would not be obligated to compensate Dr. Stocker.

Also, as I indicated during my call, I plan to submit to you / BU my annual report on the '475 / ▮▮▮ licensing effort by the end of the year, i.e. at the end of this month.

Best regards, Fred

On Wed, Nov 23, 2011 at 1:03 PM, Schubert, E. Fred <efredschubert@gmail.com> wrote:

Dear Michael

A few weeks ago, I sent a query to BU that is shown in the email from me to Janine below. Janine forwarded my email to you. Could you please let me know your view on my query? Thank you in advance.

Happy Thanksgiving! --- Fred

On Wed, Oct 12, 2011 at 6:24 PM, Anderson, Janine B <jandersn@bu.edu> wrote:

Dear Fred,

**BU001204**

By copy of this email, I am asking Michael Pratt , Executive Director of Business Development, to respond to your email.


Best,

Janine

---

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Wednesday, October 12, 2011 5:09 PM
**To:** Anderson, Janine B
**Subject:** U.S. Patent No. 6,294,475


Dear Janine,

This communication concerns my licensing efforts with respect to the U.S. Patent No. 6,294,475. The licensing effort is proceeding as planned and I will update you later this year through the annual report. One question came up: From our agreement, dated July 16, 2010, it is my understanding that payments from me to Boston University will come from income arising from licensing.


I would like to consider the following scenarios:

(A)   I may license the patent to a company. My income from licensing the patent would be a one-time payment of $ 500,000. However, the company may derive an income of $ 5,000,000 from the patent. It is my understanding that payments from me to BU would be based on my income, i.e. $ 500,000.


(B)   I may sell my Patent Rights to an Intellectual Property (IP) Firm (Troll company). I would receive a one-time payment of $ 500,000 from the IP Firm for the Patent Rights. The IP Firm may enforce the Patent Rights via a lawsuit and may receive $ 5,000,000 from which I would receive nothing.  It is my understanding that payments to BU would be based on my income, i.e. $ 500,000.

(C)   I may litigate against one or multiple companies for infringement on the patent with the assistance of a law firm. As a result, a settlement or verdict would be reached. I would receive $ 500,000. An additional $ 500,000 would be paid by the companies to the law firm assisting me. It is my understanding that payments to BU would be based on my income, i.e. $ 500,000.

I would very much appreciate if you could please let me know that my understanding is congruent with the understanding of the BU Technology

BU001205

Transfer Office. For your convenience, I have attached BU's Letter / Agreement concerning this Patent. Thank you very much in advance.

Best regards, Fred

| | |
|---|---|
| **From:** | Schubert, E. Fred |
| **To:** | Anderson, Janine B |
| **Subject:** | Annual report on patents returned to inventor: "475 patent and "    patent |
| **Date:** | Saturday, December 31, 2011 5:50:34 PM |
| **Attachments:** | 2011-12-31 EFSchubert-to-BostonUniversity--Report-on-475-&- ▮ -patents.pdf |

Dear Janine

Attached please find my report, for the year 2011, on two patents ('475 and '    )
that Boston University returned to me. Thank you.

Sincerely, Fred

| To: | Ms. Janine Anderson; Manager, IP, and Licensing < jandersn@bu.edu > |
|-----|---|
|     | Boston University, 53 Bay State Road, Boston MA 02215 |
| From: | E. Fred Schubert, 17 Eaton Road, Troy NY 12180 < EFredSchubert@gmail.com > |
| Re: | Annual report on patent returned by BU to inventor |
| Date: | December 31, 2011 |
| Classification: | Confidential |

This report concerns

φφ1 US patent 6,294,475 entitled "Crystallographic wet chemical etching of III-nitride material". The inventors are Dean A. Stocker, a BU alumnus, and I (E. Fred Schubert), a former faculty member of BU. In 2010, the patent was returned from BU to one of the inventors, me (Dr. Schubert).

φφ1 ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

**Status**: In 2010, I engaged a law firm (Troutman Sanders LLP) to assist with the licensing effort of both patents. At the present time and during 2011, the patent was being offered for licensing in a joint effort by the law firm and me.

**Licensing**: The patent has not been licensed in 2011.

**Revenue**: No revenue has been collected in 2011.

Should you have questions, please do not hesitate to contact me. Thank you.

Sincerely, *E F Schubert*

From:       Ladow, Daniel A.
To:         Gildea, Brian D
Cc:         Pratt, Micheal J; Essunger, Magnus; Anderson, Janine B
Subject:    Re: Prof. Schubert: '475 Patent Supplemental Assignment
Date:       Wednesday, July 11, 2012 2:32:53 PM

Thanks all.

On Jul 11, 2012, at 1:53 PM, "Gildea, Brian D" <gildeabd@bu.edu> wrote:

Dan,

As per our discussion yesterday, here is the fully executed supplemental assignment. Original to follow by mail. Please confirm receipt of the original when acquired. Good luck.

Brian

**Brian D. Gildea, Esq.**
*Executive Director, Intellectual Property & Licensing*
**Boston University | Technology Development**
53 Bay State Road, Boston, MA 02215
Phone: (617) 353-8996 • Fax: (617) 358-6207
Web Site: http://www.bu.edu/otd/

**Confidentiality Notice:**
This e-mail, including any attachment(s), is intended for receipt and use by the intended addressee(s), and may contain confidential information as well as information subject to the attorney-client privilege and/or attorney work product immunity. If you are not an intended recipient of this e-mail, you are hereby notified that any unauthorized use or distribution of this e-mail is strictly prohibited and may be a violation of applicable privacy law(s). You are hereby requested to delete this communication and its attachment(s) without making any copies thereof and to contact the sender of this e-mail immediately. Nothing contained in the body and/or header of this e-mail is intended as a signature or intended to bind the addressor or any person represented by the addressor to the terms of any agreement that may be the subject of this e-mail or its attachment(s), except where such intent is expressly and unequivocally indicated.

**From:** Ladow, Daniel A. [mailto:Daniel.Ladow@troutmansanders.com]
**Sent:** Friday, June 29, 2012 3:11 PM
**To:** Gildea, Brian D
**Cc:** Pratt, Micheal J; Essunger, Magnus; Anderson, Janine B
**Subject:** RE: Prof. Schubert: '475 Patent Supplemental Assignment

Thanks, Brian.

The letter is enclosed.

Enjoy the holiday all.

We'll keep an eye out for the executed supplement.

Regards,
Dan

**Daniel A. Ladow**
Troutman Sanders LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
daniel.ladow@troutmansanders.com
212.704.8218 p
212.704.5929 f

**From:** Gildea, Brian D [mailto:gildeabd@bu.edu]
**Sent:** Friday, June 29, 2012 2:34 PM
**To:** Ladow, Daniel A.
**Cc:** Pratt, Micheal J; Essunger, Magnus; Anderson, Janine B
**Subject:** RE: Prof. Schubert: '475 Patent Supplemental Assignment

Dan,

Today, I finally received permission from my OGC to move forward with this matter. The text of the side-letter is fine. Please prepare the letter and send to me. In the meantime I'll have a clean version of the assignment prepared and executed by Marty Howard. I'll be out next week but will send these out to you when I return to the office.

Regards,
Brian

**Brian D. Gildea, Esq.**
*Executive Director, Intellectual Property & Licensing*
**Boston University | Technology Development**
53 Bay State Road, Boston, MA 02215
Phone: (617) 353-8996 • Fax: (617) 358-6207
Web Site: http://www.bu.edu/otd/

**Confidentiality Notice:**
This e-mail, including any attachment(s), is intended for receipt and use by the intended addressee(s), and may contain confidential information as well as information subject to the attorney-client privilege and/or attorney work product immunity. If you are not an intended recipient of this e-mail, you are hereby notified that any unauthorized use or distribution of this e-mail is strictly prohibited and may be a violation of applicable privacy law(s). You are hereby requested to delete this communication and its attachment(s) without making any copies thereof and to contact the sender of this e-mail immediately. Nothing contained in the body and/or

header of this e-mail is intended as a signature or intended to bind the addressor or any person represented by the addressor to the terms of any agreement that may be the subject of this e-mail or its attachment(s), except where such intent is expressly and unequivocally indicated.

**From:** Ladow, Daniel A. [mailto:Daniel.Ladow@troutmansanders.com ]
**Sent:** Friday, June 15, 2012 9:36 PM
**To:** Gildea, Brian D
**Cc:** Pratt, Michael J; Essunger, Magnus
**Subject:** Re: Prof. Schubert: '475 Patent Supplemental Assignment

Thanks, Brian.
You too.

On Jun 15, 2012, at 6:59 PM, "Gildea, Brian D" <gildeabd@bu.edu> wrote:

Dan,

I've been swamped this week because I'm out next week.  I just sent your draft letter to OGC for their consideration. Despite what you read in a auto-reply I'll be looking for OCGs comments next week and forward any of them to you for your consideration. Enjoy the weekend.

Regards,
Brian



Brian D. Gildea, Esq.
*Executive Director, Intellectual Property & Licensing*
**Boston University | Technology Development**
53 Bay State Road, Boston, MA 02215
Phone: (617) 353-8996 • Fax: (617) 358-6207
Web Site: http://www.bu.edu/otd/

**Confidentiality Notice:**
This e-mail, including any attachment(s), is intended for receipt and use by the intended addressee(s), and may contain confidential information as well as information subject to the attorney-client privilege and/or attorney work product immunity. If you are not an intended recipient of this e-mail, you are hereby notified that any unauthorized use or distribution of this e-mail is strictly prohibited and may be a violation of applicable privacy law(s). You are hereby requested to delete this communication and its attachment(s) without making any copies thereof and to contact the sender of this e-mail immediately. Nothing contained in the body and/or header of this e-mail is intended as a signature or intended to bind the addressor or any person represented by the addressor to the terms of any agreement that may be the subject of this e-mail or its attachment(s), except where such intent is expressly and unequivocally indicated.

**From:** Ladow, Daniel A. [mailto:Daniel.Ladow@troutmansanders.com ]
**Sent:** Tuesday, June 12, 2012 9:45 PM
**To:** Gildea, Brian D
**Cc:** Pratt, Michael J; Essunger, Magnus
**Subject:** RE: Prof. Schubert: '475 Patent Supplemental Assignment

Thanks, Brian.
The changes from the OGC are fine with us.  When you accept the changes there is one errant comma after the second word in the first line that should be omitted.
As for the letter, the draft text follows below.  Please let me know if you have any questions or comments.
Regards,
Dan
Draft Letter:
Re: U.S. Patent No. 6,294,475: Crystallographic Wet Chemical Etching of III-Nitride Material
Dear Brian,
This concerns terms of the acquisition by (and return to) and assignment of the above-referenced patent (the "Patent") to Professor E. Fred Schubert who is a named inventor thereon.  A letter dated July 18, 2010 (the "July 2010 Letter") from Vinit Nijhawan, then the Managing Director of Boston University's Technology Development Office, set forth various terms relating to Professor Schubert's acquisition, or the return to him, of the Patent.  As set forth in the July 2010 Letter, Professor Schubert agreed, in consideration for the assignment of the rights to the Patent, to pay Boston University (the "University") 25% of any future income arising from the Patent until the amount of $27,272.32 is reimbursed (that amount represents the University's patent prosecution related costs, of which $10,000 have already been paid by Professor Schubert towards the $27,272.32 at the time of the acquisition in 2010) and 10% thereafter.  The present letter supplements and clarifies those terms as follows.
It is understood that whatever payment(s) to the University become due at the 10% rate (i.e., after the prosecution cost amount is reimbursed) will be based on the net proceeds Professor Schubert receives from licensing or selling the Patent such that Professor's Schubert's costs and expenses in obtaining income from the Patent, including legal expenses, are not included in the calculation of such net proceeds.  However, in the event that the University should incur out-of-pocket costs and expenses, such as for outside counsel, as a result of any legal action brought by Professor Schubert on the Patent and if such out-of-pocket expenses incurred by the University amount to more than 10% of Professor Schubert's net proceeds from the Patent, Professor Schubert agrees to pay the University an amount sufficient to make the University whole for such expenses insofar as Professor Schubert has received sufficient net proceeds from the Patent in order to do so.  It is understood that Professor Schubert is obligated to make such a payment to the University only insofar as he obtains sufficient net proceeds from the Patent; he is not obligated to reimburse the University for any such expenses the University may incur in the event he receives no net proceeds from the Patent and he is not obligated to make the University whole with respect to the full amount of such expenses if the net proceeds he receives from the Patent are insufficient to do so.
The July 2010 Letter and this letter solely concern the payment terms relating to Professor Schubert's acquisition (or reacquisition) of the Patent.  The terms of the assignment of the Patent are governed by that certain Assignment dated October 20, 2010 and that certain Supplemental Assignment agreed to by the parties.
Sincerely,

**From:** Gildea, Brian D [mailto:gildeabd@bu.edu ]
**Sent:** Tuesday, June 12, 2012 5:39 PM
**To:** Ladow, Daniel A.
**Cc:** Pratt, Michael J; Essunger, Magnus
**Subject:** RE: Prof. Schubert: '475 Patent Supplemental Assignment

Dan,

Sorry but I've only got a reply today from my OGC about the assignment. I sent them the attached for their review and approval and they have approved this document as of today. I think the few edits clarify what BU has assigned to Dr. Schubert. Please review.

Also can you send me a draft letter regarding our understanding with respect to recovering costs the University might incur if your client is successful in recovering for patent infringement. Thanks.

Brian

Brian D. Gildea, Esq.
*Executive Director, Intellectual Property & Licensing*
**Boston University | Technology Development**
53 Bay State Road, Boston, MA 02215
Phone: (617) 353-8996 • Fax: (617) 358-6207
Web Site: http://www.bu.edu/otd/



**Confidentiality Notice:**

This e-mail, including any attachment(s), is intended for receipt and use by the intended addressee(s), and may contain confidential information as well as information subject to the attorney-client privilege and/or attorney work product immunity. If you are not an intended recipient of this e-mail, you are hereby notified that any unauthorized use or distribution of this e-mail is strictly prohibited and may be a violation of applicable privacy law(s). You are hereby requested to delete this communication and its attachment(s) without making any copies thereof and to contact the sender of this e-mail immediately. Nothing contained in the body and/or header of this e-mail is intended as a signature or intended to bind the addressor or any person represented by the addressor to the terms of any agreement that may be the subject of this e-mail or its attachment(s), except where such intent is expressly and unequivocally indicated.

**From:** Ladow, Daniel A. [mailto:Daniel.Ladow@troutmansanders.com ]
**Sent:** Tuesday, June 05, 2012 8:19 AM
**To:** Gildea, Brian D
**Cc:** Pratt, Michael J; Essunger, Magnus
**Subject:** Re: Prof. Schubert: '475 Patent Supplemental Assignment

Sure. We'll call you at 11:00. Thanks.

On Jun 5, 2012, at 7:35 AM, "Gildea, Brian D" <gildeabd@bu.edu> wrote:

Would 11AM work? I now have a meeting from 9:30 to 11.

Brian D. Gildea, Esq.
*Executive Director, Intellectual Property & Licensing*
**Boston University | Technology Development**
53 Bay State Road, Boston, MA 02215
Phone: (617) 353-8996 • Fax: (617) 358-6207
Web Site: http://www.bu.edu/otd/



**Confidentiality Notice:**

This e-mail, including any attachment(s), is intended for receipt and use by the intended addressee(s), and may contain confidential information as well as information subject to the attorney-client privilege and/or attorney work product immunity. If you are not an intended recipient of this e-mail, you are hereby notified that any unauthorized use or distribution of this e-mail is strictly prohibited and may be a violation of applicable privacy law(s). You are hereby requested to delete this communication and its attachment(s) without making any copies thereof and to contact the sender of this e-mail immediately. Nothing contained in the body and/or header of this e-mail is intended as a signature or intended to bind the addressor or any person represented by the addressor to the terms of any agreement that may be the subject of this e-mail or its attachment(s), except where such intent is expressly and unequivocally indicated.

**From:** Ladow, Daniel A. [mailto:Daniel.Ladow@troutmansanders.com ]
**Sent:** Monday, June 04, 2012 6:41 PM
**To:** Gildea, Brian D
**Cc:** Pratt, Michael J; Essunger, Magnus
**Subject:** Re: Prof. Schubert: '475 Patent Supplemental Assignment

Brian, how about 10:15 am tomorrow, or please suggest another time if more convenient.
Thanks,
Dan

On Jun 4, 2012, at 6:33 PM, "Gildea, Brian D" <gildeabd@bu.edu> wrote:

Daniel,

I had a discussion with my OGC about this issue. Is there a good time to discuss with you tomorrow.

Brian

Brian D. Gildea, Esq.
*Executive Director, Intellectual Property & Licensing*
**Boston University | Technology Development**
53 Bay State Road, Boston, MA 02215
Phone: (617) 353-8996 • Fax: (617) 358-6207
Web Site: http://www.bu.edu/otd/



**BU001211**

**Confidentiality Notice:**
This e-mail, including any attachment(s), is intended for receipt and use by the intended addressee(s), and may contain confidential information as well as information subject to the attorney-client privilege and/or attorney work product immunity. If you are not an intended recipient of this e-mail, you are hereby notified that any unauthorized use or distribution of this e-mail is strictly prohibited and may be a violation of applicable privacy law(s). You are hereby requested to delete this communication and its attachment(s) without making any copies thereof and to contact the sender of this e-mail immediately. Nothing contained in the body and/or header of this e-mail is intended as a signature or intended to bind the addressor or any person represented by the addressor to the terms of any agreement that may be the subject of this e-mail or its attachment(s), except where such intent is expressly and unequivocally indicated.

**From:** Ladow, Daniel A. [mailto:Daniel.Ladow@troutmansanders.com ]
**Sent:** Thursday, May 17, 2012 2:24 PM
**To:** Gildea, Brian D
**Cc:** Pratt, Michael J; Essunger, Magnus
**Subject:** Re: Prof. Schubert: '475 Patent Supplemental Assignment

Thanks, Brian. We look forward to hearing from the GC's office.

Regards,

Dan

On May 17, 2012, at 2:19 PM, "Gildea, Brian D" <gildeabd@bu.edu> wrote:

> Dan,
>
> I got your voice mail and have to admit that I didn't delegate to anyone. I just haven't been able to attend to it.
>
> In principal, we at OTD agree that by assigning to Dr. Schubert, we didn't intend to retain a right to sue or any of the proceeds for past infringement. However I have to put this before my Office of General Counsel before it can be approved for signature by the University. I'll get this to them today and let you know if they have any comments or requests for changes.
>
> Brian



Brian D. Gildea, Esq.
*Executive Director, Intellectual Property & Licensing*
**Boston University | Technology Development**
53 Bay State Road, Boston, MA 02215
Phone: (617) 353-8996 • Fax: (617) 358-6207
Web Site: http://www.bu.edu/otd/

**Confidentiality Notice:**
This e-mail, including any attachment(s), is intended for receipt and use by the intended addressee(s), and may contain confidential information as well as information subject to the attorney-client privilege and/or attorney work product immunity. If you are not an intended recipient of this e-mail, you are hereby notified that any unauthorized use or distribution of this e-mail is strictly prohibited and may be a violation of applicable privacy law(s). You are hereby requested to delete this communication and its attachment(s) without making any copies thereof and to contact the sender of this e-mail immediately. Nothing contained in the body and/or header of this e-mail is intended as a signature or intended to bind the addressor or any person represented by the addressor to the terms of any agreement that may be the subject of this e-mail or its attachment(s), except where such intent is expressly and unequivocally indicated.

**From:** Pratt, Michael J
**Sent:** Monday, May 07, 2012 3:27 PM
**To:** Gildea, Brian D
**Cc:** Daniel.Ladow@troutmansanders.com
**Subject:** FW: Prof. Schubert: '475 Patent Supplemental Assignment

Brian,

See attached regarding Prof. Fred Schubert and the assignment provision we discussed briefly this morning.

Dan – Brian Gildea should be able to assist you on this matter.

If you have any questions please let me know.

Best,

Mike

Michael Pratt
Executive Director, Business Development
Boston University

**BU001212**

A-0271

Office of Technology Development
53 Bay State Road
Boston, MA 02169

Ph. 617-353-4569
mpratt@bu.edu
www.bu.edu/otd

**From:** Ladow, Daniel A. [mailto:Daniel.Ladow@troutmansanders.com ]
**Sent:** Monday, May 07, 2012 2:20 PM
**To:** Pratt, Michael J
**Subject:** Prof. Schubert: '475 Patent Supplemental Assignment

Dear Mike,

As discussed, enclosed is the Supplemental Assignment.  Please let me know if there are any questions.  Could you kindly provide us with an original signed copy and also email an executed copy?

Thanks and best regards,

Dan

**Daniel A. Ladow**
Troutman Sanders LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
daniel.ladow@troutmansanders.com
212.704.6218 p
212.704.8929 f

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any tax advice that may be contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding any penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction(s) or tax-related matter(s) that may be addressed herein.

This e-mail communication (including any attachments) may contain legally privileged and confidential information intended solely for the use of the intended recipient. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying or other use of this communication (or its attachments) is strictly prohibited.

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any tax advice that may be contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding any penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction(s) or tax-related matter(s) that may be addressed herein.

This e-mail communication (including any attachments) may contain legally privileged and confidential information intended solely for the use of the intended recipient. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying or other use of this communication (or its attachments) is strictly prohibited.

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any tax advice that may be contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding any penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction(s) or tax-related matter(s) that may be addressed herein.

This e-mail communication (including any attachments) may contain legally privileged and confidential information intended solely for the use of the intended recipient. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying or other use of this communication (or its attachments) is strictly prohibited.

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any tax advice that may be contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding any penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction(s) or tax-related matter(s) that may be addressed herein.

This e-mail communication (including any attachments) may contain legally privileged and confidential information intended solely for the use of the intended recipient. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying or other use of this communication (or its attachments) is strictly prohibited.

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any tax advice that may be contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding any penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction(s) or tax-related matter(s) that may be addressed herein.

**BU001213**

This e-mail communication (including any attachments) may contain legally privileged and confidential information intended solely for the use of the intended recipient. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying or other use of this communication (or its attachments) is strictly prohibited.

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any tax advice that may be contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding any penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction(s) or tax-related matter(s) that may be addressed herein.

This e-mail communication (including any attachments) may contain legally privileged and confidential information intended solely for the use of the intended recipient. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying or other use of this communication (or its attachments) is strictly prohibited.

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any tax advice that may be contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding any penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction(s) or tax-related matter(s) that may be addressed herein.

This e-mail communication (including any attachments) may contain legally privileged and confidential information intended solely for the use of the intended recipient. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying or other use of this communication (or its attachments) is strictly prohibited.

<ExecutedSupplementalAssignment_July11_2012.pdf>

IRS Circular 230 disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any tax advice that may be contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding any penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction(s) or tax-related matter(s) that may be addressed herein.

This e-mail communication (including any attachments) may contain legally privileged and confidential information intended solely for the use of the intended recipient. If you are not the intended recipient, you should immediately stop reading this message and delete it from your system. Any unauthorized reading, distribution, copying or other use of this communication (or its attachments) is strictly prohibited.

**BU001214**

| From: | Anderson, Janine B |
|---|---|
| To: | "Schubert, E. Fred" |
| Cc: | Gildea, Brian D |
| Subject: | RE: US Patent 6,294,475 - ONR and NSF approval |
| Date: | Tuesday, October 12, 2010 9:26:20 AM |
| Importance: | High |

Dear Fred,

Good news on receiving approval from the ONR and NSF on returning the invention to you!

Per our agreement, you will reimburse Boston University $10,000 for previous patent costs. Please make the check payable to Trustees of Boston University and send to me. Upon receipt of your check, we will have the assignment of patent rights to you executed by Martin J. Howard on behalf of the Trustees of Boston University and then record the assignment with the USPTO. I will provide you with a copy of the executed assignment for your files.

Per your request, attached is a copy of our April 5, 2010 letter to Dean Stocker sent via Certified Mail, Return Receipt Requested and the Return Receipt signed by Dean Stocker on April 12, 1010.

All the best,
Janine

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Friday, October 08, 2010 2:36 PM
**To:** Anderson, Janine B
**Subject:** US Patent 6,294,475

Dear Ms. Anderson,

This email is in further communication regarding the assignment of the patent rights of US Patent 6,294,475 to me, E. Fred Schubert.

The letter from Mr. Nijhawan Vinit, dated July 16, 2010, indicates that Boston University (BU) will file the assignment of the patent rights of US Patent 6,294,475 to me once the Office of Naval Research (ONR) and the National Science Foundation (NSF) have given consent.

ONR has now approved Boston University's assignment of its rights of US Patent 6,294,475 to me. Ms. Robin Clay from the NSF informed me that ONR is the designated lead agency in this invention and as such makes the determination regarding the transfer of principal rights to the inventor on behalf of the government. I have attached the documents from ONR and NSF to this email.

I would appreciate if you could provide me with a copy of the letter from BU to co-inventor Dean Stocker that he received and signed for on April 12, 2010.

Please let me know if you need further information to complete the assignment of the patent

rights to me.

Thank you in advance.

Best regards, Fred Schubert

**BU001216**

| From: | Anderson, Janine B |
|---|---|
| To: | "Schubert, E. Fred" |
| Cc: | Gildea, Brian D |
| Subject: | RE: Assignment of US Patent 6,294,475 |
| Date: | Tuesday, October 19, 2010 3:36:29 PM |
| Attachments: | BU98-11 Assignment BU to Schubert.doc |
| Importance: | High |

Dear Fred,

We received your check yesterday. Thanks!

Attached is the Assignment prepared by Brian Gildea, our Executive Director of IP & Licensing, who is also a patent attorney. Please review the assignment and let us know if you have any questions or concerns before we send it to Martin Howard for signature on behalf of the Trustees of Boston University.

Best,
Janine

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Tuesday, October 12, 2010 10:44 AM
**To:** Anderson, Janine B
**Cc:** Gildea, Brian D
**Subject:** Re: US Patent 6,294,475 - ONR and NSF approval

Dear Janine

Thank you --- we have put the $ 10,000 check into the mail today (addressed to you, payable to the Trustees of BU) --- please let me know when you receive it.

Best regards, Fred

On Tue, Oct 12, 2010 at 9:26 AM, Anderson, Janine B <jandersn@bu.edu> wrote:
Dear Fred,

Good news on receiving approval from the ONR and NSF on returning the invention to you!

Per our agreement, you will reimburse Boston University $10,000 for previous patent costs. Please make the check payable to Trustees of Boston University and send to me. Upon receipt of your check, we will have the assignment of patent rights to you executed by Martin J. Howard on behalf of the Trustees of Boston University and then record the assignment with the USPTO. I will provide you with a copy of the executed assignment for your files.

Per your request, attached is a copy of our April 5, 2010 letter to Dean Stocker sent via Certified Mail, Return Receipt Requested and the Return Receipt signed by Dean Stocker on April 12, 1010.

All the best,

Janine

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Friday, October 08, 2010 2:36 PM
**To:** Anderson, Janine B
**Subject:** US Patent 6,294,475

Dear Ms. Anderson,

This email is in further communication regarding the assignment of the patent rights of US Patent 6,294,475 to me, E. Fred Schubert.

The letter from Mr. Nijhawan Vinit, dated July 16, 2010, indicates that Boston University (BU) will file the assignment of the patent rights of US Patent 6,294,475 to me once the Office of Naval Research (ONR) and the National Science Foundation (NSF) have given consent.

ONR has now approved Boston University's assignment of its rights of US Patent 6,294,475 to me. Ms. Rohin Clay from the NSF informed me that ONR is the designated lead agency in this invention and as such makes the determination regarding the transfer of principal rights to the inventor on behalf of the government. I have attached the documents from ONR and NSF to this email.

I would appreciate if you could provide me with a copy of the letter from BU to co-inventor Dean Stocker that he received and signed for on April 12, 2010.

Please let me know if you need further information to complete the assignment of the patent rights to me.

Thank you in advance.

Best regards, Fred Schubert


--
E. Fred Schubert, Rensselaer Polytechnic Institute
110 Eighth Street, Troy, New York 12180
Office: 518-276-8775 Email: EFSchubert@rpi.edu
Assistant: Gina Moore 518-276-8072 Email: gina@ecse.rpi.edu

## ASSIGNMENT

WHEREAS, WE, Trustees of Boston University, a Massachusetts corporation, with its principal place of business at One Silber Way, Boston, MA 02215, have ownership of U.S. Patent No. 6,294,475 (the "Patent"), the assignment of which is recorded with the United States Patent and Trademark Office at Reel 010687, Frame 0578;

AND WHEREAS, E. Fred Schubert, a United States citizen, residing at 17 Eaton Road, Troy, NY 12180, desires to acquire the entire right, title and interest in and to the said Patent:

NOW, THEREFORE, for good and valuable consideration, the Trustees of Boston University do hereby sell, assign, transfer and set over, unto the said E. Fred Schubert, his successors, legal representatives and assigns, the entire right, title and interest throughout the world in, to and under said Patent including all reissues, re-examinations and extensions thereof.

The undersigned hereby grant(s) Brian D. Gildea, Esq. the power to insert on this Assignment any further identification which may be necessary or desirable in order to comply with the rules of the U.S. Patent and Trademark Office.

IN TESTIMONY WHEREOF, WE, Trustees of Boston University, hereunto set our signature this _____ day of _____, 20___.


_____
Signature of Trustees of Boston University Representative


_____
Printed Name of Representative


_____
Title of Representative

STATE OF _____
COUNTY OF _____ SS:

This _____ day of _____, 20___, before me personally came the above-named _____, to me personally known as the individual who executed the same of his/her own free will for the purposes therein set forth.


_____
Notary Public


**BU001219**

A-0278

| | |
|---|---|
| **From:** | Anderson, Janine B |
| **To:** | "Schubert, E. Fred"; Gildea, Brian D |
| **Subject:** | RE: Assignment of US Patent 6,294,475 |
| **Date:** | Thursday, October 21, 2010 8:59:11 AM |

Fred, I don't think so.

Brian, do you agree?

---

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Thursday, October 21, 2010 8:57 AM
**To:** Anderson, Janine B
**Subject:** Re: Assignment of US Patent 6,294,475

Dear Janine,

One question came to my mind regarding the Assignment document: In the Assignment document, should there be any reference to the BU letter from Mr. Vinit Nijhawan, dated July 16, 2010, and the conditions outlined in the letter?

Thanks in advance, Fred

On Tue, Oct 19, 2010 at 7:53 PM, Schubert, E. Fred <efredschubert@gmail.com> wrote:
Dear Janine,

Thank you very much for the Assignment document. It looks good to me. Please go ahead.

Best regards, Fred

On Tue, Oct 19, 2010 at 3:36 PM, Anderson, Janine B <jandersn@bu.edu> wrote:
Dear Fred,

We received your check yesterday. Thanks!

Attached is the Assignment prepared by Brian Gildea, our Executive Director of IP & Licensing, who is also a patent attorney. Please review the assignment and let us know if you have any questions or concerns before we send it to Martin Howard for signature on behalf of the Trustees of Boston University.

Best,
Janine

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Tuesday, October 12, 2010 10:44 AM
**To:** Anderson, Janine B
**Cc:** Gildea, Brian D
**Subject:** Re: US Patent 6,294,475 - ONR and NSF approval

**BU001220**

Dear Janine

Thank you --- we have put the $ 10,000 check into the mail today (addressed to you, payable to the Trustees of BU) --- please let me know when you receive it.

Best regards, Fred


On Tue, Oct 12, 2010 at 9:26 AM, Anderson, Janine B <jandersn@bu.edu> wrote:
Dear Fred,

Good news on receiving approval from the ONR and NSF on returning the invention to you!

Per our agreement, you will reimburse Boston University $10,000 for previous patent costs. Please make the check payable to Trustees of Boston University and send to me. Upon receipt of your check, we will have the assignment of patent rights to you executed by Martin J. Howard on behalf of the Trustees of Boston University and then record the assignment with the USPTO. I will provide you with a copy of the executed assignment for your files.

Per your request, attached is a copy of our April 5, 2010 letter to Dean Stocker sent via Certified Mail, Return Receipt Requested and the Return Receipt signed by Dean Stocker on April 12, 1010.

All the best,
Janine

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Friday, October 08, 2010 2:36 PM
**To:** Anderson, Janine B
**Subject:** US Patent 6,294,475

Dear Ms. Anderson,

This email is in further communication regarding the assignment of the patent rights of US Patent 6,294,475 to me, E. Fred Schubert.

The letter from Mr. Nijhawan Vinit, dated July 16, 2010, indicates that Boston University (BU) will file the assignment of the patent rights of US Patent 6,294,475 to me once the Office of Naval Research (ONR) and the National Science Foundation (NSF) have given consent.

ONR has now approved Boston University's assignment of its rights of US Patent 6,294,475 to me. Ms. Robin Clay from the NSF informed me that ONR is the designated lead agency in this invention and as such makes the determination regarding the transfer of principal rights to the inventor on behalf of the government. I have attached the documents from ONR and NSF to this email.

I would appreciate if you could provide me with a copy of the letter from BU to co-inventor Dean Stocker that he received and signed for on April 12, 2010.

**BU001221**

Please let me know if you need further information to complete the assignment of the patent rights to me.

Thank you in advance.

Best regards, Fred Schubert

**BU001222**

| From: | Anderson, Janine B |
| To: | "Schubert, E. Fred" |
| Cc: | Pratt, Michael J; Gildea, Brian D |
| Subject: | FW: U.S. Patent No. 6,294,475 |
| Date: | Wednesday, October 12, 2011 6:24:30 PM |
| Attachments: | 2010-06-21 BU to EFS Patent Wet Etching-Letter-EFS signed.pdf |

Dear Fred,

By copy of this email, I am asking Michael Pratt , Executive Director of Business Development, to respond to your email.

Best,
Janine

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Wednesday, October 12, 2011 5:09 PM
**To:** Anderson, Janine B
**Subject:** U.S. Patent No. 6,294,475

Dear Janine,

This communication concerns my licensing efforts with respect to the U.S. Patent No. 6,294,475. The licensing effort is proceeding as planned and I will update you later this year through the annual report. One question came up: From our agreement, dated July 16, 2010, it is my understanding that payments from me to Boston University will come from income arising from licensing.

I would like to consider the following scenarios:

(A)  I may license the patent to a company. My income from licensing the patent would be a one-time payment of $ 500,000. However, the company may derive an income of $ 5,000,000 from the patent. It is my understanding that payments from me to BU would be based on my income, i.e. $ 500,000.

(B)  I may sell my Patent Rights to an Intellectual Property (IP) Firm (Troll company). I would receive a one-time payment of $ 500,000 from the IP Firm for the Patent Rights. The IP Firm may enforce the Patent Rights via a lawsuit and may receive $ 5,000,000 from which I would receive nothing.  It is my understanding that payments to BU would be based on my income, i.e. $ 500,000.

(C)  I may litigate against one or multiple companies for infringement on the patent with the assistance of a law firm. As a result, a settlement or verdict would be reached. I would receive $ 500,000. An additional $ 500,000 would be paid by the companies to the law firm assisting me. It is my understanding that payments to BU would be based on my income, i.e. $ 500,000.

I would very much appreciate if you could please let me know that my understanding is congruent with the understanding of the BU Technology Transfer Office. For your convenience, I have attached BU's Letter / Agreement concerning this Patent. Thank you

BU001223

very much in advance.

Best regards, Fred

**BU001224**



**Boston University** Technology Development

53 Bay State Road
Boston, Massachusetts 02215
T 617 353-4550 F 617-353-6141

**Vinit Nijhawan**
**Managing Director, Technology Development Office**
**Lecturer School of Management & Director Enterprise Programs, ITEC**
**T 617-353-0608**
**vinit@bu.edu**

July 16, 2010

VIA EMAIL (efredschubert@gmail.com and FEDEX

Dr. E. Fred Schubert
17 Eaton Road
Troy, NY 12180

Dear Fred:

Re:      BU98-11 Invention Disclosure
"Crystallographic Wet Chemical Etching of III-Nitride Material"
U.S. Application No. 09/338,709 filed June 23, 1999
U.S. Patent No. 6,294,475 issued September 25, 2001
Inventors: E. Fred Schubert and Dean A. Stocker

I am pleased to be able to inform you that the Charles River Campus Patent Committee approved your request that the above -referenced invention be returned to you under the Charles River Campus Patent Policy, subject to the stipulations set out below.

The invention will be returned solely to you. On April 5, 2010 we sent a Certified Mail, Return Receipt Requested letter to Dean Stocker notifying him that Boston University is no longer supporting the patent costs for this invention and asking if he was interested in having the invention returned to him. The letter was received and signed for by Dean on April 12, 2010. We indicated in our letter that if we received no response by April 16 we would treat the matter as closed regarding his potential interest in the invention. As of this date, we have not received a response from him. Nevertheless, Dean Stocker may continue to have rights in this invention under U.S. patent law.

Because the U.S. application was assigned to Trustees of Boston University, we will need to file an assignment of it to you. The law firm of Gauthier and Connors is preparing such an Assignment for execution by Martin J. Howard on behalf of the Trustees of Boston University.

Since you used federal funding in the course of research that led to the Patent Rights, the University must obtain the consent of the Office of Naval Research and the National Science Foundation to assign the Patent Rights to you. We are notifying the ONR and the NSF that we are relinquishing our rights to the invention and returning the invention to the ONR and the NSF. You now need to request title of this invention from the ONR and NSF and your request should be directed to John Karasek at the ONR and Robin Fritsch at the NSF (contact details below). They will then send you the appropriate paperwork for electing title to the invention.

BU001225

E. Fred Schubert
Page 2
June 15, 2010

ONR Grant No. N00014-98-1-0194
John Karasek
Tel:    (703) 696-4007
Email:  john.karasek@navy.mil

NSF Grant No. ECS 9714047
Robin Fritsch
Tel:    (703) 292-8060
Email:  rfritsch@nsf.gov

The University's expenditures on the case to date total $27,272.32. This amount does not include the
$3,771.00 for reviving the patent which we invoiced you for on June 14, 2010. In consideration for the
assignment of the Patent Rights, you agree to pay the University 25% of any future income stream arising
from the Patent Rights until these costs are reimbursed and 10% thereafter.

You also agree that, upon notification from the ONR and the NSF that they have granted your request for
election of title to the invention, you will reimburse Trustees of Boston University $10,000.00 to cover
previous prosecution costs.

You agree not to assert any patent that may be issued against Boston University, Boston Medical Center
or any other educational or non-profit research institution that is conducting non-commercial research
using the Patent Rights.

THE UNIVERSITY MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EITHER
EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, WARRANTIES OF
MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR WITH RESPECT TO (1)
THE SCOPE OR VALIDITY OF ANY OF THE PATENT RIGHTS; (2) WHETHER THE PATENT
RIGHTS MAY BE EXPLOITED BY YOU OR ANY SUBLICENSEE WITHOUT INFRINGING THE
RIGHTS (INCLUDING PATENT RIGHTS) OF OTHERS; OR (3) THE RESULTS TO BE OBTAINED
BY USE OF THE PATENT RIGHTS. THE PATENT RIGHTS ARE DELIVERED "AS IS" IN EVERY
RESPECT.

You agree to defend, indemnify and hold the University and its affiliated hospital, Boston Medical Center
Corporation, their trustees, officers, employees, agents and harmless from and against all claims, suits,
demands, liability and expenses, including legal expenses and reasonable attorneys' fees, arising out of or
relating to the Patent Rights and any product, service or process relating to or developed using the Patent
Rights

You agree to provide us with a short annual report on your utilization of the technology by January 31 of
each year commencing in 2011, until such time as you abandon the intellectual property. This report will
be for our internal purposes only and will be considered a confidential document.

Boston University appreciates having had the opportunity to work with you on this case and wishes you
success with it in the future.

**BU001226**

A-0285

E. Fred Schubert
Page 3
June 15, 2010

Please signify you agreement to these conditions by countersigning this letter below and returning one copy to me, retaining the other for your files.

Yours sincerely,

*Vinit Nijn*

Vinit Nijhawan

cc      Andre Ruckenstein *(email only)*
        Christy Talley *(email only)*
        Janine Anderson
        Jon Jensen
        Matt Connors    Gauthier & Connors (*email and mail)*

Acknowledged and Agreed:

*E. Fred Schubert*

E. Fred Schubert

BU001227

| | |
|---|---|
| **From:** | Anderson, Janine B |
| **To:** | Gildea, Brian D; Pratt, Michael J |
| **Subject:** | FW: Annual report on patents returned to inventor: "475 patent and "    patent |
| **Date:** | Tuesday, January 01, 2013 9:48:05 AM |
| **Attachments:** | 2012-12-31 EFSchubert-to-BostonUniversity--Report-on-475-&-    -patents.pdf |

Brian/Michael – FYI

Happy New Year!

Janine

---

**From:** Schubert, E. Fred [mailto:efredschubert@gmail.com]
**Sent:** Monday, December 31, 2012 8:27 AM
**To:** Anderson, Janine B
**Subject:** Re: Annual report on patents returned to inventor: '475 patent and '    patent

Dear Janine

Attached please find a report, for the year 2012, on two patents ('475 and '    ) that Boston University returned to me. Thank you.

Sincerely, Fred

BU001228

| To: | Ms. Janine Anderson; Manager, IP, and Licensing < jandersn@bu.edu ><br>Boston University, 53 Bay State Road, Boston MA 02215 |
|---|---|
| From: | E. Fred Schubert, 17 Eaton Road, Troy NY 12180 < EFredSchubert@gmail.com > |
| Re: | Annual report on patents returned by BU to inventor |
| Date: | December 31, 2012 |
| Classification: | Confidential |

Dear Janine:

This report concerns

- US patent 6,294,475 entitled "Crystallographic wet chemical etching of III-nitride material". The inventors are Dean A. Stocker, a BU alumnus, and I (E. Fred Schubert), a former faculty member of BU. In 2010, the patent was returned from BU to one of the inventors, me (Dr. Schubert).

- ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

**Status**: In 2010, I engaged a law firm (Troutman Sanders LLP) to assist with the licensing effort of the patents. During 2011, the patent was being offered for licensing in a joint effort by the law firm and me. In July 2012, three complaints were filed in Delaware federal court (Schubert vs. Cree; Schubert vs. Osram; Schubert vs. Philips). The complaints are public documents and can be easily found on the Internet by entering my full name (E. Fred Schubert), the word "lawsuit", and a company name (Cree, Osram, or Philips).

**Licensing**: No patent has been licensed in 2012.

**Revenue**: No revenue has been collected in 2012.

Should you have questions, please do not hesitate to contact me. Thank you.

Sincerely, *EF Schubert*

Memorandum

| To: | Sean Lee, Licensing Associate (Boston University) |
|---|---|
| From: | E. Fred Schubert, 17 Eaton Road, Troy, NY |
| Date: | February 2, 2010 |
| Reference: | BU patent '475 by Schubert and Stocker |

This memorandum is to confirm the following:

- I am interested to acquire ownership of the '475 patent currently owned by BU.
- I understand that the transfer of ownership is subject to a BU-internal approval process.
- To make the transfer of ownership possible, I am willing to pay an up-front fee.
- To make the transfer of ownership possible, I am willing to share future patent revenue with BU as follows:
    - ○ 25 % of the patent revenue will be paid to BU up to the amount that covers BU expenses associated with the patent (approximately $ 27,000 minus the up-front fee)
    - ○ 10% of the patent revenue will be paid to BU beyond the above amount.
- Effective immediately, I am willing to pay USPTO fees associated with the patent.

E. Fred Schubert
Feb. 2, 2010

BU000450

**Boston University** Technology Development



53 Bay State Road
Boston, Massachusetts 02215
T 617-353-6303 F 617-353-6141

Ashley J. Stevens, D.Phil (Oxon), CLP
Executive Director, Technology Transfer
Senior Research Associate, ITEC
astevens@bu.edu

**TO:** Charles River Campus Patent Committee

**FROM:** Ashley Stevens

**DATE:** February 22, 2010

**SUBJECT:** Recommendation to return invention BU98-11 "Crystallographic Wet Chemical Etching of GaN" to Professor Fred Schubert, currently of Rensselaer Polytechnic Institute

### Background

The invention is a photo-enhanced electro-chemical process for etching smooth crystallographic surfaces into III-Nitrides. This method has the advantage of low surface damage and relatively lower cost than the currently used dry plasma etching. The inventors are Professor Fred Schubert and Dr. Dean Stocker. Professor Schubert is currently at RPI and Dr. Stocker at Thermo-Fischer. The invention was funded by an NIH grant.

A US Utility patent was issued 9/25/2001 (Foreign rights were abandoned in 1999.) OTD paid the first maintenance fee in 2005 but after Professor Schubert's move to RPI from BU, did not pay the second fee of $1,010 due on 9/25/2009 after consulting with Professor Schubert. The case is therefore currently abandoned at the patent office, but can be revived for a filing fee of $2,500.

Total patent expenses to date are $27,272.

Subsequently Professor Schubert expressed interest in having the patent rights assigned to him. We proposed the following terms to both Professor Schubert and his co-inventor Dr. Stocker, contingent on CRC Patent Committee approval.

### Proposed Terms

- BU would return the invention to the government funding agency, and the inventors would then seek to have title transferred to them.
- Initial fee of $10,000 paid by the inventors to BU to cover the fees at the patent office and part of the prior prosecution costs.
- Any future fees due to the patent office
- If there is success at generating any future revenues from this invention, then
  - o 25% of such revenue would go to BU until the balance of the patent costs were paid (i.e. $17,272)

o Thereafter, 10% royalty to BU on future sales.

Professor Schubert has accepted our proposal. The same proposal was made to Dr. Stocker on January 20, 2010 with the statement that, should we not hear from him by February 8, 2010, we would assume he is not interested in the proposal. Dr. Stocker has not responded, therefore we assume he is not interested in the above proposed terms.

Recommendation

We believe this is a good opportunity for BU to recover at least a portion of prior patent costs on a technology that was not likely to be licensed and generate significant revenue before its expiration. Generally, when an invention is returned to the inventor, BU only is promised a portion of future revenue, but not up-front money for prior patent costs.

We therefore recommend that the Patent Committee approve the above plan to return the invention to Professor Schubert.

Ashley J. Stevens

BU000448

A-0297

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 7466047 |
| **Application Number:** | 09338709 |
| **Patent Number:** | 6294475 |
| **Confirmation Number:** | 1727 |
| **Petition Issued Date:** | April 22,2010 |
| **Title of Invention:** | CRYSTALLOGRAPHIC WET CHEMICAL ETCHING OF III-NITRIDE MATERIAL |
| **First Named Inventor/Applicant Name:** | E. FRED SCHUBERT |
| **Correspondence Address:** | SAMUELS GAUTHIER & STEVENS LLP<br>225 FRANKLIN STREET<br>SUITE 3300<br>-<br>BOSTON                    MA              02110<br>US            -<br>- |
| **Filer:** | Matthew Edward Connors/Elizabeth Ball |
| **Filer Authorized By:** | Matthew Edward Connors |
| **Attorney Docket Number:** | 4458 |
| **Receipt Date:** | 22-APR-2010 |
| **Filing Date:** | 23-JUN-1999 |
| **Time Stamp:** | 13:22:08 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |

BU000289

| Payment Type | Credit Card |
|---|---|
| Payment was successfully received in RAM | $2880 |
| RAM confirmation Number | 11544 |
| Deposit Account | 190079 |
| Authorized User | CONNORS, MATTHEW E. |

The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows:

Charge any Additional Fees required under 37 C.F.R. Section 1.16 (National application filing, search, and examination fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.17 (Patent application and reexamination processing fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.19 (Document supply fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.20 (Post Issuance fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.21 (Miscellaneous fees and charges)

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Petition automatically granted by EFS | sb0066e_fill.pdf | 841475 <br> e3722dcbc84f8184d1ef76e696bcb6327cfac2b05 | no | 3 |

**Warnings:**

**Information:**

| 2 | Fee Worksheet (PTO-875) | fee-info.pdf | 32525 <br> 9b749d66998a479b69e5b62272d5727bd3cb4a43 | no | 2 |

**Warnings:**

**Information:**

| | | Total Files Size (in bytes): | | 874000 | |

**This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.**

**New Applications Under 35 U.S.C. 111**
**If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.**

**National Stage of an International Application under 35 U.S.C. 371**
**If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.**

**New International Application Filed with the USPTO as a Receiving Office**
**If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.**

BU000290

Under the Paperwork Reduction ... of 1995, no persons are required to respond to a collection ... ormation unless it displays valid OMB control number.

## PETITION TO ACCEPT UNINTENTIONALLY DELAYED PAYMENT OF MAINTENANCE FEE IN AN EXPIRED PATENT (37 CFR 1.378(c))

| Patent Number | Issue Date (YYYY-MM-DD) | Application Number | Filing Date (YYYY-MM-DD) | Docket Number (if applicable) |
|---|---|---|---|---|
| 6294475 | 2001-09-25 | 09338709 | 1999-06-23 | BU.4458 |

CAUTION: Maintenance fee (and surcharge, if any) payment must correctly identify: (1) the patent number and (2) the application number of the actual U.S. application leading to issuance of that patent to ensure the fee(s) is/are associated with the correct patent. 37 CFR 1.366(c) and (d).

SMALL ENTITY
☒ Patentee claims, or has previously claimed, small entity status. See 37 CFR 1.27.

LOSS OF ENTITLEMENT TO SMALL ENTITY STATUS
☐ Patentee is no longer entitled to small entity status. See 37 CFR 1.27(g)

NOT Small Entity

| | Fee | Code |
|---|---|---|
| ○ | 3 ½ year | (1551) |
| ○ | 7 ½ year | (1552) |
| ○ | 11 ½ year | (1553) |

Small Entity

| | Fee | Code |
|---|---|---|
| ○ | 3 ½ year | (2551) |
| ◉ | 7 ½ year | (2552) |
| ○ | 11 ½ year | (2553) |

SURCHARGE
The surcharge required by 37 CFR 1.20(i)(2) (Fee Code 1558) must be paid as a condition of accepting unintentionally delayed payment of the maintenance fee.

MAINTENANCE FEE (37 CFR 1.20(e)-(g))
The appropriate maintenance fee must be submitted with this petition.

STATEMENT
THE UNDERSIGNED CERTIFIES THAT THE DELAY IN PAYMENT OF THE MAINTENANCE FEE TO THIS PATENT WAS UNINTENTIONAL

PETITIONER(S) REQUEST THAT THE DELAYED PAYMENT OF THE MAINTENANCE FEE BE ACCEPTED AND THE PATENT REINSTATED

THIS PORTION MUST BE COMPLETED BY THE SIGNATORY OR SIGNATORIES

37 CFR 1.378(d) states: "Any petition under this section must be signed by an attorney or agent registered to practice before the Patent and Trademark Office, or by the patentee, the assignee, or other party in interest."

I certify, in accordance with 37 CFR 1.4(d)(4) that I am

◉ An attorney or agent registered to practice before the Patent and Trademark Office

○ A sole patentee

○ A joint patentee; I certify that I am authorized to sign this submission on behalf of all the other patentees.

○ A joint patentee; all of whom are signing this e-petition

○ The assignee of record of the entire interest

BU000291

Under the Paperwork Reductio.    of 1995, no persons are required to respond to a collection    ormation unless it displays valid OMB control number.

| Patent Practitioner | | | |
|---|---|---|---|
| A signature of the applicant or representative is required in accordance with 37 CFR 1.33 and 10.18. Please see 37 CFR 1.4(d) for the form of the signature | | | |
| Signature | /Matthew E. Connors/ | Date (YYYY-MM-DD) | 2010-04-22 |
| Name | Matthew E. Connors | Registration Number | 33298 |

This collection of information is required by 37 CFR 1.378(c). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **This form can only be used when in conjunction with EFS-Web. If this form is mailed to the USPTO, it may cause delays in reinstating the patent.**

BU000292

**Privacy Act Statement**

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these records.

2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

BU000293

Case 1:12-cv-00924-MN   Document 272   Filed 02/05/21   Page 237 of 282 PageID #: 20163

DR. JAMES
SHEALY
020

*Journal of The Electrochemical Society*, **157** (6) H676-H678 (2010)
0013-4651/2010/157(6)/H676/3/$28.00 © The Electrochemical Society



# Effects of Photoelectrochemical Etching of N-Polar and Ga-Polar Gallium Nitride on Sapphire Substrates

**Younghun Jung,[a] Kwang Hyeon Baik,[b] Fan Ren,[c,*] Stephen J. Pearton,[d,*] and Jihyun Kim[a,**,z]**

[a]*Department of Chemical and Biological Engineering, Korea University, Seoul 136-701, Korea*
[b]*Optoelectronics Laboratory, Korea Electronics Technology Institute, Gyeonggi 462-816, Republic of Korea*
[c]*Department of Chemical Engineering and* [d]*Department of Materials Science and Engineering, University of Florida, Gainesville, Florida 32611, USA*

We studied the effects of photo electrochemical (PEC) etching by using various concentrations (1, 2, and 4 M) of KOH solutions on both Ga- and N-face GaN layers on sapphire substrates. The Ga-face was chemically stable for KOH solutions, while dry sharp contrast the KOH could etch the N-face, where the 6-fold symmetry was observed after the PEC etching. Surface texturing of GaN-based light emitting diodes and solar cells by KOH-based PEC etch could enhance the efficiency of GaN-based photonic devices by increasing the number of the scattering events and randomly changing the angles of the light.
© 2010 The Electrochemical Society.   [DOI: 10.1149/1.3382713] All rights reserved.

Manuscript submitted February 28, 2010; revised manuscript received March 10, 2010. Published April 28, 2010.

The gallium nitride (GaN) material system has been developed for a broad range of applications involving light emitting diodes (LEDs), laser diodes, and high power electronic devices.[1-3] In particular, the exceptional optical properties such as direct bandgap (3.4 eV at room temperature) and the availability of bandgap engineering through alloying with In and Al make the nitride system ideal for emerging optoelectronic applications.[4] Although GaN-based LEDs have been successfully commercialized, there are still issues related to the choice of crystal polarity. Current GaN-based LED structures employ Ga-face growth of GaN and these layers are generally smoother and more stable than N-face GaN.[5,6] Because the availability of large area homoepitaxial GaN substrates is still limited, most GaN-based LEDs have been grown on sapphire, where the thermal conductivity is extremely low (about 42 W/m·K) at room temperature].[7] To efficiently remove the generated heat, LED flip-chip technologies, where the N-face is facing up, have been developed. In this case, GaN is in contact with the heat sink and provides more efficient cooling because the thermal conductivity [160 W/m·K) at room temperature] of GaN is about 4 times higher than that of sapphire.[8]

Low light extraction efficiency is also an issue that hinders further improvement in the light output from LEDs.[4] The escape cone from GaN into air is about 24°, according to Snell's law. Because the bond strength of Ga–N is very high (8.92 eV/atom), GaN is chemically and mechanically very stable. Much effort has focused on developing methods to improve the light extraction efficiency, including the use of photonic crystals, photoelectron-chemical etching, conventional lithography, and nanoimprinting technologies.[9-11] Among these, PEC (photo electrochemical) etching has advantages in terms of the compatibility with conventional semiconductor processing equipment and easy scalability to large wafers as well as the processing cost.

Recently, GaN-based solar cells have also attracted much interest, with demonstrations that the theoretical conversion efficiency can be as high as 40.3% at air mass 1.5.[12,13] Because these solar cells suffer from losses due to the total reflection at the interface between air and solar cells, the minimization of the reflection is critical to optimize the structure of the cells.[4] In the crystalline Si solar cells, a pyramid structure obtained using the wet etching method has been widely employed because the wet etching does not cause any lattice damage to the crystal compared with dry etching methods such as reactive ion etching (RIE) and ion-induced sputtering.[14] GaN with its wurtzite structure can be preferentially

wet etched to form the hexagonal pyramid structure depending on the facets and polarity.[15-19] It is believed that the surface texturing is also important for GaN-based solar cells. In this paper, we directly compared the characteristics of KOH-based PEC etching on both Ga-face and N-face GaN by using atomic force microscopy (AFM), scanning electron microscopy (SEM), and the reflectance measurement at various KOH concentrations.

## Experimental

Several pieces of GaN cut from the same sample were used for contactless PEC etching experiments in various KOH concentrations. The nominally undoped ($n \sim 5 \times 10^{16}$ cm⁻³) 3 μm thick layers were grown by metalorganic chemical vapor deposition, as described elsewhere.[20] To compare the morphologies of both Ga-and N-face GaN after PEC etch treatments, both faces were dipped in the solution for the same time (10 min). We used various concentrations (1, 2, and 4 M) at 50°C under UV illumination with a magnetic stirrer (300 rpm). Figure 1 shows our experimental setup. The GaN samples were contained inside a Teflon holder during the PEC etch process. The surface morphologies and optical properties of both Ga- and N-faces were characterized by AFM (VEECO Multimode), scanning electron microscope (Hitachi S-4700), and reflectivity measurements (Ocean Optics Inc., USB 2000+).

## Results and Discussion

Figures 2 and 3 present the SEM and AFM images of Ga-face and N-face GaN after each PEC etch, respectively. As shown in Fig. 2, the Ga-face GaN was initially very flat before PEC etching. The Ga-face GaN became even flatter after PEC etching, which is consistent with the previous reports that Ga-face GaN is very stable and inert.[5,6] Table I shows that the root-mean-square (rms) roughness of Ga-face GaN changed from 27.9 nm (before PEC treatment) to 2.1 nm (4M KOH). The triangular inclusion in Fig. 2B can be explained by the removal of the defects, for example, the inverted domain. By sharp contrast, pristine N-face GaN was rough with rms of 141.3 nm. After PEC etching at 4 M KOH concentrations, the roughness went up to 227.7 nm. As can be seen in the SEM and AFM images, the facets of the hexagonal pyramids became very sharp as a result of the PEC etching process. In addition, the density of the hexagonal pyramids was increased after the PEC treatments. Li et al. reported the etch reaction under similar conditions as

$$\underset{KOH}{2GaN + 3H_2O \rightarrow Ga_2O_3 + 2NH_3}$$

where KOH is both a catalyst for the reaction and a solvent for the resulting $Ga_2O_3$.[17] Because the wet etch process occurs through the negatively charged OH⁻ ions, Ga-face GaN is more stable than N-face GaN due to the negatively charged triple dangling bonds at the surface of Ga-polar GaN.[17,18] This etch process can be acceler-

* Electrochemical Society Fellow.
** Electrochemical Society Active Member.
z E-mail: hyunjhyun?@korea.ac.kr

Downloaded 03 Feb 2011 to 128.113.121.46. Redistribution subject to ECS license or copyright; see http://www.ecsdl.org/terms_use.jsp

A-0303

EFS00015846

*Journal of The Electrochemical Society*, **157** (6) H676-H678 (2010)

H677



**Figure 1.** (Color online) Schematic of PEC etch setup used in our experiments. The GaN samples were immersed at various KOH concentrations (1, 2, and 4 M) for 10 min under UV lamp illumination with a stirring speed of 300 rpm.



**Figure 2.** (Color online) Top-view SEM and AFM (inset) images of the surface morphology on Ga-face GaN/sapphire at 50°C for 10 min in various concentrations of KOH solutions (A) before etching. (B) 1 M KOH, (C) 2 M KOH, and (D) 4 M KOH.



**Figure 3.** (Color online) Top-view SEM and AFM (inset) images of the surface morphology on N-face GaN/sapphire at 50°C for 10 min in various concentrations of KOH solutions (A) before etching. (B) 1 M KOH, (C) 2 M KOH, and (D) 4 M KOH.

**Table I. Summary of rms data of each faces (Ga-, N-) at various PEC etch conditions.**

| rms | Ref (nm) | 1 M-10 min (nm) | 2 M-10 min (nm) | 4 M-10 min (nm) |
|---|---|---|---|---|
| Ga-face | 27.9 | 20.7 | 18 | 2.1 |
| N-face | 141.3 | 191.9 | 203.4 | 227.7 |





**Figure 4.** (Color online) (A) SEM image of N-face GaN surface after PEC etching. [(B) and (C)] figures are schematic drawings of the light path to compare the flat surface with the textured surface for applications in (B) LEDs and (C) solar cells.

ated by increasing the KOH concentrations by adding more OH⁻ ions.

To extract the photons generated within the quantum well in LEDs and to absorb the incoming light into the semiconductor in solar cells, a roughened surface is highly desirable because it can reduce the total reflection by increasing the number of the reflection events and randomizing the angles of the light rays.[21] In contrast to the dry etching process, which involves high energy ions, the KOH-based PEC etching avoids the damage induced by high energy particles. Figure 4A is our optimal surface structure after the PEC etch of N-face GaN, where the surface with dense hexagonal pyramids is ideal for both LEDs (Fig. 4B) and solar cell applications (Fig. 4C). Figure 5 shows the image from N-polar GaN that was PEC-etched



**Figure 5.** (Color online) High magnification SEM image of hexagonal pyramid on N-face GaN after PEC etch. (Inset: schematic view of the pyramid with six {10$\bar{1}$1} facets)

Downloaded 03 Feb 2011 to 128.113.121.46. Redistribution subject to ECS license or copyright; see http://www.ecsdl.org/terms_use.jsp

A-0304

EFS00015847

H678                     *Journal of The Electrochemical Society*, 157 (6) H676-H678 (2010)



(a)



(b)

**Figure 6.** (Color online) (A) Reflectance data as a function of wavelength from Ga-face GaN after each PEC etch. (B) Reflectance data as a function of wavelength from N-face GaN after each PEC etch.

in 4 M KOH. Figure 5 has a 6-fold symmetry that confirms six $\{10\bar{1}\bar{1}\}$ facets (inset of Fig. 5).

The reflectance data were compared between N-polar and Ga-polar GaN at various KOH concentrations. As expected from the SEM and AFM results, the Ga-polar face showed a higher reflectance than the N-polar face (Fig. 6). Also, the reflectance was increased in Ga-polar GaN after the prolonged PEC etching because the surface became smoother. By sharp contrast, the roughened surface after PEC etch at higher KOH concentrations gave a lower

reflectance because of the populated hexagonal pyramids with the sharper tips, which are beneficial to increase the light extraction efficiency in LEDs and the light absorption efficiency in the solar cells.

## Conclusions

Ga-polar and N-polar GaN on sapphire substrates were compared for PEC etching characteristics at various KOH concentrations. Triple dangling bonds with negative charges prohibited etching on the chemically stable Ga-polar faces. N-polar faces were able to be chemically etched by exposing the 6-fold crystal facets. This process eliminates the high energy ions used in RIE or sputtering, which can cause severe lattice damage and create traps that degrade the performance of optical devices. Therefore, our KOH-based PEC etching on N-polar GaN has great potential for improving the efficiency of GaN-based optoelectronic devices by texturing the surface.

## Acknowledgments

The research at Korea University was supported by the Carbon Dioxide Reduction and Sequestration Center, one of the 21st Century Frontier R&D Program funded by the Ministry of Education, Science and Technology of Korea.

*Korea University assisted in meeting the publication costs of this article.*

## References

1. M. S. Shur and R. F. Davis, *GaN-based Materials and Devices: Growth, Fabrication, Characterization and Performance*, World Scientific, Singapore (2004).
2. *Introduction to Nitride Semiconductor Blue Lasers and Light-Emitting Diodes*, S. Nakamura and S. F. Chichibu, Editors, Taylor and Francis, London (2000).
3. H. Morkoç, *Nitride Semiconductors and Devices*, Springer, Berlin (1999).
4. M. Fukuda, *Optical Semiconductor Devices*, John Wiley & Sons, New York (1999).
5. H. M. Ng, N. G. Weimann, and A. Chowdhury, *Jpn. J. Appl. Phys., Part 2*, **42**, L1405 (2003).
6. Y. Gao, M. D. Craven, J. S. Speck, S. P. DenBaars, and E. L. Hu, *Appl. Phys. Lett.*, **84**, 3322 (2004).
7. http://global.kyocera.com/prdct/tc/sapphire/, last accessed March 10, 2010.
8. B. J. Kim, H. Jung, S. H. Kim, J. Bang, and J. Kim, *IEEE Photon. Technol. Lett.*, **21**, 700 (2009).
9. D. H. Kim, C. O. Cho, Y. G. Roh, H. Jeon, Y. S. Park, J. Cho, J. S. Im, C. Sone, Y. Park, W. J. Choi, et al., *Appl. Phys. Lett.*, **87**, 203508 (2005).
10. T. A. Truong, L. M. Campos, E. Matioli, I. Meinel, C. J. Hawker, C. Weisbuch, and P. M. Petroff, *Appl. Phys. Lett.*, **94**, 023101 (2009).
11. T. Fujii, Y. Gao, R. Sharma, E. L. Hu, S. P. DenBaars, and S. Nakamura, *Appl. Phys. Lett.*, **84**, 855 (2004).
12. W. Hu, B. Ma, D. Li, H. Miyake, and K. Hiramatsu, *Appl. Phys. Lett.*, **94**, 231102 (2009).
13. J. J. Wierer, Jr., A. J. Fischer, and D. D. Koleske, *Appl. Phys. Lett.*, **96**, 051107 (2010).
14. P. Paper, O. Nichiporuk, A. Kaminski, Y. Rozier, J. Kraiem, J.-F. Lelievre, A. Chaumartin, A. Fave, and M. Lemiti, *Sol. Energy Mater. Sol. Cells*, **90**, 2319 (2006).
15. M. S. Minsky, M. White, and E. L. Hu, *Appl. Phys. Lett.*, **68**, 1531 (1996).
16. C. Youtsey, I. Adesida, and G. Bulman, *Appl. Phys. Lett.*, **71**, 2151 (1997).
17. D. Li, M. Sumiya, S. Fuke, D. Yang, D. Que, Y. Suzuki, and Y. Fukuda, *J. Appl. Phys.*, **90**, 4219 (2001).
18. H. M. Ng, N. G. Weimann, and A. Chowdhury, *J. Appl. Phys.*, **94**, 650 (2003).
19. D. Zhuang and J. H. Edgar, *Mater. Sci. Eng. R.*, **48**, 1 (2005).
20. S.-M. Hwang, Y. G. Seo, K. H. Baik, I. S. Cho, J. H. Baek, S. Jung, T. G. Kim, and M. Cho, *Appl. Phys. Lett.*, **95**, 071101 (2009).
21. I. Schnitzer, E. Yablonovitch, C. Caneau, T. J. Gmitter, and A. Scherer, *Appl. Phys. Lett.*, **63**, 2174 (1993).

Downloaded 03 Feb 2011 to 128.113.121.46. Redistribution subject to ECS license or copyright; see http://www.ecsdl.org/terms_use.jsp

EFS00015848

**Boston University** Technology Development

53 Bay State Road
Boston, Massachusetts 02215
T 617-353-4550 F 617-353-6141

**Vinit Nijhawan**
**Managing Director, Technology Development Office**
**Lecturer School of Management & Director Enterprise Programs, ITEC**
**T 617-353-0606**
**vinit@bu.edu**

July 16, 2010

VIA EMAIL (efredschubert@gmail.com and FEDEX

Dr. E. Fred Schubert
17 Eaton Road
Troy, NY 12180

Dear Fred:

Re:     BU98-11 Invention Disclosure
"Crystallographic Wet Chemical Etching of III-Nitride Material"
U.S. Application No. 09/338,709 filed June 23, 1999
U.S. Patent No. 6,294,475 issued September 25, 2001
Inventors: E. Fred Schubert and Dean A. Stocker

I am pleased to be able to inform you that the Charles River Campus Patent Committee approved your request that the above -referenced invention be returned to you under the Charles River Campus Patent Policy, subject to the stipulations set out below.

The invention will be returned solely to you. On April 5, 2010 we sent a Certified Mail, Return Receipt Requested letter to Dean Stocker notifying him that Boston University is no longer supporting the patent costs for this invention and asking if he was interested in having the invention returned to him. The letter was received and signed for by Dean on April 12, 2010. We indicated in our letter that if we received no response by April 16 we would treat the matter as closed regarding his potential interest in the invention. As of this date, we have not received a response from him. Nevertheless, Dean Stocker may continue to have rights in this invention under U.S. patent law.

Because the U.S. application was assigned to Trustees of Boston University, we will need to file an assignment of it to you. The law firm of Gauthier and Connors is preparing such an Assignment for execution by Martin J. Howard on behalf of the Trustees of Boston University.

Since you used federal funding in the course of research that led to the Patent Rights, the University must obtain the consent of the Office of Naval Research and the National Science Foundation to assign the Patent Rights to you. We are notifying the ONR and the NSF that we are relinquishing our rights to the invention and returning the invention to the ONR and the NSF. You now need to request title of this invention from the ONR and NSF and your request should be directed to John Karasek at the ONR and Robin Fritsch at the NSF (contact details below). They will then send you the appropriate paperwork for electing title to the invention.

E. Fred Schubert
Page 2
June 15, 2010

ONR Grant No. N00014-98-1-0194
John Karasek
Tel:    (703) 696-4007
Email:  john.karasek@navy.mil

NSF Grant No. ECS 9714047
Robin Fritsch
Tel:    (703) 292-8060
Email:  rfritsch@nsf.gov

The University's expenditures on the case to date total $27,272.32. This amount does not include the
$3,771.00 for reviving the patent which we invoiced you for on June 14, 2010. In consideration for the
assignment of the Patent Rights, you agree to pay the University 25% of any future income stream arising
from the Patent Rights until these costs are reimbursed and 10% thereafter.

You also agree that, upon notification from the ONR and the NSF that they have granted your request for
election of title to the invention, you will reimburse Trustees of Boston University $10,000.00 to cover
previous prosecution costs.

You agree not to assert any patent that may be issued against Boston University, Boston Medical Center
or any other educational or non-profit research institution that is conducting non-commercial research
using the Patent Rights.

THE UNIVERSITY MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EITHER
EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, WARRANTIES OF
MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR WITH RESPECT TO (1)
THE SCOPE OR VALIDITY OF ANY OF THE PATENT RIGHTS; (2) WHETHER THE PATENT
RIGHTS MAY BE EXPLOITED BY YOU OR ANY SUBLICENSEE WITHOUT INFRINGING THE
RIGHTS (INCLUDING PATENT RIGHTS) OF OTHERS; OR (3) THE RESULTS TO BE OBTAINED
BY USE OF THE PATENT RIGHTS. THE PATENT RIGHTS ARE DELIVERED "AS IS" IN EVERY
RESPECT.

You agree to defend, indemnify and hold the University and its affiliated hospital, Boston Medical Center
Corporation, their trustees, officers, employees, agents and harmless from and against all claims, suits,
demands, liability and expenses, including legal expenses and reasonable attorneys' fees, arising out of or
relating to the Patent Rights and any product, service or process relating to or developed using the Patent
Rights

You agree to provide us with a short annual report on your utilization of the technology by January 31 of
each year commencing in 2011, until such time as you abandon the intellectual property. This report will
be for our internal purposes only and will be considered a confidential document.

Boston University appreciates having had the opportunity to work with you on this case and wishes you
success with it in the future.

BU000425

E. Fred Schubert
Page 3
June 15, 2010

Please signify you agreement to these conditions by countersigning this letter below and returning one copy to me, retaining the other for your files.

Yours sincerely,

*Vinit Njir*

Vinit Nijhawan

cc      Andre Ruckenstein *(email only)*
        Christy Talley *(email only)*
        Janine Anderson
        Jon Jensen
        Matt Connors    Gauthier & Connors (*email and mail*)

Acknowledged and Agreed:

E. Fred Schubert
_____
E. Fred Schubert

BU000426

| | |
|---|---|
| **From:** | Schubert, E. Fred |
| **To:** | Anderson, Janine B |
| **Subject:** | Letter received |
| **Date:** | Monday, June 21, 2010 7:39:16 PM |

Janine

I received the hard copy of the letter -- thank you very much. I signed it and mailed it back to you by US Mail. The check with the patent revival fee is included with the signed letter. So you should receive the letter and check in a couple of days.

Regards, Fred

BU000427

| From: | Schubert, E. Fred |
|-------|-------------------|
| To: | Anderson, Janine B |
| Cc: | Jensen, Jonathan J |
| Subject: | Re: BU98-11 invention return letter |
| Date: | Friday, June 18, 2010 3:07:38 PM |

Dear Janine

Thank you very much for the electronic advance copy of the letter. Once I receive the hard copy of the letter, I will sign it and send one signed copy back to you along with the first payment ($ 3771).

Best regards, Fred

On Fri, Jun 18, 2010 at 2:12 PM, Anderson, Janine B <jandersn@bu.edu> wrote:

Dear Fred,

Scanned copy of our letter returning BU98-11 invention to you attached. Original going out today via FedEx.

Best,

Janine

Janine B. Anderson

Patent Manager, Technology Transfer

Boston University

Technology Development Office

53 Bay State Road

Boston, MA 02215

Tel: (617) 358-0238

Fax: (617) 353-6141

email: jandersn@bu.edu

Web: www.bu.edu/otd/

BU000428

**Anderson, Janine B**

| | |
|---|---|
| **From:** | Anderson, Janine B |
| **Sent:** | Thursday, November 04, 2010 4:30 PM |
| **To:** | 'Schubert, E. Fred' |
| **Subject:** | Assignment of patents rights BU to Schubert |
| **Attachments:** | Executed assignment.pdf; Notice of Recordation Assignment.pdf |

Dear Fred,

Attached, for your files, is a PDF of the executed assignment of patents rights of USP 6,294,475 from Boston University to you. Also attached is the Notice of Recordation of Assignment which shows that the assignment for this patent was recorded by the USPTO on October 25, 2010 at Reel 025178, Frame 0715.

Please be aware that the 3rd and final maintenance fee for this patent is due March 25, 2013. Instructions for paying the maintenance fee are on the USPTO website at:  https://ramps.uspto.gov/eram/.

All the best,
Janine

Janine B. Anderson
Patent Manager, Technology Transfer
Boston University
Technology Development Office
53 Bay State Road
Boston, MA 02215
Tel: (617) 358-0238
Fax: (617) 353-6141
email: jandersn@bu.edu
Web: www.bu.edu/otd/

1

BU000398



**UNITED STATES PATENT AND TRADEMARK OFFICE**

UNDER SECRETARY OF COMMERCE FOR INTELLECTUAL PROPERTY AND
DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE



OCTOBER 25, 2010                                      *700448846A*

PTAS

BRIAN D. GILDEA
53 BAY STATE ROAD
BOSTON, MASSACHUSETTS 02155

UNITED STATES PATENT AND TRADEMARK OFFICE
NOTICE OF RECORDATION OF ASSIGNMENT DOCUMENT

THE ENCLOSED DOCUMENT HAS BEEN RECORDED BY THE ASSIGNMENT DIVISION OF
THE U.S. PATENT AND TRADEMARK OFFICE.  A COMPLETE MICROFILM COPY IS
AVAILABLE AT THE ASSIGNMENT SEARCH ROOM ON THE REEL AND FRAME NUMBER
REFERENCED BELOW.

PLEASE REVIEW ALL INFORMATION CONTAINED ON THIS NOTICE.  THE
INFORMATION CONTAINED ON THIS RECORDATION NOTICE REFLECTS THE DATA
PRESENT IN THE PATENT AND TRADEMARK ASSIGNMENT SYSTEM.  IF YOU SHOULD
FIND ANY ERRORS OR HAVE QUESTIONS CONCERNING THIS NOTICE, YOU MAY
CONTACT THE EMPLOYEE WHOSE NAME APPEARS ON THIS NOTICE AT 571-272-3350.
PLEASE SEND REQUEST FOR CORRECTION TO:  U.S. PATENT AND TRADEMARK OFFICE,
MAIL STOP: ASSIGNMENT SERVICES BRANCH, P.O. BOX 1450, ALEXANDRIA, VA 22313.

RECORDATION DATE: 10/25/2010          REEL/FRAME: 025178/0715
                                      NUMBER OF PAGES: 2

BRIEF:  ASSIGNMENT OF ASSIGNOR'S INTEREST (SEE DOCUMENT FOR DETAILS).

ASSIGNOR:
    TRUSTEES OF BOSTON UNIVERSITY      DOC DATE: 10/20/2010

ASSIGNEE:
    SCHUBERT, E. FRED
    17 EATON ROAD
    TROY, NEW YORK 12180

SERIAL NUMBER: 09338709               FILING DATE: 06/23/1999
PATENT NUMBER: 6294475                ISSUE DATE: 09/25/2001
TITLE: CRYSTALLOGRAPHIC WET CHEMICAL ETCHING OF III-NITRIDE MATERIAL

TONYA LEE, EXAMINER
ASSIGNMENT SERVICES BRANCH
PUBLIC RECORDS DIVISION

P.O. Box 1450, Alexandria, Virginia 22313-1450 · www.uspto.gov

BU000399

A-0312

):BRIAN D. GILDEA   COMPAN\ .53 BAY STATE ROAD

Oct. 25. 2010  8:27AM

**10/25/2010**
**700448846**

No. 0030   P. 1/2

Form PTO-1595 (Rev. 03-05)
OMB No. 0651-0027 (exp. 03/31/2009)

U.S. DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

## RECORDATION FORM COVER SHEET
# PATENTS ONLY

To the Director of the U.S. Patent and Trademark Office: Please record the attached documents or the new address(es) below.

| 1. Name of conveying party(ies) | 2. Name and address of receiving party(ies) |
|---|---|
| Trustees of Boston University | Name: E. Fred Schubert |
|  | Internal Address: |
| Additional name(s) of conveying party(ies) attached? ☐ Yes ☒ No |  |

**3. Nature of conveyance/Execution Date(s):**
Execution Date(s) October 20, 2010

☒ Assignment          ☐ Merger
☐ Security Agreement   ☐ Change of Name
☐ Joint Research Agreement
☐ Government Interest Assignment
☐ Executive Order 9424, Confirmatory License
☐ Other_____

Street Address: 17 Eaton Road

City: Troy

State: New York

Country: United States          Zip: 12180

Additional name(s) & address(es) attached? ☐ Yes ☒ No

**4. Application or patent number(s):**   ☐ This document is being filed together with a new application.
A. Patent Application No.(s)       B. Patent No.(s)

6,294,475

Additional numbers attached? ☐ Yes ☒ No

| 5. Name and address to whom correspondence concerning document should be mailed: | 6. Total number of applications and patents involved: 1 |
|---|---|
| Name: Brian D. Gildea | 7. Total fee (37 CFR 1.21(h) & 3.41)  $ 40.00 |
| Internal Address: |  |
|  | ☒ Authorized to be charged to deposit account |
| Street Address: 53 Bay State Road | ☐ Enclosed |
|  | ☐ None required (government interest not affecting title) |
| City: Boston | **8. Payment Information** |
| State: Massachusetts      Zip: 02155 |  |
| Phone Number: 617-353-8995 |  |
| Fax Number: 617-358-6207 | Deposit Account Number 023255 |
| Email Address: gildeabd@bu.edu | Authorized User Name Brian D. Gildea |

**9. Signature:**

/Brian D. Gildea/                                              October 25, 2010
Signature                                                              Date

Brian D. Gildea, Reg. No. 39,995        Total number of pages including cover
Name of Person Signing                  sheet, attachments, and documents:    2

Documents to be recorded (including cover sheet) should be faxed to (571) 273-0140, or mailed to:
Mail Stop Assignment Recordation Services, Director of the USPTO, P.O.Box 1450, Alexandria, V.A. 22313-1450

BU000400

P. 1

* * * Communication Result Report ( Oct. 25. 2010  8:28AM ) * * *

Date/Time: Oct. 25. 2010  8:21AM

| File<br>No. Mode | Destination | Pg(s) | Result | Page<br>Not Sent |
|---|---|---|---|---|
| 0030 Memory TX | 915712730140#28111 | P.  2 | OK | |

Reason for error
  E. 1) Hang up or line fail          E. 2) Busy
  E. 3) No answer                     E. 4) No facsimile connection
  E. 5) Exceeded max. E-mail size



BU000401

Form PTO-1595 (Rev. 03-09)
OMB No. 0651-0027 (exp. 03/31/2009)

U.S. DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

## RECORDATION FORM COVER SHEET
# PATENTS ONLY

To the Director of the U.S. Patent and Trademark Office: Please record the attached documents or the new address(es) below.

| 1. Name of conveying party(ies) | 2. Name and address of receiving party(ies) |
|---|---|
| Trustees of Boston University<br><br>Additional name(s) of conveying party(ies) attached? ☐ Yes ☒ No | Name: E. Fred Schubert<br>Internal Address:_____<br>_____<br>Street Address: 17 Eaton Road<br>_____<br>City: Troy<br>State: New York<br>Country: United States _____ Zip: 12180<br>Additional name(s) & address(es) attached? ☐ Yes ☒ No |

**3. Nature of conveyance/Execution Date(s):**
Execution Date(s) October 20, 2010

☒ Assignment          ☐ Merger
☐ Security Agreement   ☐ Change of Name
☐ Joint Research Agreement
☐ Government Interest Assignment
☐ Executive Order 9424, Confirmatory License
☐ Other_____

**4. Application or patent number(s):**   ☐ This document is being filed together with a new application.
A. Patent Application No.(s)          B. Patent No.(s)

6,294,475

Additional numbers attached?  ☐ Yes ☒ No

| 5. Name and address to whom correspondence concerning document should be mailed: | 6. Total number of applications and patents involved: 1 |
|---|---|
| Name: Brian D. Gildea<br>Internal Address:_____<br>_____<br>Street Address: 53 Bay State Road<br>_____<br>City: Boston<br>State: Massachusetts  Zip: 02155<br>Phone Number: 617-353-8996<br>Fax Number: 617-358-6207<br>Email Address: gildeabd@bu.edu | 7. Total fee (37 CFR 1.21(h) & 3.41)  $ 40.00<br><br>☒ Authorized to be charged to deposit account<br>☐ Enclosed<br>☐ None required (government interest not affecting title)<br><br>**8. Payment Information**<br><br>Deposit Account Number  023255<br>Authorized User Name Brian D. Gildea |

**9. Signature:**

| /Brian D. Gildea/ | October 25, 2010 |
|---|---|
| Signature | Date |
| Brian D. Gildea, Reg. No. 39,995<br>Name of Person Signing | Total number of pages including cover sheet, attachments, and documents: 2 |

Documents to be recorded (including cover sheet) should be faxed to (571) 273-0140, or mailed to:
Mail Stop Assignment Recordation Services, Director of the USPTO, P.O.Box 1450, Alexandria, V.A. 22313-1450

BU000402

A-0315



# UNITED STATES PATENT AND TRADEMARK OFFICE

## Facsimile Transmission

| To: | Name:<br>Company:<br>Fax Number:<br>Voice Phone: | BRIAN D. GILDEA<br>53 BAY STATE ROAD<br>16173586207 |
|---|---|---|
| From: | Name:<br>Voice Phone: | ASSIGNMENT SERVICES BRANCH<br>571-272-3350 |

37 C.F.R. 1.6 sets forth the types of correspondence that can be communicated to the Patent and Trademark Office via facsimile transmissions. Applicants are advised to use the certificate of facsimile transmission procedures when submitting a reply to a non-final or final Office action by facsimile (37 CFR 1.8(a)).

Fax Notes:

| Pg# | Description |
|---|---|
| 1 | Cover Page |
| 2 | 790.TXT |
| 3 | Document 1, Batch 2220624 |

USPTO ASSIGNMENT SYSTEM PROCESSING

Date and time of transmission: Tuesday, October 26, 2010 12:15:14 PM
Number of pages including this cover sheet: 03

BU000403

## ASSIGNMENT

WHEREAS, WE, Trustees of Boston University, a Massachusetts corporation, with its principal place of business at One Silber Way, Boston, MA 02215, have ownership of U.S. Patent No. 6,294,475 (the "Patent"), the assignment of which is recorded with the United States Patent and Trademark Office at Reel 010687, Frame 0578;

AND WHEREAS, E. Fred Schubert, a United States citizen, residing at 17 Eaton Road, Troy, NY 12180, desires to acquire the entire right, title and interest in and to the said Patent:

NOW, THEREFORE, for good and valuable consideration, the Trustees of Boston University do hereby sell, assign, transfer and set over, unto the said E. Fred Schubert, his successors, legal representatives and assigns, the entire right, title and interest throughout the world in, to and under said Patent including all reissues, re-examinations and extensions thereof.

The undersigned hereby grant(s) Brian D. Gildea, Esq. the power to insert on this Assignment any further identification which may be necessary or desirable in order to comply with the rules of the U.S. Patent and Trademark Office.

IN TESTIMONY WHEREOF, WE, Trustees of Boston University, hereunto set our signature this _20ᵗʰ_ day of _Ocᴛobᴇʀ_, 20**10**.

_____
Signature of Trustees of Boston University Representative

**Martin J. Howard**
Printed Name of Representative **Treasurer**

_____
Title of Representative

STATE OF _Maₛₛachuₛeᴛᴛₛ_
COUNTY OF _Suffoᵢₖ_     SS:

This _20ᵗʰ_ day of _Ocᴛobᴇʀ_, 20**10**, before me personally came the above-named _Marᴛiₙ J. Howₐrd_, to me personally known as the individual who executed the same of his/her own free will for the purposes therein set forth.

_____
Notary Public



```
LINDA M. DIONNE
Notary Public
Commonwealth of Massachusetts
My Commission Expires Jan 19, 2012
```



BU000404

):BRIAN D. GILDEA   COMPANY, 53 BAY STATE ROAD

βα G8-11



## UNITED STATES PATENT AND TRADEMARK OFFICE

UNDER SECRETARY OF COMMERCE FOR INTELLECTUAL PROPERTY AND
DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE



OCTOBER 25, 2010

PTAS

* 700448846A*

BRIAN D. GILDEA
53 BAY STATE ROAD
BOSTON, MASSACHUSETTS 02155

UNITED STATES PATENT AND TRADEMARK OFFICE
NOTICE OF RECORDATION OF ASSIGNMENT DOCUMENT

THE ENCLOSED DOCUMENT HAS BEEN RECORDED BY THE ASSIGNMENT DIVISION OF
THE U.S. PATENT AND TRADEMARK OFFICE.  A COMPLETE MICROFILM COPY IS
AVAILABLE AT THE ASSIGNMENT SEARCH ROOM ON THE REEL AND FRAME NUMBER
REFERENCED BELOW.

PLEASE REVIEW ALL INFORMATION CONTAINED ON THIS NOTICE.  THE
INFORMATION CONTAINED ON THIS RECORDATION NOTICE REFLECTS THE DATA
PRESENT IN THE PATENT AND TRADEMARK ASSIGNMENT SYSTEM.  IF YOU SHOULD
FIND ANY ERRORS OR HAVE QUESTIONS CONCERNING THIS NOTICE, YOU MAY
CONTACT THE EMPLOYEE WHOSE NAME APPEARS ON THIS NOTICE AT 571-272-3350.
PLEASE SEND REQUEST FOR CORRECTION TO:  U.S. PATENT AND TRADEMARK OFFICE,
MAIL STOP: ASSIGNMENT SERVICES BRANCH, P.O. BOX 1450, ALEXANDRIA, VA 22313.

RECORDATION DATE: 10/25/2010        REEL/FRAME: 025178/0715
                                    NUMBER OF PAGES: 2

BRIEF:  ASSIGNMENT OF ASSIGNOR'S INTEREST (SEE DOCUMENT FOR DETAILS).

ASSIGNOR:
    TRUSTEES OF BOSTON UNIVERSITY      DOC DATE: 10/20/2010

ASSIGNEE:
    SCHUBERT, E. FRED
    17 EATON ROAD
    TROY, NEW YORK 12180

SERIAL NUMBER: 09338709              FILING DATE: 06/23/1999
PATENT NUMBER: 6294475               ISSUE DATE: 09/25/2001
TITLE: CRYSTALLOGRAPHIC WET CHEMICAL ETCHING OF III-NITRIDE MATERIAL

TONYA LEE, EXAMINER
ASSIGNMENT SERVICES BRANCH
PUBLIC RECORDS DIVISION

P.O. Box 1450, Alexandria, Virginia 22313-1450 - www.uspto.gov

BU000405



# UNITED STATES PATENT AND TRADEMARK OFFICE

## Facsimile Transmission

| To: | Name: | BRIAN D. GILDEA |
|-----|-------|-----------------|
| | Company: | 53 BAY STATE ROAD |
| | Fax Number: | 16173586207 |
| | Voice Phone: | |

| From: | Name: | ASSIGNMENT SERVICES BRANCH |
|-------|-------|----------------------------|
| | Voice Phone: | 571-272-3350 |

**37 C.F.R. 1.6 sets forth the types of correspondence that can be communicated to the Patent and Trademark Office via facsimile transmissions. Applicants are advised to use the certificate of facsimile transmission procedures when submitting a reply to a non-final or final Office action by facsimile (37 CFR 1.8(a)).**

Fax Notes:

| Pg# | Description |
|-----|-------------|
| 1 | Cover Page |
| 2 | 790.TXT |
| 3 | Document 1, Batch 2220624 |

USPTO ASSIGNMENT SYSTEM PROCESSING

Date and time of transmission: Tuesday, October 26, 2010 12:15:14 PM
Number of pages including this cover sheet: 03

BU000406

:BRIAN D. GILDEA    COMPANY 53 BAY STATE ROAD

Oct. 25. 2010  8:27AM          **10/25/2010**          No. 0030  P. 1/2
                               **700448846**

| Form PTO-1595 (Rev. 03-09) | U.S. DEPARTMENT OF COMMERCE |
|---|---|
| OMB No. 0651-0027 (exp. 03/31/2009) | United States Patent and Trademark Office |

## RECORDATION FORM COVER SHEET
## PATENTS ONLY

To the Director of the U.S. Patent and Trademark Office: Please record the attached documents or the new address(es) below.

| 1. Name of conveying party(ies) | 2. Name and address of receiving party(ies) |
|---|---|
| Trustees of Boston University | Name: E.Fred Schubert |
| | Internal Address: |
| Additional name(s) of conveying party(ies) attached? ☐ Yes ☒ No | |

| 3. Nature of conveyance/Execution Date(s): | Street Address: 17 Eaton Road |
|---|---|
| Execution Date(s) October 20, 2010 | |
| ☒ Assignment   ☐ Merger | |
| ☐ Security Agreement   ☐ Change of Name | City: Troy |
| ☐ Joint Research Agreement | State: New York |
| ☐ Government Interest Assignment | Country: United States     Zip: 12180 |
| ☐ Executive Order 9424, Confirmatory License | |
| ☐ Other: | Additional name(s) & address(es) attached? ☐ Yes ☒ No |

| 4. Application or patent number(s): ☐ This document is being filed together with a new application. | |
|---|---|
| A. Patent Application No.(s) | B. Patent No.(s) |
| | 6,294,475 |
| Additional numbers attached? ☐ Yes ☒ No | |

| 5. Name and address to whom correspondence concerning document should be mailed: | 6. Total number of applications and patents involved: 1 |
|---|---|
| Name: Brian D. Gildea | 7. Total fee (37 CFR 1.21(h) & 3.41)  $ 40.00 |
| Internal Address: | |
| | ☒ Authorized to be charged to deposit account |
| Street Address: 53 Bay State Road | ☐ Enclosed |
| | ☐ None required (government interest not affecting title) |
| City: Boston | 8. Payment Information |
| State: Massachusetts     Zip: 02155 | |
| Phone Number: 617-353-8996 | Deposit Account Number  023255 |
| Fax Number: 617-358-6207 | Authorized User Name Brian D. Gildea |
| Email Address: gildeabd@bu.edu | |

| 9. Signature: | | |
|---|---|---|
| | /Brian D. Gildea/ | October 25, 2010 |
| | Signature | Date |
| | Brian D. Gildea, Reg. No. 39,995 | Total number of pages including cover sheet, attachments, and documents: 2 |
| | Name of Person Signing | |

Documents to be recorded (including cover sheet) should be faxed to (571) 273-0140, or mailed to:
Mail Stop Assignment Recordation Services, Director of the USPTO, P.O.Box 1450, Alexandria, V.A. 22313-1450

BU000407

* * * Communication Result Report ( Oct. 25. 2010  :28AM ) * * *

1)
2)

Date/Time: Oct. 25. 2010  8:21AM

| File No. | Mode | Destination | Pg(s) | Result | Page Not Sent |
|----------|------|-------------|-------|--------|---------------|
| 0030 | Memory TX | 915712730140#28111 | P.  2 | OK | |

Reason for error
 E. 1) Hang up or line fail          E. 2) Busy
 E. 3) No answer                     E. 4) No facsimile connection
 E. 5) Exceeded max. E-mail size



BU000408

## SUPPLEMENTAL ASSIGNMENT

WHEREAS, the, Trustees of Boston University, a Massachusetts corporation, with its principal place of business at One Silber Way, Boston, MA 02215, transferred its entire right, title and interest in and to U.S. Patent No. 6,294,475 (the "Patent") to E. Fred Schubert (Professor. Schubert), a United States citizen, residing at 17 Eaton Road, Troy, NY 12180, through an Assignment executed October 20, 2010, which is recorded with the United States Patent and Trademark Office at Reel 025178, Frame 0715 (the "Assignment"); and

WHEREAS, the Trustees of Boston University and Professor Schubert intended said transfer to include all rights to recoveries based on any claim for damages by reason of past infringements of the Patent, i.e., for any infringement which occurred prior to the date of the Assignment (October 20, 2010), in addition to any damages based on any act of infringement occurring subsequent to the date of the Assignment; and

WHEREAS, the Trustees of Boston University and Professor Schubert recognize that, to pass the right to sue and recover for past infringements, it may be necessary to expressly so state in the assignment, and desire that this Supplemental Assignment perform that function:

NOW, THEREFORE, this Supplemental Assignment: a) confirms that the Assignment was intended to and did sell, assign, and transfer to Professor Schubert, his successors, legal representatives, and assigns, all rights to sue for, obtain, and collect any recoveries based on any claim for damages by reason of any past infringement of the Patent; and b) to the extent that the original Assignment did not assign such rights, the Trustees of Boston University hereby assign, transfer and sell (for good and valuable consideration) to Professor Schubert, his successors, legal representatives, and assigns, all rights of the Trustees of Boston University to sue for, obtain and collect any recoveries based on any claim for damages by reason of any past infringements of the Patent, i.e., for damages based on any act of infringement that occurred prior to the date of the Assignment (October 20, 2010).

The undersigned hereby grant(s) Professor Schubert's patent counsel, Troutman Sanders LLP,. the power to insert on this Supplemental Assignment any further identification which may be necessary or desirable in order to comply with the rules of the U.S. Patent and Trademark Office.

1487180v1

BU000391

IN TESTIMONY WHEREOF, WE, Trustees of Boston University, hereunto set our signature this 2nd day of _July_, 2012.

_(signature)_

Signature of Trustees of Boston University Representative

Martin J. Howard
Treasurer

Printed Name of Representative

_____

Title of Representative

STATE OF _Massachusetts_
COUNTY OF _Suffolk_ SS:

This 2nd day of _July_, 2012, before me personally came the above-named _Martin J. Howard_, to me personally known as the individual who executed the same of his/her own free will for the purposes therein set forth.

_(signature)_

Notary Public





BU000392

A-0323

US008263424B2

(12) **United States Patent** (10) **Patent No.:** **US 8,263,424 B2**
Hashimoto et al. (45) **Date of Patent:** **Sep. 11, 2012**

(54) **OPTO-ELECTRONIC AND ELECTRONIC DEVICES USING AN N-FACE OR M-PLANE GALLIUM NITRIDE SUBSTRATE PREPARED VIA AMMONOTHERMAL GROWTH**

(75) Inventors: **Tadao Hashimoto**, Santa Barbara, CA (US); **Hitoshi Sato**, Santa Barbara, CA (US); **Shuji Nakamura**, Santa Barbara, CA (US)

(73) Assignees: **The Regents of the University of California**, Oakland, CA (US); **Japan Science and Technology Agency**, Saitama Prefecture (JP)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 169 days.

(21) Appl. No.: **12/792,615**

(22) Filed: **Jun. 2, 2010**

(65) **Prior Publication Data**

US 2010/0275837 A1 Nov. 4, 2010

**Related U.S. Application Data**

(63) Continuation of application No. 11/765,629, filed on Jun. 20, 2007, now Pat. No. 7,755,172.

(60) Provisional application No. 60/815,507, filed on Jun. 21, 2006.

(51) **Int. Cl.**
| | |
|---|---|
| *H01L 21/00* | (2006.01) |
| *C30B 23/00* | (2006.01) |
| *C30B 25/00* | (2006.01) |
| *C30B 28/12* | (2006.01) |
| *C30B 28/14* | (2006.01) |

(52) **U.S. Cl.** .............. 438/46; 438/47; 117/88; 117/101; 117/216; 257/E21.09; 257/E29.089; 257/E33.03

(58) **Field of Classification Search** .................... 438/46, 438/47; 117/216, 88, 101; 257/E21.09, E29.089, 257/E33.03
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,398,867 | B1 | 6/2002 | D'Evelyn et al. |
| 7,078,731 | B2 | 7/2006 | D'Evelyn et al. |
| 2004/0051105 | A1 | 3/2004 | Tsuda et al. |
| 2004/0245535 | A1 | 12/2004 | D3 Evelyn et al. |
| 2005/0098095 | A1 | 5/2005 | D'Evelyn et al. |
| 2005/0224783 | A1 | 10/2005 | Matsuyama et al. |
| 2006/0057749 | A1 | 3/2006 | Dwilinski et al. |
| 2006/0118799 | A1 | 6/2006 | D'Evelyn et al. |
| 2006/0255341 | A1 | 11/2006 | Pinnington et al. |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| FR | | 2796657 | 1/2001 |
| WO | WO 03035945 | | 5/2003 |
| WO | WO2004003261 | | 1/2004 |

OTHER PUBLICATIONS

EP Search Report dated Jun. 22, 2010 (EP Application No. 07809717.7).

(Continued)

*Primary Examiner* — David S Blum

(74) *Attorney, Agent, or Firm* — Gates & Cooper LLP

(57) **ABSTRACT**

A method for growing III-V nitride films having an N-face or M-plane using an ammonothermal growth technique. The method comprises using an autoclave, heating the autoclave, and introducing ammonia into the autoclave to produce smooth N-face or M-plane Gallium Nitride films and bulk GaN.

**40 Claims, 10 Drawing Sheets**



c (Ga-face) (0001) 112
a (11$\bar{2}$0) 116
m (10$\bar{1}$0) 118
120
r (10$\bar{1}$2) 114
c (N-face) (000$\bar{1}$)

**US 8,263,424 B2**

Page 2

OTHER PUBLICATIONS

Dimitrov R., et al., "Two-dimensional electron gases in Ga-face and N-face AlGaN/GaN heterostructures grown by plasma-induced molecular beam epitaxy and metalorganic chemical vapor deposition on sapphire", Journal of Applied Physics, 2000 American Institute of Physics. New York, US LNKD-DOI:10/1063/1.372353, vol. 87, No. 7, Apr. 1, 2000, pp. 3375-3380, XP012049755 ISSN: 0021-8979.

Callahan, M. et al., "Growth of GaN crystals under ammonothermal conditions," Materials Research Society 798 (2004): Y2.10.1-Y2.10.6.

Rajan, S. et al., "Growth and electrical characterization of n-face AlGaN/GaN heterostructures," Japanese Journal of Applied Physics, vol. 44, No. 49, 2005, pp. L1478-L1480.

Ramachandran, V. et al., "Inversion of wurtzite GaN(0001) by exposure to magnesium" Applied Physics Letters, vol. 75, No. 6, Aug. 9, 1999, pp. 808-810.



**FIG. 1(a)**              **FIG. 1(b)**



**FIG. 2**



**FIG. 3**



**FIG. 4**



**FIG. 5**



(a)          (b)

FIG. 6



**FIG. 7**



**FIG. 7C**



**FIG. 8**



PLACING A SEED CRYSTAL OF GAN HAVING AN EXPOSED N-FACE OR M-PLANE OF GAN INTO AN AUTOCLAVE — 900

PLACING A MINERALIZER INTO THE AUTOCLAVE — 902

PLACING A SOURCE INTO THE AUTOCLAVE — 904

ADDING AMMONIA TO THE AUTOCLAVE — 906

HEATING THE AUTOCLAVE — 908

**FIG. 9**

US 8,263,424 B2

1

# OPTO-ELECTRONIC AND ELECTRONIC DEVICES USING AN N-FACE OR M-PLANE GALLIUM NITRIDE SUBSTRATE PREPARED VIA AMMONOTHERMAL GROWTH

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation under 35 U.S.C Section 120 of U.S. Utility application Ser. No. 11/765,629, filed on Jun. 20, 2007, by Tadao Hashimoto, Hitoshi Sato, and Shuji Nakamura, entitled "OPTO-ELECTRONIC AND ELEC-TRONIC DEVICES USING N-FACE OR M-PLANE GaN SUBSTRATE PREPARED WITH AMMONOTHERMAL GROWTH," now U.S. Pat. No. 7,755,172, issued Jul. 13, 2010, which application claims the benefit under 35 U.S.C Section 119(e) of U.S. Provisional Application Ser. No. 60/815,507, filed on Jun. 21, 2006, by Tadao Hashimoto, Hitoshi Sato, and Shuji Nakamura, entitled "OPTO-ELEC-TRONIC AND ELECTRONIC DEVICES USING N-FACE GaN SUBSTRATE PREPARED WITH AMMONOTHER-MAL GROWTH," both of which applications are incorpo-rated by reference herein.

The present application is related to the following applica-tion:

U.S. Provisional Patent Application Ser. No. 60/790,310, filed Apr. 7, 2006, entitled "A METHOD FOR GROWING LARGE SURFACE AREA GALLIUM NITRIDE CRYS-TALS IN SUPERCRITICAL AMMONIA AND LARGE SURFACE AREA GALLIUM NITRIDE CRYSTALS," by Tadao Hashimoto, et al.;

which application is incorporated by reference herein.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The invention is related to a method and materials for growing N-face Gallium Nitride (GaN) or M-plane Gallium Nitride using ammonothermal growth techniques.

2. Description of the Related Art

The usefulness of gallium nitride (GaN) and its ternary and quaternary alloys incorporating aluminum and indium (Al-GaN, InGaN, AlInGaN) has been well established for fabri-cation of visible and ultraviolet opto-electronic devices and high-power electronic devices. These devices are typically grown epitaxially on heterogeneous substrates, such as sap-phire and silicon carbide, by Vapor Phase Epitaxy (VPE) techniques such as Metal-Organic Chemical Vapor Deposi-tion (MOCVD) and Molecular Beam Epitaxy (MBE). The growth of device layers is usually initiated by growing a buffer layer on the substrate in the MOCVD or MBE reactor. The buffer layer provides a smooth surface of GaN or AlN suitable for successive growth of device layers. However, the buffer layer is usually a Ga-polar (Ga-face) surface, because growth along the N-polar (N-face) direction results in a rough surface in the VPE growth phase.

Commercially available GaN-based devices are all grown on Ga-polar surface (Gallium-face of the C-plane, also known as the (0001) plane). Recently, however, several stud-ies have pointed out many benefits of N-polar (the Nitrogen-face of the C-plane, also known as the (000-1) plane) devices. Also, it has been pointed out that devices grown on M-plane, also known as the {10-10} plane have further advantages over Ga-polar or N-polar devices.

One major benefit of N-face (N-face) growth is for p-type doping. In Ga-polar (Ga-face) growth of Mg-doped GaN, the film polarity locally starts to invert to the N-polar (N-face)

2

direction. This phenomenon is known as inversion domains when the concentration of Mg exceeds a certain limit. The inversion domains deteriorate the surface smoothness; there-fore, a Ga-polar (Ga-face) film is limited in its hole concen-trations. Since high Mg doping favors N-polar (N-face) growth, using a N-polar (N-face) substrate is expected to attain higher Mg concentrations, and thus higher hole con-centrations. Opto-electronic devices with high p-type con-duction will improve their efficiency by decreasing series resistance of the devices.

A second major benefit is the inverted polarization charge. Although GaN-based High Electron Mobility Transistors (HEMTs) are currently available, their usage is very limited due to many unsolved problems. GaN-based HEMTs cur-rently available have high gate leakage and are typically depletion mode devices. Transistors grown on N-face GaN would realize low gate leakage devices, devices that operate in enhancement mode (normally off mode), are crucial for power switching devices, low dispersion devices, and improved carrier confinement.

One of the major benefits of M-plane optical devices is the higher emission efficiency due to absence of polarization field. Another major benefit of M-plane optical devices is that the optically active layer can contain more In, allowing longer wavelength emission. This enables to realize green, yellow, even red color LEDs.

Despite these benefits, current technology is limited to Ga-polar (Ga-face) devices because of the poor surface smoothness of N-polar (N-face) surface or M-plane surface. Therefore new technology to attain a smooth surface of N-po-lar (N-face) or M-plane GaN is needed to realize the next generation of high-performance devices such as ultra-high bright LEDs, low threshold current Laser Diodes (LDs), high-power high-speed signal transistors and high-power switch-ing transistors.

## SUMMARY OF THE INVENTION

To overcome the limitations in the prior art described above, and to overcome other limitations that will become apparent upon reading and understanding the present speci-fication, the present invention discloses a method for growing N-face or M-plane GaN using an ammonothermal growth technique.

In summary, the present invention describes methods and devices which have a directly grown N-face of the C-plane (000-1) or M-plane {10-10}. Although described with respect to GaN herein, any group-III nitride material can benefit from the teachings of the present invention.

An electronic device in accordance with the present inven-tion comprises a GaN layer, wherein the GaN layer is fabri-cated by utilizing an N-polar (000-1) surface or M-plane {10-10} surface of the GaN layer having an off-axis angle less than 10 degrees, wherein the N-polar (000-1) surface or the M-plane {10-10} surface is prepared with an ammono-thermal growth technique.

Such a device further optionally comprises the GaN being fabricated under pressure less than 760 Torr, and an AlGaN layer coupled to the N-polar or M-plane surface of the GaN layer, and a second GaN layer coupled to the AlGaN layer, wherein electrons are induced at the interface between the AlGaN layer and the second GaN layer on the second GaN layer side.

An opto-electronic device in accordance with the present invention comprises an electrically conducting GaN substrate having an N-polar or M-plane surface whose off-axis angle is less than ten degrees, the GaN substrate being fabricated

US 8,263,424 B2

3

using an ammonothermal growth method, a plurality of n-type group III nitride layers coupled to the N-polar or M-plane surface of the GaN substrate, at least one group III nitride light-emitting active layer coupled to the plurality of n-type group III nitride layers, and at least one p-type group III nitride layer having an Mg doping coupled to the active layers.

Such a device further optionally comprises at least one Mg-doped layer, wherein a concentration of the Mg-doped layer is more than $10^{21}$ cm$^{-3}$, and a thickness of the Mg-doped layer is more than 0.1 micron.

A method for directly growing N-polar (000-1) or M-plane {10-10} Gallium Nitride (GaN) in accordance with the present invention comprises placing a seed crystal of GaN having an exposed N-face (000-1) or M-plane {10-10} of GaN into an autoclave, placing a mineralizer into the auto-clave, placing a source into the autoclave, adding ammonia to the autoclave, and heating the autoclave.

Such a method further optionally comprises the mineral-izer being selected from a group comprising NaNH$_2$, KNH$_2$, LiNH$_2$, NH$_4$Cl, NH$_4$Br, and NH$_4$I, the source comprising Ga metal, the autoclave being heated in zones, a first zone being heated to a first temperature and a second zone being heated to a second temperature, and the source being placed in the first zone and the seed crystal of GaN having an exposed N-face (000-1) or M-plane {10-10} of GaN being placed in the second zone.

A group-III nitride layer in accordance with the present invention comprises a group-III nitride layer grown on a substrate, wherein the group-III nitride layer comprises an N-face of a C-plane (000-1) or a M-plane {10-10} that is directly exposed as a result of the growth of the group-III nitride layer.

Such a layer further optionally comprises the growth being an ammonothermal growth, the N-face of the C-plane (000-1) or the M-plane {10-10} is substantially co-planar with a surface of the substrate, the N-face of the C-plane (000-1) or the M-plane {10-10} is tilted with respect to a surface of the substrate, the N-face of the C-plane (000-1) or the M-plane {10-10} is tilted at an angle less than 10 degrees with respect to the surface of the substrate, the N-face of the C-plane (000-1) or the M-plane {10-10} directly accepts growth of at least one additional group-III nitride layer, the at least one additional group-III nitride layer comprising at least one Mg-doped layer wherein a concentration of the Mg-doped layer is more than $10^{21}$ cm$^{-3}$, and a thickness of the Mg-doped layer being more than 0.1 micron.

The current invention provides opto-electronic devices such as Light Emitting Diodes (LEDs) and Laser Diodes (LDs), and electronic devices such as High-Electron Mobility Transistors (HEMTs), Field Effect Transistors (FETs) and Hetero-Bipolar Transistors (HBTs) with higher performance than existing devices by utilizing an N-face or M-plane GaN substrate prepared with an ammonothermal growth method. All commercially available GaN-related devices are fabri-cated on the Ga-face of GaN substrates at this moment, although utilizing the N-face or M-plane of GaN substrates would provide better performance. This is because growth of GaN template on a heterogeneous substrate such as sapphire or SiC favors Ga-face growth, and N-face or M-plane growth usually suffers from a rough surface profile, making process-ing and further growth more difficult. By using an ammono-thermal growth method, N-face or M-plane growth results in a smoother surface than Ga-face growth. Utilizing such a smooth surface of an N-polar (N-face) or M-plane substrate

4

will enable to improve performance of various opto-elec-tronic and electronic devices made of GaN and its related alloys.

BRIEF DESCRIPTION OF THE DRAWINGS

Referring now to the drawings in which like reference numbers represent corresponding parts throughout:

FIGS. 1(a) and 1(b) are schematics of crystallographic directions and planes of interest in hexagonal GaN;

FIG. 2 is a schematic of an autoclave according to an embodiment of the present invention;

FIG. 3 illustrates a process flow diagram;

FIG. 4 illustrates an example of a LED using a high-doped Mg layer on a N-polar (N-face) substrate;

FIG. 5 illustrates a HEMT utilizing N-polar (N-face) smooth surface of GaN grown by the ammonothermal method;

FIGS. 6(a) and 6(b) illustrate GaN crystals grown in a first method in accordance with the present invention;

FIGS. 7(a) and 7(b) illustrate GaN crystals grown in a second method in accordance with the present invention;

FIG. 7C shows a photograph of the grown M-plane GaN;

FIG. 8 illustrates a 1 micron-thick GaN layer with a smooth surface grown on the GaN crystals of FIG. 4(a); and

FIG. 9 illustrates a process chart outlining the steps used to perform the invention.

DETAILED DESCRIPTION OF THE INVENTION

In the following description of the preferred embodiment, reference is made to a specific embodiment in which the invention may be practiced. It is to be understood that other embodiments may be utilized and structural changes may be made without departing from the scope of the present inven-tion.

Crystallography

FIGS. 1(a) and 1(b) are schematics of crystallographic directions and planes of interest in hexagonal GaN. These schematics show the different crystallographic growth direc-tions and also the planes of interest in the hexagonal wurtzite GaN structure. The fill patterns are intended to illustrate the planes of interest, but do not represent the materials of the structure.

FIG. 1(a) shows a top view of c-plane 100, with directions a1 102, a2 104, and a3 106 to orient the wurtzite crystal. Directions 108 and 110 also assist in orienting the crystal, showing the <10-10> and <11-20> directions, respectively.

FIG. 1(b) illustrates an isometric view of the wurtzite crys-tal. The c-plane, Ga-face (0001) of the crystal is shown as plane 112. The c-plane, N-face (000-1) of the crystal is shown as plane 114. The a-plane 116, m-plane 118, and r-plane 120 are shown for clarity.

It is relatively easy to grow c-plane (Ga-face, (0001)) GaN due to its large growth window (pressure, temperature and precursor flows) and its stability. Therefore, nearly all GaN-based devices are grown along the polar c-axis. However, as a result of c-plane growth, each material layer suffers from separation of electrons and holes to opposite faces of the layers. Furthermore, strain at the interfaces between adjacent layers gives rise to piezoelectric polarization, causing further charge separation.

Growth Chamber

FIG. 2 is a schematic of an autoclave according to an embodiment of the present invention.

The autoclave (200) comprises an autoclave lid (202), autoclave screws (204), a gasket (206), an internal chamber

US 8,263,424 B2

5

(208), an ammonia releasing port (210), an ammonia inlet port (212), internal chamber baffle (214) and internal chamber lid (216).

As noted above, the objective of the present invention is to provide a method of growing large high-quality GaN crystals in supercritical ammonia with a fast growth rate. GaN bulk crystals are grown in supercritical ammonia by using Ga-containing source materials, typically Ga metal or polycrystalline GaN.

The autoclave (200), which has a long dimension along the vertical direction, is used to contain high-pressure ammonia at temperatures exceeding 300° C. Since the pressure of ammonia reaches more than 1.5 kbar, the wall thickness of the autoclave (200) must be at least 1 inch.

In order to grow large crystals, the inner diameter of the autoclave (200) is designed to be more than 5 cm. Due to high pressure and the large cross section of the autoclave (200), the necessary tightening torque of screws (204) to seal the lid (202) of the autoclave (200) is very high. To hold high-pressure at temperatures higher than 300° C., a Ni—Cr based superalloy is used as an autoclave (200) material. However, the Ni—Cr seizes the screws (204) of the lid (202) after heat cycling to grow GaN. After the autoclave (200) is cooled down, the necessary torque to loosen the screws (204) of the lid (202) easily exceeds the maximum torque of a hydraulic wrench.

Therefore, it is necessary to loosen the screws (204) of the lid (202) before cooling down the autoclave (200). In order to loosen the screws (204) of the lid (202) before cooling down, the high-pressure ammonia is released under heated condition after GaN growth. The autoclave (200) is equipped with an ammonia-releasing port (210) with a high-pressure valve. The location of the ammonia-releasing port (210) is at the top of the autoclave (200) because $H_2$ generated by growth reaction stays inside the tubing of the ammonia-releasing port (210), thereby preventing clogging of the port (210).

The internal chamber (208) is used to realize safe operation and pure crystal growth. Since the total volume of the autoclave (200) to grow large GaN crystals is very large, the necessary amount of anhydrous liquid ammonia is more than 100 g. Since the direct feeding of ammonia to the autoclave (200) through the ammonia-releasing port (210) takes a very long time due to the very small conductance of the high-pressure valve, it is necessary to use an internal chamber (208) equipped with an ammonia-inlet port (212) whose conductance is larger than that of the ammonia-releasing port (210). In this way, Ga-containing materials used as source materials, GaN single crystals used as seed crystals, mineralizers, and ammonia can be loaded outside of the massive autoclave (200).

The internal chamber (208) is equipped with a baffle (214), which divides the internal chamber (208) into two regions along the longitudinal direction of the autoclave (200), wherein these regions are designated as a top region and a bottom region. The Ga-containing materials are typically loaded in the top region and the GaN single crystals are typically placed in the bottom region. Mineralizers containing alkali metal or alkali earth metal are also loaded into the internal chamber (208). Moreover, In-containing material, typically In metal, is preferably added to increase growth rate of GaN. After loading all solid materials in the internal chamber (208), the lid (216) of the internal chamber (208) is sealed. Ammonia is fed through the ammonia-inlet port (212) of the internal chamber (208). After the ammonia charge, the ammonia-inlet port (212) is closed with a gas-tight screw. In

6

this way, all solid materials and ammonia can be loaded into the internal chamber (208) without any oxygen and moisture contamination.

Existing technology typically uses $KNH_2$, $NaNH_2$, $LiNH_2$, K, Na, Li as mineralizers. Instead of the mineralizers containing Group I alkali metals, use of Group II alkali earth compounds such as $Ca(NH_2)_2$, $Mg(NH_2)_2$, $Ba(NH_2)_2$, $Ca_3N_2$, $Mg_3N_2$, $MgCl_2$, $CaCl_2$, $MgBr_2$, $CaBr_2$, $MgI_2$, or $CaI_2$ is preferable because contamination of group I alkali metal results in colored GaN crystals. In-containing materials such as In metal can be added to increase the growth rate of GaN.

After charging all necessary materials in the internal chamber (208), the internal chamber (208) is transported into the autoclave (200). The internal chamber (208) is designed to release ammonia under heated conditions and the high-pressure ammonia is contained by the autoclave (200). The autoclave (200) is heated with multi-zone heaters to set a temperature difference between the top region and the bottom region. In this way, the source materials are dissolved in the supercritical ammonia, transported to the seed crystals, and GaN is crystallized on the seed crystals.

Existing technology uses Ni—Cr superalloy for the internal chamber materials. However, Ni—Cr superalloy causes contamination of the grown GaN. Based on corrosion-resistance experiments on various metals, Vanadium and Vanadium based alloys are suitable materials for the internal chamber (208) or a liner coating of the internal chamber (208).

The internal chamber is equipped with baffles (214) which divides the internal chamber (208) into two regions along the longitudinal direction of the autoclave, wherein the two regions are known as a top region and a bottom region. Since the large sized high-pressure vessel has a thick wall to hold high-pressure, it is challenging to set enough temperature difference between the two regions with one baffle plate. Therefore, using more than one baffle plate is preferable.

The Ga-containing source materials (218) such as Ga metal or polycrystalline GaN are placed in the top region (218) of the internal chamber and seed crystals (220) such as single crystal GaN are placed in the bottom region (222) of the internal chamber (208).

To enhance the reaction, a small amount of chemicals called mineralizers are added. Existing technology typically uses $KNH_2$, $NaNH_2$, $LiNH_2$, K, Na, Li to obtain a basic condition. Instead of the mineralizers containing Group I alkali metals, use of Group II alkali earth compounds such as $Ca(NH_2)_2$, $Mg(NH_2)_2$, $Ba(NH_2)_2$, $Ca_3N_2$, $Mg_3N_2$, $MgCl_2$, $CaCl_2$, $MgBr_2$, $CaBr_2$, $MgI_2$, $CaI_2$, prevents contamination of the grown GaN crystals with alkali metals. In addition, in this invention, indium (In) containing materials such as In metal is added to increase the GaN growth rate.

The internal chamber (208) is filled with ammonia, loaded into the autoclave (200), and the autoclave (200) is heated from outside by multi-zone heaters to a set temperature difference between the top region (220) and the bottom region (224).

The use of the autoclave (200) and proper heating and materials (218, 222) being added to the autoclave (200) in accordance with the present invention allow for direct growth of GaN with an exposed N-face or M-plane that is of device quality. This allows for direct processing of GaN devices rather than performing debonding and/or cleaving of the grown GaN to expose the N-face or M-plane, or processing of a rough N-face or M-plane prior to device layer growth. This reduction in processing steps reduces the overall cost of GaN devices, as well as reducing the time to produce such devices and increasing the yield of such devices.

US 8,263,424 B2

7

Process Flow

FIG. 3 shows a process flow diagram.

The objective of the present invention is to provide high-performance opto-electronic and electronic devices by utilizing a smooth surface of N-polar (N-face) GaN or M-plane GaN as a substrate. Box 300 illustrates growing a smooth N-polar (N-face) GaN or M-plane GaN substrate by ammonothermal growth as described herein. The ammonothermal growth illustrated in box 300 can be used for either growing a N-polar (N-face) or M-plane film of GaN or growing bulk GaN. In the case of film growth, box 302 illustrates shaping the substrate and back-etching so that it fits into the VPE reactor. Further, box 302 illustrates that before growing device layers, the N-polar (N-face) or M-plane surface grown in box 300 is cleaned with solvents, and, if necessary, surface polishing, angled-polishing of the surface, or surface etching can be performed.

In the case of bulk growth, box 304 illustrates slicing GaN substrates from the bulk crystals grown in box 300, and further illustrates subsequent appropriate surface polishing and treatment. Then, box 306 illustrates growing device layers on the N-polar (N-face) or M-plane surface by conventional vapor phase epitaxy such as MOCVD or MBE. The exposed N-face or M-plane can be exactly within the c-plane 114, or the surface of the GaN can be slightly out-of-plane, with an off-axis angle of up to and including 25 degrees, but typically less than 10 degrees off-axis. Finally, box 308 illustrates fabricating a device structure using semiconductor processing.

So, the present invention allows for a group-III nitride layer to be grown on a substrate, wherein the group III nitride layer comprises an N-face of a C-plane (000-1) or M-plane {10-10} that is directly exposed as a result of the growth of the group-III nitride layer. Directly exposing the N-face or M-plane typically means that the N-face or M-plane is exposed as a result of the ammonothermal growth process, rather than the use of laser lift-off, cutting, or de-bonding techniques that separate the N-face or M-plane from the substrate. Further, the present invention contemplates that the N-face or M-plane will be substantially co-planar with the plane of the substrate, rather than substantially perpendicular as in sidewall lateral-epitaxial overgrowth (SLEO) or lateral-epitaxial overgrowth (LEO) techniques described elsewhere in the related art. However, if the seed crystals are slightly miss cut, then the N-face or M-plane will be slightly misaligned with the plane of the substrate, as much as 25 degrees as described above.

The group-III nitride layer having the N-face of the C-plane (000-1) or M-plane {10-10} grown in accordance with the present invention directly accepts growth of at least one additional group-III nitride layer. Directly accepts growth typically means that the group-III nitride layer grown in accordance with the present invention can be used to grow additional layers, e.g., InGaN layers, additional GaN layers, etc., without further processing to smooth out the layer. No dry etching, wet etching, or polishing is typically needed to prepare the N-face of the C-plane (000-1) or M-plane {10-10} when the present invention's methods and devices are used.

Although described with respect to ammonothermal growth herein, other growth techniques can be used in conjunction with or in place of the ammonothermal growth technique herein described without departing from the scope of the present invention.

Device Examples

FIG. 4 illustrates an example of a LED using a high-doped Mg layer on a N-polar (N-face) or M-plane substrate. By

8

using the N-polar (N-face) or M-plane surface, the doping level of Mg is not limited by formation of inversion domains. This structure has a lower series resistance which leads to higher emission efficiency.

Substrate 400 is shown, and is grown using the ammonothermal method disclosed herein. Substrate 400 is grown with the N-polar (N-face) or M-plane surface 402 as a surface for future growth steps. N-type GaN layer 404 is then grown on the N-polar (N-face) or M-plane surface 402, using VPE or other growth techniques. Active layer 406 is then grown on N-type layer 404, where active layer 406 is a light-emitting layer of material. Highly doped layer 408 is then grown on active layer 406. Highly doped layer 408 is typically a highly-doped p-type GaN layer, doped with Mg and thicker than 0.1 micron, where the Mg doping level is typically above $10^{20}$ $cm^{-3}$ and sometimes above $10^{21}$ $cm^{-3}$. Anode 410 and cathode 412 act as the electrode contacts for device 414, which is a LED.

FIG. 5 illustrates a HEMT utilizing N-polar (N-face) smooth surface of GaN grown by the ammonothermal method. As in FIG. 2, substrate 500 is shown, and is grown using the ammonothermal method disclosed herein. Substrate 500 is grown with the N-polar (N-face) surface 502 as a surface for future growth steps. Undoped AlGaN layer 504 is then grown on the N-polar (N-face) surface 502, using VPE or other growth techniques. Undoped GaN layer 506 is then grown on undoped AlGaN layer 504, where layer 506 acts as the charge carrying layer for the HEMT. Undoped AlGaN gate layer 508 is then grown on layer 506. Gate electrode 510, source electrode 512 and drain electrode 514 act as the electrode contacts for device 516, which is a HEMT.

Unlike the conventional HEMT structure using Ga-polar (Ga-face) GaN, the electron sheet charge 518 is induced above AlGaN layer 504, not below AlGaN layer 504, so that the induced carriers cannot leak out to the substrate 500. Also, the AlGaN layer 508 below the gate electrode 510 modifies the internal electric field to sweep away the electrons under the gate while maintaining electrons under the source 512 and drain 514 regions. This enables enhancement-mode HEMT (normally-off mode) devices 516 which have not been attained with GaN/AlGaN systems grown on a Ga-polar (Ga-face) surface.

EXPERIMENTAL RESULTS

Example 1

Growth of Smooth N-Polar (N-Face) GaN Using Metallic Ga in Ammonothermal Method

A large surface area, about 3 cm×4 cm, of a GaN seed crystal, a small surface area about 5 mm×5 mm, of some GaN seed crystals, 40 g of Ga metal, NaNH₂ (1 mol % to ammonia), NaI (0.05 mol % to ammonia), 1.0 g of In metal, and 114.3 g of anhydrous liquid ammonia were loaded into the internal chamber. After transporting the internal chamber 208 into the autoclave 200 of which the inner diameter is about 5 cm, the autoclave 200 was heated at 625° C. (top region 220) and 675° C. (bottom region 224). The resulting maximum pressure was 31505 psi (2.2 kbar). The autoclave 200 was maintained at this high temperature for 1 day and the ammonia was released after 1 day. The resulting GaN crystal grown in the autoclave 200 according to the method of the present invention is shown in FIGS. 6(a) and 6(b). FIG. 6(a) shows the N-polar (N-face) surface and FIG. 6(b) shows the Ga-polar (Ga-face) surface. The thickness of the ammonothermally grown layer (layers 400 and/or 500 discussed in FIGS. 4 and 5) was about 40

US 8,263,424 B2

9

microns. As shows in FIGS. 6(a)-(b), the N-face is smoother than Ga-face. This smooth surface is suitable for successive device fabrication by vapor phase growth.

The N-face shown in FIG. 6(a) is ready for device layer growth described in FIGS. 4-5 without subsequent processing; as such, GaN wafers produced by the method of the present invention do not need to be de-bonded or have substrates removed to expose the N-face of the c-plane for device production.

### Example 2

Growth of Smooth N-Polar (N-Face) GaN Using Polycrystalline GaN in Ammonothermal Method

GaN seed crystals in size of about 5 mm×5 mm, about 120 g of polycrystalline GaN, NaNH$_2$(3 mol % to ammonia), and 101.3 g of anhydrous liquid ammonia were loaded into the internal chamber. After transporting the internal chamber **208** into the autoclave **200** of which the inner diameter is about 5 cm, the autoclave **200** was heated at 550° C. (top region **220**) and 675° C. (bottom region **224**). The resulting maximum pressure was 27686 psi (1.9 kbar). The autoclave **200** was maintained at this high temperature for 10 days and the ammonia was released after 10 days. About 2.5-2.6 microns of GaN films were grown on a seed crystal. Scanning electron microscope images of the resulting GaN crystal are shown in FIGS. 7(a) and 7(b). FIG. 7(a) shows the N-face and FIG. 7(b) shows the Ga-face. Similar to Example 1, the N-polar (N-face) surface was smoother than the Ga-polar (Ga-face). The N-face shown in FIG. 7(a) is smooth enough for direct growth of device layers as described in FIGS. 4-5.

### Example 3

Growth of Smooth M-Plane GaN Using Polycrystalline GaN in Ammonothermal Method

M-plane GaN seed crystals in size of about 3 mm×3 mm, about 100 g of polycrystalline GaN, NaNH$_2$(3.8 mol % to ammonia), and 101.5 g of anhydrous liquid ammonia were loaded into the internal chamber. After transporting the internal chamber **208** into the autoclave **200** of which the inner diameter is about 5 cm, the autoclave **200** was heated at 510° C. (top region **220**) and 700° C. (bottom region **224**). The resulting maximum pressure was 27986 psi (1.9 kbar). The autoclave **200** was maintained at this high temperature for 83 days and the ammonia was released after 83 days. Smooth M-plane GaN was grown on the M-plane GaN seed. FIG. 7C shows a photograph of the grown M-plane GaN.

### Example 4

Growth of Smooth N-Polar (N-Face) GaN by MOCVD on N-Polar (N-Face) GaN Prepared by the Ammonothermal Method

A GaN thin film was grown by MOCVD on N-face GaN grown in Example 1. Prior to the growth, the backside (Ga-face) of the substrate was thinned with a grinding machine down to about 400 microns. A GaN thin film was grown with trimethylgallium and ammonia as source gases under low pressure. The flow rate of trimethylgallium and ammonia was 18 μmol/min and 3 liter/min, respectively. The substrate temperature was 1185° C. and the reactor pressure was 76 Torr. Typically, the growth pressure is below 760 Torr, and is typically approximately 100 Torr. After 1 hour of growth, about a

10

1 micron-thick GaN layer with a smooth surface of the N-face of the C-plane directly exposed was obtained, as shown in FIG. 8.

### Possible Modifications and Variations on the Preferred Embodiment

Although GaN films growth by ammonothermal method were presented in the examples, GaN substrates sliced from bulk GaN crystals grown by ammonothermal method can also be used for high-performance optoelectronic and electron devices. Mineralizers used in the examples were NaNH$_2$, but other mineralizers such as KNH$_2$, LiNH$_2$, NH$_4$Cl, NH$_4$Br, NH$_4$I, and others can be used to grow smooth N-polar (N-face) GaN.

In the experimental results and examples, only N-face of the C-plane GaN or M-plane GaN was explained. However, similar effect can be expected for {11-20} A-plane GaN, {10-11}, {10-1-1}, {11-22}, or {11-2-2} semipolar planes.

Advantages

In existing methods and devices, the Ga-polar (Ga-face) surface is used for device fabrication. The use of the Ga-polar (Ga-face) surface has disadvantages in its nature, which limits the performance of resulting opto-electronic and electronic devices. However, despite predicted benefits of N-polar (N-face) or M-plane devices, existing growth methods cannot provide a smooth N-polar (N-face) or M-plane surface for subsequent growth and device processing.

In the current invention, it is presented that ammonothermal growth method provides a smooth N-polar (N-face) or M-plane surface which is suitable for successive device fabrication. All kinds of opto-electronic and electronic devices can improve the performance by using the N-polar (N-face) or M-plane surface prepared with the ammonothermal method of the present invention. The present invention also reduces processing steps because flip-chip bonding and de-bonding steps are no longer needed to expose the N-face or M-plane of the growth.

Process Chart

FIG. 9 illustrates a process chart outlining the steps used to perform the invention.

Box **900** illustrates placing a seed crystal of GaN having an exposed N-face or M-plane of GaN into an autoclave.

Box **902** illustrates placing a mineralizer into the autoclave.

Box **904** illustrates placing a source into the autoclave.

Box **906** illustrates adding ammonia to the autoclave.

Box **908** illustrates heating the autoclave.

### CONCLUSION

In summary, the present invention describes methods and devices which have a directly grown N-face of the C-plane (000-1) or M-plane {10-10}. Although described with respect to GaN herein, any group-III nitride material can benefit from the teachings of the present invention.

An electronic device in accordance with the present invention comprises a GaN layer, wherein the GaN layer is fabricated by utilizing an N-polar (000-1) surface of the GaN layer having an off-axis angle less than 10 degrees, wherein the N-polar (000-1) surface is prepared with an ammonothermal growth technique.

Such a device further optionally comprises the GaN being fabricated under pressure less than 760 Torr, and an AlGaN layer coupled to the N-polar surface of the GaN layer, and a second GaN layer coupled to the AlGaN layer, wherein elec-

US 8,263,424 B2

**11**

trons are induced at the interface between the AlGaN layer and the second GaN layer on the second GaN layer side.

An opto-electronic device in accordance with the present invention comprises an electrically conducting GaN substrate having an N-polar or M-plane surface whose off-axis angle is less than ten degrees, the GaN substrate being fabricated using an ammonothermal growth method, a plurality of n-type group III nitride layers coupled to the N-polar or M-plane surface of the GaN substrate, at least one group III nitride light-emitting active layer coupled to the plurality of n-type group III nitride layers, and at least one p-type group III nitride layer having an Mg doping coupled to the active layers.

Such a device further optionally comprises at least one Mg-doped layer, wherein a concentration of the Mg-doped layer is more than $10^{21}$ cm$^{-3}$, and a thickness of the Mg-doped layer is more than 0.1 micron.

A method for directly growing N-polar (000-1) or M-plane Gallium Nitride (GaN) in accordance with the present invention comprises placing a seed crystal of GaN having an exposed N-face (000-1) or M-plane of GaN into an autoclave, placing a mineralizer into the autoclave, placing a source into the autoclave, adding ammonia to the autoclave, and heating the autoclave.

Such a method further optionally comprises the mineralizer being selected from a group comprising NaNH$_2$, KNH$_2$, LiNH$_2$, NH$_4$Cl, NH$_4$Br, and NH$_4$I, the source comprising Ga metal, the autoclave being heated in zones, a first zone being heated to a first temperature and a second zone being heated to a second temperature, and the source being placed in the first zone and the seed crystal of GaN having an exposed N-face (000-1) or M-plane of GaN being placed in the second zone.

A group-III nitride layer in accordance with the present invention comprises a group-III nitride layer grown on a substrate, wherein the group-III nitride layer comprises an N-face of a C-plane (000-1) or M-plane {10-10} that is directly exposed as a result of the growth of the group-III nitride layer.

Such a layer further optionally comprises the growth being an ammonothermal growth, the N-face of the C-plane (000-1) or M-plane {10-10} is substantially co-planar with a surface of the substrate, the N-face of the C-plane (000-1) or M-plane {10-10} is tilted with respect to a surface of the substrate, the N-face of the C-plane (000-1) or M-plane {10-10} is tilted at an angle less than 10 degrees with respect to the surface of the substrate, the N-face of the C-plane (000-1) or M-plane {10-10} directly accepts growth of at least one additional group-III nitride layer, the at least one additional group-III nitride layer comprising at least one Mg-doped layer wherein a concentration of the Mg-doped layer is more than $10^{21}$ cm$^{-3}$, and a thickness of the Mg-doped layer being more than 0.1 micron.

Although described with respect to the N-face of the C-plane and the M-plane of the GaN crystal, the present invention works with any surface of the GaN crystal that is not Ga-polar. In other words, the present invention works with every surface of the GaN wurtzite structure other than the Ga-face of the C-plane, which is Ga-polar. All other non-Ga polar surfaces, especially those outside of the C-plane, benefit from the present invention. Such surfaces include at least the M-plane {10-10} surface, the A-plane {11-20} surface, a {10-11} surface, a {10-1-1} surface, a {11-22} surface, and a {11-2-2} surface.

**12**

This concludes the description of the preferred embodiment of the present invention. The foregoing description of one or more embodiments of the invention has been presented for the purposes of illustration and description. It is not intended to be exhaustive or to limit the invention to the precise form disclosed. Many modifications and variations are possible in light of the above teaching. It is intended that the scope of the invention be limited not by this detailed description, but rather by the claims appended hereto and the full range of equivalents to the claims appended hereto.

What is claimed is:

**1**. A method for directly growing a non-Ga-polar surface of gallium nitride (GaN), comprising:

placing a seed crystal of GaN having an exposed non-Ga-polar surface of GaN into an autoclave;

placing a mineralizer into the autoclave;

placing a source into the autoclave;

adding ammonia to the autoclave;

heating the autoclave; and

ammonothermally growing the GaN in the heated autoclave, using the mineralizer, source and ammonia, wherein the exposed non-Ga-polar surface of the GaN is smoother than a Ga-polar surface of the GaN.

**2**. The method of claim **1**, wherein the mineralizer is selected from a group comprising NaNH$_2$, KNH$_2$, LiNH$_2$, NH$_4$Cl, NH$_4$Br, and NH$_4$I.

**3**. The method of claim **1**, wherein the source comprises polycrystalline GaN.

**4**. The method of claim **1**, wherein the autoclave is heated in zones.

**5**. The method of claim **4**, wherein a first zone is heated to a first temperature and a second zone is heated to a second temperature.

**6**. The method of claim **5**, wherein the source is placed in the first zone and the seed crystal of GaN having the exposed non-Ga polar surface of GaN is placed in the second zone.

**7**. The method of claim **6**, wherein the non-Ga polar surface is an N-polar C-plane (000-1) surface.

**8**. The method of claim **6**, wherein the non-Ga polar surface is an M-plane {10-10} surface.

**9**. The method of claim **6**, wherein the non-Ga polar surface is an A-plane {11-20} surface.

**10**. The method of claim **6**, wherein the non-Ga polar surface is a {10-11} surface.

**11**. The method of claim **6**, wherein the non-Ga polar surface is a {10-1-1} surface.

**12**. The method of claim **6**, wherein the non-Ga polar surface is a {11-22} surface.

**13**. The method of claim **6**, wherein the non-Ga polar surface is a {11-2-2} surface.

**14**. The method of claim **1**, wherein the source comprises Ga metal.

**15**. A method of fabricating a gallium nitride (GaN) substrate, comprising:

ammonothermally growing a GaN substrate resulting in an exposed N-polar (N-face) or M-plane surface that is smoother than a Ga-polar (Ga-face) surface of the GaN substrate.

**16**. The method of claim **15**, wherein the N-polar (N-face) or M-plane surface is smooth enough for growth of device layers.

**17**. The method of claim **16**, wherein the N-polar (N-face) or M-plane surface is smooth enough for direct growth of device layers.

**18**. The method of claim **17**, wherein the N-polar (N-face) or M-plane surface is smooth enough for direct growth of device layers without subsequent processing.

US 8,263,424 B2

13

**19.** A method of fabricating an opto-electronic device comprising:

fabricating a GaN substrate from a GaN bulk crystal grown ammonothermally on a GaN seed, wherein a growth surface of the GaN bulk crystal is not a Ga-polar surface and the growth surface as grown is smoother than a Ga-polar surface; and

growing one or more group III nitride layers on the growth surface of the GaN substrate.

**20.** The method of claim **19,** wherein the growing step comprises:

growing a plurality of n-type group III nitride layers on the growth surface;

growing at least one group III nitride light-emitting active layer on the plurality of n-type group III nitride layers; and

growing at least one p-type group III nitride layer having an Mg doping on the active layers.

**21.** The method of claim **20,** wherein an Mg concentration of the Mg-doped layer is more than $10^{21}$ cm$^{-3}$.

**22.** The method of claim **19,** wherein the growth surface is an M-plane {10-10} surface.

**23.** The method of claim **19,** wherein the growth surface is an A-plane {11-20} surface.

**24.** The method of claim **19,** wherein the growth surface is a {10-11} surface.

**25.** The method of claim **19,** wherein the growth surface is a {10-1-1} surface.

**26.** The method of claim **19,** wherein the growth surface is a {11-22} surface.

**27.** The method of claim **19,** wherein the growth surface is a {11-2-2} surface.

**28.** The method of claim **19,** wherein the growth surface is a {20-21} surface.

**29.** A method for fabricating a GaN layer, comprising:

utilizing an N-polar surface or an M-plane surface of the GaN layer as a growth surface, wherein the N-polar surface or the M-plane surface is prepared and directly exposed using an ammonothermal growth technique and the N-polar surface or the M-plane surface is smoother than a Ga-polar surface of the GaN layer.

**30.** The method of claim **29,** further comprising growing one or more group-III nitride layers to the N-polar or M-plane surface of the GaN layer.

14

**31.** A method for growing a group-III nitride layer, comprising:

ammonothermally growing a group-III nitride layer on a substrate, wherein the group-III nitride layer comprises an N-face of a C-plane (000-1) or a M-plane {10-10} that is directly exposed as a result of the growth of the group-III nitride layer and the N-face of the C-plane (000-1) or the M-plane {10-10} is smoother than a Ga-face of the C-plane (0001).

**32.** The method of claim **31,** wherein the N-face of the C-plane (000-1) or the M-plane {10-10} is substantially co-planar with a surface of the substrate.

**33.** The method of claim **31,** wherein the N-face of the C-plane (000-1) or the M-plane {10-10} is tilted with respect to a surface of the substrate.

**34.** The method of claim **31,** wherein the N-face of the C-plane (000-1) or the M-plane {10-10} is tilted at an angle less than 10 degrees with respect to the surface of the substrate.

**35.** The method of claim **31,** wherein the N-face of the C-plane (000-1) or the M-plane {10-10} directly accepts growth of at least one additional group-III nitride layer.

**36.** A method for fabricating a GaN substrate, comprising:

directly growing a GaN substrate with an exposed N-face or M-plane surface that is of device quality using an ammonothermal growth method, wherein the exposed N-face or M-plane surface is smoother than a Ga-polar surface of the GaN substrate.

**37.** The method of claim **36,** further comprising growing a group-III nitride layer on the substrate, wherein the group III nitride layer comprises an N-face of a C-plane (000-1) or M-plane {10-10} that is directly exposed as a result of the growth of the group-III nitride layer.

**38.** The method of claim **36,** wherein the N-face or M-plane is substantially co-planar with the plane of the substrate, rather than substantially perpendicular.

**39.** The method of claim **36,** wherein the N-face or M-plane is misaligned with the plane of the substrate.

**40.** The method of claim **36,** wherein the group-III nitride layer directly accepts growth of at least one additional group-III nitride layer.

\*   \*   \*   \*   \*

Case 1:12-cv-00924-MN Document 272 Filed 02/05/21 Page 277 of 282 PageID #: 11672

## Computing Equilibrium Shapes of Wurtzite Crystals: The Example of GaN

Hong Li,[1,2,*] Lutz Geelhaar,[2] Henning Riechert,[2] and Claudia Draxl[1]

[1]*Institut für Physik and IRIS Adlershof, Humboldt-Universität zu Berlin, Zum Großen Windkanal 6, 12489 Berlin, Germany*
[2]*Paul-Drude-Institut für Festkörperelektronik, Hausvogteiplatz 5-7, 10117 Berlin, Germany*

Crystal morphologies are important for the design and functionality of devices based on low-dimensional nanomaterials. The equilibrium crystal shape (ECS) is a key quantity in this context. It is determined by surface energies, which are hard to access experimentally but can generally be well predicted by first-principles methods. Unfortunately, this is not necessarily so for polar and semipolar surfaces of wurtzite crystals. By extending the concept of Wulff construction, we demonstrate that ECSs can nevertheless be obtained for this class of materials. For the example of GaN, we identify different crystal shapes depending on the chemical potential, shedding light on experimentally observed GaN nanostructures.

PACS numbers: 61.46.-w,68.35.Md,68.47.Fg,81.10.Aj

Low-dimensional semiconductor nanostructures have attracted a lot of interest in the past decades, largely due to their applications in low-energy consumption and energy-harvesting devices [1, 2]. Owing to surface effects, the performance of such devices strongly depends on the nanocrystal morphology. To achieve comprehensive understanding and control of the preferred growth morphology, one must know the material's natural shape that results from its crystallographic anisotropy. *Ab initio* theory can generally provide more insight into this complicated issue through the calculation of surface energies since, according to Wulff's theorem [3], the equilibrium crystal shape (ECS) of a solid can be constructed by the mere knowledge of surface energies of various crystal planes. For a crystalline solid, the surface energy $\gamma$ is defined as the excess free energy required to create one unit of surface area $A$ [4],

$$\gamma = \frac{1}{A}[G - \sum_i N_i \mu_i]. \tag{1}$$

$G$ represents the Gibbs free energy of the system that, neglecting temperature and pressure, is replaced by the total energy. The chemical potential $\mu_i$ is the free energy per atom in the system for species $i$, and $N_i$ denotes the number of atoms of this species. In a bulk material, the total chemical potential is known from the corresponding total energy $E_{\text{bulk}} = \sum_i n_i \mu_i$, where $n_i$ is the number of atoms of species $i$ in the bulk. Hence, the surface energy of a nonpolar plane can be extracted from density-functional-theory (DFT) results for a slab that contains two identical surfaces well separated from each other. For some polar and semipolar planes, however, individual surface energies are difficult to access, because different facets may appear at the two surfaces of the slab. To overcome this problem, a method has been proposed [5] involving two surface types on three side faces of a triangular wedge. This approach is, however, not applicable to all surfaces and crystal structures; polar surfaces in wurtzite crystals are one example [6, 7]. Consequently, not every individual surface energy of wurtzite crystals can be computed; hence, the construction of the ECS seemed im-

possible. Recently, neglecting the different layer-stacking sequence, the surface energy of the polar $c$ plane was estimated from the zincblende (111) plane [10].

In this Letter, we show that such an approximation is not required to unambiguously determine the ECS. We introduce a generalization of the Wulff construction, based on combinations of surface energies, to show how the ECS for the class of wurtzite materials can be obtained. We demonstrate this principle by taking GaN as a technologically important example. The wide-band-gap semiconductor GaN is a key material in today's white-light-emitting diodes for general illumination, blue lasers, and high-power and high-frequency electronics [11]. GaN readily grows in the form of nanowires (NWs) in molecular beam epitaxy (MBE) [12, 13] and metal-organic chemical vapor deposition (MOCVD) [14, 15]. However, different shapes are observed, depending on the growth temperature, pressure, and chemical environment [16-20]. Our study leads to new understanding of these GaN crystal shapes under various growth conditions.

We performed DFT calculations in the local-density approximation using the projector-augmented-wave method [21] as implemented in VASP code [22, 23]. (For computational details see Supplemental Material (SM) [24].) The crystal planes considered here were chosen on the basis of experimental data and include the nonpolar $m$ plane ($1\bar{1}00$) and $a$ plane ($11\bar{2}0$), the polar $c$ planes (0001) and ($000\bar{1}$), and the semipolar planes ($11\bar{2}2$), ($11\bar{2}\bar{2}$), ($1\bar{1}01$), ($1\bar{1}0\bar{1}$), ($1\bar{1}02$), and ($1\bar{1}0\bar{2}$). Six differently oriented slabs are constructed to calculate the surface energies according to Eq. (1). Since the surface can have different terminations, below we label a surface by its plane indices together with a subscript of the terminating layer or bilayer. For the $a$ plane and $m$ plane, individual surface energies are directly determined, because the two surfaces of the slab are identical. For the other slabs only the sum (average) of the surface energies of the two sides can be obtained. Depending on the two surface terminations, these slabs can be stoichiometric or nonstoichiometric, where, for the former, the sum of surface en-

arXiv:1411.4839v2 [cond-mat.mtrl-sci] 25 Aug 2015

TABLE I. Average surface energies (in meV/Å$^2$) of two opposite surfaces (relaxed) obtained from differently oriented slabs. The corresponding surface terminations are described in the text.

| Slab | $[1\bar{1}00]$ | $[11\bar{2}0]$ | $[0001]$ | $[11\bar{2}2]$ | $[1\bar{1}01]$ | $[1\bar{1}02]$ |
|---|---|---|---|---|---|---|
| $\gamma_{av}$ | 124 | 132 | 209 | 223 | 249 | 208 |

ergies is independent of the chemical potential. Having considered two surface terminations for either side, we now determine the energetically most favorable combinations. For the [0001] slab, $\gamma_{av}$ of $(0001)_{Ga}$ and $(000\bar{1})_N$ is lower than that of $(0001)_N$ and $(000\bar{1})_{Ga}$. For the $[11\bar{2}2]$ slab, the combination of $(11\bar{2}2)_{Ga}$ and $(11\bar{2}2)_N$ is more stable than that of $(11\bar{2}2)_N$ and $(11\bar{2}2)_{Ga}$. Further, we identify $(1\bar{1}01)_{2N}$ and $(1\bar{1}0\bar{1})_{2Ga}$ to be favorable over $(1\bar{1}01)_{2Ga}$ and $(1\bar{1}0\bar{1})_{2N}$. Surface terminations of $(1\bar{1}02)_{GaN}$ and $(1\bar{1}0\bar{2})_{GaN}$ exhibit lower $\gamma_{av}$ than $(1\bar{1}02)_{Ga}$ combined with $(1\bar{1}0\bar{2})_N$. The respective minimum average surface energies are summarized in Table I together with the individual values for the $a$ and $m$ planes. In agreement with previous DFT results [39], we find the $m$ plane more stable than the $a$ plane by 8 meV/Å$^2$. The average surface energies of the polar and semipolar planes are higher than those of nonpolar planes, indicating that the preferential growth is mainly along the $c$ axis, as always observed for GaN nanowires.

To construct the ECS, we need surface energies to solve the equation

$$r(\mathbf{h}) = \min_m \left( \frac{\gamma(\mathbf{m})}{\mathbf{m} \cdot \mathbf{h}} \right), \quad (2)$$

where $r(\mathbf{h})$ denotes the radius of the crystal shape along a given vector $\mathbf{h}$ and $\gamma(\mathbf{m})$ denotes the surface energy of a plane with normal vector $\mathbf{m}$. Because individual surface energies are not accessible for wurtzite crystals, a straightforward solution of Eq. (2) is not possible. However, an alternative geometrical route for determining the ECS can be accomplished based using suitable surface-energy combinations. We will show below these quantities can be calculated. We note at this point that in any Wulff construction based on DFT, the different surfaces contributing to the ECS are obtained from individual calculations, i.e., charge redistribution between these surfaces towards a common Fermi level [40] is neglected. Possible effects related to Fermi-level pinning by surface sates, surface electrostatics, and reconstruction are briefly described in the SM [24], and will be discussed elsewhere [34]. Estimates on the effect of surface reconstructions indicate that the shapes are hardly affected [41].

To illustrate our central idea, Fig. 1 depicts a two-dimensional (2D) schematic for a generalized Wulff construction. With $\gamma_{0001} + \gamma_{000\bar{1}}$, the distance $\overline{MN}$ between these two planes is fixed, but their position with respect to the origin $O$ is not. This uncertainty, however, does not influence the crystal shape, because the surface-energy



FIG. 1. (color online) Schematic of a 2D Wulff construction. The crystal planes and radial vectors are depicted by black and red solid lines, respectively. The shaded area indicates the resulting quarter of the ECS.

combinations actually fix its inner envelope. For instance, $\Delta\gamma_1 = \gamma_{1\bar{1}02}/\cos\theta_1 - \gamma_{0001}$, corresponding to the distance $\overline{LM}$, provides the difference in *hypothetical* crystal radii of the $(1\bar{1}02)$ plane, $\overline{OL}$, and the $(0001)$ plane, $\overline{OM}$, along the [0001] direction. ("Hypothetical" refers to the fact that the individual surface energies are not known.) The crossing point $P_1$ of these two planes is determined by $\overline{LM}$ and the dihedral angle $\theta_1$ (given by the lattice parameter). Likewise, $\Delta\gamma_2 = \gamma_{1\bar{1}01}/\cos\theta_2 - \gamma_{0001}$ fixes the length $\overline{HM}$ and, thus, together with $\theta_2$ we know the crossing point $P_2$. Since $\overline{OQ}$ can be calculated directly, the crossing point $P$ is clear. Overall, one can determine a quarter of the crystal shape, i.e., the shaded area in Fig. 1, despite the vertical coordinates of these points being unknown. The lower left quarter is constructed analogously, while the right half is determined by symmetry. Adding a constant value to an individual surface energy will reduce its counterpart by the same amount, resulting in a shift of the entire ECS along the $c$ axis. In fact, it was shown already in 1975 [42] for ten point groups that, for this reason, the determination of the ECS is not prevented. However, until the present, no way of constructing an ECS for such cases has been demonstrated.

Having achieved this goal, as illustrated above, we need to show now that such a surface-energy combination $\Delta\gamma_i$ can be indeed calculated for each semipolar plane. Table II lists all involved surface-energy combinations calculated from wedges only (I) or in combination with slabs (II and III). Note that $\sigma$ is the surface energy per surface cell and is related to $\gamma$ by $\sigma = \gamma A$. The surface-energy combinations I and II were calculated for unrelaxed (superscript "un") surfaces with $H$ passivation, and the combinations III are, consequently, derived involving surface relaxations. The used wedge structures can be found in the SM [24]. The overall scheme of our calculations, as sketched in Fig. 2, involves five steps. (1) The most stable surface terminations of one semipolar plane and one polar plane are adopted to build the 1D wedge structures (as shown in the upper panel of Fig. 3,

TABLE II. Surface-energy combinations as obtained from the wedge calculations only (I) or in combination with slab calculations (II, III). (a), (b), and (c) refer to different wedge structures (see the SM [24]). Combinations in every second row refer to wedge structures with interchanged Ga and N, required for the construction of the lower half of the ECS.

| Wedge | I | II | III |
|---|---|---|---|
| (a) | $\sigma^{un}_{11\bar{2}2} + 2\sigma^{un}_{000\bar{1}}$ | $\sigma^{un}_{11\bar{2}2} - 2\sigma^{un}_{000\bar{1}}$ | $\sigma_{11\bar{2}2} - 2\sigma_{0001}$ |
|  | $\sigma^{un}_{11\bar{2}\bar{2}} + 2\sigma^{un}_{0001}$ | $\sigma^{un}_{11\bar{2}\bar{2}} - 2\sigma^{un}_{0001}$ | $\sigma_{11\bar{2}\bar{2}} - 2\sigma_{000\bar{1}}$ |
| (b) | $\sigma^{un}_{1\bar{1}01} + \sigma^{un}_{000\bar{1}}$ | $\sigma^{un}_{1\bar{1}01} - \sigma^{un}_{000\bar{1}}$ | $\sigma_{1\bar{1}01} - \sigma_{0001}$ |
|  | $\sigma^{un}_{1\bar{1}0\bar{1}} + \sigma^{un}_{0001}$ | $\sigma^{un}_{1\bar{1}0\bar{1}} - \sigma^{un}_{0001}$ | $\sigma_{1\bar{1}0\bar{1}} - \sigma_{000\bar{1}}$ |
| (c) | $\sigma^{un}_{1\bar{1}02} + 2\sigma^{un}_{000\bar{1}}$ | $\sigma^{un}_{1\bar{1}02} - 2\sigma^{un}_{000\bar{1}}$ | $\sigma_{1\bar{1}02} - 2\sigma_{0001}$ |
|  | $\sigma^{un}_{1\bar{1}0\bar{2}} + 2\sigma^{un}_{0001}$ | $\sigma^{un}_{1\bar{1}0\bar{2}} - 2\sigma^{un}_{0001}$ | $\sigma_{1\bar{1}0\bar{2}} - 2\sigma_{000\bar{1}}$ |



FIG. 2. (color online) Workflow of surface-energy calculations. Slabs and wedges are depicted by rectangular and triangular boxes, respectively. The surface energy $\sigma$ is labeled for each facet. The subscripts "s" and "c" stand for semipolar facet and polar facet, respectively, while "+" and "-" distinguish the facet orientation with respect to the [0001] direction. Surface-energy combinations are expressed symbolically, omitting the respective plane indices.

see also the SM [24]). This allows us to determine the sum of surface energies of a semipolar surface and a polar surface. (2) Using a 2D slab, the sum of two surface energies is obtained for different slab orientations. (3) Combining the sum of surface energies obtained from the wedge (I) with the sum of surface energies obtained from the slab, combination II is derived. (4) Additional calculations are carried out with the slab approach. However, this time, one of the two surfaces of a slab is relaxed while the opposite surface is kept fixed and $H$ passivated as in previous cases of slabs and wedges. That way, the sum of surface energies of a relaxed surface and an unrelaxed surface is obtained. (5) Finally, these surface-energy sums are added to combinations II to achieve combinations of type III. Figure 3 illustrates a particular example for determining the surface-energy combination $\sigma_{1\bar{1}02} - 2\sigma_{0001}$ for the case of the $(1\bar{1}02)_{GaN}$ surface and the $(0001)_{Ga}$ surface. Results for other crystal planes, as well as different surface configurations are calculated accordingly.

These quantities are plotted in Fig. 4. Typically, the chemical potential of nitrogen $\mu_N$ can vary from Ga-rich to N-rich conditions, $E_{GaN} - E_{Ga} \leq \mu_N \leq E_{N_2}$, where $E_{GaN}$ and $E_{Ga}$



FIG. 3. (color online) Structures to calculate particular surface-energy combinations according to Fig. 2. Top: Wedge structure with one $(000\bar{1})_N$ facet and two $(1\bar{1}02)_{GaN}$ facets. Middle: Slab along the [1$\bar{1}$02] direction. Bottom: Additional slabs, allowing for atomic relaxations on the $(0001)_{Ga}$ and $(1\bar{1}02)_{GaN}$ surfaces. Vertical dashed lines indicate the boundaries between the fixed part and the relaxed part of the slab. Large (small) spheres represent Ga (N) atoms.

represent the total energies of wurtzite GaN and bulk Ga, respectively, and $E_{N_2}$ is the total energy (per atom) of the $N_2$ molecule. In the figure, this range is extended by 2 eV on both sides to mimic experimental temperature and pressure conditions. We find that the $(0001)_N$ termination has higher surface energy than the $(0001)_{Ga}$ termination over the whole considered range of $\Delta\mu_N$. $\Delta\gamma$ of the $(1\bar{1}01)_{2Ga}$ surface becomes negative when $\Delta\mu_N$ is low. On the other hand, $\Delta\gamma$ of the $(1\bar{1}02)_{GaN}$ surface becomes negative when $\Delta\mu_N$ is high. Therefore, $(1\bar{1}01)_{2Ga}$ and $(1\bar{1}02)_{GaN}$ surfaces dominate the Wulff construction in these two extreme cases. For an intermediate range of $\Delta\mu_N$, the $(0001)_{Ga}$ surface has the lowest energy; thus, this surface remains at the top of the crystal. On the bottom side, as shown in Fig. 4(b), the situation is different: The $(000\bar{1})_{Ga}$ surface is more stable than the semipolar surfaces, and for higher $\Delta\mu_N$ $(000\bar{1})_N$ becomes more favorable. This means that the crystal is terminated either by the $(000\bar{1})_{Ga}$ or the $(000\bar{1})_N$ facet under various $\Delta\mu_N$ conditions.

Figure 4(c) shows the 3D Wulff crystals constructed from



FIG. 4.    (color online) Surface energies and crystal shapes of wurtzite GaN. (a) Relative energies $\Delta\gamma$ versus chemical potential along the [0001] direction. (b) The same but for the $[000\bar{1}]$ direction. (c) GaN crystals under thermodynamic equilibrium conditions. The shape varies continuously from Ga-rich conditions (left) to N-rich conditions (right). The labels—pyramid I, truncated pyramid, and pyramid II—refer to the top shape.

the above results. We summarize the major features. (i) The GaN crystal, in general, exhibits a rodlike shape along [0001] under various conditions. (ii) The shapes on the top and bottom side are changing according to the chemical potential. Under extremely Ga-rich conditions, the crystal forms a complete pyramid consisting of $\{1\bar{1}01\}$ planes at the top. When $\Delta\mu_N$ increases to a higher value, the crystal adopts the shape of a truncated pyramid, and eventually turns into another pyramid formed by $\{1\bar{1}02\}$ facets. At the bottom side, the flat $(000\bar{1})$ surface turns into a polyhedral shape consisting of $(000\bar{1})$, $\{11\bar{2}2\}$, and $\{1\bar{1}0\bar{1}\}$ planes, and is further formed by $\{1\bar{1}0\bar{2}\}$ and $(000\bar{1})$ planes only. Finally, the flat $(000\bar{1})$ plane appears again. (iii) The side wall consists of both nonpolar facets, namely the $m$ plane and the $a$ plane. These findings complement those of Lymperakis and Neugebauer [43], having shown that the coexistence of these

facets facilitates two diffusion channels for Ga atoms. When Ga atoms arrive at the $m$ plane (indicated by the blue color), lateral diffusion is favorable; for Ga atoms at the $a$ planes (green color), vertical diffusion along the $c$ axis takes place. Ga atoms then accumulate at the top of the crystal and axial growth continues. The appearance of two nonpolar planes on the side walls also agrees with recent experiments [19, 44] that nanocolumns and NWs indeed do not exhibit atomically sharp corners.

Finally, let us recall the variety of experimentally achieved crystal morphologies. Selective-area MOCVD growth [16] exhibited convex $\{1\bar{1}01\}$ and concave $\{11\bar{2}2\}$ surfaces. In contrast, Jindal [17] observed in MOCVD growth a complete hexagonal pyramid on the $(0001)$ plane as its equilibrium shape, and truncated hexagonal pyramids out of equilibrium, while the crystal grown on the $(11\bar{2}0)$ and $(1\bar{1}00)$ planes showed $\{1\bar{1}01\}$ facets along the [0001] direction and a $(000\bar{1})$ facet on the opposite side. In hydride vapor phase epitaxy [18], depending on the temperature and pressure, the truncation of the pyramidal shape was confirmed to be continuously varying along the [0001] direction. More recently, semipolar $\{1\bar{1}02\}$ facets on top of GaN nanocolumns were reported from selective-area MBE growth [19]. Considering our theoretical results, these observations are not controversial. In fact, most of the observed crystal morphologies are consistent with our computed ECSs. Particularly, the crystal shape under N-rich conditions is fully consistent with the different morphologies of GaN NWs [15, 45, 46], where pyramid or truncated pyramid shapes are observed in the case of Ga-polar NWs, and the flat $(000\bar{1})$ facet dominates the top in the case of N-polar NWs. At the same time, the aspect ratio of experimental NWs can be much larger than that seen in these ECSs. This implies that kinetic effects also play an important role in NW growth.

Summarizing, we have demonstrated a generalization of Wulff construction to determine equilibrium crystal shapes for wurtzite crystals. Although the individual surface energies for semipolar and polar surfaces are not accessible, the ECS can still be obtained. For each semipolar plane, the relative energy with respect to its neighboring polar plane can be unambiguously computed as a function of chemical potential. This energy difference, corresponding to the crystal radius along the polar axis, is the important quantity that governs the crystal shape. We have exemplified our approach with wurtzite GaN. Taking into account several bulk-truncated surfaces, ECSs have been constructed. These crystals exhibit a rodlike shape along the polar $c$ axis, with top and bottom geometries depending on the chemical potential, while the side walls are formed by both types of nonpolar surfaces. Our results can well explain the experimentally observed NW shapes. They also open a perspective to gaining insight into morphologies of the entire class of polar materials, concerning point groups of 6, $6mm$, 4, $4mm$, 3, $3mm$, 2, and $2mm$, where such polar axes exist.

Input and output files of our calculations can be downloaded from the NoMaD Repository by following the link in Ref. [47].

We gratefully acknowledge valuable discussions with S. Fernández-Garrido and O. Brandt, and we thank S. Erwin for critical reading of the manuscript.

* hong.li@physik.hu-berlin.de
[1] M. Law, J. Goldberger, and P. Yang, Ann. Rev. Mater. Res. 34, 83 (2004).
[2] S. J. Pearton, B. S. Kang, B. P. Gila, D. P. Norton, O. Kryliouk, F. Ren, Y.-W. Heo, C.-Y. Chang, G.-C. Chi, W.-M. Wang, and L.-C. Chen, J. Nanosci. Nanotechnol. 8, 99 (2008).
[3] G. Wulff, Z. Kristallogr. Mineral. 34, 449 (1901).
[4] J. W. Gibbs, The Collected Works of J. Willard Gibbs (Yale University Press, New Haven, 1957).
[5] S. B. Zhang and S. H. Wei, Phys. Rev. Lett. 92, 086102 (2004).
[6] P. Ruterana, M. Albrecht, and J. Neugebauer, eds., Nitride Semiconductors (Wiley-VCH, Weinheim, 2003).
[7] A possible way out may be provided by the energy-density method [8, 9], but its performance for various polar surfaces in GaN is still unclear. A detailed investigation on this is underway and will be the subject of a forthcoming publication.
[8] N. Chetty and R.M. Martin, Phys. Rev. B 45, 6074 (1992).
[9] N. Chetty and R.M. Martin, Phys. Rev. B 45, 6089 (1992).
[10] C. E. Dreyer, A. Janotti, and C. G. Van de Walle, Phys. Rev. B 89, 081305 (2014).
[11] R. F. Service, Science 327, 1598 (2010).
[12] L. Geelhaar, C. Chèze, B. Jenichen, O. Brandt, C. Pfüller, S. Münch, R. Rothemund, S. Reitzenstein, A. Forchel, T. Kehagias, P. Komninou, G. Dimitrakopulos, T. Karakostas, L. Lari, P. Chalker, M. Gass, and H. Riechert, IEEE J. Sel. Top. Quantum Electron. 17, 878 (2011).
[13] V. Consonni, Phys. Status Solidi RRL 7, 699 (2013).
[14] S. D. Hersee, X. Sun, and X. Wang, Nano Lett. 6, 1808 (2006).
[15] X. J. Chen, G. Perillat-Merceroz, D. Sam-Giao, C. Durand, and J. Eymery, Appl. Phys. Lett. 97, 151909 (2010).
[16] D. Du, D. J. Srolovitz, M. E. Coltrin, and C. C. Mitchell, Phys. Rev. Lett. 95, 155503 (2005).
[17] V. Jindal and F. Shahedipour-Sandvik, J. Appl. Phys. 106, 083115 (2009).
[18] B. N. Bryant, A. Hirai, E. C. Young, S. Nakamura, and J. S. Speck, J. Cryst. Growth 369, 14 (2013).
[19] A. Urban, J. Malindretos, J.-H. Klein-Wiele, P. Simon, and A. Rizzi, New J. Phys. 15, 053045 (2013).
[20] M. Jin, H. Shu, P. Liang, D. Cao, X. Chen, and W. Lu, J. Phys. Chem. C 117, 23349 (2013).

[21] P. E. Blöchl, Phys. Rev. B 50, 17953 (1994).
[22] G. Kresse and J. Furthmüller, Phys. Rev. B 54, 11169 (1996).
[23] G. Kresse and D. Joubert, Phys. Rev. B 59, 1758 (1999).
[24] See Supplemental Material at [url], which includes Refs. [25-38], for more information about the calculation of surface energies, the wedge calculations, the computational details, and the convergence behavior.
[25] X. Gonze, P. Ghosez, and R. W. Godby, Phys. Rev. Lett. 78, 294 (1997).
[26] N. G. Hörmann and A. Groß, ChemPhysChem 15, 2058 (2014).
[27] O. Dulub, U. Diebold, and G. Kresse, Phys. Rev. Lett. 90, 016102 (2003).
[28] M. H. Du, S. B. Zhang, J. E. Northrup, and S. C. Erwin, Phys. Rev. B 78, 155424 (2008).
[29] C. Noguera, J. Phys. Condens. Matter 12, R367 (2000).
[30] M. Stengel, Phys. Rev. B 84, 205432 (2011).
[31] C. G. Van De Walle and D. Segev, J. Appl. Phys. 101, 081704 (2007).
[32] H. Moormann, D. Kohl, and G. Heiland, Surf. Sci. 80, 261 (1979).
[33] W. Mönch, Semiconductor Surfaces and Interfaces, 3rd ed. (Springer, Berlin, 2001).
[34] H. Li, J. Sofo, L. Geerhaal, H. Riechert, and C. Draxl (to be published).
[35] H. J. Monkhorst and J. D. Pack, Phys. Rev. B 13, 5188 (1976).
[36] J. Neugebauer and M. Scheffler, Phys. Rev. B 46, 16067 (1992).
[37] A. Jenichen and C. Engler, Surf. Sci. 608, 204 (2013).
[38] J. Li and L.-W. Wang, Phys. Rev. B 72, 125325 (2005).
[39] J. E. Northrup and J. Neugebauer, Phys. Rev. B 53, R10477 (1996).
[40] N. W. Ashcroft and N. D. Mermin, Solid State Physics (Holt, Rinehart and Winston, New York, 1976).
[41] The assumption that all surface energies are lowered by surface reconstruction by the same amount would obviously not have any impact on the shape. The fist results on the reconstruction of the (0001) and (000$\bar{1}$) surfaces show a shrinkage of the pyramid tip, while the overall shape is retained. Considering the effect of reconstruction on the (1$\bar{1}$02) surface basically recovers the original ECS.
[42] E. Arbel and J. W. Cahn, Surf. Sci. 51, 305 (1975).
[43] L. Lymperakis and J. Neugebauer, Phys. Rev. B 79, 241308 (2009).
[44] O. Brandt, S. Fernández-Garrido, J. K. Zettler, E. Luna, U. Jahn, C. Chéze, and V. M. Kaganer, Cryst. Growth Des. 14, 2246 (2014).
[45] S. Fernández-Garrido, X. Kong, T. Gotschke, R. Calarco, L. Geelhaar, A. Trampert, and O. Brandt, Nano Lett. 12, 6119 (2012).
[46] M. Mandl, X. Wang, T. Schimpke, C. Kölper, M. Binder, J. Ledig, A. Waag, X. Kong, A. Trampert, F. Bertram, J. Christen, F. Barbagini, E. Calleja, and M. Strassburg, Phys. Status Solidi RRL 7, 800 (2013).
[47] See http://nomad-repository.eu, http://doi.org/57s.

01:12:40

               IN THE UNITED STATES DISTRICT COURT

                  FOR THE DISTRICT OF DELAWARE


E. FRED SCHUBERT, et al.,        )
                                 )
              Plaintiffs,        )
                                 ) C.A. No. 12-924-MN
v.                               )
                                 )
KONINKLIJKE PHILIPS ELECTRONICS  )
N.V., et al.,                    )
                                 )
              Defendants.        )


                    Monday, May 18, 2020
                    1:00 p.m.
                    Markman Teleconference


                    844 King Street
                    Wilmington, Delaware


BEFORE:   THE HONORABLE MARYELLEN NOREIKA
          United States District Court Judge



APPEARANCES:


          FARNAN LLP
          BY:  MICHAEL J. FARNAN, ESQ.

          -and-

          TROUTMAN SANDERS LLP
          BY:  MAGNUS ESSUNGER, ESQ.
          BY:  JAMES MOORE BOLLINGER, ESQ.
          BY:  GERALD E. PORTER, ESQ.


                    Counsel for the Plaintiffs